# 11-1150-cv(L),
## 11-1264-cv(CON)

IN THE

# United States Court of Appeals
### FOR THE SECOND CIRCUIT

◆◆◆

CHEVRON CORPORATION,

*Plaintiff-Appellee,*

—against—

HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE,
STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Appellants,*

(*caption continued on inside cover*)

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**JOINT APPENDIX
VOLUME I OF XXXVII
(Pages A-1 to A-227)**

---

JULIO C. GOMEZ, ESQ.
GOMEZ LLC
The Trump Building
40 Wall Street, 28th Floor
New York, New York 10005
(212) 400-7150

CARLOS A. ZELAYA, II, ESQ.
F. GERALD MAPLES, PA
365 Canal Street, Suite 2650
New Orleans, Louisiana 70130
(504) 569-8732

JAMES E. TYRRELL, JR., ESQ.
ERIC S. WESTENBERGER, ESQ.
JASON W. ROCKWELL, ESQ.
JOHN J. ZEFUTIE, JR., ESQ.
BRENDAN M. WALSH, ESQ.
EDWARD M. YENNOCK, ESQ.
PATTON BOGGS LLP
One Riverfront Plaza
Newark, New Jersey 07102
(973) 848-5600

*Attorneys for Defendants-Appellants
Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje*

(*Counsel continued on inside cover*)

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, AKA AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST, MARIA VICTORIA AGUINDA SALAZAR, CARLOS GREGA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUINDA AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUNIDA, BEATRIZ MERCEDES GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUNIDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSÉ ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA, JOSÉ GABRIEL REVELO LLORE, MARÍA CLELIA REASCOS REVELO, MARÍA MAGDALENA RODRIGUEZ, JOSÉ MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVÁEZ, LOURDES BEATRIZ CHIMBO TANGUILA, MARÍA HORTENCIA VIVEROS CUSANGUA, SEGUNDO ÁNGEL AMANTA MILÁN, OCTAVIO ISMAEL CÓRDOVA HUANCA, ELÍAS ROBERTO PIYAHUAJE PAYAHUAJE, DANIEL CARLOS LUSITANDE YAIGUAJE, VENANCIO FREDDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUAJE LUSITANDE, DELFÍN LEONIDAS PAYAGUAJE, ALFREDO DONALDO PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJE PAYAGUAJE, FERMÍN PIAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTÍN PAYAGUAJE PIAGUAJE, EMILIO MARTÍN LUSITANDE YAIGUAJE, SIMÓN LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ÁNGEL JUSTINO PIAGUAJE LUCITANDE,

                                                        *Defendants.*

---

KRISTEN L. HENDRICKS, ESQ.
ANDREA E. NEUMAN, ESQ.
RANDY M. MASTRO, ESQ.
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166
(212) 351-4000

SCOTT A. EDELMAN, ESQ.
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, California 90067
(310) 552-8500

WILLIAM E. THOMSON, ESQ.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
(213) 229-7000

*Attorneys for Plaintiff-Appellee
  Chevron Corporation*

JOHN W. KEKER, ESQ.
ELLIOT R. PETERS, ESQ.
JAN N. LITTLE, ESQ.
MATTHEW M. WERDEGAR, ESQ.
  *(admission pending)*
STEVEN A. HIRSCH, ESQ.
  *(admission pending)*
KEKER & VAN NEST, LLP
710 Sansome Street
San Francisco, California 94111
(415) 391-5400

*Attorneys for Defendants-Appellants
  Steven R. Donziger and The Law
  Offices of Steven R. Donziger*

# TABLE OF CONTENTS

**PAGE**

Civil Docket Sheet for Case No. 11-cv-00691-LAK ..................................................A1

Chevron's Complaint, No. 11-cv-00691-LAK, dated February 1, 2011 ....................................A67

Order to Show Cause Why a Temporary Restraining Order and Preliminary
Injunction Should Not be Entered, dated February 3, 2011 ........................................A222

Chevron's Memorandum of Law in Support of Order to Show Cause Why
a Temporary Restraining Order and Preliminary Injunction Should Not be
Entered, dated February 5, 2011 ................................................................A228

> Exhibit A to Chevron's Memorandum of Law in Support of its
> Application by Order to Show Cause for a Temporary Restraining Order
> and Preliminary Injunction, dated February 3, 2011 - an annotated version
> of Chevron's complaint, including citations to support exhibits ....................................A311

Declaration of Kristen L. Hendricks in Support of Chevron Corporation's Motion for
Preliminary Injunction, dated February 3, 2011 ..................................................A578

> Exhibit 1 to Hendricks Declaration - CD containing true and correct
> copies of selected excerpts from the unreleased footage from the movie
> *Crude* .......................................................................................A673

> Exhibit 2 to Hendricks Declaration - Copies of the certified transcriptions
> and translations of the video files contained in Exhibit 1 ..................................A674

> Exhibit 6 to Hendricks Declaration - Portions of the transcript of the
> deposition of Steven Donziger, taken on November 29, 2010, December 1,
> 2010, December 8, 2010, December 13, 2010, December 22, 2010,
> December 23, 2010, December 29, 2010, January 8, 2011, January 18,
> 2011 and January 29, 2011 in *In re Application of Chevron Corp.*, No. 10-
> mc-00002-LAK (S.D.N.Y.) .......................................................................A1129

> Exhibit 8 to Hendricks Declaration - Copy of Richard Cabrera's
> Supplemental Report, filed in the Lago Agrio Litigation on November 17,
> 2008, and a certified English translation thereof ...........................................A1279

> Exhibit 9 to Hendricks Declaration - Email Chain dated October 27, 2008
> among Douglas Beltman, Jennifer Peers, and Ann Maest with the subject,
> "Ecuador. Doug you should read this" .........................................................A1385

> Exhibit 11 to Hendricks Declaration - Email dated March 30, 2010 from
> Julio Prieto to Steven Donziger, Luis Yanza and Pablo Fajardo with the
> subject, "Protection Action" .................................................................A1387

Exhibit 12 to Hendricks Declaration - Email chain dated May 16, 2010 among Jay Horowitz, Andrew Wilson, Steven Donziger, and others with the subject, "Rule 60(b) and Stratus Materials"................................................................A1390

Exhibit 13 to Hendricks Declaration - Email chain dated May 25, 2010 among Eric Westenberger, Jonathan Abady, and others ending with an email with the subject, "print for trip" ............................................................A1402

Exhibit 14 to Hendricks Declaration - Email dated November 3, 2006 from Steven Donziger to David Kuhn with the subject, "Book Proposal attached," and attachments................................................................A1408

Exhibit 19 to Hendricks Declaration - Agreement for Change of Operator of the Consortium Petroecuador - Texaco, with accompanying certified English translation, dated June 30, 1990 ........................................................A1448

Exhibit 21 to Hendricks Declaration - Article entitled, "*Petroecuador diagnostica los dafiios ambientales por crudo*" ["Petroecuador assesses environmental damage cause by crude oil"], EL UNIVERSO, dated February 28, 2009, *available at* http://www.eluniverso.coml2009/02/28/1/1356/45286F57B7784DOEBCD I9E45E5A974DE.htm1, and a certified English translation thereof................................A1519

Exhibit 22 to Hendricks Declaration - Copy of a statement made by President Rafael Correa at a press conference in Lago Agrio, Ecuador, dated April 27, 2007, and a certified English translation thereof ....................................A1522

Exhibit 23 to Hendricks Declaration - Final Report of the FLACSO Petroecuador Project Phase Two: Study on Socio - Environmental Conflicts in the Sacha and Shushufindi Fields (1994 - 2002) by Dr. Guillaume Fontaine, dated November 2003, and a certified English translation thereof ..........................................................................A1536

Exhibit 29 to Hendricks Declaration - Portions of the transcript of the deposition of Giovanni Elicio Mario Rosnaia Schiavone, taken on October 19, 2006, in *Republic of Ecuador v. ChevronTexaco Corp.*, No. 04-cv-8378-LBS (S.D.N.Y.) ......................................................................A1541

Exhibit 31 to Hendricks Declaration - Opinion of Dr. Celia Armas Erazo de Tobar, Deputy Prosecutor General addressed to the Presiding Justice of the Criminal Division of the Ecuadorian Supreme Court, regarding the Preliminary Criminal Investigation commenced by means of a criminal complaint field against Ricardo Reis Veiga, Rodrigo Pérez Pallares, and others, and a certified English translation thereof ............................................................. A1552

Exhibit 32 to Hendricks Declaration - Memorandum of Understanding between the Government of Ecuador, PetroEcuador and Texaco Petroleum

Company, dated December 14, 1994, and a certified English translation thereof ............................................................................................A1564

Exhibit 33 to Hendricks Declaration - Constitution of the Republic of Ecuador, Codification of 1993, Law No. 25, Official Registry No. 183, and a certified English translation thereof ....................................................A1574

Exhibit 42 to Hendricks Declaration - Portions of the transcript of the deposition of Galo Abril Ojeda, taken on October 10, 2006 in *Republic of Ecuador v. ChevronTexaco Corp.* No. 04-cv-8378-LBS (S.D.N.Y.) .............................A1579

Exhibit 44 to Hendricks Declaration - Scope of the Environmental Remedial Work agreed upon by the Ecuadorian Government, Petroecuador, and Texaco Petroleum Company, and a contemporaneous English translation ............................................................................A1585

Exhibit 46 to Hendricks Declaration - Final Document dated September 30, 1998 by and between the Government of the Republic of Ecuador, Petroecuador, Petroproduccion, and TexPet, and a contemporaneous English translation ............................................................................A1598

Exhibit 47 to Hendricks Declaration - Contract for Implementing of Environmental Remedial Work and Release from Obligations, Liability and Claims by and between the Government of Ecuador, Petroecuador, and Texaco Petroleum Company, dated May 4, 1995, and a contemporaneous English translation thereof.................................................A1613

Exhibit 52 to Hendricks Declaration - Contract of Settlement and Release from Obligations and Claims, Executed between the Municipality of Lago Agrio, Province of Sucumbios, and the Company Texaco Petroleum Company, dated May 2, 1996, and a contemporaneous English translation thereof ............................................................................A1669

Exhibit 53 to Hendricks Declaration - Contract of Settlement and Release from Obligations, Responsibilities, and Claims, Executed between the Municipality of La Joya de los Sachas and Texaco Petroleum Company, dated May 2, 1996, and a contemporaneous English translation thereof .......................A1689

Exhibit 54 to Hendricks Declaration - Contract of Settlement and Release from Obligations, Responsibilities and Claims, Executed between the Municipality of the Canton of Francisco de Orellana (Coca) and the Company Texaco Petroleum Company, dated May 2, 1996, and a contemporaneous English translation thereof ...............................................A1713

Exhibit 55 to Hendricks Declaration - Contract of Settlement and Release from Obligations, Responsibilities and Claims, Executed between the municipality of Shushufindi and Texaco Petroleum Company, dated May 2, 1996, and a contemporaneous English translation thereof .........................................A1739

Exhibit 60 to Hendricks Declaration - Contract of Settlement and Release from Obligations, Responsibilities and Claims, Executed between the Provincial Prefect's Office of Sucumbios and Texaco Petroleum Company, dated May 2, 1996, and a contemporaneous English translation thereof ........................................................................................................A1760

Exhibit 61 to Hendricks Declaration - Instrument of Settlement and Release from Obligations, Responsibilities and Claims by the Municipalities Consortium of the Province of Napo - Comuna, releasing Texaco Petroleum Company, Texaco, Inc., and any other affiliate, subsidiary or related company, dated April 26, 1996, and a contemporaneous English translation thereof.................................................A1784

Exhibit 75 to Hendricks Declaration - Letter dated June 10, 1996 from Ambassador Edgar Teran to Judge Rakoff, re: *Maria Aguinda, et al. v. Texaco Inc.*, No. 93-cv-7527 (S.D.N.Y.) ........................................................A1787

Exhibit 76 to Hendricks Declaration - Collection of pages containing entries from Steven Donziger's personal notes .............................................A1788

Exhibit 78 to Hendricks Declaration - Undated letter from Steven Donziger to Russell DeLeon .............................................................................A1907

Exhibit 79 to Hendricks Declaration - Email dated January 2, 2008 from Pablo Fajardo to Alejandro Ponce, Steven Donziger, Luis Yanza, and others with the subject, "TAREAS" ["TASKS"], and attached document entitled, "TAREAS NECESARIAS A DEARROLLAR EN EL ANO 2008" [NECESSARY TASKS TO BE COMPLETED IN THE YEAR 2008"], and a certified English translation thereof ...........................................A1909

Exhibit 81 to Hendricks Declaration - Copy of Waiver of Rights, dated November 20, 1996, in *Aguinda v. Texaco*, No. 93-cv-7527 (S.D.N.Y.) (CH - 0000233), and a certified English translation thereof...........................A1918

Exhibit 83 to Hendricks Declaration - Article by Gonzalo Solano entitled, "*US Lawyers take $1 billion lawsuit against ChevronTexaco to Ecuador*," Associated Press, dated May 6, 2003........................................................................A1925

Exhibit 84 to Hendricks Declaration - 1999 Environmental Management Act, and a certified English translation thereof .............................................A1927

4

Exhibit 86 to the Hendricks Declaration - English translation of Ecuadorian Plaintiffs' Complaint in Lago Agrio Litigation, *Maria Aguinda Salazar, et al. v. Chevron Corp.*, dated May 7, 2003 ........................................A1934

Exhibit 87 to Hendricks Declaration - Copy of a certified English translation of a transcript of Prosecutor Washington Pesántez's press conference, dated September 4, 2009 ...........................................................A1950

Exhibit 89 to Hendricks Declaration - Email dated September 9, 2008 from Steven Donziger to Luis Yanza with the subject, "pregunta importante/CONFIANZA" ["important question/CONFIDENTIAL"], and a certified ENGLISH translation thereof ........................................................A1967

Exhibit 91 to Hendricks Declaration - Transcript of the theatrical version of *Crude* ................................................................................................A1972

Exhibit 92 to Hendricks Declaration - Copy of a press release issued by Amazon Watch/Frente de Defensa de la Amazonia entitled, "Ecuador Rising - Hatarinchej: Chevron's Recent Setbacks in U.S. Courts Forced its Hand on Arbitration Claim, Lawyers Say," dated September 29, 2009, *available at* http://ecuador - rising.blogspot.com/2009/09/chevrons - recent - setbacks - in - us - courts.html ...........................................A2034

Exhibit 93 to Hendricks Declaration - Certified transcription of a portion of a speech given by Steven Donziger on November 15, 2010 ......................................A2038

Exhibit 94 to Hendricks Declaration - Lago Agrio Plaintiffs' Complaint to Stay Arbitration, field on January 14, 2010 in *Yaiguaje, et al. v. Chevron Corp. & Texaco Petroleum Co.*, No. 10-cv-0316-LBS (S.D.N.Y.)..............................A2052

Exhibit 95 to Hendricks Declaration - Transcription of a Radio Quito interview with Pablo Fajardo on September 4, 2009, and a certified English translation thereof ..............................................................A2074

Exhibit 96 to Hendricks Declaration - Email dated June 14, 2006 from Steven Donziger to Alejandro Ponce Villacis with the subject, "Need plan"................................................................................................A2101

Exhibit 99 to Hendricks Declaration - Email chain dated June 28, 2007 among Michael Bonfiglio, Joe Berlinger, and Steven Donziger with the subject, "update" ..................................................................................A2102

Exhibit 100 to Hendricks Declaration - Email chain dated February 9, 2006 among Steven Donziger, Alejandro Ponce and others with the subject, "idea" .....................................................................................A2104

Exhibit 101 to Hendricks Declaration - Email dated September 25, 2006 from Steven Donziger to Aaron Marr, with the subject, "one other thing"....................A2109

Exhibit 103 to Hendricks Declaration - Email chain dated August 18, 2006, between Joseph Mutti, Steven Donziger, and others, re: "Temas" ["Topics"], and a certified English translation thereof .....................................................A2111

Exhibit 110 to Hendricks Declaration - Email chain dated September 30, 2009 between Steven Donziger and Douglas Beltman with the subject, "can u be available tomorrow afternoon for a phone call?" .............................................A2118

Exhibit 112 to Hendricks Declaration - Email chain dated June 22, 2009 between Steven Donziger, Juan Pablo Saenz, Pablo Fajardo, Luis Yanza with the subject "PREOCUPANTE" ["WORRISOME"], and a certified English translation thereof .................................................................................A2119

Exhibit 113 to Hendricks Declaration - article by Isabel Ordonez entitled, "*Amazon Oil Row: US - Ecuador Ties Influence Chevron Amazon Dispute*," DOW JONES NEWSWIRES, dated August 7, 2008......................................A2126

Exhibit 117 to the Hendricks Declaration - 2009 World Bank Worldwide Governance Indicators for Ecuador, Liberia, and North Korea, *available at* http://infor.worldbank.org/governance/wgi/index.asp.......................................A2129

Exhibit 118 to the Hendricks Declaration - U.S. Department of State, Bureau of Democracy, Human Rights, and Labor, Country Reports on Human Rights Practices – Ecuador for 2007, 2008, and 2009, *available at* http://www.state.gove/g/drl/rls/hrrpt/2007/100638.htm, http://www.state.gove/g/drl/rls/hrrpt/2008/wha/119158.htm, http://www.state.gove/g/drl/rls/hrrpt/2009/wha/136111.htm .........................A2133

Exhibit 125 to Hendricks Declaration - Filing by Pablo Fajardo in the Lago Agrio Litigation on October 29, 2007, endorsing Richard Cabrera's request that Petroecuador's remediation efforts be suspended, and a certified English translation thereof..............................................................A2183

Exhibit 126 to Hendricks Declaration - Email dated December 21, 2006 from Steven Donziger to Pablo Fajardo, Luis Yanza, Julio Prieto, and Juan Pablo Saenz with the subject, "CONSULTA URGENTE" ["URGENT PROPOSAL"], and a certified English translation thereof...............................A2186

Exhibit 127 to Hendricks Declaration - Report of the "Settling Experts" on the Judicial Inspection of the Sacha 53 Well in the Lago Agrio Litigation, dated February 1, 2006, and a certified English translation thereof ...............................A2195

Exhibit 128 to Hendricks Declaration - Email dated December 22, 2006 from Leila Lopez to Steven Donziger with the subject, "Makarik Nihua/Judith's concerns…".........................................................................A2223

Exhibit 129 to Hendricks Declaration - Letter dated February 14, 2006 from David Russell, an expert retained by Defendants, to Steven Donziger with the subject, "Cease and Desist" ................................................................A2224

Exhibit 130 to Hendricks Declaration - Email chain dated December 12, 2004 from David Russell to Steven Donziger, Cristobal Bonifaz, Alberto Wray and others with the subject, "I disagree!" ...............................................A2226

Exhibit 131 to Hendricks Declaration - Memorandum dated December 27, 2004 from David Russell to Steven Donziger, with the subject "Mid Course Corrections and the Scope of the Global Inspection"..........................A2234

Exhibit 132 to Hendricks Declaration - Email chain dated February 11, 2005 among Steven Donziger, David Russell, and Edison Camino with the subject, "Needed: A different analysis".........................................................A2237

Exhibit 135 to Hendricks Declaration - Press Release issued by Amazon Watch, "Ecuador Court Speeds up Chevron's $6 Billion Amazon Trial Over Rainforest Contamination," dated March 20, 2007, *available at* http://chevrontoxico.com/news - and - multimedia/2007/0320 - ecuador - court - speeds - up - chevrons - 6 - billion - amazon - trial.html .....................................A2239

Exhibit 136 to Hendricks Declaration - Portions of the transcript of the deposition of Charles W. Calmbacher, taken on March 29, 2010 in *In re Application of Chevron Corp.*, 10-MI-0076-TWT - GGB (N.D. Ga) ............................A2241

Exhibit 137 to Hendricks Declaration - Email chain dated August 14, 2007 among Steven Donziger, Joseph Kohn, Karen Wilson of Kohn Swift, and others with the subject, "Critical money transfer"............................................A2276

Exhibit 138 to Hendricks Declaration - Email chain dated July 25, 2005 among Steven Donziger, Pablo Fajardo, Alejandro Ponce, and others with the subject, "importante – Chuck Calmbacher," and a certified English translation thereof ........................................................................................A2279

Exhibit 141 to Hendricks Declaration - Email dated October 24, 2004 from Charles Calmbacher to David Russell and Steven Donziger with the subject, "Pertio's Responsibilities"...............................................................A2286

Exhibit 142 to Hendricks Declaration - Email dated October 25, 2004 from Steven Donziger to Manuel Pallares, Alberto Wray, Joseph Kohn, Cristóbal Bonifaz, and John Bonifaz with the subject, "Update on Case From Ecuador".........................................................................................A2288

Exhibit 149 to Hendricks Declaration - Email chain dated July 26, 2006 among Joseph Mutti, Steven Donziger, and Joseph Kohn with the subject, "Potentially huge," and attached draft letter from Luis Yanza and Alejandro Ponce to Attorney General Alberto Gonzales, Director of the Criminal Division, U.S. Department of Justice Alice Fisher, and Direct of the Division of Enforcement, U.S. Securities & Exchange Commission Linda Chatman Thomsen ........................................................................................... A2291

Exhibit 151 to Hendricks Declaration - Order dated October 3, 2007 issued in the Lago Agrio Litigation, detailing Cabrera's duties and obligations, and a certified English translation thereof ................................................... A2298

Exhibit 152 to Hendricks Declaration - Email chain dated May 10, 2007 between Steven Donziger and Pablo Fajardo with the subject, "PREOCUPACIO CONFIDENCIAL" ["CONCERN CONFIDENTIAL", and certified English translation thereof ........................................................................ A2340

Exhibit 154 to Hendricks Declaration - Certificate of Swearing - In of Expert Richard Cabrera on June 13, 2007, and a certified English translation thereof ........................................................................................... A2345

Exhibit 155 to Hendricks Declaration - Order dated November 29, 2007 in the Lago Agrio Litigation, regarding supporting documents to Richard Cabrera's report, and a certified English translation thereof ........................................... A2426

Exhibit 156 to Hendricks Declaration - Email dated July 17, 2007 from Steven Donziger to Luis Yanza and Pablo Fajardo with the subject, "Ideas para reunion con Richard" ["Ideas for the meeting with Richard"], and a certified English translation thereof ................................................................. A2455

Exhibit 157 to Hendricks Declaration - Email dated April 3, 2007 from Steven Donziger to David Chapman, Ann Maest, and David Mills with the subject, "Approach for assessment," and a certified English translation thereof ........................................................................................................................ A2460

Exhibit 158 to Hendricks Declaration - Portions of the transcript of the deposition of David Chapman, taken on April 23, 2010 in C*hevron Corp. v. Stratis Consulting, Inc.*, No. 10-cv-00047-MSK-MEH (D.Colo.) .............................. A2465

Exhibit 159 to Hendricks Declaration – Notes from "Ecuador Meeting in Boulder," dated June 4 and 5, 2008 .............................................................................. A2476

Exhibit 162 to Hendricks Declaration - Letter dated August 9, 2010 from Joseph Kohn to Pablo Fajardo, Luis Yanza, and others; a letter dated November 10, 2009 from Joseph Kohn to Luis Yanza and Pablo Farjardo with the subject, "Ecuador - Texaco Case"; and a letter dated November 19, 2009 from Joseph Kohn to Luis Yanza and Pablo Fajardo with the subject, "Ecuador - Texaco Case," and an attachment entitled "Payments to Selva Viva CIA ltda. In re Texaco/Chevron Years 2007 - 2008 - 2009" ....................A2481

Exhibit 164 to Hendricks Declaration - Email dated February 26, 2008 from Douglas Beltman to Ann Maest and others at Stratus with the subject, "Ecuador annex schedule," and attachment entitled, "DRAFT - Outline for PG Report" ....................................................................................A2503

Exhibit 166 to Hendricks Declaration - Email chain dated November 17, 2007 among Steven Donziger, Douglas Beltman, Joseph Kohn, and Ann Maest with the subject, "Unjust Enrichment" .................................................A2514

Exhibit 167 to Hendricks Declaration - Email chain dated September 19, 2007 among Steven Doziger, Douglas Beltman, Ann Maest, and others with the subject, "Important Idea" ...................................................................A2518

Exhibit 168 to Hendricks Declaration - Email dated February 22, 2008 from Douglas Beltman to "Science Group" at Stratus, David Chapman, and others at Stratus with the subject, "CONFIDENTIAL – Ecuador Project Update" ..................................................................................................A2519

Exhibit 169 to the Hendricks Declaration - Email chain dated March 11, 2008 among Ann Maest, Douglas Beltman, and Jennifer Peers with the subject, "Report help" ..................................................................................A2521

Exhibit 170 to Hendricks Declaration - Email chain dated February 27, 2008 between Steven Donziger and Douglas Beltman with the subject, "Start on report text; human text annex" .......................................................A2522

Exhibit 171 to the Hendricks Declaration - Portions of the transcript of the deposition of William Powers, taken on September 10, 2010, in *In re Application of Chevron Corp.*, No. 10-cv-01146- IEG (WMC) (S.D. Cal.) ..................A2523

Exhibit 174 to the Hendricks Declaration - Email chain dated May 14, 2008 between Steven Donziger and Douglas Beltman with the subject, "Urgent issue" ...............................................................................................A2555

Exhibit 175 to the Hendricks Declaration - Email dated July 28, 2008 from Douglas Beltman to Brian Lazar at Stratus, copying others at Stratus, with the subject, "english translations" ..................................................................A2556

Exhibit 176 to Hendricks Declaration - Email dated March 12, 2008 from Douglas Beltman to info@translatingspanish.com, copying Ann Maest, with the subject, "Big Report," and attachment entitled, "PERITAJE GLOBAL SUMMARY REPORT"................................................................A2557

Exhibit 178 to Hendricks Declaration - Summary Report of Expert Examination by Richard Stalin Cabrera Vega dated March 24, 2008, filed by Richard Cabrera in the Lago Agrio Litigation on April 1, 2008, and a certified English translation thereof............................................................A2589

Exhibit 182 to Hendricks Declaration - Email dated March 23, 2008 from Douglas Beltman to Steven Donziger with the subject, "Powers Report" .....................A2708

Exhibit 185 to Hendricks Declaration - Email dated May 16, 2010 from Jonathan Abady to Steven Donziger, Ilann Maazel, and others with the subject, "Motion Under Rule 60 (B)(3)" ........................................................A2709

Exhibit 188 to Hendricks Declaration - Email dated November 18, 2008 from Douglas Beltman to Steven Donziger with the subject, "Ecuador trip report and health summary," forwarding emails from Richard Clapp, and attached document entitled, "Report of Richard Clapp, D.Sc., MPH"...........................A2713

Exhibit 189 to Hendricks Declaration - Email dated July 28, 2008 from Douglas Beltman to David Mills with the subject, "another annex for Clapp" .................................................................................................A2719

Exhibit 190 to Hendricks Declaration - Portions of the transcript of the deposition of David M. Mills, taken on October 20, 2010, in *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH (D. Colo.)..................A2720

Exhibit 191 to Hendricks Declaration - Email dated March 18, 2009 from Steven Donziger to Pablo Fajardo with the subject, "Necesito repuesta" ["I need a response"], and a certified English translation thereof........................................A2736

Exhibit 194 to Hendricks Declaration - Press release dated April 2, 2008 issued by Frente de Defensa de la Amazonia entitled, "Court Expert Smacks Chevron With Up To $16 Billion In Damages for Polluting Indigenous Lands In Amazon" ........................................................................A2741

Exhibit 196 to Hendricks Declaration - Email chain dated October 29, 2008 among Douglas Beltman, Jennifer Peers, and Ann Maest with the subject, "Plan for rough estimate of groundwater damages"...........................................A2743

Exhibit 197 to Hendricks Declaration - Email dated October 31, 2008 from Ann Maest to William Powers, copying Douglas Beltman and Jennifer Peers with the subject, "Reinjection and gas capture questions," and a certified English translation thereof ....................................................A2744

Exhibit 198 to Hendricks Declaration - Email chain dated November 6, 2008 between Douglas Beltman and Steven Donziger with the subject, "clapp," produced by Stratus and bearing the Bates number STRATUS - NATIVE065062..................................................................................................A2751

Exhibit 199 to Hendricks Declaration - Portions of the transcript of the deposition of Douglas C. Allen, taken on December 16, 2010, in *Application of Chevron Corp. v. Allen*, 10-mc-00091-WKS (D. Vt.) ............................A2752

Exhibit 200 to Hendricks Declaration - Email dated June 26, 2008 from Douglas Beltman to members of Amazon Watch with the subject, "Greetings, and….,"and attachment entitled, "Technical Summary Report By: Engineer Richard Stalin Cabrera Vega," dated March 24, 2008 .............................A2775

Exhibit 201 to Hendricks Declaration - Chevron Stratus Consulting, Inc.'s "Comments on the Report of the Court - Appointed Expert Richard Cabrera Vega in the Case of Maria Aguinda y Otros v. Chevron Corp.," dated December 1, 2008, signed by Executive Vice President Douglas Beltman, Principal David Chapman, Managing Scientist Ann Maest, Senior Scientist Jennifer Peers, and Senior Analyst David Mills, *available at* http://amazonwatch.org/documents/ecuador - press - kit/stratus - comments - on - cabrera.pdf .........................................................................A2828

Exhibit 202 to Hendricks Declaration - Email dated June 12, 2008 from David Mills to Steve Hampton with the subject, "Assistance with report review"..................................................................................................................A2844

Exhibit 203 to Hendricks Declaration - Email dated June 26, 2009 from Douglas Beltman to geraldo@cpqam.fiocruz.br with the subject, "support on Chevron case," and attachment entitled, "Comments on the Report of the Court - Appointed Expert Ing. Richard Cabrera Vega in the Case of Maria Aguinda y Otros v. Chevron Corp."..................................................................A2846

Exhibit 204 to Hendricks Declaration - Email dated July 29, 2008 from Douglas Beltman to Steven Donziger, Joseph Kohn, and David Mills, with the subject, "Cabrera document review" ......................................................A2863

Exhibit 206 to Hendricks Declaration - Flings by Pablo Fajardo in the Lago Agrio Litigation relating to payments to Richard Cabrera, and checks paid to Richard Cabrera, and certified English translations thereof ...................A2865

Exhibit 208 to Hendricks Declaration - Filing by Richard Cabrera in the Lago Agrio Litigation dated July 23, 2007, stating that he has no relation or agreements with the Lago Agrio Plaintiffs, and a certified English translation thereof ...............................................................................................A2920

Exhibit 211 to Hendricks Declaration - Filing by Richard Cabrera in the Lago Agrio Litigation dated March 4, 2009, defending his neutrality, and a certified English translation thereof................................................................A2923

Exhibit 212 to Hendricks Declaration - Filing by Pablo Fajardo in the Lago Agrio Litigation on April 4, 2008, denying Chevron's assertions regarding the Lago Agrio Plaintiffs' relationship with Richard Cabrera's report, and a certified English translation thereof..........................................A2944

Exhibit 213 to Hendricks Declaration - Filing by Pablo Fajardo in the Lago Agrio Litigation, dated April 25, 2008, denying Chevron's assertions regarding the Lago Agrio Plaintiffs' relationship with Richard Cabrera, and a certified English translation thereof ...................................................A2955

Exhibit 214 to Hendricks Declaration - Email dated August 18, 2010 among Steven Donziger, Jonathan Abady of Emery Celli, and Adlai Small and Eric Westenberger of Patton Boggs with the subject, "Brainstorming on Expert issues – PRIVILEGED AND CONFIDENTIAL – ATTORNEY WORK PRODUCT"...................................................................................A2961

Exhibit 215 to Hendricks Declaration - Letter dated August 18, 2010 from H. Edward Dunkelberger, III, Senior Director of The Weinberg Group Inc. to Jonathan Abady of Emery Celli, and attachment entitled, "Statement of Terms and Conditions" ......................................................................................A2964

Exhibit 216 to Hendricks Declaration - Email dated August 20, 2010 among Steven Donziger, Julia Brickell of H5, and Nicolas Economou with the subject, "Call to discuss expert report"..................................................A2969

Exhibit 217 to Hendricks Declaration - Portions of the transcript of the deposition of Lawrence W. Barnthouse, taken on December 10, 2010, in *Chevron v. Barnthouse*, 10-mc-53 (S.D. Ohio) ..............................................A2974

Exhibit 218 to Hendricks Declaration - Email chain dated July 13, 2010 among Steven Donziger, Eric Westenberger, and Adlai Small with the subject, "Expert"............................................................................................A2995

Exhibit 219 to Hendricks Declaration -  Chevron portions of the transcript of the deposition of Jonathan S. Shefftz, taken on December 16, 2010, in *Chevron Corp. v. Shefftz*, No. 10-mc-10352- FT (D. Mass.)...........................A2997

Exhibit 220 to Hendricks Declaration - Portions of the transcript of the deposition of Carlos Emilio Picone, taken on December 16, 2010, in *Chevron Corp. v. Picone*, No. 10-cv-02990- AW (D. Md.) .............................A3016

Exhibit 221 to Hendricks Declaration - Portions of the transcript of the deposition of Robert Paolo Scardina, taken on December 22, 2010, in *In re Application of Chevron Corp. v. Scardina*, No. 10-mc-00067 (W.D. Va.) .....................A3041

Exhibit 222 to Hendricks Declaration - Email dated October 3, 2005 from Steven Donziger to Joseph Kohn with the subject, "Lehane's first press plan," and attached memorandum, dated October 1, 2005 entitled, "Roll - Out Plan"........................................................................................................A3058

Exhibit 223 to Hendricks Declaration - Email chain dated May 30, 2005 among Steven Donziger, Joseph Kohn, Alberto Wray, Cristóbal Bonifaz, and John Bonifaz, ending with an email with the subject, "sked conference call monday at 10 a.m." ...........................................................................................A3062

Exhibit 224 to Hendricks Declaration - Transcript and certified English translation of the Lago Agrio Plaintiffs' press conference on July 31, 2008 and photos from the press conference.............................................................A3065

Exhibit 224A to Hendricks Declaration - Email chain dated August 10, 2005 among Dr. Martha Escobar, Alberto Wray, Cristóbal Bonifaz, and others with the subject, "reunion presidente" ["meeting president"], and a certified English translation thereof.................................................................A3075

Exhibit 226A to Hendricks Declaration - Email chain dated July 21, 2006 among William Powers, Steven Donziger, Ann Maest, Mark Quarles, and others ending with an email with the subject, "restructuring E - Tech response in light of government lawsuit" .......................................................A3080

Exhibit 227 to Hendricks Declaration - Order dated August 26, 2008 issued by the Office of the Prosecutor General Washington Pesántez, ordering investigation of the case against Messrs. Ricardo Reis Vega and Rodrigo Pérez Pallares to begin, and a contemporaneous translation thereof ..........................................................................................................A3083

Exhibit 230 to the Hendricks Declaration - United States Department of State, Bureau of Economic, Energy and Business Affairs, "2010 Investment Climate Statement – Ecuador," dated March 2010, *available at* http://www.state.gov/e/eeb/rls/othr/ics/2010/138060.htm................................A3101

Exhibit 231 to Hendricks Declaration – Email dated February 10, 2006 from Steven Donziger to Pablo Fajardo, Luis Yanza and Alexander Ponce with the subject, "Always on the offensive/Ricardito," and a certified translation thereof .........................................................................................A3117

Exhibit 231A to Hendricks Declaration - Presidential Press release entitled, "Que el mundo entero vea la barbaridad que hizo Texaco" ["The whole world should see the barbarity displayed by Texaco"], dated April 26, 2007, and a certified English translation thereof ........................................................A3126

Exhibit 232A to Hendricks Declaration - Article entitled "*Correa se declara 'indignado' por daños en la Amazonía causados por Texaco*" ["Correa Says He is 'Furious' About the Damage Texaco caused in the Amazonian Region"], Agencia EFE, dated April 28, 2007, and a certified English translation thereof ................................................A3129

Exhibit 234 to Hendricks Declaration - Article by Peter Maass entitled, "*Slick*," OUTSIDE, March 2007, *available at* http://www.petermaass.com/articles/slick/ ....................................................A3132

Exhibit 236 to Hendricks Declaration - Email dated August 9, 2006 from Simeon Tegel of Amazon Watch to Steven Donziger and Jennifer Ciplet with the subject, "Posting release," and attached press release dated August 9, 2006 entitled, "Chevron Executive Cancels Press Conference To Defend Against Fraud Charges In Ecuador" ..............................................A3143

Exhibit 237 to Hendricks Declaration - Email chain dated August 24, 2007 among Pablo Fajardo, Steven Donziger, Simeon Tegel, and others with the subject, "follow up on press releases" .............................................................A3146

Exhibit 239 to Hendricks Declaration - Letter from Atossa Soltani, Executive Director of Amazon Watch, to Chevron CEO John Watson, dated December 17, 2009, *available at* http://chevrontoxico.com/news - and - multimedia/2009/1217 - letter - fromatossa - soltani - to - new - chevron - ceo - john - watson.html ...............................................................A3155

Exhibit 241 to Hendricks Declaration - Email dated July 1, 2009 from Russ DeLeon to Steven Donziger with the subject, "Fee Breakdown Chart through 5 - 31 - 09 (00053725 - 2).XLS," forwarding email chain between Russ DeLeon and Joseph Kohn, and attachment entitled, "Fee Breakdown Chart through 5 - 31 - 09 v.JRD.xls" .............................................................A3158

Exhibit 243 to Hendricks Declaration - Email dated March 19, 2009 from Steven Donziger to Crude filmmakers, Joe Berlinger and Michael Bonfiglio, with the subject, "did u know that…" ...........................................A3165

Exhibit 244 to Hendricks Declaration - Portions of the transcript of the deposition of Joseph Berlinger, taken on November 5, 2010 in *In re Application of Chevron*, 10-MC-00001-LAK (S.D.N.Y.) ................................................A3166

14

Exhibit 245 to Hendricks Declaration - Email chain dated August 3, 2010 among Joe Berlinger, Steven Donziger, Pablo Fajardo, and others with the subject, "GRACIAS" ["THANK YOU"], and a certified English translation thereof .............................................................................................A3199

Exhibit 246 to Hendricks Declaration - Email chain dated February 24, 2009 between Pablo Fajardo and Steven Donziger with the subject, "ME PREOCUPA" ["I'M WORRIED"]..............................................................................A3207

Exhibit 247 to Hendricks Declaration - Email dated April 6, 2009 from Ali Pflaum, Office of Joe Berlinger, to Emma Vaughn at cnn.com with the subject, "Crude Footage" ...............................................................................A3212

Exhibit 251 to Hendricks Declaration - ChevronToxico webpage, "$27 Billion Damages Assessment," *available at* http://chevrontoxico.com/about/historic - trial/27 - billion - damages - assessment.html ............................................................................................A3213

Exhibit 252 to Hendricks Declaration - Press release issued by Amazon Defense Coalition / Frente de Defensa de la Amazonia entitled, "Chevron Accused of Lying to Shareholders Over $16 billion Damages Claim in Ecuador Rainforest Case by Amazon Defense Coalition," dated April 3, 2008, available at http://chevrontoxico.com/news - and - multimedia/2008/04032 - chevron - accused - of - lyingto - shareholders - over - 16 - billion - damages.html...................................................................A3215

Exhibit 253 to Hendricks Declaration - Email dated August 14, 2008 between Steven Donziger and Pablo Fajardo with the subject, "interesante" ["interesting"], and a certified English translation thereof ........................A3217

Exhibit 254 to Hendricks Declaration - Certified transcript of a Fox News interview with Joseph Kohn on May 31, 2008 ................................................A3220

Exhibit 255 to Hendricks Declaration - Press release issued by Amazon Defense Coalition / Frente de Defensa de la Amazonia entitled, "Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Scientists," dated December 1, 2008, *available at* http://chevrontoxico.com/news - andmultimedia/2008/1201 - chevrons - 27 - billion - liability - in - ecuadors - amazon - confirmed.html ....................................A3223

Exhibit 256 to Hendricks Declaration - Email chain dated March 18, 2009 between Douglas Beltman and Steven Donziger with the subject, "draft text to address Chevron ad re: language in Cabrera response".......................A3225

Exhibit 257 to Hendricks Declaration - Article by Mercedes Alvaro entitled, "*Update: Chevron Seeks to Dismiss Ecuador Court Appointment*," DOW JONES NEWSWIRES, dated May 24, 2010 ...............................A3227

Exhibit 258 to Hendricks Declaration - Email chain dated May 25, 2010 among Pablo Fajardo, Juan Pablo Sáenz, and others with the subject, "REGARDING CHEVRON'S ANNULMENT REQUEST" .........................................A3229

Exhibit 259 to Hendricks Declaration - Article by Reuters entitled, "*Report Says Chevron Owes Billions for Ecuadorean Pollution*," NEW YORK TIMES, dated April 3, 2008, *available at* http://www.nytimes.com/2008/04/03/business/worldbusiness/03chevron.ht ml ...........................................................................................................................A3234

Exhibit 260 to Hendricks Declaration - Chevron transcript of a 60 MINUTES program on May 3, 2009...........................................................................A3236

Exhibit 261 to Hendricks Declaration -  Chevron Press release issued by Amazon Defense Coalition / Frente de Defensa de la Amazonia entitled, "Chevron Faces Tens of Billions in Clean - Up Costs; Potential Death Toll Put at 10,000 in Ecuador Rainforest," dated September 17, 2010, *available at* http://chevrontoxico.com/news - andmultimedia/2010/0917 - chevron - faces - tens - of – billions...................................................................................A3254

Exhibit 265 to Hendricks Declaration - Letter dated January 30, 2006 from Amazon Watch to the Chairman of the U.S. Securities and Exchange Commission,*available at* http://chevrontoxico.com/news - and - multimedia/2006/0130 - letter - to - secchairman.Html....................................................A3257

Exhibit 267 to Hendricks Declaration - Letter dated March 18, 2008 from Amazon Watch to Christopher Cox, Chairman of the U.S. Securities and Exchange Commission, *available at* http://amazonwatch.org/amazon/EC/toxico/downloads/SECLetterFinal200 8.pdf ........................................................................................................................A3260

Exhibit 269 to Hendricks Declaration - Statement by Steven R. Donziger to the Tom Lantos Human Rights Commission, dated April 28, 2009, *available at* http://chevrontoxico.com/assets/docs/20090428statement - by - steven - donziger.pdf .........................................................................................A3269

Exhibit 270 to Hendricks Declaration - Email dated January 31, 2009 from Douglas Beltman to Cindy Buhl with the subject, "I'm sure you sent this to me before, but . . ." ...................................................................................................A3280

Exhibit 271 to Hendricks Declaration - Letter dated May 4, 2009 from New York Attorney General Andrew Cuomo to Chevron CEO David O'Reilly...................................................................................................................A3281

Exhibit 273 to Hendricks Declaration - Press release issued by Amazon Defense Coalition / Frente de Defensa de la Amazonia entitled Amazon Watch Campaign, *available at* http://chevrontoxico.com/about/amazon - watch - campaign/ ......................................................................................................A3283

Exhibit 274 to Hendricks Declaration - Press release issued by Amazon Defense Coalition / Frente de Defensa de la Amazonia entitled, "Chevron Blasted for Misconduct and Corruption in Ecuador Trial," dated February 13, 2009, *available at* http://www.amazonwatch.org/newsroom/view_news.php?id=1714 ............................... A3285

Exhibit 276 to Hendricks Declaration - Amazon Watch Letter to Shareholders, dated May 25, 2009, available *at* http://chevrontoxico.com/news - andmultimedia/2009/0525 - amazon - watch - letter - to - shareholders.html ........................................................... A3287

Exhibit 277 to Hendricks Declaration - Email dated May 12, 2009 from Andrew Woods to Steven Donziger, William Featherston, Managing Director at UBS Investment Research, and others at UBS with the subject, "Available times next week" .............................................................................. A3298

Exhibit 278 to Hendricks Declaration - Press release issued by Amazon Defense Coalition / Frente de Defensa de la Amazonia entitled, "Chevron Falls Short On Disclosure Obligations Relating to $27 Billion Ecuador Liability, Says Investor Advisory Group," dated May 26, 2009, *available at* http://chevrontoxico.com/news - andmultimedia/2009/0526 - chevron - falls - short - on - disclosure - obligations - relating - to - 27 - billion - ecuador - liability - says - i.html ........................................................................ A3301

Exhibit 279 to Hendricks Declaration - Press release issued by Amazon Watch / Frente de Defensa de la Amazonia entitled, "Chevron Management Dealt Major Blow with CalPERS Announcement on Ecuador," dated May 21, 2009, *available at* http://chevrontoxico.com/news - and - multimedia/2009/0521 - chevron - management - dealtmajor - blow - with - calpers - announcement - on - ecuador.html .......................................................................................... A3303

Exhibit 280 to Hendricks Declaration - Press release issued by Amazon Watch entitled, "Chevron Investors Urged To Freeze Purchase of Company Stock Because of Ecuador Disaster," dated October 24, 2007, *available at* http://www.amazonwatch.org/newsroom/view_news.php?id=1486 ............................... A3305

Exhibit 282 to Hendricks Declaration - Email dated December 1, 2008 from Mitchell Anderson of Amazon Watch to Douglas Beltman, Steven Donziger, and others with the subject, "2009 Shareholder Resolution – Urgent Update" ............................................................................................ A3307

Exhibit 283 to Hendricks Declaration - Letter dated December 2, 2008 from Patrick Doherty, City of New York, Office of the Comptroller, to Lydia Beebe, Corporate Secretary and Chief Governance Officer of Chevron, enclosing "Stockholder Proposal: Report on Global Environmental Standards" ............................................................................... A3309

Exhibit 285 to Hendricks Declaration - Article by Liam Denning entitled, *Chevron Ecuador Woes Mask Potential*," WALL STREET JOURNAL, dated July 24, 2009 ................................................................................................. A3312

Exhibit 287 to Hendricks Declaration - Translation of a statement dated November 4, 2004 of Pablo Fajardo to the District Attorney for Canton of Shushufindi ............................................................................................................ A3316

Exhibit 292 to Hendricks Declaration - Email chain dated May 27, 2010 among Steven Donziger, lawyers from Donziger & Associates, lawyers from Emery Celli, lawyers from Patton Boggs, and lawyers from Motley Rice, with the subject, "Mini - revelation" .................................................... A3321

Exhibit 293 to Hendricks Declaration - Email chain dated June 15, 2010 among Steven Donziger, and lawyers from Emery Celli, lawyers from Patton Boggs, and lawyers from Motley Rice with the subject, "Final Proposed Draft" ................................................................................................... A3323

Exhibit 294 to Hendricks Declaration - Response of the Ecuadorian Plaintiffs, Uhl, Baron, Rana & Associates, Inc., and Juan Cristóbal Villao Yepez to Order to Show Cause and Opposition to Chevron Corporation's Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery, filed on June 7, 2010 in *In re Application of Chevron Corp.*, No. 10-cv-02675-SRC-MAS (D.N.J.) ............................................................ A3329

Exhibit 295 to Hendricks Declaration - Lago Agrio Plaintiffs' Response in Opposition to Chevron's Fed. R. Civ. P. 72(a) Objections, filed on July 9, 2010 in *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH (D. Colo.) ...................................................................................... A3333

Exhibit 296 to Hendricks Declaration - Email chain dated April 23, 2010 among Steven Donziger, Eric Westenberger of Patton Boggs, and Jonathan Abady, Andrew Wilson, and Ilann Maazel of Emery Celli, with the subject, "Colorado Update" ........................................................................ A3337

Exhibit 300 to Hendricks Declaration - Transcript of a hearing held on April 27, 2010 in *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH (D. Colo.) ..................................................................... A3389

Exhibit 305 to Hendricks Declaration - Brief for Appellants UBR and Ecuadorian Plaintiffs, submitted on July 30, 2010, in *In re Application of Chevron Corp.*, No. 10-2815 (3d Cir.) ............................................................ A3453

Exhibit 306 to Hendricks Declaration - Email chain dated October 23, 2007 among Steven Donziger, Pablo Fajardo, Luis Yanza, and Cristobal Villao with the subject "informe agua potable espanol" ..................................................A3518

Exhibit 307 to Hendricks Declaration - Email chain dated July 19, 2010 among Steven Donziger, Andrew Woods of Donziger and Associates, and Andrew Wilson, Jonathan Abady, and Ilann Maazel of Emery Celli with the subject, "urgent - - does this pass muster for a journalist about New Jersey case?" ................................................................................................A3520

Exhibit 308 to Hendricks Declaration - Email chain dated May 5, 2010 among Steven Donziger, lawyers from Emery Celli, lawyers from Patton Boggs, and others with the subject, "aguinda litigation"..................................................A3524

Exhibit 309 to Hendricks Declaration - Email chain dated May 4, 2010 among Steven Donziger, Andrew Wilson of Donziger and Associates, lawyers from Emery Celli, and lawyers from Patton Boggs with the subject, "Fajardo Declaration".........................................................................................A3537

Exhibit 310 to Hendricks Declaration - Memorandum dated May 24, 2010 from J. McDermott to Steven Donziger regarding, "Steven Donziger" .........................A3540

Exhibit 312 to Hendricks Declaration - Email chain dated March 21, 2010 between Steven Donziger and John McDermott with the subject, "Chevron v. Stratus"....................................................................................................A3542

Exhibit 316 to Hendricks Declaration - Declaration of Pablo Fajardo Mendoza, dated May 5, 2010, filed by the Lago Agrio Plaintiffs (or Ecuadorian Plaintiffs) in support of their Motion for a Protective Order in *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH (D. Colo.) ....................................................................................................A3544

Exhibit 317 to Hendricks Declaration - Ecuadorian Plaintiffs' Reply Memorandum of Points and Authorities in Further Support of Motion for a Protective Order, filed on May 17, 2010 in *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH (D. Colo.).............................................A3551

Exhibit 318 to Hendricks Declaration - Email chain among Andrew Wilson, Steven Donziger, Jonathan Abady, and others with the subject, "need preliminary review," and attachment entitled "Fajardo Letter" ...........................A3574

Exhibit 320 to Hendricks Declaration - Ecuadorian Plaintiffs' Memorandum of Points and Authorities in Support of Motion for a Protective Order in Connection with Subpoenas Issued to the Ecuadorian Plaintiffs' Non - Testifying Litigation Consultants Pursuant to 28 U.S.C. § 1782, filed on May 5, 2010 in *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH (D. Colo).........................................................A3578

Exhibit 324 to Hendricks Declaration - Transcript of a hearing held on June 17, 2010 in *In re Application of Chevron Corp.*, No. 10-2675-SRC-(MAS) (D.N.J.) ................................................................................A3611

Exhibit 325 to the Hendricks Declaration - Order Granting Discovery under 28 U.S.C. § 1782 in *Chevron Corp. v. Champ*, Nos. 10-MC-27, 10-MC-28 - GCM - DLH (W.D.N.C.), dated August 30, 2010............................A3617

Exhibit 326 to the Hendricks Declaration - Amended Memorandum Opinion and Order Authorizing Discovery from Kamp and E - Tech in *In re Application of Chevron Corp.*, Nos. 10-mc-21, 10-mc-22-JCH - LFG (D.N.M.), dated September 2, 2010................................................................A3630

Exhibit 327 to the Hendricks Declaration - Order in *In re Application of Chevron Corp.*, No. 10-cv-1146-IEG (S.D. Cal.), dated September 10, 2010........................................................................................................A3642

Exhibit 328 to Hendricks Declaration - Memorandum Opinion and Order Rejecting Claims of Attorney - Client Privilege and Ordering Production of Documents, issued on September 13, 2010 in *In re Chevron Corp.*, Nos. 10-mc-21, 10-mc-22-JCHLFG (D.N.M.) ........................................................A3653

Exhibit 329 to Hendricks Declaration - Memorandum of Law by the Lago Agrio Plaintiffs in Opposition to Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in Foreign Proceedings, filed on April 23, 2010 in *In re Application of Chevron*, No. M-19-111 (S.D.N.Y.)........................................................................................................A3666

Exhibit 330 to Hendricks Declaration - Chevron Brief and Special Appendix for Respondent - Appellant Lago Agrio Plaintiffs, filed on June 14, 2010 in *Chevron Corp. v. Berlinger*, 10-1918 – cv (L), 10-1966- cv (CON) (2d Cir.)........................................................................................A3671

Exhibit 331 to Hendricks Declaration - Email dated May 7, 2007 from Pablo Fajardo to Carlos Beristain, *Steven* Donziger, and others with subject, "CALENDARIO DE REUNIONES" ["MEETING CALENDAR"], with attachment entitled, "PLAN DE REUNIONES CON C" ["Plan for Meetings with C"], produced by Steven Donziger and bearing the Bates number DONZ00043170, and certified English translation thereof .............................................................................................A3677

Exhibit 332 to Hendricks Declaration - Email dated July 15, 2010 from Ilann Maazel to Steven Donziger and Eric Westenberger with subject, "2d Circuit order" ..................................................................................A3680

Exhibit 333 to Hendricks Declaration - Declaration of Mark Anthony Quarles, P.G., dated September 17, 2007, filed in *Republic of Ecuador v. ChevronTexaco Corp.*, 04Civ8378-LBS (S.D.N.Y) ........................................A3685

Exhibit 334 to Hendricks Declaration - Portions of the transcript of the deposition of Mark Quarles, *taken* on September 1, 2010, in *In re Application of Chevron Corp.*, No. 10-cv-00686 (M.D. Tenn.) .....................................A3691

Exhibit 337 to Hendricks Declaration - Email chain dated August 28, 2010 among Steven Donziger, James Tyrrell of Patton Boggs, and Christopher Bogart, Selvyn Seidel, and Jonathan Molot of Burford Group with the subject, "Burford proposal" ..........................................................................................A3702

Exhibit 338 to Hendricks Declaration - Order dated December 17, 2010 in the Lago Agrio Litigation, issuing the *autos para sentencia* and declaring the evidence period concluded and requesting the record so that a judgment can be issued, and a certified English translation thereof...............................A3706

Exhibit 339 to Hendricks Declaration - Plaintiffs' filing in the Lago Agrio case, dated December 15, 2010, and a certified English translation thereof ..................A3709

Exhibit 341 to Hendricks Declaration - Undated memorandum prepared by Patton Boggs entitled, "Invictus – Path Forward: Securing and Enforcing Judgment and Reaching Settlement" ............................................................A3714

Exhibit 342 to Hendricks Declaration - Press release issued by Amazon Watch entitled, "*Chevron* Launches 'Dirty War' on Ecuador Court," dated July 4, 2007, *available at* http://chevrontoxico.com/news - and - multimedia/2007/0704 - chevronlaunches - dirty - war - on - ecuador - court.html....................................................................................................................A3746

Exhibit 343 to Hendricks Declaration - Press release issued by Amazon Defense Coalition / Frente de Defensa de la Amazonia entitled, "New Evidence of Chevron Fraud from Final Judicial Inspections in $27 Billion Environmental Case," dated June 24, 2009, *available at* http://chevrontoxico.com/news - and - multimedia/2009/0624 - new - evidence - of - chevron - fraud - from - final - judicial - inspections.html.....................A3749

Exhibit 344 to Hendricks Declaration - Article by Fiona Smith entitled, "*Chevron Case Comes to a Head*," DAILY JOURNAL, dated April 22, 2010......................................................................................................................A3751

Exhibit 345 to Hendricks Declaration - Transcript of a hearing held on March 11, 2010 in *Republic of Ecuador v. Chevron Corp.*, No. 09-cv-9958-LBS (S.D.N.Y.) and *Yaiguaje v. Chevron Corp.*, No. 10-cv-316-LBS (S.D.N.Y.) .....................................................................................................................A3753

Exhibit 346 to Hendricks Declaration - Email chain dated January 27, 2005 among Steven Donziger, Charles Calmbacher, David Russell, and others with the subject, "A Mexican *Standoff*??" ............................................................A3759

Exhibit 347 to Hendricks Declaration - Email chain dated March 3, 2005 between Steven *Donziger* and Charles Calmbacher with the subject, "papers"...................................................................................................................A3766

Exhibit 348 to Hendricks Declaration - Email dated August 8, 2007 from Luis Yanza to Steven *Donziger* with the subject, "vaca" ["vacation"], and a certified English translation thereof ............................................................A3767

Exhibit 352 to Hendricks Declaration - Email dated February 29, 2008 from Douglas Beltman to Ann Maest and Jennifer Peers with the subject, "annexes" ...................................................................................................................A3770

Exhibit 353 to Hendricks Declaration - Email dated March 1, 2008 from Douglas Beltman to Michael Carney of Stratus with the subject, "eco risk annex" ......................................................................................................................A3771

Exhibit 355 to Hendricks Declaration - Email dated March 7, 2008 from Douglas Beltman to info@*translatingspanish*.com with the subject, "One more annex"...................................................................................................................A3772

*Exhibit* 358 to Hendricks Declaration - Email chain dated March 13, 2008 between Douglas Beltman and Steven Donziger, copying Ann Maest, with the subject, "catch up" ..........................................................................................A3773

Exhibit 364 to Hendricks Declaration - Email dated March 24, 2008 from Douglas Beltman to E. English, David Mills, and David Chapman with the subject, "reliability of surveys"...........................................................................A3775

Exhibit 365 to Hendricks Declaration - Email dated March 27, 2008 from Pablo Fajardo to Jennifer Peers with the subject, "Re: Figuras corregidas – Annexo IMPACTOS ECOLOGICOS" ["Re: Corrected Figures – ECOLOGICAL IMPACTS Annex"], and a certified English translation thereof ...............................................................................................................A3776

Exhibit 367 to Hendricks Declaration - Email dated June 26, 2008 from Steven Donziger to Pablo Fajardo, Luis Yanza, and others with the subject, "important" ...............................................................................................A3779

Exhibit 368 to Hendricks Declaration - Email dated July 31, 2008 from Pablo Fajardo to Ann Maest, Douglas Beltman, Jennifer Peers, and Steven Donziger with the subject, "TRABAJOS *INFORME* CABRERA" ["WORK – CABRERA REPORT"], and a certified English translation thereof ...................................................................................................................A3780

Exhibit 370 to Hendricks Declaration - Email dated October 31, 2008 from Ann Maest to William Powers, copying Douglas Beltman and Jennifer Peers, with the subject, "Reinjection and gas capture questions," and a certified English translation thereof ....................................................A3783

Exhibit 371 to Hendricks Declaration - Email chain dated November 3 - 4, 2008 among William Powers, Ann Maest, and Douglas Beltman with the subject, "response to Qs on reinjection and use of produced gas" ................................A3790

Exhibit 373 to Hendricks Declaration - Ecuadorian Plaintiffs' Brief in Support of Motion to Quash, filed on May 7, 2010 in *Chevron Corp. v. 3TM Consulting, LLC.*, No. 4: 10-mc-134 (S.D. Tex.)......................................A3791

Exhibit 374 to Hendricks Declaration - Declaration of Pablo Fajardo Mendoza, filed as Exhibit 2 to the Ecuadorian Plaintiffs' Brief in Support of Motion to Quash, filed on May 7, 2010 in *Chevron Corp. v. 3TM Consulting, LLC.*, No. 4: 10-mc-134 (S.D. Tex.) ............................................A3824

Exhibit 375 to Hendricks Declaration - Declaration of Pablo Fajardo Mendoza, dated May 5, 2010, filed as Exhibit O to the Certification of James T. Hunt, Jr. in Support of the Response of the Ecuadorian Plaintiffs, Uhl, Baron, Rana & Associates, Inc., and Juan Cristóbal Villao Yepez to Order to Show Cause and Opposition to Chevron Corporation's Application for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery, filed on June 7, 2010 in *In re Application of Chevron Corp.*, No. 10-cv-02675-SRC-(MAS) (D.N.J.)..........................................................A3833

Exhibit 377 to Hendricks Declaration - Petition to the Lago Agrio Court, submitted by Pablo Fajardo to the Lago Agrio Court on June 20, 2010, filed as Exhibit A to the Plaintiffs' Second Response to "Update on Lago Agrio Proceeding and Request for Status Conference on June 21, 2010," filed on June 21, 2010 in *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-MSK-MEH (D. Colo.)..............................................................A3846

Exhibit 379 to Hendricks Declaration - Declaration of Pablo Fajardo Mendoza, dated May 5, 2010, filed as Exhibit O to the Declaration of Maria C. Severson in Support of Plaintiffs' and Respondents' Motion to Quash Subpoenas, filed on June 26, 2010 in *Chevron Corp. v. E - Tech International*, No. 10-cv-1146 - IEG - WMC (S.D. Cal.) ...............................A3863

Exhibit 380 to Hendricks Declaration - Appellant's Reply Brief, filed on August 2, 2010 in *Ecuadorian Plaintiffs v. Chevron Corp.*, No. 10-20389 (5th Cir.).........................................................................................................A3876

Exhibit 382 to Hendricks Declaration - Declaration of Pablo Fajardo Mendoza, dated May 5, 2010, filed as Exhibit I to the Declaration of Wyatt S. Stevens in Support of Respondent Charles Champ and Interested Parties the Lago Agrio Plaintiffs' Opposition to Application of Chevron Corporation For an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery, filed on August 24, 2010 in *Chevron Corp. v. Champ*, No. 10-mc-00027-GCM - DLH (W.D.N.C.) ..............................................................A3909

Exhibit 383 to Hendricks Declaration - Declaration of Pablo Fajardo Mendoza, dated May 5, 2010, filed as Exhibit 7 to the Declaration of John W. Boyd in Support of Respondents' and Ecuadorian Plaintiffs Preliminary Response, filed on August 25, 2010 in *Chevron Corp.,* No. 10-mc-00021 - JCH - LFG (D.N.M.)................................................................A3920

Exhibit 384 to Hendricks Declaration - Declaration of Pablo Fajardo Mendoza, dated May 5, 2010, filed as Exhibit 46 to the Declaration of O. Andrew F. Wilson in Support of Ecuadorian Plaintiffs' Motion to Quash or Modify Subpoenas Served Upon Steven R. Donziger, filed on August 28, 2010 in *In Re Application of Chevron Corp.*, No. 10-mc-00002 - LAK (W.D.N.C.)................................................................................A3933

Exhibit 387 to Hendricks Declaration - Email dated July 1, 2010 from Eric Westenberger to Eric Daleo, Steven Donziger, and others with the subject, "Tomorrow's Production to Chevron"................................................A3949

Exhibit 388 to Hendricks Declaration - Email dated May 2, 2010 from Steven Donziger to Eric Westenberger, Jonathan Abady, and others, with the subject, "Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International, Inc. et al Memorandum and Order"................................A3950

Exhibit 389 to Hendricks Declaration - Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment and in Opposition to Defendants' Motion to Dismiss, filed on February 18, 2010 in *Yaiguaje v. Chevron Corp.*, No. 10-cv-316 (S.D.N.Y.)........................................A3957

Exhibit 391 to Hendricks Declaration - Order from the United States Court of Appeals for the Second Circuit, issued on July 15, 2010 in *Chevron Corp. v. Berlinger*, Nos. 10-1918-cv, 10-1966-cv (2d Cir.)........................A3977

Exhibit 392 to Hendricks Declaration - Email dated March 26, 3007 from Pablo Fajardo to Steven Donziger, Luis Yanza, and others with the subject, "ALERTA NARANJA" ["ORANGE ALERT"], and a certified English translation thereof......................................................A3979

Exhibit 393 to Hendricks Declaration - El Comercio article titled, "*What Rule of Law?*," by Antonio Rodríguez Vicéns, dated November 11, 2008, and a certified English translation thereof....................................A3982

Exhibit 394 to Hendricks Declaration - Motion to Dismiss filed by W. Pesántez in the Lago Agrio Litigation on March 13, 2007, and a certified English translation thereof......................................................A3985

Exhibit 395 to Hendricks Declaration - Email dated February 4, 2009 from Juan Pablo Saenz to Steven Donziger with the subject, "Nuevo Boletin/importante" ["New Press Release/important"], and a certified English translation thereof......................................................A4006

24

Exhibit 399 to Hendricks Declaration - Email dated November 14, 2006 from Charles Champ to Steven Donziger with the subject, "Ann Maest".......................A4019

Exhibit 403 to Hendricks Declaration - Filing by Richard Cabrera in the Lago Agrio Litigation on October 11, 2007, in which Cabrera defends his impartiality, and a certified English translation thereof....................................................A4022

Exhibit 404 to Hendricks Declaration - Email dated July 1, 2007 from Steven Donziger to Pablo Fajardo and Luis Yanza with the subject, "PREOCUPADO" ["WORRIED"], and a certified English translation thereof ..........................................................................................................A4030

Exhibit 405 to Hendricks Declaration - Portions of the transcript of the deposition of Steven Donziger, taken on December 23, 2010, December 29, 2010, and January 29, 2011, in *In re Application of Chevron*, No. 10-MC-00002-LAK (S.D.N.Y.) ...........................................................................A4037

Exhibit 408 to Hendricks Declaration - Email dated April 1, 2008 from Douglas Beltman to Ann Maest and Brian Lazar with the subject, "Declaration of findings," attaching a summary of findings, produced by Stratus and bearing the Bates number Stratus - Native065493........................................A4076

Exhibit 410 to Hendricks Declaration - Email dated May 3, 2010 from Ilann Maazel to Eric Westenberger, Steven Donziger, and others with the subject, "Draft Affidavit"...................................................................................A4081

Exhibit 411 to Hendricks Declaration - Email dated June 14, 2010 from Steven Donziger to N. Economou with the subject, "FYI" .............................................A4085

Exhibit 415 to Hendricks Declaration - Email dated February 13, 2006 from Steven Donziger to Atossa Soltani with the subject, "How to explain 20 billion damage figure" ..............................................................................A4087

Exhibit 416 to Hendricks Declaration - Email dated May 10, 2007 from Steven Donziger to Pablo Fajardo, Juan Pablo Saenz, and others with the subject, "Nueva Boletin por favor" ["New Press Release please"], and a certified English translation thereof................................................................A4090

Exhibit 419 to Hendricks Declaration - Draft memorandum dated March 24, 2010 that lists issues Steven Donziger wanted to discuss with Michael Ross......................................................................................................A4097

Exhibit 420 to Hendricks Declaration - Email dated May 22, 2010 from Jonathan Abady to Jay Horowitz, Eric Westenberger, Steven Donziger, and others with the subject, "Plaintiffs' Response to Stratus Status Report".................A4099

Exhibit 421 to Hendricks Declaration - Email dated May 27, 2010 from Eric Westenberger to Steven Donziger with the subject, "Document Production and Deposition Scheduling," attaching one JPG file entitled "image002" and one GIF file entitled "image003"...........................................................A4101

Exhibit 424 to Hendricks Declaration - Reply Brief for Respondents - Appellants Lago Agrio Plaintiffs, filed on June 25, 2010 in *Chevron Corp. v. Berlinger*, No. 10 - 1918 - cv(L), No. 10 - 1966 - cv(CON) (2d Cir.).........................A4106

Exhibit 425 to Hendricks Declaration - Email dated December 25, 2008 from Pablo Fajardo to Michael Bonfiglio with the subject, "TRABAJO" ["WORK"], and a certified English translation thereof....................................................A4109

Exhibit 426 to Hendricks Declaration - Letter dated May 18, 2009 from Joseph Kohn to Russell DeLeon with the subject, "Chevron/Ecuador".........................A4112

Exhibit 430 to Hendricks Declaration - Memorandum dated August 26, 2010 to Jonathan Molot and Selvyn Seidel with the subject, "Additional Summary" ...............................................................................................................A4114

Exhibit 434 to Hendricks Declaration - La Hora article published on March 15, 2010 entitled, "*Hay preocupacion por ataques a la justicia*" ["Concern over attacks on judicial branch"], and a certified English translation thereof ...........................................................................................................A4121

Exhibit 435 to Hendricks Declaration - Resolution dated June 22, 2010 from the Judiciary Council, No. 043 - 2010, and a certified English translation thereof ............................................................................................................A4125

Exhibit 436 to Hendricks Declaration - Transcript of the hearing dated June 11, 2010 in *In re Application of* Chevron, No. 10 - 2675(SRC) (D. N.J)..................................................................................................................A4129

Exhibit 437 to Hendricks Declaration - Transcript of the hearing dated May 19, 2010 in *In re Application of Chevron Corp.*, No. M19-111 (S.D.N.Y.) ...........................................................................................................A4132

Exhibit 438 to Hendricks Declaration - Email dated March 2, 2009 from Pablo Fajardo to Steven Donziger with the subject, "ESTOY PENSANDO" ["I'M THINKING], and a certified English translation thereof ........................................................................................................................A4136

Exhibit 439 to Hendricks Declaration - Letter dated October 8, 2004 from Alberto Wray to Steven Donziger, and a certified English translation thereof ........................................................................................................................A4139

Exhibit 441 to Hendricks Declaration - Motion to Dismiss filed by J. German in the Lago Agrio Litigation on March 1, 2007, and a certified English translation thereof ............................................................................... A4142

Exhibit 442 to Hendricks Declaration - Email dated July 11, 2007 from Julio Prieto to Pablo Fajardo and Steven Donziger with the subject, "seguro para el wao"["insurance for the wao"], and a certified English translation thereof ............................................................................... A4145

Exhibit 455 to Hendricks Declaration - Westlaw News & Insight article entitled, "*Ecuador judge works marathon hours on Chevron case*," published January 31, 2011 ............................................................................... A4150

Exhibit 456 to Hendricks Declaration - Email dated September 3, 2007 from Steven Donziger to Pablo Fajardo and others with the subject, "Imputado con la situacion HAVOC" ["Pissed off with the HAVOC situation"], and a certified English translation thereof ............................................................................... A4152

Exhibit 457 to Hendricks Declaration - PR Newswire article entitled "*Amazon Defense Coalition: Scientific Evidence Will Triumph Over Chevron's Intimidation Tactics in Ecuador, Says Plaintiffs*," published February 2, 2011, and *available at* http://www.prnewswire.com/news - releases/amazon - defense - coalition - scientific evidence - will - triumph - over - chevrons - intimidation - tactics - in - ecuador - say - plaintiffs - 115126314.html ............................................................................... A4157

Exhibit 458 to Hendricks Declaration - Chevron Snapshot of the Contact information on the Amazon Defense Coalition website, *available at* http://www.texacotoxico.org/eng/contact ............................................................................... A4159

Exhibit 459 to Hendricks Declaration - Letter dated February 2, 2011 from Nicolás Zambrano, the Presiding Judge of the Unified Chamber of the Sucumbios Provincial Court in Ecuador, to M. Doe of the Permanent Arbitration Court ............................................................................... A4163

Declaration of Vladimiro Álvarez Grau in Support Of Chevron Corporation's Motion for a Temporary Restraining Order and Preliminary Injunction, filed February 6, 2011 ............................................................................... A4168

Expert Report of Vladimir Alvarez Grau in Support of Chevron's Order to Show Cause Why a Temporary Restraining Order and Preliminary Injunction Should Not be Entered, dated February 6, 2011 ............................................................................... A4171

Exhibit 30 to the Grau Report - *President Correa Rejects Judge's Decision Granting Exclusive Vital Records Authority to the Municipio of Guayaquil*, EL CIUDADANO, dated February 14, 2009 ............................................................................... A4277

Affidavit of Service of Summons and Complaint on Steven Donziger, dated
February 7, 2011 ...........................................................................................A4281

Affidavit of Service of Summons and Complaint on Douglas Beltman, dated
February 1, 2011 ...........................................................................................A4284

Affidavit of Service of Summons and Complaint on Ann Maest, dated February 1,
2011................................................................................................................A4285

Affidavit of Service of Summons and Complaint on Stratus Consulting, Inc., dated
February 1, 2011 ...........................................................................................A4286

Affidavit of Service of Order To Show Cause for a Temporary Restraining Order and
Preliminary Injunction on Douglas Beltman, dated February 3, 2011 .......................A4287

Affidavit of Service of Order To Show Cause for a Temporary Restraining Order and
Preliminary Injunction on Ann Maest, dated February 3, 2011 ..................................A4288

Affidavit of Service of Order To Show Cause for a Temporary Restraining Order and
Preliminary Injunction on Stratus Consulting, Inc., dated February 3, 2011 ..............A4289

Declaration Regarding Service of Summons and Complaint and Papers in Support of
Chevron's Application by Order to Show Cause for a Temporary Restraining Order
and Preliminary Injunction, dated February 8, 2011 ...................................................A4290

Memorandum of Law Of Defendants Hugo Gerado Camacho Naranjo and Javier
Piaguaje Payaguaje in Opposition to Plaintiff Chevron Corporation's Application by
Order to Show Cause for a Temporary Restraining Order and Preliminary Injunctive
Relief, filed February 8, 2011 ......................................................................................A4298

Certification of Sheldon Elsen in Support of Ecuadorian Plaintiffs' Memorandum of
Law in Opposition to Order to Show Cause Why a Temporary Restraining Order and
Preliminary Injunction Should Not be Entered, dated February 8, 2011 ....................A4376

Exhibit B (1 - 2) to the Elsen Certification - Chevron's Appellee Brief,
filed in the Court of Appeals for the Second Circuit, dated December 20,
2001....................................................................................................A4383

Exhibit C to the Elsen Certification - Affidavit of Dr. Alejandro Ponce
Martinez, dated February 9, 2000 ...............................................................A4489

Exhibit D to the Elsen Certification - Affidavit of Dr. Rodrigo Perez
Pallares, dated December 1, 1995................................................................A4493

Exhibit E to the Elsen Certification - Affidavit of Dr. Enrique Ponce y
Carbo, dated December 7, 1995...................................................................A4495

Exhibit F to the Elsen Certification - Affidavit of Vincente Bermeo Lanas, dated December 11, 1995 ................................................................................................A4502

Exhibit G to the Elsen Certification - Texaco's Memorandum of Law in Support of its Renewed Motions to Dismiss based on Forum Non Conveniens and International Comity, dated January 11, 1999 ....................................A4506

Exhibit H to the Elsen Certification - Texaco's Reply Memorandum of Law in Support of Renewed Motions to Dismiss based on Forum Non Conveniens and International Comity, dated January 25, 1999 ....................................A4587

Exhibit I to the Elsen Certification - Texaco's Objections and Responses to Plaintiffs' Interrogatories Regarding Proposed Alternative Fora, dated December 28, 1998 ..........................................................................................A4632

Exhibit J to the Elsen Certification - Website printout of U.S. Department of State's Country Report on Human Rights Practices in Ecuador, dated February 23, 2011 ............................................................................................A4642

Exhibit K to the Elsen Certification - Texaco's Appendix of Affidavits, Documents and Other Authorities in Support of Motion to Dismiss, dated January 11, 1999 ..............................................................................................A4654

Exhibit M to the Elsen Certification - Stipulation and Order dismissing the *Aguinda* and *Jota* actions, dated June 21, 2001 ..............................................A4664

Exhibit Q to the Elsen Certification - Chevron Press Release, *Chevron Calls for Dismissal of Ecuador Lawsuit*, dated October 8, 2007....................................A4667

Exhibit S to the Elsen Certification - Chevron's Notice of Arbitration, dated September 23, 2009................................................................................A4669

Exhibit T to the Elsen Certification - Website printout of a Global Post Article, *Chevron vs. Ecuadorian Activists*, dated May 3, 2009......................................A4690

Exhibit U to the Elsen Certification - Contract for Implementing of Environmental Remedial Work and Release from Obligation, Liability and Claims, dated May 4, 1995 ............................................................................A4694

Exhibit V to the Elsen Certification - Memorandum of Understanding Between the Government of Ecuador, PetroEcuador and Texaco Petroleum Company, dated December 16, 1994 ............................................................A4721

Exhibit W to the Elsen Certification - Ecuador Bilateral Investment Treaty signed on August 27, 1993 and entered into force on May 11, 1997 ..............................A4732

29

Exhibit Z to the Elsen Certification - Chevron's *Ex Parte* Petition and Application for Order under 28 U.S.C. § 1782 in the Matter of *In re Chevron Corp. v. Stratus Consulting, Inc., et al.*, No. 10-cv-00047, dated December 18, 2009 ...........................................................................................A4752

Exhibit AA to the Elsen Certification - Hearing Transcript, *In re Application of Chevron Corporation, Ricardo Reis Veiga and Rodrigo Perez Pallares v. Joseph Kohn*, No. 10-4699-cv, dated December 17, 2010 ................A4755

Exhibit BB to the Elsen Certification - Declaration of Pablo Fajardo Mendoza, dated May 5, 2010...........................................................................A4932

Exhibit CC to the Elsen Certification - Chevron's Motion for Terminating Sanctions, filed in the Provincial Court of Justice of Sucumbíos, Ecuador ...................A4940

Exhibit DD to the Elsen Certification - Excerpt from Vol. I of Ecuadorian Plaintiffs' Joint Appendix in *In re Application of Chevron Corp., Ricardo Reis Veiga and Rodrigo Perez Pallares v. Steven Donziger*, No. 10-4341-cv (2d Cir.)...........................................................................................................A4978

Exhibit FF to the Elsen Certification - Ecuadorian Plaintiffs' Brief filed with the Provincial Court of Justice of Sucumbíos, Ecuador, dated June 2010...................................................................................................................A4981

Exhibit GG to the Elsen Certification - Provincial Court of Justice of Sucumbíos, Ecuador Order regarding Supplemental Damages Experts Reports, dated August 2, 2010.........................................................................A4999

Exhibit HH to the Elsen Certification - Brief to Accompany Supplemental Damages Experts Reports, dated September 16, 2010 (corrected September 22, 2010) ........................................................................................A5005

Exhibit II to the Elsen Certification - Website printout of Chevron's Press Release, *Chevron Statement on Ecuador Court filings*, *available at* http://www.chevron.com/chevron/pressreleases/artcle09172010_chevronst atementonecuador (last visited Nov. 1, 2010) .................................................A5043

Exhibit JJ to the Elsen Certification - Chevron's Petition to Provincial Court of Justice of Sucumbíos, Ecuador listing Supplemental Damages Submission, dated September 16, 2010 ........................................................A5047

Exhibit LL to the Elsen Certification - Website printout of AmericanLawyer.com article, *Judge Kaplan Lays into Plaintiffs in Ecuador Suit Against Chevron*, dated November 8, 2010 ...............................A5052

Exhibit MM to the Elsen Certification - Chevron's Memorandum of Points and Authorities in Support of *Ex Parte* Motion for an Order Pursuant to 28 U.S.C. § 1782 in *In re Chevron Corp. v. Douglas Allen*, No. 10-mc-00091, dated October 22, 2010 ......................................................................................................A5055

Exhibit NN to the Elsen Certification - Website printout "*The Global Lawyer: The Mystery of the Ghostwritten Report*," by Michael Goldhaber, dated January 28, 2011, *available at* http://amlawdaily.typepad.com/amlawdaily/2011/01/globallawyerjanuary3 1.html (last visited February 3, 2011) ...........................................................................A5076

Exhibit ZZ to the Elsen Certification - Transcript of Hearing before the District Court for the Southern District of New York in *In re Application of Chevron Corp.*, No. 10-MC-00002-LAK (S.D.N.Y.), dated September 23, 2010......................................................................................................................A5079

Exhibit AAA to the Elsen Certification - Transcript of Hearing before the District Court for the Southern District of New York in *In re Application of Chevron Corp.*, No. 10-MC-00002-LAK (S.D.N.Y.), dated November 22, 2010......................................................................................................................A5157

Transcript of Oral Argument in the Matter of *Chevron v. Donziger, et al.*, Case No. 11-cv-00691 (S.D.N.Y. 2011), dated February 8, 2011 .................................................A5182

Order granting a temporary restraining order and scheduling argument on the motion for a preliminary injunction, dated February 9, 2011 ....................................................A5237

Order on Plaintiff's Motion for a Temporary Restraining Order, dated February 8, 2011 ............................................................................................A5238

Memorandum of Law Of Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje in Opposition To Preliminary Injunction, dated February 11, 2011.....................................................................................................................A5241

Order Extending Temporary Restraining Order, dated February 14, 2011 ................................A5261

Order Denying Adjournment of Argument and Evidentiary Hearing, dated February 14, 2011.................................................................................................................A5262

Chevron's Reply Brief in Further Support of Preliminary Injunction, dated February 15, 2011..................................................................................................................A5263

Affidavit of Rene Enrique Recalde Mera in Support of Chevron's Application by Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, dated February 15, 2011, and a certified English translation thereof ..........................................A5310

Affidavit of Enrique Carvajal Salas in Support of Chevron's Application by Order to
Show Cause for a Temporary Restraining Order and Preliminary Injunction, dated
February 15, 2011, and a certified English translation thereof ....................................A5317

Declaration of Dr. César Coronel Jones in Support of Chevron's Application by
Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction,
dated February 14, 2011, and a certified English translation thereof ...........................A5322

Declaration of Rex J. Mitchell in Support of Chevron's Reply Brief in Further
Support of Preliminary Injunction, dated February 15, 2011 ......................................A5341

Affidavit of Ivan Alberto Racines Enrique in Support of Chevron's Application by
Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction,
dated February 14, 2011, and a certified English translation thereof ...........................A5345

Declaration of Maria Gabriela Davila Cueva in Support of Chevron's Reply Brief in
Further Support of Preliminary Injunction, dated February 15, 2011 ..........................A5352

Declaration of Pablo Salvador Defina Bucaram in Support of Chevron's Reply Brief
in Further Support of Preliminary Injunction, dated February 15, 2011 .....................A5357

Declaration of Kirsten Galler Regarding Service of Summons and Complaint by
FedEx International Priority Mail on Defendants Pablo Fajardo Mendoza, Luis
Yanza, Frente de Defensa de la Amazonia, Selva Viva, and the "Lago Agrio
Plaintiffs" in Support of Chevron's Application by Order to Show Cause for a
Temporary Restraining Order and Preliminary Injunction, dated February 15, 2011 ................A5362

Opinion/Declaration of Jan Paulsson in Support of Chevron's Application by Order
to Show Cause for a Temporary Restraining Order and Preliminary Injunction, dated
February 14, 2011 ........................................................................................A5367

Second Supplemental Declaration of Kristen L. Hendricks in Support of Chevron
Corporation's Motion for Preliminary Injunction, dated February 15, 2011 .............................A5385

    Exhibit 465 to Supplemental Hendricks Declaration - CD containing true
    and correct copies of selected excerpts from the unreleased footage from
    the movie *Crude* (disk filed with Clerk)........................................................A5407

    Exhibit 466 to Supplemental Hendricks Declaration - Copies of the
    certified transcriptions and translations of the video files contained on
    Exhibit 465...................................................................................A5415

    Exhibit 475 to Supplemental Hendricks Declaration - Document dated
    October 27, 2010 entitled, "Intercreditor Agreement (PMW)" .......................................A5439

    Exhibit 476 to Supplemental Hendricks Declaration - Document dated
    October 27, 2010 entitled, "Funding Agreement" ..................................................A5461

Exhibit 477 to Supplemental Hendricks Declaration - Document dated October 22, 2010 entitled, "Master Agreement" ............................................................A5498

Exhibit 479 to Supplemental Hendricks Declaration - Email chain dated March 11, 2008 among Pablo Fajardo, Steven Donziger, and Farihah Zaman with the subject, "PARA STEVEN" ["FOR STEVEN"], and a certified English translation thereof................................................................A5520

Exhibit 480 to Supplemental Hendricks Declaration - Declaration by Pablo Fajardo filed in *In re Application of Chevron*, No. 10-mc-00002 - LAK (S.D.N.Y.) on January 19, 2011, and a certified English translation thereof ......................................................................................................A5524

Exhibit 481 to Supplemental Hendricks Declaration - Document dated November 5, 2010 entitled, "Special Power of Attorney and Legal Mandate Authorized by Octavio Ismael Cordova Huanca and Others To: Attorney Pablo Estenio Fajardo Mendoza," and a certified English translation thereof .............................................................................A5532

Exhibit 482 to Supplemental Hendricks Declaration - Stipulation and Order, entered June 21, 2001 in Aguinda *v. Texaco Inc.*, No. 93 CIV. 7527 (JSR) and *Jota v. Texaco Inc.*, No. 94 CIV. 9266 (JSR) (S.D.N.Y.)..............................A5696

Exhibit 483 to Supplemental Hendricks Declaration – Email from S. Donziger to Andres Snaider, dated October 19, 2007 ....................................................A5700

Exhibit 484 to Supplemental Hendricks Declaration - Texaco Inc.'s Appendix of Affidavits, Documents and Other Authorities, and its 1999 Notice of Agreements, filed in support of Texaco Inc.'s Motion to Dismiss Based on *Forum Non Conveniens* and International Comity in *Aguinda v. Texaco Inc*., No. 93 CIV. 7527 (JSR) (S.D.N.Y.) ...........................................................A5705

Exhibit 486 to Supplemental Hendricks Declaration - Order for Interim Measures from the Permanent Court of Arbitration in the matter of PCA Case No. 2009 - 23, *Chevron Corp. v. Republic of Ecuador*, dated February 9, 2011 ..........................................................................................................A5717

Exhibit 488 to Supplemental Hendricks Declaration - Undated draft Co - counseling Agreement from Jonathan Abady of Emery Celli Brinckerhoff & Abady LLP to Steven Donziger and Joseph Kohn .....................................................A5722

Exhibit 490 to Supplemental Hendricks Declaration - Email dated January 7, 2010 from Elora Mukherjee to C. MacNeil Mitchell and Eric Bloom, copying Steven Donziger and others, with the subject, "Aguinda Petition" ..................A5727

Exhibit 491 to Supplemental Hendricks Declaration - Email dated January 12, 2010 from Steven Donziger to Ilann Maazel, Jonathan Abady and Elora Mukherjee with the subject "authorization from Pablo," and a certified English translation thereof ................................................................................A5729

Exhibit 492 to Supplemental Hendricks Declaration - Email dated October 27, 2008 from Joe Berlinger to Steven Donziger with the subject "Film Notes" ............................................................................................................................A5735

Exhibit 494 to Supplemental Hendricks Declaration - Singapore Rules of Court Order 29 – 2 ..................................................................................................A5745

Exhibit 495 to Supplemental Hendricks Declaration - Portions of a book entitled "*Enforcement of Foreign Judgments*," edited by Dennis Campbell...................A5747

Exhibit 496 to Supplemental Hendricks Declaration - Article entitled "*Bucaram acusó a Mera de tráfico de influencias en caso de la Cervecería Nacional*" ["*Bucaram accuses Mera of influence peddling in Cervecería Nacional case*"], ECUADOR EN VIVO, dated February 10, 2011, and a certified English translation thereof ................................................................................A5750

Exhibit 497 to Supplemental Hendricks Declaration - Article entitled "*Metiendo mano*" ["Getting hands on"] by Gonzalo Ruiz Álvarez, EL COMERCIO, dated February 11, 2011, and a certified English translation thereof ................................................................................................................A5756

Exhibit 498 to Supplemental Hendricks Declaration - Article entitled "*Una amenaza a las petroleras foráneas*" ["Foreign companies threatened"] EL COMERCIO, dated June 21, 2009, and a certification translation thereof ................................................................................................A5761

Exhibit 499 to Supplemental Hendricks Declaration - Article entitled "*Ecuador to denounce remaining BITS*," GLOBAL ARBITRATION REVIEW, dated October 30, 2009, *available at* http://www.globalarbitrationreview.com/news/article/19251/ecuador - denounce remaining - bits ................................................................................A5766

Exhibit 500 to Supplemental Hendricks Declaration - Article entitled "*Ecuador terminates BITs with eight LatAm states*," GLOBAL ARBITRATION REVIEW, dated November 5, 2008, *available at* http://www.globalarbitrationreview.com/news/article/14919/ecuadortermi nates - bits - eight - latam - states/ ................................................................................A5769

Exhibit 501 to Supplemental Hendricks Declaration - Article entitled "*Ecuador: Investor Concern Grows, Perenco threatens to leave Ecuador as the government plans to raise corporate taxes*," LATIN BUSINESS CHRONICLE, dated July 14, 2009, *available at* http://www.latinbusinesschronicle.com/app/article.aspx?id=3552 ................................A5772

34

Exhibit 502 to Supplemental Hendricks Declaration - Article entitled "*Perenco and Conoco threaten to suspend Ecuador Operations*," GLOBAL ARBITRATION REVIEW, dated July 15, 2009 ...........................................A5775

Exhibit 504 to Supplemental Hendricks Declaration - Article by Daniel Cancel entitled "*Ecuador Likely Will Appeal Chevron Court Ruling, Barclays Says*," BLOOMBERG.COM, dated March 31, 2010 .......................................A5779

Exhibit 506 to Supplemental Hendricks Declaration - Affidavit of Doctor César Coronel Jones in Support of Chevron's Application by Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, dated September 1, 2010, and a certified English translation thereof .........................................................................................................................A5781

Exhibit 507 to Supplemental Hendricks Declaration - Courthouse News Service article dated February 1, 2011 entitled, "*Chevron Levels RICO Charges Over $113 Billion Trial in Ecuador*," by Barbara Leonard, *available at* http://www.courthousenews.com/2011/02/01/33808.html .........................A5831

Exhibit 508 to Supplemental Hendricks Declaration - El Comercio article dated February 12, 2011 entitled "*El escándalo de los cheques tumbó el fallo en la Corte Constitucional*" ["Check scandal topples a Constitutional Court ruling"], and a certified English translation thereof, *available at* http://www4.elcomercio.com/Generales/Solo                              - Texto.aspx?gn3articleID=294552 ..................................................................................A5834

Exhibit 509 to Supplemental Hendricks Declaration - La Hora article dated February 12, 2011 entitled "*Caso de la Cervecería regresó a los juzgados*" ["Cervecería Case returned to the courts"], and a certified English     translation     thereof,     *available     at* http://www.lahora.com.ec/index.php/noticias/show/1101093831/          - 1/Caso_de_Cervecería_regresó_a_los_juzgados.html ......................................................A5840

Exhibit 510 to Supplemental Hendricks Declaration - Westlaw News & Insight article dated February 2, 2011 entitled "*Chevron accuses Ecuadorean plaintiffs of extortion*" ...............................................................A5847

Exhibit 511 to Supplemental Hendricks Declaration - Huffington Post article dated February 1, 2011 entitled "*Chevron Countersues Ecuador Pollution          Lawyers*,"          *available          at* http://www.huffingtonpost.com/2011/02/02/chevron                       - countersuesecuad_n_817411.html?view=screen ...........................................................A5850

Exhibit 513 to Supplemental Hendricks Declaration - Email dated March 9, 2008 from Douglas Beltman to Lorena Gamboa with the subject "questions,"         with         an         attachment         entitled "ecovalue.Annex.formatted.english.doc" .......................................................................A5853

Exhibit 514 to Supplemental Hendricks Declaration - El Comercio article dated February 13, 2011 entitled "*2 fallos internacionales a favor de la Chevron*" ["Two international rulings in favor of Chevron"], and a certified English translation thereof ............................................................... A5857

Exhibit 515 to Hendricks Supplemental Declaration - Excerpts from Provincial Court of Justice of Sucumbíos, Ecuador filing by Pablo Fajardo, and accompanying certified English translation ................................................. A5864

Exhibit 516 to Supplemental Hendricks Declaration - PR Newswire dated February 2, 2011 entitled "A*mazon Defense Coalition: Scientific Evidence Will Triumph Over Chevron's Intimidation Tactics in Ecuador, Say Plaintiffs*," available at http://beforeitsnews.com/story/391/843/scientific_Evidence_Will_Triumph_Chevron_s_Intimidation_Tactics_in_Ecuador,_Say_Plaintiffs.html ......................... A5892

Exhibit 519 to Supplemental Hendricks Declaration - Email dated July 2, 2008 from Steven Donziger to Joseph Kohn with the subject "big meeting today" ................................................................................................................... A5895

Exhibit 523 to Supplemental Hendricks Declaration - Email dated May 28, 2007 from William Powers to Steven Donziger and others with the subject, "FOE is on our team RE: exxon valdez 30x" ..................................... A5903

Exhibit 525 to Supplemental Hendricks Declaration - Email chain dated January 17, 2008 between "Russ" and Steven Donziger with the subject, "update on Ecuador" ............................................................................................ A5906

Exhibit 527 to Supplemental Hendricks Declaration - Email chain dated May 21, 2010 among Steven Donziger, Ilann Maazel, and others with the subject, "Plaintiffs' Response To Stratus Status Report" ................................. A5910

Exhibit 528 to Supplemental Hendricks Declaration - Email chain dated April 2, 2008 among Pablo Fajardo, Steven Donziger, Luis Yanza, and others with the subject, "lo mas pronto possible" ["as soon as possible"], and a certified English translation thereof ..................................................... A5914

Exhibit 529 to Supplemental Hendricks Declaration - Email chain dated June 20, 2008 among Steven Donziger, Pablo Fajardo, and Luis Yanza with the subject, "CORREA ISSUES" .......................................................... A5920

Exhibit 531 to Supplemental Hendricks Declaration - Email dated August 1, 2008 from Douglas Beltman to Pablo Fajardo and Steven Donziger with the subject, "Plan de Trabajo – Texpet cleanup" ............................................ A5926

Exhibit 533 to Supplemental Hendricks Declaration - Excerpt of a report entitled, "2011 Country Scorebook," by Millennium Challenge Corporation ...................................................................................................... A5929

Exhibit 536 to Supplemental Hendricks Declaration - Graph entitled "Rule of Law (2009)," from a publication entitled "The Worldwide Governance Indicators: Methodology and Analytical Issues," by Kaufmann D., A. Kraay, and M. Mastruzzi ............................................................................................A5932

Exhibit 537 to Supplemental Hendricks Declaration - Undated Radio Sucumbíos article entitled "*Abogados de Chevron demandaron a campesinos y abogados demandantes*" ["Chevron Attorneys Sue Peasants and Plaintiffs' Attorneys"], and a certified English translation thereof..........................A5934

Exhibit 538 to Supplemental Hendricks Declaration - Undated Dow Jones article entitled "*Ecuador President Seeks to End Investment Protection Agreements*," by Mercedes Alvaro ...............................................................................A5940

Exhibit 540 to Supplemental Hendricks Declaration - Email dated March 14, 2008 from Steven Donziger to G. Heredia, Luis Yanza, Pablo Fajardo, Julio Prieto, Juan Pablo Saenz and others with the subject "BUENAS NOTICIAS!" ["GOOD NEWS!"], and a certified translation thereof ...........................A5942

Exhibit 542 to Supplemental Hendricks Declaration - Email dated August 11, 2008 from Steven Donziger to Pablo Fajardo, Luis Yanza, and others with the subject, "problema" ["problem"], and a certified English translation thereof .......................................................................................................A5948

Exhibit 547 to Supplemental Hendricks Declaration - CD containing selected excerpts from the unreleased footage from the movie Crude (disk filed with Clerk)....................................................................................................A5951A

Exhibit 548 to Supplemental Hendricks Declaration - certified transcriptions and translations of the video files contained on Exhibit 547 ...................A5952

Exhibit 552 to Supplemental Hendricks Declaration - Transcript of excerpts from the deposition of Steven Donziger taken on December 23, 2010, January 18, 2011, January 19, 2011, January 29, 2011, and January 31, 2011 in *In re Application of Chevron*, No. 10-mc-00002-LAK (S.D.N.Y.), excerpts from the unreleased footage from the movie *Crude*, and excerpts from the deposition of Charles W. Calmbacher, taken on March 29, 2010 in *In re Application of Chevron Corp.*, 10-MI-0076-TWT - GGB (N.D. Ga.)...........................................................................................A5961

Exhibit 558 to Supplemental Hendricks Declaration - Portions of the transcript of the deposition of Ann Maest taken on January 19, 2011 and January 20, 2011 in *Chevron Corp. v. Stratus Consulting* No. 10-cv-00047-MSK-MEH (D. Colo.)........................................................................A5989

Exhibit 559 to Supplemental Hendricks Declaration - Portions of the transcript of the deposition of Daniel Lee Rourke, taken on December 20, 2010, in *Chevron Corp. v. Rourke*, No. 10-cv-02989 - AW (D. Md.)............................A6012

Exhibit 560 to Supplemental Hendricks Declaration - Portions of the transcript of the deposition of Douglas C. Allen, taken on December 16, 2010, in *Application of Chevron Corp. v. Allen*, 10-mc-00091 - WKS (D. Vt.) .................................................................................................................A6020

Exhibit 561 to Supplemental Hendricks Declaration – Portions of the transcript of the deposition of Jonathan Shefftz taken on December 16, 2010 in *Chevron Corp. v. Shefftz*, No. 10-mc-10352 - JFT (D. Mass.).........................A6025

Exhibit 563 to Supplemental Hendricks Declaration - Wolters Kluwer article dated February 15, 2011 entitled "*Plaintiffs' Lawyer Pablo Fajardo Discusses Chevron Ecuador Judgment*," by Roger Alford, *available at* http://kluwerarbitrationblog.com/blog/2011/02/15/plaintiffs - lawyer - pablo - fajardo discusses - chevron - ecuador - judgment/ ...........................................A6031

Letter addressed to Judge Lewis A. Kaplan from John Clopper, dated February 15, 2011, with the subject, "The Department of State does not have any specific comment at this time regarding plaintiff's pending motion for a preliminary injunction and relations between the US and Ecuador ...............................................A6034

Transcript of Oral Argument in the Matter of *Chevron v. Donziger, et al.*, Case No. 11-cv-00691 (S.D.N.Y.), dated February 18, 2011 ....................................................A6035

Declaration of Alejandro Garro in Support of Donziger's Opposition to Preliminary Injunction, dated February 24, 2011 .......................................................................A6119

Exhibit A to the Garro Declaration – Garro Resume......................................A6127

Affidavit of Farith Ricardo Simon in Support of Ecuadorian Plaintiffs' Opposition to Preliminary Injunction, dated February 24, 2011 ........................................................A6141

Affidavit of César Coronel Jones in Support of Chevron's Order to Show Cause for Preliminary Injunction, dated February 24, 2011 .......................................................A6153

Appendix Tabs 1 through 10 in support of the Affidavit of Dr. Cesar Coronel Jones Regarding Appellate Remedies and Judgment Enforcement in Ecuador, dated February 24, 2011 Order granting in part and denying in part Chevron Corporation's motion for preliminary injunction, dated March 7, 2011.............................................A6186

Exhibit 1 to Declaration of Elliot R. Peters in Support of Donziger's Memorandum in Opposition to Preliminary Injunction and Objection to Court's Closure of Record, dated February 25, 2011 - Letter from John W. Keker to the Honorable Lewis A. Kaplan, dated February 17, 2011.................................................................................A6313

Exhibit 3 to the Peters Declaration - Expert Statement on Foreign law by Genaro Eguiguren, and accompanying certified English translation, dated January 30, 2008 ................A6319

Exhibit 4 to the Peters Declaration - Rebuttal Expert Statement by Genaro Eguiguren, and accompanying certified English translation, dated May 9, 2008 .......................A6347

Exhibit 5 to the Peters Declaration - Expert Report of Dr. Alicia Arias Salgado, dated September 22, 2008 .................................................................................................A6532

Exhibit 6 to the Peters Declaration - Supplemental Expert Report of Dr. Alicia Arias Salgado, dated January 26, 2009...........................................................................A6589

Exhibit 7 to the Peters Declaration - Expert Statement of Marco Vinicio Albuja Martinez, dated January 30, 2008 ...............................................................A6607

Exhibit 8 to the Peters Declaration - Rebuttal Expert Statement of Marco Vinicio Albuja Martinez, dated May 9, 2008 .......................................................A6620

Exhibit 9 to the Peters Declaration - Third Expert Report of Dr. Marco Vinicio Albuja Martinez, dated January 26, 2009 ................................................A6633

Exhibit 11 to the Peters Declaration - Letter from Steven R. Donziger to Honorable Lewis A. Kaplan, dated February 8, 2011 ................................................A6653

Exhibit 12 to the Peters Declaration - Final Legal Argument filed in the Provincial Court of Justice of Sucumbíos, Ecuador in *Aguinda v. Chevron Corp.*, dated February 1, 2011 ...........................................................................................A6658

Exhibit 13 to the Peters Declaration - Memorandum in Support of *Ex Parte* Application for an Order under 28 U.S.C. § 1782 for the Issuance of a Subpoena to Diego Borja, filed by Winston and Strawn in *In re Application of Republic of Ecuador*, No.-cv-- 10 - 80225 MISC (N.D. Cal.), dated September 10, 2010 ...........................A6852

Exhibit 14 to the Peters Declaration - Criminal Indictment of Several Chevron Employees by the First Criminal Division of the National Court of Justice in Ecuador, dated April 29, 2010, and accompanying certified English translation .......................A6877

Exhibit 15 to the Peters Declaration - Excerpts describing Criminal Indictment filed by Republic of Ecuador in BIT Arbitration ............................................................A7146

Exhibit 16 to the Peters Declaration - Unofficial translation of Contract between Texaco Petroleum Company and the Fourth Army Division "Amazonas" for the building of a corporate lodging on military base RAYO - IV, dated March 26, 2004 ...............A7160

Exhibit 17 to the Peters Declaration - Certified English Translation Ecuadorian Ministry of National Defense Report, attaching confidential affidavits submitted by Major I Arturo Velasco C., Sub - Commander of Special Forces, and Col. of E.M.C. Miguel Fuertes Ruiz, Commander of 19 - BS, summarizing the Guanta station incident, dated February 3, 2006...................................................................................A7165

Exhibit 22 to the Peters Declaration - Chevron Corporation's 2009 Annual Financial Report, *available at* http://www.chevron.com/annualreport/2009/documents/pdf/ ...................A7181

Exhibit 30 to the Peters Declaration - Website printout of the 2001 Transparency International Corruption Perceptions Index, *available at* http://www.transparency.org/layout/set/print/policy_research/surveys_indices/cpi/2001...............................................................................................................................A7274

Exhibit 31 to the Peters Declaration - Website printout of the 2010 Transparency international Corruption Perceptions Index, *available at* http://www.transparency.org/policy_research/surveys_indices/cpi/2010/results........................A7280

Exhibit 32 to the Peters Declaration - Translation of the Provincial Court of Justice of Sucumbíos, Ecuador Judgment in *Aguinda v. Chevron Corp.*, dated February 14, 2011...............................................................................................................................A7293

Exhibit 33 to the Peters Declaration - Transcript of Hearing before the District Court for the Southern District of New York in *Chevron Corp. v. Steven Donziger, et al.*, dated April 30, 2011 ...............................................................................................A7483

Donziger's Memo of Law in Opposition to Chevron's Motion for Preliminary Injunction, dated February 25, 2011 ............................................................................A7534

Declaration of Elliot Peters in support of Donziger's Opposition to Chevron's Motion for Preliminary Injunction, dated February 25, 2011 ................................................A7576

Exhibit 18 to the Peters Declaration - Affidavits relating to the Ecuadorian justice systems that Chevron has submitted to this Court...............................................A7582

Exhibit 24 to the Peters Declaration - Affidavit of Dr. Alejandro Ponce Martinez, dated February 9, 2000 ..................................................................................A7608

Letter to Judge Lewis A. Kaplan from Elliot Peters, dated February 28, 2011..........................A7613

Donziger's Notice of Application to Transfer Case, dated February 28, 2011 ..........................A7616

Donziger's Application for Transfer of Case, dated February 28, 2011 .....................................A7618

Declaration of Elliot Peters in support of Donziger's Motion to Transfer, dated February 28, 2011 ...................................................................................................A7642

Exhibit A to the Peters Declaration - Civil Cover Sheet filed on February 1, 2011 by Chevron Corporation in this matter ...............................................................A7645

Exhibit B to the Peters Declaration - Chevron Corporation's Related Case Explanation (Local Rule 1.6), dated February 1, 2011.....................................................A7648

40

Declaration of Juan Pablo Sáenz in Support of Ecuadorian Plaintiffs' Memorandum of Law in Support Motion to Increase Bond on Short Notice, dated February 28, 2011...............................................................................................................A7653

Exhibit 1 to the Sáenz Declaration - CD ROM of Escobar/Borja Skype Conversation (disk filed with Clerk)................................................................A7696

Exhibit 2 to the Sáenz Declaration - Transcript Excerpts of Escobar/Borja Skype Conversation .......................................................................................A7697

Exhibit 3 to the Sáenz Declaration - Relevant pages of the Republic of Ecuador's Memorandum of Law, filed in *In re* The *Republic of Ecuador v. Borja*, No.-cv-10 - 80225 MISC EMC, Dkt. 2 (N.D. Cal. Sept. 10, 2010) ....................A7710

Exhibit 4 to the Sáenz Declaration - Memorandum from R.C. Shields to Mr. Crawford, dated July 17, 1972 ...............................................................A7714

Exhibit 14 to the Sáenz Declaration - Website printout of the 2001 Transparency International Corruption Perceptions Index ...............................A7715A

Exhibit 15 to the Sáenz Declaration - Website printout of Transparency International's 2010 Corruption Perceptions Index.........................................A7715H

Exhibit 16 to the Sáenz Declaration - Website printout of the Fiscal Year 2001 Ecuador Country Commercial Guide published by the U.S. and Foreign Commercial Service and U.S. Department of State ...........................A7716

Exhibit 17 to the Sáenz Declaration - Website printout of the U.S. Department of State 2010 Investment Climate Statement on Ecuador...........................A7726

Exhibit 18 to the Sáenz Declaration - Letter from Sens. Barack Obama & Patrick Leahy to U.S. Trade Rep. Rob Portman, dated February 2, 2006......................A7739

Exhibit 19 to the Sáenz Declaration - Website printout of an article by Michael Isikoff, *A $16 Billion Problem: Chevron hires lobbyists to squeeze Ecuador in toxic - dumping case. What Obama win could mean*, NEWSWEEK, August 4, 2008, available at http://www.newsweek.com/2008/07/25/a - 16 - billion - problem.print.html ...........................................................................................A7742

Exhibit 20 to the Sáenz Declaration - Internal Texaco facsimile from Mike Kestiw to York LaCorgne, Ricardo Veiga, and Mike Trovino, dated December 6, 1993 ...............................................................................................A7745

Exhibit 21 to the Sáenz Declaration - Unofficial translation of Letter to the Department of State from the Ecuadorian Embassy, dated December 3, 1993.......................................................................................................................A7749

Exhibit 22 to the Sáenz Declaration - Excerpts of Deposition Transcript of Ricardo Reis Vega, dated November 8, 2006 in *Republic of Ecuador, et al. v. Chevron Corp.*, 04-cv-8378 --LBS (S.D.N.Y.)............................................................A7756

Exhibit 23 to the Sáenz Declaration - Memorandum of Holwill & Company, dated January 18, 1994................................................................A7760

Exhibit 24 to the Sáenz Declaration - Memorandum of Holwill & Company, dated August 17, 1993................................................................A7762

Exhibit 25 to the Sáenz Declaration - Memorandum of Holwill & Company, dated August 17, 1993................................................................A7765

Exhibit 26 to the Sáenz Declaration - Sworn Affidavit of Dr. Jaime Espinosa Ramírez, dated February 28, 2000 ..................................................A7768

Exhibit 29 to the Sáenz Declaration - Untranslated Letter from the Inter - American Commission on Human Rights regarding Precautionary Measures for the protection of Alejandro Ponce Villacis and others, dated December 22, 2005 (translated version of this document will be provided to the Court *post haste*)......................................................................A7771

Exhibit 30 to the Sáenz Declaration - Untranslated Letter from the United Nations Commission on Human Rights regarding Precautionary Measures, dated November 17, 2005 (translated version of this document will be provided to the Court *post haste*)......................................................A7774

Exhibit 31 to the Sáenz Declaration - Chevron's 11H30M filing with the Superior Court of Justice, Nueva Loja, Ecuador, dated November 5, 2003....................A7778

Exhibit 33 to the Sáenz Declaration - Chevron's 17H40M filing with the Superior Court of Justice, Nueva Loja, Ecuador, dated August 16, 2006 ......................A7785

Exhibit 34 to the Sáenz Declaration - Chevron's filing with the Superior Court of Justice, Nueva Loja, Ecuador, dated August 25, 2006......................................A7800

Exhibit 35 to the Sáenz Declaration - Provincial Court of Justice of Sucumbíos, Ecuador's Appointment of Expert José René López Chávez, dated December 10, 2009 ............................................................................A7824

Exhibit 36 to the Sáenz Declaration - Expert José René López Chávez's Activities and Chronology of Work filed with the Provincial Court of Justice, Sucumbíos, Ecuador................................................................A7828

Exhibit 37 to the Sáenz Declaration - Relevant pages of the Order of Provincial Court of Justice of Sucumbíos, Ecuador, dated January 5, 2010 ..................A7850

Exhibit 38 to the Sáenz Declaration - Chevron's 11H47M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated January 8, 2010 ..................A7854

Exhibit 40 to the Sáenz Declaration - Chevron's 15H35M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated February 22, 2010......................................................................................................................A7860

Exhibit 41 to the Sáenz Declaration - Relevant pages of and Order of Provincial Court of Justice of Sucumbíos, Ecuador, dated February 2, 2010......................................................................................................................A7871

Exhibit 42 to the Sáenz Declaration - Chevron's 16H55M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated January 25, 2010......................................................................................................................A7879

Exhibit 43 to the Sáenz Declaration - Order of Provincial Court of Justice of Sucumbíos, Ecuador, dated March 23, 2010 ...............................................A7890

Exhibit 44 to the Sáenz Declaration - Chevron's 15H22M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated March 30, 2010 ..................A7894

Exhibit 45 to the Sáenz Declaration - Expert José René López Chávez's 09H39M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated March 24, 2010 .......................................................................A7900

Exhibit 46 to the Sáenz Declaration - Expert José René López Chávez's 08H58M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated April 7, 2010 ...........................................................................A7906

Exhibit 47 to the Sáenz Declaration - Expert José René López Chávez's 09H39M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated April 14, 2010 .........................................................................A7910

Exhibit 48 to the Sáenz Declaration - Expert Marcelo Muñoz's 15H50M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated June 3, 2010 .........................................................................................A7916

Exhibit 49 to the Sáenz Declaration - Expert Marcelo Muñoz's 16H18M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated October 29, 2010...............................................................................A7920

Exhibit 50 to the Sáenz Declaration - Order of Provincial Court of Justice of Sucumbíos, Ecuador, dated October 11, 2010............................................A7926

Exhibit 51 to the Sáenz Declaration - Article by Mary Cuddehe titled "*A Spy in the Jungle*," THE ATLANTIC MAGAZINE, dated August 2010................................A7941

Exhibit 52 to the Sáenz Declaration - Chevron's 17H17M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated October 14, 2010.................................................................................................................A7946

Exhibit 53 to the Sáenz Declaration - Chevron's 17H18M filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated October 14, 2010; Chevron's 17H39M filing, dated October 14, 2010; Chevron's 17H43M filing, dated October 14, 2010; and Chevron's 17H44M filing, dated October 14, 2010 ................................................................................A7955

Exhibit 54 to the Sáenz Declaration - Certified translation of Chevron filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated December 20, 2010 .........................................................................................A7967

Exhibit 55 to the Sáenz Declaration - Certified translation of Chevron filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated December 22, 2010 .........................................................................................A7987

Exhibit 56 to the Sáenz Declaration - Advertisement in "El Universo," an Ecuadorian Newspaper, dated July 3, 2007 ....................................................A8043

Exhibit 57 to the Sáenz Declaration - Advertisement in "El Comercio," an Ecuadorian Newspaper, dated July 3, 2007 ....................................................A8047

Exhibit 58 to the Sáenz Declaration - Advertisement in "La Hora El País," an Ecuadorian Newspaper, dated July 3, 2007 ...............................................A8052

Exhibit 59 to the Sáenz Declaration - Translated Declaration of Dr. Juan Pablo Albán Alencastro, dated February 16, 2011 ...........................................A8056

Exhibit 60 to the Sáenz Declaration - Translated Declaration of Dr. Farith Ricardo Simon Affidavit, dated February 16, 2011.........................................A8072

Exhibit 61 to the Sáenz Declaration - Certified English translation of letter from expert Dr. Marcelo Muñoz Herrería to the Provincial Court of Justice of Sucumbíos, dated October 29, 2010 ..........................................................A8080

Exhibit 62 to the Sáenz Declaration - Final Compliance Document of the Contract for Implementing of [sic] Environmental Remedial Work and Release from Obligations, Liability and Claims, entered into among the Government of Ecuador, represented by the Ministry of Energy and Mines, Petroecuador, and Texaco Petroleum Company, dated September 30, 1998...........................................................................................................A8086

Exhibit 63 to the Sáenz Declaration - Texaco's Draft Memorandum of Understanding Among the Ecuadorian State, Petroecuador, and Texaco Petroleum Company...........................................................................................A8097

Exhibit 64 to the Sáenz Declaration - Letter from National Executive Director of the Ecuadorian Foundation for the Preservation of Nature, dated October 20, 1994 ................................................................................A8107

Exhibit 65 to the Sáenz Declaration - Certified English translation of the Republic of Ecuador, Ministry of Energy and Mines Final Memorandum of Understanding between [sic] the Government of Ecuador, Petroecuador and Texaco Petroleum Company, dated December 14, 1994 ...........................................A8111

Exhibit 66 to the Sáenz Declaration - Website printout of *Chevron Looks for Home - Field Advantage In Ecuador Fight*, WALL STREET JOURNAL, dated July 20, 2009, *available at* http://blogs.wsj.com/law/2009/07/20/chevron - looks - for - home - field - advantage - in - ecuador - fight/ .................................................................................A8117

Exhibit 67 to the Sáenz Declaration - Website printout of *Chevron vs. Ecuadorean Activists*, by John Otis, THE GLOBAL POST, dated May 3, 2009, *available at* http://www.globalpost.com/dispatch/the - americas/090429/chevron - ecuador?page=0,2# ...........................................A8119

Exhibit 68 to the Sáenz Declaration - Website printout of a Chevron Press Release *Illegitimate Judgment Against Chevron in Ecuador Lawsuit*, dated February 14, 2011, *available at* http://www.chevron.com/chevron/pressreleases /article/02142011_illegitimatejudgmentagainstchevroninecuadorlawsuit.ne ws ...............................................................................................................................A8125

Exhibit 69 to the Sáenz Declaration - Website printout of an article, *Ecuador Judge Orders Chevron to Pay $9 Billion*, by Simon Romero and Clifford Krauss, NY TIMES, dated February 14, 2011, *available at* http://www.nytimes.com/2011/02/15/ world/americas/15ecuador.html?partner=rss&emc=rss ...................................................A8127

Exhibit 70 to the Sáenz Declaration - Website printout of Linkedin profile page for Alfredo Guerrero, indicating that he has been employed by Chevron - Texaco since 1980 in various positions: Private Consultant, Operations Representative and Engineer, and Production Foreman and Engineer ........................................................................................................................A8132

Exhibit 71 to the Sáenz Declaration - English translation of the charging document for indictment of Rodrigo Perez Pallares and Ricardo Reis Veiga ...............................................................................................................................A8135

Exhibit 72 to the Sáenz Declaration - Ecuadorian Plaintiffs' Alegato Final Filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated January 17, 2011 ...........................................................................................................A8271

Exhibit 73 to the Sáenz Declaration - Ecuadorian Plaintiffs' Alegato Final Filing with the Provincial Court of Justice of Sucumbíos, Ecuador, dated February 1, 2011 ................................................................................A8390

Exhibit D to Declaration of Elliot R. Peters in Support of Donziger's Application for Transfer of Case as Related to *Aguinda, et al. v. Texaco, et al.*, No. 93-cv-07527 JSR, Pursuant to Rule 15 of the Division of Business Among District Judges, Southern District, dated February 28, 2011 - Transcript of Hearing before District Court for Southern District of New York in *In re Application of Rodrigo Perez Pallares*, No. 10-MC-00002-LAK (S.D.N.Y.), dated July 19, 2010 ..........................................A8468

Exhibit F to the Peters Declaration - Order entered in *In re Application of Chevron Corp.*, No. 10-MC-00002-LAK (S.D.N.Y.), dated August 24, 2010 ........................................A8493

Exhibit G to the Peters Declaration - Memorandum Opinion in *In re Application of Chevron Corp.*, No. 10-MC-00002-LAK (S.D.N.Y.), dated November 29, 2010 .....................A8495

Exhibit I to the Peters Declaration - Opinion in *In re Application of Chevron Corp.*, No. 10-MC-00002-LAK (S.D.N.Y.), dated November 4, 2010 ...................................................A8528

Exhibit J to the Peters Declaration - Memorandum and Order in *In re Application of Chevron Corp.*, No. 10-MC-00002-LAK (S.D.N.Y.), dated October 20, 2010 ........................A8583

Exhibit K to the Peters Declaration - Excerpts of Transcripts of Deposition of Steven R. Donziger, in *In re Application of Chevron Corp.*, No. 10-MC-00002-LAK (S.D.N.Y.), between November 29, 2010 and January 31, 2011 ................................................A8593

Exhibit 5 to Declaration of Kristen L. Hendricks in Support of Chevron Corporation's Opposition to the Motion to Admit John W. Keker Pro Hac Vice, dated March 5, 2011 ...............................................................................................A8746

Exhibit 16 to the Hendricks Declaration - Email from Eric Westenberger to Steven Donziger, copying Edward Yennock and Eric Daleo, entitled "Ecuador Filing" (DONZ00058111), dated July 22, 2010 ........................................................................A8752

Memorandum and Order denying Motion to Transfer Case, dated March 7, 2011 ...................A8754

Order denying Motion for Leave to File Document, dated March 7, 2011 ...............................A8762

Letter to Judge Lewis A. Kaplan from Randy M. Mastro Transmitting Copy of March 4, 2011 Ruling of Ecuadorian Court, dated March 8, 2011 .............................................A8765

Order to Show Cause Why the Declaratory Judgment Claim Should Not be Bifurcated in Whole or in Part, dated March 11, 2011 ................................................................A8766

Transcript of Scheduling Conference Regarding Order to Show Cause Why the Declaratory Judgment Claim Should Not be Bifurcated in Whole or in Part in *Chevron v. Donziger, et al.*, No. 11-cv-00691 (S.D.N.Y.), dated March 15, 2011 ....................A8768

Exhibit 1 to Declaration of Elliot R. Peters in Support of Donziger's Opposition to Chevron's Motion to Bifurcate its Ninth Claim for Relief, in Whole or in Part, for Expedited Trial, and Response to March 11, 2011 Order to Show Cause, dated March 21, 2011 - Website printout of *U.S. Department of State Background Note: Ecuador*, *available at* http://state.gov/r/pa/ei/bgn/35761.htm (last visited March 16, 2011) ................................................................................................................................A8804

Exhibit 2 to the Peters Declaration - *Ecuador's U.S. Ambassador Speaks Out on Chevron Case*, NEW YORK TIMES, dated March 10, 2011, *available at* http://www.nytimes.com/gwire/2011/03/10/10greewire - ecuadors - us - ambassador - speaks - out - on - chevron - c - 86771.html?pagewanted=print .................................................A8814

Order Setting Scheduling Conference for March 30, 2011 on Chevron's Order to Show Cause Why the Declaratory Judgment Claim Should Not be Bifurcated in Whole or in Part, dated March 23, 2011 ....................................................................................A8819

Ecuadorian Plaintiffs' Notice of Appeal, dated March 24, 2011...................................................A8820A

Ecuadorian Plaintiffs' Order to Show Cause Why Proceedings and Certain Portions of the March 7, 2011 Order Should Not be Stayed Pending Appeal, dated March 29, 2011.................................................................................................................................A8821

Chevron's Pre - Conference Statement on Proposed Discovery Plans and Schedules, dated March 29, 2011 .....................................................................................................................A8823

Memorandum and Order Directing Parties to Confer Regarding Order to Show Cause Why Proceedings and Certain Portions of the March 7, 2011 Order Should Not be Stayed Pending Appeal, dated March 29, 2011 ...............................................................A8834

Transcript of Scheduling Conference in *Chevron v. Donziger, et al.*, No. 11-cv-00691 (S.D.N.Y.), dated March 30, 2011 .................................................................................A8836

Donziger's Notice of Appeal from March 7, 2011 Opinion Granting in Part and Denying in Part Chevron's Motion for Preliminary Injunction, dated April 1, 2011..................A8858A

Exhibit 1 to the Declaration of Kristen L. Hendricks In Support of Chevron Corporation's Opposition to Defendants Hugo Gerardo Camacho Naranjo's and Javier Piaguaje Payaguaje's Application by Order to Show Cause Why Proceedings and Certain Portions of the March 7, 2011 Order Should not be Stayed Pending Appeal - - - executed Funding Agreement between Treca Financial Solutions, El Frente de Defensa de la Amazonia ("FDA"), and Claimants in the Lago Agrio litigation ....................................................................................................................................A8859

Exhibit 11 to Declaration of Kristen L. Hendricks in Support of Chevron's Opposition to Ecuadorian Plaintiffs' Order to Show Cause Why Proceedings and Certain Portions of the March 7, 2011 Order Should Not be Stayed Pending Appeal, dated April 1, 2011 Letter from C. Zelaya to R. Mastro attaching proposed

Stipulation and Consent Order Regarding Preliminary Injunction, dated April 1, 2011.................................................................................................................A8863

Letter to Judge Lewis A. Kaplan from John W. Keker, dated February 17, 2011 ....................A8868

Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje response in compliance with the Court's March 29, 2011 Memorandum and Order, dated April 4, 2011 ..........................................................................................................A8873

Exhibit C to Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje's submission of the following report on their further efforts to confer with Chevron Corporation regarding the language of the preliminary injunction - [Proposed] Order Supplementing the March 7, 2011 Preliminary Injunction .............................. A8884

Memorandum and Order Denying Stay of Proceedings Pending Appeal, dated April 6, 2011................................................................................................................A8888

Order Regarding Denial of Stay of Proceedings Pending Appeal, dated April 8, 2011.............A8898

Memorandum and Opinion Granting Chevron's Motion to Bifurcate the Declaratory Judgment Claim, dated April 15, 2011 ......................................................................A8901

Scheduling Order Pursuant to Memorandum and Opinion Granting Chevron's Motion to Bifurcate the Declaratory Judgment Claim, dated April 15, 2011..............................A8923

Memorandum and Order Denying Ecuadorian Plaintiffs' Proposal to Modify Preliminary Injunction Order, dated April 18, 2011 ..................................................A8925

Order to Show Cause Why the Presiding District Judge Should Not be Recused Pursuant to 28 U.S.C. § 455(a), dated April 22, 2011 .................................................A8930

Ecuadorian Plaintiffs' Memorandum in Support of Order to Show Cause Why the Presiding District Judge Should Not be Recused Pursuant to 28 U.S.C. § 455(a), dated April 22, 2011 ..........................................................................................A8932

Affidavit of Julio C. Gomez in Support of Ecuadorian Plaintiffs' Order to Show Cause Why the Presiding District Judge Should Not be Recused Pursuant to 28 U.S.C. § 455(a), dated April 22, 2011 ........................................................................A8972

Declaration of Julio C. Gomez in Support of Ecuadorian Plaintiffs' Order to Show Cause Why the Presiding District Judge Should Not be Recused Pursuant to 28 U.S.C. § 455(a), dated April 22, 2011 ........................................................................A8981

Exhibit 1 to the Gomez Declaration - Transcript of Hearing before the Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, No. M - 19 - 111, dated April 30, 2010 .........................................................A8988

Exhibit 4 to the Gomez Declaration - Transcript of Hearing before the Honorable Lewis A. Kaplan in *In re Application of Rodrigo Perez Pallares*, No. M - 19 - 111, dated July 19, 2010.................................................A9039

Exhibit 5 to the Gomez Declaration - Transcript of Hearing before the Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, 10-mc-00002, dated November 22, 2010 .......................................A9064

Exhibit 18 to the Gomez Declaration - Order regarding Pallares & Veiga Motion to Compel Compliance and Reply Briefs Schedule in *In re Application of Chevron Corporation*, No. 10-mc-00001, dated August 24, 2010 ...................................................................................................................A9090

Exhibit 19 to the Gomez Declaration - Ecuadorian Plaintiffs' Response to Chevron's Motion to Supplement the Record in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated September 21, 2010...........................A9092

Exhibit 20 to the Gomez Declaration - Memorandum of Law in Support of Chevron Corporation's Order to Show Cause Why Leave to Supplement the Record in Opposition to the Motions to Quash or Modify Subpoenas Submitted by (1) Steven R. Donziger and (2) the Ecuadorian Plaintiffs Should Not be Granted in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated September 22, 2010 .......................................A9098

Exhibit 21 to the Gomez Declaration - Order of the Honorable Lewis A. Kaplan granting Chevron Corporation's Motion to Supplement the Record in *In re Application of Chevron Corporation*, 10-mc-00002, dated September 22, 2010 .........................................................................................A9109

Exhibit 22 to the Gomez Declaration - Ecuadorian Plaintiffs' Memorandum of Law in Support of Their Motion to Supplement the Record to Correct Erroneous and Incomplete Translation by Chevron in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated September 28, 2010 .........................................................................................A9111

Exhibit 23 to the Gomez Declaration - Memorandum and Order Denying Donziger and Lago Agrio Plaintiffs' Motion to Quash Subpoenas in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated October 20, 2010...............................................................................................................A9116

Exhibit 24 to the Gomez Declaration - Opinion Denying Donziger and Lago Agrio Plaintiffs' Motion to Quash Subpoenas in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated November 5, 2010..............................A9126

Exhibit 25 to the Gomez Declaration - Memorandum and Order of the Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated November 29, 2010.................................................A9181

Exhibit 26 to the Gomez Declaration - Order of the Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated January 10, 2011 ................................................................................A9214

Exhibit 28 to the Gomez Declaration - *Chevron Ecuador Plaintiffs Face Tough Sell in U.S.*, by D. Fisher, FORBES, dated February 15, 2011, *available at* http://blogs.forbes.com/danielfisher/2011/02/15/chevron - ecuador - plaintiffs - face - tough - sell - in - u - s/ ........................................................A9218

Exhibit 29 to the Gomez Declaration - Memorandum Opinion of the Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated September 7, 2010 ..................................................A9222

Exhibit 30 to the Gomez Declaration - Order of the Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated August 24, 2010 ......................................................................................A9251

Exhibit 31 to the Gomez Declaration - Memorandum Opinion of the Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated September 7, 2010 ..................................................A9253

Exhibit 32 to the Gomez Declaration - Opinion of the Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated November 10, 2010 ................................................................................A9282

Exhibit 33 to the Gomez Declaration - Memorandum Opinion of Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated November 30, 2010..................................................A9337

Exhibit 36 to the Gomez Declaration - Opinion of the United States Court of Appeals for the Second Circuit in *Republic of Ecuador v. Chevron Corporation,* Nos. 10 - 1020 --cv-(L) and 10 - 1026 (Con), dated March 17, 2011....................................................................................................A9370

Exhibit 37 to the Gomez Declaration - *Ecuadoreans Must Defend $18B Award at Nov. Trial*, COURTHOUSE NEWS SERVICE, dated April 18, 2011, *available at* http://www.courthousenews.com/2011/04/18/35888.htm (last visited April 18, 2011) ................................................................................A9401

Exhibit 38 to the Gomez Declaration - Transcript of Hearing before the Honorable Lewis A. Kaplan in *Chevron Corporation v. Steven Donziger, et al.*, No. 11-cv-00691, dated March 15, 2011 ............................................A9403

Exhibit 39 to the Gomez Declaration - Transcript of Hearing before the Second Circuit Court of Appeals in *Lago Agrio Plaintiffs v. Chevron,* Nos. 10 - 4341 --cv-(L), 10 - 4405 - cv(CON), dated November 15, 2010 ............................A9440

Exhibit 40 to the Gomez Declaration - Order of the Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, No. 10-mc-00002, dated September 20, 2010 ............................................................................A9471

Letter to Judge Lewis A. Kaplan from John Keker, dated April 6, 2011 ....................................A9474

Letter to Judge Lewis A. Kaplan from John Keker, dated April 22, 2011 ................................A9477

Order to Show Cause Why Steven Donziger, Law Offices of Steven Donziger, and Donziger & Associates, PLLC, Should Not be Permitted to Intervene in the Declaratory Judgment Claim Pursuant to Fed. R. Civ. P. 24, dated April 29, 2011 ..................A9479

Ecuadorian Plaintiffs' Reply Memorandum in Further Support of Order to Show Cause Why the Presiding District Judge Should Not be Recused Pursuant to 28 U.S.C. § 455(a), dated May 4, 2011 ............................................................................A9481

Exhibit A to Declaration of Julio C. Gomez in Support of Ecuadorian Plaintiffs' Reply Memorandum in Further Support of Order to Show Cause Why the Presiding District Judge Should Not be Recused Pursuant to 20 U.S.C. § 455(a), dated May 4, 2011 - Order of the Honorable Michael E. Hegarty, U.S.M.J. in *Chevron Corp. v. Stratus Consulting, Inc., et al.*, No. 10-cv-00047 (D. Colo.), dated December 1, 2010 ..............A9493

Exhibit B to the Gomez Declaration - Order of the Honorable Joe B. Brown, U.S.M.J. in *In re Application of Chevron Corporation, et al.*, No. 10-cv-00686 (D. Tenn.), dated September 21, 2010 ............................................................................A9515

Exhibit C to the Gomez Declaration - Memorandum and Order of the Honorable William K. Sessions, U.S.D.J. in *In re Application of Chevron Corporation, et al.*, No. 10-mc-91 (D.Vt.), dated December 2, 2010 ........................................................A9524

Exhibit D to the Gomez Declaration - Memorandum Opinion of the Honorable Joseph L. Tauro, U.S.D.J. in *Chevron v. Shefftz*, No. 10-mc-10352 (D. Mass.), dated December 7, 2010 ............................................................................A9544

Exhibit E to the Gomez Declaration - Order of the Honorable Karen L. Litkovitz, U.S.M.J. in *Chevron Corporation v. Barnthouse*, No. 10-mc-0053 (S.D. Ohio), dated November 26, 2010..............................................................................A9567

Exhibit F to the Gomez Declaration - Notice of Opinion submitted by Chevron Corporation in *Chevron Corporation v. The Weinberg Group*, No. 11-mc-00030 (D.D.C.), dated March 16, 2011 ............................................................................A9590

Exhibit G to the Gomez Declaration - Memorandum Decision and Order of the Honorable Lisa Margaret Smith, U.S.M.J. in *Aguinda v. Texaco, Inc.*, 93-cv-7527 (S.D.N.Y.), dated June 19, 1992 ............................................................................A9595

Exhibit H to the Gomez Declaration - Federal Rules of Appellate Procedure Rule 28(j) letter sent to the U.S. Court of Appeals for the Third Circuit on behalf of Appellees Rodrigo Perez Pallares and Ricardo Reis Veiga, in *In re Application of Chevron Corp., et al.*, No. 10 - 4699 - cv(L) and 11 - 1099 --cv-(CON), dated February 18, 2011 ......................................................................................................A9606

Exhibit I to the Gomez Declaration - Relevant portions of Appellees Rodrigo Perez Pallares and Ricardo Reis Veiga's Opposition to Appellants' Emergency Motion for a Stay Pending Appeal filed in *In re Chevron Corporation*, Nos. 10 - 4341 - cv(L); 10 - 4405 - cv(CON)(3d Cir.), dated December 1, 2010 ...........................................................A9613

Exhibit J to the Gomez Declaration - Relevant portions of the Brief of Applicants - Appellees Rodrigo Perez Pallares' and Ricardo Reis Veiga's Opposition to Appellants' Emergency Motion for a Stay Pending Appeal in *In re Chevron Corporation*, Nos. 10 - 4341 - cv(L); 10 - 4405 - cv(CON)(3d Cir.), dated February 2, 2011.........................................................................................................................A9617

Exhibit K to the Gomez Declaration - *Chevron Scrubs Lawsuit to Block Ecuador Award*, COURTHOUSE NEWS SERVICE, dated April 22, 2001, *available at* http://www.courthousenews.com/2011/04/22/36045.htm ............................................A9620

Exhibit L to the Gomez Declaration - *Chevron Ecuador Plaintiffs Face Tough Sell in U.S.*, FORBES, dated February 15, 2011, *available at* http://blogs.forbes.com/danielfisher/2011 - 02/15/chevron - ecuador - plaintiffs - face - tough - sell - in - u - s/ (last visited March 10, 2011) ...............................................A9623

Memorandum Opinion Denying Ecuadorian Plaintiffs' Motion to Recuse Presiding District Judge Pursuant to 28 U.S.C. § 455(a), dated May 9, 2011............................................A9627

Declaration of Julio C. Gomez in Support of Supplemental Memorandum of Law of Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje in Further Opposition to Chevron Corporation's Motion for Preliminary Injunction, dated March 4, 2011 (FILED UNDER SEAL)...........................................................................A9668

    Exhibit 2 to the Gomez Declaration - Email from Diego Borja counsel Michael Anderson (Arguedas, Cassman & Headley, LLP) to Chevron Corporation counsel Caroline N. Mitchell (Jones Day), dated July 9, 2009 (FILED UNDER SEAL)..................................................................................A9685

    Exhibit 3 to the Gomez Declaration - Email from Wayne Hansen to "Mr. Beard" (iri.pi@sbcgobal.net) (Chevron Corporation private investigator), dated July 14, 2009 (FILED UNDER SEAL) ...............................................A9686

    Exhibit 4 to the Gomez Declaration - Chevron Corporation "Employment Application" signed by Diego Borja, dated August 11, 2009 (FILED UNDER SEAL) ....................................................................................A9687

Exhibit 5 to the Gomez Declaration - Chevron Corporation "Employment Application" signed by Diego Borja's spouse, Sara Portilla (a/k/a Sara Wanderley), dated August 11, 2009 (FILED UNDER SEAL) .......................................A9701

Exhibit 6 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated August 13, 2009 (FILED UNDER SEAL) .................................................................................................................A9715

Exhibit 7 to the Gomez Declaration - Email from David Moyer, in - house counsel for Chevron Corporation, to other attorneys, dated August 26, 2009 (FILED UNDER SEAL) ..........................................................................A9716

Exhibit 8 to the Gomez Declaration - Email from Chevron Corporation counsel John Cline (Jones Day) to Diego Borja counsel Laurel Headley (Arguedas, Cassman & Headley, LLP), dated August 26, 2009 (FILED UNDER SEAL) ...............................................................................................A9721

Exhibit 9 to the Gomez Declaration - Email from Diego Borja counsel Laurel Headley (Arguedas, Cassman & Headley, LLP) to Chevron Corporation counsel David Moyer, dated August 27, 2009 (FILED UNDER SEAL) ...............................................................................................................A9725

Exhibit 10 to the Gomez Declaration - Copy of a payment made by Chevron Corporation to "Borja Diego," dated September 10, 2009 (FILED UNDER SEAL) ..........................................................................................A9727

Exhibit 11 to the Gomez Declaration - Email chain between Diego Borja counsel Cris Arguedas (Arguedas, Cassman & Headley, LLP) and Chevron Corporation counsel John Cline (Jones Day), dated September 15, 2009 (FILED UNDER SEAL) ...................................................................A9728

Exhibit 12 to the Gomez Declaration - Email chain between Diego Borja and others regarding "Disposal of ALL sampling and lab waste from Coca and Quito," dated September 16, 2009 (FILED UNDER SEAL) ....................................A9730

Exhibit 13 to the Gomez Declaration - Email from Chevron Corporation counsel David Moyer to Iuliana Neagu, dated September 18, 2009 (FILED UNDER SEAL) ..........................................................................................A9736

Exhibit 14 to the Gomez Declaration - Copy of invoice, dated September 18, 2009 (FILED UNDER SEAL) ...................................................................A9738

Exhibit 15 to the Gomez Declaration - Copy of non - negotiable pay record from Chevron Corporation to Sara R. Wanderley (FILED UNDER SEAL) ...............................................................................................................A9741

Exhibit 16 to the Gomez Declaration - Copy of a payment made by Chevron Corporation to "Borja Diego," dated October 8, 2009 (FILED UNDER SEAL) ................................................................................A9769

Exhibit 17 to the Gomez Declaration - Copy of an executed "Statement by Diego Borja," dated October 19, 2009 (FILED UNDER SEAL)...................................A9770

Exhibit 18 to the Gomez Declaration - Copy of a payment made by Chevron Corporation to "Borja Diego," dated November 3, 2009 (FILED UNDER SEAL) ................................................................................A9774

Exhibit 19 to the Gomez Declaration - Copy of a payment made by Chevron Corporation to "Borja Diego," dated December 7, 2009 (FILED UNDER SEAL) ................................................................................A9775

Exhibit 20 to the Gomez Declaration - Copy of a payment made by Chevron Corporation to "Borja Diego," dated January 11, 2010 (FILED UNDER SEAL) ................................................................................A9776

Exhibit 21 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated February 4, 2010 (FILED UNDER SEAL) ................................................................................A9777

Exhibit 22 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated February 26, 2010 (FILED UNDER SEAL) ................................................................................A9778

Exhibit 23 to the Gomez Declaration - Email from Chevron Corporation counsel Caroline Mitchell (Jones Day) to Diego Borja counsel Mike Anderson (Arguedas, Cassman & Headley, LLP), dated April 2, 2010 (FILED UNDER SEAL).............................................................A9779

Exhibit 24 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated April 13, 2010 (FILED UNDER SEAL) ................................................................................A9780

Exhibit 25 to the Gomez Declaration - Declaration of "Diego Borja," dated April 29, 2009 (FILED UNDER SEAL).............................................A9781

Exhibit 26 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated May 6, 2010 (FILED UNDER SEAL) ................................................................................A9784

Exhibit 27 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated June 2, 2010 (FILED UNDER SEAL) ................................................................................A9785

Exhibit 28 to the Gomez Declaration - Email chain between Arguedas attorney Mike Anderson and Chevron Corporation counsel Caroline N. Mitchell (Jones Day), dated June 7, 2010 (FILED UNDER SEAL) ...............................A9786

Exhibit 29 to the Gomez Declaration - Email chain between Chevron Corporation counsel Caroline N. Mitchell (Jones Day) and Diego Borja counsel Mike Anderson (Arguedas, Cassman & Headley, LLP), subject line "Diego's Car Bill," dated June 28, 2010 (FILED UNDER SEAL)..........................A9788

Exhibit 30 to the Gomez Declaration - "Declaration of Diego Borja," dated June 29, 2010 (FILED UNDER SEAL)...................................................................A9791

Exhibit 31 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated June 30, 2010 (FILED UNDER SEAL) .......................................................................................................A9794

Exhibit 32 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated July 7, 2010 (FILED UNDER SEAL)..................A9795

Exhibit 33 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated August 3, 2010 (FILED UNDER SEAL) .......................................................................................................A9796

Exhibit 34 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated August 3, 2010 (FILED UNDER SEAL) .......................................................................................................A9797

Exhibit 35 to the Gomez Declaration - Email from Diego Borja counsel Mike Anderson (Arguedas, Cassman & Headley, LLP) to Chevron Corporation counsel Caroline N. Mitchell (Jones Day), dated August 20, 2010 (FILED UNDER SEAL)..........................................................................A9798

Exhibit 36 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated August 24, 2010 (FILED UNDER SEAL) .......................................................................................................A9799

Exhibit 37 to the Gomez Declaration - Email chain between Diego Borja counsel Michael Anderson (Arguedas, Cassman & Headley, LLP) to Chevron Corporation counsel Caroline N. Mitchell (Jones Day), subject line "Jobs for Sara," dated August 26, 2010 (FILED UNDER SEAL) ..........................A9800

Exhibit 38 to the Gomez Declaration - Email from Chevron Corporation counsel Caroline N. Mitchell (Jones Day) to Diego Borja counsel Mike Anderson (Arguedas, Cassman & Headley, LLP), subject line "Job in Houston," dated August 26, 2010 (FILED UNDER SEAL) ...........................................A9802

Exhibit 39 to the Gomez Declaration - Email chain between Chevron Corporation counsel Caroline N. Mitchell (Jones Day) and Diego Borja counsel Mike Anderson (Arguedas, Cassman & Headley, LLP), subject line "RE: Jobs for Sara," dated August 26, 2010 (FILED UNDER SEAL)....................A9805

Exhibit 40 to the Gomez Declaration - Email chain between Diego Borja counsel Cris Arguedas and Mike Anderson (Arguedas, Cassman & Headley, LLP), and Chevron Corporation counsel Robert A. Mittelstaedt (partner - in - charge of the Jones Day San Francisco office), dated August 31, 2010 (FILED UNDER SEAL)................................................................................A9807

Exhibit 41 to the Gomez Declaration - Email from Diego Borja forwarding an email subject line "RE: INTERINTELG INVOICES AUGUST 2009," dated September 7, 2010 (FILED UNDER SEAL)...........................A9810

Exhibit 42 to the Gomez Declaration - Email from Diego Borja counsel Mike Anderson (Arguedas, Cassman & Headley, LLP) to Chevron Corporation counsel Caroline N. Mitchell (Jones Day), subject line "Sara's Job," dated September 10, 2010 (FILED UNDER SEAL)................................A9812

Exhibit 43 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated October 4, 2010 (FILED UNDER SEAL) ......................................................................................................A9813

Exhibit 44 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated October 11, 2010 (FILED UNDER SEAL) ......................................................................................................A9814

Exhibit 45 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated October 11, 2010 (FILED UNDER SEAL) ......................................................................................................A9815

Exhibit 46 to the Gomez Declaration - Email from Diego Borja to his counsel Mike Anderson (Arguedas, Cassman & Headley, LLP), subject line "Fwd: Car Rental for the 09/12/10" (sic), dated October 14, 2010 (FILED UNDER SEAL)................................................................................A9816

Exhibit 47 to the Gomez Declaration - Email from Diego Borja to his counsel Mike Anderson (Arguedas, Cassman & Headley, LLP), subject line "Fwd: Auto Transport," dated October 14, 2010 (FILED UNDER SEAL) ......................................................................................................A9819

Exhibit 48 to the Gomez Declaration - Email from Diego Borja to his counsel Mike Anderson (Arguedas, Cassman & Headley, LLP), dated October 14, 2010 (FILED UNDER SEAL)................................................A9827

56

Exhibit 49 to the Gomez Declaration - Email from Diego Borja to Arguedas attorney Mike Anderson, dated October 14, 2010 (FILED UNDER SEAL) ....................................................................................A9832

Exhibit 50 to the Gomez Declaration - Email from Chevron Corporation counsel Caroline N. Mitchell (Jones Day) to Diego Borja counsel Michael W. Anderson (Arguedas, Cassman & Headley, LLP), subject line "Metro PCS account," dated November 4, 2010 (FILED UNDER SEAL) ................................A9837

Exhibit 51 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated November 9, 2010 (FILED UNDER SEAL) ....................................................................................................A9838

Exhibit 52 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated November 22, 2010 (FILED UNDER SEAL) ....................................................................................................A9839

Exhibit 53 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated December 14, 2010 (FILED UNDER SEAL) ....................................................................................................A9840

Exhibit 54 to the Gomez Declaration - Email from Wayne Hansen to Eric Mason at Mason Investigative Services (private investigator retained by Diego Borja), dated December 3, 2010 (FILED UNDER SEAL)...................................A9841

Exhibit 55 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated January 13, 2011 (FILED UNDER SEAL) ....................................................................................................A9842

Exhibit 56 to the Gomez Declaration - Draft check by Chevron Corporation in the name of Diego Borja and Sara Borja, dated January 17, 2011 (FILED UNDER SEAL).........................................................................A9843

Exhibit 57 to the Gomez Declaration - Email from Diego Borja counsel Michael W. Anderson (Arguedas, Cassman & Headley, LLP) to Chevron Corporation counsel Caroline N. Mitchell (Jones Day), subject line "Borja Rent," dated January 17, 2011 (FILED UNDER SEAL) ................................................A9845

Exhibit 58 to the Gomez Declaration - Payment made by Chevron Corporation to "Borja Diego," dated February 7, 2011 (FILED UNDER SEAL) ....................................................................................................A9847

Exhibit 59 to the Gomez Declaration - Privilege Log submitted by Diego Borja in connection with pending discovery proceedings under 28 U.S.C. § 1782, dated March 2, 2011 (FILED UNDER SEAL)...................................A9848

Exhibit 60 to the Gomez Declaration - Sampling of Diego Borja's and Sara Portilla's bank statements from December 2009 to January 25, 2011 (FILED UNDER SEAL) ..................................................................................A10031

Exhibit 61 to the Gomez Declaration - Invoices to Chevron from InterIntelg (FILED UNDER SEAL) ..............................................................A10089

Exhibit 62 to the Gomez Declaration - Undated résumé of Diego Borja (FILED UNDER SEAL) ..................................................................................A10131

Exhibit 63 to the Gomez Declaration - Undated résumé of Sara Portilla (FILED UNDER SEAL) ..................................................................................A10137

Exhibit 64 to the Gomez Declaration - Sears (Woodland, Texas) receipt for what appears to be a Kenmore washing (laundry) machine and electric dryer, dated September 17, 2010 (FILED UNDER SEAL) ...........................A10142

Exhibit 65 to the Gomez Declaration - Chevron check stub, dated August 3, 2010 (FILED UNDER SEAL) ..................................................................A10143

Exhibit 66 to the Gomez Declaration - Chevron Press Release, *Videos Reveal Serious Judicial Misconduct and Political Influence in Ecuador lawsuit*, dated August 31, 2009 (FILED UNDER SEAL) ...............................A10144

Exhibit 67 to the Gomez Declaration - *Felon involved in clandestine videos in Ecuador*, ASSOCIATED PRESS, dated October 29, 2009 (FILED UNDER SEAL) .......................................................................................A10147

Exhibit 68 to the Gomez Declaration - Excerpts from the Transcript of hearing before the Honorable Lewis A. Kaplan in *In re Application of Chevron Corporation*, No. M - 19 - 111, dated April 30, 2010 (FILED UNDER SEAL) .......................................................................................A10150

Exhibit 69 to the Gomez Declaration - Letter from Thomas F. Cullen, Jr. (Jones Day) to Dr. Washington Pesántez Muñoz, Prosecutor General of Ecuador, dated July 14, 2010 (FILED UNDER SEAL) ..................................A10152

APPEAL, ECF, RELATED

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:11-cv-00691-LAK

Chevron Corporation v. Donziger et al
Assigned to: Judge Lewis A. Kaplan
Related Case: 1:10-mc-00002-LAK
Cause: 18:1962 Racketeering (RICO) Act

Date Filed: 02/01/2011
Jury Demand: Both
Nature of Suit: 470 Racketeer/Corrupt
Organization
Jurisdiction: Federal Question

**Plaintiff**

**Chevron Corporation**                     represented by   **Andrea E. Neuman**
Gibson, Dunn & Crutcher LLP(Irvine)
3161 Michelson Drive
Irvine, CA 92612
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kristen Luise Hendricks**
Gibson, Dunn & Crutcher, LLP (NY)
200 Park Avenue, 47th Floor
New York, NY 10166
(212)-351-4051
Fax: (212)-351-6339
Email: khendricks@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Randy M. Mastro**
Gibson, Dunn & Crutcher, LLP (NY)
200 Park Avenue, 47th Floor
New York, NY 10166
212-351-5391
Fax: 212-351-5328
Email: rmastro@gibsondunn.com
*ATTORNEY TO BE NOTICED*

**Scott A Edelman**
Gibson, Dunn & Crutcher, LLP (CA)
1881 Page Mill Road
Palo Alto, CA 94304
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William Edward Thomson**
Gibson, Dunn & Crutcher, LLP
333 South Grand Avenue
Los Angeles, CA 90071

A-2

(213)-229-7891
Fax: (213)-229-6891
Email: wthomson@gibsondunn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Steven Donziger**                represented by    **Elliot Remsen Peters**
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415)-391-5400
Fax: (415)-397-7188
Email: epeters@kvn.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. Young**
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415)-391-5400
Fax: (415)-397-7188
Email: cyoung@kvn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jan Nielsen Little**
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415) 391-5400
Fax: (415)-397-7188
Email: jlittle@kvn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John W. Keker**
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111-1704
415/391-5400
Email: jkeker@kvn.com
*ATTORNEY TO BE NOTICED*

**Matthew M. Werdegar**
Keker & Van Nest, LLP
710 Sansome Street

San Francisco, CA 94111
(415)-391-5400
Fax: (415)-397-7188
Email: mwerdegar@kvn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nikki H. Vo**
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415)-391-5400
Fax: (415)-397-7188
Email: nvo@kvn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paula Lenore Blizzard**
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415)-391-5400
Fax: (415)-397-7188
Email: pblizzard@kvn.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William S. Hicks**
Keker & Van Nest, LLP
710 Sansome Street
San Francisco, CA 94111
(415)-391-5400
Fax: (415)-397-7188
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**The Law Offices of Steven R. Donziger**

represented by **Elliot Remsen Peters**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher J. Young**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jan Nielsen Little**
(See above for address)
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**John W. Keker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Matthew M. Werdegar**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Nikki H. Vo**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Paula Lenore Blizzard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William S. Hicks**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pablo Fajardo Mendoza**

**Defendant**

**Luis Yanza**

**Defendant**

**Frente de Defensa De La Amazonia**
*also known as*
Amazon Defense Front

**Defendant**

**Selva Viva Selviva CIA, Ltda**

**Defendant**

**Stratus Consulting, Inc.**                represented by  **Benjamin H. Green**
                                            Zeichner Ellman & Krause LLP
                                            575 Lexington Avenue
                                            New York, NY 10022
                                            (203)-622-0900
                                            Fax: (203)-862-9889
                                            Email: bgreen@zeklaw.com
                                            *ATTORNEY TO BE NOTICED*

**Gordon Mehler**
Law Offices of Gordon Mehler,
P.L.L.C.
747 Third Avenue
32nd Floor
New York, NY 10017
(212) 527-7503
Fax: (212) 527-7504
Email: gmehler@mehlerlaw.com
*TERMINATED: 05/05/2011*

**Jessica R. Torbin**
Silver & Deboskey, A Professional
Corporation
1801 York Street
Denver, CO 80206
(303)-399-3000
Fax: (303)-399-2650
Email: torbinj@s-d.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joe L. Silver**
Silver & Silver LLP
One Liberty Square
New Britain, CT 06051
(303)-399-3000
Fax: (303)-399-2650
Email: silverj@s-d.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Martin Beier**
Silver & Deboskey, A Professional
Corporation
1801 York Street
Denver, CO 80206
(303)-399-3000
Fax: (303)-399-2650
Email: beierm@s-d.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stuart Alan Krause**
Zeichner Ellman & Krause LLP
575 Lexington Avenue
New York, NY 10022
212-223-0400
Fax: 212-753-0396
Email: skrause@zeklaw.com

*ATTORNEY TO BE NOTICED*

**Defendant**

**Stratus Consulting , Inc.**                    represented by   **Benjamin H. Green**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gordon Mehler**
(See above for address)
*TERMINATED: 05/05/2011*

**Jessica R. Torbin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joe L. Silver**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Martin Beier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stuart Alan Krause**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Douglas Beltman**                              represented by   **Benjamin H. Green**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gordon Mehler**
(See above for address)
*TERMINATED: 05/05/2011*

**Jessica R. Torbin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joe L. Silver**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Martin Beier**
(See above for address)

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stuart Alan Krause**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Ann Maest**                                    represented by   **Benjamin H. Green**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gordon Mehler**
(See above for address)
*TERMINATED: 05/05/2011*

**Jessica R. Torbin**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joe L. Silver**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Martin Beier**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stuart Alan Krause**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Maria Aguinda Salazar**

**Defendant**

**Carlos Grefa Huatatoca**

**Defendant**

**Catalina Antonia Aguinda Salazar**

**Defendant**

**Lidia Alexandra Aguinda Aguinda**

**Defendant**

**Patricio Alberto Chimbo Yumbo**

**Defendant**

**Clide Ramiro Aguinda Aguinda**

**Defendant**

**Luis Armando Chimbo Yumbo**

**Defendant**

**Beatriz Mercedes Grefa Tanguila**

**Defendant**

**Lucio Enrique Grefa Tanguila**

**Defendant**

**Patricio Wilson Aguinda Aguinda**

**Defendant**

**Celia Irene Viveros Cusangua**

**Defendant**

**Francisco Matias Alvarado Yumbo**

**Defendant**

**Francisco Alvarado Yumbo**

**Defendant**

**Olga Gloria Grefa Cerda**

**Defendant**

**Lorenzo Jose Alvarado Yumbo**

**Defendant**

**Narcisa Aida Tanguila Narvaez**

**Defendant**

**Bertha Antonia Yumbo Tanguila**

**Defendant**

**Gloria Lucrecia Tanguila Grefa**

**Defendant**

**Franciso Victor Tanguilla Grefa**

**Defendant**

**Rosa Teresa Chimbo Tanguila**

**Defendant**

**Jose Gabriel Revelo Llore**

**Defendant**

**Maria Clelia Reascos Revelo**

**Defendant**

**Maria Magdalena Rodriguez
Barcenes**

**Defendant**

**Hugo Gerardo Camacho Naranjo**          represented by  **Julio Cesar Gomez**
Julio C. Gomez, Attorney At Law LLC
The Sturde Building
111 Quimby Street
Suite 8
Westfield, NJ 07090
(908)-490-0360
Fax: (908)-490-0362
Email: jgomez@gomezllc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carlos A. Zelaya , II**
F. Gerald Maples, PA
365 Canal Street, Suite 2650
New Orleans, LA 70130
504-569-8732
Fax: 504-525-6932
Email: czelaya@fgmapleslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**F. Gerald Maples**
F. Gerald Maples, P.A.
365 Canal Street; Suite 2650
New Orleans, LA 70130
(504)-569-8732
Fax: (504) 525-6932
Email: federal@fgmapleslaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Norman H. Siegel**
Norman Siegel, Attorney At Law
260 Madison Avenue, 18th Floor
New York, NY 10016
212 532-7586
Fax: 212 448-0066
Email: siegelnorman@aol.com
*TERMINATED: 03/14/2011*

**Sheldon Howard Elsen**
Orans, Elsen & Lupert, LLP
875 Third Avenue, 28th Flr
New York, NY 10020
(212) 586-2211
Fax: (212) 765-3662
Email: selsen@oellaw.com
*TERMINATED: 02/16/2011*

**Steven J. Hyman**
McLaughlin and Stern, LLP
260 Madison Ave
New York, NY 10016
(212) 448-1100
Fax: (212) 448-6273
Email: Shyman@mclaughlinstern.com
*TERMINATED: 03/14/2011*

**Defendant**

**Jose Miguel Ipiales Chicaiza**

**Defendant**

**Heleodoro Pataron Guaraca**

**Defendant**

**Luisa Delia Tanguila Narvaez**

**Defendant**

**Lourdes Beatriz Chimbo Tanguil**

**Defendant**

**Maria Hortencia Viveros Cusangua**

**Defendant**

**Segundo Angel Amanta Milan**

**Defendant**

**Octavio Ismael Cordova Huanca**

**Defendant**

**Elias Roberto Piyahuaje Payahuaje**

**Defendant**

**Daniel Carlos Lusitande Yaiguaje**

**Defendant**

**Benancio Fredy Chimbo Grefa**

**Defendant**

**Guillermo Vicente Payaguaje Lusitante**

Defendant

**Delfin Leonidas Payaguaje Payaguaje**

Defendant

**Alfredo Donaldo Payaguaje Payaguaje**

Defendant

**Miguel Mario Payaguaje Payaguaje**

Defendant

**Teodoro Gonzalo Piaguaje Payaguaje**

Defendant

**Fermin Piaguaje Payaguaje**

Defendant

**Reinaldo Lusitande Yaiguaje**

Defendant

**Luis Agustin Payaguaje Piaguaje**

Defendant

**Emilio Martin Lusitande Yaiguaje**

Defendant

**Simon Lusitande Yaiguaje**

Defendant

**Armando Wilfrido Piaguaje Payaguaje**

Defendant

**Angel Justino Piaguage Lucitant**

Defendant

**Donziger & Associates, PLLC**          represented by **John W. Keker**
                                          (See above for address)
                                          *LEAD ATTORNEY*

Defendant

**Javier Piaguaje Payaguaje**            represented by **Julio Cesar Gomez**
                                          (See above for address)
                                          *LEAD ATTORNEY*
                                          *ATTORNEY TO BE NOTICED*

**Carlos A. Zelaya , II**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**F. Gerald Maples**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Norman H. Siegel**
(See above for address)
*TERMINATED: 03/14/2011*
*ATTORNEY TO BE NOTICED*

**Sheldon Howard Elsen**
(See above for address)
*TERMINATED: 02/16/2011*

**Steven J. Hyman**
(See above for address)
*TERMINATED: 03/14/2011*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/01/2011 | 1 | COMPLAINT against Clide Ramiro Aguinda Aguinda, Lidia Alexandra Aguinda Aguinda, Patricio Wilson Aguinda Aguinda, Francisco Matias Alvarado Yumbo, Lorenzo Jose Alvarado Yumbo, Segundo Angel Amanta Milan, Douglas Beltman, Hugo Gerardo Camacho Naranjo, Benancio Fredy Chimbo Grefa, Lourdes Beatriz Chimbo Tanguil, Rosa Teresa Chimbo Tanguila, Luis Armando Chimbo Yumbo, Octavio Ismael Cordova Huanca, Steven Donziger, Frente de Defensa De La Amazonia, Olga Gloria Grefa Cerda, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Heleodoro Pataron Guaraca, Carlos Grefa Huatatoca, Jose Miguel Ipiales Chicaiza, Daniel Carlos Lusitande Yaiguaje, Emilio Martin Lusitande Yaiguaje, Reinaldo Lusitande Yaiguaje, Ann Maest, Pablo Fajardo Mendoza, Guillermo Vicente Payaguaje Lusitante, Alfredo Donaldo Payaguaje Payaguaje, Delfin Leonidas Payaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Luis Agustin Payaguaje Piaguaje, Angel Justino Piaguage Lucitant, Teodoro Gonzalo Piaguaje Payaguaje, Armando Wilfrido Piaguaje Payaguaje, Fermin Piaguaje Payaguaje, Javier Piaguaje Payaguaje, Elias Roberto Piyahuaje Payahuaje, Maria Clelia Reascos Revelo, Jose Gabriel Revelo Llore, Maria Magdalena Rodriguez Barcenes, Catalina Antonia Aguinda Salazar, Maria Aguinda Salazar, Selva Viva Selviva CIA, Ltda, Stratus Consulting, Inc., Stratus Consulting, Inc., Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Luisa Delia Tanguila Narvaez, Narcisa Aida Tanguila Narvaez, Franciso Victor Tanguilla Grefa, The Law Offices of Steven R. Donziger, Celia Irene Viveros Cusangua, Maria |

| | | |
|---|---|---|
| | | Hortencia Viveros Cusangua, Simon Lusitande Yaiguaje, Luis Yanza, Francisco Alvarado Yumbo, Patricio Alberto Chimbo Yumbo. (Filing Fee $ 350.00, Receipt Number 928066)Document filed by Chevron Corporation. (Attachments: # 1 Exhibit, # 2 Exhibit)(rdz) (Entered: 02/02/2011) |
| 02/01/2011 | | SUMMONS ISSUED as to All Defendants. (rdz) (Entered: 02/02/2011) |
| 02/01/2011 | | CASE REFERRED TO Judge Lewis A. Kaplan as possibly related to 10-mc-00002. (rdz) (Entered: 02/02/2011) |
| 02/01/2011 | | Case Designated ECF. (rdz) (Entered: 02/02/2011) |
| 02/01/2011 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Chevron Corporation.(rdz) (Entered: 02/02/2011) |
| 02/03/2011 | | CASE ACCEPTED AS RELATED. Create association to 1:10-mc-00002-LAK. Notice of Assignment to follow. (sjo) (Entered: 02/03/2011) |
| 02/03/2011 | 3 | NOTICE OF CASE ASSIGNMENT to Judge Lewis A. Kaplan. Judge Unassigned is no longer assigned to the case. (sjo) (Entered: 02/03/2011) |
| 02/03/2011 | | Magistrate Judge James C. Francis IV is so designated. (sjo) (Entered: 02/03/2011) |
| 02/03/2011 | 4 | ORDER TO SHOW CAUSE WHY A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD NOT BE ENTERED; ORDERED that the defendants listed herein, and their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them, show cause on 2/8/2011 at 02:00 PM in Courtroom 12D, 500 Pearl Street, New York, NY 10007 before Judge Lewis A. Kaplan, why an order should not be issued, pursuant to Rule 65(b) of the F.R.C.P., temporarily enjoining and restraining, until after the Court has had an opportunity to rule on Chevron's application for a preliminary injunction, as further set forth in this Order. It is further ORDERED that Chevron is granted permission to file an oversized brief of up to 70 pages in support of its Application by Order to Show Cause for a Temporary Restraining Order and Preliminary ; and Defendants may file one or more briefs collectively totaling up to 70 pages, as further set forth in this Order. (Signed by Judge Lewis A. Kaplan on 2/3/2011) (tro) (Entered: 02/03/2011) |
| 02/05/2011 | 5 | MEMORANDUM OF LAW in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit A - Part 1, # 2 Exhibit A - Part 2, # 3 Exhibit A - Part 3, # 4 Exhibit A - Part 4) (Mastro, Randy) (Entered: 02/05/2011) |
| 02/06/2011 | 6 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 1, # 3 Exhibit 2, part 1, # 4 Exhibit 2, part 2, # 5 Exhibit 2, part 3, # 6 Exhibit 2, part 4, # 7 Exhibit 2, part 5, # 8 Exhibit 2, part 6, # 9 Exhibit 2, part 7, # 10 Exhibit 2, part 8)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 7 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 |

| | | |
|---|---|---|
| | | Declaration, part 2, # 2 Exhibit 2, part 9, # 3 Exhibit 2, part 10, # 4 Exhibit 2, part 11, # 5 Exhibit 2, part 12, # 6 Exhibit 2, part 13, # 7 Exhibit 2, part 14, # 8 Exhibit 2, part 15, # 9 Exhibit 2, part 16, # 10 Exhibit 2, part 17)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 8 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 2, part 18, # 3 Exhibit 2, part 19, # 4 Exhibit 2, part 20, # 5 Exhibit 2, part 21, # 6 Exhibit 3, # 7 Exhibit 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, part 1, # 11 Exhibit 7, part 2, # 12 Exhibit 7, part 3, # 13 Exhibit 7, part 4)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 9 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 8, part 1, # 3 Exhibit 8, part 2, # 4 Exhibit 9, # 5 Exhibit 10, # 6 Exhibit 11, # 7 Exhibit 12, # 8 Exhibit 13, # 9 Exhibit 14, # 10 Exhibit 15, part 1, # 11 Exhibit 15, part 2, # 12 Exhibit 15, part 3, # 13 Exhibit 15, part 4, # 14 Exhibit 15, part 5)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 10 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 16, part, # 3 Exhibit 16, part 2, # 4 Exhibit 16, part 3, # 5 Exhibit 16, part 4, # 6 Exhibit 16, part 5, # 7 Exhibit 16, part 6, # 8 Exhibit 16, part 7, # 9 Exhibit 16, part 8, # 10 Exhibit 16, part 9)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 11 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 16, part 10, # 3 Exhibit 16, part 11, # 4 Exhibit 16, part 12, # 5 Exhibit 16, part 13, # 6 Exhibit 16, part 14, # 7 Exhibit 16, part 15, # 8 Exhibit 16, part 16, # 9 Exhibit 16, part 17)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 12 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 16, part 18, # 3 Exhibit 16, part 19, # 4 Exhibit 16, part 20, # 5 Exhibit 16, part 21, # 6 Exhibit 16, part 22, # 7 Exhibit 16, part 23, # 8 Exhibit 16, part 24, # 9 Exhibit 16, part 25, # 10 Exhibit 16, part 26, # 11 Exhibit 16, part 27, # 12 Exhibit 16, part 28)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 13 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 16, part 29, # 3 Exhibit 16, part 30, # 4 Exhibit 16, part 31, # 5 Exhibit 16, part 32, # 6 Exhibit 16, part 33, # 7 Exhibit 16, part 34, # 8 Exhibit 16, part 35, # 9 Exhibit 16, part 36, # 10 Exhibit 16, part 37, # 11 Exhibit 16, part 38, # 12 Exhibit 16, part 39, # 13 Exhibit 16, part 40, # 14 Exhibit 16, part 41)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 14 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show |

A-15

| | | |
|---|---|---|
| | | Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 16, part 42, # <u>3</u> Exhibit 16, part 43, # <u>4</u> Exhibit 16, part 44, # <u>5</u> Exhibit 16, part 45, # <u>6</u> Exhibit 16, part 46, # <u>7</u> Exhibit 16, part 47, # <u>8</u> Exhibit 16, part 48, # <u>9</u> Exhibit 16, part 49, # <u>10</u> Exhibit 16, part 50, # <u>11</u> Exhibit 16, part 51, # <u>12</u> Exhibit 16, part 52, # <u>13</u> Exhibit 16, part 53, # <u>14</u> Exhibit 16, part 54)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>15</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 16, part 55, # <u>3</u> Exhibit 16, part 56, # <u>4</u> Exhibit 16, part 57, # <u>5</u> Exhibit 16, part 58, # <u>6</u> Exhibit 16, part 59, # <u>7</u> Exhibit 16, part 60, # <u>8</u> Exhibit 16, part 61, # <u>9</u> Exhibit 16, part 62, # <u>10</u> Exhibit 16, part 63, # <u>11</u> Exhibit 16, part 64, # <u>12</u> Exhibit 16, part 65, # <u>13</u> Exhibit 16, part 66, # <u>14</u> Exhibit 16, part 67)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>16</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 16, part 68, # <u>3</u> Exhibit 16, part 69, # <u>4</u> Exhibit 16, part 70, # <u>5</u> Exhibit 16, part 71, # <u>6</u> Exhibit 16, part 72, # <u>7</u> Exhibit 16, part 73, # <u>8</u> Exhibit 16, part 74, # <u>9</u> Exhibit 16, part 75, # <u>10</u> Exhibit 16, part 76)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>17</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 16, part 77, # <u>3</u> Exhibit 16, part 78, # <u>4</u> Exhibit 16, part 79, # <u>5</u> Exhibit 16, part 80, # <u>6</u> Exhibit 16, part 81, # <u>7</u> Exhibit 16, part 82, # <u>8</u> Exhibit 16, part 83, # <u>9</u> Exhibit 16, part 84)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>18</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 16, part 85, # <u>3</u> Exhibit 16, part 86, # <u>4</u> Exhibit 16, part 87, # <u>5</u> Exhibit 16, part 88, # <u>6</u> Exhibit 16, part 89, # <u>7</u> Exhibit 16, part 90, # <u>8</u> Exhibit 16, part 91, # <u>9</u> Exhibit 16, part 92, # <u>10</u> Exhibit 16, part 93, # <u>11</u> Exhibit 16, part 94, # <u>12</u> Exhibit 16, part 95, # <u>13</u> Exhibit 16, part 96, # <u>14</u> Exhibit 17, part 1, # <u>15</u> Exhibit 17, part 2)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>19</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 17, part 3, # <u>3</u> Exhibit 17, part 4, # <u>4</u> Exhibit 17, part 5, # <u>5</u> Exhibit 17, part 6, # <u>6</u> Exhibit 18, # <u>7</u> Exhibit 19, part 1, # <u>8</u> Exhibit 19, part 2)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>20</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 19, part 3, # <u>3</u> Exhibit 19, part 4, # <u>4</u> Exhibit 20, part 5, # <u>5</u> Exhibit 21, # <u>6</u> Exhibit 22, part 1, # <u>7</u> Exhibit 22, part 2, # <u>8</u> Exhibit 23, # <u>9</u> Exhibit 24, # <u>10</u> Exhibit 25, # <u>11</u> Exhibit 26, # <u>12</u> Exhibit 27, # <u>13</u> Exhibit 28, # <u>14</u> Exhibit 29, # <u>15</u> Exhibit 30, # <u>16</u> Exhibit 31)(Mastro, Randy) |

| | | |
|---|---|---|
| | | (Entered: 02/06/2011) |
| 02/06/2011 | 21 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 32, part 1, # 3 Exhibit 32, part 2, # 4 Exhibit 33, # 5 Exhibit 34, # 6 Exhibit 35, # 7 Exhibit 36, # 8 Exhibit 37, # 9 Exhibit 38, # 10 Exhibit 39, # 11 Exhibit 40, # 12 Exhibit 41, # 13 Exhibit 42, # 14 Exhibit 43, # 15 Exhibit 44, # 16 Exhibit 45, # 17 Exhibit 46, # 18 Exhibit 47, part 1, # 19 Exhibit 47, part 2, # 20 Exhibit 47, part 3, # 21 Exhibit 47, part 4, # 22 Exhibit 47, part 5)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 22 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 47, part 6, # 3 Exhibit 47, part 7, # 4 Exhibit 47, part 8, # 5 Exhibit 47, part 9, # 6 Exhibit 47, part 10, # 7 Exhibit 47, part 11, # 8 Exhibit 47, part 12, # 9 Exhibit 47, part 13, # 10 Exhibit 47, part 14, # 11 Exhibit 47, part 15, # 12 Exhibit 48, # 13 Exhibit 49, part 1, # 14 Exhibit 49, part 2)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 23 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 49, part 3, # 3 Exhibit 49, part 4, # 4 Exhibit 50, part1, # 5 Exhibit 50, part 2, # 6 Exhibit 51, # 7 Exhibit 52, part 1, # 8 Exhibit 52, part 2, # 9 Exhibit 52, part 3, # 10 Exhibit 53)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 24 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 54, part 1, # 3 Exhibit 54, part 2, # 4 Exhibit 54, part 3, # 5 Exhibit 54, part 4, # 6 Exhibit 55, part 1, # 7 Exhibit 55, part 2, # 8 Exhibit 55, part 3)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 25 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 56, # 3 Exhibit 57, # 4 Exhibit 58, # 5 Exhibit 59, part 1, # 6 Exhibit 59, part 2, # 7 Exhibit 59, part 3, # 8 Exhibit 59, part 4, # 9 Exhibit 60, part 1, # 10 Exhibit 60, part 2, # 11 Exhibit 60, part 3, # 12 Exhibit 61)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 26 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 62, part 1, # 3 Exhibit 62, part 2, # 4 Exhibit 63, part 1, # 5 Exhibit 63, part 2, # 6 Exhibit 63, part 3, # 7 Exhibit 63, part 4, # 8 Exhibit 64, # 9 Exhibit 65, # 10 Exhibit 66)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 27 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 67, # 3 Exhibit 68, # 4 Exhibit 69, part 1, # 5 Exhibit 69, part 2, # 6 Exhibit 69, part 3, # 7 Exhibit 69, part 4, # 8 Exhibit 69, part 5, # 9 Exhibit 70, part 1, # 10 Exhibit 70, part 2)(Mastro, Randy) (Entered: 02/06/2011) |
| | | |

| 02/06/2011 | 28 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 71, # 3 Exhibit 72, # 4 Exhibit 73, # 5 Exhibit 74, # 6 Exhibit 75, # 7 Exhibit 76, part 1, # 8 Exhibit 76, part 2, # 9 Exhibit 76, part 3)(Mastro, Randy) (Entered: 02/06/2011) |
|---|---|---|
| 02/06/2011 | 29 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 76, part 4, # 3 Exhibit 76, part 5, # 4 Exhibit 77, # 5 Exhibit 78, # 6 Exhibit 79, # 7 Exhibit 80, # 8 Exhibit 81, # 9 Exhibit 82, # 10 Exhibit 83, # 11 Exhibit 84, # 12 Exhibit 85, part 1, # 13 Exhibit 85, part 2, # 14 Exhibit 85, part 3, # 15 Exhibit 85, part 4, # 16 Exhibit 85, part 5, # 17 Exhibit 86, # 18 Exhibit 87, # 19 Exhibit 88, # 20 Exhibit 89, # 21 Exhibit 90)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 30 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 91, # 3 Exhibit 92, # 4 Exhibit 93, # 5 Exhibit 94, # 6 Exhibit 95, # 7 Exhibit 96, # 8 Exhibit 97, # 9 Exhibit 98, # 10 Exhibit 99, # 11 Exhibit 100, # 12 Exhibit 101, # 13 Exhibit 102, # 14 Exhibit 103, # 15 Exhibit 104, # 16 Exhibit 105, # 17 Exhibit 106, # 18 Exhibit 107, # 19 Exhibit 108, # 20 Exhibit 109, # 21 Exhibit 110, # 22 Exhibit 111, # 23 Exhibit 112, part 1, # 24 Exhibit 112, part 2, # 25 Exhibit 113, # 26 Exhibit 114, # 27 Exhibit 115, # 28 Exhibit 116, # 29 Exhibit 117, # 30 Exhibit 118, # 31 Exhibit 119, # 32 Exhibit 120)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 31 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 121, part 1, # 3 Exhibit 121, part 2, # 4 Exhibit 121, part 3, # 5 Exhibit 121, part 4, # 6 Exhibit 122, # 7 Exhibit 122A, # 8 Exhibit 123, # 9 Exhibit 124, # 10 Exhibit 125, # 11 Exhibit 126, # 12 Exhibit 127, # 13 Exhibit 128, # 14 Exhibit 129, # 15 Exhibit 130, # 16 Exhibit 131, # 17 Exhibit 132, # 18 Exhibit 133, # 19 Exhibit 134, # 20 Exhibit 135, # 21 Exhibit 136, # 22 Exhibit 137, # 23 Exhibit 138, # 24 Exhibit 139, # 25 Exhibit 140, # 26 Exhibit 141, # 27 Exhibit 142, # 28 Exhibit 143, # 29 Exhibit 144, # 30 Exhibit 145, # 31 Exhibit 146)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 32 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 147, # 3 Exhibit 148, # 4 Exhibit 149, # 5 Exhibit 150, # 6 Exhibit 151, # 7 Exhibit 152, # 8 Exhibit 153, # 9 Exhibit 154, part 1, # 10 Exhibit 154, part 2, # 11 Exhibit 155, # 12 Exhibit 156, # 13 Exhibit 157, # 14 Exhibit 158, # 15 Exhibit 159, # 16 Exhibit 160, # 17 Exhibit 161, # 18 Exhibit 162, # 19 Exhibit 163, # 20 Exhibit 164, # 21 Exhibit 165, # 22 Exhibit 166, # 23 Exhibit 167)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 33 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 168, # 3 Exhibit 169, # 4 Exhibit 170, # 5 Exhibit 171, # 6 Exhibit 172, # 7 Exhibit 173, # 8 Exhibit 174, # 9 Exhibit |

| | | |
|---|---|---|
| | | 175, # <u>10</u> Exhibit 176, # <u>11</u> Exhibit 177, # <u>12</u> Exhibit 178, part 1, # <u>13</u> Exhibit 178, part 2, # <u>14</u> Exhibit 178, part 3, # <u>15</u> Exhibit 178, part 4, # <u>16</u> Exhibit 178, part 5, # <u>17</u> Exhibit 178, part 6, # <u>18</u> Exhibit 178, part 7)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>34</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 178, part 8, # <u>3</u> Exhibit 178, part 9, # <u>4</u> Exhibit 179, # <u>5</u> Exhibit 180, # <u>6</u> Exhibit 181, # <u>7</u> Exhibit 182, # <u>8</u> Exhibit 183, # <u>9</u> Exhibit 184, # <u>10</u> Exhibit 185, # <u>11</u> Exhibit 186, # <u>12</u> Exhibit 187, # <u>13</u> Exhibit 188, # <u>14</u> Exhibit 189, # <u>15</u> Exhibit 190, # <u>16</u> Exhibit 191, # <u>17</u> Exhibit 192, # <u>18</u> Exhibit 193, # <u>19</u> Exhibit 194, # <u>20</u> Exhibit 195, # <u>21</u> Exhibit 196, # <u>22</u> Exhibit 197, # <u>23</u> Exhibit 198, # <u>24</u> Exhibit 199, # <u>25</u> Exhibit 200, # <u>26</u> Exhibit 201, # <u>27</u> Exhibit 202, # <u>28</u> Exhibit 203, # <u>29</u> Exhibit 204, # <u>30</u> Exhibit 205)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>35</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 206, part 1, # <u>3</u> Exhibit 206, part 2, # <u>4</u> Exhibit 206, part 3, # <u>5</u> Exhibit 206, part 4, # <u>6</u> Exhibit 206, part 5, # <u>7</u> Exhibit 206, part 6, # <u>8</u> Exhibit 207, # <u>9</u> Exhibit 208, # <u>10</u> Exhibit 209) (Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>36</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 210, part 1, # <u>3</u> Exhibit 210, part 2, # <u>4</u> Exhibit 211, # <u>5</u> Exhibit 212, # <u>6</u> Exhibit 213, # <u>7</u> Exhibit 214, # <u>8</u> Exhibit 215, # <u>9</u> Exhibit 216, # <u>10</u> Exhibit 217, # <u>11</u> Exhibit 218, # <u>12</u> Exhibit 219, # <u>13</u> Exhibit 220, # <u>14</u> Exhibit 221, # <u>15</u> Exhibit 222, # <u>16</u> Exhibit 223, # <u>17</u> Exhibit 224, # <u>18</u> Exhibit 224A, # <u>19</u> Exhibit 225, # <u>20</u> Exhibit 225A, # <u>21</u> Exhibit 226, # <u>22</u> Exhibit 226A, # <u>23</u> Exhibit 227, # <u>24</u> Exhibit 227A, # <u>25</u> Exhibit 228, # <u>26</u> Exhibit 228A)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>37</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 229, # <u>3</u> Exhibit 229A, # <u>4</u> Exhibit 230, # <u>5</u> Exhibit 230A, # <u>6</u> Exhibit 231, # <u>7</u> Exhibit 231A, # <u>8</u> Exhibit 232, # <u>9</u> Exhibit 232A, # <u>10</u> Exhibit 233, # <u>11</u> Exhibit 233A, # <u>12</u> Exhibit 234, # <u>13</u> Exhibit 235, # <u>14</u> Exhibit 236, # <u>15</u> Exhibit 237, # <u>16</u> Exhibit 238, # <u>17</u> Exhibit 239, # <u>18</u> Exhibit 240, # <u>19</u> Exhibit 241, # <u>20</u> Exhibit 242, part 1, # <u>21</u> Exhibit 242, part 2, # <u>22</u> Exhibit 242, part 3, # <u>23</u> Exhibit 242, part 4, # <u>24</u> Exhibit 242, part 5, # <u>25</u> Exhibit 242, part 6, # <u>26</u> Exhibit 242, part 7, # <u>27</u> Exhibit 242, part 8)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>38</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Declaration, part 2, # <u>2</u> Exhibit 242, part 9, # <u>3</u> Exhibit 242, part 10, # <u>4</u> Exhibit 242, part 11a, # <u>5</u> Exhibit 242, part 11b, # <u>6</u> Exhibit 242, part 12, # <u>7</u> Exhibit 242, part 13a, # <u>8</u> Exhibit 242, part 13b, # <u>9</u> Exhibit 242, part 14) (Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | <u>39</u> | DECLARATION of Kristin Hendricks in Support re: <u>4</u> Order to Show |

| | | |
|---|---|---|
| | | Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 242, part 15, # 3 Exhibit 242, part 16, # 4 Exhibit 242, part 18, # 5 Exhibit 242, part 19, # 6 Exhibit 242, part 20, # 7 Exhibit 242, part 21)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 40 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 242, part 21, # 3 Exhibit 242, part 23, # 4 Exhibit 242, part 24, # 5 Exhibit 242, part 25, # 6 Exhibit 242, part 26, # 7 Exhibit 242, part 27)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 41 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 242, part 28, # 3 Exhibit 242, part 29, # 4 Exhibit 242, part 30, # 5 Exhibit 242, part 31, # 6 Exhibit 242, part 32, # 7 Exhibit 242, part 33, # 8 Exhibit 242, part 34)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 42 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 242, part 35, # 3 Exhibit 242, part 36, # 4 Exhibit 242, part 37, # 5 Exhibit 242, part 38, # 6 Exhibit 242, part 39, # 7 Exhibit 242, part 40, # 8 Exhibit 242, part 41, # 9 Exhibit 242, part 42, # 10 Exhibit 242, part 43)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 43 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 242, part 44, # 3 Exhibit 242, part 45, # 4 Exhibit 242, part 46, # 5 Exhibit 242, part 47, # 6 Exhibit 242, part 48, # 7 Exhibit 242, part 49, # 8 Exhibit 242, part 50)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 44 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 242, part 51, # 3 Exhibit 242, part 52, # 4 Exhibit 242, part 53, # 5 Exhibit 242, part 54, # 6 Exhibit 242, part 55, # 7 Exhibit 242, part 56, # 8 Exhibit 242, part 57, # 9 Exhibit 242, part 58) (Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 45 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 242, part 59, # 3 Exhibit 242, part 60, # 4 Exhibit 242, part 61, # 5 Exhibit 242, part 62, # 6 Exhibit 242, part 63, # 7 Exhibit 242, part 64, # 8 Exhibit 242, part 65, # 9 Exhibit 242, part 66) (Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 46 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 242, part 67, # 3 Exhibit 242, part 68, # 4 Exhibit 242, part 69, # 5 Exhibit 242, part 70, # 6 Exhibit 242, part 71, # 7 Exhibit 242, part 72, # 8 Exhibit 242, part 73, # 9 Exhibit 242, part 74, # 10 Exhibit 242, part 75)(Mastro, Randy) (Entered: 02/06/2011) |
| | | |

| 02/06/2011 | 47 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 242, part 76, # 3 Exhibit 242, part 77, # 4 Exhibit 243, # 5 Exhibit 244, # 6 Exhibit 245, # 7 Exhibit 246, # 8 Exhibit 247, # 9 Exhibit 248, # 10 Exhibit 249, # 11 Exhibit 250, # 12 Exhibit 251, # 13 Exhibit 252, # 14 Exhibit 253, # 15 Exhibit 254, # 16 Exhibit 255, # 17 Exhibit 256, # 18 Exhibit 257, # 19 Exhibit 258, # 20 Exhibit 259, # 21 Exhibit 260, # 22 Exhibit 261, # 23 Exhibit 262, # 24 Exhibit 263, # 25 Exhibit 264, # 26 Exhibit 265, # 27 Exhibit 266, # 28 Exhibit 267, # 29 Exhibit 268, # 30 Exhibit 269, # 31 Exhibit 270, # 32 Exhibit 270A, # 33 Exhibit 271, # 34 Exhibit 272, # 35 Exhibit 273, # 36 Exhibit 274, # 37 Exhibit 275, # 38 Exhibit 276, # 39 Exhibit 277, # 40 Exhibit 278, # 41 Exhibit 279, # 42 Exhibit 280, # 43 Exhibit 281, # 44 Exhibit 282, # 45 Exhibit 283, # 46 Exhibit 284, # 47 Exhibit 285, # 48 Exhibit 286, # 49 Exhibit 287, # 50 Exhibit 288, # 51 Exhibit 289, # 52 Exhibit 290, # 53 Exhibit 291, # 54 Exhibit 292, # 55 Exhibit 293, # 56 Exhibit 294, # 57 Exhibit 295, # 58 Exhibit 296, # 59 Exhibit 297, # 60 Exhibit 298, # 61 Exhibit 299, # 62 Exhibit 300, # 63 Exhibit 301, # 64 Exhibit 302, # 65 Exhibit 303, # 66 Exhibit 304)(Mastro, Randy) (Entered: 02/06/2011) |
| --- | --- | --- |
| 02/06/2011 | 48 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 305, # 3 Exhibit 306, # 4 Exhibit 307, # 5 Exhibit 308, # 6 Exhibit 309, # 7 Exhibit 310, # 8 Exhibit 311, # 9 Exhibit 312, # 10 Exhibit 313, # 11 Exhibit 314, # 12 Exhibit 315, # 13 Exhibit 316, part 1, # 14 Exhibit 316, part 2, # 15 Exhibit 317, # 16 Exhibit 318, # 17 Exhibit 319, # 18 Exhibit 320, # 19 Exhibit 321, # 20 Exhibit 322, # 21 Exhibit 323, # 22 Exhibit 324, # 23 Exhibit 325, # 24 Exhibit 326, # 25 Exhibit 327, # 26 Exhibit 328, # 27 Exhibit 329, # 28 Exhibit 330, # 29 Exhibit 331, # 30 Exhibit 332, # 31 Exhibit 333, # 32 Exhibit 334, # 33 Exhibit 335, # 34 Exhibit 336, # 35 Exhibit 337)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 49 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 338, # 3 Exhibit 339, # 4 Exhibit 340, # 5 Exhibit 341, # 6 Exhibit 342, # 7 Exhibit 343, # 8 Exhibit 344, # 9 Exhibit 345, # 10 Exhibit 346, # 11 Exhibit 347, # 12 Exhibit 348, # 13 Exhibit 349, # 14 Exhibit 350, # 15 Exhibit 351, # 16 Exhibit 352, # 17 Exhibit 353, # 18 Exhibit 354, # 19 Exhibit 355, # 20 Exhibit 356, # 21 Exhibit 357, # 22 Exhibit 358, # 23 Exhibit 359, # 24 Exhibit 360, # 25 Exhibit 361, # 26 Exhibit 362, # 27 Exhibit 363, # 28 Exhibit 364, # 29 Exhibit 365, # 30 Exhibit 366, # 31 Exhibit 367, # 32 Exhibit 368, # 33 Exhibit 369, # 34 Exhibit 370, # 35 Exhibit 371, # 36 Exhibit 372, # 37 Exhibit 373, # 38 Exhibit 374, part 1)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 50 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 374, part 2, # 3 Exhibit 375, part 1, # 4 Exhibit 375, part 2, # 5 Exhibit 376, # 6 Exhibit 377, # 7 Exhibit 378, # 8 Exhibit 379, part 1, # 9 Exhibit 379, part 2, # 10 Exhibit 380, # 11 Exhibit |

| | | 381, part 1, # 12 Exhibit 381, part 2)(Mastro, Randy) (Entered: 02/06/2011) |
|---|---|---|
| 02/06/2011 | 51 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 381, part 3, # 3 Exhibit 381, part 4, # 4 Exhibit 382, part 1, # 5 Exhibit 382, part 2, # 6 Exhibit 383, # 7 Exhibit 384, # 8 Exhibit 385, # 9 Exhibit 386, # 10 Exhibit 387, # 11 Exhibit 388, # 12 Exhibit 389, # 13 Exhibit 390, # 14 Exhibit 391, # 15 Exhibit 392, # 16 Exhibit 393, # 17 Exhibit 394)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 52 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 395, # 3 Exhibit 396, # 4 Exhibit 397, # 5 Exhibit 398, part 1, # 6 Exhibit 398, part 2, # 7 Exhibit 399, # 8 Exhibit 400, part 1, # 9 Exhibit 400, part 2, # 10 Exhibit 400, part 3, # 11 Exhibit 400, part 4, # 12 Exhibit 400, part, # 13 Exhibit 401)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 53 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 402, # 3 Exhibit 403, # 4 Exhibit 404, # 5 Exhibit 405, # 6 Exhibit 406, # 7 Exhibit 407, # 8 Exhibit 408, # 9 Exhibit 409, # 10 Exhibit 410, # 11 Exhibit 411, # 12 Exhibit 412, # 13 Exhibit 413, part 1, # 14 Exhibit 413, part 2, # 15 Exhibit 414, # 16 Exhibit 415, # 17 Exhibit 416, # 18 Exhibit 417, # 19 Exhibit 418, # 20 Exhibit 419, # 21 Exhibit 420, # 22 Exhibit 421, # 23 Exhibit 422, # 24 Exhibit 423, # 25 Exhibit 424, # 26 Exhibit 425, # 27 Exhibit 426, # 28 Exhibit 427, # 29 Exhibit 428, # 30 Exhibit 429, # 31 Exhibit 430)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 54 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 430, # 3 Exhibit 431, # 4 Exhibit 432, # 5 Exhibit 433, # 6 Exhibit 434, # 7 Exhibit 435, # 8 Exhibit 436, # 9 Exhibit 437, # 10 Exhibit 438, # 11 Exhibit 439, # 12 Exhibit 440, # 13 Exhibit 441, # 14 Exhibit 442, # 15 Exhibit 443, # 16 Exhibit 444, # 17 Exhibit 445, # 18 Exhibit 446, # 19 Exhibit 447, # 20 Exhibit 448, # 21 Exhibit 449, # 22 Exhibit 450, # 23 Exhibit 451, # 24 Exhibit 452, # 25 Exhibit 453, # 26 Exhibit 454, # 27 Exhibit 455, # 28 Exhibit 456, # 29 Exhibit 457, # 30 Exhibit 458, # 31 Exhibit 459)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 55 | DECLARATION of Kristin Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Declaration, part 2, # 2 Exhibit 242, part 17, # 3 Exhibit 333)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/06/2011 | 56 | DECLARATION of Vladimir Alvarez Grau in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Tab A, # 2 Exhibits 1 - 3, # 3 Exhibit 4, part 1, # 4 Exhibit 4, part 2, # 5 Exhibits 5 - 9, # 6 Exhibits 10 - 13, # 7 Exhibits 14 - 18, # 8 Exhibits 19 - 26, # 9 Exhibits 27 - 34)(Mastro, Randy) (Entered: 02/06/2011) |
| | | |

| 02/06/2011 | 57 | DECLARATION of Vladimiro Alvarez Grau in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibits 35 - 39, # 2 Exhibits 40 - 41, # 3 Exhibits 42 - 47, # 4 Exhibit 48, # 5 Exhibits 49 - 67, # 6 Exhibits 68 - 73, # 7 Exhibits 74 - 82, # 8 Exhibits 83 - 95)(Mastro, Randy) (Entered: 02/06/2011) |
| --- | --- | --- |
| 02/06/2011 | 58 | DECLARATION of Vladimiro Alvarez Grau in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibits 96 - 103, # 2 Exhibits 104 - 111, # 3 Exhibits 112 - 113, # 4 Exhibits 114 - 130)(Mastro, Randy) (Entered: 02/06/2011) |
| 02/07/2011 | 59 | NOTICE OF APPEARANCE by Kristen Luise Hendricks on behalf of Chevron Corporation (Hendricks, Kristen) (Entered: 02/07/2011) |
| 02/08/2011 | 60 | NOTICE OF APPEARANCE by Sheldon Howard Elsen on behalf of Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje (Elsen, Sheldon) (Entered: 02/08/2011) |
| 02/08/2011 | 61 | MEMORANDUM OF LAW in Opposition *to Order to Show Cause....* Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Memorandum of Law 2 of 2)(Elsen, Sheldon) (Entered: 02/08/2011) |
| 02/08/2011 | 62 | AFFIRMATION of Sheldon Elsen in Opposition re: 61 Memorandum of Law in Opposition. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B-1, # 3 Exhibit Exhibit B-2, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D, # 6 Exhibit Exhibit E, # 7 Exhibit Exhibit F)(Elsen, Sheldon) (Entered: 02/08/2011) |
| 02/08/2011 | 63 | AFFIRMATION of Sheldon Elsen in Opposition re: 4 Order to Show Cause,,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit Exhibit G-1, # 2 Exhibit Exhibit G-2, # 3 Exhibit Exhibit G-3, # 4 Exhibit Exhibit G-4, # 5 Exhibit Exhibit H-1, # 6 Exhibit Exhibit H-2, # 7 Exhibit Exhibit H-3, # 8 Exhibit Exhibit I, # 9 Exhibit Exhibit J, # 10 Exhibit Exhibit K)(Elsen, Sheldon) (Entered: 02/08/2011) |
| 02/08/2011 | 64 | AFFIRMATION of Sheldon Elsen in Opposition re: 4 Order to Show Cause,,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit Exhibit L-1, # 2 Exhibit Exhibit L-2, # 3 Exhibit Exhibit L-3, # 4 Exhibit Exhibit L-4, # 5 Exhibit Exhibit M, # 6 Exhibit Exhibit N-1, # 7 Exhibit Exhibit N-2, # 8 Exhibit Exhibit O, # 9 Exhibit Exhibit P, # 10 Exhibit Exhibit Q)(Elsen, Sheldon) (Entered: 02/08/2011) |
| 02/08/2011 | 65 | AFFIRMATION of Sheldon Elsen in Opposition re: 4 Order to Show Cause,,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit Exhibit R-1, # 2 Exhibit Exhibit R-2, # 3 Exhibit Exhibit R-3, # 4 Exhibit Exhibit S-1, # 5 Exhibit Exhibit S-2, # 6 Exhibit Exhibit T, # 7 Exhibit Exhibit U, # 8 Exhibit Exhibit V, # 9 Exhibit Exhibit W, # 10 Exhibit Exhibit X, # 11 Exhibit Exhibit Y, # 12 Exhibit Exhibit Z)(Elsen, Sheldon) (Entered: 02/08/2011) |

A-23

| 02/08/2011 | 66 | AFFIRMATION of Sheldon Elsen in Opposition re: 4 Order to Show Cause,,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit AA, # 2 Exhibit BB, # 3 Exhibit CC, # 4 Exhibit DD, # 5 Exhibit EE, # 6 Exhibit FF, # 7 Exhibit GG, # 8 Exhibit HH, # 9 Exhibit II, # 10 Exhibit JJ, # 11 Exhibit KK, # 12 Exhibit LL, # 13 Exhibit MM, # 14 Exhibit NN, # 15 Exhibit OO-1, # 16 Exhibit OO-2, # 17 Exhibit OO-3, # 18 Exhibit PP, # 19 Exhibit QQ, # 20 Exhibit RR, # 21 Exhibit SS, # 22 Exhibit TT, # 23 Exhibit UU)(Elsen, Sheldon) (Entered: 02/08/2011) |
| --- | --- | --- |
| 02/08/2011 | 67 | AFFIRMATION of Sheldon Elsen in Opposition re: 4 Order to Show Cause,,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit VV, # 2 Exhibit WW, # 3 Exhibit XX, # 4 Exhibit YY, # 5 Exhibit ZZ, # 6 Exhibit AAA)(Elsen, Sheldon) (Entered: 02/08/2011) |
| 02/08/2011 | 68 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,,,. Steven Donziger served on 2/3/2011, answer due 2/24/2011; The Law Offices of Steven R. Donziger served on 2/3/2011, answer due 2/24/2011. Service was accepted by Rafael Quinetine, Doorman. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/08/2011) |
| 02/08/2011 | 69 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,,,. Douglas Beltman served on 2/1/2011, answer due 2/22/2011. Service was accepted by Douglas Beltman. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/08/2011) |
| 02/08/2011 | 70 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,,,. Ann Maest served on 2/1/2011, answer due 2/22/2011. Service was accepted by Ann Maest. Document filed by Ann Maest. (Mastro, Randy) (Entered: 02/08/2011) |
| 02/08/2011 | 71 | AFFIDAVIT OF SERVICE of Summons and Complaint,,,,,,. Stratus Consulting, Inc. served on 2/1/2011, answer due 2/22/2011. Service was accepted by Douglas Beltman, Authorized Agent. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/08/2011) |
| 02/08/2011 | 72 | AFFIDAVIT OF SERVICE of Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, Proposed Order to Show Cause, Memorandum of Law dated February 3, 2011, Declaration of Kristen L. Hendricks with supporting exhibits dated February 3, 2011, and Declaration of Vladimiro Alvarez Grau with supporting exhibits dated February 3, 2011 (Doc No. 4 to 58) served on Douglas Beltman on 02/03/2011. Service was accepted by Douglas Beltman. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/08/2011) |
| 02/08/2011 | 73 | AFFIDAVIT OF SERVICE of Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, Proposed Order to Show Cause, Memorandum of Law dated February 3, 2011, Declaration of Kristen L. Hendricks with supporting exhibits dated February 3, 2011, and Declaration of Vladimiro Alvarez Grau with supporting exhibits dated February 3, 2011 (Doc No. 4 to 58) served on Ann Maest on 02/03/2011. Service was accepted by Ann Maest. Document filed by Chevron |

| | | Corporation. (Mastro, Randy) (Entered: 02/08/2011) |
|---|---|---|
| 02/08/2011 | 74 | AFFIDAVIT OF SERVICE of Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, Proposed Order to Show Cause, Memorandum of Law dated February 3, 2011, Declaration of Kristen L. Hendricks with supporting exhibits dated February 3, 2011, and Declaration of Vladimiro Alvarez Grau with supporting exhibits dated February 3, 2011 (Doc No. 4 to 58) served on Stratus Consulting, Inc. on 02/03/2011. Service was accepted by Douglas Beltman, Authorized Agent. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/08/2011) |
| 02/08/2011 | 75 | AFFIDAVIT OF SERVICE of 1) Summons in a Civil Action, filed February 1, 2011; 2) Civil Cover Sheet and Related Case Explanation, filed February 1, 2011; 3) Complaint, filed February 1, 2011; 4) Chevron Corporation's Rule 7.1 Statement, filed February 1, 2011; 5) Order to Show Cause Why a Temporary Restraining Order and Preliminary Injunction Should Not Be Entered, issued February 3, 2011; 6) Chevron's Memorandum of Law in Support of Its Application by Order to Show Cause for a Temporary Restraining Order and Preliminary Injunction, filed February 3, 2011; 7) Declaration of Kristen L. Hendricks in Support of Chevron Corporation's Motion for Preliminary Injunction, filed February 3, 2011; 8) Declaration of Vladimiro lvarez Grau in Support of Chevron Corporation's Motion for a Temporary Restraining Order and Preliminary Injunction, filed February 3, 2011; and 9) a cover letter from Randy M. Mastro to the Court, dated February 3, 2011, enclosing documents 58 served on Steven Donziger, Pablo Fajardo Mendoza, Luis Yanza, the Frente de Defensa de la Amazonia a/k/a Amazon Defense Front, Selva Viva Selviva CIA, LTDA, and Fajardo as agent for the 47 Individual Lago Agrio Plaintiffs (See Declaration for Individually Named Defendants) on 02/04/2011. Service was made by Electronic Mail, By Hand Delivery and Overnight Mail Delivery. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit A through F, # 2 Exhibit G through L)(Mastro, Randy) (Entered: 02/08/2011) |
| 02/08/2011 | 76 | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT (LETTER) - NOTICE of Request for Adjournment and Other Relief re: 4 Order to Show Cause. Document filed by Steven Donziger. (Donziger, Steven) Modified on 2/10/2011 (ka). (Entered: 02/08/2011) |
| 02/08/2011 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Oral Argument held on 2/8/2011. (mro) (Entered: 03/02/2011) |
| 02/09/2011 | 77 | ORDER ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER: Accordingly, the motion for a temporary restraining order is granted. Defendants, their officers, agents, servants, employees and attorneys and all other persons in active concert or participation with any of the foregoing be and they hereby are restrained, to and including 11:59 p.m. on February 22, 2011, from funding, commencing, prosecuting, advancing in any way, or receiving benefit from, directly or indirectly, any action or proceeding for recognition or enforcement of any judgment entered against Chevron in Maria Aguinda y Otros v. Chevron Corporation, No. 002-2003 (the "Lago Agrio Litigation") currently pending in the Provincial Court of Justice of |

| | | |
|---|---|---|
| | | Sucumbios in Ecuador, or for prejudgment seizure or attachment of assets based on any such judgment. The continuation of the temporary restraining order beyond noon on February 11, 2011 is conditioned upon Chevron having posted a bond in the amount of $10,000 prior to that time. It is further ordered as follows: 1. All papers in opposition to plaintiff s motion for a preliminary injunction shall be filed and served no later than February 11, 2011 at 5 p.m., and any reply papers in support of that motion shall be filed and served no later than February 15, 2011 at 5 p.m. 2. Unless otherwise ordered, the Court will hear argument on the motion for preliminary injunction on February 18, 2011 at 9:30 a.m. 3. The parties shall hold the period beginning on February 22, 2011 available for an evidentiary hearing in the event the Court determines that such a hearing is necessary or appropriate. (Responses due by 2/11/2011. Replies due by 2/15/2011. Oral Argument set for 2/18/2011 at 09:30 AM before Judge Lewis A. Kaplan.) (Signed by Judge Lewis A. Kaplan on 2/8/2011) (tro) Modified on 2/16/2011 (tro). (Entered: 02/09/2011) |
| 02/09/2011 | 78 | ORDER: Chevron should file with the Court a DVD or CD-Rom containing the exhibits presented at the February 8, 2011 oral argument. (Signed by Judge Lewis A. Kaplan on 2/9/2011) (jpo) (Entered: 02/09/2011) |
| 02/09/2011 | 79 | ORDER: The Court yesterday granted a temporary restraining order and has scheduled argument on the motion for a preliminary injunction for 9:30 a.m. on February 18, 2011. the Court hereby solicits the views, if any, of the U,S, Department of State with respect to the pending motion. Should the Department wish to express a position, the Court would appreciate receiving its submission on or before February 15, 2010 or, in any case, as soon thereafter as possible. The parties are directed to provide copies of (1) this order, (2) all papers filed herein, and (3) this Court's and the Court of Appeals' decision in In re Chevron Corp., Nos, 10 Mc 0001 and 10 Mc 002 to the Legal Advisor of the Department of State no later than the close of business on February 10, 2011. (Signed by Judge Lewis A. Kaplan on 2/9/2011) (jpo) (Entered: 02/09/2011) |
| 02/09/2011 | | Set/Reset Hearings: Oral Argument set for 2/18/2011 at 09:30 AM before Judge Lewis A. Kaplan. (tro) (Entered: 02/09/2011) |
| 02/09/2011 | | ***DELETED DOCUMENT. Deleted document number 80 Order as a duplicate of 79 . The document was incorrectly filed in this case. (tro) (Entered: 02/09/2011) |
| 02/10/2011 | | ***NOTE TO ATTORNEY THAT THE ATTEMPTED FILING OF Document No. 76 HAS BEEN REJECTED. Note to Attorney Steven R. Donziger : THE CLERK'S OFFICE DOES NOT ACCEPT LETTERS FOR FILING, either through ECF or otherwise, except where the judge has ordered that a particular letter be docketed. Letters may be sent directly to a judge. (ka) (Entered: 02/10/2011) |
| 02/11/2011 | 80 | NOTICE OF APPEARANCE by Steven J. Hyman on behalf of Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje (Hyman, Steven) (Entered: 02/11/2011) |
| 02/11/2011 | 81 | MEMORANDUM OF LAW in Opposition re: 4 Order to Show Cause,,,,. |

| | | Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Hyman, Steven) (Entered: 02/11/2011) |
|---|---|---|
| 02/11/2011 | 82 | NOTICE of Substitution of Attorney. Old Attorney: Shelden Elsen, Esq., New Attorney: Steven J. Hyman, Esq. and Norman Siegel, Esq., Address: McLaughlin and Stern, LLP, 260 Madison Ave., 18th Fl., New York, NY, USA 10016, 212-448-1100. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Hyman, Steven) (Entered: 02/11/2011) |
| 02/11/2011 | 83 | FILING ERROR - DEFICIENT DOCKET ENTRY - (SEE DOCUMENT #85) - CERTIFICATE OF SERVICE of Notice of Substitution of Counsel served on Chevron Corporation on February 11, 2011. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Hyman, Steven) Modified on 2/18/2011 (lb). (Entered: 02/11/2011) |
| 02/11/2011 | 84 | CERTIFICATE OF SERVICE of Notice of Appearance served on Chevron Corporation on Feburary 11, 2011. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Hyman, Steven) (Entered: 02/11/2011) |
| 02/11/2011 | 85 | CERTIFICATE OF SERVICE of Memorandum of Law in Opposition to Preliminary Injunction served on Chevron Corporation on February 11, 2011. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Hyman, Steven) (Entered: 02/11/2011) |
| 02/11/2011 | 86 | CERTIFICATE OF SERVICE of Notice of Substitution of Counsel served on Chevron Corporation on February 11, 2011. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Hyman, Steven) (Entered: 02/11/2011) |
| 02/14/2011 | 87 | ORDER. Papers in opposition to Chevron's motion for preliminary injunction were due by 5 p.m. on February 11, 2011. None of the defendants, except for Hugo Gerado Camacho Naranjo and Javier Piaguaje Payaguaje, have filed opposition papers. Nevertheless, in order to facilitate careful consideration of the motion for preliminary injunction, the temporary restraining order is hereby extended to 11:59 p.m. on March 8, 2011. (Signed by Judge Lewis A. Kaplan on 2/14/11) (djc) (Entered: 02/14/2011) |
| 02/14/2011 | 88 | ORDER: Proposed new counsel for defendants Camacho Naranjo and Piaguaje Payaguaje have filed a proposed stipulation of substitution and requested, in light of the extension today of the temporary restraining order until March 8, 2011, an adjournment until the week of February 28 of the argument of and any evidentiary hearing with respect to the preliminary injunction motion now scheduled for argument on February 22. In view of the fact that the temporary restraining order now expires on March 8, 2011 and perhaps cannot be extended further except on consent, the effect of granting the proposed adjournment could be to leave the Court with a maximum of six business days following the requested adjourned argument, and perhaps less, within which to reflect on the argument and the record, hold any evidentiary hearing that may be appropriate, and render a considered decision before the TRO expires. The purpose of extending the temporary restraining order was to ease precisely such time pressure. It would be defeated if the proposed |

| | | |
|---|---|---|
| | | adjournment were granted. Thus, while the Court would like to accommodate counsel if possible, the request for an adjournment is denied. This result is all the more important to reach in light of the reported entry of judgment in Ecuador against Chevron. This order is without prejudice to a renewed application provided that all defendants consent to an extension of the TRO for a satisfactory period beyond March 8, 2011 or, alternatively, plaintiff agrees. (Signed by Judge Lewis A. Kaplan on 2/14/2011) (tro) (Entered: 02/14/2011) |
| 02/14/2011 | 89 | NOTICE OF APPEARANCE by Norman H. Siegel on behalf of Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje (Siegel, Norman) (Entered: 02/14/2011) |
| 02/14/2011 | 113 | MOTION for Scott A. Edelman, William E. Thomson and Andrea E. Neuman to Appear Pro Hac Vice. Document filed by Chevron Corporation.(mro) (Entered: 02/16/2011) |
| 02/15/2011 | 90 | ENDORSED LETTER addressed to Judge Lewis A. Kaplan from Randy M. Mastro dated 2/14/2011 re: Requesting permission to file a single reply brief of no more than 35 pages responding to both of these oppositions. ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 2/15/2011) (jpo) (Entered: 02/15/2011) |
| 02/15/2011 | 91 | REPLY MEMORANDUM OF LAW in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 92 | DECLARATION of Rene Enrique Recalde Mera in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 93 | DECLARATION of Enrique Carvajal Salas in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 94 | DECLARATION of Randy M. Mastro in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 1)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 95 | DECLARATION of Cesar Coronel Jones in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 96 | DECLARATION of Kirsten Galler in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 97 | DECLARATION of Rex J. Mitchell in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 1 - Part 1, # 2 Exhibit 1 - Part 2, # 3 Exhibit 1 - Part 3, # 4 Exhibit 1 - Part 4, # 5 Exhibit 2 - Part 1, # 6 Exhibit 2 - Part 2, # 7 Exhibit 2 - Part 3)(Mastro, Randy) (Entered: 02/15/2011) |
| | | |

| 02/15/2011 | 98 | DECLARATION of Ivan Alberto Racines Enrique in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/15/2011) |
|---|---|---|
| 02/15/2011 | 99 | DECLARATION of Cesar Coronel Jones in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 100 | DECLARATION of Maria Gabriela Davila Cueva in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 101 | DECLARATION of Pablo Salvador Defina Bucaram in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 102 | DECLARATION of Jan Paulsson in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Curriculum Vitae, # 2 Index to Paulsson Declaration, # 3 Exhibit 1 - 1, # 4 Exhibit 1 - 2, # 5 Exhibit 1 - 3, # 6 Exhibit 1 - 4, # 7 Exhibit 1 - 5, Part 1, # 8 Exhibit 1 - 5, Part 2, # 9 Exhibit 1 - 5, Part 3, # 10 Exhibit 1 - 6)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 103 | DECLARATION of Jan Paulsson in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Index to Paulsson Declaration, # 2 Exhibit 1 -7, # 3 Exhibit 1 - 8, # 4 Exhibit 1 - 9, # 5 Exhibit 1 - 10, # 6 Exhibit 1 - 11, # 7 Exhibit 1 - 12, Part 1, # 8 Exhibit 1 - 12, Part 2, # 9 Exhibit 1 - 12, Part 3, # 10 Exhibit 1 - 13, # 11 Exhibit 1 - 14, # 12 Exhibit 1 - 15, # 13 Exhibit 1 - 16)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 104 | DECLARATION of Kristen L. Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 114, # 2 Exhibit 407, # 3 Exhibit 445, # 4 Exhibit 453, # 5 Exhibit 454) (Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 105 | DECLARATION of Kristen L. Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 465, # 2 Exhibit 466, Part1, # 3 Exhibit 466, Part 2, # 4 Exhibit 466, Part 3, # 5 Exhibit 466, Part 4, # 6 Exhibit 467, # 7 Exhibit 468, # 8 Exhibit 469, # 9 Exhibit 470, # 10 Exhibit 471, # 11 Exhibit 472, # 12 Exhibit 473, # 13 Exhibit 474, Part 1, # 14 Exhibit 474, Part 2, # 15 Exhibit 475)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 106 | DECLARATION of Kristen L. Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 476, # 2 Exhibit 477, # 3 Exhibit 478, # 4 Exhibit 479, # 5 Exhibit 480, # 6 Exhibit 481, Part 1, # 7 Exhibit 481, Part 2, # 8 Exhibit 481, Part 3, # 9 Exhibit 481, Part 4, # 10 Exhibit 482, # 11 Exhibit 483, # 12 Exhibit 484, # 13 Exhibit 485, # 14 Exhibit 486)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | 107 | DECLARATION of Kristen L. Hendricks in Support re: 4 Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 487, # 2 Exhibit 488, # 3 Exhibit 489, # 4 Exhibit 490, # 5 Exhibit 491, # 6 |

| | | |
|---|---|---|
| | | Exhibit 492, # <u>7</u> Exhibit 493, # <u>8</u> Exhibit 494, # <u>9</u> Exhibit 495, # <u>10</u> Exhibit 496, # <u>11</u> Exhibit 497, # <u>12</u> Exhibit 498, # <u>13</u> Exhibit 499, # <u>14</u> Exhibit 500, # <u>15</u> Exhibit 501, # <u>16</u> Exhibit 502, # <u>17</u> Exhibit 503, # <u>18</u> Exhibit 504)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | <u>108</u> | DECLARATION of Kristen L. Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Exhibit 505, # <u>2</u> Exhibit 506, Part 1, # <u>3</u> Exhibit 506, Part 2, # <u>4</u> Exhibit 506, Part 3, # <u>5</u> Exhibit 506, Part 4, # <u>6</u> Exhibit 506, Part 5, # <u>7</u> Exhibit 507, # <u>8</u> Exhibit 508, # <u>9</u> Exhibit 509, # <u>10</u> Exhibit 510, # <u>11</u> Exhibit 511, # <u>12</u> Exhibit 512, # <u>13</u> Exhibit 513, # <u>14</u> Exhibit 514)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | <u>109</u> | DECLARATION of Kristen L. Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Exhibit 515, # <u>2</u> Exhibit 516, # <u>3</u> Exhibit 517, # <u>4</u> Exhibit 518, # <u>5</u> Exhibit 519, # <u>6</u> Exhibit 520, Part 1, # <u>7</u> Exhibit 520, Part 2, # <u>8</u> Exhibit 520, Part 3, # <u>9</u> Exhibit 520, Part 4, # <u>10</u> Exhibit 521, # <u>11</u> Exhibit 522, # <u>12</u> Exhibit 523, # <u>13</u> Exhibit 524, # <u>14</u> Exhibit 525)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | <u>110</u> | DECLARATION of Kristen L. Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Exhibit 526, # <u>2</u> Exhibit 527, # <u>3</u> Exhibit 528, # <u>4</u> Exhibit 529, # <u>5</u> Exhibit 530, # <u>6</u> Exhibit 531, # <u>7</u> Exhibit 532, # <u>8</u> Exhibit 533, # <u>9</u> Exhibit 534, # <u>10</u> Exhibit 535, # <u>11</u> Exhibit 536, # <u>12</u> Exhibit 537, # <u>13</u> Exhibit 538, # <u>14</u> Exhibit 539, # <u>15</u> Exhibit 540, # <u>16</u> Exhibit 541, # <u>17</u> Exhibit 542, # <u>18</u> Exhibit 543, # <u>19</u> Exhibit 544, # <u>20</u> Exhibit 545)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/15/2011 | <u>111</u> | DECLARATION of Kristen L. Hendricks in Support re: <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Attachments: # <u>1</u> Exhibit 546, # <u>2</u> Exhibit 547, # <u>3</u> Exhibit 548, # <u>4</u> Exhibit 549, # <u>5</u> Exhibit 550, # <u>6</u> Exhibit 551, # <u>7</u> Exhibit 552, # <u>8</u> Exhibit 553, # <u>9</u> Exhibit 554, Part 1, # <u>10</u> Exhibit 554, Part 2, # <u>11</u> Exhibit 555, # <u>12</u> Exhibit 556, # <u>13</u> Exhibit 557, # <u>14</u> Exhibit 558, # <u>15</u> Exhibit 559, # <u>16</u> Exhibit 560, # <u>17</u> Exhibit 561, # <u>18</u> Exhibit 562, # <u>19</u> Exhibit 563)(Mastro, Randy) (Entered: 02/15/2011) |
| 02/16/2011 | <u>112</u> | SUBSTITUTION OF COUNSEL that Norman Siegel and Steven J. Hyman be substituted in the place and stead of Orans Elsen Lupert & Brown, LLP as attorneys for Defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje. (Signed by Judge Lewis A. Kaplan on 2/14/11) (cd) (Entered: 02/16/2011) |
| 02/16/2011 | <u>114</u> | Letter addressed to Judge Lewis A. Kaplan from John Clopper dated 2/15/11 re: The Department of State doe not have any specific comment at this time regarding plaintiff's pending motion for a preliminary injunction and relations between the US and Ecuador. (cd) (Entered: 02/16/2011) |
| 02/17/2011 | <u>115</u> | DECLARATION of Maria Gabriela Davila Cueva in Support re: <u>100</u> Declaration in Support, <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/17/2011) |
| 02/17/2011 | <u>116</u> | DECLARATION of Pablo Salvador Defina Bacuram in Support re: <u>101</u> Declaration in Support, <u>4</u> Order to Show Cause,,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/18/2011) |

| 02/18/2011 | 117 | DECLARATION of Kirsten Galler re: 1 Complaint,,,,,, Summons Issued to various defendants. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Mastro, Randy) (Entered: 02/18/2011) |
|---|---|---|
| 02/18/2011 | 118 | DECLARATION of Elaine K. Kim Regarding Service of Chevron's Reply in Support of the Motion for Preliminary Injunction and Supporting Declarations. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/18/2011) |
| 02/18/2011 | 119 | DECLARATION of Elaine K. Kim Regarding Service of the Order Dated February 8, 2011 on Plaintiff's Motion for Temporary Restraining Order. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/18/2011) |
| 02/18/2011 | 120 | DECLARATION of Jason E. Morrow Regarding Service of Chevron's Reply in Support of Motion for Preliminary Injunction and Supporting Declarations. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/18/2011) |
| 02/18/2011 | 121 | DECLARATION of Kristen L. Hendricks Regarding Service of Chevron's Reply in Support of Motion for Preliminary Injunction and Supporting Declarations. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/18/2011) |
| 02/18/2011 | 122 | DECLARATION of Kristen L. Hendricks Regarding Service of the Order dated February 8, 2011 on Plaintiff's Motion for a Temporary Restraining Order. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/18/2011) |
| 02/18/2011 | 123 | DECLARATION of Kristen L. Hendricks Regarding Service of Order dated February 14, 2011. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/18/2011) |
| 02/18/2011 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Oral Argument held on 2/18/2011. Expert affidavits are due 2/24/11 before 4pm. Each side may submit one such affidavit. (mro) (Entered: 03/07/2011) |
| 02/23/2011 | 124 | NOTICE OF APPEARANCE by Elliot Remsen Peters on behalf of Steven Donziger, The Law Offices of Steven R. Donziger (Peters, Elliot) (Entered: 02/23/2011) |
| 02/23/2011 | 125 | CERTIFICATE OF SERVICE of CERTIFICATE OF SERVICE on 02/11/11. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Peters, Elliot) (Entered: 02/23/2011) |
| 02/23/2011 | 126 | MEMO ENDORSEMENT ON 113 Motion for Scott A. Edelman, William E. Thomson and Andrea E. Neuman to Appear Pro Hac Vice. ENDORSEMENT: Granted. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 2/23/2011) (lnl) (Entered: 02/23/2011) |
| 02/24/2011 | 127 | ORDER: Mr. Fajardo' s application, insofar as it is made on behalf of himself, is granted to the extent that his time to answer, move or otherwise respond to the complaint is extended to and including March 1, 2011. The application, |

| | | |
|---|---|---|
| | | insofar as it is brought on his behalf, is denied in all other respects without prejudice to a timely motion for a further extension made on notice to all parties. Insofar as the application is made on behalf of Ecuadorian defendants other than Messrs. Camacho Naranjo and Piaguaje Payaguaje, it is denied without prejudice to a renewed motion made on notice to all parties by duly admitted counselor by the individuals in question pro se. The Court, on its own motion, extends the time of the Ecuadorian defendants other than Messrs. Camacho Naranjo and Piaguaje Payaguaje to answer, moved or otherwise respond to the complaint to and including March 1, 2011. It will consider a further extension in the event a stipulation or proper application seeking one is properly presented. Insofar as the application is made on behalf of Messrs. Camacho Naranjo and Piaguaje Payaguaje, it is denied as moot. Pablo Fajardo Mendoza answer due 3/1/2011. (Signed by Judge Lewis A. Kaplan on 2/24/2011) (tro) (Entered: 02/24/2011) |
| 02/24/2011 | 128 | Letter addressed to Judge Lewis A. Kaplan from Pablo Fajardo Mendoza dated 2/23/2011 re: Mr. Pablo Fajardo Mendoza along with the Ecuadorian defendants, request an extension of time to respond to the complaint. Document filed by Pablo Fajardo Mendoza.(tro) (Entered: 02/24/2011) |
| 02/24/2011 | 129 | STIPULATION AND ORDER: The time for defendants Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje to answer, move against, or otherwise respond to the complaint herein be and hereby is adjourned to 3/16/2011. (Signed by Judge Lewis A. Kaplan on 2/24/2011) (tro) (Entered: 02/24/2011) |
| 02/24/2011 | 130 | NOTICE OF APPEARANCE by Gordon Mehler on behalf of Douglas Beltman, Ann Maest, Stratus Consulting, Inc., Stratus Consulting, Inc. (Mehler, Gordon) (Entered: 02/24/2011) |
| 02/24/2011 | 131 | NOTICE of NOTICE OF FILING. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit A)(Peters, Elliot) (Entered: 02/24/2011) |
| 02/24/2011 | 132 | DECLARATION of Alejandro Garro in Opposition re: 5 Memorandum of Law in Support, 4 Order to Show Cause,,,,. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit A)(Peters, Elliot) (Entered: 02/24/2011) |
| 02/24/2011 | 133 | AFFIDAVIT of Dr. Farith Ricardo Simon in Opposition re: 4 Order to Show Cause,,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Hyman, Steven) (Entered: 02/24/2011) |
| 02/24/2011 | 134 | AFFIDAVIT of Dr. Cesar Coronel Jones re: 4 Order to Show Cause,,,, *Affidavit of Dr. Cesar Coronel Jones Regarding Appellate Remedies and Judgment Enforcement in Ecuador*. Document filed by Chevron Corporation. (Attachments: # 1 Appendix Cover and Table of Tabs, # 2 Tabs 1 through 10, # 3 Tabs 11 through 20, # 4 Tabs 21 through 27, # 5 Tab 28, # 6 Tabs 29 through 34)(Mastro, Randy) (Entered: 02/24/2011) |
| 02/24/2011 | 135 | CERTIFICATE OF SERVICE of Affidavit of Dr. Farith Ricardo Simon in Opposition to Preliminary Injunction served on Chevron Corporation on February 24, 2011. Document filed by Hugo Gerardo Camacho Naranjo, |

| | | |
|---|---|---|
| | | Javier Piaguaje Payaguaje. (Hyman, Steven) (Entered: 02/24/2011) |
| 02/24/2011 | 136 | STIPULATION AND ORDER, Steven Donziger answer due 3/16/2011; The Law Offices of Steven R. Donziger answer due 3/16/2011 or Motion due by 3/16/2011, and as further set forth in this document. (Signed by Judge Lewis A. Kaplan on 2/24/11) (cd) (Entered: 02/24/2011) |
| 02/25/2011 | 137 | MEMORANDUM OF LAW in Opposition re: 77 Order, Set Deadlines/Hearings,,,,,,,,,,,,,. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Peters, Elliot) (Entered: 02/25/2011) |
| 02/25/2011 | 138 | DECLARATION of Elliot R. Peters in Support re: 137 Memorandum of Law in Opposition. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, Part 1, # 5 Exhibit 4, Part 2, # 6 Exhibit 4, Part 3, # 7 Exhibit 4, Part 4, # 8 Exhibit 5, # 9 Exhibit 6, # 10 Exhibit 7, # 11 Exhibit 8, # 12 Exhibit 9, # 13 Exhibit 10, # 14 Exhibit 11, # 15 Exhibit 12, # 16 Exhibit 13) (Peters, Elliot) (Entered: 02/25/2011) |
| 02/25/2011 | | CASHIERS OFFICE REMARK on 113 Motion to Appear Pro Hac Vice in the amount of $75.00, paid on 02/14/2011, Receipt Number 930015. (jd) (Entered: 02/25/2011) |
| 02/25/2011 | 139 | DECLARATION of Elliot R. Peters in Support re: 137 Memorandum of Law in Opposition. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit 14, Part 1, # 2 Exhibit 14, Part 2, # 3 Exhibit 14, Part 3, # 4 Exhibit 14, Part 4, # 5 Exhibit 14, Part 5, # 6 Exhibit 14, Part 6, # 7 Exhibit 14, Part 7, # 8 Exhibit 14, Part 8, # 9 Exhibit 14, Part 9)(Peters, Elliot) (Entered: 02/25/2011) |
| 02/25/2011 | 140 | DECLARATION of Elliot R. Peters in Support re: 137 Memorandum of Law in Opposition. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit 15, # 2 Exhibit 16, # 3 Exhibit 17, # 4 Exhibit 18, # 5 Exhibit 19, # 6 Exhibit 20, # 7 Exhibit 21, # 8 Exhibit 22, Part 1, # 9 Exhibit 22, Part 2, # 10 Exhibit 22, Part 3, # 11 Exhibit 22, Part 4, # 12 Exhibit 22, Part 5, # 13 Exhibit 22, Part 6, # 14 Exhibit 23, # 15 Exhibit 24, # 16 Exhibit 25)(Peters, Elliot) (Entered: 02/25/2011) |
| 02/25/2011 | 141 | DECLARATION of Elliot R. Peters in Support re: 137 Memorandum of Law in Opposition. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit 26, Part 1, # 2 Exhibit 26, Part 2, # 3 Exhibit 26, Part 3, # 4 Exhibit 26, Part 4, # 5 Exhibit 27, Part 1, # 6 Exhibit 27, Part 2, # 7 Exhibit 27, Part 3, # 8 Exhibit 27, Part 4, # 9 Exhibit 28, Part 1, # 10 Exhibit 28, Part 2, # 11 Exhibit 28, Part 3, # 12 Exhibit 28, Part 4, # 13 Exhibit 28, Part 5)(Peters, Elliot) (Entered: 02/25/2011) |
| 02/25/2011 | 142 | DECLARATION of Elliot R. Peters in Support re: 137 Memorandum of Law in Opposition. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit 29, # 2 Exhibit 30, # 3 Exhibit 31, # 4 Exhibit 32, # 5 Exhibit 33)(Peters, Elliot) (Entered: 02/25/2011) |
| 02/27/2011 | 143 | NOTICE OF APPEARANCE by Julio Cesar Gomez on behalf of Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje (Gomez, Julio) |

| | | |
|---|---|---|
| | | (Entered: 02/27/2011) |
| 02/27/2011 | <u>144</u> | FILING ERROR - DEFICIENT DOCKET ENTRY - MOTION to Increase Bond Amount (On Short Notice). Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # <u>1</u> Memorandum of Law, # <u>2</u> Proposed Order, # <u>3</u> Certificate of Service)(Gomez, Julio) Modified on 2/28/2011 (ka). (Entered: 02/27/2011) |
| 02/27/2011 | <u>145</u> | FILING ERROR - DEFICIENT DOCKET ENTRY - DECLARATION of Juan Pablo Saenz M. in Support re: <u>144</u> MOTION to Increase Bond Amount (On Short Notice). Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15 (Part 1), # <u>16</u> Exhibit 15 (Part 2), # <u>17</u> Exhibit 15 (Part 3), # <u>18</u> Exhibit 15 (Part 4), # <u>19</u> Exhibit 16, # <u>20</u> Exhibit 17, # <u>21</u> Exhibit 18, # <u>22</u> Exhibit 19, # <u>23</u> Exhibit 20, # <u>24</u> Exhibit 21, # <u>25</u> Exhibit 22, # <u>26</u> Exhibit 23, # <u>27</u> Exhibit 24, # <u>28</u> Exhibit 25, # <u>29</u> Exhibit 26, # <u>30</u> Exhibit 27, # <u>31</u> Exhibit 28, # <u>32</u> Exhibit 29, # <u>33</u> Exhibit 30, # <u>34</u> Exhibit 31, # <u>35</u> Exhibit 32)(Gomez, Julio) Modified on 2/28/2011 (ka). (Entered: 02/28/2011) |
| 02/28/2011 | <u>146</u> | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT (EXHIBITS) - DECLARATION of Juan Pablo Saenz M. in Support re: <u>144</u> MOTION to Increase Bond Amount (On Short Notice).. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # <u>1</u> Exhibit 33, # <u>2</u> Exhibit 34, # <u>3</u> Exhibit 35, # <u>4</u> Exhibit 36, # <u>5</u> Exhibit 37, # <u>6</u> Exhibit 38, # <u>7</u> Exhibit 39, # <u>8</u> Exhibit 40, # <u>9</u> Exhibit 41, # <u>10</u> Exhibit 42, # <u>11</u> Exhibit 43, # <u>12</u> Exhibit 44, # <u>13</u> Exhibit 45, # <u>14</u> Exhibit 46, # <u>15</u> Exhibit 47, # <u>16</u> Exhibit 48, # <u>17</u> Exhibit 49, # <u>18</u> Exhibit 50, # <u>19</u> Exhibit 51, # <u>20</u> Exhibit 52, # <u>21</u> Exhibit 53, # <u>22</u> Exhibit 54)(Gomez, Julio) Modified on 2/28/2011 (ka). (Entered: 02/28/2011) |
| 02/28/2011 | <u>147</u> | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT (EXHIBITS) - DECLARATION of Juan Pablo Saenz M. in Support re: <u>144</u> MOTION to Increase Bond Amount (On Short Notice).. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # <u>1</u> Exhibit 55, # <u>2</u> Exhibit 56, # <u>3</u> Exhibit 57, # <u>4</u> Exhibit 58, # <u>5</u> Exhibit 59, # <u>6</u> Exhibit 60, # <u>7</u> Exhibit 61, # <u>8</u> Exhibit 62, # <u>9</u> Exhibit 63, # <u>10</u> Exhibit 64, # <u>11</u> Exhibit 65, # <u>12</u> Exhibit 66, # <u>13</u> Exhibit 67, # <u>14</u> Exhibit 68, # <u>15</u> Exhibit 69, # <u>16</u> Exhibit 70, # <u>17</u> Exhibit 71 (Part 1), # <u>18</u> Exhibit 71 (Part 2), # <u>19</u> Exhibit 71 (Part 3), # <u>20</u> Exhibit 71 (Part 4))(Gomez, Julio) Modified on 2/28/2011 (ka). (Entered: 02/28/2011) |
| 02/28/2011 | <u>148</u> | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT (EXHIBITS) - DECLARATION of Juan Pablo Saenz M. in Support re: <u>144</u> MOTION to Increase Bond Amount (On Short Notice).. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # <u>1</u> Exhibit 71 (Part 5), # <u>2</u> Exhibit 71 (Part 6), # <u>3</u> Exhibit 71 (Part 7), # <u>4</u> Exhibit 71 (Part 8), # <u>5</u> Exhibit 71 (Part 9), # <u>6</u> Exhibit 71 (Part 10), # <u>7</u> Exhibit 71 (Part 11), # <u>8</u> Exhibit 72, # <u>9</u> Exhibit 73)(Gomez, Julio) Modified on 2/28/2011 (ka). (Entered: 02/28/2011) |

| 02/28/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Julio Cesar Gomez to RE-FILE Document 144 MOTION to Increase Bond Amount (On Short Notice). MOTION to Increase Bond Amount (On Short Notice). ERROR(S): Filing Error of Attachments. Supporting Memorandum must be filed individually. Event code located under Replies, Opposition and Supporting Documents. ***NOTE: Email pdf of Proposed Order to judgments@nysd.uscourts.gov. (ka) (Entered: 02/28/2011) |
|---|---|---|
| 02/28/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Julio Cesar Gomez to RE-FILE Document 145 Declaration in Support of Motion. ERROR(S): Link to incorrect filing of document#144. (ka) (Entered: 02/28/2011) |
| 02/28/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - NON-ECF DOCUMENT ERROR. Note to Attorney FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT(EXHIBITS) - to MANUALLY RE-FILE Document No. 146 Exhibits. This document is not filed via ECF. (ka) (Entered: 02/28/2011) |
| 02/28/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - NON-ECF DOCUMENT ERROR. Note to Attorney Julio Cesar Gomez to MANUALLY RE-FILE Document No. 147 Exhibits. This document is not filed via ECF. (ka) (Entered: 02/28/2011) |
| 02/28/2011 | 149 | FILING ERROR - DEFICIENT DOCKET ENTRY - MEMORANDUM OF LAW in Support re: 144 MOTION to Increase Bond Amount (On Short Notice). MOTION to Increase Bond Amount (On Short Notice). Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) Modified on 2/28/2011 (ka). (Entered: 02/28/2011) |
| 02/28/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - NON-ECF DOCUMENT ERROR. Note to Attorney Julio Cesar Gomez to MANUALLY RE-FILE Document No. 148 Exhibits. This document is not filed via ECF. (ka) (Entered: 02/28/2011) |
| 02/28/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Julio Cesar Gomez to RE-FILE Document 149 Memorandum of Law in Support of Motion. ERROR (S): Link to incorrect filing of document#144.***NOTE: Refile Motion (doc.#144 first and then refile supporting memorandum(doc.#149) and link to refiled motion). (ka) (Entered: 02/28/2011) |
| 02/28/2011 | 150 | MOTION Increase the Bond (on Short Notice). Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Certificate of Service)(Gomez, Julio) (Entered: 02/28/2011) |
| 02/28/2011 | 151 | MEMORANDUM OF LAW in Support re: 150 MOTION Increase the Bond (on Short Notice).. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 02/28/2011) |
| 02/28/2011 | 152 | DECLARATION of Juan Pablo Saenz M. in Support re: 150 MOTION Increase the Bond (on Short Notice).. Document filed by Javier Piaguaje |

| | | |
|---|---|---|
| | | Payaguaje. (Attachments: # 1 Exhibit Ex. 1, # 2 Exhibit Ex. 2, # 3 Exhibit Ex. 3, # 4 Exhibit Ex. 4, # 5 Exhibit Ex. 5, # 6 Exhibit Ex. 6, # 7 Exhibit Ex. 7, # 8 Exhibit Ex. 8, # 9 Exhibit Ex. 9, # 10 Exhibit Ex. 10, # 11 Exhibit Ex. 11, # 12 Exhibit Ex. 12, # 13 Exhibit Ex. 13, # 14 Exhibit Ex. 14, # 15 Exhibit Ex. 15 -part 1, # 16 Exhibit Ex. 15- part 2, # 17 Exhibit Ex. 15-part 3, # 18 Exhibit Ex. 15 - part 4, # 19 Exhibit Ex. 16, # 20 Exhibit Ex. 17, # 21 Exhibit Ex. 18, # 22 Exhibit Ex. 19, # 23 Exhibit Ex. 20, # 24 Exhibit Ex. 21, # 25 Exhibit Ex. 22, # 26 Exhibit Ex. 23, # 27 Exhibit Ex. 24, # 28 Exhibit Ex. 25, # 29 Exhibit Ex. 26, # 30 Exhibit Ex. 27, # 31 Exhibit Ex. 28, # 32 Exhibit Ex. 29, # 33 Exhibit Ex. 30, # 34 Exhibit Ex. 31, # 35 Exhibit Ex. 32)(Gomez, Julio) (Entered: 02/28/2011) |
| 02/28/2011 | 153 | DECLARATION of Juan Pablo Saenz M. in Support re: 150 MOTION Increase the Bond (on Short Notice).. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit Ex. 33, # 2 Exhibit Ex. 34, # 3 Exhibit Ex. 35, # 4 Exhibit Ex. 36, # 5 Exhibit Ex. 37, # 6 Exhibit Ex. 38, # 7 Exhibit Ex. 39, # 8 Exhibit Ex. 40, # 9 Exhibit Ex. 41, # 10 Exhibit Ex. 42, # 11 Exhibit Ex. 43, # 12 Exhibit Ex. 44, # 13 Exhibit Ex. 45, # 14 Exhibit Ex. 46, # 15 Exhibit Ex. 47, # 16 Exhibit Ex. 48, # 17 Exhibit Ex. 49, # 18 Exhibit Ex. 50, # 19 Exhibit Ex. 51, # 20 Errata Ex. 52, # 21 Exhibit Ex. 53, # 22 Exhibit Ex. 54)(Gomez, Julio) (Entered: 02/28/2011) |
| 02/28/2011 | 154 | DECLARATION of Juan Pablo Saenz M. in Support re: 150 MOTION Increase the Bond (on Short Notice).. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit Ex. 55, # 2 Exhibit Ex. 56, # 3 Exhibit Ex. 57, # 4 Exhibit Ex. 58, # 5 Exhibit Ex. 59, # 6 Exhibit Ex. 60, # 7 Exhibit Ex. 61, # 8 Exhibit Ex. 62, # 9 Exhibit Ex. 63, # 10 Exhibit Ex. 64, # 11 Exhibit Ex. 65, # 12 Exhibit Ex. 66, # 13 Exhibit Ex. 67, # 14 Exhibit Ex. 68, # 15 Exhibit Ex. 69, # 16 Exhibit Ex. 70, # 17 Exhibit Ex. 71 -part 1, # 18 Exhibit Ex. 71 -part 2, # 19 Exhibit Ex. 71-part 3, # 20 Exhibit Ex. 71 - part 4)(Gomez, Julio) (Entered: 02/28/2011) |
| 02/28/2011 | 155 | DECLARATION of Juan Pablo Saenz M. in Support re: 150 MOTION Increase the Bond (on Short Notice).. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit Ex. 71-part 5, # 2 Exhibit Ex. 71-part 6, # 3 Exhibit Ex. 71-part 7, # 4 Exhibit Ex. 71-part 8, # 5 Exhibit Ex. 71- part 9, # 6 Exhibit Ex. 71-part 10, # 7 Exhibit Ex. 71-part 11, # 8 Exhibit Ex. 72, # 9 Exhibit Ex. 73)(Gomez, Julio) (Entered: 02/28/2011) |
| 02/28/2011 | 156 | NOTICE of Substitution of Attorney. Old Attorney: Norman Siegel and Steven Hyman, New Attorney: Julio C. Gomez: Gomez LLC, Attorney at Law, The Trump Building, 40 Wall Street, 28th Floor, New York, New York, US 10005, 212-400-7150. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Certificate of Service)(Gomez, Julio) (Entered: 02/28/2011) |
| 02/28/2011 | 157 | STIPULATION AND ORDER: It is hereby stipulated and agreed by and between the parties that the time of defendants Stratus Consulting, Douglas Beltman, and Ann Maest to answer, move against, or otherwise respond to the complaint is hereby adjourned to March 16, 2011. (Signed by |

| | | Judge Lewis A. Kaplan on 2/28/2011) (jpo) (Entered: 02/28/2011) |
|---|---|---|
| 02/28/2011 | 158 | Letter addressed to Judge Lewis A. Kaplan from Steven R. Donziger dated 2/8/2011 re: I write with respect to the above referenced matter to address issues of considerable urgency. (jpo) (Entered: 02/28/2011) |
| 02/28/2011 | 159 | NOTICE of Application for Transfer of Case as Related to Aguinda, et al. v. Texaco, et al., 93-CV-07527 JSR, Pursuant to Rule 15 of the Division of Business Among District Judges, Southern District. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Peters, Elliot) (Entered: 02/28/2011) |
| 02/28/2011 | 160 | MOTION to Transfer Case - *Application for Transfer of Case as Related to Aguinda, et al. v. Texaco, et al., 93-CV-07527 JSR, Pursuant to Rule 15 of the Division of Business Among District Judges, Southern District*. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger.(Peters, Elliot) (Entered: 02/28/2011) |
| 02/28/2011 | 161 | DECLARATION of Elliot R. Peters in Support re: 160 MOTION to Transfer Case - *Application for Transfer of Case as Related to Aguinda, et al. v. Texaco, et al., 93-CV-07527 JSR, Pursuant to Rule 15 of the Division of Business Among District Judges, Southern District*.. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, Part 1, # 4 Exhibit C, Part 2, # 5 Exhibit C, Part 3, # 6 Exhibit C, Part 4, # 7 Exhibit C, Part 5, # 8 Exhibit D, # 9 Exhibit E, # 10 Exhibit F, # 11 Exhibit G, # 12 Exhibit H, # 13 Exhibit I, # 14 Exhibit J, # 15 Exhibit K, # 16 Exhibit L, # 17 Exhibit M)(Peters, Elliot) (Entered: 02/28/2011) |
| 02/28/2011 | 162 | CERTIFICATE OF SERVICE of Affidavit of Dr. Cesar Coronel Jones and three (3) letters to Honorable Lewis A. Kaplan, dated February 24, 2011 served on Defendants and Co-Conspirators on 02/24/2011. Service was made by ECF Notification, overnight mail, by hand, Electronic Mail. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/28/2011) |
| 02/28/2011 | 163 | CERTIFICATE OF SERVICE of Affidavit of Dr. Cesar Coronel Jones and three (3) letters to Honorable Lewis A. Kaplan, dated February 24, 2011 served on Defendants and Co-Conspirators on 02/24/2011. Service was made by Overnight Mail, By Hand, Electronic Mail, Regular Mail. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 02/28/2011) |
| 02/28/2011 | 166 | MOTION for John W. Keker to Appear Pro Hac Vice. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger.(mbe) (Entered: 03/01/2011) |
| 03/01/2011 | 164 | TRANSCRIPT of proceedings held on 2/18/2011 before Judge Lewis A. Kaplan. (mbe) (Entered: 03/01/2011) |
| 03/01/2011 | 165 | TRANSCRIPT of proceedings held on 2/8/2011 before Judge Lewis A. Kaplan. (mbe) (Entered: 03/01/2011) |
| 03/01/2011 | 190 | MOTION for Carlos A Zelaya, II to Appear Pro Hac Vice. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje.(mro) (Entered: |

| | | 03/09/2011) |
|---|---|---|
| 03/01/2011 | 197 | MOTION for Jan Nielsen Little to Appear Pro Hac Vice. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger,mbe) Modified on 3/11/2011 (mbe). (Entered: 03/11/2011) |
| 03/02/2011 | 167 | NOTICE of Joinder in Defendant Steven Donziger's Application for Transfer of Case as Related to Aguinda, et al., 93 cv 07527 JSR, Pursuant to Rule 15 of the Division of Business Among District Judges, Southern District. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 03/02/2011) |
| 03/02/2011 | 171 | MOTION for Martin D. Beier, Joe L. Silver and Jessica R. Torbin to Appear Pro Hac Vice. Document filed by Douglas Beltman, Ann Maest, Stratus Consulting, Inc., Stratus Consulting, Inc..(mbe) (Entered: 03/04/2011) |
| 03/03/2011 | 168 | LETTER: addressed to Judge Lewis A. Kaplan from The Law Firm of Gibson Dunn dated 2/24/2011 re: As Your Honor requested at the preliminary injunction hearing, enclosed please find two copies of the certified translation of the 188-page Lago Agrio judgment. It awards approximately $18.2 billion in total damages. The Lago Agrio court imposes $8.646 billion in damages for "reparation measures" derived from the following categories $600 million for groundwater remediation (p. 179). $5.396 billion for soil remediation (p.181); $200 million to implement a potable water system in the allegedly affected areas (p. 183); $1.4 billion to establish a healthcare system to serve the general population of the allegedly affected communities (p. 183); $800 million for "a plan of health," including potential cancer treatment (p. 184); and $100 million to rebuild ethnic communities and indigenous culture (pp. 183-184). All other provisions as further set forth in this order. So Ordered. Document filed by Chevron Corporation.(js) (ae). (Entered: 03/03/2011) |
| 03/03/2011 | 169 | LETTER: addressed to Judge Lewis A. Kaplan from Steven Hyman dated 2/23/2011 re: Counsel represents defendants Hugo Gerado Camacho Naranjo and Javier Piaguaje Payaguaje. This responds to Your Honor's inquiry at the hearing on February 18, 2011, as to whether we will consent to a severance and trial of the declaratory judgment cause of action in the Complaint. This is to advise Your Honor, respectfully, that we will not consent to such a severance and trial.(js) (Entered: 03/03/2011) |
| 03/04/2011 | 170 | ENDORSED LETTER addressed to Judge Lewis A. Kaplan from Randy Mastro dated 2/24/11 re: Request to deliver to the Clerk copies of the listed exhibits, which are CD or DVD discs and could not electronically filed. ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 3/4/11) (cd) (Entered: 03/04/2011) |
| 03/04/2011 | 172 | MOTION for Leave to File Supplemental Opposition to Chevron Corporation's Motion for Preliminary Injunction. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje.(Gomez, Julio) (Entered: 03/04/2011) |
| 03/04/2011 | 177 | CERTIFICATE OF SERVICE of Notice of Motion on Short Notice of Defs Hugo Gerardo Camacho Naranjo and Javier Piaguaje Payaguaje Seeking Leave of Court to File Supplemental Opposition to Chevron Corp.'s Motion |

| | | |
|---|---|---|
| | | for Preliminary Injunction; Supp. Memorandum of Law for which leave is sought to file; and Declaration of Julio C. Gomez served on ALL Counsel of Record on 3/4/2011. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 03/04/2011) |
| 03/04/2011 | | ***DELETED DOCUMENT. Deleted document number 173 SUPPLEMENTAL MEMORANDUM OF LAW in Opposition re: 172 MOTION. The document is deleted in regards to docket entry No. 187. (jfe) (Entered: 03/09/2011) |
| 03/04/2011 | | ***DELETED DOCUMENT. Deleted document number 174 DECLARATION of Julio C. Gomez in Support re: 172 MOTION. The document is deleted in regards to docket entry No. 187. (jfe) (Entered: 03/09/2011) |
| 03/04/2011 | | ***DELETED DOCUMENT. Deleted document number 175 DECLARATION of Julio C. Gomez in Support re: 172 MOTION. The document is deleted in regards to docket entry No. 187. (jfe) (Entered: 03/09/2011) |
| 03/04/2011 | | ***DELETED DOCUMENT. Deleted document number 176 DECLARATION of Julio C. Gomez in Support re: 172 MOTION. The document is deleted in regards to docket entry No. 187. (jfe) (Entered: 03/09/2011) |
| 03/05/2011 | 178 | MEMORANDUM OF LAW in Opposition re: 166 MOTION for John W. Keker to Appear Pro Hac Vice.. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 03/05/2011) |
| 03/05/2011 | 179 | DECLARATION of Kristen L. Hendricks in Opposition re: 166 MOTION for John W. Keker to Appear Pro Hac Vice.. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17)(Mastro, Randy) (Entered: 03/05/2011) |
| 03/07/2011 | 180 | LETTER: addressed to Judge Lewis A. Kaplan from John W. Keker dated 2/17/2011 re: Counsel for defendant requests that the Preliminary Injunction hearing(s) be continued 60 days. Mr. Donziger is willing to stipulate to the TRO being extended to cover that time period. Counsel has asked opposing counsel for Chevron to agree to such a continuance, and they have declined, on the grounds that all defendants (whom we do not represent) must consent too. While failure to grant such a continuance would be prejudicial to Mr. Donziger, granting this continuance as to Mr. Donziger, with the present TRO in place, preserves the status quo and visits no harm whatever on Chevron. (js) (Entered: 03/07/2011) |
| 03/07/2011 | 181 | OPINION #100038 granting in part and denying in part motion for preliminary injunction. (re: DI 4 Order to Show Cause) (Signed by Judge Lewis A. Kaplan on 3/7/2011) (jar) Modified on 3/16/2011 (ajc). (Entered: 03/07/2011) |
| | | |

A-39

| 03/07/2011 | 182 | MEMORANDUM AND ORDER denying 160 Motion to Transfer Case. The motion to transfer this case [DI 160] is denied. (Signed by Judge Lewis A. Kaplan on 3/7/2011) (jar) (Entered: 03/07/2011) |
|---|---|---|
| 03/07/2011 | 183 | ORDER denying 172 Motion for Leave to File Document. The motion for leave to supplement the record [DI 172] is denied. (Signed by Judge Lewis A. Kaplan on 3/7/2011) (jar) (Entered: 03/07/2011) |
| 03/08/2011 | 184 | Letter addressed to Judge Lewis A. Kaplan from Julio C. Gomez dated 3/7/2011 re: Counsel respectfully request that Your Honor seal Dockets 173, 174, 175 and 176. (jfe) (Entered: 03/08/2011) |
| 03/08/2011 | 185 | Letter addressed to Judge Lewis A. Kaplan from Michael W. Anderson dated 3/7/2011 re: Counsel respectfully ask the Court to Order that the Gomez declaration and the attached documents be placed under seal, or otherwise stricken from the docket. (jfe) (Entered: 03/08/2011) |
| 03/08/2011 | 186 | LETTER TRANSMITTING COPY OF MARCH 4, 2011 RULING OF ECUADORIAN COURT: addressed to Judge Lewis A. Kaplan from Randy M. Mastro dated 3/7/2011 re: Counsel writes to inform Your Honor that this past Friday, March 4, the Lago Agrio court in Ecuador denied Chevron's February 17 motion seeking clarification and amplification of the judgment in Maria Aguinda y Otros v. Chevron Corporation, No. 002-2003.(jfe) (Entered: 03/08/2011) |
| 03/08/2011 | 187 | ORDER: Accordingly, the Clerk shall print out copies of DI 173 through 176, file those copies under seal, and delete the corresponding electronic versions from the CM/ECF system as promptly as possible. (Signed by Judge Lewis A. Kaplan on 3/8/2011) (jfe) (Entered: 03/08/2011) |
| 03/08/2011 | | Transmission to Sealed Records Clerk. Transmitted re: 187 Order,, to the Sealed Records Clerk for the sealing or unsealing of document or case. (jfe) (Entered: 03/08/2011) |
| 03/08/2011 | 188 | MEMO ENDORSEMENT re: 150 Motion to Increase the Bond (on Short Notice). ENDORSEMENT: The motion is denied as moot. So ordered. (Signed by Judge Lewis A. Kaplan on 3/8/2011) (mro) Modified on 3/9/2011 (mro). (Entered: 03/08/2011) |
| 03/08/2011 | 189 | REPLY MEMORANDUM OF LAW in Support re: 166 MOTION for John W. Keker to Appear Pro Hac Vice.. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Peters, Elliot) (Entered: 03/08/2011) |
| 03/09/2011 | 191 | SEALED DOCUMENT placed in vault.(mps) (Entered: 03/09/2011) |
| 03/09/2011 | 192 | ORDER. Granting 166 Motion for John W. Keker to Appear Pro Hac Vice. (Signed by Judge Lewis A. Kaplan on 3/9/11) (rjm) (Entered: 03/09/2011) |
| 03/09/2011 | 193 | ORDER. The Court is in receipt of letters, both dated March 8, 2011, from counsel to Chevron and Donziger requesting that the Court schedule a discovery conference. Donziger's counsel requests sufficient lead time to permit them to travel in order to attend. The Court will conduct such a conference in Courtroom 12D at 4:30 p.m. on March 15, 2011, and as further set forth. (Discovery Conference set for 3/15/2011 at 04:30 PM in Courtroom |

| | | 12D, 500 Pearl Street, New York, NY 10007 before Judge Lewis A. Kaplan.) (Signed by Judge Lewis A. Kaplan on 3/9/11) (rjm) Modified on 3/9/2011 (rjm). (Entered: 03/09/2011) |
|---|---|---|
| 03/09/2011 | 194 | MEMO ENDORSEMENT Re: NOTICE OF MOTION TO ADMIT COUNSEL PRO HAC VICE. ENDORSEMENT: Granted. So ordered. Granting 171 Motion for Martin D. Beier, Joe L. Silver and Jessica R. Torbin to Appear Pro Hac Vice. (Signed by Judge Lewis A. Kaplan on 3/9/11) (rjm) (Entered: 03/09/2011) |
| 03/10/2011 | 195 | ORDER: The opinion issued on March 7, 2011 [DI 181 ], in this matter is corrected in the following manner: 1. Footnote 338, on page 91, is replaced with "Id. at 439-40." 2. The semicolon at the end of footnote 381, on page 104, is replaced with a period. 3. In the final sentence of the second paragraph on page 121, the word "they" is inserted in front of the word "made." SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/10/2011) (lnl) (Entered: 03/10/2011) |
| 03/10/2011 | 196 | MEMO ENDORSEMENT ON 190 Motion for Carlos A. Zelaya, II to Appear Pro Hac Vice. ENDORSEMENT: Granted. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/10/2011) (lnl) (Entered: 03/10/2011) |
| 03/11/2011 | | CASHIERS OFFICE REMARK on 166 Motion to Appear Pro Hac Vice in the amount of $25.00, paid on 02/28/2011, Receipt Number 930696. (jd) (Entered: 03/11/2011) |
| 03/11/2011 | | CASHIERS OFFICE REMARK on 190 Motion to Appear Pro Hac Vice in the amount of $25.00, paid on 03/01/2011, Receipt Number 930832. (jd) (Entered: 03/11/2011) |
| 03/11/2011 | | CASHIERS OFFICE REMARK on 197 Motion to Appear Pro Hac Vice,,,,,,, in the amount of $25.00, paid on 03/01/2011, Receipt Number 930784. (jd) (Entered: 03/11/2011) |
| 03/11/2011 | | CASHIERS OFFICE REMARK on 171 Motion to Appear Pro Hac Vice in the amount of $75.00, paid on 03/02/2011, Receipt Number 930903. (jd) (Entered: 03/11/2011) |
| 03/11/2011 | 198 | Preliminary Injunction BOND # 6729431 in the amount of $ 21,800,000.00 posted by Chevron Corporation. (ml) (Entered: 03/11/2011) |
| 03/11/2011 | 199 | ORDER TO SHOW CAUSE WHY THE DECLARATORY JUDGMENT CLAIM SHOULD NOT BE BIFURCATED IN WHOLE OR IN PART Chevron shall serve counsel for Defendants, who have appeared in this action with the Memorandum of Law and Declaration of Kristen L. Hendricks in Support of its Motion and this Order, on or before 4:00 on 3/11/11. Defendants must show cause before this Court on 3/22/11 why an order should not be made to bifurcate for expedited discovery and trial within six months or less Chevron's Ninth Claim for Relief (its Declaratory Judgment claim), in whole or in part, and to stay resolution of Chevron's other claims and any related discovery, pending resolution of Chevron's Declaratory Judgment Claim; and it is further ordered that the motion will be taken on submission without the need for any argument in open court unless otherwise |

| | | |
|---|---|---|
| | | ordered. Show Cause Response due by 3/18/2011. (Signed by Judge Lewis A. Kaplan on 3/11/11) (cd) (Entered: 03/11/2011) |
| 03/11/2011 | 200 | MEMORANDUM OF LAW in Support re: 199 Order to Show Cause,,, *WHY THE DECLARATORY JUDGMENT CLAIM SHOULD NOT BE BIFURCATED IN WHOLE OR IN PART*. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 03/11/2011) |
| 03/11/2011 | 201 | DECLARATION of Kristen L. Hendricks in Support re: 199 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7)(Mastro, Randy) (Entered: 03/11/2011) |
| 03/11/2011 | 202 | CERTIFICATE OF SERVICE of ORDER TO SHOW CAUSE WHY THE DECLARATORY JUDGMENT CLAIM SHOULD NOT BE BIFURCATED IN WHOLE OR IN PART, MEMORANDUM OF LAW IN SUPPORT AND DECLARATION OF KRISTEN L. HENDRICKS IN SUPPORT served on Counsel for Defendants that have appeared on 03/11/2011. Service was made by via Electronic Mail. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 03/11/2011) |
| 03/11/2011 | 203 | CERTIFICATE OF SERVICE of Order Granting Chevron's Motion for Preliminary Injunction served on Defendants and Co-Conspirators on 03/08/2011. Service was made by Electronic Mail, By Hand, Overnight Mail and Express Mail. Document filed by Chevron Corporation. (Attachments: # 1 Service Declaration)(Mastro, Randy) (Entered: 03/11/2011) |
| 03/11/2011 | 204 | CERTIFICATE OF SERVICE of Opposition to the Motion to Admit John W. Keker pro hac vice and the Declaration of Kristen L. Hendricks in Support of the Opposition served on Defendants and Co-Conspirators on 03/05/2011 and 03/07/2011. Service was made by ECF Notice, Electronic Mail, By Hand, Overnight Mail and Express Mail. Document filed by Chevron Corporation. (Attachments: # 1 Service Declaration)(Mastro, Randy) (Entered: 03/11/2011) |
| 03/11/2011 | 205 | NOTICE of of Entry of Default against Defendants Pablo Fajardo Mendoza, Luis Yanza, Frente de Defensa de la Amazonia a/k/a Amazon Defense Front, Selva Viva Selviva Cia, Ltda., and the 45 defaulting Lago Agrio Plaintiffs. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 03/11/2011) |
| 03/11/2011 | 206 | DECLARATION of Kristen L. Hendricks in Support re: 205 Notice (Other), Notice (Other). Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 1 - Part 1, # 2 Exhibit 1 - Part 2, # 3 Exhibit 1 - Part 3, # 4 Exhibit 2, # 5 Exhibit 3, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11, # 14 Exhibit 12, # 15 Exhibit 13, # 16 Exhibit 14, # 17 Exhibit 15, # 18 Exhibit 16)(Mastro, Randy) (Entered: 03/11/2011) |
| 03/11/2011 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Pre-Motion Conference held on 3/11/2011. Judge's Decision: See docket item No. 199. Exparte application with plaintiff's counsel only present. (mro) (Entered: 03/16/2011) |

| 03/11/2011 | 217 | MOTION for Paula L. Blizzard, Matthew M. Werdegar, William S. Hicks, Christopher J. Young, and Nikki H. Vo to Appear Pro Hac Vice. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger.(mro) (Entered: 03/18/2011) |
|---|---|---|
| 03/14/2011 | 207 | NOTICE OF APPEARANCE by Martin Beier on behalf of Douglas Beltman, Ann Maest, Stratus Consulting, Inc. (Beier, Martin) (Entered: 03/14/2011) |
| 03/14/2011 | 208 | NOTICE OF APPEARANCE by Jessica R. Torbin on behalf of Douglas Beltman, Ann Maest, Stratus Consulting, Inc. (Torbin, Jessica) (Entered: 03/14/2011) |
| 03/14/2011 | 209 | SUBSTITUTION OF COUNSEL: We the undersigned, hereby consent and agree that Julio C. Gomez, Esq. of GOMEZ LLC Attorney At Law, located at 40 Wall Street, 28th Floor, New York, NY 10005 and Carlos A. Zelaya, II, Esq. (pro hac vice forthcoming) of F. Gerald Maples, PA, 365 Canal Street, Suite 2650, New Orleans, LA 70130 be substituted in the place of the undersigned, Norman Siegel, Esq. and Steven Hyman, Esq. (Signed by Judge Lewis A. Kaplan on 3/14/2011) (jpo) (Entered: 03/14/2011) |
| 03/14/2011 | 210 | MEMO ENDORSEMENT on 197 Motion for Jan Nielsen Little to Appear Pro Hac Vice. ENDORSEMENT: Granted. So Ordered. (Signed by Judge Lewis A. Kaplan on 3/14/2011) (jpo) (Entered: 03/14/2011) |
| 03/14/2011 | 211 | FILING ERROR - ELECTRONIC FILING FOR NON-ECF DOCUMENT - NOTICE of Filing Of Stipulation And Order. Document filed by Douglas Beltman, Ann Maest, Stratus Consulting, Inc. (Attachments: # 1 Stipulation And Proposed Order)(Mehler, Gordon) Modified on 3/16/2011 (db). (Entered: 03/14/2011) |
| 03/14/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - NON-ECF DOCUMENT ERROR. Note to Attorney Gordon Mehler to E-MAIL Document No. 211 Stipulation to judgments@nysd.uscourts.gov. This document is not filed via ECF. (db) (Entered: 03/16/2011) |
| 03/14/2011 | | ***DELETED DOCUMENT. Deleted document number 214 Order. The document was incorrectly filed in this case. (tro) (Entered: 03/17/2011) |
| 03/15/2011 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Scheduling Conference held on 3/15/2011. The date to respond to the opposition of the motion set by Order docket item #199 is extended to Monday, 3/21/11 at 1pm. (mro) (Entered: 03/16/2011) |
| 03/16/2011 | 212 | DEMAND for Trial by Jury. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger(Little, Jan) (Entered: 03/16/2011) |
| 03/16/2011 | 213 | STIPULATION AND ORDER: the time for defendants Douglas Beltman; Hugo Gerardo Camacho Naranjo; Steven Donziger; Ann Maest; Javier Piaguaje Payaguaje; Stratus Consulting, Inc.; and The Law Offices of Steven R. Donziger to answer, move against, or otherwise respond to the complaint herein shall be and hereby is adjourned to 3/30/2011. (Signed by Judge Lewis A. Kaplan on 3/15/2011) (tro) Modified on 3/16/2011 (tro). (Entered: 03/16/2011) |
| | | |

| 03/17/2011 | 214 | CERTIFICATE OF SERVICE of Order to Show Cause on the Action should not be Bifurcated and supporting papers served on Defendants and Co-Conspirators on 03/11/2011. Service was made by ECF Notification, Electronic Mail, By Hand, Overnight Mail. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 03/18/2011) |
|---|---|---|
| 03/17/2011 | 219 | MOTION for F. Gerald Maples to Appear Pro Hac Vice. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje.(mbe) (Entered: 03/21/2011) |
| 03/18/2011 | 215 | CERTIFICATE OF SERVICE of Notice Requesting Entry of Default served on Defendants on 03/11/2011. Service was made by ECF Notification, Electronic Mail, By Hand, Overnight Mail. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 03/18/2011) |
| 03/18/2011 | 216 | CERTIFICATE OF SERVICE of Notice Requesting Entry of Default served on Defendants on 03/14/2011. Service was made by Overnight Mail, By Hand, Electronic Mail. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 03/18/2011) |
| 03/18/2011 | | CASHIERS OFFICE REMARK on 217 Motion to Appear Pro Hac Vice in the amount of $125.00, paid on 03/11/2011, Receipt Number 931702. (jd) (Entered: 03/18/2011) |
| 03/18/2011 | 232 | TRANSCRIPT of proceedings held on February 8, 2011 2:20 p.m. before Judge Lewis A. Kaplan. (ajc) (Entered: 03/24/2011) |
| 03/20/2011 | 218 | DEMAND for Trial by Jury. Document filed by Douglas Beltman, Ann Maest, Stratus Consulting, Inc.(Mehler, Gordon) (Entered: 03/20/2011) |
| 03/21/2011 | 220 | RESPONSE TO ORDER TO SHOW CAUSE re: 199 Order to Show Cause,,,. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Keker, John) (Entered: 03/21/2011) |
| 03/21/2011 | 221 | DECLARATION of Elliot R. Peters in Support re: 220 Response to Order to Show Cause. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Keker, John) (Entered: 03/21/2011) |
| 03/21/2011 | 222 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Stratus Consulting, Inc..(Mehler, Gordon) (Entered: 03/21/2011) |
| 03/21/2011 | 223 | MEMORANDUM OF LAW in Opposition re: 200 Memorandum of Law in Support. Document filed by Douglas Beltman, Ann Maest, Stratus Consulting, Inc.. (Attachments: # 1 Exhibit A)(Mehler, Gordon) (Entered: 03/21/2011) |
| 03/21/2011 | 224 | RESPONSE TO ORDER TO SHOW CAUSE re: 199 Order to Show Cause,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 03/21/2011) |
| 03/21/2011 | 225 | MOTION for Oral Argument *REQUEST for Oral Argument in Connection with Chevron's Motion to Bifurcate Declaratory Judgment Claim in Whole or* |

| | | *in Part.* Document filed by Steven Donziger, The Law Offices of Steven R. Donziger.(Peters, Elliot) (Entered: 03/21/2011) |
|---|---|---|
| 03/21/2011 | 226 | DEMAND for Trial by Jury. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje(Gomez, Julio) (Entered: 03/21/2011) |
| 03/22/2011 | 227 | ORDER: The Opinion dated March 7, 2011 is corrected as set forth in this Order. (Signed by Judge Lewis A. Kaplan on 3/22/2011) (jpo) (Entered: 03/22/2011) |
| 03/22/2011 | 228 | ENDORSED LETTER addressed to Judge Lewis A. Kaplan from Randy M. Mastro dated 3/21/2011 re: Requesting permission to fie a single reply brief of no more than 25 pages responding to all three of these opposition submissions. ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 3/22/2011) (jpo) (Entered: 03/22/2011) |
| 03/22/2011 | 229 | REPLY MEMORANDUM OF LAW in Support re: 199 Order to Show Cause,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 03/22/2011) |
| 03/22/2011 | 230 | DECLARATION of Kristen L. Hendricks in Support re: 199 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Mastro, Randy) (Entered: 03/22/2011) |
| 03/23/2011 | 231 | ORDER: The Court will hold a scheduling conference on March 30, 2011 at 3:00 p.m. by conference call. Counsel shall confer in advance of that conference and formulate discovery plans and schedules for the disposition of this case on each of three possibilities. as set forth in this order. The discovery plans and proposed schedules, which shall explain the bases for the parties' estimates as to the time desired, shall be filed no later than March 29, 2011, at 4 p.m. They shall be free of any further argument and shall be responsive only to this order. They shall not exceed ten double spaced pages each. So Ordered (Signed by Judge Lewis A. Kaplan on 3/23/2011) (js) (Entered: 03/23/2011) |
| 03/24/2011 | 233 | NOTICE OF APPEAL from 181 Opinion, 195 Order, 227 Order, 183 Order on Motion for Leave to File Document, 188 Order on Motion for Miscellaneous Relief. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. Filing fee $ 455.00, receipt number E 933063. (nd) (Entered: 03/25/2011) |
| 03/24/2011 | 247 | TRANSCRIPT of proceedings held on 3/15/11, 3:40 p.m. before Judge Lewis A. Kaplan. (rjm) (Entered: 03/31/2011) |
| 03/25/2011 | | Transmission of Notice of Appeal to the District Judge re: 233 Notice of Appeal,. (nd) (Entered: 03/25/2011) |
| 03/25/2011 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 233 Notice of Appeal,. (nd) (Entered: 03/25/2011) |
| 03/25/2011 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 24 Declaration in Support, filed by Chevron Corporation, 141 Declaration in Support,, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 139 Declaration in Support, filed by The Law |

Offices of Steven R. Donziger, Steven Donziger, 194 Order on Motion to Appear Pro Hac Vice, 96 Declaration in Support, filed by Chevron Corporation, 168 Letter,,,, filed by Chevron Corporation, 71 Affidavit of Service Complaints filed by Chevron Corporation, 179 Declaration in Opposition to Motion, filed by Chevron Corporation, 107 Declaration in Support, filed by Chevron Corporation, 109 Declaration in Support, filed by Chevron Corporation, 199 Order to Show Cause,,, 134 Affidavit, filed by Chevron Corporation, 80 Notice of Appearance filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 74 Affidavit of Service Other,, filed by Chevron Corporation, 117 Declaration filed by Chevron Corporation, 150 MOTION Increase the Bond (on Short Notice). filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 93 Declaration in Support filed by Chevron Corporation, 78 Order, Set Deadlines/Hearings, 26 Declaration in Support, filed by Chevron Corporation, 132 Declaration in Opposition filed by The Law Offices of Steven R. Donziger, Steven Donziger, 102 Declaration in Support, filed by Chevron Corporation, 12 Declaration in Support, filed by Chevron Corporation, 111 Declaration in Support,, filed by Chevron Corporation, 62 Affirmation in Opposition, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 138 Declaration in Support,, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 177 Certificate of Service Other, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 30 Declaration in Support,,, filed by Chevron Corporation, 151 Memorandum of Law in Support of Motion filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 82 Notice of Substitution of Attorney, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 204 Certificate of Service Other, filed by Chevron Corporation, 160 MOTION to Transfer Case - *Application for Transfer of Case as Related to Aguinda, et al. v. Texaco, et al., 93-CV-07527 JSR, Pursuant to Rule 15 of the Division of Business Among District Judges, Southern District.* filed by The Law Offices of Steven R. Donziger, Steven Donziger, 230 Declaration in Support, filed by Chevron Corporation, 163 Certificate of Service Other, filed by Chevron Corporation, 43 Declaration in Support, filed by Chevron Corporation, 133 Affidavit in Opposition filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 25 Declaration in Support, filed by Chevron Corporation, 17 Declaration in Support, filed by Chevron Corporation, 207 Notice of Appearance filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., 178 Memorandum of Law in Opposition to Motion filed by Chevron Corporation, 159 Notice (Other), Notice (Other) filed by The Law Offices of Steven R. Donziger, Steven Donziger, 162 Certificate of Service Other, filed by Chevron Corporation, 32 Declaration in Support,, filed by Chevron Corporation, 213 Stipulation and Order, Set Deadlines,, 193 Order, Set Deadlines/Hearings,,,, 116 Declaration in Support filed by Chevron Corporation, 65 Affirmation in Opposition, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 140 Declaration in Support,, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 212 Jury Demand filed by The Law Offices of Steven R. Donziger, Steven Donziger, 161 Declaration in Support of Motion,, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 130 Notice of Appearance filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., Stratus Consulting, Inc., 75 Affidavit of Service Other,,,,, filed by Chevron

A-46

Corporation, 91 Reply Memorandum of Law in Support filed by Chevron Corporation, 208 Notice of Appearance filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., 170 Endorsed Letter, 98 Declaration in Support filed by Chevron Corporation, 29 Declaration in Support,, filed by Chevron Corporation, 77 Order, Set Deadlines/Hearings,,,,,,,,,,,,, 172 MOTION for Leave to File Supplemental Opposition to Chevron Corporation's Motion for Preliminary Injunction. filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 171 MOTION for Martin D. Beier, Joe L. Silver and Jessica R. Torbin to Appear Pro Hac Vice. filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., Stratus Consulting, Inc., 226 Jury Demand filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 210 Order on Motion to Appear Pro Hac Vice, 69 Affidavit of Service Complaints filed by Chevron Corporation, 48 Declaration in Support,,, filed by Chevron Corporation, 121 Declaration filed by Chevron Corporation, 68 Affidavit of Service Complaints, filed by Chevron Corporation, 8 Declaration in Support, filed by Chevron Corporation, 10 Declaration in Support, filed by Chevron Corporation, 115 Declaration in Support filed by Chevron Corporation, 224 Response to Order to Show Cause filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 180 Letter,, 136 Stipulation and Order, Set Deadlines/Hearings, 190 MOTION for Carlos A Zelaya, II to Appear Pro Hac Vice. filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 166 MOTION for John W. Keker to Appear Pro Hac Vice. filed by The Law Offices of Steven R. Donziger, Steven Donziger, 119 Declaration filed by Chevron Corporation, 182 Order on Motion to Transfer Case, 64 Affirmation in Opposition, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 127 Order, Set Deadlines,,,,,,,, 27 Declaration in Support, filed by Chevron Corporation, 31 Declaration in Support,,, filed by Chevron Corporation, 227 Order, 92 Declaration in Support filed by Chevron Corporation, 156 Notice of Substitution of Attorney, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 100 Declaration in Support filed by Chevron Corporation, 112 Order, 5 Memorandum of Law in Support filed by Chevron Corporation, 22 Declaration in Support,, filed by Chevron Corporation, 158 Letter, 44 Declaration in Support, filed by Chevron Corporation, 203 Certificate of Service Other, filed by Chevron Corporation, 97 Declaration in Support, filed by Chevron Corporation, 184 Letter, 218 Jury Demand filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., 23 Declaration in Support, filed by Chevron Corporation, 105 Declaration in Support, filed by Chevron Corporation, 45 Declaration in Support, filed by Chevron Corporation, 53 Declaration in Support,,, filed by Chevron Corporation, 154 Declaration in Support of Motion,, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 61 Memorandum of Law in Opposition filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 38 Declaration in Support, filed by Chevron Corporation, 217 MOTION for Paula L. Blizzard, Matthew M. Werdegar, William S. Hicks, Christopher J. Young, and Nikki H. Vo to Appear Pro Hac Vice. filed by The Law Offices of Steven R. Donziger, Steven Donziger, 7 Declaration in Support, filed by Chevron Corporation, 36 Declaration in Support,, filed by Chevron Corporation, 41 Declaration in Support, filed by Chevron Corporation, 181 Memorandum & Opinion, 113 MOTION for Scott A.

Edelman, William E. Thomson and Andrea E. Neuman to Appear Pro Hac Vice. filed by Chevron Corporation, 57 Declaration in Support, filed by Chevron Corporation, 126 Order on Motion to Appear Pro Hac Vice, 195 Order, 131 Notice (Other) filed by The Law Offices of Steven R. Donziger, Steven Donziger, 186 Letter, 46 Declaration in Support, filed by Chevron Corporation, 6 Declaration in Support, filed by Chevron Corporation, 200 Memorandum of Law in Support filed by Chevron Corporation, 128 Letter, filed by Pablo Fajardo Mendoza, 135 Certificate of Service Other filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 39 Declaration in Support, filed by Chevron Corporation, 87 Order, 198 Bond filed by Chevron Corporation, 206 Declaration in Support,, filed by Chevron Corporation, 222 Rule 7.1 Corporate Disclosure Statement filed by Stratus Consulting, Inc., 59 Notice of Appearance filed by Chevron Corporation, 197 MOTION for Jan Nielsen Little to Appear Pro Hac Vice. filed by The Law Offices of Steven R. Donziger, Steven Donziger, 125 Certificate of Service Other filed by The Law Offices of Steven R. Donziger, Steven Donziger, 35 Declaration in Support, filed by Chevron Corporation, 47 Declaration in Support,,,, filed by Chevron Corporation, 231 Order, Set Deadlines/Hearings,,,, 90 Endorsed Letter, 94 Declaration in Support filed by Chevron Corporation, 110 Declaration in Support,, filed by Chevron Corporation, 185 Letter, 3 Notice of Case Assignment/Reassignment, 49 Declaration in Support,,, filed by Chevron Corporation, 106 Declaration in Support, filed by Chevron Corporation, 34 Declaration in Support,,, filed by Chevron Corporation, 104 Declaration in Support filed by Chevron Corporation, 33 Declaration in Support,, filed by Chevron Corporation, 223 Memorandum of Law in Opposition filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., 202 Certificate of Service Other, filed by Chevron Corporation, 11 Declaration in Support, filed by Chevron Corporation, 63 Affirmation in Opposition, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 95 Declaration in Support filed by Chevron Corporation, 192 Order on Motion to Appear Pro Hac Vice, 99 Declaration in Support filed by Chevron Corporation, 103 Declaration in Support, filed by Chevron Corporation, 40 Declaration in Support, filed by Chevron Corporation, 21 Declaration in Support,, filed by Chevron Corporation, 54 Declaration in Support,,, filed by Chevron Corporation, 67 Affirmation in Opposition, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 189 Reply Memorandum of Law in Support of Motion filed by The Law Offices of Steven R. Donziger, Steven Donziger, 122 Declaration filed by Chevron Corporation, 152 Declaration in Support of Motion,,,, filed by Javier Piaguaje Payaguaje, 20 Declaration in Support, filed by Chevron Corporation, 101 Declaration in Support filed by Chevron Corporation, 52 Declaration in Support, filed by Chevron Corporation, 120 Declaration filed by Chevron Corporation, 19 Declaration in Support, filed by Chevron Corporation, 214 Certificate of Service Other, filed by Chevron Corporation, 60 Notice of Appearance filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 183 Order on Motion for Leave to File Document, 196 Order on Motion to Appear Pro Hac Vice, 4 Order to Show Cause,,,, 129 Stipulation and Order, Set Deadlines,, 155 Declaration in Support of Motion, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 219 MOTION for F. Gerald Maples to Appear Pro Hac Vice. filed by Javier Piaguaje

Payaguaje, Hugo Gerardo Camacho Naranjo, 124 Notice of Appearance filed by The Law Offices of Steven R. Donziger, Steven Donziger, 233 Notice of Appeal, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 37 Declaration in Support,,, filed by Chevron Corporation, 118 Declaration filed by Chevron Corporation, 72 Affidavit of Service Other,, filed by Chevron Corporation, 85 Certificate of Service Other filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 18 Declaration in Support,, filed by Chevron Corporation, 2 Rule 7.1 Corporate Disclosure Statement filed by Chevron Corporation, 188 Order on Motion for Miscellaneous Relief, 123 Declaration filed by Chevron Corporation, 66 Affirmation in Opposition,, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 229 Reply Memorandum of Law in Support filed by Chevron Corporation, 169 Letter, 42 Declaration in Support, filed by Chevron Corporation, 16 Declaration in Support, filed by Chevron Corporation, 13 Declaration in Support,, filed by Chevron Corporation, 14 Declaration in Support,, filed by Chevron Corporation, 86 Certificate of Service Other filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 58 Declaration in Support, filed by Chevron Corporation, 50 Declaration in Support, filed by Chevron Corporation, 228 Endorsed Letter, 56 Declaration in Support, filed by Chevron Corporation, 70 Affidavit of Service Complaints filed by Ann Maest, 88 Order,,,,,, 216 Certificate of Service Other filed by Chevron Corporation, 209 Stipulation and Order, Add and Terminate Attorneys,, 157 Stipulation and Order, Set Deadlines/Hearings,, 205 Notice (Other), Notice (Other) filed by Chevron Corporation, 15 Declaration in Support,, filed by Chevron Corporation, 1 Complaint,,,,,,, filed by Chevron Corporation, 73 Affidavit of Service Other, filed by Chevron Corporation, 89 Notice of Appearance filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 201 Declaration in Support, filed by Chevron Corporation, 220 Response to Order to Show Cause filed by The Law Offices of Steven R. Donziger, Steven Donziger, 114 Letter, 142 Declaration in Support, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 167 Notice (Other), Notice (Other) filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 137 Memorandum of Law in Opposition filed by The Law Offices of Steven R. Donziger, Steven Donziger, 28 Declaration in Support, filed by Chevron Corporation, 108 Declaration in Support, filed by Chevron Corporation, 143 Notice of Appearance filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 221 Declaration in Support filed by The Law Offices of Steven R. Donziger, Steven Donziger, 55 Declaration in Support filed by Chevron Corporation, 215 Certificate of Service Other filed by Chevron Corporation, 51 Declaration in Support,, filed by Chevron Corporation, 79 Order, Set Deadlines/Hearings,,,,,, 9 Declaration in Support, filed by Chevron Corporation, 225 MOTION for Oral Argument *REQUEST for Oral Argument in Connection with Chevron's Motion to Bifurcate Declaratory Judgment Claim in Whole or in Part*. filed by The Law Offices of Steven R. Donziger, Steven Donziger, 153 Declaration in Support of Motion,, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 81 Memorandum of Law in Opposition filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 84 Certificate of Service Other filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo were transmitted to the U.S. Court of Appeals. (nd) (Entered: 03/25/2011)

A-49

| | 234 | NOTICE OF APPEARANCE by Joe L. Silver on behalf of Douglas Beltman, Ann Maest, Stratus Consulting, Inc. (Silver, Joe) (Entered: 03/28/2011) |
|---|---|---|
| 03/28/2011 | 235 | MEMO ENDORSEMENT on 219 Motion for F. Gerald Maples to Appear Pro Hac Vice. ENDORSEMENT: Granted. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 3/28/2011) (lnl) (Entered: 03/28/2011) |
| 03/29/2011 | 236 | ORDER: The Court recognizes that the parties presumably have assumed since the stipulation was signed on March 24, 2011 that the Court would approve it and that the appearing defendants therefore have lost three business and five calendar days that were available to them between the date of the stipulation and today. Accordingly, the Court on its own motion extends the time of the appearing defendants to answer the complaint (but not to file any Rule 12(b) motion) to and including April 4, 2011. So Ordered (Signed by Judge Lewis A. Kaplan on 3/29/2011) (js) (Entered: 03/29/2011) |
| 03/29/2011 | 237 | ORDER TO SHOW CAUSE filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. Plaintiff Chevron Corporation shall show cause as to why proceedings and certain portions of the March 7, 2011 Order should not be stayed pending Appeal, dated March 29, 2011; and the Declaration of Julio C. Gomez and supporting exhibits, dated March 29, 2011 and notwithstanding their delay of 22 days in seeking this relief and their failure to comply with the SDNY Civ. R. 6.1(d). Chevron must show cause before this court at Room 12D on 4/4/11. The motion will be taken on submission unless otherwise ordered. Show Cause Response due by 4/1/2011. Show cause reply due by 4/4/11. (Signed by Judge Lewis A. Kaplan on 3/29/11) (djc) Modified on 4/1/2011 (djc). (Entered: 03/29/2011) |
| 03/29/2011 | | CASHIERS OFFICE REMARK on 219 Motion to Appear Pro Hac Vice in the amount of $25.00, paid on 03/17/2011, Receipt Number 932037. (jd) (Entered: 03/29/2011) |
| 03/29/2011 | 238 | JOINT PRE-CONFERENCE STATEMENT *for March 30, 2011 Conference*. Document filed by Hugo Gerardo Camacho Naranjo, Steven Donziger, Javier Piaguaje Payaguaje, The Law Offices of Steven R. Donziger.(Gomez, Julio) (Entered: 03/29/2011) |
| 03/29/2011 | 239 | RULE 26(f) DISCOVERY PLAN REPORT.Document filed by Douglas Beltman, Ann Maest, Stratus Consulting, Inc., Stratus Consulting, Inc..(Beier, Martin) (Entered: 03/29/2011) |
| 03/29/2011 | 240 | PRE-CONFERENCE STATEMENT - *CHEVRON CORPORATION'S PROPOSED DISCOVERY PLANS AND SCHEDULES*. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit A)(Mastro, Randy) (Entered: 03/29/2011) |
| 03/29/2011 | 241 | MEMORANDUM AND ORDER. The parties are directed to confer promptly on this issue. The Court would be surprised if any dispute could not be resolved or, at least, narrowed by agreement. If the parties cannot resolve the matter entirely, they are to report to the Court in writing no later than April 4,2011 as to their respective positions. Their respective submissions (one on each side) shall not exceed seven double spaced pages absent leave of the Court.(Signed by Judge Lewis A. Kaplan on 3/29/11) (djc) (Entered: |

| | | 03/29/2011) |
|---|---|---|
| 03/29/2011 | | Set Deadlines/Hearings:Clide Ramiro Aguinda Aguinda answer due 4/4/2011; Lidia Alexandra Aguinda Aguinda answer due 4/4/2011; Patricio Wilson Aguinda Aguinda answer due 4/4/2011; Francisco Matias Alvarado Yumbo answer due 4/4/2011; Lorenzo Jose Alvarado Yumbo answer due 4/4/2011; Segundo Angel Amanta Milan answer due 4/4/2011; Douglas Beltman answer due 4/4/2011; Hugo Gerardo Camacho Naranjo answer due 4/4/2011; Benancio Fredy Chimbo Grefa answer due 4/4/2011; Lourdes Beatriz Chimbo Tanguil answer due 4/4/2011; Rosa Teresa Chimbo Tanguila answer due 4/4/2011; Luis Armando Chimbo Yumbo answer due 4/4/2011; Octavio Ismael Cordova Huanca answer due 4/4/2011; Steven Donziger answer due 4/4/2011; Frente de Defensa De La Amazonia answer due 4/4/2011; Olga Gloria Grefa Cerda answer due 4/4/2011; Beatriz Mercedes Grefa Tanguila answer due 4/4/2011; Lucio Enrique Grefa Tanguila answer due 4/4/2011; Heleodoro Pataron Guaraca answer due 4/4/2011; Carlos Grefa Huatatoca answer due 4/4/2011; Jose Miguel Ipiales Chicaiza answer due 4/4/2011; Daniel Carlos Lusitande Yaiguaje answer due 4/4/2011; Emilio Martin Lusitande Yaiguaje answer due 4/4/2011; Reinaldo Lusitande Yaiguaje answer due 4/4/2011; Ann Maest answer due 4/4/2011; Pablo Fajardo Mendoza answer due 4/4/2011; Guillermo Vicente Payaguaje Lusitante answer due 4/4/2011; Alfredo Donaldo Payaguaje Payaguaje answer due 4/4/2011; Delfin Leonidas Payaguaje Payaguaje answer due 4/4/2011; Miguel Mario Payaguaje Payaguaje answer due 4/4/2011; Luis Agustin Payaguaje Piaguaje answer due 4/4/2011; Angel Justino Piaguage Lucitant answer due 4/4/2011; Teodoro Gonzalo Piaguaje Payaguaje answer due 4/4/2011; Armando Wilfrido Piaguaje Payaguaje answer due 4/4/2011; Fermin Piaguaje Payaguaje answer due 4/4/2011; Javier Piaguaje Payaguaje answer due 4/4/2011; Elias Roberto Piyahuaje Payahuaje answer due 4/4/2011; Maria Clelia Reascos Revelo answer due 4/4/2011; Jose Gabriel Revelo Llore answer due 4/4/2011; Maria Magdalena Rodriguez Barcenes answer due 4/4/2011; Catalina Antonia Aguinda Salazar answer due 4/4/2011; Maria Aguinda Salazar answer due 4/4/2011; Selva Viva Selviva CIA, Ltda answer due 4/4/2011; Stratus Consulting, Inc. answer due 4/4/2011; Stratus Consulting, Inc. answer due 4/4/2011; Bertha Antonia Yumbo Tanguila answer due 4/4/2011; Gloria Lucrecia Tanguila Grefa answer due 4/4/2011; Luisa Delia Tanguila Narvaez answer due 4/4/2011; Narcisa Aida Tanguila Narvaez answer due 4/4/2011; Franciso Victor Tanguilla Grefa answer due 4/4/2011; The Law Offices of Steven R. Donziger answer due 4/4/2011; Celia Irene Viveros Cusangua answer due 4/4/2011; Maria Hortencia Viveros Cusangua answer due 4/4/2011; Simon Lusitande Yaiguaje answer due 4/4/2011; Luis Yanza answer due 4/4/2011; Francisco Alvarado Yumbo answer due 4/4/2011; Patricio Alberto Chimbo Yumbo answer due 4/4/2011. (js) (Entered: 04/04/2011) |
| 03/30/2011 | 242 | MOTION to Dismiss *(Notice of Motion to Dismiss)*. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger.(Peters, Elliot) (Entered: 03/30/2011) |
| 03/30/2011 | 243 | MEMORANDUM OF LAW in Support re: 242 MOTION to Dismiss *(Notice of Motion to Dismiss)*.. Document filed by Steven Donziger, The Law Offices |

| | | of Steven R. Donziger. (Peters, Elliot) (Entered: 03/30/2011) |
|---|---|---|
| 03/30/2011 | 244 | FILING ERROR - DEFICIENT DOCKET ENTRY - MEMORANDUM OF LAW in Support re: 237 Order to Show Cause,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) Modified on 3/31/2011 (ka). (Entered: 03/30/2011) |
| 03/30/2011 | 245 | FILING ERROR - DEFICIENT DOCKET ENTRY - DECLARATION of Julio C. Gomez in Support re: 237 Order to Show Cause,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit A (Part 1), # 2 Exhibit A (Part 2), # 3 Exhibit A (Part 3), # 4 Exhibit A (Part 4), # 5 Exhibit A (Part 5), # 6 Exhibit A (Part 6), # 7 Exhibit A (Part 7), # 8 Exhibit A (Part 8), # 9 Exhibit B, # 10 Exhibit C, # 11 Exhibit D, # 12 Exhibit E)(Gomez, Julio) Modified on 3/31/2011 (ka). (Entered: 03/30/2011) |
| 03/30/2011 | 246 | CERTIFICATE OF SERVICE of Supporting Papers for Order to Show Cause Why Proceedings and Certain Portions of Mar. 7, 2011 Order Should Not Be Stayed Pending Appeal served on Plaintiff Chevron Corporation on 03/29/2011. Service was made by Electronic Mail. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 03/30/2011) |
| 03/30/2011 | | Minute Entry for proceedings held before Judge Lewis A. Kaplan: Scheduling Conference held on 3/30/2011. (mbe) (Entered: 03/31/2011) |
| 03/31/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Julio Cesar Gomez to RE-FILE Document 244 Memorandum of Law in Support. ERROR(S): Attorney signature or s/ signature missing from document. (ka) (Entered: 03/31/2011) |
| 03/31/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - DEFICIENT DOCKET ENTRY ERROR. Note to Attorney Julio Cesar Gomez to RE-FILE Document 245 Declaration in Support. ERROR(S): Attorney signature or s/ signature missing from document. (ka) (Entered: 03/31/2011) |
| 03/31/2011 | 248 | MEMORANDUM OF LAW in Support re: 237 Order to Show Cause,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 03/31/2011) |
| 03/31/2011 | 249 | DECLARATION of Julio C. Gomez in Support re: 237 Order to Show Cause,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit A (Part 1), # 2 Exhibit A (Part 2), # 3 Exhibit A (Part 3), # 4 Exhibit A (Part 4), # 5 Exhibit A (Part 5), # 6 Exhibit A (Part 6), # 7 Exhibit A (Part 7), # 8 Exhibit A (Part 8), # 9 Exhibit B, # 10 Exhibit C, # 11 Exhibit D, # 12 Exhibit E)(Gomez, Julio) (Entered: 03/31/2011) |
| 04/01/2011 | 250 | NOTICE OF APPEAL from 181 Opinion, 195 Order, 227 Order. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. Filing fee $ 455.00, receipt number E 933704. (nd) (Entered: 04/01/2011) |
| 04/01/2011 | | Transmission of Notice of Appeal to the District Judge re: 250 Notice of Appeal. (nd) (Entered: 04/01/2011) |

| 04/01/2011 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 250 Notice of Appeal. (nd) (Entered: 04/01/2011) |
|---|---|---|
| 04/01/2011 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 239 Rule 26(f) Discovery Plan Report filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., Stratus Consulting, Inc., 240 Pre-Conference Statement filed by Chevron Corporation, 248 Memorandum of Law in Support filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 237 Order to Show Cause, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 249 Declaration in Support, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 235 Order on Motion to Appear Pro Hac Vice, 238 Pre-Conference Statement filed by Javier Piaguaje Payaguaje, The Law Offices of Steven R. Donziger, Hugo Gerardo Camacho Naranjo, Steven Donziger, Note to Attorney to Re-File Document - Deficient Docket Entry Error, 250 Notice of Appeal filed by The Law Offices of Steven R. Donziger, Steven Donziger, 246 Certificate of Service Other, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 242 MOTION to Dismiss *(Notice of Motion to Dismiss).* filed by The Law Offices of Steven R. Donziger, Steven Donziger, 236 Order, Set Deadlines/Hearings,,,, 243 Memorandum of Law in Support of Motion filed by The Law Offices of Steven R. Donziger, Steven Donziger, 234 Notice of Appearance filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., 241 Order,, 24 Declaration in Support, filed by Chevron Corporation, 141 Declaration in Support,, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 139 Declaration in Support, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 194 Order on Motion to Appear Pro Hac Vice, 96 Declaration in Support, filed by Chevron Corporation, 168 Letter,,,, filed by Chevron Corporation, 71 Affidavit of Service Complaints filed by Chevron Corporation, 179 Declaration in Opposition to Motion, filed by Chevron Corporation, 107 Declaration in Support, filed by Chevron Corporation, 109 Declaration in Support, filed by Chevron Corporation, 199 Order to Show Cause,,, 134 Affidavit, filed by Chevron Corporation, 80 Notice of Appearance filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 74 Affidavit of Service Other,, filed by Chevron Corporation, 117 Declaration filed by Chevron Corporation, 150 MOTION Increase the Bond (on Short Notice). filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 93 Declaration in Support filed by Chevron Corporation, 78 Order, Set Deadlines/Hearings, 26 Declaration in Support, filed by Chevron Corporation, 132 Declaration in Opposition filed by The Law Offices of Steven R. Donziger, Steven Donziger, 102 Declaration in Support, filed by Chevron Corporation, 12 Declaration in Support, filed by Chevron Corporation, 111 Declaration in Support,, filed by Chevron Corporation, 62 Affirmation in Opposition, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 138 Declaration in Support,, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 177 Certificate of Service Other, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 30 Declaration in Support,,, filed by Chevron Corporation, 151 Memorandum of Law in Support of Motion filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 82 Notice of Substitution of Attorney, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 204 Certificate of Service Other, filed by Chevron |

Corporation, 160 MOTION to Transfer Case - Application for Transfer of Case as Related to Aguinda, et al. v. Texaco, et al., 93-CV-07527 JSR, Pursuant to Rule 15 of the Division of Business Among District Judges, Southern District. filed by The Law Offices of Steven R. Donziger, Steven Donziger, 230 Declaration in Support, filed by Chevron Corporation, 163 Certificate of Service Other, filed by Chevron Corporation, 43 Declaration in Support, filed by Chevron Corporation, 133 Affidavit in Opposition filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 25 Declaration in Support, filed by Chevron Corporation, 17 Declaration in Support, filed by Chevron Corporation, 207 Notice of Appearance filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., 178 Memorandum of Law in Opposition to Motion filed by Chevron Corporation, 159 Notice (Other), Notice (Other) filed by The Law Offices of Steven R. Donziger, Steven Donziger, 162 Certificate of Service Other, filed by Chevron Corporation, 32 Declaration in Support,, filed by Chevron Corporation, 213 Stipulation and Order, Set Deadlines,, 193 Order, Set Deadlines/Hearings,,,, 116 Declaration in Support filed by Chevron Corporation, 65 Affirmation in Opposition, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 140 Declaration in Support,, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 212 Jury Demand filed by The Law Offices of Steven R. Donziger, Steven Donziger, 161 Declaration in Support of Motion,, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 130 Notice of Appearance filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., Stratus Consulting, Inc., 75 Affidavit of Service Other,,,,, filed by Chevron Corporation, 91 Reply Memorandum of Law in Support filed by Chevron Corporation, 208 Notice of Appearance filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., 170 Endorsed Letter, 98 Declaration in Support filed by Chevron Corporation, 29 Declaration in Support,, filed by Chevron Corporation, 77 Order, Set Deadlines/Hearings,,,,,,,,,,,,, 172 MOTION for Leave to File Supplemental Opposition to Chevron Corporation's Motion for Preliminary Injunction. filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 171 MOTION for Martin D. Beier, Joe L. Silver and Jessica R. Torbin to Appear Pro Hac Vice. filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., Stratus Consulting, Inc., 226 Jury Demand filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 210 Order on Motion to Appear Pro Hac Vice, 69 Affidavit of Service Complaints filed by Chevron Corporation, 48 Declaration in Support,,, filed by Chevron Corporation, 121 Declaration filed by Chevron Corporation, 68 Affidavit of Service Complaints, filed by Chevron Corporation, 8 Declaration in Support, filed by Chevron Corporation, 10 Declaration in Support, filed by Chevron Corporation, 115 Declaration in Support filed by Chevron Corporation, 224 Response to Order to Show Cause filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 180 Letter,, 136 Stipulation and Order, Set Deadlines/Hearings, 190 MOTION for Carlos A Zelaya, II to Appear Pro Hac Vice. filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 166 MOTION for John W. Keker to Appear Pro Hac Vice. filed by The Law Offices of Steven R. Donziger, Steven Donziger, 119 Declaration filed by Chevron Corporation, 182 Order on Motion to Transfer Case, 64 Affirmation in Opposition, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho

A-54

Naranjo, 127 Order, Set Deadlines,,,,,,,, 27 Declaration in Support, filed by Chevron Corporation, 31 Declaration in Support,,, filed by Chevron Corporation, 227 Order, 92 Declaration in Support filed by Chevron Corporation, 156 Notice of Substitution of Attorney, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 100 Declaration in Support filed by Chevron Corporation, 112 Order, 5 Memorandum of Law in Support filed by Chevron Corporation, 22 Declaration in Support,, filed by Chevron Corporation, 158 Letter, 44 Declaration in Support, filed by Chevron Corporation, 203 Certificate of Service Other, filed by Chevron Corporation, 97 Declaration in Support, filed by Chevron Corporation, 184 Letter, 218 Jury Demand filed by Ann Maest, Douglas Beltman, Stratus Consulting, Inc., 23 Declaration in Support, filed by Chevron Corporation, 105 Declaration in Support, filed by Chevron Corporation, 45 Declaration in Support, filed by Chevron Corporation, 53 Declaration in Support,,, filed by Chevron Corporation, 154 Declaration in Support of Motion,, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 61 Memorandum of Law in Opposition filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 38 Declaration in Support, filed by Chevron Corporation, 217 MOTION for Paula L. Blizzard, Matthew M. Werdegar, William S. Hicks, Christopher J. Young, and Nikki H. Vo to Appear Pro Hac Vice. filed by The Law Offices of Steven R. Donziger, Steven Donziger, 7 Declaration in Support, filed by Chevron Corporation, 36 Declaration in Support,, filed by Chevron Corporation, 41 Declaration in Support, filed by Chevron Corporation, 181 Memorandum & Opinion, 113 MOTION for Scott A. Edelman, William E. Thomson and Andrea E. Neuman to Appear Pro Hac Vice. filed by Chevron Corporation, 57 Declaration in Support, filed by Chevron Corporation, 126 Order on Motion to Appear Pro Hac Vice, 195 Order, 131 Notice (Other) filed by The Law Offices of Steven R. Donziger, Steven Donziger, 186 Letter, 46 Declaration in Support, filed by Chevron Corporation, 6 Declaration in Support, filed by Chevron Corporation, 200 Memorandum of Law in Support filed by Chevron Corporation, 128 Letter, filed by Pablo Fajardo Mendoza, 135 Certificate of Service Other filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 39 Declaration in Support, filed by Chevron Corporation, 87 Order, 198 Bond filed by Chevron Corporation, 206 Declaration in Support,, filed by Chevron Corporation, 222 Rule 7.1 Corporate Disclosure Statement filed by Stratus Consulting, Inc., 59 Notice of Appearance filed by Chevron Corporation, 197 MOTION for Jan Nielsen Little to Appear Pro Hac Vice. filed by The Law Offices of Steven R. Donziger, Steven Donziger, 125 Certificate of Service Other filed by The Law Offices of Steven R. Donziger, Steven Donziger, 35 Declaration in Support, filed by Chevron Corporation, 47 Declaration in Support,,,, filed by Chevron Corporation, 231 Order, Set Deadlines/Hearings,,,, 90 Endorsed Letter, 94 Declaration in Support filed by Chevron Corporation, 110 Declaration in Support,, filed by Chevron Corporation, 185 Letter, 3 Notice of Case Assignment/Reassignment, 49 Declaration in Support,,, filed by Chevron Corporation, 106 Declaration in Support, filed by Chevron Corporation, 34 Declaration in Support,,, filed by Chevron Corporation, 104 Declaration in Support filed by Chevron Corporation, 33 Declaration in Support,, filed by Chevron Corporation, 223 Memorandum of Law in Opposition filed by Ann Maest, Douglas Beltman,

Stratus Consulting, Inc., 202 Certificate of Service Other, filed by Chevron Corporation, 11 Declaration in Support, filed by Chevron Corporation, 63 Affirmation in Opposition, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 95 Declaration in Support filed by Chevron Corporation, 192 Order on Motion to Appear Pro Hac Vice, 99 Declaration in Support filed by Chevron Corporation, 103 Declaration in Support, filed by Chevron Corporation, 40 Declaration in Support, filed by Chevron Corporation, 21 Declaration in Support,, filed by Chevron Corporation, 54 Declaration in Support,,, filed by Chevron Corporation, 67 Affirmation in Opposition, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 189 Reply Memorandum of Law in Support of Motion filed by The Law Offices of Steven R. Donziger, Steven Donziger, 122 Declaration filed by Chevron Corporation, 152 Declaration in Support of Motion,,,, filed by Javier Piaguaje Payaguaje, 20 Declaration in Support, filed by Chevron Corporation, 101 Declaration in Support filed by Chevron Corporation, 52 Declaration in Support, filed by Chevron Corporation, 120 Declaration filed by Chevron Corporation, 19 Declaration in Support, filed by Chevron Corporation, 214 Certificate of Service Other, filed by Chevron Corporation, 60 Notice of Appearance filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 183 Order on Motion for Leave to File Document, 196 Order on Motion to Appear Pro Hac Vice, 4 Order to Show Cause,,,, 129 Stipulation and Order, Set Deadlines,, 155 Declaration in Support of Motion, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 219 MOTION for F. Gerald Maples to Appear Pro Hac Vice. filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 124 Notice of Appearance filed by The Law Offices of Steven R. Donziger, Steven Donziger, 233 Notice of Appeal, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 37 Declaration in Support,,, filed by Chevron Corporation, 118 Declaration filed by Chevron Corporation, 72 Affidavit of Service Other,, filed by Chevron Corporation, 85 Certificate of Service Other filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 18 Declaration in Support,, filed by Chevron Corporation, 2 Rule 7.1 Corporate Disclosure Statement filed by Chevron Corporation, 188 Order on Motion for Miscellaneous Relief, 123 Declaration filed by Chevron Corporation, 66 Affirmation in Opposition,, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 229 Reply Memorandum of Law in Support filed by Chevron Corporation, 169 Letter, 42 Declaration in Support, filed by Chevron Corporation, 16 Declaration in Support, filed by Chevron Corporation, 13 Declaration in Support,, filed by Chevron Corporation, 14 Declaration in Support,, filed by Chevron Corporation, 86 Certificate of Service Other filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 58 Declaration in Support, filed by Chevron Corporation, 50 Declaration in Support, filed by Chevron Corporation, 228 Endorsed Letter, 56 Declaration in Support, filed by Chevron Corporation, 70 Affidavit of Service Complaints filed by Ann Maest, 88 Order,,,,,, 216 Certificate of Service Other filed by Chevron Corporation, 209 Stipulation and Order, Add and Terminate Attorneys,, 157 Stipulation and Order, Set Deadlines/Hearings,, 205 Notice (Other) filed by Chevron Corporation, 15 Declaration in Support,, filed by Chevron Corporation, 1 Complaint,,,,,,,, filed by Chevron Corporation, 73 Affidavit of Service Other, filed by Chevron Corporation, 89 Notice of

A-56

| | | |
|---|---|---|
| | | Appearance filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 201 Declaration in Support, filed by Chevron Corporation, 220 Response to Order to Show Cause filed by The Law Offices of Steven R. Donziger, Steven Donziger, 114 Letter, 142 Declaration in Support, filed by The Law Offices of Steven R. Donziger, Steven Donziger, 167 Notice (Other), Notice (Other) filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 137 Memorandum of Law in Opposition filed by The Law Offices of Steven R. Donziger, Steven Donziger, 28 Declaration in Support, filed by Chevron Corporation, 108 Declaration in Support, filed by Chevron Corporation, 143 Notice of Appearance filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 221 Declaration in Support filed by The Law Offices of Steven R. Donziger, Steven Donziger, 55 Declaration in Support filed by Chevron Corporation, 215 Certificate of Service Other filed by Chevron Corporation, 51 Declaration in Support,, filed by Chevron Corporation, 79 Order, Set Deadlines/Hearings,,,,,, 9 Declaration in Support, filed by Chevron Corporation, 225 MOTION for Oral Argument REQUEST for Oral Argument in Connection with Chevron's Motion to Bifurcate Declaratory Judgment Claim in Whole or in Part. filed by The Law Offices of Steven R. Donziger, Steven Donziger, 153 Declaration in Support of Motion,, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 81 Memorandum of Law in Opposition filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo, 84 Certificate of Service Other filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo were transmitted to the U.S. Court of Appeals. (nd) (Entered: 04/01/2011) |
| 04/01/2011 | 251 | MEMORANDUM OF LAW in Opposition re: 237 Order to Show Cause,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 04/01/2011) |
| 04/01/2011 | 252 | DECLARATION of Kristen L. Hendricks in Opposition re: 237 Order to Show Cause,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 1, Part 1, # 2 Exhibit 1, Part 2, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11)(Mastro, Randy) (Entered: 04/01/2011) |
| 04/01/2011 | 253 | TRANSCRIPT of proceedings held on 3/30/2011 before Judge Lewis A. Kaplan. (ja) (Entered: 04/04/2011) |
| 04/01/2011 | 261 | TRANSCRIPT of proceedings held on 2/18/2011 before Judge Lewis A. Kaplan. (ja) (Entered: 04/05/2011) |
| 04/01/2011 | 265 | TRANSCRIPT of proceedings held on 3/30/2011 before Judge Lewis A. Kaplan. (dnd) (Entered: 04/07/2011) |
| 04/04/2011 | 254 | REPLY MEMORANDUM OF LAW in Support re: 237 Order to Show Cause,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 04/04/2011) |
| 04/04/2011 | 255 | RESPONSE re: 241 Order,, *CHEVRON CORPORATION'S STATEMENT REGARDING DEFENDANTS' PROPOSAL TO MODIFY THE PRELIMINARY INJUNCTION ORDER*. Document filed by Chevron |

| | | |
|---|---|---|
| | | Corporation. (Mastro, Randy) (Entered: 04/04/2011) |
| 04/04/2011 | 256 | DECLARATION of Randy M. Mastro in Support re: 255 Response. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Mastro, Randy) (Entered: 04/04/2011) |
| 04/04/2011 | 257 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Douglas Beltman, Ann Maest, Stratus Consulting, Inc..(Beier, Martin) (Entered: 04/04/2011) |
| 04/04/2011 | 258 | ANSWER to Complaint with JURY DEMAND. Document filed by Douglas Beltman, Ann Maest, Stratus Consulting, Inc..(Beier, Martin) (Entered: 04/04/2011) |
| 04/04/2011 | 259 | ANSWER to Complaint with JURY DEMAND. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje.(Gomez, Julio) (Entered: 04/04/2011) |
| 04/04/2011 | 260 | RESPONSE re: 241 Order,, *Regarding Defendants' Proposal to Modify the Preliminary Injunction Order*. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit Ex. A, # 2 Exhibit Ex. B, # 3 Exhibit Ex. C)(Gomez, Julio) (Entered: 04/04/2011) |
| 04/04/2011 | 268 | MOTION for Nikki K. Vo to Appear Pro Hac Vice. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger.(mbe) (Entered: 04/11/2011) |
| 04/04/2011 | 269 | MOTION for Christopher J. Young to Appear Pro Hac Vice. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger.(mbe) (Entered: 04/11/2011) |
| 04/04/2011 | 270 | MOTION for Matthew M. Werdegar to Appear Pro Hac Vice. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger.(mbe) (Entered: 04/11/2011) |
| 04/06/2011 | 262 | First Supplemental ROA Sent to USCA (Index). Notice that the Supplemental Index to the record on Appeal for 250 Notice of Appeal filed by The Law Offices of Steven R. Donziger, Steven Donziger; 233 Notice of Appeal filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. USCA Case Number 11-1150, 3 Copies of the index, Certified Supplemental Clerk Certificate and Certified Docket Sheet were transmitted to the U.S. Court of Appeals. (tp) Modified on 4/6/2011 (tp). (nd). (Entered: 04/06/2011) |
| 04/06/2011 | 263 | MEMORANDUM AND ORDER: The LAP Representatives are not likely to prevail on appeal. The balance of the equities strongly favors Chevron. The public interest does not alter the balance in favor of a stay pending appeal. Accordingly, so much of the LAP Representatives' motion as seeks a stay of the preliminary injunction pending appeal is denied. The Court reserves decision on the balance of the motion. SO ORDERED. (Signed by Judge Lewis A. Kaplan on 4/6/2011) (lnl) (Entered: 04/06/2011) |
| 04/07/2011 | 264 | Letter addressed to Judge Lewis A. Kaplan from John Keker dated 4/6/11 re: In response to Chevron's 4/5/11 letter. Document filed by Steven Donziger. (cd) (Entered: 04/07/2011) |

| 04/07/2011 | 266 | MEMO ENDORSEMENT on re: 225 Motion for Oral Argument ENDORSEMENT: Denied. So Ordered. (Signed by Judge Lewis A. Kaplan on 4/7/2011) (jfe) (Entered: 04/07/2011) |
| 04/08/2011 | 267 | ORDER, that the "Court does not consider the parties' efforts to date to have been reasonable or conducted in a good faith effort to reach agreement. They are directed to make a further effort and report back to the Court by the close of business next Wednesday, April 13, 2011. Should they fail to resolve the differences between them, the Lago Agrio Representatives then may move to modify the preliminary injunction or seek to stay pending appeal so much of it as may remain at issue. (Signed by Judge Lewis A. Kaplan on 4/8/11) (pl) Modified on 4/18/2011 (pl). Modified on 4/18/2011 (pl). (Entered: 04/08/2011) |
| 04/11/2011 | 271 | AMENDED ANSWER to 1 Complaint,,,,,,, with JURY DEMAND. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 04/11/2011) |
| 04/13/2011 | 272 | MEMO ENDORSEMENT granting 268 Motion for Nikki K. Vo to Appear Pro Hac Vice. ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 4/13/2011) (jpo) (Entered: 04/13/2011) |
| 04/13/2011 | 273 | MEMO ENDORSEMENT granting 269 Motion for Christopher J. Young to Appear Pro Hac Vice. ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 4/13/2011) (jpo) (Entered: 04/13/2011) |
| 04/13/2011 | 274 | MEMO ENDORSEMENT granting 270 Motion for Matthew M. Werdegar to Appear Pro Hac Vice. ENDORSEMENT: Granted. (Signed by Judge Lewis A. Kaplan on 4/13/2011) (jpo) (Entered: 04/13/2011) |
| 04/13/2011 | 275 | SUPPLEMENTAL RESPONSE re: 267 Order, Set Scheduling Order Deadlines,,,,,,,,,,,,,,,,,,,,,,,,, *CHEVRON CORPORATION'S SUPPLEMENTAL STATEMENT REGARDING THE LAP REPRESENTATIVES' PROPOSAL TO MODIFYTHE PRELIMINARY INJUNCTION ORDER.* Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 04/13/2011) |
| 04/13/2011 | 276 | DECLARATION of Randy M. Mastro re: 275 Response, - *DECLARATION IN SUPPORT OF CHEVRON CORPORATION'S SUPPLEMENTAL STATEMENT REGARDING THE LAP REPRESENTATIVES' PROPOSAL TO MODIFYTHE PRELIMINARY INJUNCTION ORDER.* Document filed by Chevron Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Mastro, Randy) (Entered: 04/13/2011) |
| 04/13/2011 | 277 | RESPONSE re: 267 Order, Set Scheduling Order Deadlines,,,,,,,,,,,,,,,,,,,,,,,,,, *Regarding Defendants' Proposal to Modify the Preliminary Injunction Order.* Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Exhibit Exhibit C)(Gomez, Julio) (Entered: 04/13/2011) |
| 04/15/2011 | 278 | MEMORANDUM OPINION; #100253 The interests of justice, convenience, the avoidance of prejudice, and the desirability of an expedited resolution of |

| | | |
|---|---|---|
| | | Count 9 all support conducting a separate trial on that claim. Chevrons motion to bifurcate Count 9 therefore is granted. The Court, however, retains complete flexibility to ensure that the matter is handled appropriately and that any Seventh Amendment rights are preserved. It therefore will stand ready to consider changes to this order, should circumstances warrant, as the matter proceeds. Additional relief as set forth in this Order. (Signed by Judge Lewis A. Kaplan on 4/15/11) (pl) Modified on 4/27/2011 (ajc). (Entered: 04/15/2011) |
| 04/15/2011 | 279 | SCHEDULING ORDER: that, Unless otherwise ordered, the following schedule shall govern proceedings with respect to Count Nine of the complaint in this action: Any amendments or motions for leave to amend pleadings shall be filed on or before May 13, 2011. Any motions for leave to add parties shall be filed on or before May 13, 2011. All discovery shall be completed by September 15, 2011. All summary judgment or other dispositive motions shall be filed no later than September 23, 2011. All papers in opposition to any summary judgment or other dispositive motions shall be filed no later than October 10, 2011. All reply papers in support of any summary judgment or other dispositive motions shall be filed no later than October 19, 2011. Unless Count Nine is sooner disposed of by other means, the trial will commence on November 14, 2011. In view of the desirability of joining issue for the purpose, among others, of determining the scope of discovery with respect to Count Nine and the somewhat uninformative nature of the list of affirmative defenses provided voluntarily by defendant Donziger, the Court, pursuant to Fed. R. Civ. P. 12(a)(4), directs defendant Donziger, notwithstanding the pendency of his motion to dismiss, to file an answer to the complaint no later than April 28, 2011. Amended Pleadings due by 5/13/2011. Motions due by 9/23/2011. Responses due by 10/10/2011 Replies due by 10/19/2011. Discovery due by 9/15/2011. (Signed by Judge Lewis A. Kaplan on 4/15/11) (pl) (Entered: 04/15/2011) |
| 04/15/2011 | | Set/Reset Deadlines: Steven Donziger answer due 4/28/2011. (pl) (Entered: 04/15/2011) |
| 04/15/2011 | | Set/Reset Deadlines: Ready for Trial by 11/14/2011. (pl) (Entered: 04/15/2011) |
| 04/18/2011 | 280 | MEMORANDUM AND ORDER: To the extent not already ruled upon, the motion of the LAP Representatives [DI 237] is denied. (Signed by Judge Lewis A. Kaplan on 4/18/2011) (jfe) (Entered: 04/18/2011) |
| 04/20/2011 | 283 | AMENDED COMPLAINT amending 1 Complaint, against Clide Ramiro Aguinda Aguinda, Lidia Alexandra Aguinda Aguinda, Patricio Wilson Aguinda Aguinda, Francisco Matias Alvarado Yumbo, Lorenzo Jose Alvarado Yumbo, Segundo Angel Amanta Milan, Douglas Beltman, Hugo Gerardo Camacho Naranjo, Benancio Fredy Chimbo Grefa, Lourdes Beatriz Chimbo Tanguil, Rosa Teresa Chimbo Tanguila, Luis Armando Chimbo Yumbo, Octavio Ismael Cordova Huanca, Steven Donziger, Frente de Defensa De La Amazonia, Olga Gloria Grefa Cerda, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Heleodoro Pataron Guaraca, Carlos Grefa Huatatoca, Jose Miguel Ipiales Chicaiza, Daniel Carlos Lusitande Yaiguaje, Emilio Martin Lusitande Yaiguaje, Reinaldo Lusitande Yaiguaje, |

A-60

| | | |
|---|---|---|
| | | Ann Maest, Pablo Fajardo Mendoza, Guillermo Vicente Payaguaje Lusitante, Alfredo Donaldo Payaguaje Payaguaje, Delfin Leonidas Payaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Luis Agustin Payaguaje Piaguaje, Angel Justino Piaguage Lucitant, Teodoro Gonzalo Payaguaje Payaguaje, Armando Wilfrido Piaguaje Payaguaje, Fermin Piaguaje Payaguaje, Javier Piaguaje Payaguaje, Elias Roberto Piyahuaje Payahuaje, Maria Clelia Reascos Revelo, Jose Gabriel Revelo Llore, Maria Magdalena Rodriguez Barcenes, Catalina Antonia Aguinda Salazar, Maria Aguinda Salazar, Selva Viva Selviva CIA, Ltda, Stratus Consulting, Inc., Stratus Consulting, Inc., Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Luisa Delia Tanguila Narvaez, Narcisa Aida Tanguila Narvaez, Franciso Victor Tanguilla Grefa, The Law Offices of Steven R. Donziger, Celia Irene Viveros Cusangua, Maria Hortencia Viveros Cusangua, Simon Lusitande Yaiguaje, Luis Yanza, Francisco Alvarado Yumbo, Patricio Alberto Chimbo Yumbo with JURY DEMAND.Document filed by Chevron Corporation. Related document: 1 Complaint, filed by Chevron Corporation. (rdz) (Additional attachment(s) added on 4/26/2011: # 1 Exhibit A, # 2 Exhibit B) (ama). (Entered: 04/26/2011) |
| 04/22/2011 | 281 | NOTICE OF APPEARANCE by Stuart Alan Krause on behalf of Douglas Beltman, Ann Maest, Stratus Consulting, Inc. (Krause, Stuart) (Entered: 04/22/2011) |
| 04/22/2011 | 282 | NOTICE OF APPEARANCE by Benjamin H. Green on behalf of Douglas Beltman, Ann Maest, Stratus Consulting, Inc. (Green, Benjamin) (Entered: 04/22/2011) |
| 04/26/2011 | 284 | ORDER TO SHOW CAUSE WHY THE PRESIDING DISTRICT JUDGE SHOULD NOT BE RECUSED PURSUANT TO 28 U.S.C. § 455(a). Plaintiff Chevron Corporation shall show cause as to why the Presiding District Judge Should Not Be Recused Pursuant to 28 U.S.C. § 455(a), dated April 22, 2011. ORDERED that service of a copy of this Order and of all of the papers submitted in support thereof, by hand, facsimile, or email, upon counsel for Plaintiff Chevron Corporation on or before 1:00 p.m. EDT on Tuesday, April 26, 2011, shall be deemed good and sufficient service thereof. Show Cause Response due by 5/2/2011. Ordered that reply papers, if any, shall be served and filed electronically on or before 4:00 p.m. EDT on Wednesday, May 4, 2011, and as further set forth. (Signed by Judge Lewis A. Kaplan on 4/25/2011) (rjm) Modified on 4/26/2011 (rjm). (Entered: 04/26/2011) |
| 04/26/2011 | 285 | MEMORANDUM OF LAW in Support re: 284 Order to Show Cause,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 04/26/2011) |
| 04/26/2011 | 286 | AFFIDAVIT of Julio C. Gomez in Support re: 284 Order to Show Cause,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 04/26/2011) |
| 04/26/2011 | 287 | DECLARATION of Julio C. Gomez in Support re: 284 Order to Show Cause,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 |

| | | |
|---|---|---|
| | | Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40) (Gomez, Julio) (Entered: 04/26/2011) |
| 04/26/2011 | 288 | CERTIFICATE OF SERVICE of Supporting Papers for Order to Show Cause Why the Presiding District Judge Should Not Be Recused Pursuant to 28 U.S.C. § 455(a) served on Plaintiff Chevron Corporation on 4/26/2011. Service was made by Electronic Mail. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 04/26/2011) |
| 04/28/2011 | 289 | ORDER Donziger shall file an answer to the amended complaint on or before May 4, 2011. This is without prejudice to any application for a reasonable extension of the May 4, 2011 date if Donziger wishes additional time. He is free to file a Rule 12 motion as well as an answer should he be so advised. SO ORDERED. Steven Donziger answer due 5/4/2011. (Signed by Judge Lewis A. Kaplan on 4/28/2011) (jmi) (Entered: 04/28/2011) |
| 04/28/2011 | 290 | TRANSCRIPT of Proceedings re: ARGUMENT held on 3/15/11 before Judge Lewis A. Kaplan. Court Reporter/Transcriber: Khristine Sellin, (212) 805-0300. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 5/23/2011. Redacted Transcript Deadline set for 6/3/2011. Release of Transcript Restriction set for 8/1/2011.(McGuirk, Kelly) (Entered: 04/28/2011) |
| 04/28/2011 | 291 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a ARGUMENT proceeding held on 3/15/11 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days...(McGuirk, Kelly) (Entered: 04/28/2011) |
| 04/29/2011 | 292 | ORDER TO SHOW CAUSE WHY STEVEN DONZIGER, LAW OFFICES OF STEVEN R. DONZIGER, AND DONZIGER & ASSOCIATES, PLLC SHOULD NOT BE PERMITTED TO INTERVENE IN THE DECLARATORY JUDGMENT CLAIM PURSUANT TO FED. R. CIV. P. 24, that service of a copy of this Order and of all of the papers submitted in support thereof, in accordance with Fed. R. Civ. P. 5, upon counsel for Plaintiff Chevron Corporation ("Chevron"), on or before 11:00 a.m. EDT on Monday May 2, 2011, shall be deemed good and sufficient service thereof; and it further: ORDERED that papers in opposition to Donziger's application for an order permitting him to intervene in Chevron's Ninth Claim for Relief, if any, shall be served and filed electronically on or before 4:00 p.m. EDT on |

| | | |
|---|---|---|
| | | Thursday, May 12, 2011; and it is further: ORDERED that reply papers, if any, shall be served and filed electronically on or before 4:00 p.m. EDT on Monday May 16, 2011; and it is further: ORDERED that Chevron show cause before this Court, on May 16, 2011, why an order should not be issued, pursuant to Rule 24 of the Federal Rules of Civil Procedure, granting Donziger's request to intervene in Chevron's Ninth Claim for Relief. Unless otherwise ordered, the motion will be taken on submission, and no appearance of counsel if required. SO ORDERED. Show Cause Response due by 5/16/2011. (Signed by Judge Lewis A. Kaplan on 4/29/2011) (lnl) (Entered: 04/29/2011) |
| 04/29/2011 | 293 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - MOTION to Intervene *Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger Associates, PLLC's Memorandum of Law In Support of Application by Order to Show Cause Why They Should Not be Permitted to Intervene in the Declaratory Judgment Claim Pursuant to Fed.R.Civ.P.24.* Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Little, Jan) Modified on 5/2/2011 (ldi). (Entered: 04/29/2011) |
| 04/29/2011 | 294 | FILING ERROR - WRONG EVENT TYPE SELECTED FROM MENU - DECLARATION of Elliot R. Peters in Support re: 293 MOTION to Intervene *Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger Associates, PLLC's Memorandum of Law In Support of Application by Order to Show Cause Why They Should Not be Permitted to Intervene in the Declaratory Jud.* Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # *1* Exhibit A)(Peters, Elliot) Modified on 5/2/2011 (ldi). (Entered: 04/29/2011) |
| 04/29/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney Jan Nielsen Little to RE-FILE Document 293 MOTION to Intervene *Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger Associates, PLLC's Memorandum of Law In Support of Application by Order to Show Cause Why They Should Not be Permitted to Intervene in the Declaratory Jud.* Use the event type Memorandum of Law in Support (non-motion) found under the event list Other Answers. (ldi) (Entered: 05/02/2011) |
| 04/29/2011 | | ***NOTE TO ATTORNEY TO RE-FILE DOCUMENT - EVENT TYPE ERROR. Note to Attorney Elliot Remsen Peters to RE-FILE Document 294 Declaration in Support of Motion. Use the event type Declaration in Support (non-motion) found under the event list Other Answers. (ldi) (Entered: 05/02/2011) |
| 05/02/2011 | | First Supplemental ROA Sent to USCA (File). Supplemental Indexed record on Appeal Files for 233 Notice of Appeal, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo USCA Case Number 11-1150-cv, were transmitted to the U.S. Court of Appeals. (nd) (Entered: 05/02/2011) |
| 05/02/2011 | 295 | MEMORANDUM OF LAW in Support *Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC's Memorandum of Law in Support of Their Application by Order to Show Cause Why They Should Not be Permitted to Intervene in the Declaratory Judgment Claim* |

| | | |
|---|---|---|
| | | *Pursuant to Fed. R. Civ. P. 24*. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Little, Jan) (Entered: 05/02/2011) |
| 05/02/2011 | 296 | DECLARATION of Elliot R. Peters in Support re: 295 Memorandum of Law in Support,. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit A)(Peters, Elliot) (Entered: 05/02/2011) |
| 05/02/2011 | 297 | MEMORANDUM OF LAW in Opposition re: 284 Order to Show Cause,,,. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 05/02/2011) |
| 05/02/2011 | 298 | DECLARATION of Randy M. Mastro in Opposition re: 284 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30)(Mastro, Randy) (Entered: 05/02/2011) |
| 05/02/2011 | 299 | DECLARATION of Seth A. Leone in Opposition re: 284 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit A through D)(Mastro, Randy) (Entered: 05/02/2011) |
| 05/02/2011 | 300 | DECLARATION of Michael L. Younger in Opposition re: 284 Order to Show Cause,,,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit A and B)(Mastro, Randy) (Entered: 05/02/2011) |
| 05/04/2011 | 301 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. Identifying No as Corporate Parent. Document filed by Steven Donziger, The Law Offices of Steven R. Donziger, Donziger & Associates, PLLC.(Werdegar, Matthew) (Entered: 05/04/2011) |
| 05/04/2011 | 302 | MOTION to Dismiss *(Notice of Motion to Dismiss Chevron Corporation's Amended Complaint)*. Document filed by Steven Donziger, Donziger & Associates, PLLC, The Law Offices of Steven R. Donziger.(Keker, John) (Entered: 05/04/2011) |
| 05/04/2011 | 303 | MEMORANDUM OF LAW in Support re: 302 MOTION to Dismiss *(Notice of Motion to Dismiss Chevron Corporation's Amended Complaint)*.. Document filed by Steven Donziger, Donziger & Associates, PLLC, The Law Offices of Steven R. Donziger. (Keker, John) (Entered: 05/04/2011) |
| 05/04/2011 | 304 | DECLARATION of John W. Keker in Support re: 302 MOTION to Dismiss *(Notice of Motion to Dismiss Chevron Corporation's Amended Complaint)*.. Document filed by Steven Donziger, Donziger & Associates, PLLC, The Law Offices of Steven R. Donziger. (Attachments: # 1 Exhibit A)(Keker, John) (Entered: 05/04/2011) |
| 05/04/2011 | 305 | REPLY MEMORANDUM OF LAW in Support re: 284 Order to Show Cause,,,. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje |

| | | Payaguaje. (Gomez, Julio) (Entered: 05/04/2011) |
|---|---|---|
| 05/04/2011 | 306 | DECLARATION of Julio C. Gomez in Support re: 305 Reply Memorandum of Law in Support. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Attachments: # 1 Exhibit Ex. A, # 2 Exhibit Ex. B, # 3 Exhibit Ex. C, # 4 Exhibit Ex. D, # 5 Exhibit Ex. E, # 6 Exhibit Ex. F, # 7 Exhibit Ex. G, # 8 Exhibit Ex. H, # 9 Exhibit Ex. I, # 10 Exhibit Ex. J, # 11 Exhibit Ex. K, # 12 Exhibit Ex. L)(Gomez, Julio) (Entered: 05/04/2011) |
| 05/04/2011 | 307 | ANSWER to Amended Complaint with JURY DEMAND. Document filed by Steven Donziger, Donziger & Associates, PLLC, The Law Offices of Steven R. Donziger. Related document: 283 Amended Complaint,,,,,,, filed by Chevron Corporation.(Keker, John) (Entered: 05/04/2011) |
| 05/05/2011 | 308 | ENDORSED LETTER addressed to Judge Lewis A. Kaplan from Benjamin H. Green dated 4/29/2011 re: Counsel writes on behalf of Defendants Stratus Consulting, Inc., Douglas Beltman and Ann Maest, to request a 30 day extension of time until 6/8/2011 to answer or otherwise respond to plaintiff's amended complaint. ENDORSEMENT: Time extended to and including 5/17/2011. (Signed by Judge Lewis A. Kaplan on 5/5/2011) (ab) (Entered: 05/05/2011) |
| 05/05/2011 | 309 | CONSENT TO CHANGE COUNSEL: Zeichner Ellman & Krause LLP shall be substituted as attorneys of record for defendants Stratus Consulting, Inc., Douglas Beltman and Ann Maest in place and stead of the undersigned attorneys. Attorney Stuart Alan Krause,Benjamin H. Green for Stratus Consulting, Inc. Douglas Beltman and Ann Maest added. Attorney Gordon Mehler terminated. (Signed by Judge Lewis A. Kaplan on 5/5/2011) (tro) (Entered: 05/05/2011) |
| 05/09/2011 | 310 | MEMORANDUM OPINION. #100300 This Court has considered this motion with the great care that it deserves. Informed persons, knowing and understanding all of the myriad and complex facts of these extensive proceedings, and putting aside the rhetoric and other devices deployed here by the LAP Representatives, readily would see that the Court's rulings have been firmly grounded in the law and the evidence. There is no objective reason to think that it has been anything less than entirely impartial. The motion to recuse the undersigned [DI 284] is denied. (Signed by Judge Lewis A. Kaplan on 5/9/11) (rjm) Modified on 5/9/2011 (rjm). Modified on 5/10/2011 (ajc). (Entered: 05/09/2011) |
| 05/10/2011 | 311 | ANSWER to Amended Complaint with JURY DEMAND. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. Related document: 283 Amended Complaint,,,,,,, filed by Chevron Corporation. (Gomez, Julio) (Entered: 05/10/2011) |
| 05/12/2011 | 312 | MEMORANDUM OF LAW in Opposition re: 292 Order to Show Cause,,,,, *CHEVRON CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO THE APPLICATION BY ORDER TO SHOW CAUSE OF DEFENDANTS STEVEN DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER, AND DONZIGER & ASSOCIATES, PLLC WHY THEY SHOULD NOT BE PERMITTED TO INTERVENE IN THE DECLARATORY JUDGMENT* |

| | | |
|---|---|---|
| | | *CLAIM PURSUANT TO FED. R. CIV. P. 24*. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 05/12/2011) |
| 05/12/2011 | 313 | DECLARATION of Kristen L. Hendricks in Support re: 312 Memorandum of Law in Opposition,. Document filed by Chevron Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Mastro, Randy) (Entered: 05/12/2011) |
| 05/12/2011 | 314 | ORDER of USCA (Certified Copy) as to 250 Notice of Appeal filed by The Law Offices of Steven R. Donziger, Steven Donziger, 233 Notice of Appeal, filed by Javier Piaguaje Payaguaje, Hugo Gerardo Camacho Naranjo USCA Case Number 11-1150-cv(L), 11-1264-cv(con). It is ORDERED that the request to stay the district court's proceedings is DENIED without prejudice to renew before the merits panel. It is further ORDERED that the motion for a partial stay, pending resolution of the appeal of the preliminary injunction is GRANTED. It is further ORDERED that Appellants' motions to expedite the appeal and to file oversized briefs are GRANTED. Catherine O'Hagan Wolfe, Clerk USCA for the Second Circuit. Certified: 05/12/2011. (nd) (Entered: 05/12/2011) |
| 05/13/2011 | 315 | NOTICE of Intent to Rely on Foreign Law Pursuant to Fed. R. Civ. P. 44.1. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 05/13/2011) |
| 05/13/2011 | 316 | NOTICE of Intent To Rely on Foreign Law Per FRCP 44.1 re: 279 Scheduling Order,,,,,. Document filed by Steven Donziger, Donziger & Associates, PLLC, The Law Offices of Steven R. Donziger. (Peters, Elliot) (Entered: 05/13/2011) |
| 05/13/2011 | 317 | NOTICE of PURSUANT TO RULE 44.1 OF THE FEDERAL RULES OF CIVIL PROCEDURE OF INTENT TO RAISE ISSUES OF FOREIGN LAW. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 05/13/2011) |
| 05/13/2011 | 318 | NOTICE of PURSUANT TO RULE 44.1 OF THE FEDERAL RULES OF CIVIL PROCEDURE OF INTENT TO RAISE ISSUES OF FOREIGN LAW. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 05/14/2011) |
| 05/16/2011 | 319 | REPLY MEMORANDUM OF LAW in Support re: 292 Order to Show Cause,,,,, *Steven Donziger, The Law Offices of Steven R. Donziger, and Donziger & Associates, PLLC's Reply In Support Of Application By Order To Show Cause Why They Should Not Be Permitted to Intervene In The Declaratory Judgment Claim Pursuant to Fed. R. Civ. P. 24*. Document filed by Steven Donziger, Donziger & Associates, PLLC, The Law Offices of Steven R. Donziger. (Keker, John) (Entered: 05/16/2011) |
| 05/17/2011 | 320 | MOTION to Dismiss *Amended complaint*. Document filed by Douglas Beltman, Ann Maest, Stratus Consulting, Inc..(Krause, Stuart) (Entered: 05/17/2011) |
| 05/17/2011 | 321 | DECLARATION of Benjamin H. Green in Support re: 320 MOTION to Dismiss *Amended complaint*.. Document filed by Douglas Beltman, Ann |

| | | Maest, Stratus Consulting, Inc.. (Attachments: # 1 Exhibit A)(Krause, Stuart) (Entered: 05/17/2011) |
|---|---|---|
| 05/17/2011 | 322 | MEMORANDUM OF LAW in Support re: 320 MOTION to Dismiss *Amended complaint*.. Document filed by Douglas Beltman, Ann Maest, Stratus Consulting, Inc.. (Krause, Stuart) (Entered: 05/17/2011) |
| 05/18/2011 | 323 | NOTICE of Joinder in Support of Defendants Steven Donziger's, The Law Offices of Steven R. Donziger's and Donziger & Associates, PLLC'S Application by Order to Show Cause Why They Should Not be Permitted to Intervene in the Declaratory Judgment Claim Pursuant to Fed. R. Civ. P. 24. Document filed by Hugo Gerardo Camacho Naranjo, Javier Piaguaje Payaguaje. (Gomez, Julio) (Entered: 05/18/2011) |
| 05/18/2011 | 324 | MEMORANDUM OF LAW in Opposition re: 302 MOTION to Dismiss *(Notice of Motion to Dismiss Chevron Corporation's Amended Complaint)*.. Document filed by Chevron Corporation. (Mastro, Randy) (Entered: 05/18/2011) |
| 05/25/2011 | 325 | REPLY MEMORANDUM OF LAW in Support re: 302 MOTION to Dismiss *(Notice of Motion to Dismiss Chevron Corporation's Amended Complaint)*.. Document filed by Steven Donziger, Donziger & Associates, PLLC, The Law Offices of Steven R. Donziger. (Keker, John) (Entered: 05/25/2011) |
| 05/26/2011 | 326 | ORDER: Defendant Donziger earlier today submitted a proposed order to show cause why discovery should not be stayed pending this Court's decision on his motion to intervene on Count 9, which has been fully submitted for about a week. The proposed order, if signed, would have required that opposing papers be served no later than May 31. The Court conducted a conference call with counsel for all parties this afternoon. As the Court understands it, none of the noticed discovery is scheduled to occur before June 3. The Court presently anticipates ruling on the intervention motion in advance of that date. The question of a stay of discovery pending that ruling therefore is likely to be academic. In all the circumstances, the Court declines to sign the proposed order to show cause. Should circumstances change, Donziger is free to renew the application next week. (Signed by Judge Lewis A. Kaplan on 5/26/2011) (tro) (Entered: 05/26/2011) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 05/28/2011 08:01:26 | | |
| **PACER Login:** | pb1601 | **Client Code:** | 029853.0101Tyjer |
| **Description:** | Docket Report | **Search Criteria:** | 1:11-cv-00691-LAK |
| **Billable Pages:** | 30 | **Cost:** | 2.40 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11 CV 0691

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

        Plaintiff,

    v.

STEVEN DONZIGER, THE LAW OFFICES OF
STEVEN R. DONZIGER, PABLO FAJARDO
MENDOZA, LUIS YANZA, FRENTE DE
DEFENSA DE LA AMAZONIA A/K/A AMAZON
DEFENSE FRONT, SELVA VIVA SELVIVA
CIA, LTDA., STRATUS CONSULTING, INC.,
DOUGLAS BELTMAN, ANN MAEST, MARIA
AGUINDA SALAZAR, CARLOS GREFA
HUATATOCA, CATALINA ANTONIA
AGUINDA SALAZAR, LIDIA ALEXANDRA
AGUINDA AGUINDA, PATRICIO ALBERTO
CHIMBO YUMBO, CLIDE RAMIRO AGUINDA
AGUINDA, LUIS ARMANDO CHIMBO
YUMBO, BEATRIZ MERCEDES GREFA
TANGUILA, LUCIO ENRIQUE GREFA
TANGUILA, PATRICIO WILSON AGUINDA
AGUINDA, CELIA IRENE VIVEROS
CUSANGUA, FRANCISCO MATIAS
ALVARADO YUMBO, FRANCISCO
ALVARADO YUMBO, OLGA GLORIA GREFA
CERDA, LORENZO JOSÉ ALVARADO
YUMBO, NARCISA AIDA TANGUILA
NARVÁEZ, BERTHA ANTONIA YUMBO
TANGUILA, GLORIA LUCRECIA TANGUILA
GREFA, FRANCISCO VICTOR TANGUILA
GREFA, ROSA TERESA CHIMBO TANGUILA,
JOSÉ GABRIEL REVELO LLORE, MARÍA
CLELIA REASCOS REVELO, MARÍA
MAGDALENA RODRÍGUEZ BARCENES,
HUGO GERARDO CAMACHO NARANJO, JOSÉ
MIGUEL IPIALES CHICAIZA, HELEODORO
PATARON GUARACA, LUISA DELIA
TANGUILA NARVÁEZ, LOURDES BEATRIZ
CHIMBO TANGUILA, MARÍA HORTENCIA
VIVEROS CUSANGUA, SEGUNDO ÁNGEL

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:



COMPLAINT

JURY TRIAL DEMANDED

AMANTA MILÁN, OCTAVIO ISMAEL     :
CÓRDOVA HUANCA, ELIAS ROBERTO    :
PIYAHUAJE PAYAHUAJE, JAVIER PIAGUAJE :
PAYAGUAJE, DANIEL CARLOS LUSITANDE :
YAIGUAJE, BENANCIO FREDY CHIMBO   :
GREFA, GUILLERMO VICENTE PAYAGUAJE :
LUSITANTE, DELFÍN LEONIDAS PAYAGUAJE :
PAYAGUAJE, ALFREDO DONALDO      :
PAYAGUAJE PAYAGUAJE, TEODORO     :
GONZALO PIAGUAJE PAYAGUAJE, MIGUEL :
MARIO PAYAGUAJE PAYAGUAJE, FERMIN  :
PIAGUAJE PAYAGUAJE, REINALDO     :
LUSITANDE YAIGUAJE, LUIS AGUSTÍN   :
PAYAGUAJE PIAGUAJE, EMILIO MARTÍN  :
LUSITANDE YAIGUAJE, SIMON LUSITANDE :
YAIGUAJE, ARMANDO WILFRIDO PIAGUAJE :
PAYAGUAJE, and ÁNGEL JUSTINO     :
PIAGUAGE LUCITANTE,              :
                                :
       Defendants.        :
                                x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................. 1

PARTIES AND RELEVANT NON-PARTIES ..................................................... 4

    Plaintiff ............................................................................................................ 4

    RICO Defendants ............................................................................................ 4

    Non-Party Co-Conspirators ........................................................................... 6

    Remaining Defendants ................................................................................. 11

SUBJECT MATTER JURISDICTION AND VENUE ...................................... 11

PERSONAL JURISDICTION ........................................................................... 12

FACTUAL BASIS FOR CLAIMS .................................................................... 17

A.    Background .................................................................................................. 17

       1.    TexPet Participates in Ecuador's State Oil Consortium and Negotiates Release From Liability in Return for Specified Remediation ............................ 18

       2.    U.S. Plaintiffs' Lawyers Devise Baseless Litigation Against Chevron in Ecuador ........................................................................................... 26

B.    The Conspirators Are Corrupting the Judicial Process to Extort a Payment From Chevron ............................................................................................... 29

       1.    Pressuring the Lago Agrio Court and Manufacturing Evidence .......................... 31

           a.    Implementing Pressure Tactics and Colluding With Ecuadorian Government Officials .............................................................. 31

           b.    Manipulating and Falsifying Their Own Experts' Findings to Corrupt the Judicial Inspection Process ............................................ 39

               (i)    Inducing an Expert to Report Biased and False Results .............. 40

               (ii)    Filing Falsified Expert Reports ..................................................... 43

           c.    Arranging Cabrera's Appointment as Global Assessment Expert and Secretly Writing His Supposedly "Independent" Report ......................................................................................... 46

(i)    Weeks Before the Court Appointed Cabrera, the RICO Defendants Meet With Him to Plan His "Independent" Expert Report ........................................................................ 47

(ii)   The Court Appointed Cabrera as Its "Independent" "Global Assessment Expert"........................................ 51

(iii)  While Cabrera Staged Mock Inspections, the RICO Defendants and Their Co-Conspirators Secretly Ghostwrote His Report. .............................................. 53

(iv)  The "Cabrera" Report:  The RICO Defendants' Repeated Fraud ........................................................ 62

(v)   The RICO Defendants' Fraudulent Endorsements of Their "Cabrera Report" and Procurement of Other Endorsements Through Misrepresentations.................. 65

(vi)  The RICO Defendants' Payments to Cabrera for Work He Did Not Perform.............................................. 68

(vii) The RICO Defendants' Attempt to Launder the "Cabrera Report" ........................................................ 70

2.    Colluding With the Republic of Ecuador to Bring Sham Charges Against Chevron's Attorneys ................................................ 73

3.    Launching Public Attacks on Chevron Based on Misleading Statements and Lies to Force Chevron to Pay Up ................ 78

a.    The Fraudulent Media Blitz........................................ 79

b.    Misrepresenting the "Independent" and "Neutral" Cabrera Report........................................................................ 84

c.    The RICO Defendants Make False Statements to U.S. State and Federal Government Officials ............................. 87

d.    The Conspirators Attempt to Manipulate Chevron's Stock Price to Coerce a Favorable Settlement .................... 90

e.    The RICO Defendants Falsely Accuse Chevron of Murder to Generate Outrage and Force Chevron to Pay .......... 95

C.   The Conspirators' Campaign of Lies and Obstruction in U.S. Courts ............................ 97

1. Attempting to Obstruct Chevron's Discovery Proceedings by Making False and Misleading Statements Before U.S. District Courts and Courts of Appeals .......................................................................................... 98

    a. The RICO Defendants' Initial False Representations to U.S. Courts That They Had No Relationship With Cabrera and No Role in Preparing the "Cabrera Report" ..................................................... 99

    b. The RICO Defendants' Subsequent False and Misleading Statements in an Attempt to Justify and Excuse Their Emerging Misconduct ........................................................................ 104

2. Making False Statements to Deceive New York Courts in Connection With Chevron's Section 1782 Applications and Other Actions ........................ 109

3. Obstructing Judicial Proceedings by Tampering With Witnesses, Withholding Documents, and Making False Statements to This Court.............. 111

D. Chevron Has Suffered Substantial Damages as a Result of the RICO Defendants' Conspiracy, and Enforcement of a Corrupt Judgment in the Lago Agrio Litigation Would Deepen the Harm .................................................. 114

CLAIMS FOR RELIEF ................................................................................... 119

    FIRST CLAIM FOR RELIEF
    (Violations of RICO, 18 U.S.C. § 1962(c)) ........................................... 119

    SECOND CLAIM FOR RELIEF
    (Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d)) ..................... 133

    THIRD CLAIM FOR RELIEF
    (Fraud)............................................................................................. 135

    FOURTH CLAIM FOR RELIEF
    (Tortious Interference With Contract) ............................................... 137

    FIFTH CLAIM FOR RELIEF
    (Trespass to Chattels)....................................................................... 138

    SIXTH CLAIM FOR RELIEF
    (Unjust Enrichment).......................................................................... 140

    SEVENTH CLAIM FOR RELIEF
    (Civil Conspiracy)............................................................................ 141

    EIGHTH CLAIM FOR RELIEF
    (Violations of New York Judiciary Law § 487) ................................. 142

NINTH CLAIM FOR RELIEF
    (Request for Declaratory Judgment That the Judgment by the Lago
    Agrio Court Against Chevron is Unenforceable and Non-
    Recognizable) .................................................................................... 144

PRAYER FOR RELIEF ............................................................................ 146

Plaintiff Chevron Corporation ("Chevron") for its Complaint against the Defendants listed below alleges as follows:

## INTRODUCTION

1.     Over the course of several years, defendants Steven Donziger and his co-defendants and co-conspirators have sought to extort, defraud, and otherwise tortiously injure plaintiff Chevron by means of a plan they conceived and substantially executed in the United States. It has been carried out by a U.S.-based enterprise comprised of, among others, U.S. plaintiffs' lawyers, led by Donziger; U.S. environmental consultants, led by Stratus Consulting, Inc., Ann Maest, and Doug Beltman; their Ecuadorian colleagues, led by Pablo Fajardo and Luis Yanza; and their front organizations, the Amazon Defense Front and Selva Viva. These conspirators are collectively referred to herein as the "RICO Defendants."[1] Their co-conspirators in the enterprise include, among others, U.S. law firms and attorneys, such as Joseph Kohn of Kohn Swift & Graf, P.C., Emery Celli Brinckerhoff & Abady LLP, Motley Rice LLC and Patton Boggs LLP; U.S. environmental "activists," such as Atossa Soltani, Amazon Watch, and Rainforest Action Network; U.S. public relations consultants, such as Karen Hinton; and additional financiers, such as Russell DeLeon and the Burford Group.

2.     The enterprise's ultimate aim is to create enough pressure on Chevron in the United States to extort it into paying to stop the campaign against it. The RICO Defendants have sought to inflict maximum "damage to [Chevron's] reputation," to put "personal psychological

---

[1]  Forty-seven of the 48 Ecuadorian individuals who are named in the caption of the Lago Agrio complaint are also named as defendants here (the exception being one who is now deceased). Whether or not these 47 individuals were actively involved with the corrupt acts described in the Complaint, or knew or should have known about them, the Lago Agrio Litigation and multiple acts in United States courts have been undertaken in their names, as well as in the name of the Amazon Defense Front, by the other defendants or those acting in concert with them on their behalves. Thus, they are vicariously liable for the torts of their agents undertaken on their behalf, can in no way benefit from a corruptly obtained judgment, and any relief Chevron procures by means of this action or other legal avenues applies equally to these 47 Ecuadorian individuals, who necessarily would thereby be acting in concert with their corrupt agents.

1

pressure [on] their top executives," to disrupt Chevron's relations with its shareholders and investors, to provoke U.S. federal and state governmental investigations, and thereby force the company into making a payoff.

  3.  To effect this plan, the RICO Defendants initiated a sham litigation in Lago Agrio, Ecuador (the "Lago Agrio Litigation"), claiming to seek money damages for "collective environmental rights" of the "affected" "communities" to remediate alleged petroleum contamination in Ecuador's Oriente region. The Lago Agrio Litigation was directed and funded in significant part from the United States by United States residents, such as Donziger and Kohn. In prosecuting the Lago Agrio Litigation, the RICO Defendants and their co-conspirators have engaged in a series of corrupt acts. For example, they have submitted in the Lago Agrio Litigation fabricated evidence in the form of expert reports in the name of a U.S. environmental consultant, Dr. Charles Calmbacher, that he did not draft or approve. They also pressured U.S. environmental consultant David Russell to generate an inflated $6 billion damages figure, which they never filed in Lago Agrio but instead touted in the press and, via co-conspirator Amazon Watch, submitted to the U.S. Securities and Exchange Commission in an attempt to trigger a Sarbanes-Oxley investigation. And they arranged the appointment of Richard Stalin Cabrera Vega ("Cabrera") as the Ecuadorian court's sole expert to conduct a "global damages assessment." They then secretly met with Cabrera to plan his report and—in the United States—ghostwrote the report and its annexes that Cabrera adopted "pretty much verbatim." The U.S.-based consultant RICO Defendants drafted "comments" purporting to criticize "the Expert's work and conclusions," even though they had written his initial report themselves, and then ghostwrote "Cabrera's" responses to their own "comments," increasing his fake damage assessment to more than $27 billion. In addition, the RICO Defendants have adopted a strategy to intimidate Ecuadorian judges, whom they have described as "mak[ing] decisions based on who they fear the most, not based on what the laws should dictate," and they have colluded with the Republic of Ecuador to procure sham criminal charges against Chevron's attorneys.

4.      To pressure Chevron in the United States, the RICO Defendants have cited this fabricated evidence, Cabrera's supposedly "independent" report and these trumped-up criminal charges in false statements to the U.S. Congress, the U.S. Department of Justice, state and federal regulatory agencies, including the Securities and Exchange Commission, the U.S. media, and Chevron shareholders, among others. They have also made false statements to U.S. courts in an attempt to cover up their wrongdoing and to obstruct Chevron's discovery efforts. In fact, when U.S. discovery proceedings were poised last March to require disclosure of the RICO Defendants' collusion with Ecuadorian court expert Cabrera, the RICO Defendants sought to delay the truth from coming out. As one of the Ecuadorian lawyers told Defendant Donziger at the time, "the effects" of disclosure "are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)." U.S. counsel agreed, admitting in a remarkable series of internal emails that "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator." Undeterred, however, Donziger and other U.S. counsel then conspired to "cleanse" the Cabrera scandal by submitting to the Lago Agrio court last September new expert reports which largely relied on the tainted "Cabrera" report, but hiked the damages sought to $113 billion.

5.      The RICO Defendants' conduct violates the Racketeer Influenced and Corrupt Organizations Act, 28 U.S.C. § 1961 *et seq.*, with predicate acts of extortion, mail and wire fraud, money laundering, obstruction of justice, and witness tampering, among others. In addition, Defendants' conduct constitutes common law fraud, unjust enrichment, intentional interference with contract, trespass to chattels, and civil conspiracy, among others. As a result, Defendant's misconduct entitles Chevron to injunctive relief precluding Defendants from attempting to enforce any judgment emanating from the proceedings in Lago Agrio, Ecuador, a declaratory judgment that any such judgment is unenforceable, damages, and other relief.

## PARTIES AND RELEVANT NON-PARTIES

**Plaintiff**

6.　　　Plaintiff Chevron Corporation ("Chevron") is a Delaware corporation with its principal place of business located at 6001 Bollinger Canyon Road, San Ramon, California 94583. Chevron is therefore a citizen of Delaware and California.

**RICO Defendants**

7.　　　The defendants listed in paragraphs 8 through 16 are the individuals who have conspired to engage in a pattern of racketeering activity, have each committed numerous criminal acts as part of their scheme to defraud and extort Chevron, and have each participated in the operation or management of the criminal enterprise. These defendants shall be referred to herein as the "RICO Defendants."

8.　　　Defendant Steven Donziger ("Donziger") is currently a "consulting" attorney for the Amazon Defense Front in the Lago Agrio Litigation and, as he described himself, "the person primarily responsible for putting [the Lago Agrio] team together and supervising it." Donziger is an individual residing in New York, New York, with an intention to reside there indefinitely, and is therefore a citizen of New York. Exercise of jurisdiction over Donziger is reasonable and proper in this District for the reasons set forth in paragraph 23, *infra*.

9.　　　Defendant the Law Offices of Steven R. Donziger is a sole proprietorship located at 245 W. 104th Street, #7D, New York, New York 10025, and is therefore a citizen of the State of New York. Exercise of jurisdiction over the Law Offices of Steven R. Donziger is reasonable and proper in this District for the reasons set forth in paragraph 24, *infra*.

10.　　　Defendant Pablo Fajardo Mendoza ("Fajardo") is counsel of record for the Amazon Defense Front as well as purportedly counsel of record for the named plaintiffs in the Lago Agrio Litigation. Fajardo is an individual residing in Ecuador, with an intention to reside there indefinitely, and is therefore a citizen of Ecuador. Exercise of jurisdiction over Fajardo is reasonable and proper in this District for the reasons set forth in paragraph 26, *infra*.

11.     Defendant Luis Yanza ("Yanza") is the co-founder of the Amazon Defense Front and is or has been the General Manager for Defendant Selva Viva. Yanza is an individual residing in Ecuador, with an intention to reside there indefinitely, and is therefore a citizen of Ecuador. Exercise of jurisdiction over Yanza is reasonable and proper in this District for the reasons set forth in paragraph 27, *infra*.

12.     Defendant Frente de Defensa de la Amazonia, a/k/a the Amazon Defense Front or Amazon Defense Coalition (the "Frente" or the "Front"), is a "non-profit" organization purporting to represent the "plaintiffs" in the Lago Agrio Litigation. The Front is the designated "trustee" in the Lago Agrio Litigation, and seeks to be charged with administering the portion of any judgment entered against Chevron as defined by the Lago Agrio court not received by the Republic of Ecuador or the other Defendants. The Front is a non-profit organization registered under the laws of Ecuador with offices located in the town of Nueva Loja (Lago Agrio) in the province of Sucumbíos, Ecuador. The Front is therefore a citizen of Ecuador. Exercise of jurisdiction over the Front is reasonable and proper in this District for the reasons set forth in paragraph 28, *infra*.

13.     Defendant Selva Viva, a/k/a Selva Viva Selviva CIA, Ltda. ("Selva Viva") is or was an Ecuadorian limited liability company with an office located at 1240 Shirys Street, Tumbaco, Ecuador. Selva Viva is therefore a citizen of Ecuador. Defendant the Front created Selva Viva to administer funds for the litigation. Defendant the Front controls Selva Viva, Defendant Donziger is or has been the President of Selva Viva, and Defendant Yanza is or has been the General Manager of Selva Viva. Exercise of jurisdiction over Selva Viva is reasonable and proper in this District for the reasons set forth in paragraph 29, *infra*.

14.     Defendant Stratus Consulting, Inc. ("Stratus") provided various environmental consulting services to the RICO Defendants, and was involved in producing the purportedly "independent" expert report filed in the Lago Agrio Litigation. Stratus is a private corporation incorporated in Colorado with its main office at 1881 Ninth Street, Suite 201, Boulder, Colorado

80302, and is therefore a citizen of Colorado. Exercise of jurisdiction over Stratus is reasonable and proper in this District for the reasons set forth in paragraph 25, *infra*.

15.     Defendant Douglas Beltman ("Beltman") is an Executive Vice President of Stratus. Beltman is an individual residing in Colorado, with an intention to reside there indefinitely, and is therefore a citizen of Colorado. Exercise of jurisdiction over Beltman is reasonable and proper in this District for the reasons set forth in paragraph 25, *infra*.

16.     Defendant Ann Maest ("Maest") is a Managing Scientist at Stratus. Maest is an individual residing in Colorado, with an intention to reside there indefinitely, and is therefore a citizen of Colorado. Exercise of jurisdiction over Maest is reasonable and proper in this District for the reasons set forth in paragraph 25, *infra*.

**Non-Party Co-Conspirators**

17.     Certain other non-party individuals and business entities played roles, direct or indirect, in the scheme to defraud and extort Chevron. Foremost among these individuals and business entities are the following:

    a.  Joseph Kohn ("Kohn") of the law firm Kohn Swift & Graf, P.C. ("Kohn Swift") is or has been a funder and a "consulting" attorney for the Amazon Defense Front in the Lago Agrio Litigation. Kohn is a resident of Pennsylvania.

    b.  Kohn Swift is a professional corporation organized under the laws of the State of Pennsylvania with its principal place of business located at One South Broad Street, Suite 2100, Philadelphia, Pennsylvania 19107. Kohn Swift has bankrolled the Lago Agrio Litigation as one of its "flagship cases" and funded the co-conspirators' other illegal activities.

    c.  Joshua Lipton ("Lipton") is the President of Stratus and is a resident of Colorado. Together with the RICO Defendants, Lipton coordinated and oversaw the use of Stratus and other resources by the RICO Defendants to ghostwrite the Cabrera Report and publicize its findings. To these ends, Lipton met with Donziger to discuss the RICO Defendants' plan to draft portions of the Cabrera Report and

was included in various correspondence concerning Stratus's work in ghostwriting the Cabrera Report.

d. David Chapman ("Chapman") is a Principal at Stratus and is a resident of Colorado. Chapman proposed drafting the Cabrera Report to Donziger, worked with Lipton and the RICO Defendants to coordinate the use of Stratus resources in the ghostwriting of the Cabrera Report, and participated in the subsequent obstruction of Chevron's efforts to uncover evidence of the fraud in U.S. court proceedings. He met with Donziger to discuss the RICO Defendants' plan to ghostwrite the Cabrera Report, signed Stratus's report endorsing the Cabrera Report, and perjured himself in a deposition when he testified that he had no reason to believe that Stratus had provided work product to Cabrera.

e. William Powers ("Powers") is a subcontractor for Stratus and is a resident of California. Powers had responsibility for components of the fraudulent scheme to ghostwrite the Cabrera Report; he worked on two annexes of the Cabrera Report and drafted portions of Cabrera's supplemental report.

f. Amazon Watch is a "non-profit" organization with its main office at 221 Pine Street, San Francisco, California 94104. Amazon Watch undertakes various projects ostensibly on behalf of environmental and human rights causes in the Amazon Basin. In connection with the Lago Agrio Litigation, Amazon Watch applied its experience and resources in public, media and government relations to use the Cabrera Report and other false and fraudulent claims as the basis for the RICO Defendants' public pressure campaign against Chevron. With the Amazon Defense Front, Amazon Watch maintains at least one of the RICO Defendants' websites, chevrontoxico.com, and through that and other means, distributes false and misleading statements as part of the RICO Defendants' extortionate scheme. Kohn and Kohn Swift are significant financial supporters of Amazon Watch.

g. Atossa Soltani ("Soltani") is the founder and executive director of Amazon Watch and, in that capacity, Soltani repeatedly distributed false and misleading statements about Chevron and the Lago Agrio Litigation as part of the RICO Defendants' extortionate scheme. She has also worked with Donziger, Yanza and other RICO Defendants to coordinate the public pressure campaign against Chevron, and to develop the RICO Defendants' strategy of manipulating the Lago Agrio court through intimidation and collusion with the Republic of Ecuador. Soltani is a resident of California.

h. Rainforest Action Network ("RAN") is a "non-profit" organization with its main office at 221 Pine Street, San Francisco, California 94104. The organization specializes in boycotts, demonstrations, and other high-profile means of exerting pressure on corporations that it perceives threaten the world's rainforests. In close concert with Amazon Watch (with which it shares a headquarters location), RAN has organized demonstrations and boycotts against Chevron and distributed false and misleading statements about Chevron and the Lago Agrio Litigation. RAN also maintains at least one of the websites, changechevron.org, through which the RICO Defendants distribute false and misleading statements.

i. Richard Stalin Cabrera Vega ("Cabrera") is a mining engineer and court expert in the Lago Agrio Litigation and a resident of Ecuador. The RICO Defendants secured his appointment as a purportedly independent court expert in the Lago Agrio Litigation. He was paid by the RICO Defendants and their co-conspirators for his cooperation in signing a fraudulent report ghostwritten by the RICO Defendants and their co-conspirators and he has repeatedly misrepresented his independence.

j. Alberto Wray ("Wray") is the former counsel of record for the plaintiffs in the Lago Agrio Litigation and is a resident of Washington, D.C. Wray previously served on Ecuador's Supreme Court and has significant political connections in

Ecuador. The RICO Defendants have used Wray's connections to procure the sham criminal investigations of Chevron's attorneys.

k.  Cristóbal Bonifaz ("Bonifaz") of the Law Offices of Cristóbal Bonifaz was counsel of record for plaintiffs in two actions that were filed in the Southern District of New York, *Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527 (S.D.N.Y. Nov. 3, 1993), and *Jota v. Texaco, Inc.*, No. 94 Civ. 9266 (S.D.N.Y. Dec. 28, 1994). Bonifaz is a resident of Massachusetts. Until in or about 2006, Bonifaz was also a consulting attorney for the Front, and purportedly the named plaintiffs, in the Lago Agrio Litigation.

l.  Karen Hinton ("Hinton") is a spokeswoman for the Front in the United States and is a resident of Virginia. Hinton assisted the RICO Defendants in the development of their public pressure campaign and, often in concert with Amazon Watch, has authored false and misleading press releases and media statements about the Lago Agrio Litigation in furtherance of the RICO Defendants' extortionate scheme.

m.  E-Tech International ("E-Tech") is an environmental consulting firm located at 231 Las Mananitas, Santa Fe, New Mexico 87501. E-Tech provided various environmental consulting services to the RICO Defendants and helped the RICO Defendants secretly draft Cabrera's work plan and otherwise colluded with Cabrera.

n.  Burford Capital Limited, Burford Group Limited, and Burford Group LLC (collectively, "Burford") are associated entities in the business of litigation finance. Burford Capital Limited is registered in the Bailiwick of Guernsey and is publicly traded on the London Stock Exchange's AIM Market. Burford Group Limited is also a Guernsey corporation, and it operates in the United States through its subsidiary Burford Group LLC, which has its principal office at 1185 Avenue of the

Americas, New York, NY 10036. Burford began funding the Lago Agrio Litigation in 2010.

o. Russell DeLeon ("DeLeon") is a law school friend of Donziger's and entrepreneur whose businesses include PartyGaming Plc, an online gambling company headquartered in Gibraltar. DeLeon has funded the RICO Defendants' activities for several years, providing over $1 million in support, and has made payments directly to Ecuadorians including Pablo Fajardo and others.

p. Emery Celli Brinckerhoff & Abady LLP ("Emery Celli") is a law firm located at 75 Rockefeller Plaza, 20th Floor, New York, New York 10019. Emery Celli has spearheaded the RICO Defendants' obstruction and cover-up efforts in the United States, filing numerous meritless filings in opposition to Chevron's discovery proceedings in U.S. courts in an express effort to delay those proceedings and "buy time" for the RICO Defendants' criminal scheme.

q. Patton Boggs LLP ("Patton Boggs") is a law firm with its principal office at 2550 M Street, NW, Washington D.C. 20037. Patton Boggs has developed the RICO Defendants' strategy for pursuing the assets of Chevron and its subsidiaries around the world on the basis of a fraudulent judgment in Ecuador, and has also been instrumental in the cover-up and obstruction of Chevron's U.S. discovery proceedings.

r. Motley Rice LLC ("Motley Rice") is a law firm with an office located at One Corporate Center, 20 Church St., Hartford, Connecticut 06103. Motley Rice has participated in the obstruction of Chevron's U.S. discovery efforts.

18.     At all relevant times, each and every non-party named in paragraph 17 was acting in concert with, or as an agent for, one or more of the RICO Defendants and, further, as described in more detail below, conspired with one or more of the other RICO Defendants to perform the acts averred herein.

10

**Remaining Defendants**

19.     The Lago Agrio Litigation was ostensibly brought on behalf of forty-eight named individual Ecuadorians,[2] referred to herein as the Lago Agrio Plaintiffs.  They seek no individual damages in the Lago Agrio Litigation, and the signatures for twenty of the Lago Agrio Plaintiffs on the power of attorney form submitted along with the complaint in the Lago Agrio Litigation are the product of forgery.  Whether or not the individual Lago Agrio Plaintiffs were or are aware of the fraud that has been perpetrated by the RICO Defendants and their co-conspirators in their names, the Lago Agrio Plaintiffs cannot benefit from the fraud and corrupt acts perpetrated ostensibly on their behalf.

20.     At all relevant times, the Lago Agrio Plaintiffs have been individuals residing in the Republic of Ecuador.  The Lago Agrio Plaintiffs are those individuals identified in Appendix A to this Complaint, which is incorporated by reference as if set forth herein in its entirety.

## SUBJECT MATTER JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction over Chevron's claims under 28 U.S.C. §§ 1331 and 1332, and under 18 U.S.C. § 1964(c).  Chevron's first claim for relief arises under 18 U.S.C. § 1961 *et seq.*, as hereinafter more fully appears.  There is also complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.  Chevron's state law claims arise out of the same case or controversy as its federal law claims, as all claims in this action arise out of a common nucleus of operative facts.  Thus, this Court also has supplemental jurisdiction over Chevron's state law claims under 28 U.S.C. § 1367.

22.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2), as a substantial number of the events giving rise to this action occurred in this District, and also under 18 U.S.C. § 1965.

---

2  One of these individuals, Esteban Lusitante Yaiguaje, is now deceased and thus is not named as a defendant in this case.

## PERSONAL JURISDICTION

23.     Exercise of jurisdiction over Defendant Donziger is reasonable and proper in this District because Donziger is a citizen of the State of New York and because he conducts extensive business activities within the State.  Donziger is the sole proprietor of the Law Offices of Steven R. Donziger, which is located and does business in New York.  Through his activities in New York, Donziger has served as the ringleader in the enterprise to defraud and extort Chevron, working closely with the other RICO Defendants in this action.  For Chevron's claims for violations of 18 U.S.C. § 1962 and New York state law, exercise of jurisdiction over Donziger is proper pursuant to 18 U.S.C. § 1965(a) and N.Y. C.P.L.R. § 301.

24.     Exercise of jurisdiction over the Law Offices of Steven R. Donziger is reasonable and proper in this District because the Law Offices of Steven R. Donziger is a citizen of New York, and because it conducts extensive business activities in the State.  Further, by and through the activities of Donziger described above, the Law Offices of Steven R. Donziger has served as a key player in the conspiracy against Chevron.  For Chevron's claims for violations of 18 U.S.C. § 1962 and New York state law, exercise of jurisdiction over the Law Offices of Steven R. Donziger is proper pursuant to 18 U.S.C. § 1965(a) and N.Y. C.P.L.R. § 301.

25.     Defendants Stratus, Beltman, and Maest are all residents of the United States. For Chevron's claims for violations of 18 U.S.C. § 1962, the exercise of jurisdiction over each of these defendants is proper in this District pursuant to 18 U.S.C. § 1965(b).  The ends of justice require application of the nationwide service provisions of 18 U.S.C. § 1965(b) because there is no district in which all of the RICO Defendants could otherwise be tried together.  For Chevron's claims under New York state law, exercise of jurisdiction over Defendants Stratus, Beltman, and Maest is proper pursuant to N.Y. C.P.L.R. § 302.  Through their agents and co-conspirators, Defendants Stratus, Beltman, and Maest have transacted and continue to transact business in the State of New York, and there is a substantial nexus between Defendants Stratus, Beltman, and Maest's purposeful availment of the New York forum and Chevron's claims.

26.     Exercise of jurisdiction over Fajardo is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. § 302.  Fajardo has transacted business and engaged in tortious conduct in the United States and New York which give rise in part to Chevron's claims.  Among other things, Fajardo (i) met with his co-conspirators in the United States multiple times to plan the ghostwriting of the Cábrera Report, including trips to New York to meet with Donziger and to Boulder, Colorado; (ii) acted in the United States and New York to conceal the conspiracy and fraud, including falsely testifying in *In re Application of Chevron*, Case No. 10 MC 00002 (S.D.N.Y. Aug. 6, 2010) that Cabrera was "independent" while knowing the RICO Defendants' role in Cabrera's appointment and reports (*see id.*, Dkt. 31 at Ex. 46); (iii) solicited and obtained funds for the Lago Agrio Litigation while in the United States and, on information and belief, in New York; and (iv) caused to be filed in the Southern District of New York an action on behalf of the Lago Agrio Plaintiffs to stay the international arbitration that Chevron initiated pursuant to the United States-Ecuador Bilateral Investment Treaty (the "Treaty Arbitration"), *Yaiguaje et al. v. Chevron Corp. and Texaco Petroleum Co.*, No. 10 CV 316 (LBS) (S.D.N.Y. Jan. 14, 2010) ("*Yaiguaje*").  Fajardo has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which Fajardo knew and intended would be felt in the United States and New York. For example, Fajardo has (i) directed a multitude of phone calls, emails, and other forms of communication to his co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; and (ii) participated in and orchestrated campaigns in the United States and New York to influence United States federal officials, State of New York officials, financial analysts, investors, and stockholders for the purpose of extorting money from Chevron.  Also, as set forth more fully herein, Fajardo's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States and New York.  Fajardo was aware of the effects in the United States and New York of those acts, the activities of Fajardo's co-conspirators and agents were to the benefit of Fajardo, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Fajardo in committing those acts.

27.     Exercise of jurisdiction over Yanza is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. § 302.  Yanza has transacted business and engaged in tortious conduct in the United States and New York which give rise in part to Chevron's claims.  Among other things, Yanza (i) met with his co-conspirators in the United States multiple times to plan the ghostwriting of the Cabrera Report, including trips to New York to meet with Donziger and to Boulder, Colorado; (ii) caused funds to be transferred within the United States and from the United States to Ecuador in furtherance of the RICO Defendants' wrongful activities; (iii) attended Chevron shareholder meetings to attempt to pressure Chevron's stockholders and board of directors in furtherance of the conspiracy; (iv) solicited and received funds for the Lago Agrio Litigation while in the United States and, on information and belief, in New York and from persons in the United States and New York directly and through agents by other means for the purpose of carrying out the conspiracy and fraud; (v) attempted to conceal the conspiracy and fraud by making false and misleading statements in the United States and elsewhere; and (vi) caused to be filed in the Southern District of New York the *Yaiguaje* action on behalf of the Lago Agrio Plaintiffs to stay the Treaty Arbitration initiated by Chevron.  Yanza has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which Yanza knew and intended would be felt in the United States and New York.  For example, Yanza has (i) directed multitudes of phone calls, emails, and other forms of communication to his co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; and (ii) participated in and orchestrated campaigns in the United States and New York to influence United States federal officials, State of New York officials, financial analysts, investors, and stockholders for the purpose of extorting money from Chevron.  Also, as set forth more fully herein, Yanza's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States and New York.  Yanza was aware of the effects in the United States and New York of those acts, the activities of Yanza's co-conspirators and agents were to the benefit of Yanza, and his co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Yanza in committing those acts.

28.     Exercise of jurisdiction over the Front is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. § 302.  The Front has been designated trustee in the Lago Agrio Litigation and stands to benefit from any fraudulent judgment entered against Chevron.  Yanza is the Front's co-founder, Fajardo is a leader within the organization, and at all times relevant herein Yanza and Fajardo were acting as the Front's co-conspirators, agents and/or alter egos in perpetrating the conspiracy and fraud against Chevron.  By and through its co-conspirators, agents and/or alter egos Yanza and Fajardo, the Front has transacted business and engaged in tortious conduct in the United States and New York which give rise in part to Chevron's claims, as set forth more fully above.  The Front has also engaged in intentional, wrongful, illegal, and/or tortious acts the effects of which the Front knew and intended would be felt in the United States and New York.  Among other things, the Front: (i) directed multitudes of phone calls, emails, and other forms of communication to its co-conspirators in the United States and New York for the purpose of planning and carrying out their conspiracy and fraud; (ii) maintains or causes to be maintained a website intentionally directed towards a U.S.-based audience called www.texacotoxico.org through which the Front has attempted to conceal the conspiracy and fraud by making false and misleading statements and, on information and belief, raised funds from the United States and New York for the purpose of carrying out the conspiracy and fraud; (iii) solicited and received funds from persons in the United States and New York directly and through agents by other means for the purpose of carrying out the conspiracy and fraud; (iv) used Amazon Watch as its public relations firm in the United States to publish false and misleading statements to conceal the conspiracy and fraud; and (v) hired a Washington, D.C.-based lobbyist to pursue its and its co-conspirators' interests before the U.S. Congress.  Also, as set forth more fully herein, the Front's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States and New York.  The Front was aware of the effects in the United States and New York of those acts, the activities of the Front's co-conspirators and agents were to the benefit of the Front, and its co-conspirators and agents were working at the

15

direction, under the control, at the request, and/or on behalf of the Front in committing those acts.

29.     Exercise of jurisdiction over Selva Viva is proper pursuant to 18 U.S.C. § 1965(b) and N.Y. C.P.L.R. § 302. Donziger is or has been the President of Selva Viva, Yanza is or was the General Manager of Selva Viva, and at all times relevant herein Donziger, Yanza and Fajardo were acting as Selva Viva's co-conspirators, agents and/or alter egos in perpetrating the conspiracy and fraud against Chevron. By and through its co-conspirators, agents and/or alter egos Donziger, Yanza and Fajardo, Selva Viva has transacted business and engaged in tortious conduct in the United States and New York which give rise in part to Chevron's claims, as set forth more fully above. Selva Viva has also directly transacted business and engaged in tortious conduct in the United States which give rise in part to Chevron's claims. The RICO Defendants use or have used Selva Viva as a conduit for funding their wrongful activities in Ecuador. Selva Viva has solicited and received several payments from Kohn Swift in the United States in order to fund the Lago Agrio Litigation, and some of those payments were subsequently channeled to Cabrera from a Selva Viva bank account. Also, as set forth more fully herein, Selva Viva's co-conspirators and agents have engaged in intentional, wrongful, illegal, and/or tortious acts in the United States and New York. Selva Viva was aware of the effects in the United States and New York of those acts, the activities of Selva Viva's co-conspirators and agents were to the benefit of Selva Viva, and its co-conspirators and agents were working at the direction, under the control, at the request, and/or on behalf of Selva Viva in committing those acts.

30.     Exercise of jurisdiction over the Lago Agrio Plaintiffs is proper pursuant to N.Y. C.P.L.R. §§ 301-02 because the Lago Agrio Plaintiffs have purposefully availed themselves of the New York forum by purportedly engaging New York attorneys and instituting and otherwise participating in related litigation in this District. The Lago Agrio Plaintiffs have reportedly hired Defendant Donziger, a New York attorney, to represent their interests in the Lago Agrio Litigation. Additionally, they have reportedly hired co-conspirator Emery Celli, a New York law firm,

to represent them in litigation pending in this Court and elsewhere in the United States. On January 14, 2010, the Lago Agrio Plaintiffs were the named plaintiffs in an action filed in this Court against Chevron to stay the Treaty Arbitration that Chevron initiated to obtain relief for the Republic of Ecuador's violations of its obligations under the United States-Ecuador Bilateral Investment Treaty, investment agreements, and international law, including Ecuador's failure to abide by the negotiated settlement and releases relating to the remediation of the former concession area. *See Yaiguaje*, No. 10 CV 316 (LBS) (S.D.N.Y. Jan. 14, 2010), Transcript of Hearing, Mar. 10-11, 2010. The Lago Agrio Plaintiffs have also intervened in Chevron's 28 U.S.C. § 1782 proceedings in this Court (and in other federal district courts) by filing various motions and briefs as "interested parties." The Lago Agrio Plaintiffs' involvement in the § 1782 proceedings in this Court caused Judge Kaplan to specifically find that "they [have] subjected themselves to the personal jurisdiction of this Court." *In re Application of Chevron*, 10 MC 00001 (LAK) (S.D.N.Y. July 22, 2010), 9/7/2010 Order at 23. There is a substantial nexus between the Lago Agrio Plaintiffs' purposeful availment of the New York forum and Chevron's claims under New York state law. For such claims, exercise of jurisdiction over the Lago Agrio Plaintiffs is therefore proper pursuant to N.Y. C.P.L.R. §§ 301-02.

## FACTUAL BASIS FOR CLAIMS

**A.**     **Background**

31.     This Complaint details how a group of U.S. plaintiffs' lawyers, together with U.S. and Ecuadorian co-conspirators, set about fraudulently exploiting images of environmental degradation in rural Ecuador to extort money from a U.S. company in a criminal scheme. Many of the quotations included in this Complaint were captured in video footage in the making of *Crude: The Real Price of Oil,* a film commissioned by the RICO Defendants and their co-conspirators in furtherance of their criminal scheme.

1. **TexPet Participates in Ecuador's State Oil Consortium and Negotiates Release From Liability in Return for Specified Remediation**

32.     In 1964, Ecuador granted oil exploration and production rights (known as a "concession") in a designated part of the Oriente region of Ecuador to Texaco Petroleum Company ("TexPet") and the Ecuadorian Gulf Oil Company ("Gulf"), which then formed what came to be known as the consortium. Ecuador's state-owned oil company, Petroecuador (formerly known as Corporación Estatal Petrolera Ecuatoriana or CEPE), became a stakeholder in the consortium in 1974 and, on December 31, 1976, it became the 62.5% majority stakeholder.

33.     When the consortium began its exploration activities, TexPet and Gulf agreed that TexPet would serve as the operator on behalf of both companies. As operator, and per the terms of the 1965 Napo Joint Operating Agreement that governed the internal workings of the consortium, TexPet was "in direct charge of carrying out the [p]arties' work obligations and performing other duties" with their prior consent and approval. Each party was obligated to provide operating expenses and investment funds according to their ownership interest in the consortium. TexPet was required to render its services as operator at cost and, in consideration therefore, was to be indemnified and held harmless by the parties for any claims brought by third parties arising out of or related to its performance as operator.

34.     Once Petroecuador entered the consortium and after it became the majority owner, TexPet continued to serve as operator. As majority owner, however, Petroecuador contributed 62.5 percent of the consortium's investments and operating costs and approved all annual work programs and budgets. Petroecuador retained oversight of TexPet's activities as operator beyond the annual budgeting cycles by approving projects as they were implemented and answering monthly "cash calls" with the funds necessary for each month's operating expenses.

35.     TexPet continued in the role of operator until 1990 when Petroecuador assumed operations. In 1992 when the concession contract expired, Petroecuador took over 100% ownership of the former consortium fields and facilities. TexPet has not operated any oilfields in Ecuador since 1990, and has had no ownership interest in any oilfield operations in Ecuador since

1992. From 1992 to the present, Petroecuador has been the sole owner and operator of the former concession area.

36.    Before its termination, the consortium's activities generated over US$23 billion. The Republic of Ecuador retained 97.3% of this amount, however, through an array of income taxes, royalties, contributions for domestic consumption, and gross profit on Petroecuador's share. The money generated by the consortium represented more than 50% of Ecuador's gross national product during that period.

37.    TexPet's total profits over the life of the consortium were a small fraction of those realized by Ecuador—less than US$500 million.

38.    Since Petroecuador took over operational control in 1990, it has drilled 414 new wells—almost 30% more than were drilled during TexPet's 25 years as the operator—and, according to Ecuadorian public media sources, was responsible for more than 1,400 disclosed spills from 2000 to 2008 alone. Petroecuador's environmental record has prompted Ecuador's current President, Rafael Correa to comment that Petroecuador "has dreadful environmental management practices."

39.    Defendant Fajardo—before he realized that such candor might undercut the conspiracy's attempts to extort Chevron—also spoke out against Petroecuador's environmental record:

> [Petroecuador is] unreliable because what Petro[ecuador] says is one thing and what it does is the complete opposite. Since Texaco left here, Petro[ecuador] has inflicted more damage and many more disasters than Texaco itself. But they'd never, ever say that. So there's one spill after another; there's broken pipes, there's contamination of wetlands, of rivers, of streams in great magnitude. But since it's a state-owned company, since it's the same people involved in the laws and all, no one says a thing.

40.    When Petroecuador took over as operator of the consortium in 1990, TexPet consented to Ecuador's request that it collaborate with Petroecuador to conduct an environmental audit of the consortium's oil fields. TexPet insisted, however, that Petroecuador, as majority owner of the consortium, share responsibility for any necessary remediation that the audit identi-

fied in the same manner as the parties had shared all operating costs. Ecuador acknowledged that TexPet was responsible for only its 37.5% share of the costs of remediating the environmental impact of the consortium's operations, and the parties recognized that TexPet could not be held responsible for the environmental impact of oil field operations conducted after its concession rights expired in 1992.

41.    In 1994, Ecuador publicly rejected the preliminary findings of the independent, joint audit and threatened to bring suit against TexPet for injuries to Ecuador's environment. Ecuador further informed TexPet that Petroecuador would not participate with TexPet in conducting environmental remediation because it lacked the necessary money to fund its share of the work. Thus, instead of identifying remediation work to be funded jointly, Ecuador insisted that the parties identify a set of remediation obligations corresponding to TexPet's share of responsibility.

42.    On or about December 14, 1994, Ecuador, Petroecuador, and TexPet entered into a Memorandum of Understanding ("MOU") in which they agreed to define TexPet's "Scope of the Work of Environmental Reparation" with respect to the "biotic" and "abiotic" environment, and also secured from TexPet a commitment to "carry out socio-economic compensation projects in order to address problems . . . stemming from the oil operations. . . ." This compensatory effort would accrue to the benefit not of the government in a narrow sense, but rather of the larger population. In fact, elsewhere, the document expressly underscores that these projects had to "tak[e] into account the residents of the Oriental Region." In exchange, the MOU obligated Ecuador to "negotiate the full and complete release of TexPet's obligations for environmental impact arising from the operations of the Consortium."

43.    The MOU furthered Ecuador's own constitutional duties toward its citizens. Under Article 19(2) of the extant Constitution, the authority to vindicate any environmental rights on behalf of the Ecuadorian people was held exclusively by the Government of Ecuador. According to the Ecuadorian Ambassador to the United States, "It is the Republic's *obligation* to become involved in matters that directly impact the welfare of Ecuadorian citizens, territory and

natural resources, and the very sovereignty of the Republic of Ecuador. The recent agreement between the Republic, Petroecuador and Texaco Petroleum Company, which was reviewed and supported by the Ecuadorian Congress, . . . demonstrates the Republic's determination to fulfill this obligation."

44.   Thus, as TexPet was winding-down its operations, an Environmental Committee of the Ecuadorian Congress insisted that any settlement agreement between TexPet and Ecuador "indemnify or alleviate the negative environmental effects caused . . . to the Ecuadorian population living in [the] Amazonian region," and stressed, to that end, that TexPet had to provide compensation in the "biotic, abiotic and socio-economic areas," and, with an "atmosphere of consensus[,] . . . tak[e] into consideration the inhabitants and authorities in the region." TexPet and the representatives of Ecuador and Petroecuador "t[ook] into consideration" the comments and suggestions from the Ecuadorian Congress. Local politicians from the Oriente region also played what they saw as a "leading role as the interested party" in the "negotiations to reach an understanding between Texaco and the Ecuadorian Government regarding environmental remediation in the Amazon."

45.   Defendant the Front also openly and actively participated in the negotiation of this settlement between TexPet and Ecuador. Defendant Yanza, President of the Front, sought an "audience" with the President of Ecuador "to explain directly the situation" of the people of the Oriente whom he purported to represent, so that their situation "may be taken into consideration when signing the agreements with [TexPet]." Yanza later submitted his group's "proposal" for defining the scope of work, which he claimed represented "far-reaching and vigorous work to reach consensus" among the population. Reflecting this cooperation with groups like the Front, Ecuadorian officials recently repeated, under oath, that the negotiations leading to these settlements were "open for all those who wanted to attend," and members of many environmental organizations, including the Front, did attend. These governmental officials saw themselves as the "facilitator[s]" of an open dialogue between the communities and TexPet, and followed orders from the "National Congress to take into account the problems that Amazonian groups were hav-

ing." As a result of this dialogue, the environmental groups were "behind everything that was being done," leading to a final instrument that considered and accounted for the interests of individuals and communities in the concession areas. When the MOU was opened to public scrutiny, and while the Scope of Work was being defined, the Front was one of the groups that wrote to the Ministry of Energy and Mines to express their "agree[ment] that the process of understanding [between Ecuador and TexPet] and the immediate performance of the environmental remediation work should continue."

46.     Pursuant to the terms of the MOU, on or about March 23, 1995, Ecuador, Petroecuador, and TexPet executed a precise "Scope of Work" identifying the particular sites and projects that would constitute TexPet's remediation obligations, consistent with TexPet's former one-third ownership share of the consortium. The "Scope of Work" required the performance of not only a vast remediation effort by TexPet, but also a number of socioeconomic projects, including the payment of $1 million to a redress fund to "be used for the rehabilitation of the areas affected, establishing, together with the population, viable systems for the use of renewable natural resources, and . . . to improve the quality of life." The Ministry of Energy and Mines received that money, and was entrusted to administer the fund "for the benefit of the Indigenous Communities of the Amazonian region." TexPet also financed the establishment of education and medical centers in the Oriente, together with "logistical support" for those centers such as ambulances and aircraft.

47.     Following the execution of the Scope of Work, on or about May 4, 1995, Ecuador, Petroecuador, and TexPet executed a settlement agreement (the "1995 Settlement Agreement"). In consideration for its release from any future responsibility for environmental impacts, TexPet agreed to perform the defined "Environmental Remedial and Mitigation Work" and provide "socio-economic compensation" for the affected areas. The 1995 Settlement Agreement immediately "release[d], acquit[ted] and forever discharge[d]" TexPet from all claims based on "Environmental Impact" from the consortium's activities at sites not included in the Scope of Work and provided that TexPet would be released from any "Environmental Impact" associated

22

with the sites covered by the Scope of Work upon completion of the prescribed remediation at each site. In other words, because Petroecuador continued to operate the oil fields, it assumed any residual or future responsibility, recognizing both its share of the past, as the former consortium's majority owner, and its control over the future, as sole owner and operator going forward.

48.     The settlement was purposefully broad. "Environmental Impact" was defined as "[a]ny solid, liquid or gaseous substance present or released into the environment in such concentration or condition, the presence or release of which causes, or has the potential to cause harm to human health or the environment." Reflecting this breadth of coverage, the release "include[ed] but [was] not limited to consequences of all types of injury that the Government or Petroecuador may allege concerning persons, properties, business, reputations, and all other types of injuries that may be measured in money, including but not limited to, trespass, nuisance, negligence, strict liability, breach of warranty, or any other theory or potential theory of recovery." The claims expressly released also included all "causes of action under Article 19-2 of the [1978] Political Constitution of the Republic of Ecuador," which, as discussed in paragraph 43, *supra*, placed the "duty [on] the State" to "oversee the preservation of nature" and guarantee all Ecuadorians "[t]he right to live in a pollution-free environment." The 1995 Settlement Agreement was signed by Abril Ojeda, Ecuador's Minister of Energy and Mines; Federico Vintimilla Salcedo, Executive President of Petroecuador; Ricardo Reis Veiga, Vice President of TexPet; and Rodrigo Pérez Pallares, legal representative of TexPet.

49.     The 1995 Settlement Agreement also obligated TexPet "to continue negotiations" with certain municipalities in eastern Ecuador that had also brought suit against the company. Filing materially identical complaints, the municipalities of Joya De Los Sachas, Orellana, Shushufindi, and Lago Agrio had each sued TexPet in 1994 in order to protect "the health of [their] citizens, the rivers of [their] communities." These municipalities purported to fulfill their quasi-sovereign duties to assist the Republic in meeting its environmental obligations to all citizens, and to exercise their own capacity to "carry out legal actions" necessary to protect the "col-

lective needs of [their] community" of inhabitants, specifically those needs concerning health and the environment.

50.     In consideration for TexPet financing specified "social interest works," each municipality suit was settled in 1996, similarly "exempt[ing], releas[ing], exonerat[ing] and reliev[ing] forever" Texaco and TexPet "from any responsibility, claim, request, demand or complaint, be it past, current or future, for any and all reasons related to" the consortium's operations, "especially concerning damages possibly caused to the environment in said cantonal jurisdiction of the Municipality." Each settlement agreement represented that the municipal government had consulted "with the entities and organizations representing the community of its inhabitants" in order to choose an appropriate reparation project. According to sworn statements of the relevant government officials, each agreement met "the interests of The Community and of its citizens as to any claims they may have against TEXPET." All of these settlements were "approve[d] . . . in full" by Ecuadorian courts because they "d[id] not violate any legal provision" and "cover[ed] all issues described in the [municipality] complaint[s]."

51.     In addition to the national and municipal governments, two Provinces also settled their potential claims against TexPet in the name of their residents and of the ecosystems within their respective territories. In 1996, the provincial government of Sucumbíos conferred "with entities and organizations representing the community of its inhabitants" in order to select an acceptable reparation project and avoid a potential lawsuit with TexPet. It ultimately demanded, "according to the interests of the community," that TexPet fund "social interest works," viz., "provincial eco-production projects." A Consortium of Municipal Mayors in the Napo Province also endorsed a settlement contract that identified their potential disputes with TexPet relating to "the oil concession," and, especially, to "the impact or damages possibly caused to the environment." Like its counterparts in Sucumbíos and at the national level, it negotiated and settled with TexPet in order to safeguard environmental and communal entitlements. These agreements with the municipalities and provinces shall be referred to herein collectively as the "1996 Municipality Releases."

52.     Pursuant to the terms of the 1995 Settlement Agreement with Ecuador, TexPet selected Woodward-Clyde, one of the largest environmental engineering firms in the world at the time, from a list provided by Ecuador of acceptable contractors to perform the remediation. Woodward-Clyde conducted additional investigations of the well sites listed in the Scope of Work and developed a Remedial Action Plan, which identified the specific pits at each well site requiring remediation under the criteria set out in the 1995 Settlement Agreement and specified the remedial action to be taken at each site. Ecuador reviewed Woodward-Clyde's Remedial Action Plan and conducted its own investigation of the sites to confirm that it was consistent with the MOU and the 1995 Settlement Agreement. In September 1995, Ecuador, Petroecuador, TexPet, and Woodward-Clyde each approved and signed off on the Remedial Action Plan.

53.     Between October 1995 and September 1998, Woodward-Clyde conducted all of the remediation required by the 1995 Settlement Agreement and the Remedial Action Plan on behalf of TexPet and at TexPet's expense. The remediation work was monitored and supervised by Petroecuador, the Ministries of Energy and Environment, and outside auditors. Ecuador issued a series of official records called " *Actas*" during this time certifying the adequacy of the remediation work that it had supervised and evaluated on an ongoing basis. In all, TexPet spent approximately $40 million (unadjusted dollars) on environmental remediation and community development in Ecuador pursuant to the 1995 Settlement Agreement in exchange for the releases granted by Ecuador.

54.     On September 30, 1998, Ecuador, Petroecuador, and TexPet executed the *Acta Final* (the "1998 Final Release"), certifying that TexPet had performed all of its obligations under the 1995 Settlement Agreement, and thus fully releasing TexPet from any and all environmental liability arising from the consortium's activities except for individual personal injury claims, such as to specific persons or property, which the parties understood as not being covered by the release. The 1998 Final Release was signed on behalf of Ecuador by Patricio Ribadeneira, the Minister of Energy and Mines; on behalf of Petroecuador by Ramiro Gordillo, Executive

Chairman, and by Luis Alban Granizo, Manager of Petroproducción; and on behalf of TexPet by Rodrigo Pérez Pallares and Ricardo Reis Veiga.

55.     The validity of these agreements has been publicly acknowledged by the Republic of Ecuador, and—recently—by the Lago Agrio Plaintiffs as well. As noted above, *supra* paragraphs 43 and 48, at the time the 1995 Settlement Agreement and the 1998 Final Release were executed, the Republic of Ecuador was the only legal person or entity with standing to represent and assert legal claims for environmental damage. Ecuador, and only Ecuador, could demand environmental remediation; individuals could only assert individual property damage or personal injury claims. Accordingly, TexPet's settlement with Ecuador and the affected municipalities and provinces fully discharged TexPet from any responsibility or liability that may have existed for environmental impact as a result of the consortium's activities, except individual personal injury claims.

### 2.     U.S. Plaintiffs' Lawyers Devise Baseless Litigation Against Chevron in Ecuador

56.     Certain plaintiffs' attorneys in the United States sought to exploit any environmental harm in the Oriente region by turning it into a financial windfall for themselves. These U.S. plaintiffs' attorneys (including Defendant Donziger and co-conspirators Kohn and Cristóbal Bonifaz), devised a plan to use TexPet's former participation in the consortium as the basis for extracting large sums of money from TexPet's parent, Texaco, Inc. ("Texaco"). As Kohn described his motivation, "[A]t the end of the day . . . , it [would] be a lucrative case for the firm." As Donziger described it, "I sit back and dream . . . . Billions of dollars on the table. A movie, a possible book." In other words, a financial windfall of unprecedented proportion, and one that would make Donziger "quite wealthy." According to Donziger's estimates, he thought his "own fee right now would be around 200m[illion]."

57.     In 1993 and 1994, these U.S. plaintiffs' attorneys filed two lawsuits against Texaco in federal district court in New York, purportedly on behalf of classes of "30,000 residents" of the Oriente and "25,000 residents" of Peru. *See Aguinda v. Texaco, Inc.*, No. 93 Civ. 7527

(S.D.N.Y. Nov. 3, 1993) ("*Aguinda*") and *Jota v. Texaco, Inc.*, No. 94 Civ. 9266 (S.D.N.Y. Dec. 28, 1994) ("*Jota*"). Those actions were dismissed on grounds including *forum non conveniens*, international comity, and failure to join indispensable parties Petroecuador and the Republic of Ecuador.

58.     Because Ecuador and Petroecuador had released TexPet from liability following its remediation efforts and because Ecuadorian law does not allow class actions, the U.S. plaintiffs' attorneys required the government's cooperation to bring a potentially lucrative lawsuit in Ecuador. The U.S. plaintiffs' attorneys had no desire to sue Petroecuador or Ecuador for the harms that had occurred—despite their actual culpability—because, as Defendant Donziger explained, "[T]he government here will never pay for any judgment. In contrast, Texaco can pay." In order to get the "juicy check" that, as Fajardo put it, was the ultimate goal, the U.S. plaintiffs' attorneys struck a deal with the Ecuadorian government in order to bring an action against a convenient U.S. target.

59.     The U.S. plaintiffs' attorneys agreed not to sue Petroecuador and assured the Republic of Ecuador that it would benefit from any judgment entered against Chevron in exchange for public and private governmental support for the U.S. plaintiffs' attorneys' case.

60.     The U.S. plaintiffs' attorneys presented Ecuador's Attorney General with written promises not to pursue legal action against the Republic of Ecuador or Petroecuador or to collect a judgment against Ecuador if one were awarded to them. Bonifaz stated that "if the U.S. court [in the *Aguinda* or *Jota* actions] finds both Petroecuador and Texaco guilty, we will not accept the percentage of the claim assigned to [Petroecuador]." And he admitted that the Lago Agrio Plaintiffs had "committed in legal documents not to sue Ecuador."

61.     With reported legislative assistance from the U.S. plaintiffs' attorneys, Ecuador enacted the Environmental Management Act of 1999 (the "EMA"). For the first time, the EMA enabled private individuals to bring generalized environmental injury claims previously held exclusively by the state. It also extended standing for the first time to private citizens to enforce "collective environmental rights" for environmental harm. These actions are private in name

only, however, because the EMA provides that any monetary judgment be awarded to the "community."

62.     With a new and highly advantageous legal framework thus in place, the U.S. plaintiffs' attorneys, joined and assisted by other RICO Defendants and their co-conspirators, filed the Lago Agrio Litigation, *Maria Aguinda et al. v. Chevron-Texaco*, in May 2003 in the Superior Court of Nueva Loja, Ecuador. As a result of the EMA, and the RICO Defendants' attempt to apply it retroactively, the Lago Agrio Litigation is unusual in structure. The ostensible plaintiffs in the Lago Agrio Litigation are forty-eight named individuals, but it is unknown whether these individuals consented to have the litigation brought in their name, as twenty of their signatures were forged in the very document that purported to provide authority to Ecuadorian counsel to file the complaint.

63.     The Lago Agrio Litigation does not seek damages based on personal injuries to the named Plaintiffs, which, along with claims for individual property damage, is the only type of claim individuals could bring (*see* ¶ 55, *supra*). Rather, relying on the EMA, the complaint seeks the costs of remediating broadly defined "environmental damages," the proceeds of which will not directly benefit the Lago Agrio Plaintiffs. Defendants Donziger, Fajardo and the other U.S. and Ecuadorian lawyers and investors reportedly expect up to 30% of the judgment. The Republic of Ecuador reportedly expects 90% of the benefit, although the RICO Defendants and their co-conspirators have already laid out plans to "keep the proceeds out of Ecuador," by placing the funds in a "trust" outside of the country. Some portion is expected to go to the Front, a fact that Donziger thought "best if Chevron did not know" out of concern that it "could harm the image" of the litigation. The individual Lago Agrio Plaintiffs, on the other hand, will not receive any portion of the judgment, and thus are at most only nominal plaintiffs.

64.     In effect, the RICO Defendants are planning to control nearly all of the proceeds from any judgment, shutting out the Lago Agrio Plaintiffs, the Republic of Ecuador, and Petroecuador and setting themselves up as a source of patronage through billions of dollars in remediation contracts that will be issued following an adverse judgment against Chevron, in a

country whose entire annual Gross Domestic Product is just over $64 billion. In an email ex-change with Fajardo and Donziger, for example, co-conspirator Julio Prieto noted that "Petroec-uador is NOT the one who must contract the remediation companies . . . . That's our job." And when the RICO Defendants heard that the Republic of Ecuador might be considering negotiating with Chevron directly, they pushed to have those conversations shut down, urging that no "repre-sentative of the Ecuadorian government . . . meet face to face with a representative of Chevron at this juncture[.]"

65.     The Lago Agrio complaint does not name the entity that has been responsible for environmental harm in the Oriente region since at least 1992: Petroecuador. Pursuant to their agreement not to bring any claims against Petroecuador or the Republic of Ecuador itself, the Lago Agrio Plaintiffs' U.S. representatives caused Chevron to be named as the only defendant in the Lago Agrio Litigation, despite the fact that Chevron has never operated in Ecuador. (Years after TexPet ceased operations in Ecuador, one of Chevron's subsidiaries merged with Texaco, TexPet's ultimate parent company. Chevron thereby became an indirect shareholder of TexPet.)

**B.     The Conspirators Are Corrupting the Judicial Process to Extort a Payment From Chevron**

66.     The support of the Republic of Ecuador, the manipulation of the EMA, and the filing of the Lago Agrio Litigation provided the U.S. lawyers with the foundation for their crimi-nal scheme. Through the conduct of their criminal enterprise, the conspirators set about to manufacture false evidence and a fake "history" that they would repeat in every media outlet, before Congress, in front of state and federal investigative and administrative agencies, and with which they would seek to scare and mislead Chevron shareholders and investors. All of this was done in furtherance of their scheme to coerce Chevron into making a massive payoff to the criminal enterprise. As part of this scheme, the conspirators keep "jack[ing] up," in Donziger's words, their demand. In 2003, they thought $6 billion was an aggressive number. In 2008, they raised the stakes to $16 billion, and then to $27 billion. Today, their claim is for $113 billion.

67.    The RICO Defendants' criminal scheme has three main lines of attack:  One, intimidate or corrupt the Lago Agrio court and obtain a fraudulent judgment against Chevron based on manufactured evidence of liability.  Two, collude with the Republic of Ecuador to procure sham criminal charges against Chevron's attorneys.  Three, conduct a massive public pressure campaign designed to spread false and misleading information about Chevron and the Lago Agrio Litigation.  The ultimate objective, in Donziger's words, is to cause "damage to [Chevron's] reputation," to put "personal psychological pressure [on] their top executives" through threats and attacks through the media and force Chevron into a payoff.

68.    Donziger has explained how the conspirators work to increase costs for Chevron on all fronts until it gives in to their extortionate demands:

> The work doesn't let up just because I'm in the U.S., at all.  I mean, it's still really intense, you know, so it's always looking for ways to increase the leverage and increase the cost to Chevron for not doing anything.  So, what's the cost?  The cost is, right now, it's the cost of the risk of getting a huge multi-billion dollar judgment at trial, . . . it's the cost of all the hassle they have to put up with from the environmental groups, . . . it's the cost of their sullied reputation, you know, in the media.

69.    The RICO Defendants and their co-conspirators have shown no signs of stopping their attack.  Indeed, Donziger has threatened to try to enforce any fraudulent judgment obtained in the Lago Agrio Litigation in the United States and in other foreign jurisdictions, observing that "Chevron operates in more than 100 countries and has numerous oil tankers that troll the world's waterways and dock in any number of ports . . . ."  In a recent speech, Donziger asserted that the conspirators are assembling a legal team to "seize assets, seize boats," wherever Chevron's subsidiaries operate around the world—even though the Lago Agrio Plaintiffs previously told this Court that Chevron's defense against any Lago Agrio judgment should be restricted to New York's recognition act.  Fajardo has likewise warned that the RICO Defendants plan to confiscate Chevron's assets in the United States in order to enforce the judgment.  And Donziger has also stated that the conspirators' plan is to move on from Chevron and Ecuador and reprise their

criminal scheme again and again: "take legal fees we can earn from this case and do more cases like this in different places. With, you know, the same team, if possible."

    **1.**    **Pressuring the Lago Agrio Court and Manufacturing Evidence**

        **a.**    **Implementing Pressure Tactics and Colluding With Ecuadorian Government Officials**

70.    Central to the RICO Defendants' and their co-conspirators' scheme to defraud and extort Chevron is the fact that Ecuador's judiciary has developed systemic weakness and corruption, in addition to other significant flaws and shortcomings. The conspirators are aware of this fact, and have sought to exploit it. According to Donziger, "[T]he court is now in play, up for grabs, and accessible." Donziger has boasted that, unlike in the United States, the "game" is "dirty" and there are "almost no rules" in Ecuador. Donziger and his co-conspirators have sought repeatedly to capitalize on the Ecuadorian judiciary's weakness, threatening violence, bullying judges, and using political connections to obtain rulings in their favor based on the judges' fear of repercussions rather than the facts or law. Indeed, Donziger instructed one of his co-conspirators: "Please prepare a detailed plan with the necessary steps to attack the judge through legal, institutional channels and through any other channel you can think of." Attacking the judge was necessary, because, as Donziger put it: "[T]he only way the court will respect us is if they fear us—and . . . the only way they will fear us is if they think we have [s]ome control over their careers, their jobs, their reputations—that is to say, their ability to earn a livelihood." This fear and "constant pressure on the judge and the court" is essential to the RICO Defendants' and their co-conspirators' plan to obtain "a fast decision." With assistance from the highest levels of the Ecuadorian government, the RICO Defendants and their co-conspirators have all but assured that a favorable but corrupt and fraudulent judgment from the Lago Agrio court is forthcoming.

71.    The RICO Defendants and their co-conspirators do not view the enterprise in which they are engaged as a lawsuit. As Donziger has explained, the litigation "is not a legal case," but a "political battle that's being played out through a legal case." In other words,

Donziger and his co-conspirators knew that what "we need to do is to get the politics in order . . . [because] the only way we're going to succeed, in my opinion, is [i]f the country gets excited about getting this kind of money out of Texaco . . . . So you have to play to those . . . themes, [with] those feelings these people have." Consistent with this strategy, Donziger and the other RICO Defendants know that their "success" will have nothing to do with pursuing the Lago Agrio Litigation on the merits, but rather will depend on using that "litigation" as a vehicle or pretense with which to attack Chevron in the media and before U.S. governmental bodies and shareholders and force it into paying them off. In Donziger's own words, the conspirators have conducted the Lago Agrio Litigation as a "flat-out street brawl, extreme fighting through litigation" in which he and his co-conspirators are seemingly "only a short step away from smashing the faces of our counterparts with a closed fist, or taking out guns[.]"

72.     Donziger has acknowledged the RICO Defendants' and their co-conspirators' use of "pressure tactics" to influence and intimidate the Ecuadorian judiciary. Donziger admitted that such tactics are "something you would never do in the United States. . . . But Ecuador, you know . . . this is how the game is played, it's dirty." Donziger further declared that "there's almost no rules here" and that "the only language that I believe, this judge is gonna understand is one of pressure, intimidation and humiliation. And that's what we're doin' today. We're gonna let him know what time it is . . . . We're going to scare the judge, I think today." These fear tactics are effective, according to Donziger, because Ecuadorian judges "are really not very bright" and "make decisions based on who they fear the most, not based on what the laws should dictate." In fact, when an associate suggested to Donziger that no judge would rule against them because "[h]e'll be killed," Donziger replied that, although the judge might not actually be killed if he ruled against them, "he thinks he will be . . . . Which is just as good." As a colleague told Donziger, "The only way we will win this case is if the judge thinks he will be doused with gasoline and burned if he rules against us." Donziger stated that this comment did not shock him. Donziger further asserted: "[The judges] don't have to be intelligent enough to understand the law, just as long as they understand the politics." And according to Donziger, "no judge can rule

against us and feel like he can get away with it in terms of his career." These threats are made all the more real given the prevalence of violence in the Oriente region of Ecuador. Indeed, Fajardo has acknowledged that paid assassins in the Oriente will kill someone for as little as $60, and the region is known to harbor elements of the terrorist group FARC.

73.    As part of their strategy to intimidate and coerce the Lago Agrio court, the RICO Defendants and their co-conspirators plotted to raise what they called their own "private army," a "specialized group" detailed "to watch over the court," for which, "if we need weapons, we can provide weapons." According to Fajardo, it was "necessary" for the RICO Defendants and their co-conspirators to "organize pressure demonstrations at the court" that will be a "little bit aggressive" in order to "teach the court a lesson." During one meeting in which the "private army" was discussed, Defendants Donziger and Yanza along with Amazon Watch founder Soltani and Kevin Koenig, Amazon Watch's Northern Amazon Program Coordinator, discussed their plans to organize and finance attempts "to control the court, to pressure the court." Donziger elaborated that the conspirators "want to send a message to the court that, 'don't f[**]k with us anymore—not now, and not—not later, and never.'" He observed that, "no one fears us right now. And, until they fear us, we're not gonna win this case. I'm convinced." Accordingly, the conspirators planned to "take over the court with a massive protest," with the goal of "shut[ting] the court down for a day." According to Donziger, "[O]nly after that should we talk to the judge about what he needs to do. The judge needs to fear us for this to move how it needs to move, and right now there is no fear, no price to pay for not making these key decisions." Realizing the ramifications of this plan, Soltani asked if the videotapes of the discussion could be subpoenaed, advising: "I just want you to know that it's—it's illegal to conspire to break the law."

74.    Ignoring these qualms, the RICO Defendants and their co-conspirators put their plan into effect, organizing their "army" in demonstrations at inspection sites and at the courthouse itself, intending to confront and instill fear into the court. Donziger described one action to Joe Berlinger, the director of the film *Crude*: "[O]ur private 'army' . . . has been very effective. Yesterday they followed a Texaco lawyer into the judge's chambers and had a confronta-

tion. This is a critical part of our strategy that is allowing the case to go forward." Over the en-suing months, the conspirators' private army would make numerous appearances at judicial in-spections of environmental sites, at the courthouse, and in the streets of Lago Agrio, always seeking to remind the judiciary that this was not litigation, but a "flat-out street brawl." At one such protest at a judicial inspection of the Sacha Sur Station, the RICO Defendants and their co-conspirators amassed their "army" of protesters who the judge would not permit to enter the Sta-tion due to the risk that such a large mob would pose to the Station's operation. When Donziger saw that what he described as his "army" would not be able to enter, he demanded that the "f[**]kin' judge" come to the gate to deal with the mob himself and warned that "they're pro-voking a violent incident." Although the RICO Defendants' and their co-conspirators' "army" was rebuffed at this inspection, the RICO Defendants and their co-conspirators achieved their purpose of letting the judiciary know that it was being watched by a potentially violent group. In another incident, the conspirators organized a protest at the judge's office after a canceled judi-cial inspection. The intimidation was successful, causing the judge to "sweat" and "promis[e] to make a decision" on a new date by the following day.

     75.     The RICO Defendants' and their co-conspirators' plan to instill fear in the judi-ciary was only one approach to illegally obtaining a favorable ruling. Another approach in-volved numerous attempts to personally influence, intimidate or negotiate with the judge in the Lago Agrio Litigation, often through *ex parte* meetings. Donziger described such actions as "lobbying." Donziger, for example, has held numerous meetings with presiding judges, often over lunch at the judges' homes, during which he has "t[aken] advantage of the situation to ex-plain [the RICO Defendants'] theory of the case." During one such meeting, Donziger pressed upon the judge the false assertion that "Texaco's sampling is full of shit." Donziger has also asked his co-conspirators to meet with the judge in secret and press their case. On another occa-sion, one of Donziger's co-conspirators suggested that in order to get the court to rule in their favor on an important legal point, "Maybe Pablo [Fajardo] can have one of his backroom conver-sations." And indeed, Fajardo and the Front—the organization that stands to receive a windfall

from any judgment—have met directly with the judge, pressing the conspirators' interests and obtaining promises of cooperation from the judge. In August 2006, co-conspirator Joseph Mutti updated Donziger that, "Luis [Yanza] reported that the judge appears to be backing down from his position regarding the cancellation of the inspections and that pressure must be brought to bear on him. Thus, it was resolved that two members of the coalition will be traveling to Lago next week to meet with the judge. Esperanza already met with him twice this week—once with an accompanying declaration—so he's already feeling the pressure." The RICO Defendants also employed blackmail to get what they wanted. For example, the RICO Defendants "wrote up a complaint against [Judge] Yanez, but never filed it, while letting him know [they] might file it if he does not adhere to the law and what [they] need." And on a task list he prepared in February 2006, Donziger wrote: "accuse [Judge] of being involved in corruption with Chevron; ask for recusal."

76.     Not content to apply pressure themselves, and as part of their previous arrangement with the Ecuadorian government (*see* ¶¶ 58-61, *supra*), the RICO Defendants and their co-conspirators have also enlisted Ecuadorian officials to pressure and intimidate the judiciary to rule against Chevron. As Donziger has explained the strategy, "We can have the best proof in the world, and if we don't have a political plan we will surely *lose*. On the other hand, we can [have] mediocre proof and a good political plan and stand a good chance of winning." Donziger understood that to get what the co-conspirators wanted, he had to do "political work at the highest level to make things happen, like get the government, for example, to take a position in a case that affects your clients." This was facilitated by the fact that, according to Donziger, the conspirators had "close ties" to "high-ranking Ecuadorian government officials" in addition to the Front's "wide influence in Ecuador" and "ab[ility] to command meetings with government ministers and even the President."

77.     The collaboration between the RICO Defendants and Republic of Ecuador is so close that one U.S. District Court has concluded that it was "an established fact" that the Republic of Ecuador was supporting the Lago Agrio Plaintiffs. The Republic of Ecuador recently as-

serted in court filings that it has had a formal "*common interest agreement*" with representatives of the Lago Agrio Plaintiffs since 2006. In pursuit of that alleged common interest, the RICO Defendants and the Republic of Ecuador have coordinated their legal and public relations strategies, both directly and through Ecuador's U.S. legal counsel. As part of this cooperation, the RICO Defendants have received assistance from the highest levels of government in Ecuador, from "allies [who were] firmly entrenched at the top." For example, Donziger himself ghost-wrote a letter from Ecuador's ambassador to the United States, Dr. Luis Gallegos, to *The Wall Street Journal*.

78.　　The RICO Defendants have also worked with Winston & Strawn LLP, the U.S. law firm hired by Ecuador to represent it against Chevron in proceedings in the United States. The RICO Defendants have provided information and other assistance to Winston & Strawn, including having Stratus provide scientific analysis and Donziger help with the drafting of legal documents. Donziger, aware that this level of cooperation crossed the line, was concerned it might lead Chevron to believe the RICO Defendants and the Ecuadorian government were "in bed" together. Thus, upon realizing he had been photographed alongside a Winston & Strawn attorney for a newspaper article, Donziger vowed to deny that the man in the photograph was him. However, Donziger recognizes that the RICO Defendants and the Republic of Ecuador have been "really helping each other."

79.　　In 2009 when a bribery scandal erupted around the presiding judge in the trial at the time, Judge Núñez, the RICO Defendants' contemporaneous correspondence reveals that the Correa government intended to bury the evidence of corruption. On September 2, 2009, days after the story broke, co-conspirator Juan Pablo Saenz wrote to Donziger and assured him that the Front's "sources at the government tell us they're actively looking for [Ecuadorians involved in the scandal], to cut their heads off. We should focu[s] on Borja and Hansen, since they're the Chevron stooges. Correa and his cronies will take care of the rest."

80.　　The RICO Defendants have also turned to the government to *shut down* Petroecuador's remediation, because of the negative impact it would have on their scheme. For exam-

ple, in 2009, in an email to Donziger and other conspirators with the subject line "WORRISOME," Fajardo warned them that a newspaper was reporting that the government was assuming responsibility for remediation, and, worse, that it believed it would cost an "extremely low" $96 million. Fearful that Chevron would "say that the State finally assumed its duty and is going to clean up what it ought to," Fajardo called on his co-conspirators to act. Donziger responded in an email to Juan Saenz, "You have to go to Correa to put an end to this s[**]t once and for all."

81.    Other members of the Ecuadorian government have also signaled to the Lago Agrio court the government's demand that Chevron be found liable. As the Ecuadorian Attorney General Diego García Carrión told a reporter in August 2008, the Correa administration's position in this case is clear: "The pollution is [the] result of Chevron's actions and not of Petroecuador." Again, in May 2010, Attorney General García "dismissed any responsibility on the part of the Ecuadorian State for the environmental damage caused in the Amazon region by the U.S.-based oil company Chevron-Texaco." And in September 2009, Ombudsman Fernando Gutiérrez announced that: (i) the Lago Agrio Litigation "has absolute priority and the judgment must be rendered as soon as possible"; (ii) the case concerns "an assault on the entire country"; and (iii) in a direct signal to the Lago Agrio court, that Chevron, rather than the State, bears full responsibility for any harm.

82.    This support was not arrived at independently, but through collusion between the RICO Defendants and the Republic of Ecuador. Ana Alban, then Ecuador's Minister of the Environment, communicated with Donziger directly, assuring him that the Government was "giving the support that we can do" to the Lago Agrio Plaintiffs, reminding him that "we brought the President to the zone," and assuring him that she had a "very close" "friend of the Frente de Amazonia working with me doing all this."

83.    The fact that President Correa and other members of the Government have sided with the Defendants and against Chevron sends a clear message to the Ecuadorian judiciary that they must find Chevron liable. And it sends a message to Chevron that it must pay money to the

conspirators in the form of a "settlement" or face a fraudulent, politically influenced judgment that the RICO Defendants intend to try to enforce in U.S. courts or elsewhere. These messages are made all the clearer by the de facto control and the near-autocratic power the Ecuadorian presidency wields over all Ecuadorian institutions today.

84.     Various sources confirm the political branches' domination over Ecuador's judiciary in recent years and the judiciary's system-wide corruption. For example, the World Bank's Worldwide Governance Indicators for 2009, compiled from 21 independent sources, ranked Ecuador below the 10th percentile of all countries surveyed with respect to the "rule of law"—down from the 31st percentile in 2003. Ecuador's negative score is -1.28, which places it below North Korea (-1.25).

85.     The U.S. Department of State's annual Human Rights Report published in March 2010 also noted that "there continued to be serious problems" with respect to "corruption and denial of due process within the judicial system" and that the judiciary was "susceptible to outside pressure and corruption." Similarly, as recently as July 15, 2010, the UN Special Rapporteur on extrajudicial executions described Ecuador's judicial system as "almost universally condemned for its inefficiency and mismanagement."

86.     Against this backdrop of collusion and corruption, the RICO Defendants have virtually assured a judgment in their favor and against Chevron by playing the "game" "dirty" and currying favor from the Ecuadorian government. And this is all part of the conspirators' scheme to convince Chevron to pay up—or else. Chevron has initiated international arbitration under the Bilateral Investment Treaty, seeking relief from the Republic of Ecuador's violations of international law and treaty obligations in connection with its failure to honor its contractual agreements. The Lago Agrio Plaintiffs and other parties named in this complaint are not and cannot be parties to the Treaty Arbitration, and Ecuador has asserted sovereign immunity against claims filed in courts of the United States.

### b. Manipulating and Falsifying Their Own Experts' Findings to Corrupt the Judicial Inspection Process

87.     At the outset of the litigation, the court ordered a process known as a judicial in-
spection to assess the 122 former consortium oil production sites.  In a process agreed to by both
parties and the court, experts were nominated by each side and appointed by the court to investi-
gate and report on conditions at the sites.  The court nominated a third set of "settling experts" to
resolve any differences between the experts nominated by the parties.

88.     The RICO Defendants and their co-conspirators believed they could use and cor-
rupt the judicial inspection process to their advantage.  To this end, they designed a strategy to
"choreograp[h]" the judicial inspections and to "create conflict, invit[ing] the press" to "entrap
[Chevron] in the conflict."  As Donziger put it, "The goal of the inspections [was] to win the le-
gal case, not to produce an independent scientific report."  From his perspective, the judicial in-
spection process was "all about politics and arguing and bullshit and show."  Part of that show
was to organize a number of demonstrations at the judicial inspection sites—some threatened to
become violent (*see* ¶ 74, *supra*)—to showcase the strength and will of the RICO Defendants'
and their co-conspirators' "army" and to send a message to the judiciary that it was being
watched.

89.     The RICO Defendants and their co-conspirators have also sought and obtained a
court order prohibiting Petroecuador from conducting any remediation of the former consortium
area.  Fajardo spelled out to his colleagues, "[Petroecuador is] altering the evidence and it is pos-
sible that when our technicians go to the PG to take samples that they will find most of the waste
has been removed.  This could complicate things for us a bit."  Fajardo explained that it was "ur-
gent" that the RICO Defendants "coordinate" with Petroecuador "so they will desist [remediat-
ing] until we've had a chance to extract the evidence we need."  In response, Donziger cautioned
Fajardo to "[b]e careful with written letters—informal and oral meetings are better[.] [W]e don't
want Texaco to use some letter to say we are obstructing remediation."  In another email to
Donziger and other conspirators, Fajardo expressed concern that the government was assuming

responsibility for remediation, and that it would cost an "extremely low" $96 million. The RICO

Defendants then turned to the government for assistance in shutting down the remediation.

90.     Ultimately, the judicial inspection process was short lived. The first and only

time settling experts issued a report for one of the judicial inspection sites was in February 2006,

at which point they agreed with Chevron's expert's findings and concluded that TexPet's reme-

diation met the standards agreed to with Ecuador. They further agreed that there was no evi-

dence of contamination posing a risk to either human health or the environment.

91.     When it became apparent to the conspirators that the judicial inspection process

was not going to provide them with the record they needed to extort a payment from Chevron,

they abandoned that process and set about developing their own false history and factual record,

entirely under their control. Using a series of paid experts whom they pressured, misled or re-

cruited to their scheme, the conspirators created an increasingly extreme and distorted record,

and then manipulated the Lago Agrio court to accept that false history as the product of inde-

pendent analysis.

### (i)     Inducing an Expert to Report Biased and False Results

92.     To create their first false data point, the RICO Defendants pressured their U.S.

expert David Russell to develop an exaggerated damages estimate and continued to "use it to put

out a figure that will scare Chevron and investors," long after Russell sent Donziger a cease and

desist letter demanding that he stop using the estimate.

93.     In 2003, Russell, who was retained by the RICO Defendants to oversee the judi-

cial inspection process for the Lago Agrio Plaintiffs and prepare a damages analysis, initially es-

timated the cost of remediation to be approximately $6 billion. In Russell's own words, that es-

timate was prepared in "a very short time, with only a week of review time in the jungle, and

heavily influenced by [Donziger] in the writing." At Donziger's insistence, and as evidence of

his heavy influence on Russell's initial calculation, Russell used the most expensive remedial

option available, because Donziger wanted a "large" damages estimate. Even so, Russell made

clear to Donziger and others that the quantitative data "ha[d] not [been] reliably established" and that he and his team were "still at the guessing stage."

94.    As Russell continued his work, he realized that the evidence on the ground did not support his damages estimate.  By December 2004, he told Donziger "that Texaco may be right when they indicate that the remediation is performing as designed, and degrading the petroleum."  Two months later he provided an update to Donziger in which he explained, "From the data I have seen so far, we are not finding any of the highly carcinogenic compounds one would hope to see when investigating the oil pits."

95.    After Russell prepared his estimate, he learned that the remediation work he considered appropriate could be completed at a substantially lower cost and wrote Donziger in February 2006 to demand that he stop using the unsupported and exaggerated $6 billion estimate. In his letter, Russell informed Donziger that the information he has since learned "would cause me to state that the 2003 cost estimate is too high by a substantial margin, perhaps by a factor of ten, or more." (Emphasis in original.)  And indeed, a year later, another of the co-conspirators, Charles Champ, estimated that a remediation and related social and development projects could be done for $1 billion, an estimate that itself is wildly exaggerated and calculated using fictional cost assumptions. Nonetheless, the RICO Defendants have never publicly disclosed this exaggerated figure because it is too low for their illicit purposes.

96.    In that same cease and desist letter, Russell objected to Donziger's and Amazon Watch's use of the $6 billion estimate in their request to the U.S. Securities and Exchange Commission ("SEC") for the SEC to "investigate Chevron under Sarbanes-Oxley" for allegedly "underreporting their liabilities."  Russell made clear that the "estimate is no longer valid and if subpoenaed to testify, I will state that the costs are much lower based upon the knowledge available to me at the time I was released from the project."

97.    Russell also emphasized in the letter that he wanted nothing more to do with Donziger and the RICO Defendants' and their co-conspirators' pursuit of the litigation against Chevron:

> I do not want to get into the courts in the US, and do not want to be involved in
> your case against Texaco/Chevron!
>
> I have not prepared any other cost estimate, nor do I intend to do so.  It is no
> longer any of my concern, except to see that the name of my company and my
> reputation are not abused by continued association with the Aguinda vs. Texaco
> lawsuit. If subpoenaed, I will tell the truth about what I know about the existing
> costs, how the cost estimate was prepared, and what the differences in unit costs
> might be to cleanup contamination in Ecuador.
>
> I am trying to stay out of your way and out of your case, but by using and abusing
> the outdated cost estimate to flail Chevron, you keep dragging me back in to [sic]
> it! The Ecuador project has been a sorry chapter in my life and I do not want to
> get re-involved with you or it on any basis.
>
> Several recent press releases using the 2003 cost estimate plus the most recent
> demand by Amazon Watch abuses me and my company.
>
> Get a new cost estimate generated in Ecuador.  You will have to do that under the
> terms of the Global Inspection as required by the Court in Ecuador.  That 2003
> cost estimate is a ticking time bomb which will come back to bite you, and very
> badly if anyone attempts due diligence on it.

(Emphasis in original.)

98.     Donziger did not mince words in response:  "I don't care what the f[**]k that

guy says."  In a conversation with co-conspirator Soltani of Amazon Watch, Donziger acknowl-

edged that the "[p]rice tag" for remediation "would only be a guess" and that Russell's $6 billion

"very rough estimate" significantly overstated the true costs of remediation:  "[The] six billion

dollar thing is out there.  The reality is, based on what this guy is telling me, [it] would cost less

than that.  Significantly less than that . . . ."  And in an email to his co-conspirators, Donziger

recognized that the "fact [Russell] sent this letter has a certain amt of danger for us."  Nonethe-

less, in a subsequent conversation with Defendants Fajardo and Yanza and others, Donziger dis-

cussed requesting a higher amount than $6 billion so a judgment of a lower amount could be por-

trayed as favorable to Chevron:  "But as a concept, I ask, do we ask for much more than we

really want as a strategy?  Do we ask for eight and expect three, so that [the judge] says, 'Look,

Texaco, I cut down the largest part.'"

99.     And despite Russell telling Donziger that his estimate was inaccurate and that he did "not want to be involved in" the Lago Agrio Litigation and despite Donziger's assurance to Russell that he would stop using Russell's work, the RICO Defendants and their co-conspirators continued to use the exaggerated and disavowed $6 billion estimate. As Donziger explained it, "[G]iven that [the RICO Defendants] ha[d] worked with Russell's number all of these years," not continuing to use the $6 billion number "would make [them] look like fools." For example, Amazon Watch, exhibiting the same disregard of the facts as Donziger, continued to tout the $6 billion figure well after Russell sent Donziger his cease and desist letter. Indeed, Amazon Watch's press releases asserted that Russell's company, Global Environmental Operations, endorsed the $6 billion damages estimate even though Russell implored Donziger to stop "abusing" the "name of [Russell's] company" by associating it with the Lago Agrio Litigation. For example, a March 20, 2007 press release entitled "Ecuador Court Speeds Up Chevron's $6 Billion Amazon Trial Over Rainforest Contamination" issued by Amazon Watch states: "The only independent damage assessment, by the U.S. firm Global Environmental Operations, puts clean-up costs at $6.14 billion, exclusive of personal damages to thousands of residents of the area." In issuing this press release, the conspirators lied about having an expert estimate of $6 billion when they knew that Russell repudiated the $6 billion figure as "no longer valid" and "a ticking time bomb" well over a year earlier.

### (ii)     Filing Falsified Expert Reports

100.     Not only did the RICO Defendants and their co-conspirators pressure Russell to come up with a large, unsupported damages assessment, but they also submitted falsified expert reports under the name of another of their U.S. experts, Dr. Charles Calmbacher, that contradicted his conclusions that he had found no evidence of harm.

101.     In 2004, the conspirators selected Dr. Calmbacher to be the expert in charge of their inspection and to act as the Lago Agrio Plaintiffs' testifying expert for four of the sites that were being inspected.

102.     Shortly after Dr. Calmbacher began his work in the field, Donziger informed him and the other members of the technical team that "[t]he goal is to win the legal case, not to produce an independent scientific report." Much to the RICO Defendants' dismay, Dr. Calmbacher did not abide by this admonition when he informed the RICO Defendants and their co-conspirators that, in his professional opinion, the sites he inspected did not require further remediation and did not pose a risk to human health or the environment. This, of course, was not what the RICO Defendants and their co-conspirators wanted to hear. Indeed, Donziger had instructed Dr. Calmbacher to find contamination during his site inspections.

103.     Dr. Calmbacher was uneasy with Donziger's instructions and the level of control the RICO Defendants tried to exert over his work. He was concerned regarding the methods and scope of analysis that the RICO Defendants and their co-conspirators planned to perform on the samples they collected. In his opinion, the analysis was insufficient to test all the aspects of the oil that he felt should be tested. When Dr. Calmbacher informed Donziger of his concerns, however, Donziger brushed them aside and decided to proceed with the limited and inadequate analysis he already had planned.

104.     When it became clear that Dr. Calmbacher's conclusions were unsatisfactory to the RICO Defendants and their co-conspirators, they submitted to the Lago Agrio Court judicial inspection samples bearing the name "Selva Viva Laboratory" on the chain of custody forms. But there is no Selva Viva Laboratory; rather, the "analysis" was performed—if it was performed at all—in the RICO Defendants' and their co-conspirators' team hotel room, and they borrowed the name "Selva Viva"—the same name as the RICO Defendant who was "created" "simply as a pass thru mechanism to administer funds for the litigation" in Ecuador—to lend false authenticity to their sham inspection. The conspirators knew such activity was not without risk, and they worried that Dr. Calmbacher would "inform the court that the Selva Viva project is a fraud."

105.     Ultimately, the RICO Defendants and their co-conspirators decided that they did not need Dr. Calmbacher to agree with their position, and that if the facts did not support their

case, they would manufacture new ones. Thus, after Dr. Calmbacher communicated his negative findings to the RICO Defendants and their co-conspirators, he was "terminated without warning or explanation" and Donziger ordered him to return to the United States. At the time, Donziger believed that "[Dr. Calmbacher] will still sign the perito [expert] reports, but we might have to write them in Quito."

106.    Dr. Calmbacher, however, was adamant that he would still be the one to "write the Perito reports," despite his differences with Donziger, because he needed "to comply with [his] obligation to the court and to maintain [his] professional integrity with the Ecuadorian court." In an email to Donziger, Dr. Calmbacher made clear that the RICO Defendants were not to alter any of the conclusions in his report:

> It also has been stressed to me that it is highly unusual for a perito [expert] to al-
> low others to contribute to the writing of a report. Comments or review is accept-
> able, but the perito's opinion and findings are final. I therefore have and feel no
> obligation to allow your team of textile engineers and associated cron[i]es to re-
> view or edit my reports. I am assured, as perito of the court, that I am completely
> within my rights to write and submit my report independent of those who have
> nominated me for appointment as perito. My sole obligation is to tell the truth, as
> I see it, to the court, no matter the consequences for either party.

107.    After Dr. Calmbacher's rebuke, Donziger threatened to withhold payment from him in order to pressure Dr. Calmbacher to draft the reports in a manner that would back up the Lago Agrio Plaintiffs' assertions. Donziger described this strategy to Wray, Kohn and Bonifaz, but also noted that, if the problem was not resolved, "we are developing a Plan B that will be ex-plained in person."

108.    Plan B put into play Donziger's view that "[s]cience has to serve the law prac-tice; the law practice doesn't serve science." The RICO Defendants and their co-conspirators cast aside Dr. Calmbacher's actual conclusions and set about manufacturing reports to be filed under Dr. Calmbacher's name, a fact that Chevron only learned for the first time at Dr. Calmbacher's March 2010 deposition that Chevron subpoenaed pursuant to 28 U.S.C. § 1782.

109.     The difficulty for the RICO Defendants was how to obtain Dr. Calmbacher's signature on the false conclusions they wanted to submit as "expert" findings. Their solution was to send Dr. Calmbacher initial drafts of the report, which correctly characterized his conclusions, for his review. Because the drafts appeared to accurately reflect his opinions, Dr. Calmbacher authorized the reports to be filed.

110.     Next, the conspirators prevailed upon Dr. Calmbacher to provide signature pages, along with several blank pages bearing his initials, which he did, based on the lie that these extra pages would be used to file the reports he had already authorized to be filed. At the conspirators' request, Dr. Calmbacher sent by overnight delivery service one set of these signed and initialed pages to Ecuador and the second set directly to Donziger in New York.

111.     The reports that the RICO Defendants and their co-conspirators filed under Dr. Calmbacher's name, however, are not the same as the reports that he authorized to be filed. Instead, as part of their Plan B, the RICO Defendants and their co-conspirators prepared different, fraudulent reports that misstated the evidence and concluded that the inspected sites presented a danger to the environment and required additional remediation. The conspirators printed their fraudulent reports on the pages that Dr. Calmbacher had initialed, used the signature pages that he had provided, and filed the forged reports with the court in Lago Agrio.

112.     Although Chevron has since informed the Lago Agrio court about the falsified Calmbacher reports, to date the court has refused to remove his reports from the record or take any corrective measures.

### c.     Arranging Cabrera's Appointment as Global Assessment Expert and Secretly Writing His Supposedly "Independent" Report

113.     When Dr. Calmbacher refused to cooperate in the scheme to defraud and extort Chevron and when the Lago Agrio court's settling experts began to confirm the RICO Defendants' and their co-conspirators' lack of evidence, the conspirators changed tactics. Realizing that neutral settling experts would not accept their fraudulent claims, the RICO Defendants and their co-conspirators requested that the Lago Agrio court abandon the judicial inspection process

that had been agreed to by the parties. In its place, the conspirators arranged for the Lago Agrio court to create a new "global assessment" process and secured the appointment of a co-conspirator to the position of the purportedly neutral "global assessment expert" with whom they would work in secret to ghostwrite his report. Until Chevron uncovered the RICO Defendants' and their co-conspirators' underlying fraudulent behavior, their plan seemed to be working.

114. To the Lago Agrio court, the conspirators proposed that a single expert be appointed, and that he and his team conduct a global assessment of the former concession area.

115. To execute their scheme, the RICO Defendants assembled a team handpicked by the conspirators of U.S. scientists, Ecuadorians, engineers, and other experts, who would do the actual work charged to Cabrera. And after the report was filed, some of individuals were disclosed as members of Cabrera's fictional team.

116. In December 2006, more than two months before Cabrera was appointed by the court, Donziger discussed the RICO Defendants' and their co-conspirators' plan to ghostwrite the "independent" report with co-conspirator Soltani: "The judge is going to appoint a guy in Ecuador, um, to be the expert, but really, you know, we'll be supporting him with the work—our people, E-Tech, whoever we choose to use." As Donziger saw it, the expert would "ha[ve] to totally play ball with us and let us take the lead while projecting the image that he is working for the court." Indeed, the driving question for the plaintiffs during this period, was, as Donziger mused, "how can we control this perito?"

> **(i)    Weeks Before the Court Appointed Cabrera, the RICO Defendants Meet With Him to Plan His "Independent" Expert Report**

117. The RICO Defendants and their co-conspirators put their expanded scheme to defraud and extort Chevron in motion in early 2007. The first order of business was to ensure that the court adopt the new "global assessment" process proposed by the RICO Defendants and their co-conspirators and appoint Cabrera as the global assessment expert.

118. On January 16, 2007, Fajardo reported that he had been in contact with the Lago Agrio judge in person and had sent him an email message regarding who to appoint as the global

assessment expert. Fajardo then set about persuading Cabrera to join them in their extortionate scheme in a series of secret meetings during February 2007. The RICO Defendants and their co-conspirators first appealed to Cabrera emotionally, impressing upon him "the importance of the case, what it means for history, how we can do something that we will always be remembered for, what this would mean for the country and world, etc." They also made it clear that he would be rewarded financially. Not only would Cabrera be paid a substantial sum for his "work," an amount that eventually totaled at least $263,000, but Donziger or one of his co-conspirators likely told Cabrera what Donziger had told another potential expert: "if he served as the global court expert and the plaintiffs won the case that he would have a job the rest of his life being involved in the remediation."

119. Having convinced Cabrera to join their conspiracy and secure in the knowledge that the court would select Cabrera, the conspirators set to work with him to plan the writing of the report by the covert U.S. team the RICO Defendants and their co-conspirators had assembled. This report would develop into an essentially fictional description of the region that alleged massive harms with little or no valid data or analysis in support. And Cabrera would act as the RICO Defendants' and their co-conspirators' puppet.

120. On March 3, 2007—two weeks *before* the court appointed Cabrera—Donziger, Fajardo and Yanza met with Cabrera to plan the report. Also present at this meeting were members of the U.S. team working with the conspirators to ghostwrite the Cabrera Report, including Defendant Ann Maest, Richard Kamp of E-Tech International and Charles Champ of Champ Science and Engineering.

121. In the morning session of the March 3rd meeting, Fajardo gave a PowerPoint presentation outlining the plan for Cabrera's Global Expert Assessment. As part of that plan, Fajardo stated: "Our legal theory is that Texaco is liable for all of the existing damage, even that caused by Petroecuador." Fajardo then outlined a plan for dealing with Chevron: "Chevron's main problem right now is that it doesn't know what the hell is going to happen in the global expert examination. In other words, they don't know that. I hope none of you tell them, please.

[laughter] . . . . [I]t's Chevron's problem." Next, Fajardo identified six steps that the RICO Defendants must take, specifically: (1) the team must "[k]eep up the pressure and constant oversight in the court"; (2) the team must "[m]ake certain that the expert constantly coordinates with the [Lago Agrio] plaintiffs' technical and legal team"; (3) "[t]he [Lago Agrio] plaintiffs' technical coordinator must be [involved] in the process fulltime" and "[a]ccompany the expert in the field"; (4) "an attorney . . . will always be in the field to also protect the activity being performed"; (5) the team must "provide the facilities and necessary support to the field team"; and (6) the team must "support the expert in writing the report."

122.    Fajardo made clear that they were the ones who would actually be writing Cabrera's report, explaining: "And here is where we do want the support of our entire technical team . . . of experts, scientists, attorneys, political scientists, so that all of us will contribute to that report—in other words—you see . . . *the work isn't going to be the expert's. All of us bear the burden*." Someone asked whether the final report was going to be prepared only by the expert Cabrera. Fajardo responded that the expert will "sign the report and review it. But all of us . . . have to contribute to that report." Ann Maest of Stratus asked, "Together?" and Fajardo confirmed. Maest then stated, "But not Chevron," and everyone laughed.

123.    Later that day, the conspirators discussed the "work plan," a document that was prepared by the conspirators and subsequently submitted to the Ecuadorian court by Cabrera as the independent court expert. Donziger proposed that he and the U.S.-based consultants form a "work committee" to present a "draft plan," with a goal of being "more or less eighty percent, ninety percent from achieving a plan" in a few days. Looking at Cabrera, Donziger then said, "and Richard, of course you really have to be comfortable with all that. And we'll also def— define the support the expert needs." The recording of the meeting ended with Donziger commenting, they could "jack this thing up to thirty billion in one day." Donziger went on to say that he was exaggerating—it would really take 90 days. And in the end, the RICO Defendants and their co-conspirators "jacked up" the damages estimate in Cabrera's Report to $27 billion. Their plan of submitting their liability and damages theories under the guise of an "independent"

expert report whose content was dictated by the very persons who stood to profit from an extorted payment from Chevron was thus well under way.

124.    The next day, March 4th, Donziger explained how he would accomplish the conspiracy's goal, despite the absence of supporting evidence. When Defendant Maest and the other consultants hired by the RICO Defendants and their co-conspirators to write Cabrera's report told Donziger that there was no evidence that contamination from the pits had spread into the surrounding groundwater, Donziger responded: "Hold on a second, you know, this is Ecuador, okay, . . . You can say whatever you want and at the end of the day, there's a thousand people around the courthouse, you're going to get what you want" and "[t]herefore, if we take our existing evidence on groundwater contamination, which admittedly is right below the source . . . [a]nd wanted to extrapolate based on nothing other than our, um, theory," then "[w]e can do it. And we can get money for it." He continued: "*Because at the end of the day, this is all for the Court just a bunch of smoke and mirrors and bullshit.*" And when Champ argued that "there is not enough information on that groundwater" and that "the one hole in the remediation, is the water," Donziger instructed the camera crew capturing his conversation to stop filming, stating, "[T]here's another point. I got to make . . . to these guys, but I can't get this on camera."

125.    The RICO Defendants' and their co-conspirators' strategy all along, as first evidenced in Donziger's discussion with Fajardo about whether to request an even higher amount than Russell's disavowed $6 billion damages estimate to make it appear as though a judgment of a lower amount was reasonable or even somehow favorable to Chevron (*see* ¶ 98, *supra*), was to provide an absurd damages number to convince the judge to award a lower but still outrageous amount. Donziger described the goal to his consultants: "If we have a legitimate fifty billion dollar damages claim, and they end up—the judge says, well, I can't give them less than five billion." He explained that an inflated damages number would allow the judge to say that "Tex had a huge victory. They knocked out ninety percent of the damages claim."

126.    Donziger brushed off other comments from consultants Champ and Kamp expressing concern about meeting with Cabrera. First, Champ told Donziger, "I know we have to

50

be totally transparent with Chevron in showing them what we're doing." Donziger responded, "No, no," and stated, "because they will find out everything we do." He continued: "Our goal is that they don't know shit . . . and that's why they're so panicked." Then, Kamp expressed unease about the process and commented to Donziger that "[h]aving the perito [Cabrera] there yesterday in retrospect . . . That was bizarre." In response, Donziger instructed Kamp: "Don't talk about it," and, "that's the way it works." Donziger told the camera crew, "[T]hat is off the record."

127.   The RICO Defendants' and their co-conspirators' close relationship with Cabrera also raised questions in the minds of the *Crude* filmmakers, who became "confused about why Chevron is saying that the Court Appointed expert is biased." The filmmakers asked Fajardo why he was paying Cabrera, "[w]hy is Chevron not also paying for the expert and why do they not have their own expert[?]" Even to sympathetic individuals untrained in legal matters, something about the RICO Defendants' and their co-conspirators relationship with Cabrera seemed wrong.

### (ii)   The Court Appointed Cabrera as Its "Independent" "Global Assessment Expert"

128.   In late February, to cover up the fact that the judge planned to appoint the "global assessment expert" championed by the RICO Defendants, the judge called Cabrera and purported to ask him for a recommendation for the expert. But by this point Cabrera's appointment had already been secretly secured by the RICO Defendants. Indeed, in their internal correspondence they discussed the steps they had taken to make "100% sure the judge would appt Richard," including threatening the judge with a complaint against him that they showed him, but never filed. Thus, when Donziger feared the judge's call to Cabrera meant the appointment of the RICO Defendants' hand-picked "expert" was in jeopardy, Fajardo reassured him that the call was just "part of the judge's complicated plan to protect himself." On March 19, 2007, the Lago Agrio court did indeed appoint Cabrera as its global assessment expert, ordering that

Cabrera would be "responsible for the entire report, the methodology used, for the work done by his assistants, etc."

129.     Cabrera, the RICO Defendants, and their co-conspirators had violated the terms of Cabrera's appointment before he had been appointed, and they would continue to do so throughout his service.  They did this even though the RICO Defendants knew, as Donziger has since admitted, that the Lago Agrio court ordered Cabrera to "act with absolute objectivity and independence" and to "act independent of the parties."  The RICO Defendants, however, knew that they had to maintain a façade of independence.  To do so, shortly after Cabrera was appointed, they plotted "something that Richard [Cabrera] could do AGAINST us in order to prove his independence."

130.     When the Lago Agrio court officially swore in Cabrera as the global assessment expert on June 13, 2007, Donziger exclaimed that "the perito just got sworn in . . . this is a huge victory!!!!!!!!"  He further elaborated that the development was good for the Lago Agrio Plaintiffs' case:  "We have to keep pushing on all fronts at all times. . . .  [A]ll this bullshit about the law and facts . . . but in the end of the day it is about brute force . . . . [Cabrera's appointment] took five months . . . five months of delay . . . and [the judge] never would have done [it] had we not really pushed him."

131.     Consistent with Cabrera's unique and central status as the court's sole expert for damages issues, including liability, the Lago Agrio court repeatedly issued orders that Cabrera was required to be independent from the parties.  For example, when the court administered the oath to Cabrera in June 2007, Cabrera had to promise that he would perform his duties "with complete *impartiality* and *independence* vis-à-vis the parties."  And on October 3, 2007, the Lago Agrio court ordered Cabrera to "work in an impartial manner and independently with respect to the parties."  The court further explained that "the role of the expert is one of complete impartiality and transparency with respect to the parties and their attorneys" and required Cabrera to "observe and ensure . . . the impartiality of his work, and the transparency of his activities."  By then, the conspirators were already well into planning the drafting of Cabrera's

purportedly independent report, and indeed the court itself may have been participating in the scheme by this point, and merely issuing these orders for the sake of appearances.

132.     In November 2007, the Lago Agrio court ordered that "all the documents that serve as support or a source of information for the work performed by the Expert must be presented together with the report. . . . [I]n his report the Expert is required to cite all of the scientific sources, and analytical and legal documents that he uses to perform his work."

> **(iii)     While Cabrera Staged Mock Inspections, the RICO Defendants and Their Co-Conspirators Secretly Ghostwrote His Report.**

133.     In public, the RICO Defendants and their co-conspirators and Cabrera worked to maintain the illusion that Cabrera was an independent expert. At one inspection, in an exchange included in the film *Crude*, Cabrera and Fajardo made a show of rejecting a suggestion from Chevron's lawyer Diego Larrea that counsel for the parties be permitted to make suggestions to Cabrera as to what samples he might take on his inspections (translations are taken from *Crude*):

Cabrera:     (Addressing the public) I have been named the expert for the global assessment report. At this juncture, I am the highest authority at this examination. The samples taken and the analyses done today will be the only ones valid for this report.

\*\*\*

Larrea:     (To Cabrera) We would like you to consider the possibility of letting us know what kind of sample will be taken at each location so that eventually we can suggest that other samples be taken—

Fajardo:     (Raising his hands in protest) Wait, wait, wait. . . .

Larrea:     In the same terms that Pablo says —

Fajardo:     You can't do that.

Larrea:     The expert can check the equipment to verify if it's visible. (To Fajardo) It's a request. He can deny it or accept it.

Fajardo:     What we agreed on was that the expert has the authority to say what is and what isn't going to be. We can't say "take samples here and there." Excuse me, but that is something he has to decide.

\*\*\*

Cabrera: (To Larrea) You can make a suggestion, but I can't work under your criteria. I decide where to take samples, and that's it, counselor.

134. Of course, while Fajardo's duet with Cabrera at the inspection site was featured in the theatrical release of *Crude*, the outtakes show that Fajardo was doing far more than merely inspecting Cabrera's equipment. At their all-day session weeks earlier, Fajardo told Cabrera exactly what "criteria" he would be working under, and how Fajardo's associates would secretly write Cabrera's report for him. And when Cabrera did go into the field to conduct testing, Donziger laid down further "criteria" under which he expected Cabrera to work in an email to Yanza and Fajardo: "When I get there, we'll re analyze the work and the budget with Richard. And we'll adjust with a much smaller team. My tendency is to stop Richard from working much more in the field . . . or, if he continues doing it, he should continue under the most strict control with an extremely limited number of samples. And we'll change the focus of the data at our offices." The RICO Defendants have also admitted that they selected the sites that Cabrera would sample.

135. Back in the United States, preparations were well underway for drafting Cabrera's Report. Just after the March meeting with Cabrera, David Chapman, a Principal at Stratus, emailed Donziger, proposing that "the way this would work best is that if Stratus did much of the work, putting the pieces together and writing the report." Shortly thereafter, on April 27, 2007, the conspirators assembled at Stratus's offices in Boulder, Colorado to discuss how they were going to "jack this thing up to thirty billion," as Donziger had put it. Present at the meeting from Stratus were President Joshua Lipton, David Chapman, Preston Sowell, and Defendants Beltman and Maest.

136. The participants in this meeting also discussed how they could leverage the Cabrera Report, once it was filed in the Lago Agrio court, as a supposedly independent endorsement of their position. Donziger talked up how important and far-reaching he thought the report should be: "We also see this case as having a larger meaning. . . . [W]e think that, Uhm, this is

the kind of thing people will be interested in reading. You know, like this damages report[—]academics, people in your field, other lawyers." Lipton responded, "we loved the whole package." As a result, Stratus entered into a contract with Kohn Swift to provide technical assistance, including the production of reports and support in discussions with the media, in furtherance of the conspiracy. The initial contract for $125,000 was modified multiple times to accommodate Stratus's increasing involvement and fees. Indeed, by the fall of 2009, Stratus received at least $1.1 million in payment for their role in the criminal scheme.

137. Meetings and communications continued between the conspirators as they prepared Cabrera's report. Leading up to the April 2008 filing of Cabrera's first report, Stratus, Donziger, Kohn, and environmental consultants exchanged hundreds of emails regarding draft outlines of the Cabrera report and proposed annexes, schedules for completion of various annexes, and discussing review, analysis, and translation of the annexes including "[e]nvironmental standards," "[e]co impacts from contamination," "[p]it (plus) cleanup costs," "[v]alue of human life losses," "[h]abitat losses at wells and stations," "TexPet [r]emediation summary," "[h]istorical data summary," "[d]ata extrapolation" and "[t]oxicity of site chemicals to humans." (Additional details concerning the emails exchanged in furtherance of the conspiracy's scheme to defraud Chevron are included in Appendix B, which is incorporated by reference as if set forth herein in its entirety.) During this period, Donziger continued to press for higher and higher damages numbers, explaining at one point that an estimate for unjust enrichment "sound[ed] awfully low" and implored that the Stratus consultants not "say or even suggest anything that backs away from the [Lago Agrio plaintiffs'] figures." And as another means of getting the high numbers he wanted—and getting the most impact from the "independent" expert—Donziger during this period suggested to Stratus that they "define the norms of clean-up" and then "propose these norms to the Ministry of Energy which governs these norms[,] and whose Minister is a good friend of ours, so that the Ministry issues them as an official decree before the trial ends."

138. The numerous emails among the Stratus team and between Stratus and Donziger were necessary because, as Beltman explained in a February 22, 2008 email urging his Stratus

colleagues' support: "We have to write, over the next 2 to 3 weeks, probably the single most important technical document for the case. The document will pull together all of the work over the last 15 or so years on the case and make recommendations for the court to consider in making its judgment." And that "single most important technical document for the case" was the Cabrera Report itself. As Donziger has now admitted, "[T]he general idea" was "that Stratus would draft the report in a form that it could be submitted directly to the Ecuadorian court by Mr. Cabrera."

139.    As Beltman, Donziger and others made decisions about the contents of appendices to the report and which appendices to include, Beltman also turned his focus to completing the draft of the report itself, writing to colleagues on March 10, 2008: "Now that the annexes are out of the way, there's the little problem of the report itself. Unfortunately, I've been too busy on annex stuff to work much on it, and it has to go to the court in [two] weeks and get translated. It's a problem." Indeed, Beltman himself was responsible for drafting the majority of the report, while the various annexes were parceled out among the various Stratus employees and contractors and others hired by the RICO Defendants. When he had an initial draft of the Cabrera Report written, Beltman sent it to Donziger, asking whether he was "on track in terms of tone, language level, and content."

140.    While Stratus was the primary coordinator of the work that went into the Cabrera Report, other members of the U.S.-based team of experts the conspirators assembled, including E-Tech International, Uhl, Baron, Rana & Associates, Inc., and 3TM Consulting, also contributed to the report without attribution in the report or disclosure to Chevron. Annex S of the Cabrera Report, for example, was drafted by co-conspirator William Powers, who worked for E-Tech and was a subcontractor for Stratus, and his calculations were used in Annex T. And Richard Clapp, another consultant hired by Donziger and his co-conspirators, drafted one of the annexes to the Cabrera Report.

141.    As the various consultants finished their portions of the Cabrera Report, Beltman took on the delicate task of translating the report, written in English by U.S. consultants, into

56

Spanish. As Beltman would later put it, they would treat "our original English version as if it's a translated version" of Cabrera's work. In March 2008, Beltman corresponded with several translation firms, ultimately working mainly with Translating Spanish, Inc. On March 12, 2008, Beltman sent the actual Cabrera Report—which contained an introduction falsely stating that "[t]his report was written by Richard Cabrera, ING to provide expert technical assistance to the Court"—to be translated into Spanish for filing with the Lago Agrio court. And as Beltman and other Stratus Consultants revised their work, they forwarded new annexes of the report for translation as well. In addition, the critical annexes to the Cabrera Report covering alleged remediation costs, excess cancer deaths, and other building blocks of what would ultimately be a $27 billion fraud were also translated into Spanish at Beltman's direction days before they were fraudulently submitted to the Lago Agrio court as the work of Cabrera and the other Spanish-speaking personnel to whom the report would be attributed. In order to facilitate the final preparations, the RICO Defendants discussed renting office space in Ecuador as well, but Donziger stressed that it had to be "isolated," and could not be space shared with those known to be affiliated with the RICO Defendants.

142.    Prior to the Cabrera Report's submission, Beltman followed up to ensure that those consultants who had actually written certain annexes had their "name[s] taken off" prior to submission. The RICO Defendants and their co-conspirators determined "to whom Richard [Cabrera would] attribute each of the annexes," and it was not to their actual authors. All of these contributions were orchestrated by the conspirators, who maintained a master schedule identifying each portion of the report, which of their team members would do the actual work, and to whom they could publicly and fraudulently "attribute[e]" each in the filed Cabrera Report."

143.    The conspirators did not entirely ignore Cabrera during this period of heavy drafting. In January 2008, Donziger, Beltman, Maest, Fajardo and others met privately with Cabrera as the conspirators were in the home-stretch of drafting his report. The RICO Defendants also delegated various aspects of the report to nominal authors who had not been publicly

identified as working with the Lago Agrio Plaintiffs, but who in fact were close associates of the RICO Defendants. The RICO Defendants kept a close eye and a firm hand on their work. For example, Luis Miguel Garcia Aragon, who was later disclosed to be a member of Cabrera's team, engaged in ongoing email communication with Beltman and Maest regarding the drafting of extensive portions of the Cabrera Report. On January 22, 2008, Aragon emailed Beltman, "We're moving forward with our model thanks to your help. Now I'm maling [sic] you after the doccuments [sic] you told me about. Do you remember, about the discount rate and so? I'd appreciate you sending me those." The RICO Defendants and their co-conspirators also retained and worked with another consultant Juan Cristobal Villao Yepez, who was also later identified in the filed Cabrera Report as a member of Cabrera's "independent" team, and the technical reports on water issues that he wrote as a paid consultant for the RICO Defendants ultimately appeared in the Cabrera Report. Another supposed member of Cabrera's "independent" team is Ximena Echeverria who has since been revealed to be an employee of Defendant Selva Viva and who was actively working with Stratus, a fact never disclosed to Chevron or the Lago Agrio court until it was revealed in Chevron's U.S. discovery efforts. Accordingly, the RICO Defendants and their co-conspirators and "Cabrera's team" were one and the same.

144. The short time table between Stratus's drafting of the report, its translation, and submission of the report to the court meant that Cabrera's review was necessarily limited, if he reviewed the report at all. As Beltman put it, the conspirators were "stuck with [a] very tight timeline" to get the report translated and reviewed. In fact, the report itself was scheduled to be translated into Spanish by March 18, 2008, giving Cabrera mere days to review the report—along with the 4,000 pages of accompanying material—before submitting it to the Lago Agrio court in his name. Such a schedule, and the resulting preclusion of any real review of the Stratus-drafted report by its purported author who, according to Donziger, ultimately "adopted pretty much verbatim what had been provided to him," put the RICO Defendants and their co-conspirators in what Beltman called a "tight bind."

145.     In fact, Cabrera himself received the translated report so late as to render any substantive review impossible.  Nonetheless, Cabrera, the RICO Defendants, and their co-conspirators intended to spread the lie that the report was Cabrera's own.  To this end, they made every effort to conceal the huge amount of work performed by Stratus and others, despite the Lago Agrio court's order that Cabrera present "all the documents that serve as support or a source of information" and "cite all of the scientific sources, and analytical and legal documents that he use[d]."  Donziger has admitted that "there was a general feeling on our team that we wanted to "ke[ep] confidential" the "fact that plaintiffs had written" "[p]ortions of what became the Cabrera report."  Concealing this fact was partly driven by the concern of some of the RICO Defendants and their co-conspirators about being criminally charged in Ecuador if they had admitted that they had ghostwritten portions of the report filed under Cabrera's name.

146.     The RICO Defendants and their co-conspirators have never disclosed, and have still not admitted, the relationship between Cabrera and the Lago Agrio Plaintiffs to the Lago Agrio court.  Indeed, they have failed to disclose this fact even though as early as May, 2010, one of the conspirators, Ilaan Maazel of Emery Celli, conceded in internal correspondence that "neither Cabrera nor plaintiffs disclosed a submission from plaintiffs that contained drafts of part of the expert report written by Stratus" and another, Jonathan Abady of the same firm, described the relationship as the "wholesale adoption of Stratus work product w/o attribution."  And Donziger himself has now conceded that he "do[es]n't think" the Cabrera Report's statement of authorship—"[t]his report was written by expert engineer Richard Stalin Cabrera Vega"—"is accurate" and that Stratus ultimately gave Cabrera "a substantial amount of material," including "an actual report with annexes in Cabrera's name."  Yet the RICO Defendants still have not acknowledged the truth.  As recently as January 2011, the RICO Defendants filed a brief in the Third Circuit stating that "[t]he Ecuadorian court was and is well aware of the Ecuadorian Plaintiffs' *ex parte* contacts with Cabrera and submission of materials to him—and indeed, *invited* such contacts and submission."

147.     The RICO Defendants and their co-conspirators, in attempting to conceal the true authorship of the Cabrera Report and its annexes, encountered some close calls.  On May 14, 2008, for example, Beltman wrote to Defendant Donziger regarding an "[u]rgent issue" that arose when Karen Hinton, spokeswoman for the Amazon Defense Front, wanted to give Richard Clapp's report—the same report the RICO Defendants submitted as an annex to the Cabrera Report—to a reporter.  To have done so would have exposed the truth that the RICO Defendants and their co-conspirators and their consultants actually wrote the Cabrera Report.  And so, Beltman told Hinton not to use the Clapp report, giving the false reason that he was "not sure of its pedigree" instead of telling her the real reason it could not be made public:  that it was used "as an Annex" to the Cabrera Report.  Concerned about covering their tracks, Beltman warned Donziger that they "need to be careful about this."  And later, when the RICO Defendants and their co-conspirators feared that Clapp himself would inadvertently disclose the true authorship of the Cabrera Report during a congressional hearing, Donziger explained the steps necessary to prevent exposure:  "We have to talk to Clapp about that 5-pager, and how we have to limit its distribution.  It CANNOT go into the Congressional Record as being authored by [Clapp]."

148.     In their rush to finish the Cabrera Report and then the supplemental report, the RICO Defendants and their co-conspirators were not careful enough.  After the Cabrera Report had already been submitted, Beltman realized that an annex to the Cabrera Report may have cited a report written by Clapp.  The problem, according to Beltman, was that the cited report had then *itself* been used verbatim in Cabrera's report.  Beltman lamented in an email to a colleague, "[o]h what a tangled web . . ." omitting the rest of the quotation, "when first we practice to deceive."

149.     In another effort to prevent Stratus's role in drafting the Cabrera Report from coming to light, Beltman attempted to influence the testimony of Stratus employees who might be called to testify in United States court.  After Chevron filed an action pursuant to 28 U.S.C. § 1782 seeking discovery from Stratus, Stratus held staff meetings attended by all staff available at that time, including some personnel who had been subpoenaed to testify.  The staff members

were provided with information about Chevron's subpoenas and the Cabrera Report, and Beltman, taking the opportunity to create a consistent but misleading story, misrepresented to the meeting attendees that Cabrera was an "independent expert who submitted his own report to the court." During this and other staff meetings, Beltman also misrepresented Stratus's role to Stratus staff. He explained that Stratus had "prepared a series of technical analyses" that were given to Cabrera "to help in his preparation of his report" and failed to disclose the fact that Beltman and other Stratus consultants had authored the report that Cabrera submitted as his own.

150.     Fajardo and Donziger also discussed how they would respond to any accusations that "Cabrera used exactly, or almost exactly, the same words we put in our motions." Fajardo offered the "[s]imple" solution of concocting a story that the RICO Defendants submitted material to Cabrera after they noticed some errors in the calculations and figures in the report and that Cabrera then adopted their submission. As Fajardo put it, "There is no substantive problem, we just have to explain it."

151.     In addition, the conspirators sought otherwise to cover their tracks in the United States. E-Tech, for example, failed to report income received for doing its work to the Internal Revenue Service, characterizing payments to consultants as charitable contributions, and routed payments, inside the United States and abroad, in order to hide the fact that these payments were being used to fund unlawful activity. E-Tech has also subsequently failed to file required reports in its home state of New Mexico, resulting in the cancellation of its Certificate of Incorporation. And as the RICO Defendants and their co-conspirators continue to obstruct Chevron's investigation into their conduct in front of many U.S. federal courts, they have kept up a constant public pressure campaign attacking every suggestion that the Cabrera Report was not neutral and independent. *See* Section B.3., *infra*. This defense of the Cabrera Report is necessary because, among other things, without it the RICO Defendants would be left with no evidence of either liability or damages.

**(iv)**     **The "Cabrera" Report: The RICO Defendants' Re-**
         **peated Fraud**

152.     On April 1, 2008, accompanied by armed guards, Cabrera filed his first report with the Lago Agrio court. Despite the fact that Cabrera still had more time to file his report and had not made any public statement that he would be filing it early, the RICO Defendants knew when he would file the report, and had prepared detailed press releases and alerted the *Crude* team to be on hand to film the event. Relying on misstatements, conclusions not supported by evidence, and bad science, the "Cabrera" Report—the culmination of the clandestine work that the conspirators had begun more than a year earlier—concluded that Chevron was liable for more than $16 billion. But the conspirators were not done ghostwriting material for Cabrera to falsely present as his own.

153.     In September 2008, the parties submitted to the Lago Agrio court questions and comments on the Cabrera Report. The RICO Defendants' and their co-conspirators' submission filed on behalf of the Lago Agrio Plaintiffs was in all respects intended to perpetuate the false appearance that Cabrera was neutral and independent and that the RICO Defendants and their co-conspirators were not the report's true authors. This submission purported to urge Cabrera to consider various documents and third-party reports, criticized his legal analysis of liability, and gave suggestions as to how he might support his existing findings and introduce new ones. But it had been the RICO Defendants and their co-conspirators themselves who had decided which documents to review, how to present the legal case, and what findings and support to put forward in Cabrera's report. Thus, the RICO Defendants and their co-conspirators wrote their "questions" to further the false appearance of independence from Cabrera.

154.     Cabrera filed a response to the Lago Agrio Plaintiffs' comments on November 17, 2008 in a supplemental report. Ignoring Chevron's objections, the comments put forward by the Lago Agrio Plaintiffs are reflected (at times word for word, including errors) in Cabrera's supplemental report, which increased the damage recommendation to $27 billion, with little ex-

planation and no legally or scientifically valid support. As Donziger had planned, the RICO Defendants and their co-conspirators were indeed able to "jack this thing up to thirty billion."

155.    The RICO Defendants and their co-conspirators also dictated other portions of Cabrera's response by secretly drafting his "answers" to their own comments and questions. Some of the "questions to the Perito [Cabrera]," according to an internal Stratus email, were "assigned to us." In an email dated August 1, 2008, Beltman outlined for his colleagues what "we need to do for the comments on the Cabrera report." His email listed the various answers that needed to be prepared, and what they should say. Beltman repeatedly referred to the Lago Agrio Plaintiffs' questions in the first-person and to their own work as that of "Mr. Cabrera." For example, he says that "[w]e comment on the lack of consideration given to cleanup of rivers and streams," and "[w]e comment that Cabrera does not consider metal contamination in his cleanup costs." He then suggests possible responses to those comments. Beltman likewise expressed his desire that work performed by U.S. consultant 3TM "be in a form that someone in Ecuador could have written," and another Stratus employee noted that Stratus needed to revise their work to "clean up the language so it [would] sound[] more like [Cabrera] and less like a comment."

156.    The RICO Defendants accomplished their ruse in part by asking Powers, the same Stratus contractor who ghostwrote portions of Cabrera's initial report (see ¶ 140, supra), to respond to questions that had been raised in connection with the Cabrera Report. Defendant Maest provided Powers the questions to be answered—questions that were the very same ones posed by the Lago Agrio Plaintiffs in their September 2008 filing. Powers then supplied Maest with the answers that are the same as those that are included in Cabrera's November 2008 report.

157.    In addition, the RICO Defendants and their co-conspirators incorporated into Cabrera's response a second report written by Richard Clapp, another one of their hired consultants. Just as the RICO Defendants and their co-conspirators had been concerned that Hinton or Clapp himself would inadvertently disclose the fact that Clapp's first report had been incorporated "as is" in the form of an annex to the Cabrera Report, they likewise became concerned that the use of Clapp's second report in Cabrera's response would accidentally be made public.

Beltman warned Donziger, "I don't think we should hand out either [report] as Clapp's, thereby distributing proof."

158.      Beyond the misrepresentations concerning Cabrera's independence and the authorship of "his" report, the Cabrera Report—without which the RICO Defendants cannot demonstrate liability or damages—suffers from substantial flaws and fundamental problems. Determined to "jack up" the damages estimate to $27 billion, the conspirators, among other egregious defects, attributed *all* alleged environmental impact from oil operations in the former consortium area to TexPet and none to Petroecuador, the sole owner of operations in the former consortium area for the past nearly 20 years and the one responsible for well over 1,400 oil spills during that time. The report includes millions of dollars of damages for remediation of disposal pits that do not exist and are, in fact, shadows and other dark objects on aerial photographs. In addition, the report relies on U.S.-derived cost baselines, standards, and methodologies which do not reflect substantial differences in costs between the U.S. and Ecuador, and are often meaningless outside the larger U.S. regulatory context. For example, the report asserts that the cost of remediating the pits—including the imaginary ones—would be $2.2 million per pit. This is *25 times* greater than Petroecuador's average actual cost of ongoing pit remediation at $85,000 per pit.

159.      Other intentional errors abound. Even though Cabrera did not take a *single* sample of drinking water and despite the existence of literally dozens of public drinking water systems in the concession area, the report assesses $428 million in damages for potable water systems. The conspirators also included $8.4 billion in damages for "unfair profits" TexPet allegedly earned, a penal levy that the Lago Agrio Plaintiffs never requested in their complaint, and included allocations such as millions of dollars to create a husbandry farm to produce hunting game for local residents.

160.      The Cabrera Report also unilaterally expanded the scope of Cabrera's mandate and went far beyond the expertise of his publicly disclosed team by addressing additional issues unrelated to the Lago Agrio Plaintiffs' claims for environmental remediation and medical monitoring. Despite the failure to identify a single individual with cancer or produce a single medical

report, the report initially assessed $2.9 billion for "excessive cancer deaths" and then increased that to $9.5 billion in the November 2008 filing, ostensibly based on just over a page of additional discussion. The report did not use any scientifically accepted method to link cancer to the consortium's operations; instead of using official data, the "excessive" cancer deaths were "assessed" on the basis of self-reporting at group meetings with undisclosed members of the local population conducted by purported member of the Cabrera team Carlos Beristain, who was in fact working at the direction of the RICO Defendants and their co-conspirators.

### (v) The RICO Defendants' Fraudulent Endorsements of Their "Cabrera Report" and Procurement of Other Endorsements Through Misrepresentations

161.    The RICO Defendants and their co-conspirators sought almost immediately after filing the Cabrera Report to bolster it through the publication of endorsements of the report by Stratus itself—the report's secret author—and by third-party experts.

162.    After the conspirators filed their report under the name of court expert Cabrera, Donziger, Beltman, Maest, Fajardo, Yanza, and Hinton assembled again in Boulder, Colorado to discuss and manage the "[s]cientific and public relation response to [the] Cabrera report." During this meeting, they developed their plan to obtain multiple levels of endorsement of the report for use in the Lago Agrio court and the U.S. media. They also strategized about how to increase the already unfounded damages number contained in the Cabrera Report, developed a plan for responding to Chevron's criticisms of the report, and outlined a plan of attack on the media front. As Beltman later acknowledged in an email to Amazon Watch about the progress of their plan to procure fraudulent endorsements, "a big part of this will be for media."

163.    The first level of endorsement the RICO Defendants and their co-conspirators put into play was the promotion of the Cabrera Report and the trumpeting of its "independence" by Stratus, the report's secret author. On December 1, 2008, Stratus released a fifteen-page document purporting to analyze and defend the Cabrera Report. In this document, which bears on its front page the signatures of Beltman and Maest, as well as other Stratus employees, Stratus claimed, "Mr. Cabrera is thus acting in the capacity of a neutral 'expert' to the Court, and his

role is to assist the Court in evaluating the scientific and technical information that was collected and compiled for the case. In the U.S. Court system, Mr. Cabrera would be called a Technical Special Master."

164.    Stratus's December 2008 review of the Cabrera Report is written to give the impression that its authors had no connection to the Cabrera Report or the supplement to his report, and were providing a neutral, third-party review. For example, the RICO Defendants and their co-conspirators described the writing of the report as follows: "After reviewing the extensive record of environmental data and information that was collected during the trial, and collecting some of his own data, Mr. Cabrera has concluded that Texpet's operations severely contaminated a large area of the Ecuadorian Amazon, and that the contamination has caused extensive damages to the environment and its inhabitants." Once completed, Stratus's "review" of the Cabrera Report was knowingly distributed by the conspirators using physical and electronic mail and remains available on a co-conspirator's website at http://amazonwatch.org.

165.    Stratus' "review" was intended to deceive, as one of the lawyers retained by the RICO Defendants who reviewed the submission in 2010 recognized. Responding to an ongoing discussion about the RICO Defendants' plan to accuse Chevron of fraud on the theory that it knew Stratus had written the Cabrera report all along, the lawyer wrote the following to Donziger and other conspirators:

> This document might end the discussion. *These "comments" are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings. There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in "ghosting" the Cabrera report.* This might not be dispositive if there were other evidence showing that Chevron had actual or constructive knowledge that Stratus had been involved in the creation of the Cabrera report. In such a case Stratus's "comments" may have been a rather crude and awkward spin by a biased expert - but it would not have been a "fraud" upon Chevron. But, in the absence of such evidence, *then it appears not only that Cabrera and [the Lago Agrio] plaintiffs can be charged with a "fraud" respecting the former's report, but that Stratus was an active conspirator.*

This statement admitting that Stratus was involved in "ghosting" the Cabrera Report and expressing concerns regarding Stratus's "endorsement" of the report was from one of the Lago Agrio Plaintiffs' attorneys purportedly retained by Donziger.

166.    The second level of endorsement envisioned by the RICO Defendants and their co-conspirators and discussed during their June 2008 meeting in Boulder involved soliciting the endorsement of credible experts by deceiving them about the Cabrera Report's authors and the collusion between the RICO Defendants and their co-conspirators and Cabrera. During the meeting, the RICO Defendants and their co-conspirators discussed the fact that experts who had already been approached for endorsement had questioned their "relationship to Cabrera," and the RICO Defendants and their co-conspirators acknowledged that they "need[ed] to be able to give them answers." What they ended up doing, in fact, was concealing that relationship entirely.

167.    In seeking the sham "endorsements" of the Cabrera Report, Stratus falsely represented to numerous third parties that the report was written by Cabrera. For example, on June 12, 2008, David Mills of Stratus emailed a representative of California's Office of Spill Prevention and Response, describing the Cabrera Report as follows: "As part of the trial, the Ecuadorian judge currently directing the case appointed a technical expert to summarize[] and analyze the technical data and information about the case and draw conclusions about the environmental and human impacts of the oil exploration and production activities. This expert report was recently submitted to the court." Stratus asked the representative to review the Cabrera Report for a fee and provide comments via telephone conversation—comments that, if favorable, could later be submitted by the RICO Defendants and their co-conspirators to the court.

168.    Similarly, on June 26, 2009, Beltman emailed a representative of Brazil's Aggeu Magalhães (Haggai Magellan) Research Center seeking an endorsement of the Cabrera Report. In that communication, Beltman referred to "the Court Expert report in which [Cabrera] presents the results of his studies and makes recommendations to the judge about the damages caused by Texaco and what needs to be done as reparation for those damages." Beltman asked the Haggai Magellan Research Center to "please review the Court Expert report and read our evaluation of

it, and think about how you could provide support. Our first choice is for you to sign the evaluation that we drafted (I can provide you with a blank signature page for you to sign and return)."

169.     The RICO Defendants' and their co-conspirators' goal of obtaining fifteen or twenty endorsements from academics in addition to consultants, however, proved difficult given what Beltman called the "weaknesses" of the Cabrera Report. As Beltman explained to Donziger in an email: "Our original concerns about this have come to pass . . . . [Academics] are trained and they function to be critical, not accepting. [Additionally], they know that signing their names onto some kind of endorsement of the Cabrera report is setting them up for public attack from Chevron (and perhaps attack within their academic circles as well) . . . . And finally, some of the underlying work in the Cabrera report has weaknesses that an academic would probably have a hard time defending." Beltman explained, "[w]e're having better success with consultants being willing to sign endorsements than academics (something I am not proud of)."

170.     The RICO Defendants and their co-conspirators did, however, ultimately succeed in convincing third parties to review the Cabrera Report that Stratus held out as having been drafted by a "Technical Special Master." For example, on July 15, 2008, Stratus executed a contract with Dr. Peter N. Jones of Bauu Institute whereby he agreed to review the Cabrera Report and provide comments in a conversation with Stratus. Such fraudulently obtained endorsements, along with Stratus's own evaluation—falsely touted as "independent"—served to further enhance the value of the Cabrera Report in the RICO Defendants' and their co-conspirators' media pressure campaign targeted at forcing Chevron to pay them off.

### (vi)     The RICO Defendants' Payments to Cabrera for Work He Did Not Perform

171.     The perceived independence of the Cabrera Report was essential to the RICO Defendants' plan. Independence was the key to its credibility with the press, the public, and the other parties whose endorsements the RICO Defendants and their co-conspirators needed. Of course, the perception of independence would be lost if it was known that the RICO Defendants and their co-conspirators wrote the report themselves, and keeping this secret required Cabrera's

cooperation. And if the Cabrera Report were perceived as untrustworthy, the RICO Defendants would be at a loss to demonstrate Chevron's liability, not to mention the "damages" they hoped to recover. Accordingly, when the RICO Defendants arranged for the court to abandon the judicial inspection process and appoint Cabrera as a "global" expert, they also insisted that the parties should pay for this process, and directly paid Cabrera over $263,000, despite the fact that Chevron objected throughout to the improper new process and refused to fund it. As it is now clear that Cabrera did not write the report, the only purpose for these payments, which were made by Defendant Selva Viva and funded by Kohn or Kohn Swift, must have been to buy Cabrera's cooperation and silence regarding the true authorship of the report.

172.    Cabrera earned his money by repeatedly perjuring himself in the Lago Agrio court. For example, on July 23, 2007, four months after an all-day PowerPoint session with Donziger and Fajardo, Cabrera declared to the court: "I should clarify that I do not have any relation or agreements with the plaintiff, and it seems to me to be an insult against me that I should be linked with the attorneys of the plaintiffs."

173.    When Chevron raised questions with the Lago Agrio court as to the authorship of the Cabrera Report and Cabrera's relationship with the Lago Agrio Plaintiffs, Cabrera Represented in multiple filings with the Lago Agrio court that he had worked independently and transparently despite evidence to the contrary. On October 7, 2008, for example, Cabrera declared in a filing that he is an "honest man with nothing to hide, and [his] conduct as an expert in this case has been as professional, impartial and objective as possible, as can be seen from [his] expert report." In that same filing, Cabrera asserted that he does "not take orders from either of the parties to the lawsuit" and that he is "not, nor will [he] be, subject to the views or whims of either of the parties." In a subsequent February 5, 2009 filing, Cabrera claimed that the "entire expert investigation procedure was completed by [him] personally." He later declared that "[a]ll the work was planned, directed, and approved by [him], as the person responsible for the expert examination."

174.    The RICO Defendants have also denied a relationship with Cabrera in filings with the Lago Agrio court.  For example, in an April 4, 2008 filing, Fajardo asserted that the notion that there was a "common interest relationship between the expert Mr. Cabrera and the plaintiff" and that Cabrera "works for us" was "simply ridiculous."  Then on April 25, 2008, the RICO Defendants and their co-conspirators characterized Chevron's claim that a close relationship existed between them and Cabrera as "[a]nother infamy," "childish and absurd."

175.    Despite these protestations of Cabrera's independence to the Lago Agrio court, Donziger himself has now admitted that Cabrera's statements were "not accurate" because "certainly the [Lago Agrio] plaintiffs provided materials for his consideration."

**(vii)    The RICO Defendants' Attempt to Launder the "Cabrera Report"**

176.    Despite the RICO Defendants' concerted efforts to conceal the true authorship of the Cabrera Report, Chevron has uncovered significant elements of the nature and extent of their pervasive fraud, through discovery in U.S. courts pursuant to 28 U.S.C. § 1782.  *See* ¶¶ 249-292 *infra*.  This partial picture of the truth coming to light, however, has not stopped the RICO Defendants from seeking a massive judgment based on "Cabrera's" report.  Instead, they have sought to whitewash the Cabrera Report by, for all intents and purposes, submitting it—again— to the Lago Agrio court, only this time with *new* names attached.  On September 16, 2010, the RICO Defendants filed seven new "expert" reports with the Lago Agrio court, through which they now demanded $113 billion in damages.

177.    These seven new expert reports purport to be independent.  In reality, however, they are a repackaging of Cabrera's flawed and fraudulent report.  Donziger discussed this plan with one of his colleagues, Adlai Small of Patton Boggs, who told him, "One overarching theme to think about throughout this process is how we want the new expert to address the Cabrera report and its conclusion.  While our new expert will most likely rely on some of the same data as Cabrera (and come to the same conclusions as Cabrera), [d]o we think the expert should make specific mention of such consistencies?"  Small went on to explain to Donziger that he thought

they should attempt to structure the new expert reports in such a way that they might rehabilitate the tainted Cabrera Report to some degree, so that someone presented with the new reports "might feel comfortable concluding that certain parts of Cabrera are a valid basis for damages." Donziger has also admitted that the new expert reports were intended to give the RICO Defendants "an argument" allowing them to "attempt to shut down Chevron's 1782 efforts in the U.S."

178.    The link between the fraudulent Cabrera Report and the work of the "new" experts is made explicit in the retention agreement signed by the Weinberg Group, a consulting firm, which, in turn, retained the "new" experts. The Weinberg Group's retention agreement provides that it was retained for the purpose of "conduct[ing] a comprehensive review of selected sections of an expert report prepared by Richard Stalin Cabrera Vega,"—not to produce a new, independent scientific report. As one co-conspirator has described it, the role of the Weinberg Group is merely to "provid[e] a submission with their name on it."

179.    The Weinberg Group provided copies of the Cabrera Report to the experts it retained for use in their own reports. According to Donziger and his co-conspirators, all the "new expert[s]" needed was the "Cabrera report in and of itself" along with the data that Cabrera relied upon. As the RICO Defendants and their co-conspirators intended, these "new" experts then relied heavily on the Cabrera Report. According to Donziger, none of these "new" experts had "go[ne] to Ecuador," "did any kind of new site inspection," "did any kind of new sampling," or indeed, did "environmental testing of any kind."

180.    One of the "new" experts, Douglas Allen, for example, made no independent evaluation of the evidence, instead relying on the unsubstantiated findings contained in the Cabrera Report. Indeed, the conspirators instructed Allen to use the Cabrera Report as his "starting point." He relied entirely on the Cabrera Report for, among other items, the number of pits requiring remediation. Despite the fact that he "[did]n't know if there are in fact 917 pits that require remediation," he relied on that number anyway—drawn from the fraudulent Cabrera Report—in developing his own estimate. He relied on the Cabrera Report despite his opinion that

the conclusions in the Cabrera Report are unreliable and that that the report lacked appropriate citations and references.

181.    Similarly, another "new" expert, Dr. Lawrence Barnthouse, relied on the standards contained in the Cabrera Report, and "assume[d] [Cabrera] was correctly characterizing what they were." Indeed, he has admitted that he was not retained to create a new, independent report, and has further acknowledged that he "couldn't be completely independent" because most of the information he needed was "only available from the Cabrera Report." Like Allen, Barnthouse has admitted that he relied on the Cabrera Report despite the fact that he had reached the conclusion that Cabrera's numbers were "uncertain" and that methodology he adopted from Cabrera was an "an unreliable indicator" and was "[s]uboptimal, [and] inadequate."

182.    Jonathan Shefftz, another of these experts, did no independent work and repackaged portions of the fraudulent Cabrera Report. For example, Shefftz assumed without doing any independent research or analysis that TexPet was required to incur costs and to remediate pits based solely on the Cabrera Report's assertion that these costs were necessary. Shefftz admitted that his report as a whole depends upon "data and cost figures from the Cabrera Report" and that he had "simply taken [Cabrera's] volume figures and . . . cost figures and used those as inputs to [his] calculations." He explained that he "was not engaging in any exercise to verify [Cabrera's] data series or his cost figures. [Shefftz] was just using them in [his] report." Shefftz also conceded that his reliance on the Cabrera Report and its flawed numbers could "lend an upward bias" to his own results. Furthermore, an annex of Shefftz's draft report relies heavily on annex T to the Cabrera report—an annex that was drafted by Stratus, the consultants who ghostwrote the Cabrera Report.

183.    The reports of other experts, such as Carlos Picone, Robert Paolo Scardina, and Daniel Rourke were written "in collaboration with the Weinberg Group," the group that had been hired not to create new reports but rather to repackage the Cabrera Report. Sections of Picone's report were written entirely by the Weinberg Group, with only "minimal" editing by Picone. Scardina's report was written largely by a person at the Weinberg Group whose identity and

qualifications are unknown to Scardina himself. Scardina, like the other experts, also relied exclusively on the Cabrera Report and the Weinberg Group for information central to his report.

184.　In summary, the "new" expert reports submitted by the RICO Defendants are new only in two aspects. First, they bear new names, despite being nothing more than another repackaging of the Stratus report that was originally submitted as the Cabrera Report. And second, they purport to support a new damages figure, a remarkable $113 billion, which is a nearly $90 billion increase over Stratus' figure, despite offering no new analysis or evidence.

### 2.　Colluding With the Republic of Ecuador to Bring Sham Charges Against Chevron's Attorneys

185.　As part of their scheme to defraud and extort Chevron, the RICO Defendants and their co-conspirators conspired with officials from the Republic of Ecuador to advance baseless criminal prosecutions against Ricardo Reis Veiga and Rodrigo Pérez Pallares, lawyers responsible for executing the 1998 Final Release that precludes Defendants' claims against Chevron in the Lago Agrio Litigation. With criminal convictions in hand, the RICO Defendants and their co-conspirators and Ecuador could then seek to nullify the release, and "fully leverage the criminal investigation"—in the media and otherwise—to force Chevron to "settle" the Lago Agrio Litigation or face a massive judgment. According to Donziger, "[I]f this penal case is brought, this will be on the wires all over the world and it will really raise the cost to [Chevron]." Indeed, footage from *Crude* shows the conspirators admitting that the criminal prosecutions are a means to exert "personal psychological pressure [on Chevron's] top executives," and Donziger's own personal notes make clear that the criminal prosecutions were meant "to keep the hammer over [Chevron's] head" and "force [Chevron] to the table for a possible settlement."

186.　The RICO Defendants' and their co-conspirators' collusion with the Republic of Ecuador to procure the criminal indictments has been long in the works. In an email exchange in August 2005 (which appears to be an excerpt from an ongoing correspondence) among conspirators Alberto Wray, Bonifaz, Fajardo, Yanza, the Front, and Ecuador's Attorney General's office, Wray wrote, "if at some point we want the Government and the Attorney General to play for our

side, we must give them some ability to maneuver." Martha Escobar, a deputy of the Attorney General, responded that both the office and "all of us working on the State's defense were searching for a way to nullify or undermine the value of the remediation contract and the final acta [*i.e.*, the 1998 Final Release] . . . ."

187.    In that same email exchange, Escobar confirmed that the Attorney General was still determined to prosecute "those who executed" the 1995 Settlement Agreement and the 1998 Final Release, despite the absence of evidence of any wrongdoing: "The Attorney General remains resolved to have the Comptroller's Office conduct another audit (that also seems unlikely to me given the time); he wants to criminally try those who executed the contract (that also seems unlikely to me, since the evidence of criminal liability established by the Comptroller's Office was rejected by the prosecutor . . . ." The Attorney General later informed one of the RICO Defendants' colleagues that "he want[ed] [them] to work together on this matter" and that, at least initially, "he [did] not want [their] meetings to be made public."

188.    After working together for some time, the RICO Defendants were successful in getting the Republic of Ecuador to pursue fraud charges related to the remediation against Chevron in litigation in the United States. When Donziger learned of this, he reveled in their success: "The Attorney General of Ecuador is now suing Chevron for fraud on the remediation!! We have been pushing this for over a year, we finally did it !!! This is huge, huge."

189.    The RICO Defendants and their co-conspirators went to great lengths to hide their collusion with the Republic of Ecuador. In an email to Donziger and others, one of the conspirators reminded them that they "had to resort to very sophisticated methods to disassociate ourselves from the case (Amicus Curiae submitted by third parties etc)," and urged Donziger and others not to undo this work by associating themselves publicly with the prosecutions. In an email to the Republic of Ecuador's U.S. counsel discussing the potential prosecution, Donziger assured him that an Ecuadorian colleague working on the matter, "understands the need to keep his contacts with your client's office totally confidential and non-public." Martha Escobar—the deputy Attorney General with whom Wray exchanged emails—even perjured herself in a deposi-

tion taken in an action pending in the Southern District of New York on November 21, 2006 and denied that she ever had *any communications* with the conspirators concerning the Lago Agrio Litigation. But when confronted with her own 2005 email with Wray proving otherwise, she confirmed that she had been acting in that correspondence at the direction of the Attorney General.

190.    The collusion with the Republic of Ecuador to obtain sham criminal charges, and the extortionate purpose of that collusion, is documented in the film *Crude* and its outtakes. In a January 2007 meeting between Donziger and Kohn captured in the *Crude* outtakes, in which they are reviewing materials the RICO Defendants provided to the Ecuadorian Attorney General in support of criminal prosecutions, Kohn discussed the RICO Defendants' extortion plan: "So, again, that may be something that we could facilitate going away at the right time . . . . if they wanted it to go away." Donziger replied, "Precisely." Donziger told Kohn that Chevron is alleging a "conspiracy" between them and the Ecuadorian government, to which Kohn responded, "If only they knew."

191.    On April 26, 2007, President Correa toured the Lago Agrio oil fields with the RICO Defendants and their co-conspirators. That same day, he issued a press release demanding the criminal prosecution of the Ecuadorian officials who had signed the 1998 Final Release. On the following day after hearing this news, Donziger mused as to whether the time might be right to "ask for the head of [Chevron's lawyer Rodrigo] Pérez Pallares—given what the President said." Donziger explained: "[H]e's totally with us." The next day, on April 28, 2007, in a national radio address, President Correa echoed the RICO Defendants' rhetoric, calling Chevron's Ecuadorian lawyers traitors and demanding that they, along with the Petroecuador officials who signed the 1998 Final Release, be criminally prosecuted. In the movie *Crude*, Donziger is shown stating that "Correa just said that anyone in the Ecuadorian Government who approved the so-called remediation is now going to be subject to litigation in Ecuador," and adding that those persons who signed the 1998 Final Release "are shittin' in their pants right now."

192.     The fact that President Correa called for the criminal indictment of those who signed the Final Release did not come as a surprise to the RICO Defendants and their co-conspirators.  A month prior to President Correa's tour of the Oriente, Fajardo met with Ecuadorian government officials, including Alexis Mera, a Judicial Secretary and chief legal advisor to President Correa, in which Fajardo asked for Mera's assistance in providing the President with a "basis" for "reopen[ing]" the "investigation for . . . the responsible parties."  The conspirators explained to Mera that, while they could mobilize the public in an effort to overturn the 1995 Settlement Agreement and the 1998 Final Release, "the official nature of the President could do much more in this case . . . [and] interest by the Executive Branch[] and pressure on the Public Prosecutor's Office . . . could do a lot on this subject."  Mera, in response, proceeded to outline various ways of nullifying the settlement and release.  Remarkably, the RICO Defendants managed to procure Mera's assistance, and thus collude with the government, despite Mera's admission that there was no "sustainable" path to nullification.

193.     The RICO Defendants and their co-conspirators made significant efforts to enlist the support of President Correa and other Ecuadorian governmental officials, holding private lunch meetings and conferences.  After one such meeting with the President, Fajardo reported: "So, the President thinks that if we put in a little effort, before getting the public involved, the Prosecutor will yield, and will re-open that investigation into the fraud of, of the contract between Texaco and the Ecuadorian Government."  By seeking assistance from Ecuadorian government representatives, this is precisely the "strategic development" the RICO Defendants ultimately achieved.

194.     The plan to procure the criminal prosecution of Chevron's attorneys included more than obtaining President Correa's support.  The RICO Defendants and their co-conspirators also aimed, as called by one of their associates, their "troops [and] artillery" against Chevron's attorneys through a series of demonstrations, and they publicly pressured Ecuadorian officials.  As Defendant Yanza proclaimed during a July 31, 2008 press conference, in order to ensure prosecution, the RICO Defendants and their co-conspirators would "have to take legal actions

76

against these officials . . . make public denunciations . . . put pressure through the people, all these mechanisms . . . ." Yanza warned that "nothing is ruled out." According to Donziger, this was part of the conspirators' strategy of conducting a "guerrilla campaign" against Veiga and Pallares.

195.     And this campaign was successful. As Donziger boasted, "[W]e are kicking some ass, and it feels awfully good." Donziger was elated not only because criminal charges would be useful to the RICO Defendants' and their co-conspirators' extortionate scheme, but also because it would satisfy a personal vendetta. As Donziger described his feelings toward Mr. Veiga, "Some days, I fantasize about putting my strong hands around Reis Veiga's neck and squeezing until he begs for mercy. I want him to know how it feels to suffer . . . ."

196.     The RICO Defendants' and their co-conspirators' objective was finally achieved on August 26, 2008 when the Ecuadorian government announced criminal charges for fraud against Ricardo Reis Veiga and Rodrigo Pérez Pallares, the two Chevron attorneys who signed the 1995 Settlement Agreement and the 1998 Final Release. The charges were issued after two previous Prosecutors General had determined that there was no evidence of fraud and had requested that the case be closed. But that was before the RICO Defendants manufactured the allegedly "independent" Cabrera Report upon which the Prosecutor General expressly relied when he filed the charges against Veiga and Pallares.

197.     After the sham criminal charges were procured, the RICO Defendants reprised their "private army" and engaged in direct threats against Veiga and Pérez. On October 5, 2009, Defendant Yanza, among others, enlisted the help of local citizens in parading crude effigies of Veiga, Pérez, and other Chevron executives in front of the courthouse in Ecuador. At the concluding rally, Yanza and others gave speeches and threatened to "kick [Pérez's] ass" and "bury [Chevron's lawyers] in the . . . pit." The protestors announced the "crimes" of each Chevron executive and a man dressed as the Grim Reaper mimed beheading each of the effigies with his scythe before placing the "bodies" in a coffin. The protesters then carried the coffin into the jungle, dug a shallow grave, and buried the Chevron executives in effigy.

198.    The criminal charges against two of Chevron's attorneys are a direct result of the collusion between the RICO Defendants and their co-conspirators and the Republic of Ecuador. The issuance of these baseless charges and the threats of violence against Chevron's attorneys were firm but also a thinly veiled extortionate threat to Chevron:  If you do not settle the Lago Agrio Litigation on our terms we will have your employees imprisoned—or worse.  Indeed, as Judge Kaplan of the Southern District of New York noted, evidence shows that Donziger and his colleagues have "attempt[ed] to procure criminal prosecutions for the purpose of extracting a settlement [from Chevron]," and that the prosecutions "appear[] to have been instigated by Donziger and others working with him for the base purposes of coercing Chevron to settle and undermining a significant element of its defense in Ecuador, the release it obtained from the [Republic of Ecuador]."  Likewise, in 2010, the U.S. State Department reported that "[c]riminal complaints and arrest warrants against foreign company officials" are used in Ecuador "to pressure companies involved in commercial disputes."  That is exactly what has occurred here.

3.    **Launching Public Attacks on Chevron Based on Misleading Statements and Lies to Force Chevron to Pay Up**

199.    Through their own efforts and those of their collaborators, the RICO Defendants have conspired to manufacture a wave of public criticism of Chevron based on deliberate falsehoods and misleading statements.  Since at least 2006, but with increased intensity since manufacturing the fraudulent Cabrera Report, they have saturated the public domain with their false propaganda—using the Internet, radio, television, and film, as well as print media, including books, newspapers, and magazines.  And they have taken this pressure campaign to U.S. state and federal agencies, seeking their falsely induced assistance in this racketeering scheme.  As conspirator Amazon Watch has explained, the strategy is to "turn up the heat on Chevron through various means, shareholder resolutions, major media coverage and major investigations through, for example, the Securities and Exchange Commission."  And Donziger has proposed that the conspirators use the slogan "Always attacking."  According to Donziger, the "strategy" is to "increase the cost to Chevron" including the "cost of their sullied reputation, you know, in

78

the media." As he explained to one of his associates in preparing for a mediation with Chevron, "[w]e need to get more press and increase the pressure b/w now and then, to get the price up." As one federal judge put it, the "object of the whole game, according to Donziger, is to make this so uncomfortable and so unpleasant for Chevron that they'll write a check and be done with it."

### a.   The Fraudulent Media Blitz

200.    Donziger outlined the RICO Defendants' and their co-conspirators' "strategy" of increasing costs to Chevron by "sull[ying] their reputation" to reporter Peter Maass. In an article published in *Outside* magazine, Maass called Donziger's strategy "attrition warfare: death by lawsuit." Donziger told Maass, "This case has to be won both in and out of the courtroom . . . . If you had the case without the pressure, you would never get a result." Maass observed, "Donziger wants to keep the public pressure on, to make the company so miserable that it throws in the towel and settles." This is "guerrilla PR," and "[r]abble rousing is a vintage Donziger tactic." Increasing the pressure involves maximizing publicity, and Donziger always "does his best to arrange a good show."

201.    To that end, Donziger recruited Karen Hinton, a public relations specialist, to create and manage the RICO Defendants' and their co-conspirators' campaign of false and misleading public statements, and to coordinate the efforts to co-opt the media and well-meaning private citizens in the conspirators' pressure campaign. Stratus contributed to the effort as well, developing what Stratus referred to as a "comprehensive press kit." And political and communications consultant Chris Lehane was brought on board to help the RICO Defendants "leverage the criminal investigation of the Chevron executives" through extensive public relations efforts. In addition to recruiting reporters to cover the story, Lehane and the conspirators planned to "[b]uild[] off the initial activity, we will want to consider several targeted specific minicampaigns all designed to create pressure points on Chevron's economics." These "minicampaigns" included filing a shareholder lawsuit against Chevron "for failure to disclose information," contacting the New York Attorney General "to see whether we can get Spitzer into the

game," and manipulating students at a "major university that is invested in Chevron for a divestment campaign."

202.     The conspirators also maintain relationships, in part through the provision of financial support, with various organizations that distribute false and misleading public statements to increase the public pressure on Chevron. Some of these organizations are dedicated to the fraud while others have broader functions, but all are knowing or unknowing accomplices of the RICO Defendants and their co-conspirators. Foremost among these are Amazon Watch, RAN, and Defendant the Front, organizations that knowingly operate and control significant aspects of the pressure campaign and overarching conspiracy to extort a payment from Chevron.

203.     The RICO Defendants and their co-conspirators funnel a substantial portion of their public attacks on Chevron through Amazon Watch, which presents itself to the public as an independent organization. Donziger has explained the crucial role of this element of the pressure campaign:

> [They have] played an absolutely critical role in this . . . [I]f it weren't for them, we would just be a legal case, but because of the work of people who care, you know, especially Amazon Watch, we're a campaign that has a legal case. And I think . . . that, um, the pain Amazon Watch can cause Chevron in many respects is greater than the pain we can cause . . . .

204.     Amazon Watch plays its role effectively, fully understanding that "the target of many of the . . . campaign releases is Chevron itself rather than the media," Amazon Watch works to "get under Chevron management's skin" as much as possible. The idea, according to Donziger, is to "keep attacking, keep pressure on, etc." He further explained his "cost-benefit" calculation of the pressure campaign: "I also think that if you run . . . the costs in terms of the hassle, the management time, reputational . . . [h]arm, dealing with the board, looking bad, having your kids . . . in school, have friends who say, hey, what'd your daddy do in Ecuador?    . . . . I think all of that factors into it in an af—extremely significant way, much more than th—the hard-core costs, . . . out-ofpocket expenses and stuff—I think that's where they're most vulnerable."

205.     The RICO Defendants rely on Amazon Watch to carry out much of the public attacks against Chevron, and the RICO Defendants closely monitor the press releases Amazon Watch issues to make sure it remains on message.  When an Amazon Watch representative complained to Donziger that Amazon Watch was "not here to simply rubber-stamp press releases," and dared to tell him that prior experience showed that Amazon Watch "needs to carefully fact-check your press releases in order to safeguard our own credibility," Donziger replied sharply. He stated that he and the other lawyers were "the final authority," and that, "We can be collaborators, but we are not equal partners."  The issue that set off Donziger's tirade is particularly telling: Amazon Watch had wanted to provide Cabrera's educational credentials in a press release about him.  Donziger's response:  "The issue about Cabrera's qualifications is a good example. He doesn't have a doctorate.  I don't want to highlight that.  So I don't mention what degree he has in the press release.  Obviously if he had a doctorate it would be in there, don't u think?"  In response, the Amazon Watch representative called Donziger's tactic an "unsubtle and unnecessary obfuscation" and "[b]ombast and hoodwink."

206.     By using Amazon Watch as their proxy, the RICO Defendants and their co-conspirators can also deliver their extortionate threats to Chevron using more direct language than they are willing to use themselves—at least publicly.  In "turn[ing] up the heat on Chevron," the RICO Defendants and their co-conspirators have made their extortionate demands explicit in direct communications with Chevron.  For example, on December 17, 2009, Soltani wrote a letter "on behalf of Amazon Watch" to then-incoming Chief Executive Officer John Watson in which she cited the fraudulent $27 billion damages assessment from the Cabrera Report, and threatened, "Until Chevron takes meaningful steps to resolve this case, it will continue to play out in the courts of Ecuador, as well as in the global court of opinion."  She went on to state, "We don't make these suggestions lightly or symbolically."

207.     The RICO Defendants and their co-conspirators use all available means to publish their lies and half-truths in the "global court of opinion."  They regularly disseminate press releases over the Internet, through electronic mail, and on newswires.  They appear on television

and radio broadcasts. Through various organizations they fund, the conspirators operate or cause to be operated websites that attack Chevron at www.chevrontoxico.com, www.texacotoxico.org, www.amazonwatch.org, www.chevroninecuador.com, truecostofchevron.com, thechevron-pit.blogspot.com, and www.changechevron.org. The conspirators also promote their scheme through social media tools, sending messages to supporters through Twitter (@changechevron) and Facebook, and by posting defamatory comments and false statements (frequently using pseudonyms) in response to articles written on the websites of newspapers, blogs and other commentators. And the conspirators' attacks on Chevron have not been limited to words, or to statements to third parties: They have arranged or threatened marches and demonstrations in front of the homes of individual Chevron employees and board members.

208. The RICO Defendants' false statements are made in support of appeals for funding, including through a link to make payments directly on their websites, at http://chevrontoxico.com/take-action/donate.html and at https://www.gifttool.com/donations/Donate?ID=38&VER=1& LNG=EN (via a link from http://www.amazonwatch.org). Again, however, the RICO Defendants are careful to use the supposedly independent Amazon Watch to front for their efforts. At chevrontoxico.com, the statements soliciting donations by mail request that they be sent to Amazon Watch at its address in San Francisco, California. Kohn and Kohn Swift have made substantial donations to Amazon Watch. In 2009, for example, Kohn reported that Kohn Swift had contributed over $184,000 to Amazon Watch and that sum did not include the donations he had personally made to Amazon Watch. On information and belief, the conspirators use funds received in this manner to continue to prosecute their unlawful scheme to defraud Chevron. In fact, Amazon Watch's tax returns reveal that it has directed at least $90,000 in donations to the Front since 2002.

209. Amazon Watch is not the RICO Defendants' and their co-conspirators' only proxy. In what they no doubt believed at the time to be a coup, they recruited award-winning filmmaker Joseph Berlinger to make *Crude*, a purported documentary about the Lago Agrio Litigation that was released in 2009. The film, according to Donziger, that shows how he "manipu-

late[d] the trial." While Berlinger has claimed that he intended his film to be "fair," he altered the film before release, at the RICO Defendants' and their co-conspirators' request, to hide the relationship between the conspirators and Carlos Beristain, who was publicly disclosed as the author of a major portion of the Cabrera Report, as discussed in paragraph 278, *infra*. This was a critical change, because public disclosure of the prior relationship between the RICO Defendants and Beristain could have been the visible tip that would alert Chevron and the public to the mammoth iceberg of collusion between the RICO Defendants and Cabrera. Well aware of this risk, Fajardo told the filmmakers that disclosure of that relationship was, "so serious that we could lose everything," and that "the way it is, the entire case will simply fall apart on us." He thus had the changes made even though they were "costly."

210.    A few months later, when Fajardo visited the University of Oregon, he expressed alarm at his discovery that students there had obtained copies of the version showing Beristain, and told Donziger that they had a "serious problem," although he assured Donziger that nobody at Oregon knew that there was a "conflict." And when the RICO Defendants learned that CNN intended to show clips from *Crude*, they and the filmmaker engaged in a scramble to ensure that the Beristain scenes were not shown, obliquely instructing CNN, "Please do NOT include any footage during Trudie's visit to the Cofan community that features a man wearing a white t-shirt." Berlinger has also stated that he expected—as did the RICO Defendants—that the documentary *Crude* could "have some real-life impact on a decision or a potential settlement." Through Section 1782 discovery proceedings authorized by this Court, Chevron has obtained a substantial volume of outtakes from *Crude*, outtakes that make clear the scope of the RICO Defendants' lies and stonewalling, and from which many of the direct quotations in this Complaint are taken.

211.    Although Donziger and his conspirators were involved in the making of the film *Crude*, they knew that the film would be far more useful to their cause if it appeared independent. Donziger emphasized to Berlinger during filming, "I do not want to been seen as helping [you] . . . in front of the Chevron lawyers." But behind the scenes, one of *Crude*'s major finan-

cial backers was Russell Deleon, a law school friend of Donziger who has also been a major financial support of the Lago Agrio litigation. Upon *Crude*'s completion, the conspirators promoted and relied upon the released version of the film in their pressure campaign against Chevron, and to raise money for that campaign. At http://chevrontoxico.com/take-action/crude-house-party.html, they urge readers to hold *Crude* "screening parties" and to ask for donations (for the RICO Defendants) at those events. On that web page, the RICO Defendants assert, "[i]n order to change Chevron, one of the largest and dirtiest oil companies on the planet, we need to build a movement a million times more powerful than them. *Crude* will educate and inspire thousands of people to commit to changing Chevron in the coming weeks and months."

      b.    **Misrepresenting the "Independent" and "Neutral" Cabrera Report**

212.    In all of these communications media, the conspirators have repeated their false claims that Cabrera offers an "independent" and scientific perspective which "proves" Chevron's liability. And in doing so, the conspirators have sought to increase pressure on Chevron and thereby extort a payment from it. For instance, there is a lengthy summary of the Cabrera Report on chevrontoxico.com, which never discloses the RICO Defendants' role in writing the report, and concludes with the following: "A final decision on Chevron's liability and damages will be made by the trial judge. However, courts in Ecuador generally give wide deference to reports prepared by independent experts."

213.    When challenged, the RICO Defendants have repeated their claim that Cabrera is independent. For example, on April 3, 2008, Fajardo stated, in a press release issued by Amazon Watch, "Chevron's claim that Professor Cabrera is cooperating with the plaintiffs is completely false," and "Chevron is frightened by Cabrera precisely because he is an independent and credible expert." The RICO Defendants' guiding principle, as Donziger wrote to Fajardo, is: "If you repeat a lie a thousand times it becomes the truth."

214.    On or about May 31, 2008, shortly after the RICO Defendants caused their own secretly written report to be filed as Cabrera's, Kohn appeared on Fox News, touting Cabrera's

independence. He not only claimed that Cabrera was an "independent expert appointed by the judge," but then falsely stated that Cabrera "analyzed all of the evidence from all of the parties from both sides," to come up with the damages estimate of "between eight and sixteen billion." Kohn did not reveal that his co-conspirators ghostwrote Cabrera's report.

215.    After the conspirators drafted the update to the Cabrera Report in November 2008, increasing the total damages assessed to $27 billion, the Front issued a press release on December 1, 2008, falsely extolling the Cabrera Report as an "independent" assessment by the "Special Master" based on the review of the "trial evidence—the vast majority of it provided by Chevron." Once again, no mention was made of the fact that Cabrera's report and its update had actually been written by the RICO Defendants, or that the majority of materials upon which it was based were not "trial evidence" at all, but that enterprise's files.

216.    The RICO Defendants and their co-conspirators, in addition to portraying Cabrera's report as independent to the media, also used the fraudulent "evaluation" drafted by Stratus to enhance the credibility of the Cabrera Report in the media. For instance, on December 1, 2008, Hinton and Amazon Watch issued a press release about the Stratus report entitled "Chevron's $27 Billion Liability in Ecuador's Amazon Confirmed by Team of Independent Scientists." That press release states that "[t]he independent expert report was prepared by Richard Cabrera, an Ecuadorian environmental scientist appointed by the court as a Special Master who has worked mostly for oil companies in preparing environmental damage assessments," and quotes an endorsement from Defendant "Douglas Beltman, a scientist at Stratus Consulting who, along with a team of scientists, reviewed the expert's report on behalf of the [Lago Agrio] plaintiffs." It is unsurprising that Stratus employees "endorsed" the report, given that they wrote it.

217.    Stratus's involvement in the media campaign was envisioned as early as the initial August 2007 contract between Kohn Swift and Stratus contemplating that Stratus would engage in "discussions with the media" in addition to performing other tasks to further the conspiracy. As an example, Defendants Beltman and Stratus were involved in orchestrating the RICO Defendants' response to Chevron's allegations that Cabrera's supplemental report showed evi-

dence of collusion between Cabrera and the Lago Agrio Plaintiffs. Indeed, Beltman sent Donziger draft language denying that the Lago Agrio Plaintiffs were in collusion with Cabrera and claiming that "Cabrera's November response to the plaintiffs is clearly his own." This response became part of the RICO Defendants' overall efforts to portray the Cabrera Report as independent.

218.    Now, despite the unequivocal evidence that the RICO Defendants' and their co-conspirators' own team of experts ghostwrote Cabrera's report and its update, the conspirators continue to spread the lie that Cabrera is independent. In May 2010, in response to a court filing by Chevron alleging collusion between the RICO Defendants and Cabrera, Fajardo again denied any wrongdoing, claiming that Cabrera had worked independently. When asked about the involvement of Stratus, Fajardo told the media, "They are our technical advisers in the United States, and they have worked with us for some years, but they have never interfered in the trial." Yet the *day before* he made that statement, he had written a review of Chevron's filing for his co-conspirators in which he conceded that it was "true" that "plaintiffs (that is, us) have worked in collusion with expert Cabrera." The RICO Defendants and their co-conspirators still continue to use the Cabrera Report as a jumping off point for their most recent claim for $113 billion in damages.

219.    The RICO Defendants' and their co-conspirators' far-reaching campaign to portray the fraudulent Cabrera Report as that of an independent court expert has been largely successful, and numerous unsuspecting media outlets have repeated uncritically the RICO Defendants' false refrain about Cabrera's independence. An April 3, 2008 Reuters article, for example, stated: "An independent environmental expert told a court in Ecuador that the oil company Chevron should pay $7 billion to $16 billion in compensation for environmental damage in the country." And in a May 2009 broadcast, the television show 60 Minutes reported on the Lago Agrio Litigation, discussing the Cabrera report in detail, but never suggesting that the RICO Defendants had actually secured Cabrera's appointment and written his report. This was undoubtedly because the RICO Defendants had never disclosed this to 60 Minutes. To this day, the

RICO Defendants and their co-conspirators maintain a link to the 60 Minutes broadcast of this misleading report on one of their websites. As the conspirators had hoped, then, the mainstream media has bought the propaganda and played the role the conspirators hoped and intended in the scheme to extort a payment from Chevron. And in fact, their hoodwinking of the mainstream press benefits the conspirators doubly in that it allows them to republish—without correction—the media outlet's false statements about the Cabrera Report, as they did with the AP story described above.

220. The RICO Defendants' and their co-conspirators' deception of the national and international media has gone beyond prompting the republication of lies about Cabrera's independence. For example, Defendants Fajardo and Yanza were awarded the Goldman Environmental Prize, "the world's largest prize program for grassroots environmental activists," and Fajardo was awarded the CNN "Heroes" award. The press release announcing the Goldman Prize echoed the RICO Defendants' misstatements and half-truths, including those regarding Cabrera's independence.

### c. The RICO Defendants Make False Statements to U.S. State and Federal Government Officials

221. The conspirators have sought to open as many fronts as possible in their offensive against Chevron, pursuant to their strategy to generate maximum pressure on Chevron to drive it into a coerced settlement. The RICO Defendants and their collaborators have made false and misleading statements in the United States to state and federal officials, seeking to enlist their (unknowing) aid in the fraudulent scheme through investigations and other official acts. Since 2008, the RICO Defendants have continuously touted the findings in the so-called "independent" Cabrera Report as evidence in support of their demands for official action.

222. The conspirators have engaged in a long-running campaign to convince the SEC to investigate Chevron for allegedly violating disclosure obligations. They have attempted to obscure their role in this campaign by using Amazon Watch as their front, but Donziger has admitted that he wrote several of the letters which purportedly came from Amazon Watch. On

January 30, 2006, at the RICO Defendants' behest, Amazon Watch wrote Christopher Cox, then Chairman of the SEC, requesting that he "open an investigation into the Chevron Corporation (CVX) for violating SEC regulations governing disclosure obligations to shareholders in reference to litigation against the company over an oil-related environmental catastrophe in Ecuador." Relying on David Russell's $6 billion damages assessment (which he had already disavowed), Amazon Watch accused Chevron of failing to inform its shareholders of its "staggering potential liability." The letter went on to mischaracterize the lawsuit as a "class action," and falsely claimed that Chevron had "been forced to admit at trial that Texaco . . . dumped over 18 billion gallons of toxic water into the rainforest . . . ." Although Donziger personally informed Amazon Watch Executive Director Soltani that the Russell report was grossly excessive (*see* ¶ 118, *supra*), Amazon Watch never corrected its false statements to the SEC or Chevron shareholders. In fact, the next month, Soltani and Amazon Watch sent a follow-up letter, accusing Chevron of distorting the report of the "settlement experts" from the then-ongoing "judicial inspection" process—the same proceeding in which the conspirators submitted the false expert report with Dr. Calmbacher's fraudulently obtained signature.

223.    On March 18, 2008, Amazon Watch reprised this effort, writing another letter signed by Soltani to the SEC. In this letter, written weeks *before* the fraudulent Cabrera Report was filed but obviously well-aware of its secret contents, Soltani emphasized the forthcoming report, and the independence of its purported author, "an independent special master" that had prepared his report "mak[ing] use of all evidence collected" with "a large team of technical experts under [his] supervision." The letter demanded an investigation and "the imposition of a penalty on Chevron for failing to comply with its obligations." Soltani argued "that Cabrera is being attacked by Chevron precisely because he *is qualified* to conduct a credible damages assessment." Soltani and Amazon Watch made these statements knowing that Cabrera's report was being ghostwritten by Stratus and the RICO Defendants' other consultants. Indeed, despite knowing that the Cabrera Report was a fraud, Soltani accused Chevron of "contriv[ing] claims of

procedural unfairness" and called Chevron's position that the process had been unfair "ludicrous."

224. The RICO Defendants and their co-conspirators have made these same false statements to other federal agencies. In a letter dated April 29, 2008, to the U.S. Trade Representative, Defendants Yanza and Fajardo called Cabrera "an independent court-appointed special master," and misstated that "the bulk of the evidence relied on by the special master, Professor Richard Cabrera, was provided by Chevron itself via its own sampling evidence."

225. And in April 2009, Donziger made false statements concerning Cabrera's purported "independence" in a statement before the U.S. House of Representatives. Donziger falsely stated that "[t]he best and most recent *independent* estimate available of the human health impact of this contamination is provided by the expert appointed by the court, Richard Cabrera." (emphasis added). Donziger also testified that "[n]umerous qualified scientists have reviewed this report and found its conclusions reasonable and the damages assessment consistent with the costs of other large environmental cleanups." At no time did Donziger disclose the fact that the "qualified scientists" were his co-conspirators Stratus, Beltman, Maest, and Chapman, who planned and secretly wrote the "Cabrera" Report.

226. The RICO Defendants have also made false statements to individual members of Congress. On December 19, 2008, Defendant Beltman provided United States Congressman Jim McGovern's office "some talking points" for an interview with the Los Angeles Times, falsely telling the Congressman's staff that "[t]he Court Expert reviewed available scientific data and concluded that people in the area suffer from many illnesses caused by the contamination, including cancer." On January 31, 2009, Beltman forwarded Cabrera's reports, stating "[t]he Court Expert's March 2008 report summary is attached," and that "[a]lso attached is the November 2008 response to the [Lago Agrio] Plaintiff's questions that was written by the Court Expert." Beltman failed to disclose that Stratus and the other RICO Defendants actually ghostwrote the responses to the Lago Agrio Plaintiffs along with Cabrera's initial report.

227.     In addition, the RICO Defendants have extended their campaign to state officials. On May 4, 2009, in response to a communication provided by Donziger, Kohn, Karen Hinton, and others, the New York Attorney General sent Chevron a letter inquiring about Chevron's disclosures related to the Lago Agrio Litigation. In the letter's first paragraph, the New York Attorney General stated, "As I understand the allegations, a technical expert has admitted that if the plaintiffs prevail in the litigation, assessed against Chevron may be as high as $27 billion." The RICO Defendants had provided the Attorney General with the false information that Cabrera was a neutral "court-appointed expert" and that the RICO Defendants had played no part in creating the exorbitant $27 billion figure. The goal was to prompt the New York Attorney General to commence an investigation that would create additional pressure on, and expense for, Chevron. And according to plan, the New York Attorney General's letter was noted in the press, and it generated media coverage suggesting that Chevron had "mishandled" the matter. For example, in reference to the New York Attorney General's letter, industry publication Oilgram news noted, "Analysts seem mixed on what the Ecuador fallout ultimately may mean to Chevron but appear to agree there will be at least a short-term knock to the stock price." It quoted an analyst with OppenheimerFunds, Inc. stating, "I would settle and cut my losses."

### d.     The Conspirators Attempt to Manipulate Chevron's Stock Price to Coerce a Favorable Settlement

228.     To increase financial and public pressure on Chevron to pay off the RICO Defendants through an extorted settlement of the Lago Agrio Litigation, the conspirators have sought to manipulate and depress Chevron's stock price by targeting Chevron's shareholders, potential investors, and stock analysts with their lies and half-truths. In furtherance of their scheme, the conspirators have staged protests at Chevron's shareholder meetings and at the homes of members of Chevron's Board of Directors, and have issued false and misleading propaganda to Chevron's shareholders about its liability in the Lago Agrio Litigation. In each instance, they have argued that the $27 billion damages assessment is independent and legiti-

mate, and thus represents a major risk to Chevron's share value. Donziger described these pressure tactics on shareholders as one of the "key cards we can play."

229.    The RICO Defendants' strategy of targeting Chevron's shareholders is stated in their public comments and on the websites they operate, which contain material aimed directly at investors. At the website changechevron.org/for-investors, operated by co-conspirator RAN, the conspirators claim "Chevron's current brand of operations exposes the company (and its investors) to great financial, reputational, and environmental risks." In reference to the damages assessed in Cabrera's report, the conspirators refer to "staggering liabilities," and suggest that Chevron has not "adequately warned shareholders about the financial risks the company faces in the Ecuador lawsuit." The conspirators describe these activities on their website: "To pressure Chevron to do the right thing in Ecuador, we engage in a variety of tactics. In the past few years we have. . . [a]lerted Chevron's shareholders to the company's lies and omissions regarding the case in Ecuador, a case in which a ruling against Chevron would dramatically threaten the value of those shareholders' investments."

230.    For example, shortly after Cabrera filed his initial report, on or about May 31, 2008, Kohn appeared on a Fox News segment touting the "independent" Cabrera Report as a reason for Chevron shareholders to be concerned. In that interview, Kohn insinuated that Chevron was hiding information regarding Cabrera's "independent" damage assessment, stating "shareholders were [recently] informed for the first time of even the existence of the case although the original case was filed in the U.S. in the 90s." He then warned that "shareholders should be concerned about the image of Chevron." At no point did Kohn explain that his co-conspirators had actually ghostwritten Cabrera's supposedly independent report.

231.    In the face of allegations that the RICO Defendants colluded with Cabrera, in a press release issued by the Front on February 13, 2009, Fajardo is quoted as saying that such allegations were "'false and defamatory'" and claimed that it would "expose Chevron shareholders to additional liability." And in an April 2008 press release issued by the Amazon Defense Front, Fajardo accused Chevron of failing to disclose to shareholders that Ecuador's Attorney General

91

had filed a formal complaint to the U.S. Department of Justice, and that "[t]his is part of [a] conscious strategy to try to discredit a trial process that Chevron knows it is losing because of the evidence." And as recently as December 21, 2010, the Front issued a press release quoting Fajardo as saying, "Chevron's Board of Directors cannot continue to ignore the mounting evidence of illegal activity and fraud on the part of the company's legal team in the United States and in Ecuador. . . . We intend to seek full redress of the harm that has been done in the name of Chevron's shareholders and to hold accountable all individuals in Chevron who have participated in this unlawful scheme."

232.    The conspirators have also communicated directly with Chevron shareholders and influential analysts on numerous occasions. On May 25, 2009, Amazon Watch sent a letter signed by Soltani to Chevron shareholders, asserting that Chevron had made "false, misleading, or incomplete" filings with the SEC, and quoted analysts from Barclays and Potomac Research stating that the litigation was hurting Chevron's stock price. As with most of the conspirators' public statements since April 2008, the letter relied upon an "independent court damages assessment," but did not disclose that the RICO Defendants and their co-conspirators themselves had secretly written that "assessment."

233.    Donziger and his co-conspirators have also personally lobbied analysts, including in personal meetings, and made fraudulent misrepresentations with the intent that their misrepresentations would be reported as fact by these analysts, and that these reports would decrease Chevron's stock price. On May 11, 2009, for example, Donziger and his co-conspirators met in New York with the Managing Director of Oil & Gas Equity research at UBS, and provided him with copies of the Cuomo letter, the Cabrera report and supplemental report, and the fraudulent "review" of that report by Stratus, all intended to convey the impression that Cabrera's report was independent and valid. Also involved in this effort was co-conspirator Daniel Orlow, described by the RICO Defendants as "an investment advisor who works with the legal team that represents the Amazonian communities," who made repeated public statements shortly after the UBS meeting on behalf of the RICO Defendants such as: "The pressure is increasing on Chev-

ron's management over the uncertainty surrounding a very significant potential environmental liability in Ecuador," and "Our team is being contacted repeatedly by shareholders and analysts who are concerned that Chevron management is not fully and honestly disclosing the company's exposure in Ecuador . . . . There is a real concern that Chevron is not playing it straight and that it might have overpaid for Texaco."

234.    In another effort to influence Chevron's share price, the conspirators have instituted a "Buy Freeze" campaign in which they have contacted investors directly and, relying on false and misleading statements about the results of the site inspections and the criminal prosecutions and government inquiries that the conspirators have instigated, urged the investors not to buy Chevron stock.  Amazon Watch describes the campaign as follows:

> Amazon Watch is contacting institutional and individual shareholders – in particular, socially responsible investment community (SRIs) and public employees, teachers and university pension funds to urge them to join the buy freeze.  The trial court in Lago Agrio, Ecuador, has found shocking levels of life-threatening toxins at dozens of former Chevron production sites in Ecuador . . . .

> Now Chevron is being accused of fraud in Ecuador for lying about the results of a limited remediation it did in the mid-1990s . . . .

> As a result, Ecuador's Attorney General has asked the U.S. Department of Justice to investigate Chevron's alleged fraud.  The Securities and Exchange Commission already is probing the company for failing to disclose the potential liability to shareholders.

Amazon Watch concealed the fact that it was the RICO Defendants and their co-conspirators who actually wrote the Ecuadorian Attorney General's report.

235.    The conspirators have also staged protests at several of Chevron's annual shareholder meetings.  As shown in the film *Crude*, these protests, while designed to appear to be grassroots, community events, are actually carefully planned and literally scripted by Donziger and his co-conspirators.

236.    In addition, the conspirators have lobbied large institutional investors to support Chevron shareholder resolutions designed to bring support for the conspirators' lies and to add additional pressure on Chevron.  For example, Stratus and Amazon Watch were involved in

drafting a 2009 shareholder resolution, offered by the Office of the Comptroller of New York City as the custodian and trustee of certain pension funds. On December 1, 2008, Mitchell Anderson of Amazon Watch emailed Beltman of Stratus with the subject line "2009 Shareholder Resolution – Urgent Update" and stated that "[w]e need to make some changes quickly to the below paragraph, given the new figures released by the court appointed expert." Beltman provided the higher numbers from Cabrera's revised report, which were then included verbatim in the shareholder resolution proposed by the funds the next day. That resolution provides that a "court-appointed expert in the Ecuadorian litigation has recommended that Chevron be held liable for up to $27.3 billion in damages," but fails to explain that Stratus and the other RICO Defendants and their co-conspirators secretly drafted the "court-appointed expert's" report finding Chevron liable.

237. The conspirators have promoted their involvement in drafting shareholder resolutions that seek to draw attention to Cabrera's finding of liability, but, again, without disclosing the RICO Defendants' and their co-conspirators' role in drafting his report. For example, on April 8, 2009, after the SEC declined to issue a no-action letter to Chevron regarding one of the conspirators' shareholder resolutions, Hinton and Amazon Watch issued a press release describing the resolution as, "a high-profile resolution that threatens to focus attention on the company's record-breaking $27 billion environmental liability in Ecuador."

238. The Wall Street Journal has reported that the RICO Defendants' statements about the Lago Agrio Litigation, and, specifically, Cabrera's assessment of $27 billion in damages has had its desired effect on Chevron's share price: "The possibility that a judge may later this year demand damages as high as $27.5 billion, roughly one-fifth of Chevron's market capitalization, appears to have spooked some investors."

239. The Front and Hinton have touted negative analyst reports regarding Chevron on the website, chevrontoxico.com. For example, on May 26, 2009, the conspirators published an article stating that "Oppenheimer, in a report dated May 4th [2009], said the $27 billion claim from Ecuador 'could depress the stock until a settlement is reached . . . the sooner [the case] is

94

removed, the better off shareholders will be'" and that "Barclay's called the Ecuador case a 'drag' on Chevron's stock value."

240.     And on August 24, 2010, FOXBusiness reported that, "the oil company has lost much of its gains over the past few weeks as it continues to fight a lawsuit in Ecuador that alleges Texaco, acquired by Chevron in 2001, wrecked portions of a jungle while drilling for oil in the 1970s and 1980s." The conspirators published this article in its entirety the next day at the chevronpit.blogspot.com.

241.     Above all, however, the RICO Defendants' and their co-conspirators' false statements, harassing conduct, and lobbying efforts with media, government, shareholders and private individuals are all aimed at one ultimate objective—forcing Chevron to pay the RICO Defendants and their co-conspirators billions of dollars to make them stop.

### e.     The RICO Defendants Falsely Accuse Chevron of Murder to Generate Outrage and Force Chevron to Pay

242.     The conspirators have made numerous public statements stating or implying that Chevron is guilty of murder. This claim is false and has been made intentionally and without any basis whatsoever. The RICO Defendants and their co-conspirators' intent in spreading this lie is to generate great outrage and disgust among the public and activists and in the media, all in furtherance of their extortionate conspiracy.

243.     Defendant Fajardo and his co-conspirators have attempted to capitalize on the violent murder of Fajardo's brother, Wilson Fajardo. They have repeatedly implied that Chevron was responsible and claimed that there has been no police investigation into the crime. Yet Fajardo knows this to be false. In a written statement made to the District Prosecutor as part of the extensive investigation into his brother's murder, Fajardo himself provided the names and addresses of the men he believed to be his brother's murderers, details concerning the place and circumstances of the murder, and, most importantly, a detailed account of the prior bad blood between the alleged murderers and Wilson Fajardo, including prior threats and an attempt by one

of the men to stab his brother a few days earlier. There is no mention in this statement of Chevron or Texaco or any connection to the Lago Agrio Litigation.

244.     Despite this statement concerning the details of Wilson Fajardo's death and his knowledge that Chevron had nothing to do with it, Fajardo has falsely and intentionally implied that Chevron was responsible. For example, on April 22, 2008, Fajardo made the following statement on Ecuadorian TV: "I can't say that it was Texaco that did it, but I can't say the contrary. This sort of thing was never investigated. In other words, there've been many things, a lot of pressure, a lot of persecution in this case, which leaves a lot to be seen." And on August 24, 2009, Fajardo said to *Publico*, "I have been threatened many times and one of my brothers was killed by hit men, but I don't have evidence that Chevron was behind his killing."

245.     Fajardo's co-conspirator Hinton has perpetuated these falsehoods in comments she posted on Politico.com on November 16, 2009, in which she stated that "no one knows who murdered [Fajardo's] brother," and the death happened when Fajardo "and other members of the [Lago Agrio] plaintiffs' legal team had received a number of anonymous death threats connected to the work on the case." These statements are false and Fajardo and Hinton knew at the time that they were false. Fajardo knew that his brother's death had been investigated and he knew that Texaco and Chevron had nothing to do with it. Yet he lied about it on television, and Hinton spread that lie.

246.     Even though he identified suspects in his brother's murder and the murderers' motives for killing his brother, Fajardo has falsely implied that the killers mistook Wilson Fajardo for Defendant Fajardo himself to create the impression that Chevron had attempted to "assassinate" Fajardo. For example, in a May 2007 article in *Vanity Fair* magazine concerning the case against Chevron, Fajardo claimed that he was being followed and that "the killers had made a mistake." Donziger has taken this outrageous claim all the way to the United States Congress. In a statement before the Tom Lantos Human Rights Commission, Donziger asserted that the "team of lawyers and advocates fighting Chevron in Ecuador's courts over clean-up responsibility have suffered harm in retaliation for exercising their legal rights[.]" And the first "[e]xample

of this retaliation" he offered the committee was: "The lead lawyer for the rainforest communi-ties, Pablo Fajardo, has been subjected to death threats. A brother of Mr. Fajardo was murdered in 2004, about a year after the trial began, under mysterious circumstances that some think was a case of mistaken identity." Similarly, in a particularly offensive scene in *Crude* set at Wilson Fajardo's grave, Defendant Fajardo linked his brother's "assassination" to the "first judicial in-spection of the Texaco case" and falsely said that the killers "were looking for me." In another scene, he "joked" that he kept a gun in his house "[f]or when Texaco comes." These knowingly false statements are intended to leave the false impression that Chevron is not only responsible for the murder of Wilson Fajardo, but seeks to kill Pablo Fajardo as well.

247. The outrageous attacks on Chevron linking it to murder are just more of the RICO Defendants' thinly veiled threats to Chevron: Pay up, or we will continue our campaign of lies, fraud, and corruption.

## C. The Conspirators' Campaign of Lies and Obstruction in U.S. Courts

248. Determined to prevent their conspiracy to defraud and extort Chevron from be-ing exposed in the discovery and other proceedings Chevron commenced in U.S. federal courts, the RICO Defendants embarked on a campaign of obstruction and lies, attempting to conceal the true authorship of the Cabrera Report and the RICO Defendants' and their co-conspirators' rela-tionship with the supposedly "independent" Cabrera. Defendants went as far as misrepresenting Cabrera's independence in a complaint they filed in this Court in related litigation seeking to stay an arbitration proceeding. And Donziger, the ringleader of the enterprise, has personally inter-fered with discovery proceedings in this Court and elsewhere, including repeated and sustained violations of multiple court orders issued from this Court. In this and other lies and misconduct before various U.S. courts, the RICO Defendants and their co-conspirators, including law firms Patton Boggs, Emery Celli and Motley Rice, have brought their pervasive fraud into the courts of this country and have attempted to hide their criminal scheme from Chevron and the courts.

1. **Attempting to Obstruct Chevron's Discovery Proceedings by Making False and Misleading Statements Before U.S. District Courts and Courts of Appeals**

249.     Faced with denials from the conspirators in Ecuador about the authorship of Cabrera's report, Chevron turned to the United States to pursue discovery from the largely U.S.-based enterprise directly through proceedings under 28 U.S.C. § 1782, which authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal." Several courts have granted Chevron's applications for discovery, resulting in the production of more evidence of fraud, collusion, and criminal misconduct, and evidence establishing the RICO Defendants' and their co-conspirators' knowing obstruction of Chevron's Section 1782 applications. This evidence, and the condemnation by numerous U.S. courts of the conduct it reveals, is detailed below. But co-conspirator Julio Prieto perhaps captured the RICO Defendants' and their co-conspirators clear knowledge of the wrongfulness of their own conduct in an email to Donziger and Fajardo after Fajardo told him that the RICO Defendants' correspondence with Stratus was likely to be disclosed in a Section 1782 proceeding in Colorado: "[T]he effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail)[.]"

250.     Accordingly, the RICO Defendants adopted a strategy of obstruction and delay in furtherance of their criminal scheme, seeking to hold off U.S. discovery until they could obtain a judgment in Ecuador and begin their plan to use it to harass and attack Chevron and its subsidiaries around the world. As co-conspirator Ilann Maazel of Emery Celli wrote to Donziger and other co-conspirators, including attorneys at Patton Boggs and Motley Rice, "Unless we want the Stratus/Cabrera revelation to come out in CO [Colorado], which seems like the worst possible place, we need to make our submission in Ecuador and fast. . . . We've bought over a month in CO and everywhere else but time is almost certainly about to run out."

251.     Throughout these Section 1782 proceedings, the first of which Chevron initiated on December 18, 2009, the RICO Defendants have sought to impede Chevron's discovery

through lies, procedural abuses, and obstructionist delaying tactics. These efforts notwithstand-ing, Chevron has obtained additional evidence demonstrating that the conspirators wrote the Cabrera Report and sought to use the so-called "independent" report to their advantage. As this evidence has come to light, the RICO Defendants and their co-conspirators have continued to make statements that are not only false, but inconsistent with their own prior representations, de-spite the fact that that this strategy made them look, "coy at best and silly or untrustworthy at worst," as Jonathan Abady of Emery Celli put it in an email to Donziger and other Emery Celli and Patton Boggs attorneys.

> **a.    The RICO Defendants' Initial False Representations to U.S. Courts That They Had No Relationship With Cabrera and No Role in Preparing the "Cabrera Report"**

252.    In opposing Chevron's discovery efforts, the RICO Defendants' first tactic was denial of any misconduct whatsoever. They apparently hoped that by stonewalling the federal court, they could avoid the discovery of their extraordinary misconduct. In multiple filings in Section 1782 proceedings, the conspirators have falsely asserted their lack of relation to Cabrera: "Mr. Cabrera is not even an expert for one party, but a Court-appointed neutral . . . ." Addition-ally, in declarations filed throughout the country, the RICO Defendants and their co-conspirators have perpetuated their false version of events, hiding their relationship with Cabrera and claim-ing that he was "independent."

253.    The RICO Defendants continued to spread their false version of events in depo-sitions. On April 23, 2010, for example, Chapman falsely testified that he had no reason to think that Stratus had provided work product to Cabrera. The RICO Defendants and their co-conspirators were proud of Chapman's performance, but realized that the truth was bound to come out. As co-conspirator Andrew Wilson of Emery Celli wrote to Donziger, "Chapman did an excellent job of not remembering anything—but Chevron will be able to do side-by-side comparisons of Stratus work product and [Cabrera's] report to a judge that will smell bad." In fact, as Stratus's own documents makes clear, Chapman, who is the head of Stratus' natural re-source economics group, was personally involved in and knowledgeable of Stratus's secret au-

thorship of Cabrera's report. Indeed, it was Chapman who provided Donziger with the initial outline and plan for Stratus to write the "damage estimate," and asked Donziger "when a final report would have to be delivered to the Judge" so that Stratus could plan its resources accordingly. Chapman's deposition misconduct, however, is not surprising given that Beltman held meetings for Stratus staff after Chevron filed for discovery from Stratus in an attempt to mislead the employees and influence their potential testimony regarding Stratus's authorship of the Cabrera Report. At these meetings, Beltman repeatedly misstated that Cabrera was an independent expert and misrepresented the role of Stratus in ghostwriting the Cabrera Report. Beltman consistently omitted any discussion of Stratus's true involvement.

254.    In another blanket denial, Stratus represented through counsel to the District of Colorado on April 27, 2010 that Stratus was "astonish[ed]" to see "similarit[ies]" between their own work product and the Cabrera Report. It assured the court that Stratus did not have "an opportunity to review Cabrera's report in draft form," and that what they provided their co-conspirators was, "intended to assist them in their analysis of data," and in the "mediation," not "to assist Cabrera." These were outright lies; Stratus *ensured* that its work product appeared in the Cabrera Report. In a "Status Report" filed three weeks later, counsel for Stratus informed the court that "continued inquiry suggests that there were communications between Mr. Cabrera and two representatives of Stratus."

255.    Allegedly before a subpoena issued under the authority of the Southern District of California, co-conspirator and Stratus subcontractor Powers threw out a computer hard drive containing responsive documents and deleted responsive emails. Evidence obtained by Chevron in other Section 1782 proceedings demonstrated that Powers had been a key participant in the RICO Defendants' scheme. Indeed, one of the RICO Defendants' *own attorneys* had written, that "we are getting an indication from these documents how important a player Bill Powers was in this whole thing. He has substantial knowledge and involvement in the Cabrera Report drafting." Ultimately, Powers confirmed in his deposition that he had drafted the annexes to the initial Cabrera Report and substantial portions of the supplemental Cabrera Report.

256.     The RICO Defendants also falsely denied contact with other Cabrera team members.  The District of New Jersey granted Chevron's application for discovery from another of the conspirators, UBR, on the basis that while that firm was a paid consultant to the RICO Defendants, one of its employees, Juan Cristobal Villao Yepez, was disclosed as one of the authors of the Cabrera Report.  On appeal, the RICO Defendants told the Third Circuit Court of Appeals that it should reverse, because there was no evidence supporting Chevron's claim that Villao had any connection to Cabrera, or that he had worked for UBR when he was supposed to have been working with Cabrera.  But several months later, when this District ordered Defendant Donziger to produce his own files, they revealed that Donizger and other RICO Defendants had had *direct* communications with Villao regarding his contribution to the Cabrera Report.  And Donziger himself has now admitted that Villao worked for both Cabrera and the RICO Defendants.  Nonetheless, the RICO Defendants have taken no action to remedy their misrepresentations to the Third Circuit.  In internal correspondence, they have, however, discussed the situation regarding Villao and whether to publicly acknowledge that the Cabrera Report was ghostwritten by the RICO Defendants and their co-conspirators, commenting on their concern at being accused of "perpetuation of the fraud."  Andrew Wilson of Emery Celli, for example, warned Donziger to be "[c]areful" because it is "not clear our relationship with Villao was disclosed."

257.     In their internal communications, the RICO Defendants and their co-conspirators have recognized that their denials did not square with the facts.  In May 2010, one of the Lago Agrio Plaintiffs' U.S. lawyers wrote that their characterization that Cabrera had "considered" Stratus's work "seems like way too much of a stretch considering that Cabrera's report, or substantial annexes to it, are in fact the consultant's work.  This is far more than 'circumstantial evidence'; this is, indeed, a '"hand in glove" showing.'"  Co-conspirator Jonathan Abady of Emery Celli described the relationship between the RICO Defendants and Cabrera as "wholesale adoption of Stratus work product w/o attribution."  Co-conspirator Wilson admitted in an internal email that "[t]he more we emphasisze [sic] [Cabrera's] neutrality the less sense it makes that we were talking to him outside of school."  And in extensive correspondence in June 2010, among

Donziger, Motley Rice, Patton Boggs, Emery Celli, and other co-conspirators, Jason Rockwell at Patton Boggs acknowledged that, "the Ann Maest notes suggest more coordination with Cabrera than counsel simply dropping off two sets of documents," and Jonathan Abady of Emery Celli conceded that, "By refusing to admit this now obvious fact, we look coy at best and silly or un-trustworthy at worst."

258.    Because their position in these proceedings has been so divergent from the facts, the RICO Defendants have had trouble retaining counsel willing to go along with this scheme of falsehoods and obstruction. Donziger has admitted that when first one and then another of the U.S. law firms that the RICO Defendants retained to represent their interests in opposing Chevron's Section 1782 applications learned of the full scope of the RICO Defendants' relationship with Cabrera, the firms withdrew from the representation.

259.    In response to Chevron's initial Section 1782 filings, the RICO Defendants re-tained a respected New York firm to represent their interests. But when a senior partner with that firm interviewed Stratus employees in Boulder, it was apparent to him that the RICO Defen-dants' relationship with Cabrera was improper and contrary to the representations made to him by Donziger. His law firm withdrew the next day.

260.    Around this time, Donziger prepared a memorandum which he addressed to lawyers from a Colorado firm also retained by the RICO Defendants to block Chevron's discov-ery from Defendant Stratus. In that memorandum, Donziger misled those attorneys on numerous material facts. For example, in a section of the memo titled "Role of Stratus Consulting," he listed such innocuous activities as "helping Ecuadorian counsel respond to scientific questions," and "giving media interviews," but failed to inform the attorneys that Stratus had in fact written the Cabrera Report, the central allegation of the pending court proceeding. And he listed "Opin-ions in Cabrera's report were taken directly from Stratus materials," as one of Chevron's "inac-curate" factual assertions.

261.    When this second firm was unable to obtain confirmation of any of Donziger's false representations, and after learning from its predecessor about the results of the interviews

he had conducted with Stratus, that firm also withdrew. Simultaneously with its withdrawal, it sent Donziger an email citing the "troubling information" that it had learned regarding Stratus' role in preparing the Cabrera report, and that "we are concerned about our ability to satisfy our obligations to Judge Kane and to the court if we continue in our representation of the Lago Agrio plaintiffs in this case." The attorney concluded, "I'm sorry it has come to this, but I feel if we proceed I may be compromising this firm's reputation and ethical stature and I cannot do that."

262.    The conspirators then turned to counsel that they thought "appear[ed] willing to sign anything," but that their relationship with that counsel lasted only a month before that firm withdrew. And when the *fourth* firm retained by the RICO Defendants in the *same* Section 1782 proceeding reviewed the record, and not merely Donziger's materially misleading memorandum, it concluded that, "it appears not only that Cabrera and plaintiffs can be charged with a 'fraud' respecting the former's report, but that Stratus was an active conspirator." At this fourth counsel's request, the second firm retained by the RICO Defendants, who had previously informed Donziger that the RICO Defendants' position was "untenable," prepared a brief memorandum summarizing its bases for withdrawal. In that memorandum, that firm stated that "we did not feel that we had a Rule 11 basis to file an opposition to Chevron's subpoena." Rule 11 of the Federal Rules of Civil Procedure requires that every filing submitted to a federal court must be signed by an attorney who represents that the filing is not "any improper purpose," that the "claims, defenses, and other legal contentions are warranted by existing law," and that "the factual contentions have evidentiary support."

263.    When another lawyer, Andrew Woods, who worked for Donziger, grew alarmed that Donziger was using him to make possibly false claims in a declaration filed in federal court, and asked to make a clarifying submission if any of his previous statements were false, Donziger and his co-conspirators talked him into remaining silent. Despite their own recognition of their misconduct, the RICO Defendants continue to deny this evidence and dissemble in sworn statements, in court filings, and in deposition testimony.

### b. The RICO Defendants' Subsequent False and Misleading Statements in an Attempt to Justify and Excuse Their Emerging Misconduct

264.    As their strategy of stonewalling and total denial became increasingly impossible to square with the emerging factual record, including the video outtakes from *Crude*, the RICO Defendants and their co-conspirators made a last-ditch effort to cover up their misconduct by attempting to confuse and mislead federal courts regarding the Lago Agrio court orders governing their association with Cabrera. The RICO Defendants distorted the record in several ways as part of their attempt to impede federal court review of Chevron's discovery applications and thereby allow the Lago Agrio court to continue its march towards judgment.

265.    In response to an inquiry from the District of Colorado seeking information about the full relationship between Cabrera and Stratus, Wilson of Emery Celli, appearing as counsel for the Lago Agrio plaintiffs, assured the court that they would provide the "full picture" in an upcoming filing. Indeed, Wilson assured the court *nine* times at the hearing that the upcoming report would provide the "full picture." When the conspirators caused that promised "full picture" to be filed, however, it was incomplete and misleading. In a sworn declaration, Defendant Fajardo provided a lengthy description of the relationship between the RICO Defendants and Cabrera, but falsely attested that Cabrera was "independent" and omitted from his declaration the substantial role he and other conspirators had played in securing Cabrera's appointment, his numerous personal meetings with Cabrera—including the March 2007 meeting captured in the *Crude* outtakes—and the massive, U.S. project to write, translate and submit the fraudulent Cabrera Report. Rather, Fajardo claimed that the RICO Defendants' contact with Cabrera was pursuant to orders issued by the Lago Agrio court in January and April 2008, requesting that the parties make various submissions to Cabrera.

266.    The RICO Defendants have repeatedly invoked these 2008 Lago Agrio orders, even though much of their extensive recruitment, meeting, and collusion with Cabrera occurred in 2007. They have also sought to explain Cabrera's various fraudulent statements to the court that he was independent from them, by asserting, in a federal court filing signed by Wilson of

104

Emery Celli, that those statements were "made before the [Lago Agrio] court order authorizing him to get material from the parties," and argued that "[w]hen the [Lago Agrio] Court ordered Mr. Cabrera to consider whatever submissions were provided by the parties, the landscape changed considerably. Nevertheless, Chevron conflates Mr. Cabrera's 2007 statements with conduct that occurred *after* Court authorization was given in 2008 . . . ."

267.     The RICO Defendants' and their co-conspirators' attempt to excuse their conduct based on these orders is unavailing on its face. These orders were issued a year after their close relationship with Cabrera began, and they do not authorize anything like what transpired. Indeed, when confronted with the evidence of the RICO Defendants' prior relationship with Cabrera, Donziger himself admitted that he and his co-conspirators "met with and interacted with Mr. Cabrera both before and after" the Lago Agrio court issued its January 2008 order. Their defense is also incompatible with their statements to the Lago Agrio court *after* those orders were issued. On April 25, 2008, Defendant Fajardo asserted in a filing in the Lago Agro court that it was "[a]nother infamy" that the plaintiffs were "accused of having a close relationship with Independent Expert Richard Cabrera." "It is disappointing, your honor, that professionals with such experience have fallen into such childish and absurd arguments." And this defense ignores the fact that the one submission the RICO Defendants made to Cabrera pursuant to court order was expressly limited to documents from "public institutions in the country," which does not include the work of their own consultants—an inconsistency they have conceded in private correspondence.

268.     Nonetheless, the RICO Defendants continue to assert in U.S. federal court that their relationship with Cabrera was pursuant to those orders and fully disclosed to the Lago Agrio court. Before the Third Circuit, for example, the RICO Defendants recently asserted that, "The Ecuadorian court was and is well aware of the Ecuadorian Plaintiffs' *ex parte* contacts with Cabrera and submission of materials to him—and indeed, *invited* such contacts and submissions." Of course, if the court was aware of the RICO Defendants' collusion with Cabrera,

which was roundly denied by the RICO Defendants and Cabrera for years, that merely implicates the court in the fraud. It does not excuse or justify it.

269.    The RICO Defendants have also made the false claim, first before the District of Colorado and then before other courts, that Cabrera disclosed his contacts with the conspirators in his report. In support of this new position, they specifically referred to a citation in the Cabrera Report which they quoted as, "*Excerpts from . . . Selva Viva 2002-2006*" (emphasis and alteration in original). But the full citation, without the conspirators' carefully placed ellipses, plainly referred to a specific set of documents related to the judicial inspections, and does not disclose anything resembling the wholesale ghostwriting that actually occurred.

270.    The RICO Defendants and their co-conspirators also claimed that their submissions to Cabrera were "privileged," and that Ecuadorian law permitted parties secretly to submit materials to court officials without disclosing those materials to other parties. In support of this claim, the RICO Defendants and their co-conspirators submitted a declaration that cited no legal authority whatsoever.

271.    In their internal correspondence, RICO Defendants and their co-conspirators admitted that they were relying on unsupportable distinctions to avoid disclosure. As early as May 16, 2010, attorney Ilaan Maazel of Emery Celli, conceded in an email to co-counsel that, "the core basis for the 1782 is nevertheless apparently correct: neither Cabrera nor plaintiffs disclosed a submission from plaintiffs that contained drafts of part of the expert report written by Stratus." Yet the very next day, the RICO Defendants caused to be filed in federal court a brief containing the claim that all contact between Cabrera and the RICO Defendants was disclosed.

272.    In response to another suggested defense, in which the conspirators would argue that the only fraud shown by the record was Donziger's and not the "clients'" thus supposedly protecting privilege, Donziger complained that, "you're throwing me under the bus," and noted that there was substantial evidence that Yanza was involved in any fraud. Co-conspirator Ilann Maazel of Emery Celli assured him that Yanza was not his client, but Donziger pointed out that Yanza was associated with the Front, which stood to receive 10% of any judgment. These con-

cerns notwithstanding, the RICO Defendants and their co-conspirators have pressed this argument in numerous U.S. courts.

273.     The RICO Defendants' and their co-conspirators' attempt to whitewash their conduct was insupportable on its face, and Chevron's subsequent discovery of their true conduct has demonstrated how baseless these attempts were. The RICO Defendants and their co-conspirators did not submit materials to Cabrera so that he could independently review them; rather, they submitted materials for him to sign and submit to the court under his name. Nor did they ever intend to disclose this to Chevron, or to anyone. As Donziger put it, their specific intent with respect to Chevron's knowledge of the RICO Defendants' relationship with Cabrera was to make sure "that they don't know shit."

274.     The RICO Defendants offered these false statements in part because they hoped to avoid discovery of their misconduct, but also in an effort to at least forestall disclosure as long as possible through factual misrepresentations and the obstructive filing of meritless court papers. Through this strategy, they would buy themselves time to allow the Lago Agrio court to issue its judgment against Chevron under which the only basis for liability would be the fraudulent Cabrera Report. In May 2010, as the conspirators realized that the truth of their relationship would start to come out, Donziger described their strategy: "I think we should appeal on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road." And another conspirator, Eric Westenberger of Patton Boggs, lawyers spelled it out in more specific terms: "What about the following? Appeal; move for stay; if we win with [the District Court Judge] great; if we lose, we produce whatever we want (narrow read); [Gibson Dunn] complains and then we move for clarification. If we lose again, we think about another appeal."

275.     The evidence that Chevron has uncovered in the Section 1782 proceedings, in spite of the RICO Defendants' and their co-conspirators' obstructive tactics, has inspired strong language from several federal courts. For example, the District Court in the District of New Jersey held that the conduct in furtherance of the conspiracy could not constitute "anything but a

fraud on the judicial proceeding." And, regarding videotaped evidence of the criminal enterprise that Chevron has obtained, Judge Kaplan of the Southern District of New York found that "the outtakes contain substantial evidence of misconduct in and relating to the Ecuadorian litigation." Specifically, Judge Kaplan noted that the outtakes "contain substantial evidence that Donziger and others (1) were involved in ex parte contacts with the court to obtain appointment of the expert, (2) met secretly with the supposedly neutral and impartial expert prior to his appointment and outlined a detailed work plan for the plaintiffs' own consultants, and (3) wrote some or all of the expert's final report that was submitted to the Lago Agrio court and the Prosecutor General's Office, supposedly as the neutral and independent product of the expert." The Western District of North Carolina court also found that "what has blatantly occurred in this matter would in fact be considered fraud by any court," while the District of New Mexico court concluded, "[t]he release of many hours of the outtakes has sent shockwaves through the nation's legal communities, primarily because the footage shows, with unflattering frankness, inappropriate, unethical and perhaps illegal conduct." The District of New Mexico court also found that the RICO Defendants have engaged in "corruption of the judicial process, fraud, attorney collusion with the Special Master, inappropriate *ex parte* communications with the court, and fabrication of reports and evidence."

276. Numerous courts have also found that the crime-fraud exception to the attorney-client privilege applied and thus did not shield the RICO Defendants' and their co-conspirators' pervasive fraud from discovery. The District Court for the Southern District of California, for example, reasoned that there "is ample evidence in the record that the Ecuadorian Plaintiffs secretly provided information to Mr. Cabrera, who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to make it look like the opinions were his own." Similarly, the District Court of New Mexico noted that "exchanges" among the RICO Defendants "trigger the crime-fraud exception, because they relate to corruption of the judicial process, the preparation of fraudulent reports," and "the fabrication of evidence." And the Southern District of New

York noted that "there is more than a little evidence" that the activities of the RICO Defendants "come within the crime-fraud exception."

### 2. Making False Statements to Deceive New York Courts in Connection With Chevron's Section 1782 Applications and Other Actions

277.    The RICO Defendants' and their co-conspirators' deliberate misrepresentations to federal courts have not been limited to lies about their relationship with Cabrera and the authorship of the Cabrera Report. Rather, the RICO Defendants and their co-conspirators have made, or caused to be made, a number of false statements before federal courts in New York in connection with their attempt to prevent the discovery of certain *Crude* outtakes in a Section 1782 proceeding and in the case the Lago Agrio Plaintiffs filed, through co-conspirator Emery Celli, to stop Chevron's arbitration with Ecuador in a bilateral investment treaty proceeding.

278.    Before the Southern District of New York, the RICO Defendants and their co-conspirators made a series of false statements regarding *Crude* and the contents of the outtakes from filming sought by Chevron pursuant to Section 1782. When Chevron discovered evidence that a scene in *Crude* had been modified at the RICO Defendants' request in order to suppress evidence of meetings between the RICO Defendants and Cabrera team member Carlos Beristain, the RICO Defendants told the court that the meeting was "innocuous" and "of no relevance to anything." Similarly, on appeal of the district court's order requiring production of the *Crude* outtakes, the RICO Defendants and their co-conspirators claimed that they had requested Berlinger to delete the scene from the DVD version of the film only to "avoid the misimpression, cynically fostered by Chevron below, that [the Lago Agrio] plaintiffs participated in one of Dr. Beristain's focus groups *after* he was a court expert" (emphasis in original). In fact, however, the meeting from which Beristain was carefully edited out of the picture was a meeting arranged and funded by the RICO Defendants and their co-conspirators as part of their scheme to control the content of the Cabrera Report. Nor was that the only evidence of wrongdoing that disclosure of the video would record. And the attorney who signed the brief in the Second Circuit, Ilann Maazel of Emery Celli, knew that the Beristain footage would turn out to be much less damaging

than what he knew the outtakes would contain, "a meeting with Steve, Pablo, Stratus, and Cabrera," as he informed his co-counsel when the Second Circuit's order compelling production was announced.

279.   Judge Kaplan noted that Berlinger's representations regarding the contents of those outtakes, which were adopted by the RICO Defendants through their agent and co-conspirator Emery Celli have "proved inaccurate." Judge Kaplan observed that "[t]hese and similar instances are worrisome in considering their present claims."

280.   In addition to the false statements concerning *Crude*, the conspirators have made misrepresentations in two other cases before the Southern District of New York. One of those cases was brought by the Republic of Ecuador and Petroecuador and the other was filed by the RICO Defendants (ostensibly on behalf of the Lago Agrio Plaintiffs), through their agent and co-conspirator Emery Celli, in an attempt to stay the Treaty Arbitration Chevron had commenced as a result of Ecuador's failure to abide by the terms of the 1998 Final Release. In making false statements about Cabrera in both proceedings in related actions before this Court, the RICO Defendants have attempted to deceive the Court.

281.   Finally, on January 14, 2010, co-conspirator Emery Celli filed an action ostensibly on behalf of the Lago Agrio Plaintiffs in the United States District Court for the Southern District of New York, seeking a court order compelling Chevron to stay the bilateral investment treaty proceeding. The complaint alleged that "[t]he best and most recent *independent* estimate available of the human health impact of this contamination is provided by the *neutral Special Master* [Cabrera] appointed by the [Lago Agrio] court to provide advice on damages." (emphasis added). It further stated that "Dr. Cabrera appointed a team of 14 technical officials," and that "the final report [was] *produced by the Cabrera team . . . .*" (emphasis added).

282.   This complaint also alleged that "[e]nvironmental remediation experts from the United States have reviewed the Cabrera report and found its conclusions reasonable and its damages assessment consistent with the costs of other large environmental clean-ups around the

world." The "environmental remediation experts from the United States" were the RICO Defendants themselves, a fact which was not disclosed by the RICO Defendants to this Court.

### 3. Obstructing Judicial Proceedings by Tampering With Witnesses, Withholding Documents, and Making False Statements to This Court

283.    Donziger, the mastermind of the RICO Defendants' fraudulent scheme, has also been a leading actor in the attempted cover up of the criminal scheme in U.S. courts. He has tampered with the testimony and sworn submissions of at least two other witnesses, Mark Quarles and Dr. Charles Calmbacher, and he has defied multiple discovery orders from this Court commanding him to produce his own documents, and lied to the Court repeatedly about his non-compliance.

284.    Donziger has been working to prevent Chevron's discovery of the RICO Defendants' scheme for years. On or before September 17, 2007, the RICO Defendants and their co-conspirators induced one of their consultants, Mark Quarles, to sign a declaration, which was submitted in an action pending in the Southern District of New York, stating that "Mr. Cabrera and his team have acted independently from both the [Lago Agrio] plaintiffs and the defendant . . . ." During Quarles's recent deposition in a Section 1782 proceeding, Quarles testified that the statement concerning Cabrera's independence in his declaration was based on several days of observation of the global assessment process in 2007, and also on specific false representations by Donziger that Cabrera had written the work plan upon which the Cabrera Report was based. He further testified that Donziger paid him to conduct his observations and sign the declaration. Quarles testified that had he known that Cabrera was working directly with the lawyers for the Lago Agrio Plaintiffs (i.e., the RICO Defendants), he would not have signed the declaration.

285.    Recent document productions from Donziger have further revealed that not only did Donziger push Quarles to swear to Cabrera's independence, he pressed for stronger language, and asked Quarles remove language that would have hurt the RICO Defendants if the true facts were known. On September 16, 2007, Donziger sent Quarles an email attaching Quarles' draft declaration. Where Quarles had written a paragraph discussing the qualifications of

Cabrera's team, Donziger requested that he replace that language with statements that Donziger knew to be utterly false: "Mr. Cabrera has at all times acted independently from both the plaintiffs and the defendant. At no time has Mr. Cabrera entertained suggestions or even met with plaintiffs or their representatives regarding his current work plan." Donziger then told Quarles to delete language suggesting that if any such contacts had taken place, "a degree of biasness would have been introduced into the sampling plan." Quarles accepted Donziger's request to delete the "biasness" passage, and ultimately signed a version containing the core of the false claim of independence.

286. More recently, when the conspirators learned that Chevron would be taking Dr. Calmbacher's deposition in a Section 1782 proceeding, the RICO Defendants attempted to stop Calmbacher from exposing the truth about the falsified reports that Defendants and their co-conspirators filed in his name.

287. Under the guise of seeking to move to quash the subpoena, Donziger contacted Dr. Calmbacher and attempted to convince him not to testify at his deposition, telling him that testifying could pose "real problems" for him and could result in a "potential law case against" him because "they're going to go after [him] for unprofessional behavior." Donziger had no factual basis upon which to make these statements, which were false and misleading. When asked at his deposition whether "Donziger [was] trying to convince [him] not to come and testify," Calmbacher testified: "Very much so. Very much so."

288. Dr. Calmbacher disregarded Donziger's threats and outrageous claims, and testified pursuant to the court-authorized subpoena. Shown copies of the reports filed by Defendants in the Lago Agrio court under his name, Dr. Calmbacher testified, "I did not reach these conclusions and I did not write this report." Dr. Calmbacher proceeded to explain how the conspirators sent him a version of his expert report that correctly stated his views and blank pages for him to initial so that they could obtain his signature for the falsified reports filed with the Lago Agrio court, as described in paragraphs 108 to 111, *supra*.

289.    In the Section 1782 proceeding directed at Donziger himself, he has disregarded the Federal Rules of Civil Procedure and this Court's multiple express orders to produce all of his responsive documents. With the approval of the Court, Chevron served a subpoena on Donziger on August 9, 2010, seeking documents and testimony regarding many of the matters described in this Complaint. Donziger moved to quash the subpoena, and this Court denied that motion on October 20, 2010 and ordered Donziger to comply with the subpoena "forthwith." Further, because Donziger had failed to produce a privilege log, the Court held that any privilege claims over Donziger's documents were waived. Nonetheless, the Court noted that it would "relieve [Donziger] of the waiver," if he "file[d] a complete privilege log on or before October 29, 2010."

290.    Donziger did not comply. Instead he produced a fraction of his documents, filed meritless and conflicting papers with the Court, and then, nearly a month later, submitted a facially defective "privilege log." On November 29, the Court *once again* ordered Donziger to produce his responsive documents, finding that Donziger's conduct "was a deliberate attempt to structure the response to the subpoenas in a way that would create the maximum possibility for delay." And Donziger once again failed to comply.

291.    At Donziger's deposition, his conduct was so improper that it prompted the Special Master, appointed by this Court to oversee the deposition, to write to the Court: "From virtually the first day of his deposition, Mr. Donziger gave many unresponsive, self serving answers to questions that should have been answered directly, with no embellishment." The Special Master went on to describe how he had repeatedly cautioned Donziger and his counsel, but that this "seemed to have little effect."

292.    On January 13, 2011, the Court *yet again*, in response to a motion to compel filed by Chevron, ordered Donziger to produce the documents he had been under orders to produce since October, and held in reserve the possibility of holding Donziger in contempt. Over the next several days, Donziger, without explanation for his prior failure to do so, produced over 87,000 documents, four times as many as he had produced before, the vast majority of

which were responsive to Chevron's requests, and included many of the probative documents that form the basis for this complaint. Yet, in deposition testimony immediately following this production, Donziger admitted that he had yet *more* responsive documents, such as those in email accounts that the RICO Defendants set up specifically to hide communications sensitive communications about, among other topics, their authorship of the Cabrera Report.

**D.** **Chevron Has Suffered Substantial Damages as a Result of the RICO Defendants' Conspiracy, and Enforcement of a Corrupt Judgment in the Lago Agrio Litigation Would Deepen the Harm**

293.    The RICO Defendants and their co-conspirators have used the corruption and politicization endemic to the Ecuadorian judicial system to their advantage and by colluding with the Ecuadorian government and corrupting the court and its "neutral" expert. It is therefore likely that the Lago Agrio court will do as the RICO Defendants and their co-conspirators have desired and enter a massive, fraudulent judgment against Chevron even though there is no legitimate evidence to establish liability or damages. *See* ¶¶ 87-184, *supra*. Indeed, as Judge Kaplan explained, "there is evidence to support Chevron's claim that the 'global assessment' is a fraud . . . . There is evidence too that other expert evidence submitted to the Ecuadorian courts on behalf of those plaintiffs also was fraudulent. Chevron thus stands in jeopardy of a huge judgment that, if ultimately rendered, could be the result of a fraud practiced by the Lago Agrio plaintiffs."

294.    The jeopardy that Chevron faces is compounded by the fact that the RICO Defendants continue to have access to significant funds to carry out their criminal scheme. Until 2010, Kohn had been the primary source of funds for the criminal scheme, supporting it with over $7 million in less than seven years—"the largest single component" of which, according to Kohn, was over $1 million to Donziger personally. This money was made available by Kohn upon specific requests from Defendants Donziger and Yanza, who worked with Kohn to prepare budgets for the case, and would contact him as often as monthly to request amounts ranging from $40,000 to $100,000 each time. These funds were distributed to U.S. consultants, including Defendant Stratus, and to Ecuador, mainly through Selva Viva and the Front, to fund the RICO De-

fendants' activities in that country. After Donziger, Yanza, and Fajardo had a falling out with Kohn, they secured additional ongoing funding from Burford, a firm that specializes in funding large lawsuits. In the summer and fall of 2010, the RICO Defendants discussed a $15 million investment from the Burford Group, and by December, the initial funds had already been provided to support their criminal activities. In exchange, Burford received not only an interest in any money obtained from Chevron, but also approval authority over the use of their funds. Another substantial source of funds has been Russell DeLeon, an online gambling entrepreneur who was a major source of funding for *Crude*.

295.    Moreover, a judgment that finds Chevron liable and awards damages appears to be imminent, as indicated by the Lago Agrio court itself. On December 17, 2010 at 9:57 a.m., only two days after counsel for the Lago Agrio Plaintiffs' Ecuadorian counsel demanded "a final declaration by the Courts: a judgment, a declaration by the court that will put an end to this long litigation" and disregard the evidence of fraud and corruption, the Lago Agrio court issued an order known as *autos para sentencia*. This order purports to formally close the evidence and vest the court with authority to enter a judgment at any time and without any further act or notice to the parties. Indeed, the Lago Agrio Plaintiffs themselves have acknowledged that judgment is imminent. In a recent filing before U.S. court, the Lago Agrio Plaintiffs asserted that a final judgment could be issued as early as February 2011. And, on January 17, 2011, the RICO Defendants and their co-conspirators caused the Lago Agrio Plaintiffs to file their *alegato* or closing arguments with the Lago Agrio court.

296.    Defendants already are planning to seek immediate enforcement of the impending Ecuadorian judgment in U.S. and foreign courts, and to extort a payment from Chevron by using the Ecuadorian judgment to threaten seizure of Chevron's assets and those of its subsidiaries. The RICO Defendants internal blueprint for global enforcement, a memo by co-conspirator Patton Boggs titled "Invictus," asserts that, "If and when an enforceable judgment is entered in Ecuador, Plaintiffs' Team expects to be engaged quickly, if not immediately, on multiple enforcement fronts—in the United States and abroad." They have said as much expressly on multiple

A-188

occasions, and, in fact, have represented to the Southern District of New York that Chevron's defense against any Lago Agrio judgment should be restricted to New York's Recognition Act.

297.    Co-conspirator Amazon Watch has reported that the Lago Agrio Plaintiffs' representatives will quickly "move to collect the judgment by any means necessary in whatever country the company has assets" and that they "will seek to enforce any judgment against the oil giant immediately in U.S. courts." Co-conspirator Hinton said that "[i]f the [Ecuadorian] courts were to agree to [force Chevron to post a bond in order to appeal the Lago Agrio judgment], then we would try to start seizing assets in other countries." According to Donziger, "If we get a judgment out of the trial court, we're coming back immediately, — soon as we can, —to get that judgment enforced. We are not waiting for the appeals process." And Donziger has threatened that "Chevron operates in more than 100 countries and has numerous oil tankers that troll the world's waterways and dock in any number of ports . . . . This could end up being one of the biggest forced asset seizures in history and it could have a significant disruptive impact on the company's operations." In an interview broadcast as part of a 60 Minutes segment on the Lago Agrio Litigation, Donziger, in response to the observation that Chevron has no assets in Ecuador, stated, "At the end of the day, it might be a situation where a U.S. court enforces the judgment and the marshals have to go to Chevron and seize their assets." These threats continue unabated. Just months before this Complaint was filed, Donziger, in a speech to law students, told them that he was assembling a legal team "to execute whatever judgment comes out of Ecuador effectively, in whatever forum might—forum might be appropriate, including multiple places that, you know, you could file suits, you could seize assets, seize boats."

298.    Through statements made to this Court, Defendants have also made clear their intent to enforce immediately the imminent judgment. When asked by Judge Sand of the Southern District of New York whether the Lago Agrio Plaintiffs in their action to stay the Treaty Arbitration were "willing to stipulate that [they would] take no efforts to enforce the judgment until . . . the arbitration is completed," their counsel refused to agree to stay enforcement: "No, your honor. We would not and cannot do that."

299. The impending judgment of the Lago Agrio court, procured by the RICO Defendants' and their co-conspirators' fraud—in addition to related attachment and enforcement efforts and the specter of immediate liability, which according to the RICO Defendants and their co-conspirators, may be as high as $113.5 billion—threatens to disrupt Chevron's business operations, sully its reputation, and otherwise cause Chevron to suffer irreparable harm. In the RICO Defendants' "Invictus" memorandum, outlining their plans to use the Lago Agrio judgment to extract payments from Chevron, Patton Boggs also proposes initiating a shareholder derivative action against Chevron in the United States, "as a point of leverage with respect to settlement [and] as a fruitful basis for discovery into the machinations of Chevron management vis à vis the Ecuadorian litigation." And that memo also reveals that the RICO Defendants do not intend to wait for judgments in their proposed enforcement proceedings: "Consistent with their aggressive approach, Plaintiffs' Team will look for ways to proceed against Chevron on a pre-judgment basis, largely as a means of attaining a favorable settlement at an early stage. Various laws and procedures within and outside the United States may permit attachment of Chevron's assets prior to successful recognition of the Ecuadorian judgment."

300. Nor are the RICO Defendants limiting their operations to the Lago Agrio Litigation. Donziger has stated that their intention is to "take legal fees we can earn from this case and, do more cases like this in different places with, you know, the same team, if possible."

301. The RICO Defendants' extensive and wide-ranging scheme to defraud and extort Chevron, as described in this Complaint, has already had a lasting and irreparable effect on Chevron. The RICO Defendants' false and misleading statements have been relied on by the U.S. courts, U.S. state and federal government agencies, Chevron's shareholders, investors, analysts, the media, and by the Lago Agrio court by means of its acceptance of Defendants' and Cabrera's misrepresentations and omissions and its failure to take meaningful corrective action. Further, the RICO Defendants' false and misleading statements have caused Chevron substantial damages. Chevron has had to expend millions of dollars in attorneys' fees and costs defending itself in the sham litigation the RICO Defendants and their co-conspirators have prosecuted in

Ecuador, and exposing the conspirators' pervasive fraud in the Section 1782 proceedings. On top of the attorneys' fees and expenses, Chevron's interest in executed contracts, including the 1995 Settlement Agreement and 1998 Final Release, has also been impaired as a result of the RICO Defendants' and their co-conspirators' collusion with the Republic of Ecuador. In addition, many of the RICO Defendants' extortionate acts have presented unfair and false representations of Chevron's business practices, harming Chevron's reputation and goodwill. As alleged throughout, these harms represent the precise result intended by the RICO Defendants' misconduct. And worse, it is clear from the RICO Defendants' actions and words that they have no intention of stopping until Chevron surrenders to their extortionate demands. Without the Court's intervention, Chevron will continue to suffer significant harm at the hands of the RICO Defendants and their unlawful scheme.

302.    The facts and evidence presented in this Complaint are the result of many thousands of hours of work by Chevron, its attorneys, and its investigators, and have been assembled at extraordinary cost. As this Complaint was being prepared for filing, however, new evidence continued to emerge, and the true nature of the RICO Defendants' criminal conduct becomes clearer and clearer. Just a few months ago, considering Chevron's request to obtain discovery directly from the ringleader of this enterprise, Donziger, the United States District Court for the Southern District of New York summarized the case as follows: "[T]he name of the game is, arguably, to put a lot of pressure on the courts to feed them a record in part false for the purpose of getting a big judgment or threatening a big judgment, which conceivably might be enforceable in the U.S. or in Britain or some other such place, in order to persuade Chevron to come up with some money. Now, do the phrases Hobbs Act, extortion, RICO, have any bearing here?"

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(Violations of RICO, 18 U.S.C. § 1962(c))**
**(Against All RICO Defendants)**

303.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

304.    At all relevant times, Chevron is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

305.    At all relevant times, each RICO Defendant is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

*The RICO Enterprise*

306.    The RICO Defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, as described in the foregoing paragraphs of this Complaint; namely, through a multi-faceted campaign of lies, fraud, threats and official corruption, to coerce Chevron into paying billions of dollars to the RICO Defendants and their co-conspirators.  These RICO Defendants and their co-conspirators have organized their operation into a cohesive group with specific and assigned responsibilities and a command structure, operating in the United States and Ecuador, funded primarily from the United States, and directed mainly from the United States.  Over the years they have adapted their scheme to changing circumstances, recruiting new members to their operation, and expanding the scope and nature of their activities.  While the organization of the criminal enterprise has changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

    a.    Defendants Donziger and the Law Offices of Steven R. Donziger have been responsible for oversight of the scheme to defraud and extort Chevron, and have directed other conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise—namely, manufactur-

ing evidence of Chevron's liability, procuring sham criminal charges against Chevron's attorneys, conducting a massive public pressure campaign designed to spread false and misleading information about Chevron and the Lago Agrio Litigation, and obstructing Chevron's efforts at uncovering the truth in various U.S. court proceedings.

b. Defendant Fajardo has been primarily responsible for prosecuting the sham litigation in the Ecuadorian courts, has served as one of the heads of the criminal enterprise in the U.S. and Ecuadorian media, and has planned and coordinated the ghostwriting of the Cabrera Report.

c. Defendants Yanza and the Front have been primarily responsible for managing the RICO Defendants' "private army," exerting influence over and colluding with Ecuadorian government and court officials, and serving as media representatives for the criminal enterprise in which they have made false statements to Chevron stockholders, financial analysts, investors, and/or state and federal agencies. Yanza arranged for funding from Kohn and/or Kohn Swift for the RICO Defendants' activities in Ecuador, and frequently caused money to be transferred out of the United States for this purpose.

d. Defendant Selva Viva has served as a conduit for funding and otherwise furthering the RICO Defendants' criminal enterprise.

e. Defendants Stratus, Beltman, and Maest have been responsible for coordinating the drafting of and actually ghostwriting the Cabrera Report and other submissions to the Lago Agrio court, and for the false promotion of the Cabrera Report as independent in the media and to U.S. courts.

307. The RICO Defendants and their co-conspirators constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c), referred to hereinafter as the

"Enterprise." Each of the RICO Defendants participated in the operation or management of the Enterprise.

308.    At all relevant times, the Enterprise was engaged in, and its activities affected interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c).

*Pattern of Racketeering Activity*

309.    The RICO Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit:

*Pattern of Racketeering Activity: Extortion in Violation of Hobbs Act, 18 U.S.C. § 1951*

310.    At all times material to this Complaint, Chevron was engaged in interstate and foreign commerce and in an industry that affects interstate and foreign commerce.

311.    As described herein, the RICO Defendants have engineered a wide-ranging campaign of public attacks based on false and misleading statements, trumped up criminal charges, threatened fraudulent civil judgments, investigations by government agencies, and ongoing harassment and disruptions of business operations, and have demanded the payment of billions of dollars before these activities will cease, all with the intent and effect of causing a reasonable fear of economic loss on the part of Chevron.

312.    As described herein, the RICO Defendants manufactured false evidence against Chevron and are relying on that false evidence in the sham Lago Agrio Litigation with the intent and effect of causing a reasonable fear of economic loss on the part of Chevron.

313.    As described herein, the RICO Defendants conspired with the Republic of Ecuador to advance baseless criminal charges against two Chevron lawyers responsible for executing the 1998 Final Release in order to extort a payment from Chevron.

314.    The RICO Defendants' actions are intended to induce fear in Chevron that the RICO Defendants will, among other things: (1) continue to pursue a scheme of misrepresentation to the great harm and public denigration of Chevron, unless and until Chevron "settles" the

Lago Agrio Litigation; (2) continue to conspire with Ecuadorian officials to have Chevron's attorneys criminally prosecuted on trumped up charges; and (3) secure a fraudulent multi-billion dollar judgment against Chevron and file lawsuits in the United States and in other foreign jurisdictions seeking recognition and enforcement of the judgment. These actions, as described herein, have created a reasonable fear of harm on the part of Chevron, including fear of economic loss.

      315.    Accordingly, the RICO Defendants have unlawfully obstructed, delayed, and affected—and attempted to obstruct, delay, and affect—commerce as that term is defined in 18 U.S.C. § 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in § 1951, in that the RICO Defendants attempted to induce Chevron to consent to relinquish property through the wrongful use of actual and threatened force, violence, and fear—including fear of economic harm.

*Pattern of Racketeering Activity: Extortion in Violation of New York Penal Law §§ 110.00, 155.05(2)(e), 155.42*

      316.    Similarly, the RICO Defendants' wrongful attempts to appropriate Chevron's property by instilling fear that if the property is not delivered the RICO Defendants would perform an act calculated to harm Chevron materially with respect to its business, financial condition, and reputation violates New York Penal Law §§ 110.00, 155.05(2)(e), 155.42.

*Pattern of Racketeering Activity: Multiple Instances of Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343*

      317.    As described herein, the RICO Defendants engaged in a wide-ranging scheme or artifice to defraud Chevron, various courts of law, and the greater public concerning Chevron's purported liability for environmental harm in Ecuador by manufacturing evidence, colluding with the court expert Cabrera to submit the RICO Defendants' manufactured evidence, and then holding out the Cabrera Report as independent and neutral when it decidedly was not. The ultimate objective of the RICO Defendants' scheme or artifice to defraud is to coerce Chevron into making a multi-billion dollar payment that will directly benefit the individual and organizational RICO Defendants.

318.   In furtherance of their scheme, and as described herein, the RICO Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in any post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

a.   emails and website postings incorporating false and misleading statements regarding the Cabrera Report;

b.   wirings and/or mailings between and among the RICO Defendants concerning the preparation of the report in the United States that was submitted to the Lago Agrio court by Cabrera;

c.   communications directed toward U.S. state and federal government officials and regulators incorporating false and misleading statements regarding Chevron's liability in the Lago Agrio Litigation;

d.   funds transferred by Kohn and/or Kohn Swift to the RICO Defendants, with the intent that those funds be used to promote the carrying on of the RICO Defendants' criminal activities; and,

e.   electronic filing and service of court papers containing false and misleading statements intended to impede the operation of those courts.

319.   Chevron incorporates by reference the attached Appendix B, which sets forth particular uses of wire and mail communications in furtherance of the RICO Defendants' scheme or artifice to defraud that constitute violations of 18 U.S.C. §§ 1341 and 1443, including which individual defendant caused the communication to be mailed or wired, when the communication was made, and how it furthered the fraudulent scheme.

320.   The RICO Defendants participated in the scheme or artifice knowingly, willfully, and with the specific intent to deceive and/or defraud Chevron into paying the RICO

Defendants and their co-conspirators. The RICO Defendants knowingly and intentionally pre-pared a self-serving analysis of Chevron's alleged liability in Lago Agrio, and then knowingly and with the intent to deceive the Lago Agrio court, Chevron, and the general public, caused that analysis to be filed under the pretense that it was a report prepared by an independent court ex-pert. The RICO Defendants colluded with the Republic of Ecuador to initiate criminal prosecu-tion of Chevron's attorneys on the basis of this report and other statements the RICO Defendants knew to be false or misleading. The RICO Defendants further caused statements regarding this report, these criminal charges and other matters, which statements the RICO Defendants knew to be false or misleading, to be disseminated to the general public, to the media, and to multiple state and federal agencies and federal courts, with the intent that those statements be believed and that they form the basis for further public attacks on Chevron, investigations of Chevron, and reduction in the value of Chevron's corporate assets. The RICO Defendants knowingly engaged in the aforementioned conduct with the intent to generate fear in Chevron such that Chevron would ultimately pay the RICO Defendants to cease their conduct, under the guise of a settle-ment of the Lago Agrio Litigation, through satisfaction of a judgment in the Lago Agrio Litiga-tion, or in a subsequent proceeding to recognize and enforce such a judgment.

321.    The RICO Defendants' false and misleading statements have been relied on by U.S. courts, U.S. state and federal government agencies, Chevron's shareholders, inves-tors, analysts , the media, and by the Lago Agrio court by means of its acceptance of Defendants' and Cabrera's misrepresentations and omissions and its failure to take meaningful corrective ac-tion. Further, RICO Defendants' false and misleading statements have caused Chevron substan-tial damages.

*Pattern of Racketeering Activity: Money Laundering in Violation of 18 U.S.C. § 1956(a)(2)(A)*

322.    Defendants Yanza and Donziger have on multiple occasions, acting in their individual capacities and as agents for Selva Viva and/or the Front have knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States to them-

selves and to Defendants Selva Viva, the Front, and other entities with the intent that those funds be used to promote the carrying on of unlawful activity in violation of 18 U.S.C. §§ 1341, 1343 and 1951, including the secret preparation of the Cabrera Report, payment to Cabrera for his complicity and silence as to the report's authorship, the funding of the RICO Defendants' pressure campaigns against the Lago Agrio court and against Chevron, and collusion with the Republic of Ecuador.

### *Pattern of Racketeering Activity: Obstruction of Justice in Violation of 18 U.S.C. § 1503*

323.    Faced with implacable denials in Ecuador from Cabrera and the RICO Defendants about the authorship of the Cabrera Report, Chevron turned to U.S. courts to pursue discovery directly from the Enterprise through proceedings under 28 U.S.C. § 1782, which authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal."

324.    In a concerted effort to thwart Chevron's attempts to uncover the truth and avoid discovery, the RICO Defendants, and their counsel, have habitually filed or caused to be filed documents, including declarations sworn to under penalty of perjury, that falsely represent that Cabrera was an independent expert and that otherwise misrepresent the RICO Defendants' interactions with Cabrera. By making these deliberate and strategic false representations in various pending federal judicial proceedings, with full awareness of their consequence and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, the RICO Defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. § 1503.

### *Pattern of Racketeering Activity: Witness Tampering in Violation of 18 U.S.C. § 1512*

325.    Pursuant to a March 2, 2010 order issued by the United States District Court for the Northern District of Georgia granting Chevron's Section 1782 application, Chevron noticed the deposition of Defendants' expert, Charles W. Calmbacher, Ph.D.

326.    Fearing that Dr. Calmbacher would expose the truth about the falsified re-
ports filed in his name by the RICO Defendants, Donziger knowingly engaged in intimidation,
threats, misleading conduct, and corrupt persuasion toward Dr. Calmbacher, with the specific
intent to influence, delay, and prevent Dr. Calmbacher's testimony or cause Dr. Calmbacher to
withhold records, objects, documents, and testimony from an official proceeding.

327.    As Dr. Calmbacher testified pursuant to the court-authorized subpoena at
his March 29, 2010 deposition, Donziger contacted Dr. Calmbacher and emphatically attempted
to convince Dr. Calmbacher not to testify at his deposition, warning him that testifying could
pose "real problems" for him and could result in a "potential law case against" him because
"they're going to go after [him] for unprofessional behavior." When asked at his deposition
whether "Donziger [was] trying to convince [him] not to come and testify," Calmbacher testi-
fied: "Very much so. Very much so." Donziger tampered with Dr. Calmbacher's testimony in
violation of 18 U.S.C. § 1512 in furtherance of the Enterprise's scheme.

328.    The RICO Defendants also tampered with the testimony of environmental
consultant Mark Quarles in furtherance of the Enterprise's scheme. In 2007, Ecuador submitted
a declaration by Quarles regarding the "independence" of the Cabrera Report in a proceeding
pending in the Southern District of New York, using that declaration to support the Govern-
ment's contention that the Lago Agrio Litigation "has proceeded in accordance with rules of pro-
cedure under Ecuador law." Quarles has recently admitted in sworn testimony that Donziger
paid him for this affidavit, and that he would not have signed the affidavit if he had known about
the RICO Defendants' involvement with Cabrera. By not disclosing the truth about Donziger's
improper contact with Cabrera and instead deliberately misleading Quarles, Donziger knowingly
engaged in misleading conduct and corrupt persuasion toward Quarles with the intent to influ-
ence his testimony in an official proceeding.

329.    The RICO Defendants and their co-conspirators also tampered with the
potential testimony of numerous Stratus employees in furtherance of the Enterprise's scheme.
After Chevron instituted a Section 1782 application in December 2009 seeking discovery from

Stratus, Beltman, undoubtedly concerned about potentially damaging future testimony from Stratus employees, knowingly engaged in misleading conduct and corrupt persuasion toward numerous Stratus employees, with the specific intent to influence, delay, and prevent those employees' truthful testimony or cause the employees to withhold records, objects, documents, and testimony from an official proceeding. Beltman repeatedly misrepresented to Stratus staff members that Cabrera was independent and had authored his own report. Beltman likewise repeatedly misled Stratus employees and omitted the true facts when he misrepresented that Stratus had played a limited role of technical advisor to the Lago Agrio Plaintiffs. Thus, Beltman tampered with the Stratus employees' potential or expected testimony in violation of 18 U.S.C. § 1512, in furtherance of the Enterprise's scheme.

### *Summary of the Pattern of Racketeering Activity Alleged Against Each RICO Defendant*

330.    Defendant Donziger has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Donziger used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud. Donziger has also engaged in extortion of Chevron and fraudulent conduct through numerous acts, including by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including making false statements to the U.S. House of Representatives), manufacturing false evidence in the form of the Cabrera Report, procuring baseless criminal charges against Chevron's attorneys in Ecuador, colluding with Ecuadorian officials and pressuring the Lago Agrio court to ensure a negative outcome for Chevron in the Lago Agrio Litigation, and threatening and causing threats to be made to Chevron directly and through its shareholders. In addition, Donziger has engaged in obstruction of justice by filing and/or causing to be filed in multiple U.S. courts documents, including declarations sworn under penalty of perjury, falsely representing that Cabrera was an independent expert and otherwise misrepresenting the RICO Defendants' interactions with Cabrera. Donziger has committed wire fraud and engaged in money laundering by knowingly causing funds to be transported, transmitted, or transferred from the United States to Selva Viva, Yanza, the Front, and other parties with the in-

tent that such payments would fund the RICO Defendants' criminal activity. Donziger has also engaged in witness tampering by knowingly engaging in intimidation, threats, misleading conduct, and corrupt persuasion toward Dr. Calmbacher with the specific intent to influence, delay, and prevent Dr. Calmbacher's testimony in the Northern District of Georgia. Donziger also tampered with the testimony of Mark Quarles by paying him for his affidavit and by concealing the RICO Defendants' involvement with Cabrera and the Cabrera Report.

      331.    Defendant the Law Offices of Steven R. Donziger, through the actions of its agent Defendant Donziger, has committed numerous mail and wire fraud violations, including those identified in Appendix B in which the Law Offices of Steven R. Donziger used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud. Through the actions of Donziger, the Law Offices of Steven R. Donziger has also engaged in extortion of Chevron and fraudulent conduct through numerous acts, including by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including making false statements to the U.S. House of Representatives), manufacturing false evidence in the form of the Cabrera Report, procuring baseless criminal charges against Chevron's attorneys in Ecuador, colluding with Ecuadorian officials and pressuring the Lago Agrio court to ensure a negative outcome for Chevron in the Lago Agrio Litigation, and threatening and causing threats to be made to Chevron directly and through its shareholders. In addition, the Law Offices of Steven R. Donziger, through Donziger, has engaged in obstruction of justice by filing and/or causing to be filed in multiple U.S. courts documents, including declarations sworn under penalty of perjury, falsely representing that Cabrera was an independent expert and otherwise misrepresenting the RICO Defendants' interactions with Cabrera. The Law Offices of Steven R. Donziger has also engaged in witness tampering through Donziger's knowing intimidation, threats, misleading conduct, and corrupt persuasion toward Dr. Calmbacher with the specific intent to influence, delay, and prevent Dr. Calmbacher's testimony in the Northern District of Georgia. In addition, the Law Offices of Steven R. Donziger, again through Donziger, also

tampered with the testimony of Mark Quarles by paying him for his affidavit and by concealing the RICO Defendants' involvement with Cabrera and the Cabrera Report.

332.　Defendant Fajardo has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Fajardo used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Fajardo has also engaged in extortion of Chevron and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including in a letter to the U.S. Trade Representative), by manufacturing and causing to be manufactured false evidence, and by applying pressure to Ecuadorian government officials to procure baseless criminal charges against Chevron's attorneys.  In addition, Fajardo has engaged in obstruction of justice by filing or causing to be filed in numerous U.S. courts documents, including a declaration sworn under penalty of perjury, that falsely represent that Cabrera was an independent expert and that otherwise misrepresent the relationship between Cabrera and the RICO Defendants.

333.　Defendant Yanza has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Yanza used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud.  Yanza has committed wire fraud and engaged in money laundering by knowingly causing funds to be transported, transmitted, or transferred from the United States to Selva Viva, the Front, and other parties with the intent that such payments would fund the RICO Defendants' criminal activity.  Yanza has also engaged in extortion of Chevron and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation (including in a letter to the U.S. Trade Representative), by manufacturing and causing to be manufactured false evidence, and by applying pressure to Ecuadorian government officials to procure baseless criminal charges against Chevron's attorneys.  In addition, Yanza has engaged in obstruction of justice by filing or causing to be filed in multiple U.S. courts documents, including declarations sworn to under penalty of perjury, that falsely represent that Cabrera was an

independent expert and that otherwise misrepresent the RICO Defendants' interactions with Cabrera.

334. Defendant the Front, through the actions of its agents Defendants Fajardo and Yanza, among others, has committed numerous mail and wire fraud violations, including those identified in Appendix B in which the Front used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud. In addition, the Front has engaged in numerous acts of extortion of Chevron and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation through a website the Front maintains as well as numerous press releases and by manufacturing and causing to be manufactured false evidence.

335. Defendant Selva Viva, through the actions of its agents Defendants Yanza and Donziger, has committed several wire fraud violations and multiple acts of money laundering by causing funds to be transferred by Kohn and/or Kohn Swift from the United States to Ecuador, acting as a conduit of those funds, and then distributing those funds to finance the RICO Defendants' illegal scheme. Selva Viva has also engaged in numerous acts of extortion of Chevron and fraudulent conduct by manufacturing and causing to be manufactured false evidence.

336. Defendant Stratus, through the actions of its agents Defendants Beltman, Maest, and other individuals, has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Stratus used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud. Stratus also has engaged in extortion of Chevron and fraudulent conduct by manufacturing false evidence, in the form of the Cabrera Report and its annexes, used extensively by the RICO Defendants in the Lago Agrio Litigation and more generally in furtherance of their illegal scheme. In addition, Stratus has engaged in extortion and fraudulent conduct by disseminating false statements about Chevron through its authorship of the Cabrera Report and through its later "evaluation" of that report. Stratus also has engaged in extortion and fraudulent conduct by participating in a campaign of public attacks based on false and misleading statements about Chevron and the Lago Agrio Litigation. Finally, Stra-

tus has engaged in obstruction of justice by misrepresenting to the United States District Court for the District of Colorado that Cabrera was an independent expert, that it was "astonished" to see "similarities" between its own work product and the Cabrera Report when Stratus actually drafted the majority of the Cabrera Report, and otherwise misrepresenting the relationship between Cabrera and the RICO Defendants.

337.  Defendant Beltman has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Beltman used or caused to be used the mail or wires in furtherance of the RICO Defendants' scheme to defraud. Beltman also has engaged in extortion of Chevron and fraudulent conduct by manufacturing false evidence, in the form of the Cabrera Report and its annexes, used extensively by the RICO Defendants in the Lago Agrio Litigation and more generally in furtherance of their illegal scheme. In addition, Beltman has engaged in extortion and fraudulent conduct by disseminating false statements about Chevron through his role in drafting both the Cabrera Report and his later "evaluation" of that report. Beltman also has engaged in extortion of Chevron and fraudulent conduct by disseminating and causing to be disseminated false statements to the public and to a member of Congress regarding Chevron, the Lago Agrio Litigation, and Cabrera's independence. Beltman also engaged in obstruction of justice by causing misrepresentations to be made to the United States District Court for the District of Colorado that Cabrera was an independent expert, that Stratus was "astonished" to see "similarities" between its own work product and the Cabrera Report when it actually drafted the majority of the Cabrera Report, and otherwise misrepresenting the relationship between Cabrera and the RICO Defendants. Finally, Beltman has engaged in witness tampering by repeatedly and intentionally misleading numerous Stratus employees regarding Cabrera's independence, and omitting facts about Stratus's true role in drafting the Cabrera Report, with the intent that the employees would then fail to testify truthfully if called to testify as to these subjects.

338.  Defendant Maest has committed numerous mail and wire fraud violations, including those identified in Appendix B in which Maest used or caused to be used the mail or

wires in furtherance of the RICO Defendants' scheme to defraud. Maest also has engaged in extortion of Chevron and fraudulent conduct by manufacturing false evidence, in the form of the Cabrera Report and its annexes, used extensively by the RICO Defendants in the Lago Agrio Litigation and more generally in furtherance of their illegal scheme. In addition, Maest has engaged in extortion and fraudulent conduct by disseminating false statements about Chevron through her role in drafting both the Cabrera Report and Cabrera's later "evaluation" of that report. Maest also has engaged in extortion of Chevron and fraudulent conduct by disseminating and causing to be disseminated false statements to the public regarding Chevron, the Lago Agrio Litigation, and Cabrera's independence. Finally, Maest has engaged in obstruction of justice by causing misrepresentations to be made to the United States District Court for the District of Colorado that Cabrera was an independent expert, that Stratus was "astonished" to see "similarities" between its own work product and the Cabrera Report when it actually drafted the majority of the Cabrera Report, and otherwise misrepresenting the relationship between Cabrera and the RICO Defendants.

339.    Each of the RICO Defendants has engaged in multiple predicate acts, as described in paragraphs 330 to 338, *supra*. The conduct of each of the RICO Defendants described in paragraphs 309 to 338, *supra*, constitutes a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

340.    Chevron was injured in its business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c). The injuries to Chevron caused by reason of the violations of 18 U.S.C. § 1962(c) include but are not limited to damage to Chevron's reputation and goodwill; the impairment of Chevron's interest in executed contracts, including the 1995 Settlement Agreement and 1998 Final Release; and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Ecuador and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud in the Section 1782 proceedings.

341.    Further, these injuries to Chevron were a direct, proximate, and reasonably fore-seeable result of the violation of 18 U.S.C. § 1962.  Chevron is the ultimate victim of the RICO Defendants' unlawful Enterprise.  Chevron has been and will continue to be injured in its business and property in an amount to be determined at trial.

342.    Pursuant to 18 U.S.C. § 1964(c), Chevron is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

343.    Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### SECOND CLAIM FOR RELIEF
**(Conspiracy to Violate RICO, Violation of 18 U.S.C. § 1962(d))**
**(Against All RICO Defendants)**

344.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

345.    The RICO Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

346.    Upon information and belief, the RICO Defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to

allow the commission of this pattern of racketeering activity. This conduct constitutes a conspiracy to violate 18 U.S.C. § 1962(c), in violation of 18 U.S.C. § 1962(d).

347. Upon information and belief, the RICO Defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

348. Each RICO Defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from Chevron. It was part of the conspiracy that the RICO Defendants and their co-conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in paragraphs 309 to 338, *supra*.

349. As a direct and proximate result of the RICO Defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Chevron has been injured in its business and property, including damage to Chevron's reputation and goodwill; the impairment of Chevron's interest in executed contracts, including the 1995 Settlement Agreement and 1998 Final Release; and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Ecuador and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the RICO Defendants' pervasive fraud in the Section 1782 proceedings.

350. Pursuant to 18 U.S.C. § 1964(c), Chevron is entitled to recover treble damages plus costs and attorneys' fees from the RICO Defendants.

351. Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or

Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### THIRD CLAIM FOR RELIEF
### (Fraud)
### (Against All Defendants)

352.     Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

353.     Defendants and their agents have knowingly misrepresented, omitted, and/or concealed material facts in their pleadings and representations before U.S. courts and before the Lago Agrio court, in their communications to federal and state government agencies and officials, and in their communications to Chevron's shareholders, investors, analysts, and the media. Each and every Defendant has personally engaged in this conduct, or knew or should have known that other Defendants were engaged in it on his or her behalf.  These false representations are detailed throughout this Complaint and include the falsified Calmbacher reports, the true authorship of the Cabrera Report, the denial of any improper contact with Cabrera, the supposed independence and neutrality of Cabrera and his liability and damages assessment, the submission of new "expert" reports based on the fraudulent Cabrera Report, and the fraudulent endorsements of the Cabrera Report.

354.     Defendants made these false representations while knowing that their misrepresentations were materially false and/or that their omissions were material.

355.     Defendants further made these misrepresentations and/or omissions with the intent of obtaining favorable rulings from the U.S. and Lago Agrio courts, pressuring U.S. state and federal agencies to pursue investigations of Chevron, and propagating false information about Chevron to shareholders, investors, analysts, and the media.

356.     These material misrepresentations and/or omissions have been reasonably and justifiably relied upon by Chevron, the U.S. courts, state and federal government agencies and officials, and Chevron's shareholders, investors, analysts, and the media, and by the Lago Agrio court by means of its acceptance of Defendants' and Cabrera's misrepresentations and omissions and its failure to take meaningful corrective action.

357.     As a direct, proximate, and foreseeable result of Defendants' fraud, Chevron has been harmed, including significant pecuniary, reputational, and other damages.  These injuries include significant damage to Chevron's reputation and goodwill, and the attorneys' fees and costs to defend itself in objectively baseless, improperly motivated sham litigation in Ecuador and in related litigation in the U.S., including the attorneys' fees and costs associated with exposing the Defendants' pervasive fraud in the Section 1782 proceedings.

358.     Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

359.     Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—from any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## FOURTH CLAIM FOR RELIEF
### (Tortious Interference With Contract)
### (Against All Defendants)

360.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

361.    Defendants are and have been aware of valid and enforceable contracts between TexPet and the Republic of Ecuador, including the 1995 Settlement Agreement and the 1998 Final Release. These contracts, in exchange for TexPet's remedial actions, released TexPet, Texaco, and their employees, successors, principals and subsidiaries from liability relating to environmental damage in Ecuador.

362.    Defendants have intentionally caused and continued to cause the Republic of Ecuador to repeatedly breach the 1995 Settlement and the 1998 Final Release. Defendants have, through improper influence and the fabricated Cabrera Report, persuaded the Republic of Ecuador to refuse to defend Chevron's rights and those of its subsidiaries under the contracts, to improperly dictate to the judiciary that Chevron be held liable in the Lago Agrio Litigation, and to bring criminal charges against Chevron's employees.

363.    Any judgment from the Lago Agrio court that finds Chevron liable and awards damages will also constitute a severe breach of the 1995 Settlement and the 1998 Final Release. Defendants have intentionally caused the Republic of Ecuador to take actions necessary to secure this fraudulent judgment.

364.    As a direct, proximate, and foreseeable result of Ecuador's breaches of the 1995 Settlement and the 1998 Final Release, Chevron has been forced to defend itself against claims for which TexPet had already secured a release, which has caused significant pecuniary, reputational, and other damages. These injuries include significant attorneys' fees and costs to defend itself against previously-released claims in Ecuador and in related litigation to attempt to enforce these contracts in international arbitration. The imminent and forthcoming breaches of the 1995 Settlement and the 1998 Final Release, which will likely occur when the Lago Agrio court issues

its judgment, will impose further direct, proximate and foreseeable costs upon Chevron, including significant damage to Chevron's reputation and Chevron's attorneys' fees and costs to defend itself and its subsidiaries in recognition and enforcement efforts around the world.

365.     Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

366.     Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## FIFTH CLAIM FOR RELIEF
### (Trespass to Chattels)
### (Against All Defendants)

367.     Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

368.     As set forth above, the RICO Defendants have engaged in a pattern of extortion, collusion, wrongdoing, and deceit with an intent to interfere with Chevron's property, and the Lago Agrio Plaintiffs have benefited and will continue to benefit from the RICO Defendants' criminal scheme through a fraudulent judgment. Through these actions, and by prosecuting a fraudulent lawsuit, manufacturing false evidence, tampering with testimony, disseminating misleading statements to courts, the public, and U.S. government officials, and otherwise engaging

in the pressure campaign described in the foregoing paragraphs of this Complaint, Defendants have intentionally, and without justification or consent, interfered and intermeddled with Chevron's use and enjoyment of its funds that were intended for Chevron's business purposes and of its business reputation and goodwill.

369.    Chevron has been harmed and the use of its property has been interfered with and disturbed when its property, resources, and funds were necessarily redirected from their intended uses to defend against Defendants' fraudulent litigation and misleading media campaign. For example, Chevron has been forced by the RICO Defendants' intentional and wrongful conduct to expend funds and resources defending against fraudulent submissions in the Lago Agrio Litigation, pursuing relief in the Treaty Arbitration, uncovering the RICO Defendants' fraud through discovery in the United States (discovery with which the RICO Defendants have continually interfered and which they have unduly extended, as described herein), responding to false and misleading reports in major media publications and broadcasts which have been induced by the RICO Defendants, and maintaining an ongoing effort to provide accurate information about the Cabrera Report and other aspects of the RICO Defendants' fraud to the media and directly to the public.

370.    Chevron also has been harmed in that Defendants' conduct has damaged Chevron's reputation, thus interfering with Chevron's interest in the public goodwill toward it. Public awareness of and positive associations with the Chevron and Texaco brand names, and Chevron's other brand assets are among Chevron's most valuable assets, and Chevron has invested substantial resources into those brand names. The RICO Defendants' have intentionally sought to reduce the value of those assets as part of their extortionate scheme. As Donziger has expressly stated, a key element of the RICO Defendants' strategy is to impose upon Chevron, "the cost of their sullied reputation, you know, in the media."

371.    The harms suffered by Chevron are the direct, proximate, and reasonably foreseeable results of the Defendants' acts of intentional interference with Chevron's funds and goodwill.

372.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

373.    Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

## SIXTH CLAIM FOR RELIEF
### (Unjust Enrichment)
### (Against All Defendants)

374.    Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

375.    Defendants seek to obtain up to $113 billion from Chevron through a fraudulent judgment in the Lago Agrio Litigation. Defendants have been and will continue to be unjustly enriched by benefits obtained due to the expectation of an imminent judgment and the forthcoming judgment itself.

376.    Any property that Defendants obtain from Chevron will be acquired as a result of Defendants' tortious, illegal, and fraudulent conduct, as set forth herein, including the prosecution of the Lago Agrio Litigation itself.

377.    Principles of equity and good conscience mandate that this Court prevent Defendants from reaping a multi-billion dollar windfall and any benefits arising out of the fraudulent

litigation by, among other things, issuing a preliminary and permanent injunction against Defen-

dants that enjoins Defendants, their assignees, and anyone else acting in concert with them—

including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers

such as Burford Group and its related entities and Russell DeLeon—from commencing, prose-

cuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any

Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the

United States or abroad, including any attempt to attach or seize any Chevron or Chevron sub-

sidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines

the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### SEVENTH CLAIM FOR RELIEF
#### (Civil Conspiracy)
#### (Against All Defendants)

378.    Chevron realleges and incorporates herein by reference each and every foregoing

paragraph of this Complaint as if set forth in full.

379.    As set forth above, Defendants have committed torts against Chevron, including

acts of racketeering giving rise to violations of RICO, fraud, tortious interference with contract,

trespass to chattels, and unjust enrichment.

380.    Defendants agreed to participate in a common scheme against Chevron. Defen-

dants intentionally participated in the furtherance of a plan or purpose to obtain property from

Chevron. In furtherance of this plan or purpose, Defendants committed overt and unlawful acts,

including acts of racketeering as alleged herein.

381.    As a direct and proximate result of Defendants' conspiracy, the overt acts com-

mitted in furtherance of that conspiracy, and the torts committed against Chevron, Chevron has

been damaged in its business and property, and further damage to Chevron's business and prop-

erty is threatened and imminent.

382.     Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, Chevron is entitled to, and should be awarded, punitive damages against each of the Defendants.

383.     Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction that enjoins Defendants, their assignees, and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### EIGHTH CLAIM FOR RELIEF
#### (Violations of New York Judiciary Law § 487)
#### (Against Defendants Donziger and the Law Offices of Steven R. Donziger)

384.     Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

385.     New York Judiciary Law § 487 provides, in pertinent part, as follows: "An attorney or counselor who . . . [i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party . . . [i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

386.     As set forth above, Donziger and the Law Offices of Steven R. Donziger engaged in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive

both Chevron and multiple federal courts, including the United States District Court for the Southern District of New York and the United States Court of Appeals for the Second Circuit.

387. Donziger and the Law Offices of Steven R. Donziger actively participated in the preparation and filing of multiple court submissions to the United States District Court for the Southern District on New York, which included false and misleading statements about the Lago Agrio Litigation and the Cabrera Report. Defendants Donziger and the Law Offices of Steven R. Donziger knowingly caused these misstatements to be filed with the intent of deceiving this Court and Chevron. As described in paragraphs 277 to 282, *supra*, these misstatements were filed in opposition to Chevron's requests for discovery under 28 U.S.C. § 1782 and in support of the Lago Agrio Plaintiffs' and the Republic of Ecuador's actions against Chevron seeking to terminate arbitration proceedings.

388. Donziger and the Law Offices of Steven R. Donziger tampered with the testimony of environmental consultant Mark Quarles in furtherance of the enterprise's scheme. In 2007, Ecuador submitted a declaration by Quarles regarding the "independence" of the Cabrera Report in a proceeding pending in the Southern District of New York, using that declaration to support Ecuador's contention that the Lago Agrio Litigation "has proceeded in accordance with rules of procedure under Ecuador law." Quarles has recently admitted in sworn testimony that Donziger paid him for this affidavit, and that he would not have signed the affidavit if Donziger had told him the truth about the RICO Defendants' involvement with Cabrera. By not disclosing the truth about the RICO Defendants' improper contact with Cabrera and instead deliberately misleading Quarles, Donziger knowingly engaged in deceit with the intent to deceive Quarles, the court, and Chevron.

389. As a result of the deceitful and fraudulent conduct of Donziger and the Law Offices of Steven R. Donziger as described herein, Chevron has been injured in an amount to be established at trial.

390.   By reason of the foregoing, Chevron is entitled to monetary damages against Donziger and the Law Offices of Steven R. Donziger, treble damages, and reasonable attorneys' fees pursuant to Judiciary Law § 487.

WHEREFORE, Chevron prays for judgment as set forth below.

### NINTH CLAIM FOR RELIEF
**(Request for Declaratory Judgment That the Judgment by the Lago Agrio Court Against Chevron is Unenforceable and Non-Recognizable)**
**(Against All Defendants)**

391.   Chevron realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

392.   Chevron is entitled to a declaratory judgment that the imminent judgment from the Lago Agrio court is unenforceable and non-recognizable pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a).

393.   A declaratory judgment will not improperly increase friction between sovereign legal systems or encroach on the proper domain of a foreign court because no court has a right to impose fraudulent judgments such as the imminent judgment of the Lago Agrio court.

394.   By this claim, Chevron seeks a declaratory judgment that any Lago Agrio judgment is unenforceable and non-recognizable, including but not limited to under the United States Constitution, federal common law, New York common law principles of comity, and/or New York's Recognition of Foreign Country Money Judgments Act (New York Civil Practice Law and Rules § 5301, *et seq.*, the "New York Act"), on, among others, grounds of fraud, failure to afford procedures compatible with due process, lack of impartial tribunals, and contravention of public policy.

395.   By reason of the fraudulent acts and fundamentally unfair proceedings described in this Complaint that have given rise to the imminent Lago Agrio judgment, an actual and justiciable controversy has arisen and now exists between Chevron and the Lago Agrio Plaintiffs as to whether the judgment is unenforceable and non-recognizable in the United States and establishing that Chevron's assets are safe from the RICO Defendants' fraudulent actions and racket-

eering activity. The actions of the RICO Defendants on behalf of the Lago Agrio Plaintiffs whom they purport to represent have damaged and are threatening to continue damaging Chevron. Unless the controversy between the parties is resolved, the Lago Agrio Plaintiffs will continue to harm Chevron and will seek recognition and enforcement of the fraudulent judgment that the RICO Defendants will have obtained on the Lago Agrio Plaintiffs' behalf.

396. Chevron has no adequate remedy at law. A declaratory action is necessary and useful in resolving and disposing of the question of whether the fraudulent Lago Agrio judgment is enforceable and recognizable, and is the best and most effective remedy for finalizing the controversy between the parties as to this issue and for relieving Chevron from the expensive and damaging uncertainty surrounding the pending enforcement and recognition of the fraudulent judgment. Chevron is entitled to have the question of whether any Lago Agrio judgment is enforceable and recognizable settled promptly so that it may continue conducting its business without the threat of a massive fraudulent judgment.

397. Chevron is further entitled to, and should be awarded, a preliminary and permanent injunction against Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action.

WHEREFORE, Chevron prays for judgment as set forth below.

### PRAYER FOR RELIEF

**On the First and Second Claims for Relief:**

1.    For general damages according to proof at trial, trebled according to statute, 18 U.S.C. § 1964(c);

2.    For prejudgment interest according to statute; and

3.    For Chevron's reasonable attorneys' fees and costs according to statute, 18 U.S.C. § 1964(c).

**On the First through Seventh Claims for Relief:**

4.    For general damages according to proof at trial;

5.    For equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction that bars Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action; and

6.    Only for the third, fourth, fifth, and seventh claims for relief, punitive damages in an amount to be proven at trial.

**On the Eighth Claim for Relief:**

7.    For general damages according to proof at trial, trebled according to statute, Judiciary Law § 487; and

8.    For Chevron's reasonable attorneys' fees and costs according to statute, Judiciary Law § 487.

**On the Ninth Claim for Relief:**

9.    For a declaration that any judgment against Chevron in the Lago Agrio Litigation is non-recognizable and unenforceable for each and every one of the reasons set forth herein; and

10.    For equitable relief as appropriate pursuant to applicable law, including but not limited to issuing a temporary restraining order, a preliminary injunction and a permanent injunction that bars Defendants, their assignees and anyone else acting in concert with them—including the law firms of Emery Celli, Motley Rice and Patton Boggs, and financial backers such as Burford Group and its related entities and Russell DeLeon—from commencing, prosecuting, or advancing in any way—directly or indirectly—any attempt to recognize or enforce any Lago Agrio judgment in any court, tribunal, or administrative agency in any jurisdiction, in the United States or abroad, including any attempt to attach or seize any Chevron or Chevron subsidiary's or co-venturer's assets, whether pre-judgment or otherwise, until this Court determines the merits and enters judgment on Chevron's claims against the Defendants in this action, or until such time as this Court deems appropriate.

**As to All Causes of Action:**

11.    For such other legal and equitable relief as the Court may deem Chevron entitled to receive.

DATED: February 1, 2011

GIBSON, DUNN & CRUTCHER LLP

By: _____
                Randy M. Mastro

200 Park Avenue
New York, New York  10166-0193
Telephone:  212.351.4000

Scott A. Edelman
2029 Century Park East
Los Angeles, California  90067
Telephone:  310.552.8500

Andrea E. Neuman
3161 Michelson Drive
Irvine, California  92612
Telephone:  949.451.3800

William E. Thomson
333 South Grand Avenue
Los Angeles, California  90071
Telephone:  213.229.7000

*Attorneys for Plaintiff Chevron Corporation*

## **DEMAND FOR JURY TRIAL**

Plaintiff Chevron Corporation hereby demands a jury trial of all issues in this action triable as of right by a jury.

DATED: February 1, 2011

GIBSON, DUNN & CRUTCHER LLP

By: _____
                Randy M. Mastro

200 Park Avenue
New York, New York 10166-0193
Telephone: 212.351.4000

Scott A. Edelman
2029 Century Park East
Los Angeles, California 90067
Telephone: 310.552.8500

Andrea E. Neuman
3161 Michelson Drive
Irvine, California 92612
Telephone: 949.451.3800

William E. Thomson
333 South Grand Avenue
Los Angeles, California 90071
Telephone: 213.229.7000

*Attorneys for Plaintiff Chevron Corporation*

*KAPLAN, J.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CHEVRON CORPORATION,

                Plaintiff,

      v.

STEVEN DONZIGER, THE LAW OFFICES OF
STEVEN R. DONZIGER, PABLO FAJARDO
MENDOZA, LUIS YANZA, FRENTE DE
DEFENSA DE LA AMAZONIA A/K/A AMAZON
DEFENSE FRONT, SELVA VIVA SELVIVA
CIA, LTDA., STRATUS CONSULTING, INC.,
DOUGLAS BELTMAN, ANN MAEST, MARIA
AGUINDA SALAZAR, CARLOS GREFA
HUATATOCA, CATALINA ANTONIA
AGUINDA SALAZAR, LIDIA ALEXANDRA
AGUINDA AGUINDA, PATRICIO ALBERTO
CHIMBO YUMBO, CLIDE RAMIRO AGUINDA
AGUINDA, LUIS ARMANDO CHIMBO
YUMBO, BEATRIZ MERCEDES GREFA
TANGUILA, LUCIO ENRIQUE GREFA
TANGUILA, PATRICIO WILSON AGUINDA
AGUINDA, CELIA IRENE VIVEROS
CUSANGUA, FRANCISCO MATIAS
ALVARADO YUMBO, FRANCISCO
ALVARADO YUMBO, OLGA GLORIA GREFA
CERDA, LORENZO JOSÉ ALVARADO
YUMBO, NARCISA AIDA TANGUILA
NARVÁEZ, BERTHA ANTONIA YUMBO
TANGUILA, GLORIA LUCRECIA TANGUILA
GREFA, FRANCISCO VICTOR TANGUILLA
GREFA, ROSA TERESA CHIMBO TANGUILA,
JOSÉ GABRIEL REVELO LLORE, MARÍA
CLELIA REASCOS REVELO, MARÍA
MAGDALENA RODRÍGUEZ BARCENES,
HUGO GERARDO CAMACHO NARANJO, JOSÉ
MIGUEL IPIALES CHICAIZA, HELEODORO
PATARON GUARACA, LUISA DELIA
TANGUILA NARVÁEZ, LOURDES BEATRIZ
CHIMBO TANGUILA, MARÍA HORTENCIA
VIVEROS CUSANGUA, SEGUNDO ÁNGEL

Case No. 11-CV-0691

**[PROPOSED] ORDER TO
SHOW CAUSE WHY A
TEMPORARY RESTRAINING
ORDER AND PRELIMINARY
INJUNCTION SHOULD NOT
BE ENTERED**





AMANTA MILÁN, OCTAVIO ISMAEL     :
CÓRDOVA HUANCA, ELIAS ROBERTO     :
PIYAHUAJE PAYAHUAJE, JAVIER PIAGUAJE     :
PAYAGUAJE, DANIEL CARLOS LUSITANDE     :
YAIGUAJE, BENANCIO FREDY CHIMBO     :
GREFA, GUILLERMO VICENTE PAYAGUAJE     :
LUSITANTE, DELFÍN LEONIDAS PAYAGUAJE   :
PAYAGUAJE, ALFREDO DONALDO     :
PAYAGUAJE PAYAGUAJE, TEODORO     :
GONZALO PIAGUAJE PAYAGUAJE, MIGUEL   :
MARIO PAYAGUAJE PAYAGUAJE, FERMIN     :
PIAGUAJE PAYAGUAJE, REINALDO     :
LUSITANDE YAIGUAJE, LUIS AGUSTÍN     :
PAYAGUAJE PIAGUAJE, EMILIO MARTÍN     :
LUSITANDE YAIGUAJE, SIMON LUSITANDE   :
YAIGUAJE, ARMANDO WILFRIDO PIAGUAJE  :
PAYAGUAJE, and ÁNGEL JUSTINO     :
PIAGUAGE LUCITANTE,     :
    :
    Defendants.     :
    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

    Upon sufficient cause appearing from Chevron Corporation's Complaint in this matter,

dated February 1, 2011; the Declaration of Kristen L. Hendricks and supporting exhibits, dated

February 3, 2011; the Declaration of Vladimiro Álvarez Grau and supporting exhibits, dated

February 1, 2011; and the Memorandum of Law in Support of Chevron's Application by Order

to Show Cause for a Temporary Restraining Order and Preliminary Injunction, dated February 3,

2011, it is hereby

    ORDERED that defendants Steven Donziger, the Law Offices of Steven R. Donziger,

Pablo Fajardo Mendoza, Luis Yanza, Frente de Defensa de la Amazonia a/k/a Amazon Defense

Front, Selva Viva Selviva CIA, Ltda., Stratus Consulting, Inc., Douglas Beltman, Ann Maest,

Maria Aguinda Salazar, Carlos Grefa Huatatoca, Catalina Antonia Aguinda Salazar, Lidia

Alexandra Aguinda Aguinda, Patricio Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda,

Luis Armando Chimbo Yumbo, Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa

Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Francisco Matias

Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo José Alvarado

Yumbo, Narcisa Aida Tanguila Narváez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia

Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, José Gabriel

Revelo Llore, María Clelia Reascos Revelo, María Magdalena Rodríguez Barcenes, Hugo

Gerardo Camacho Naranjo, José Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa

Delia Tanguila Narváez, Lourdes Beatriz Chimbo Tanguila, María Hortencia Viveros Cusangua,

Segundo Ángel Amanta Milán, Octavio Ismael Córdova Huanca, Elias Roberto Piyahuaje

Payahuaje, Javier Piaguaje Payaguaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy

Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfín Leonidas Payaguaje Payaguaje,

Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario

Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustín

Payaguaje Piaguaje, Emilio Martín Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando

Wilfrido Piaguaje Payaguaje, and Ángel Justino Piaguage Lucitante (collectively, "Defendants"),

and their officers, agents, servants, employees and attorneys, and all persons in active concert or

participation with them, show cause before this Court, at Room 12D, United States Courthouse,

500 Pearl Street, in the City, County and State of New York, on February 8, 2011, at 2:00 p.m.

EST, why an order should not be issued, pursuant to Rule 65(b) of the Federal Rules of Civil

Procedure, temporarily enjoining and restraining, until after the Court has had an opportunity to

~~hold a hearing and~~ rule on Chevron's application for a preliminary injunction, and then

preliminarily enjoining, Defendants and any persons acting in concert with them from funding,

commencing, prosecuting, advancing in any way, or receiving benefit from, directly or

3

indirectly, any action or proceeding for recognition or enforcement of any judgment entered

against Chevron in *Maria Aguinda y Otros v. Chevron Corporation*, No. 002-2003 ("Lago Agrio

Litigation") currently pending in the Provincial Court of Justice of Sucumbíos in Ecuador, or for

prejudgment seizure or attachment of assets based on any such judgment; and it is further

ORDERED that Chevron is granted permission to file an oversized brief of up to 70

pages in support of its Application by Order to Show Cause for a Temporary Restraining Order

*and Defendants may file one or more briefs collectively*

and Preliminary Injunction; and it is further *totaling up to 70 pages*

ORDERED that service of a copy of this Order to Show Cause and all of the papers

submitted in support thereof, and of the Summons and Complaint, by hand, facsimile, email or

overnight mail upon the Defendants or their counsel, including all foreign Defendants named in

the Complaint in this matter, or their counsel, on or before 1 :00 p.m. EST on February 4,

2011, shall be deemed good and sufficient service thereof; and it is further

ORDERED that, pursuant to Federal Rule of Civil Procedure 4(f), for purposes of

effecting service on defendants Luis Yanza ("Yanza") and Pablo Fajardo ("Fajardo") as called

for by this Order, it shall be deemed good and sufficient service on Yanza and Fajardo to serve

this Order, the papers submitted in support thereof, and the Summons and Complaint by e-mail;

and it is further

ORDERED that, pursuant to Federal Rule of Civil Procedure 4(f), for purposes of

effecting service on the 47 individual defendants also known as the "Lago Agrio Plaintiffs"[1], as

---

[1]  The 47 Lago Agrio Plaintiff defendants are:  Maria Aguinda Salazar, Carlos Grefa
Huatatoca, Catalina Antonia Aguinda Salazar, Lidia Alexandra Aguinda Aguinda, Patricio
Alberto Chimbo Yumbo, Clide Ramiro Aguinda Aguinda, Luis Armando Chimbo Yumbo,

[Footnote continued on next page]

4

called for by this Order, it shall be deemed good and sufficient service on the 47 Lago Agrio

Plaintiff defendants to serve this Order, the papers submitted in support thereof, and the

Summons and Complaint, by email on Defendant Pablo Fajardo, who it has been represented to

this Court possesses a power of attorney on behalf of those 47 individuals[2]; and it is further

ORDERED that, pursuant to Federal Rule of Civil Procedure 4(f), for purposes of

effecting service on defendants Frente de Defensa de la Amazonia a/k/a Amazon Defense Front

("FDA") and Selva Viva Selviva Cia, Ltda. ("Selva Viva"), as called for by this Order, it shall be

deemed good and sufficient service on FDA and Selva Viva to serve this Order, the papers

submitted in support thereof, and the Summons and Complaint by e-mail and/or mail; and it is

further

---

[Footnote continued from previous page]

Beatriz Mercedes Grefa Tanguila, Lucio Enrique Grefa Tanguila, Patricio Wilson Aguinda Aguinda, Celia Irene Viveros Cusangua, Francisco Matias Alvarado Yumbo, Francisco Alvarado Yumbo, Olga Gloria Grefa Cerda, Lorenzo José Alvarado Yumbo, Narcisa Aida Tanguila Narváez, Bertha Antonia Yumbo Tanguila, Gloria Lucrecia Tanguila Grefa, Francisco Victor Tanguilla Grefa, Rosa Teresa Chimbo Tanguila, José Gabriel Revelo Llore, María Clelia Reascos Revelo, María Magdalena Rodríguez Barcenes, Hugo Gerardo Camacho Naranjo, José Miguel Ipiales Chicaiza, Heleodoro Pataron Guaraca, Luisa Delia Tanguila Narváez, Lourdes Beatriz Chimbo Tanguila, María Hortencia Viveros Cusangua, Segundo Ángel Amanta Milán, Octavio Ismael Córdova Huanca, Elias Roberto Piyahuaje Payahuaje, Javier Piaguaje Payaguaje, Daniel Carlos Lusitande Yaiguaje, Benancio Fredy Chimbo Grefa, Guillermo Vicente Payaguaje Lusitante, Delfin Leonidas Payaguaje Payaguaje, Alfredo Donaldo Payaguaje Payaguaje, Teodoro Gonzalo Piaguaje Payaguaje, Miguel Mario Payaguaje Payaguaje, Fermin Piaguaje Payaguaje, Reinaldo Lusitande Yaiguaje, Luis Agustín Payaguaje Piaguaje, Emilio Martín Lusitande Yaiguaje, Simon Lusitande Yaiguaje, Armando Wilfrido Piaguaje Payaguaje, and Ángel Justino Piaguage Lucitante.

[2] *See In re Application of Chevron*, No. 10 MC 00002, Dkt. 165-1, 165-2 (LAK)

ORDERED that papers in opposition to Chevron's motion for a preliminary injunction, if

any, shall be served by hand, facsimile, email, or overnight mail upon Chevron's counsel ~~on or~~ by such

time as the Court may fix by subsequent order

~~before ___:00 ___.m. EST on February ___, 2011~~; and it is further

ORDERED that reply papers in further support of Chevron's motion for a preliminary

injunction, if any, shall be served by hand, facsimile, email, or overnight mail upon the

by such time as the Court may fix by subsequent order

Defendants or their counsel ~~on or before ___:00 ___.m. EST on February ___, 2011~~; and it is further

ORDERED that the Defendants and their officers, agents, servants, employees and

attorneys, and all persons in active concert or participation with them, show cause before this

Court, at Room 12D, United States Courthouse, 500 Pearl Street, in the City, County and State of

by such time as the Court may fix by subsequent order

New York, ~~on February ___, 2011, at ___:00 ___.m. EST~~, why an order should not be issued,

pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, preliminarily enjoining

Defendants and any persons acting in concert with them from funding, commencing,

prosecuting, advancing in any way, or receiving benefit from, directly or indirectly, any action or

proceeding for recognition or enforcement of any judgment entered against Chevron in *Maria*

*Aguinda y Otros v. Chevron Corporation*, No. 002-2003 ("Lago Agrio Litigation") currently

pending in the Provincial Court of Justice of Sucumbíos in Ecuador, or for prejudgment seizure

or attachment of assets based on any such judgment.

Dated: February 3, 2011
New York, New York

SO ORDERED

_____
U.S.D.J.

6