# 11-1150-cv(L)

## 11-1264-cv(CON)

IN THE

## United States Court of Appeals

FOR THE SECOND CIRCUIT



CHEVRON CORPORATION,

*Plaintiff-Appellee,*

*v.*

HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE,
STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Appellants,*

*(Additional Caption On the Reverse)*

On Appeal from the United States District Court
for the Southern District of New York

## SUPPLEMENTAL EXCERPTS OF RECORD

Andrea E. Neuman
GIBSON, DUNN & CRUTCHER LLP
3161 Michelson Drive
Irvine, CA 92612
949-451-3800

Randy M. Mastro
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166
212-351-4000

William E. Thomson
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
213-229-7000

Scott A. Edelman
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East
Los Angeles, CA 90067
310-552-8500

*Attorneys for Plaintiff-Appellee*
*Chevron Corporation*

PABLO FAJARDO MENDOZA, LUIS YANZA, FRENTE DE DEFENSA DE LA AMAZONIA, aka AMAZON DEFENSE FRONT, SELVA VIVA SELVIVA CIA, LTDA, STRATUS CONSULTING, INC., DOUGLAS BELTMAN, ANN MAEST, MARIA VICTORIA AGUINDA SALAZAR, CARLOS GREGA HUATATOCA, CATALINA ANTONIA AGUINDA SALAZAR, LIDIA ALEXANDRA AGUINDA AGUINDA, PATRICIO ALBERTO CHIMBO YUMBO, CLIDE RAMIRO AGUINDA AGUINDA, BEATRIZ MERCEDES GREFA TANGUILA, PATRICIO WILSON AGUINDA AGUINDA, CELIA IRENE VIVEROS CUSANGUA, FRANCISCO MATIAS ALVARADO YUMBO, FRANCISCO ALVARADO YUMBO, OLGA GLORIA GREFA CERDA, LORENZO JOSÉ ALVARADO YUMBO, NARCISA AIDA TANGUILA NARVAEZ, BERTHA ANTONIA YUMBO TANGUILA, GLORIA LUCRECIA TANGUI GREFA, FRANCISCO VICTOR TANGUILA GREFA, ROSA TERESA CHIMBO TANGUILA, JOSÉ GABRIEL REVELO LLORE, MARÍA CLELIA REASCOS REVELO, MARÍA MAGDALENA RODRIGUEZ, JOSÉ MIGUEL IPIALES CHICAIZA, HELEODORO PATARON GUARACA, LUISA DELIA TANGUILA NARVÁEZ, LOURDES BEATRIZ CHIMBO TANGUILA, MARÍA HORTENCIA VIVEROS CUSANGUA, SEGUNDO ÁNGEL AMANTA MILÁN, OCTAVIO ISMAEL CÓRDOVA HUANCA, ELÍAS ROBERTO PIYAHUAJE PAYAHUAJE, DANIEL CARLOS LUSITANDE YAIGUAJE, VENANCIO FREDDY CHIMBO GREFA, GUILLERMO VICENTE PAYAGUAJE LUSITANDE, DELFÍN LEONIDAS PAYAGUAJE, ALFREDO DONALDO PAYAGUAJE, MIGUEL MARIO PAYAGUAJE PAYAGUAJE, TEODORO GONZALO PIAGUAJE PAYAGUAJE, FERMÍN PIAGUAJE, REINALDO LUSITANDE YAIGUAJE, LUIS AGUSTÍN PAYAGUAJE PIAGUAJE, EMILIO MARTÍN LUSITANDE YAIGUAJE, SIMÓN LUSITANDE YAIGUAJE, ARMANDO WILMER PIAGUAJE PAYAGUAJE, ÁNGEL JUSTINO PIAGUAJE LUCITANDE,

*Defendants.*

# TABLE OF CONTENTS

**PAGE**

Exhibit 111 to the Declaration of Kristen L. Hendricks in
Support of Chevron Corporation's Motion for
Preliminary Injunction, dated February 3, 2011 -- Email
chain dated September 2, 2009 between Juan Pablo
Sáenz and Steven Donziger with the subject, "Chevron
Charged With Dirty Tricks in Ecuador" ........................................................... SER1

Excerpts of Exhibit 121 to February 3, 2011 Kristen
Hendricks Declaration -- Transcription of August 7, 2004
Summary Oral Hearing No. 002-2003 in the Lago Agrio
Litigation, regarding the Procedural Agreement for
experts, and a certified English translation thereof .......................................... SER6

Exhibit 145 to February 3, 2011 Hendricks Declaration --
Filing by P. Fajardo in the Lago Agrio Litigation, moving
to relinquish judicial inspections, dated July 21, 2006,
and a certified English translation thereof ....................................................... SER7

Exhibit 476 to the Second Supplemental Declaration of
Kristen L. Hendricks in Support of Chevron's Motion for
Preliminary Injunction, dated February 15, 2011 --
Document dated October 27, 2010 entitled, "Funding
Agreement" ...................................................................................................... SER18

Exhibit 477 to February 15, 2011 Supplemental
Hendricks Declaration -- Document dated October 22,
2010 entitled, "Master Agreement" ................................................................. SER54

Exhibit 480 to February 15, 2011 Supplemental
Hendricks Declaration -- Declaration by Pablo Fajardo
filed in In re Application of Chevron, No. 10-mc-00002-
LAK (S.D.N.Y.) on January 19, 2011, and a certified
English translation thereof .............................................................................. SER75

# TABLE OF CONTENTS

**PAGE**

Excerpts of Exhibit 481 to February 15, 2011
Supplemental Hendricks Declaration -- Document dated
November 5, 2010 entitled, "Special Power of Attorney
and Legal Mandate" in Favor of Attorney Pablo Estenio
Fajardo Mendoza, and a certified English translation
thereof ........................................................................................ SER82

Exhibit 482 to February 15, 2011 Supplemental
Hendricks Declaration -- Stipulation and Order, entered
June 21, 2001 in Aguinda v. Texaco Inc., No. 93 CIV.
7527 (JSR) and Jota v. Texaco Inc., No. 94 CIV. 9266
(JSR) (S.D.N.Y.) ....................................................................... SER173

Exhibit 486 to February 15, 2011 Supplemental
Hendricks Declaration -- Order for Interim Measures
from the Permanent Court of Arbitration in the matter of
PCA Case No. 2009 - 23, Chevron Corp. v. Republic of
Ecuador, dated February 9, 2011 ............................................... SER176

Exhibit 488 to February 15, 2011 Supplemental
Hendricks Declaration -- Undated draft Co-counseling
Agreement from Jonathan Abady of Emery Celli
Brinckerhoff & Abady LLP to Steven Donziger and
Joseph Kohn ............................................................................... SER180

Exhibit 491 to February 15, 2011 Supplemental
Hendricks Declaration -- Email dated January 12, 2010
from Steven Donziger to Ilann Maazel, Jonathan Abady,
and Elora Mukherjee with the subject, "authorization
from Pablo," and a certified translation thereof ......................... SER184

Exhibit 492 to the Supplemental Hendricks Declaration --
Email dated October 27, 2008 from Joe Berlinger to
Steven Donziger with the subject, "Film Notes" ........................ SER189

Excerpts of Exhibit 520 to February 15, 2011
Supplemental Hendricks Declaration -- Letter from Hugo
Camacho to Peter I. Bijur dated September 18, 1997 .................. SER198

# TABLE OF CONTENTS

**<u>PAGE</u>**

Excerpts of Exhibit 553 to February 15, 2011
Supplemental Hendricks Declaration – Portions of the
transcript of the deposition of Steven Donziger taken on
January 29, 2011 in *In re Application of Chevron*, No.
10-MC-00002 (LAK) (S.D.N.Y.) ................................................................. SER200

Exhibit 1 to the Declaration of Kristen L. Hendricks in
Opposition to Defendants Hugo Gerardo Camacho
Naranjo's and Javier Piaguaje Payaguaje's Application
by Order to Show Cause Why Proceedings and Certain
Portions of the March 7, 2011 Order Should Not Be
Stayed Pending Appeal, dated April 1, 2011 --- Executed
Funding Agreement between Treca Financial Solutions,
El Frente de Defensa de la Amazonia (Amazon Defense
Front), and Claimants in the Lago Agrio litigation ...................................... SER202

```
BEG_CTRL_NUM        :  DONZ00052196
END_CTRL_NUM        :  DONZ00052196
DATESENT            =  09/02/2009
TIMESENT            =  12:01:30
RECEIVEDDATE        =  09/02/2009
TIMERECEIVED        =  12:01:30
FILENAME            :  RE: Chevron Charged With Dirty Tricks in Ecuador.msg
SUBJECT             :  RE: Chevron Charged With Dirty Tricks in Ecuador
TEXT                :  From:  Juan Pablo Sáenz <juanpasaenz@hotmail.com>
                       Sent:  Wednesday, September 2, 2009 12:02 PM
                       To:  Steven Dozinger <sdonziger@gmail.com>
                       Subject:  RE: Chevron Charged With Dirty Tricks in Ecuador
```

We're on that.  Our sources at the government tell us they're they're actively looking for them, to cut their heads off.

We should focues on Borja and Hansen, since they're the Chevron stooges.  Correa and his cronies will take care of the rest.

Juan Pablo Sáenz M.

Ofi:  593(2)2273533
Cel: 593(9)6043779
-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-
www.texacotoxico.org

_____

Subject: Re: Chevron Charged With Dirty Tricks in Ecuador
To: juanpasaenz@hotmail.com
From: sdonziger@gmail.com
Date: Tue, 1 Sep 2009 21:22:16 +0000

Cool. Any info on garcia or the other characters? Who are they? Sent via BlackBerry by AT&T

_____

From: Juan Pablo Sáenz
Date: Tue, 1 Sep 2009 14:52:16 -0500
To: Steven Dozinger<sdonziger@gmail.com>
Subject: RE: Chevron Charged With Dirty Tricks in Ecuador

You got my thoughts and prayers, brother.

Apparently,we're having the press conference on thursday, once we get a hold of more information.

Juan Pablo Sáenz M.

Ofi:  593(2)2273533
Cel: 593(9)6043779
-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-
www.texacotoxico.org

_____

Subject: Re: Chevron Charged With Dirty Tricks in Ecuador
To: juanpasaenz@hotmail.com
From: sdonziger@gmail.com
Date: Tue, 1 Sep 2009 19:45:31 +0000

Terrible
U guys having a press conference? Sent via BlackBerry by AT&T

_____

From: Juan Pablo Sáenz
Date: Tue, 1 Sep 2009 14:42:36 -0500
To: Steven Dozinger<sdonziger@gmail.com>
Subject: RE: Chevron Charged With Dirty Tricks in Ecuador

How's your mom doing?

Juan Pablo Sáenz M.

Ofi:  593(2)2273533
Cel: 593(9)6043779
-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-.-
www.texacotoxico.org

_____

Date: Tue, 1 Sep 2009 15:20:50 -0400
Subject: Chevron Charged With Dirty Tricks in Ecuador
From: sdonziger@gmail.com
To: sdonziger@gmail.com

Chevron Accused of Nixon-style Dirty Tricks Operation In Ecuador

Chevron's Video Transcripts Raise Questions About Oil Giant's Misconduct to Delay $27 billion Environmental Trial In Ecuador

Department of Justice Asked to Focus on Chevron

Quito, Ecuador (September 1, 2009) – In a maneuver reminiscent of Richard Nixon's infamous "dirty tricks" operations, Chevron has posted a series of grainy videos on YouTube in an attempt to corrupt the trial proceedings where the company faces a $27 billion liability for environmental damage, representatives of the indigenous communities in Ecuador charged Tuesday.

Representatives of the communities in Ecuador called for the U.S. Department of Justice and Ecuador's Attorney General to jointly investigate Chevron for its apparent role in working with an individual who tried to bribe government officials in Ecuador, said Pablo Fajardo, the lawyer for the Amazonian communities who accuse the company of dumping billions of gallons of toxic waste into the rainforest.

"The bottom line is that evidence in the trial shows that Chevron is responsible for wrecking Ecuador's rainforest and destroying the lives of thousands of indigenous peoples," said Steven Donziger, an American lawyer who advises the Amazonian communities in the lawsuit, which is taking place in Ecuador at Chevron's insistence after the company submitted numerous affidavits praising Ecuador's courts.

"Nothing Chevron has presented in these videos changes these underlying facts one bit," he added.  The legal case will go on.  This is a desperate attempt by Chevron to delay the judgment."

After carefully reviewing the videos and transcripts of the videos released by Chevron, lawyers for the plaintiffs said Chevron's hidden cameras produced "not even a scintilla of evidence" that the judge was involved in bribes, "made no sense" about how contracts would be awarded and raised questions about Chevron's own involvement in the bribery scheme perpetrated by an Ecuadorian Chevron contractor and an American businessman.

"There is clear evidence from the videos that individuals associated with Chevron were trying to bribe Ecuadorian government officials to undermine the trial process so the company can avoid paying a judgment," Fajardo said.  "Corruption of the trial process by Chevron has become a pattern which we believe extends to the highest levels of the company and which may constitute a violation of criminal laws both in Ecuador and the United States," he added.

Both Fajardo and Donziger called on Chevron to turn over copies of the unedited videos, which were shot secretly using micro-cameras inside a watch and a pen, and to make available corporate officials and outside counsel to answer questions from investigators about their own roles or those of their subordinates in the scheme.

Curiously, Chevron has refused to disclose the whereabouts of the Ecuadorian contractor, Diego Borja, and the American businessman, Wayne Hansen.  Chevron claims the pair "innocently" turned over the videos for Chevron's use in June of this year, but Borja had been working for Chevron on the environmental trial during the final eight field inspections conducted in March.

"It is odd that Chevron says Borja tried to bribe government officials, and then they reward him by relocating him to the United States which is often seen as a huge benefit for an Ecuadorian," said Fajardo.

It is unknown who Hansen is, where he lives, or whether he received payments or other benefits from Chevron. Borja and his family have long ties to the company; a cousin works for Chevron, and it believed Borja is now working for Chevron either as an employee or consultant after being relocated by Chevron to an undisclosed location in the U.S.

Instead of immediately giving the so-called evidence of corruption to the authorities, Chevron posted the videos on YouTube yesterday – months after they came into Chevron's possession -- because the legal case was winding down after the court recently denied a Chevron attempt to conduct a study that would have added months to the trial process, said Fajardo.

"It appears the timing of the release of these videos is related to an impending judgment against the company," said Fajardo.  "If this was not part of a dirty tricks operation, the videos would have been turned over to the authorities rather than to Chevron, or at least Chevron would have taken these videos to the authorities months ago.  That's just one reason why this appears suspicious."

**SER4**

Donziger added: "More than anything, the videos appear to contradict Chevron's points. They certainly don't support Chevron's allegations in its press materials of the government directing the judge. They showed the judge repeatedly refusing the leading questions of Chevron's contractor about how he will rule. They raise questions about Chevron's possible misconduct in designing the bribery scheme. They also prove that individuals with ties to Chevron might have been involved in offering a bribe to a public official in Ecuador."

Chevron claims there was a $3 million bribe arranged to direct a remediation contract to a certain company, but produced no evidence the judge knew about it or that money changed hands. The only people present when the bribe were discussed was the Chevron contractor, Borja; Hansen; and a person purporting to represent Ecuador's government, identified as Patricio Garcia.

Chevron presented no evidence to connect Garcia to the Ecuadorian government, and when Chevron contractor Borja said he would provide a bribe to the plaintiffs, Garcia quickly cut him off and said all the bribe money should go directly to him. Chevron presented no evidence that any member of the government had any knowledge of the purported scheme.

Donziger said it looked like some of the people in the fourth and final video were "props" in a movie whose role was to contrive evidence of corruption that could then be used by Chevron even though the company had a hand in creating it. "This so-called evidence is at a minimum hearsay and would never be admitted in court," said Donziger. "If it was fabricated by Chevron, then company officials are going to have to answer for their latest episode in an ongoing smear campaign."

"This entire episode reeks of a Nixon-style dirty tricks operation and Chevron's fingerprints are all over it," said Donziger. "Chevron's contractors film themselves offering a bribe to Ecuadorians, and then Chevron uses that video to try to undermine the judicial system in Ecuador where it faces a judgment. It is classic Nixon-style dirty tricks.

"Chevron now needs to turn over all of its evidence of unedited videos, full and complete transcripts, and the witnesses that the company is hiding from investigators. Chevron employee involved in this scheme, including its General Counsel and other corporate officials, also need to answer questions from investigators about their own roles in the scheme and their knowledge of the scheme," Donziger added.

Both attorneys called for a "complete and thorough investigation" of the facts surrounding Chevron's role. They also called for the investigation to address a pattern of Chevron's corrupt acts in the country, including a fraudulent remediation in the mid-1990s, the creation of a false military report in 2005 to delay a critical field inspection during the trial, threats of physical harm to court officials, and the failure to condemn a series of deaths threats and robberies suffered by representatives of the plaintiffs in recent years.

"The indigenous people are the victims," said Fajardo. "Corruption on any level designed to delay or profit from a long overdue remediation is unacceptable, and should be investigated and sanctioned immediately."

#

--
Steven Donziger

212-570-4499 (land)
212-409-8628 (fax)
917-566-2526 (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
███████████
New York, New York 10025
Email: sdonziger@gmail.com

_____

Hotmail® is up to 70% faster. Now good news travels really fast. Try it now.
<http://windowslive.com/online/hotmail?ocid=PID23391::T:WLMTAGL:ON:WL:en-
US:WM_HYGN_faster:082009>

_____

Hotmail® is up to 70% faster. Now good news travels really fast. Try it now.
<http://windowslive.com/online/hotmail?ocid=PID23391::T:WLMTAGL:ON:WL:en-
US:WM_HYGN_faster:082009>

_____

Get back to school stuff for them and cashback for you. Try Bing now. <http://www.bing.com/cashback?
form=MSHYCB&publ=WLHMTAG&crea=TEXT_MSHYCB_BackToSchool_Cashback_BTSCashback_1x1>

| | | |
|---|---|---|
| FROM | : | Juan Pablo Sáenz <juanpasaenz@hotmail.com> |
| RECIPIENT | : | Steven Dozinger <sdonziger@gmail.com> |
| CUSTODIAN | : | Donziger, Steven |
| SOURCE | : | Inbox.pst |
| PAGES | = | 0 |
| DOCTYPE | : | E-MAIL |
| BOX_NO | = | 0 |
| ITEM_NO | = | 11916 |
| UPDATEDATE | = | 01/15/2011 |
| PRIV_DOC_NO | = | 0 |
| NATIVELINK | : | M:\Production\Gibson\Chevron\CONCORDANCE_DONZIGER_COMPEL\DON028\NATIVES\012\DONZ00052196.msg |

[upper right – hand-written text reading: 8470; 8470; eight thousand four hundred seventy; what appears to be a signature]
[lower right – stamp reading: OFFICE OF THE PRESIDENT OF THE SUPERIOR COURT OF JUSTICE; OFFICE OF THE CLERK OF THE COURT; Nueva Loja; signature]
[lower right – what appear to be two signatures]

<u>SUMMARY ORAL HEARING No. 002-2003</u>

TERMS OF REFERENCE FOR THE EXPERTS CARRYING OUT JUDICIAL INSPECTIONS

1.    STATEMENTS OF FACT

In hearing No. 02-2003, brought before the Presidency of the Superior Court of Justice of Nueva Loja by María Aguinda et al. against CHEVRONTEXACO CORPORATION, the parties have requested judicial inspections at approximately 122 wells and production installations in the former concession granted by the Ecuadorian Government to what was called the PETROECUADOR-TEXACO Consortium.

In each case, the purpose of the inspections has been specified by the petitioners in their respective motions for evidence.

2.    SCOPE

The parties considered it appropriate to discuss and agree upon certain basic parameters to serve as a framework for the judicial inspections, allowing them to be performed in an organized manner and to use scientific procedures to obtain reliable and credible expert reports about the facts being investigated in the inspections.

3.    THE INSPECTIONS

In accordance with the provisions of Articles 246 to 253 of the Civil Procedures Code, the inspections shall be carried out under the direction of the President of the Superior Court of Justice of Nueva Loja, starting on the date and time fixed for each one.

The scope or purpose of each inspection shall be defined by:

3.1    The plaintiffs' request to carry out the judicial inspections listed in number I of the motion for evidence presented at 5:45 p.m. on October 29, 2003, and in rulings on this motion.

3.2    The defendant company's request to carry out the judicial inspections listed in numbers 91, 92, 93, 94, 95, 96, 102 and 103 of the motion for evidence presented at 5:10 p.m. on October 29, 2003, and in rulings on this motion.

4.    THE EXPERTS

[Handwritten] 116,431
One hundred and sixteen thousand four hundred and thirty-one
[initials]

**YOUR HONOR, THE CHIEF JUSTICE OF THE SUPERIOR COURT OF NUEVA LOJA**

I, **Pablo Fajardo Mendoza**, **Esq.**, court representative for the plaintiffs in summary verbal proceeding no. 002/2003, brought by María Aguinda, Ángel Piaguaje et al., against CHEVRONTEXACO CORPORATION, now Chevron Corporation, for damages, respectfully appear before you and state the following:

**I**

In a petition for evidence filed by the plaintiffs at the Office of the Clerk of Court on October 29, 2003, at 5:45 PM, we had requested that 97 judicial inspections be conducted at various sites that have been operated by the Texaco Company, now Chevron, in the Ecuadorian Amazon, as stated on pp. 4,677 and 4,678 of the casefile.

In fact, the petition requested the following:

> I.
> That a judicial inspection be conducted of the projects and installations intended for petroleum production work at each of the sites specified below:
>
> 1) The wells Sacha [redacted]
> 2) The wells Sacha [redacted]
> 3) The station [redacted]
> 4) The station [redacted] and the well Aguarico 2
> 5) The station [redacted]
> 6) The wells Shushufindi [redacted]
> 7) The wells Shushufindi [redacted]
> 8) The wells Aguarico [redacted]
> 9) The wells Guanta [redacted]
> 10) The wells Parahuaco [redacted] and [redacted]
> 11) The well Lago Agrio [redacted] and [redacted]
> 12) The wells Lago Agrio [redacted], 11, 2 [redacted] and [redacted]
> 13) The wells Yuca 2 [redacted]
> 14) The wells [redacted], Yulebra 1, and [redacted]
> 15) The wells [redacted] and [redacted]
> 16) The wells Auca 1, [redacted]
> 17) The wells Shushufindi [redacted]
> 18) The wells Shushufindi [redacted]
> 19) The wells Sacha [redacted]
> 20) The wells Shushufindi [redacted]
> 21) The wells Shushufindi [redacted]
> 22) The wells Lago Agrio [redacted]
> 23) The wells Sacha [redacted]
> 24) The wells Sacha [redacted]
> 25) The wells Sacha [redacted]

[initials illegible]

[See original for stamp and illegible initials.]

1

CERT. INTERMARK VER: JD

[Handwritten] 116,432
One hundred and sixteen thousand four hundred and thirty-two
[initials]

26) The wells Sacha [redacted]
27) The wells Sacha [redacted]
28) The Station [redacted]
29) [redacted]
30) The wells [redacted], 6 and the [redacted]

In every instance, the inspection shall also cover the surrounding areas, including the rivers, streams and swamps in the immediate areas since the purpose of this step is to verify the environmental effects of the activities related to the production of hydrocarbons.

Please indicate a date and time for this purpose. The participation of experts who are proficient in applied ecology and environmental engineering will be required at every inspection.

By decision of the Office of the Chief Justice of the Court of Justice of Nueva Loja, issued on October 29, 2003, at 5:55 PM, it was ordered that these expert examinations be made beginning at 9:00 AM on November 25, 2003, during the time necessary for carrying out said inspections. In this case, because of the number of inspections requested by the parties, no date or time was set for each of the inspections requested.

## II

Of the 97 judicial inspections requested by the plaintiffs, inspections which were distributed among the various fields and/or areas that have been operated by the Texaco Company, now Chevron, until the present day, 27 judicial inspections requested by the plaintiffs have been conducted and 15 judicial inspections requested solely by the defendant have been conducted, for a total of 42 inspections carried out to date.

## III

In the same petition for evidence submitted by the plaintiffs on October 29, 2003 at 5:45 PM, the plaintiffs also requested that a Global Assessment be prepared, this being a type of expert audit of the entire area that has been operated by the defendant Chevron, formerly Texaco. Without doubt, in the course of the Global Assessment, a detailed and complete study will be conducted of each and every one of the sites that were—and continue to be—affected by Texaco's operations, and it will be possible to determine the magnitude and severity of the damage that was caused and has existed until the present time.

## IV

In the Ecuadorian procedural system, by virtue of the constitutional mandate, both the principle of swiftness and that of procedural efficiency govern. The former

[See original for stamp and illegible initials.]

2

CERT. INTERMARK VER: JD

[Handwritten] 116,433
One hundred and sixteen thousand four hundred and thirty-three
[initials]

relates to the need for lawsuits not to be unduly or unnecessarily prolonged. The latter, which is related to the former, imposes the duty to reduce not only procedural costs but also the conduct of procedural steps that are unnecessary in every lawsuit. Therefore, the parties to the proceedings, including the judge, are obliged to observe and ensure compliance with these principles. Lawsuits should not be delayed or extended unnecessarily.

### V

Your Honor, upon reviewing the content of each of the expert reports, you can see that it is the same effects, the same toxic substances and the same consequences. They are repeated in practically all of the sites that have already been inspected and reported on in the experts' reports to the Office of the Clerk of the Court over which you preside. At several judicial inspections, the aforementioned defendant company has acknowledged and admitted that, at all the production stations, the formation water was dumped into the environment, and that the alleged remediation that was carried out based on the fraudulent remediation contract was conducted using the same technology. Moreover, Your Honor, you too have observed the petroleum installations and the technology utilized by Texaco in the Ecuadorian Amazon; the latter was the same throughout the entire area. In conclusion, Your Honor, that which you have observed and inferred from the reports that are already on record in this lawsuit, and during the conduct of each of the judicial inspections, the same reality that you have witnessed can also be observed in all of the other areas that have not yet been inspected, as well as those that will not be inspected. Your Honor, it is fitting to recall that other documents or reports that, in one way or another, include and provide you with sufficient information concerning the damage caused by the defendant are also part of the lawsuit. I am referring to the report entitled "THE LEGACY OF Texaco," which appears on pp. 269 to 611, and the report entitled "STUDY TO DETERMINE THE EXTENT OF THE EFFECTS OF POLLUTION AT THE WELLS AND STATIONS DRILLED PRIOR TO 1990 AT THE LAGO AGRIO, DURENO, ATACAPI, GUANTA, SHUSHUFINDI, SACHA, YUCA, AUCA AND CONONACO FIELDS," this document is also included in the casefile and appears on pp. 612 to 2,127, among others.

Given this background, Your Honor, as well as the copious information already provided to the Court, the plaintiffs are of the opinion that it is unnecessary to conduct further judicial inspections at this stage of the lawsuit, with respect to those inspections requested by the plaintiffs, at the Sacha Centro and Shushufindi fields. It is stated thusly in my brief, which was received by the Office of the Clerk of Court on January 27, 2006, at 5:10 PM, and which appears on pp. 92,442 to 92,444. In the brief to which I am referring, I expressed the plaintiffs' willingness to waive their right to conduct judicial inspections at the Sacha and Shushufindi fields, specifically with respect to the followings sites: well SfD 14, well Sfd 16, well Sfd 45-B, well Sfd 41, well

[handwriting illegible]
[Brief 42,443]
3
[initials and stamp illegible]

CERT. INTERMARK VER: JD

[Handwritten] 116,434
One hundred and sixteen thousand four hundred and thirty-four
[initials]

Sfd 50, well Sfd 10, well Sfd 11, well Sfd 30, well Sfd 33, well Sfd 20, well Sfd 43, well Sfd 39, and well Sfd 29. All of these sites are part of the Shushufindi field, Canton of Shushufindi, Province of Sucumbíos.
The well Sacha 86, well Sacha 59, well Sacha 102, well Sacha 22, well Sacha 19, well Sacha 78, well Sacha 36, well Sacha 77, well Sacha 50, well Sacha 54, well Sacha 107, well Sacha 20 and well Sacha 60 [sic].

Today, as provided in Art. 11 of the Civil Code, which specifies: ***"Rights conferred by law may be waived, provided that they only regard the individual interest of the waiving party and that their waiver is not prohibited"*** [sic]. Therefore, I confirm the waiver of the right to conduct the aforementioned judicial inspections. This is clearly a right held by the plaintiffs, i.e., the right to waive their own evidence, one which belongs to said plaintiffs and solely and exclusively regards their interest. In fact, no prohibition whatsoever exists against making this waiver.

## VI

On the same legal ground, Your Honor, the plaintiffs believe it is no longer essential to continue carrying out inspections unnecessarily, particularly with respect to the evidentiary interests of the plaintiffs. Therefore, in the exercise of my rights granted by Art. 11 of the Civil Code of Ecuador, which states: **"Rights conferred by law may be waived, provided that they only regard the individual interest of the waiving party and that their waiver is not prohibited," I HEREBY EXPRESS MY DESIRE TO WAIVE** the right to conduct or carry out the following judicial inspections at this stage of the lawsuit: **SACHA FIELD**: well Sacha 38, well Sacha 44, well Sacha 47, well Sacha 52, well Sacha 56, well Sacha 71, well Sacha 101 and well Sacha 111. **AGUARICO FIELD:** well[s] Aguarico 03, Aguarico 04 and Aguarico 07. **GUANTA FIELD:** well Guanta 03 and well Guanta 05. **AUCA FIELD:** well Auca 08, well Auca 09, well Auca 10 and well Auca Sur 01. **CONONACO FIELD:** well Cononaco 04, well Cononaco 09, well Cononaco 12 and Cononaco Station. **LAGO AGRIO FIELD:** well Lago Agrio 01, well Lago Agrio 05, well Lago Agrio 10, well Lago Agrio 23, well Lago Agrio 23 [sic], well Lago Agrio 25 and well Lago Agrio 28. **CHARAPA FIELD,** well Charapa 01. YUCA FIELD: well Yuca 04, well Yuca 05, well Yuca 09 and well Culebra 01. PARAHUACO Field: Parahuaco station, well Parahuaco 01 and well Parahuaco 03, well Eno, well Ron and well Palo Rojo.

I repeat: All of these sites whose inspection I am waiving were requested exclusively by the plaintiffs.

Furthermore, Your Honor, you should bear in mind that a mere petition for a judicial inspection does not constitute evidence. [This is] in accordance with Art. 117 of the Code of Civil Procedure, which states: *Only evidence that has been duly produced, i.e., evidence that has been requested, submitted and examined in accordance*

[See original for stamp and illegible initials.]

4

CERT. INTERMARK VER: JD

[Handwritten] 116,435
One hundred and sixteen thousand four hundred and thirty-five
[initials]

*with the law, is deemed authentic at trial.* In this case, Your Honor, the principle of indivisibility of the evidence does not govern since the judicial inspections I am renouncing the right to conduct HAVE NOT YET BEEN PERFORMED. Therefore, they have not yet become evidence, strictly speaking.

Your Honor, you should also bear in mind that, in its brief appearing on  p. 4,697 of the casefile, the defendant objected to all of the evidence submitted by the plaintiffs, labeling it as illegal, irrelevant and improperly produced. Therefore, you are not competent to insist that the inspections requested only by the plaintiffs and challenged by the defendant be carried out.

In fact, with respect to all the evidence requested by the plaintiffs, the defendant stated the following:

**II**

Once all of the evidence of the plaintiffs has been submitted and considered, I object to all of said evidence as illegal, irrelevant and improperly produced.

*(Paragraph taken from the brief submitted by the defendant on November 5, 2003, at 11:30 AM, p. 4,697 of the casefile).*

The plain effect of this objection is to waive any right or benefit associated with the evidence requested by the plaintiffs, particularly since the defendant considers it unlawful or irrelevant. At this point, the defendant cannot change this objection. Rather, it is subject to that objection, one which must be decided on by the Office of the Chief Justice at the proper point in the proceeding.

Your Honor, based on all the foregoing, you must accept the waiver set forth in this brief.

On behalf of the Plaintiffs:

[signature]
Pablo Fajardo Mendoza, Esq.
**SUCUMBIOS BAR ASSN. NO. 042**

[Rectangular filing stamp] SUPERIOR COURT OF JUSTICE OF NUEVA LOJA
OFFICE OF THE PRESIDENT- RECEIVED in Nueva Loja on July 21, 2006, at 9:10 a.m.
4 copies and attachment [signature] CLERK

[See original for stamp and illegible initials.]

5

CERT. INTERMARK VER: JD

## CERTIFICATE OF ACCURACY

STATE OF GEORGIA

SS:

COUNTY OF WALKER

Thomas West, being duly sworn, deposes and says:

That the translation into English of the attached documents in the Spanish language is a true and complete translation to the best of my knowledge, ability and belief.

*Thomas West*

Thomas West
INTERMARK LANGUAGE
SERVICES CORPORATION

Subscribed and sworn to before me this day, <u>Friday, January 21, 2011</u>.

*Dana Orme*

Notary Public

Notary Public, Walker County, Georgia
My Commission Expires July 8, 2011

**SEÑOR PRESIDENTE DE LA CORTE SUPERIOR DE JUSTICIA DE NUEVA LOJA:**

**Ab. Pablo Fajardo Mendoza.-** Procurador Judicial de los actores, dentro del juicio verbal sumario No. 002/2003, que por daños y perjuicios sigue María Aguinda, Ángel Piaguaje y Otros, en contra de CHEVRONTEXACO, hoy Chevron CORPORATION, comparezco ante usted y expongo lo siguiente:

I

Mediante escrito de prueba, presentado por la parte actora, en la secretaria de la Corte, el día 29 de octubre de 2003, a las 17H45, habíamos solicitado la realización de 97 inspecciones judiciales, a diferentes sitios que fueron operados por la compañía Texaco hoy Chevron; en la amazonía ecuatoriana, así consta en las fojas 4.677 y 4.678 del proceso.

En efecto en dicho escrito se solicitó lo siguiente:

Que se efectúe una inspección judicial a las obras e instalaciones destinadas a labores de explotación petrolera existentes en cada uno de los sitios que a continuación se detalla:

1) Los pozos Sacha 86, 47, 56 y 121
2) Los pozos Sacha 28, 44, 42 y 59
3) La Estación Shushufindi 30 y pantano
4) La Estación Shushufindi Norte y el pozo Aguarico 2
5) La Estación Shushufindi Suroeste y pantano
6) Los pozos Shushufindi 14, 16, 49 2
7) Los pozos Shushufindi 38, 44 y 56
8) Los pozos Aguarico 9, 4 y 7
9) Los pozos Guanta 3, 8, 8, 7
10) Los pozos Parahuaco 4, 3 y Estación Parahuaco
11) El pozo Lago Agrio 2, 10 y la Estación Lago Norte
12) Los pozos Lago Agrio 2, 8, 10 1, 11 2, 25 y el pozo Charapa 1
13) Los pozos Yuca 2, 6, 8
14) Los pozos Culebra 1, Yulebra 1 y Yuca 9
15) Los pozos Eno, Ron y Palo Rojo
16) Los pozos Auca 1, 2, 17 y 20
17) Los pozos Shushufindi 4, 16, 11 y 48
18) Los pozos Shushufindi 20, 36 y 35
19) Los pozos Sacha 51, 102, 21 y 22
20) Los pozos Shushufindi 7, 28, 48 y 49
21) Los pozos Shushufindi 24, 43 y 20
22) Los pozos Lago Agrio 2, 16, 23 y 28
23) Los pozos Sacha 18, 70 y 109
24) Los pozos Sacha 18, 35 y 27
25) Los pozos Sacha 59, 54, 94 y 107





1

26) Los pozos Sacha 6, ~~12, 20~~ y 20'
27) Los pozos Sacha ~~26, 68~~ y 71
28) La Estación ~~Sacha Central (Sarcófago)~~ ~~y Sur San Carlos~~
29) ~~Los pozos Conbraco 9 y 12 y el pozo Auca sur 1~~
30) Los pozos X,6 y la ~~Estación Conenace~~

En cada caso, la inspección comprenderá también las áreas circundantes, incluidos los ríos, cursos de agua y pantanos existentes en las inmediaciones, puesto que el propósito de la diligencia es constatar los efectos ambientales de las actividades relacionadas con la explotación de hidrocarburos.

Para el efecto, se dignará señalar día y hora. En cada inspección será necesaria la intervención de peritos versados en ecología aplicada e ingeniería ambiental.

Mediante Providencia de la Presidencia de la Corte de justicia de Nueva Loja, emitida el día 29 de octubre de 2003, a las 17H55, dispuso, que estas expertícias, se realicen a partir de las 9H00 del día 25 de Noviembre de 2003, durante el tiempo que sea necesario para la evacuación de dichas inspecciones. En este caso, por la cantidad de inspecciones solicitadas por las partes, no se fijó día y hora para cada una de las diligencias solicitadas.

II

De las NOVENTA Y SIETE Inspecciones Judiciales, solicitadas por los actores, distribuidas en los diversos campos u o áreas que fueron operadas por la compañía Texaco, hoy Chevron, hasta la actualidad, se han realizado, VEINTISIETE Inspecciones Judiciales, que fueron solicitadas por la parte actora; y, QUINCE inspecciones Judiciales, que fueron solicitadas únicamente por la parte demandada; lo que da un total de CUARENTA Y DOS Inspecciones realizadas hasta la actualidad.

III

En el mismo escrito de prueba presentado por la parte actora el día 29 de octubre de 2003 a las 17H45 minutos; también la parte actora solicitó la realización de un Peritaje Global, que en otras palabras es una especie de auditoria pericial a toda el área que fue operada por la demandada Chevron, antes Texaco. Con toda seguridad en la realización del Peritaje global, se realizará el estudio minucioso y completo de todos y cada uno de los sitios que fueron y continúan afectados por las operaciones Texaco en su momento y se podrá determinar la magnitud y gravedad del daño causado y existente hasta la actualidad.

IV

En el sistema procesal ecuatoriano, rigen en virtud del mandato constitucional, tanto el principio de celeridad como el de economía procesal. El primero, se

2

relaciona con la necesidad de que los procesos no se extiendan indebidamente o se alarguen innecesariamente. El segundo, relacionado con el primero impone la obligación de reducir tanto los costos procesales como la práctica de actuaciones procesales que resulten innecesarias dentro de cada juicio. Por ello, las partes procesales, incluido el juez, se encuentran obligadas a respetar y procurar el cumplimiento de tales principios. Los procesos judiciales no deben dilatarse ni extenderse innecesariamente.

V

Al revisar el contenido, de cada uno de los informes periciales, usted se puede dar cuenta señor Presidente: que son los mismos efectos, los mismos elementos tóxicos, los mismos daños, las mismas consecuencias... se repiten prácticamente en todos los sitios ya inspeccionados y reportados sus informes a la Secretaría de la Corte, que usted preside. La misma empresa demandada, ha reconocido y admitido, en varias inspecciones judiciales, que en todas las estaciones de Producción, arrojaron el agua de formación al ambiente, que la supuesta remediación realizada, en base al Fraudulento Contrato de Remediación, se la realizó con la misma tecnología; Además usted también ha observado señor Presidente, las instalaciones petroleras y la tecnología aplicada por Texaco, en la Amazonía ecuatoriana, fue la misma en toda el área. En conclusión Señor Presidente, lo que usted ha podido observar y percibir de los informes que ya constan en el proceso, y durante la realización de cada una de las inspecciones judiciales, la misma realidad, que usted ha observado, también se podrá observar en todas las demás áreas que aún no han sido inspeccionadas y los que no van a ser inspeccionados.

Es oportuno recordar señor Presidente, que son parte del proceso, otros documentos o informes, que de varias maneras, recogen y le proporcionan información suficiente, del daño causado, por la demandada. Me refiero al informe titulado EL LEGADO DE Texaco, que consta desde la foja 269 hasta la foja 611; y el informe intitulado, denominado ESTUDIO PARA CONOCER EL ALCANCE DE LOS EFECTOS DE LA CONTAMINACION EN LOS POZOS Y ESTACIONES PERFORADOS ANTES DE 1990 EN LOS CAMPOS LAGO AGRIO, DURENO, ATACAPI, GUANTA, SHUSHUFINDI, SACHA, YUCA, AUCA Y CONONACO; documento que también está incorporado al proceso, y consta entre las fojas 612 hasta la foja 2.127, entre otros.

Con estos antecedentes, señor Presidente, y con la abundante información ya proporcionada a la Corte; la parte actora considera, que no es necesario evacuar más inspecciones judiciales en esta instancia del juicio, de aquellas solicitadas por los actores, en los Campos Sacha Centro y Shushufindi. Así consta en mi escrito, ingresado en la secretaría de la Corte el día 27 de enero de 2006, a las 17H10, y que consta a fojas 92.442, hasta la 92.444. En el escrito sobre el cual me estoy refiriendo, expresé la voluntad de los actores de renunciar al derecho de evacuar las inspecciones judiciales en los campos Sacha y Shushufindi, concretamente de los siguientes sitios: Pozo Sfd 14, Pozo Sfd 16, Pozo Sfd 45-B, Pozo Sfd 41, Pozo

3

Sfd 50, Pozo Sfd 10, Pozo Sfd 11, Pozo Sfd 30, Pozo Sfd 33, Pozo Sfd 20, Pozo Sfd 43, Pozo Sfd 39, Pozo Sfd 29. Todos estos sitios pertenecen al capo Shushufindi, Cantón Shushufindi, provincia de Sucumbíos.
Los Pozo Sacha 86, Pozo Sacha 59, Pozo Sacha 102, Pozo Sacha 22, Pozo Sacha 19, Pozo Sacha 78, Pozo Sacha 36, Pozo Sacha 77, Pozo Sacha 50, Pozo Sacha 54, Pozo Sacha 107, Pozo Sacha 20 y Pozo Sacha 60.

El día de hoy basándome en lo expuesto en el Art. 11 del Código Civil que dispone: "*Podrán renunciarse los derechos conferidos por las leyes, con tal que sólo miren al interés individual del renunciante, y que no esté prohibida su renuncia*". Por ende me ratifico en la renuncia al derecho para evacuar las inspecciones judiciales, ya mencionadas. Este es claramente un derecho de los actores, es decir aquel de renunciar a sus propias pruebas, que le pertenece a dichos actores y que mira única y exclusivamente a su interés. De hecho, no existe prohibición alguna para realizar esta renuncia.

VI

Con la misma base legal señor Presidente, los actores consideran que ya no es necesario continuar en forma innecesaria con la evacuación de inspecciones judiciales en particular en lo relacionado con los intereses probatorios de la parte actora. Por lo tanto haciendo uso a mis derechos, concedidos por el Art. 11 del Código Civil Ecuatoriano, que dice: "**Podrán renunciarse los derechos conferidos por las leyes, con tal que sólo miren al interés individual del renunciante, y que no esté prohibida su renuncia**", **EXPRESO MI VOLUNTAD DE RENUNCIAR**, al derecho de evacuar o realizar las siguientes inspecciones judiciales, en esta instancia del proceso: **CAMPO SACHA**: pozo Sacha 38, pozo Sacha 44, pozo Sacha 47, pozo Sacha 52, pozo Sacha 56, pozo Sacha 71, pozo Sacha 101 y pozo Sacha 111. **CAMPO AGUARICO**: pozo Aguarico 03, Aguarico 04 y Aguarico 07. **CAMPO GUANTA**: pozo Guanta 03 y pozo Guanta 05. **CAMPO AUCA**: Pozo Auca 08, pozo Auca 09, pozo Auca 10 y el pozo Auca Sur 01. **CAMPO CONONACO**: pozo Cononaco 04, pozo Cononaco 09, pozo Cononaco 12, y Estación Cononaco. **CAMPO LAGO AGRIO**: Pozo Lago Agrio 01, pozo Lago Agrio 05, pozo Lago Agrio 10, pozo Lago Agrio 23, pozo Lago Agrio 23, pozo Lago Agrio 25 y pozo Lago Agrio 28. **CAMPO CHARAPA**, pozo Charapa 01. CAMPO YUCA: pozo Yuca 04, pozo Yuca 05, pozo Yuca 09, pozo Culebra 01. Campo PARAHUACO: estación Parahuaco, pozo Parahuaco 01 y pozo Parahuaco 03, pozo Eno, pozo Ron y el pozo Palo Rojo.

Repito. Todos estos sitios, a los cuales estoy expresando mi renuncia, para inspeccionarlos, fueron solicitados únicamente por la parte actora.

Además señor residente, debe tener en cuenta usted, que la sola petición de inspección judicial, no constituye prueba. De acuerdo a lo establecido en el Art. 117 del Código de Procedimiento Civil, que dice: *Sólo la prueba debidamente actuada, esto es aquella que se ha pedido, presentado y practicado de acuerdo*

4

116435
*[handwritten text]*

*con la ley, hace fe en el juicio.* En este caso señor Presidente, no rige el principio de unidad de la prueba ya que las inspecciones judiciales sobre las cuales estoy renunciando mi derecho a realizarlas, AUN NO SE HAN PRACTICADO, por ende aún no se constituyen en prueba propiamente dicha.

Debe usted, señor Presiente también tener en cuenta, que la parte demandada en su escrito que consta a foja 4.697 del proceso, procedió a impugnar toda la prueba presentada por la parte actora, calificándola de ilegal, impertinente e indebidamente actuada, por lo tanto no tiene facultad para insistir que se realicen las inspecciones solicitadas únicamente por la parte actora e impugnadas por la demandada.

En efecto, la demandada afirmó sobre toda la prueba solicitada por la parte actora lo siguiente:

II

Una vez que ha sido presentada y proveída toda la prueba de la parte actora, impugno toda la prueba mencionada, por ilegal, impertinente e indebidamente actuada.

**(Párrafo tomado del escrito presentado por la demandada el día 05 de Noviembre de 2003, a las 11H30 foja 4.697 del proceso).**

Esta impugnación tiene como claro efecto el renunciar a cualquier derecho o beneficio de la prueba solicitada por los actores, más aún cuando la considera ilegal e impertinente. Hoy, la demandada no puede alterar esta impugnación, sino que por el contrario se encuentra sometida a tal impugnación, la misma que deberá ser resuelta por la Presidencia en el momento procesal oportuno.

En virtud de todo lo señalado usted Señor Presidente deberá aceptar la renuncia expresada en este escrito.

Por la parte Actora.

Ab. Pablo Fajardo Mendoza
REG. MAT. 042-C.A.S.

CORTE SUPERIOR DE JUSTICIA
DE NUEVA LOJA
**PRESIDENCIA**
RECIBIDO en Nueva Loja, a ....... de
........ del 2006
a las 09H10 ...... en ....... copias
y adjunta ..........
SECRETARIA

5

Private and Confidential

PMW Edits: October 27, 2010

**NUGENT INVESTMENTS LIMITED**
**[NTD: BVI Subsidiary name to replace Nugent once available.]**
(as the Funder)

and

**CLAIMANTS**

———————————

**FUNDING AGREEMENT**

———————————

DONZ00126569 Page 1 of 36

TABLE OF CONTENTS

PAGE

1.  DEFINITIONS AND REFERENCES ..................................................................2
2.  FUNDING ARRANGEMENTS .......................................................................2
3.  PAYMENT OF THE EXPENSES ...................................................................4
4.  POWER TO SETTLE THE CLAIM TO ACHIEVE COMMON PURPOSE .................4
5.  CLAIMANTS' DUTY TO CO-OPERATE ........................................................5
6.  LEGAL ADVICE ......................................................................................6
7.  DISTRIBUTION OF PROCEEDS ..................................................................6
8.  ESTABLISHMENT OF TRUST ....................................................................8
9.  CONDITIONS PRECEDENT .......................................................................9
10. REPRESENTATIONS AND WARRANTIES .....................................................9
11. TERMINATION AND CONSEQUENCES OF BREACH BY THE
    CLAIMANTS .......................................................................................12
12. CONFIDENTIALITY ...............................................................................13
13. INFORMATION AND PRIVILEGE ..............................................................14
14. NOTICES ............................................................................................16
15. NON-CIRCUMVENTION .........................................................................16
16. PARTIES' RELATIONSHIP AND SERVICES .................................................16
17. LIMITATION OF LIABILITY ....................................................................17
18. INDEMNIFICATION ..............................................................................17
19. POST-COMMITMENT FUNDING ..............................................................18
20. TAX MATTERS ....................................................................................18
21. MISCELLANEOUS .................................................................................20
22. GOVERNING LAW AND ARBITRATION .....................................................21
23. COUNTERPARTS ..................................................................................22
SCHEDULE 1  TRANSACTION DETAILS .........................................................23
SCHEDULE 2  CALCULATION OF RECOVERY AMOUNT ......................................1
SCHEDULE 3  DEFINITIONS ..........................................................................1
SCHEDULE 4  FORM OF INTERCREDITOR AGREEMENT ......................................1

1

Private and Confidential
PMW Edits: October 27, 2010

AGREEMENT dated as of the Effective Date between:

**BETWEEN**:

(1)　　**[NUGENT INVESTMENTS LIMITED, a company organized under the laws of Guernsey][NTD: To be replaced by BVI entity]** [Note – the Intercreditor Agreement indicates that Burford will be using a Cayman subsidiary] (the "**Funder**"); and

(2)　　**THE CLAIMANTS** whose names are set out in <u>Schedule 1</u> ("**Claimants**" and together with the Funder, the "**Parties**").

NOW THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

1.　　**DEFINITIONS AND REFERENCES**

　　1.1　　In this Agreement, unless the context otherwise requires, terms shall have the meanings set out in <u>Schedule 3</u>.

　　1.2　　References to the Parties hereto include their assignees, transferees and successors-in-title and shall include both corporate and unincorporated associations, partnerships and individuals.

　　1.3　　Headings to clauses are for information only and shall not form part of the operative provisions of this Agreement.

　　1.4　　References to Recitals, Clauses and Schedules are to recitals to, clauses of, and schedules to this Agreement. References to this Agreement shall, unless otherwise expressly stated, include references to the Recitals and the Schedules.

　　1.5　　Except where the context otherwise requires:

　　　　(a)　　words denoting the singular include the plural and vice versa;

　　　　(b)　　words denoting any gender include all genders; and

　　　　(c)　　words denoting persons include firms, partnerships, unincorporated associations and corporations and vice versa.

　　1.6　　References in this Agreement to any agreement, deed or document shall be deemed to include references to such agreement, deed or document as varied, amended, modified, novated, supplemented or replaced by any other documents, deeds, instruments or agreements from time to time whether as part of an insolvency or bankruptcy proceedings or otherwise.

2.　　**FUNDING ARRANGEMENTS**

- 2 -

2.1    Subject to the provisions of this Agreement and any other arrangements expressly agreed in writing from time to time between the Funder and the Claimants, the Funder and the Claimants shall fund the Expenses as follows, and the Claimants shall obtain funding for the Expenses and other expenses of the Claim only as set forth below and in Clause 19:

(a)    The Capital Commitment shall be funded in accordance with this Clause 2 in the following Tranches:

(i)    An initial Tranche in the amount of $4,000,000 (the "**Initial Tranche Amount**");

(ii)   A second Tranche in the amount of $5,500,000 (the "**Second Tranche Amount**"); and

(iii)  A third Tranche in the amount of $5,500,000 (the "**Third Tranche Amount**").

(b)    The Funder shall pay the full amount of the Initial Tranche Amount on the Initial Funding Date by wire transfer to the Trust Account.

(c)    On or after the date that is sixty (60) days after the Initial Funding Date, the Claimants shall have the right to call two additional Tranches in the amounts of the Second Tranche Amount and the Third Tranche Amount, respectively, by giving written notice (each, a "**Funding Notice**") to the Funder, provided that no Funding Notice shall be issued unless and until such date that is thirty (30) days prior to the date in which the Nominated Lawyers reasonably believe that the balance of the Trust Account will fall below $1,000,000.

(d)    The Funder shall have a period of fifteen (15) days from the date of the Funding Notice to notify the Claimants in writing that it agrees to fund such additional Tranche as set forth in the applicable Funding Notice.

(e)    If the Funder agrees to fund such additional Tranche in accordance with Clause 2.1(d), the Funder shall pay the amount of such additional Tranche by wire transfer to the Trust Account within two (2) Business Days following the notice described in Clause 2.1(d).

(f)    If the Funder declines to fund a Tranche or fails to deliver the requisite Funding Notice to the Claimants prior to the expiration of the 15-day period described in Clause 2.1(d), then the Claimants may negotiate and enter into agreements with one or more third parties to provide additional funding for the Claim on a basis that is consistent with the Intercreditor Agreement (it being understood that there shall be no limit on the amount of additional funding that may be sought); provided, that the Funder shall have an opportunity to compete in all respects in a fair and equitable

- 3 -

manner, and within the same time constraints, with all third parties participating in the process to provide funding of such additional Tranche on new terms.

2.2     If the Claimants require additional funds to pay for the Expenses and the Capital Commitment has not been fully funded and has not expired, then the Claimants shall seek additional funding in accordance with Clauses 2.1(c) to 2.1(f) above.

2.3     The Claimants shall instruct the Nominated Lawyers to hold any amounts funded by the Funder hereunder to pay for the Expenses in the Trust Account.

2.4     Except for the Expenses, the Funder shall have no obligation to fund, and the Trust Account shall not be used to pay, any other fees, expenses or other sums in relation to the Claim, and all such other fees, expenses or other sums shall be the sole responsibility of the Claimants.  In particular, and without implying limitation, the Funder shall have no obligation to pay any sums awarded against the Claimants, including any costs orders or awards against the Claimants.

2.5     Notwithstanding anything to the contrary set forth in this Agreement, the Claimants have the absolute right to raise and procure up to an additional $2,000,000 in funding for the Claim from the Minority Funders, on such terms as the Claimants may agree in their sole discretion, provided that such terms are consistent with the Intercreditor Agreement.  The Funder shall have no rights under this Agreement (including, without limitation, Clauses 2 or 19) or otherwise to match or participate in any such funding from Minority Funders.

**3.     PAYMENT OF THE EXPENSES**

3.1     The Claimants shall instruct the Nominated Lawyers to disburse the funds held in the Trust Account in order to pay Expenses as may be approved from time to time by the Nominated Lawyers and the Claimants' U.S. Representative.

3.2     The Claimants hereby instruct the Nominated Lawyers to disburse such portion of the Initial Tranche Amount as is required for payment in full of the outstanding invoices existing as of the date hereof in respect of Expenses.

**4.     POWER TO SETTLE THE CLAIM TO ACHIEVE COMMON PURPOSE**

4.1     The Parties acknowledge and mutually represent to each other that it is their common purpose in concluding this Agreement to enable the Claimants to pursue their Claim.  The Parties further agree that this common purpose and all steps and actions required to achieve this common purpose, including but not limited to any and all steps and actions required in accordance with the Claimants' obligation to cooperate with the Funder as set forth herein, are of the essence of this Agreement.

4.2     The Parties acknowledge that their common interest is served by settling the Claim for a commercially reasonable amount in the context of the extensive

- 4 -

Private and Confidential
PMW Edits: October 27, 2010

environmental damage that has occurred in Ecuador, the significant damage to the health and welfare of the residents of the affected area, and the significant monetary amounts that would be required to remediate the contamination that resulted from the acts that are the subject of the Claim.  In that regard, notwithstanding Schedule 2 or anything to the contrary contained in this Agreement, the Claimants may at any time without the consent of the Funder either settle or refuse to settle the Claim for any amount.

4.3     The Claimants further agree that they shall not settle the Claim for any compensation other than a cash payment in an amount at least equal to the aggregate amount owed to the Funder hereunder without the Funder's prior written consent, and that any settlement amount, cash or otherwise, shall be applied to the Recovery Amount due to the Funder in priority over the Claimants in accordance with Clause 7.

5.      **CLAIMANTS' DUTY TO CO-OPERATE**

5.1     The Claimants hereby irrevocably instruct the Nominated Lawyers to keep the Funder fully and continually informed of all material developments (including the matters set out below) and to provide the Funder with copies of all material documents. In furtherance of the foregoing, the Claimants shall, as requested by the Nominated Lawyers or the Claimants' U.S. Representative:

(a)     cooperate with the Active Lawyers and the Funder in all material matters pertaining to the Claim and devote sufficient time and attention as is reasonably necessary to conclude the Claim;

(b)     provide to the Active Lawyers all material Documentation and Confidential Information and comply with Clauses 13.1 and 13.4 herein;

(c)     submit to examination by the Active Lawyers for the preparation of written statements, subscribe to the same under oath if required, consult with the Active Lawyers and their designees as they reasonably require for purposes of pursuing the Claim or enforcing or settling the Award and appear at any proceeding or hearings (including hearings located abroad) reasonably required in connection with such statements or the Claim generally; and

(d)     use the Claimants' reasonable efforts and, subject to any relevant legal rules, cause all persons related to the Claim, including the Claimants' lawyers, to submit to examination by the Active Lawyers for the preparation of statements, to subscribe to the same under oath if required, to consult with the Active Lawyers as they reasonably require for purposes of pursuing the Claim or enforcing or settling the Award and to appear at any hearings (including hearings located abroad) reasonably required in connection with such statements or the Claim generally.

5.2     The Claimants shall, as reasonably requested by the Active Lawyers giving consideration to the location and the financial means of the Claimants, lend their name to

- 5 -

Private and Confidential
PMW Edits: October 27, 2010

all required actions and steps in relation to the Claim, and shall execute all papers and render assistance to the Nominated Lawyers so as to secure to the Funder the benefits, rights and causes of action provided for herein.  The Claimants shall: (i) do nothing that is reasonably likely to prejudice such benefits, rights or causes of action, and (ii) engage in no conduct or commercial arrangements that is reasonably likely to have a material adverse impact in any way on the value of the Claim.

5.3     The Claimants agree and undertake that neither they nor any of their Affiliates shall institute any action, suit or arbitration separate from the Claim against any Defendant or take any other step that reasonably likely to have a materially adverse impact on the Claim and the value of the Recovery Amount.

5.4     The Claimants shall authorise and instruct the Nominated Lawyers to respond fully and promptly to any reasonable request by the Funder or its Representatives for information regarding the Claim.

5.5     The Parties acknowledge and agree that the Claimants' obligation to cooperate as set out in this Clause 5 and Clauses 13.1 and 13.4 below is of the essence of this Agreement and is a condition thereof and a continuing obligation and that any material breach thereof that has a material adverse impact on the value of the Claim and the Recovery Amount shall entitle the Funder to terminate this Agreement pursuant to Clause 11.1.

6.     **LEGAL ADVICE**

6.1     The Claimants have taken legal advice in relation to this Agreement and all other arrangements between themselves, the Funder and the Nominated Lawyers, including the engagement agreement between the Claimants and the Nominated Lawyers.

7.     **DISTRIBUTION OF PROCEEDS**

7.1     The Claimants shall use their commercially reasonable efforts to cause each person named as a party to the Intercreditor Agreement, and each of its Representatives, to execute the Intercreditor Agreement or an accession agreement by which it becomes bound by the Intercreditor Agreement.

7.2     The Claimants hereby agree to act, and to cause their Representatives to act, at all times in a manner consistent in all material respects with, and to give full effect to, the Intercreditor Agreement.

7.3     In consideration of the Funder's obligations under this Agreement, the Claimants agree to pay or cause to be paid to the Funder the Recovery Amount, subject to the Intercreditor Agreement.

7.4     Each Claimant agrees to use its best efforts to cause all cash proceeds of the Award to be paid or delivered to the Escrow Account for distribution in accordance with the Intercreditor Agreement, this Agreement and applicable law.  In that regard, the

- 6 -

Private and Confidential
PMW Edits: October 27, 2010

Claimants hereby specifically authorize and permit, notwithstanding any other provision of this Agreement, at the time of any settlement or Award the Funder to direct the Nominated Lawyers to instruct any Defendant or other party related in any way to the Award on the Claimants' behalf that any proceeds of the Award be paid to the Escrow Account; provided, that the Funder, prior to so directing the Nominated Lawyers, gives notice to the Claimants of its intention to do so and affords the Claimants reasonable opportunity to discuss the advisability of doing so. Following the receipt of the Funder of the amounts due to it under the terms of this Agreement and the Intercreditor Agreement, the Claimants shall have no further obligations to pay any amounts (including, without limitation, any portion of the Award) to the Funder.

7.5    If any Claimant or any Representative thereof receives all or any part of the proceeds of the Award, that Claimant will hold those proceeds in trust (or the local law equivalent in Ecuador or elsewhere in the world where those proceeds are received) and shall cause the proceeds to be paid or delivered to the Escrow Account for distribution in accordance with the Intercreditor Agreement; and each Claimant will instruct each of its Representatives to hold all cash proceeds received by such Representatives in trust and to make that payment or delivery to the Escrow Account.

7.6    Without limiting Clause 7.1, each Claimant hereby irrevocably directs the Nominated Lawyers and authorizes the Funder to direct the Nominated Lawyers to take all steps necessary to ensure that any and all proceeds of the Award are paid or delivered into the Escrow Account.

7.7    The Claimants and the Funder both direct and authorize the Nominated Lawyers to cause the payment of the Recovery Amount and any other amount owing to the Funder under Clause 18 or any other provision of this Agreement from the Escrow Account as soon as practicable in accordance with the Intercreditor Agreement.

7.8    The Parties agree to be bound by any award made by a tribunal appointed in accordance with the arbitration provisions of the Intercreditor Agreement to resolve a dispute over the distribution of any portion of the proceeds of the Award. The Claimants shall be entitled to participate in any dispute over the distribution of the proceeds of the Award exclusively through the Claimants' Representatives, forthwith after the Claimants' Representatives have been given notice of the dispute, by causing the Claimants' Representatives to make an application to that Tribunal. Any attempt by a Party to seek relief or remedies in any other forum with respect to such dispute will constitute a breach of this Agreement and entitle the other Party to damages, equitable relief and full indemnification against all costs and expenses incurred in connection therewith. In the event of a dispute over the distribution of any proceeds of the Award, that portion of the proceeds will remain in the Escrow Account pending outcome of the arbitration proceedings provided for herein or in the Intercreditor Agreement. For the avoidance of doubt, that dispute will not affect the payment of other amounts under the Intercreditor Agreement not in dispute.

7.9    The Claimants undertake to grant to the Nominated Lawyers a full power of

- 7 -

Private and Confidential
PMW Edits: October 27, 2010

attorney (or local law equivalent in Ecuador or elsewhere in the world where any proceeds of the Award are received) to cause and allow any and all Award proceeds to be paid or delivered forthwith as set out above. The Parties acknowledge and agree that such power of attorney (or local law equivalent in Ecuador or elsewhere in the world where any proceeds of the Award are received) is of the essence of this Agreement and is a condition thereof and that any material variation or termination of such power of attorney by the Claimants will entitle the Funder to terminate this Agreement pursuant to Clause 11.1.

7.10   The Claimants undertake to grant to one or more of the Claimants' Representatives a full power of attorney (or local law equivalent in Ecuador or elsewhere in the world where any proceeds of the Award are received) to execute and do all deeds, documents and things which may be reasonably necessary or advisable to give full effect to the intent of this Agreement.

7.11   The Claimants acknowledge and agree that their obligation to pay the Recovery Amount and any other amount owing to the Funder, as and when due and owing to the Funder under Clause 18 or any other provision of this Agreement, shall apply if the Claim is decided in whole or in part in the Claimant's favour. The Funder acknowledges and agrees that the Claimants shall have no obligation to pay all or any part of the Recovery Amount to the Funder if there is no Award.

8.   **ESTABLISHMENT OF TRUST**

8.1   [The Claimants shall irrevocably assign to a trust to be incorporated under Ecuadorian Laws, in form and substance satisfactory to the Funder, their litigious rights as well as any and all interest in the Claim, the Award, its proceeds, which trust shall be administered by a trustee (the "**Trustee**") who shall become the sole and only person entitled to enforce and collect the Award, with sufficient authority to apply and distribute the Award proceeds in compliance with the provisions of this Agreement. The Claimants shall concurrently assign all and any rights and obligations they may have under this Agreement to the Trustee and the Trustee shall thereafter be the beneficiary of any such rights and the party responsible for any such obligations from the date of said assignment, without relieving the Claimants of their obligations under this Agreement. As security for the payment and performance of all obligations of each Claimant and the Trustee under or in connection with this Agreement, the Trustee shall provide the same first ranking security described below in the Claim, the Award, any proceedings to enforce the Award, and any proceeds of any of the foregoing.] [Torys to revise per call this morning with Bernardo Tobar, Torys, PMW and others.]

[Second note to Torys – Per the call yesterday with Bernardo Tobar, the trust is the only security that Burford will need, as all litigation rights will be assigned into the trust.]

8.2   The assignment of rights to the trust as set forth in Clause **Error! Reference source not found.**8.1 is a continuing obligation on the part of each Claimant and a condition of the Funder's continued performance and is accordingly a condition of this Agreement, any material breach of which shall entitle the Funder to terminate this

- 8 -

Private and Confidential
PMW Edits: October 27, 2010

Agreement pursuant to <u>Clause 11</u>.

8.3    All obligations of each Claimant under the Transaction Documents, including this Agreement and any documents provided by way of security and related rights under **Clause Error! Reference source not found.**8.1, are intended to survive the insolvency of that Claimant, subject to the operation of applicable law.

9.    **CONDITIONS PRECEDENT**

[Note to Torys – We deleted former Clause 9.1 as those requirements are not CPs but instead are covenants that are addressed elsewhere in the agreement.]

9.1    As conditions precedent to the Funder's obligations under this Agreement, there shall be Ecuadorian, United Kingdom, United States and other legal opinions addressed to the Funder to confirm that this Agreement has been duly executed and delivered and that the obligations in this Agreement are binding on and enforceable against them and in particular, that the powers of attorney described at <u>Clauses 7.9</u> and <u>8</u> may not be invalidated or otherwise be made inoperative in the event of any of the Claimants' bankruptcy or insolvency.  It is understood and agreed that Funder shall arrange for and pay for the legal opinions referenced in this <u>Clause 9.2</u>.  [Torys – Please let us know the status of these opinions.]

10.    **REPRESENTATIONS AND WARRANTIES**

10.1    <u>Representations and Warranties of the Funder</u>.  The Funder hereby represents and warrants to the Claimants that at the execution of this Agreement:

    (a)    it has full power and authority to enter into, has authorised and has obtained all necessary consents for the execution by it of, and performance by it under, the Transaction Documents, and that its obligations hereunder and thereunder are legal, valid and binding upon it; and

    (b)    the execution, delivery and performance of the Transaction Documents has not resulted in and will not result in a breach of any provision of, or constitute a default under the Funder's:

        (i)    constitutional or governing documents;

        (ii)    any statute, law, order, rule or regulation of any relevant Governmental Authority; or

        (iii)    any agreement to which it is a party or by which it is bound or to which any of its assets are subject.

10.2    <u>Representations and Warranties of the Claimants</u>.  Each of the Claimants hereby jointly and severally represents and warrants to the Funder that at the execution of this Agreement:

- 9 -

Private and Confidential
PMW Edits: October 27, 2010

(a)    it has full power and authority to enter into, has authorised and has obtained all necessary consents for the execution by it of, and performance by it under, the Transaction Documents, and that its obligations hereunder and thereunder are legal, valid and binding upon it in accordance with its terms;

(b)    the execution, delivery and performance of the Transaction Documents has not resulted in and will not result in a breach of any provision of, or constitute a default under:

   (i)    in the case of Claimants other than individuals, their constitutional or governing documents; or

   (ii)    any statute, law, order, rule or regulation of any relevant Governmental Authority; or

   (iii)    any material agreement to which it is a party or by which it is bound or to which any of its assets are subject;

(c)    no registration with, or consent or approval of, or any other action by any Governmental Authority or other Person is required in connection with the execution, delivery and performance of any of the Transaction Documents by it; [Question for Ecuadoran counsel – Does creation of the trust require obtaining any consents or approvals?]

(d)    such Claimant has received independent legal advice on the terms and effect of the Transaction Documents;

(e)    the Claimants are the sole legal and beneficial owners of, and have good title to, the Claim free and clear of any (a) mortgage, pledge, lien, charge, hypothecation, right of set-off or counterclaim, security interest or other encumbrance, security agreement or trust securing any obligation of any person or arrangement of any kind; (b) purchase or option agreement or arrangement; (c) subordination agreement or arrangement; (d) agreements to create or effect any of the foregoing or which have a similar or analogous nature or effect; in each case other than as set forth in the Intercreditor Agreement or as previously disclosed to the Funder and/or the Nominated Lawyers;

(f)    such Claimant has not made or entered into any prior assignment, trust arrangement, security, sale, transfer or sub-participation or local law equivalent of its right, title or interest in the Claim and/or the Award, other than as set forth in the Intercreditor Agreement or as previously disclosed to the Funder and/or the Nominated Lawyers;

(g)    such Claimant has not taken any steps or executed any documents which would materially or adversely affect the Claim or the recoverability of the

- 10 -

Private and Confidential
PMW Edits: October 27, 2010

Award other than as previously disclosed to the Funder and/or the Nominated Lawyers;

(h) such Claimant has not engaged in any acts or conduct or made any material omissions, agreements or arrangements, that would result in the Funder receiving proportionately less payments or less favourable treatment in respect of the Claim or the Award than any other Claimants or litigant (including the Claimants) pursuing or enforcing such Claim or Award other than as previously disclosed to the Funder and/or the Nominated Lawyers;

(i) such Claimant has not set off or agreed to set off any amounts against the Claim or the Award and no rights of set-off of, or similar rights against the Claimants exist which will permit any set-off of or counterclaim against the Claim and/or the Award other than as set forth in the Intercreditor Agreement or as previously disclosed to the Funder and/or the Nominated Lawyers;

(j) such Claimant has not received any written notice and is not otherwise to the best of its knowledge aware that the Claim or the Award or any portion thereof are subject to any Claim Impairment or is otherwise invalid or void other than as previously disclosed to the Funder and/or the Nominated Lawyers;

(k) such Claimant has no insolvency proceedings outstanding or, to his or its knowledge, threatened in writing against it;

(l) to the knowledge of such Claimant, such Claimant has disclosed to the Funder all documentation and other information in its possession or control relevant to the Claim and there is no information in the knowledge, possession or control of the Claimants or (in the case of Claimants other than individuals) any of its Affiliates or Representatives, that is or is reasonably likely to be material to the Funder's assessment of the Claim that has not been disclosed to the Funder, and the Claimant believes (and does not have, and has not been informed by any of its Representatives of, any belief to the contrary) that the Claim is meritorious and likely to prevail;

(m) except for the actions relating to the Claim that have been brought by or against Chevron Corporation or its consultants or advisors by or against Claimants or their lawyers, advisors, experts, consultants, representatives or others pursuant to 28 USC § 1782, including appeals ("**1782 Actions**"), no proceedings of or before any Governmental Authority have been commenced by or against or, to the best of its' knowledge, are threatened against such Claimant or to its knowledge any other Claimant, which is reasonably likely to materially adversely affect the Claim or the recoverability of the Award other than as previously disclosed to the

DONZ00126569 Page 12 of 36

Private and Confidential
PMW Edits: October 27, 2010

Funder and/or the Nominated Lawyers;

(n)    such Claimant has the full power and authority to bring this Claim and to instruct the Nominated Lawyers; and

(o)    such Claimant has not failed to disclose to the Funder any fact or facts of which he, she or it is aware that would, if the Funder had been so advised, be reasonably expected, individually or in the aggregate, to have led the Funder not to enter into this Agreement.

10.3    If any of the representations and warranties given herein by the Claimants are untrue in any material respect as of the date of this Agreement, the Funder's remedies include but are not limited to the termination of this Agreement pursuant to Clause 11.1 and the right to claim damages against the Claimants.

## 11.    TERMINATION AND CONSEQUENCES OF BREACH BY THE CLAIMANTS

11.1    This Agreement may, at the option of the Funder, terminate upon five (5) Business Days' written notice to the Claimants by the Funder of the occurrence of any of the following events:

(a)    any breach of a material condition of this Agreement, including but not limited to any material non-compliance with Clauses 5.1, 10.3, and 13.1 herein; or

(b)    any material breach or non-compliance with any of the representations and warranties granted by any of the Claimants in Clause 10.2;

in each case, that has a material adverse impact on the value of the Claim and the Recovery Amount.

11.2    This Agreement may be terminated at the option of the Claimants on five Business Days' written notice to the Funder if the Funder fails to fund the Initial Tranche Amount on or prior to the Initial Funding Date.

11.3    Any termination of this Agreement shall be without prejudice to the right of either Party to claim damages in relation to this Agreement.   Clauses 7 and 12 of this Agreement shall survive its termination.

11.4    The Parties agree that in the event of termination of this Agreement pursuant to Clause 11.1, the assessment of damages shall be referred to and finally determined by arbitration administered in accordance with Clause 22.

11.5    Following termination of this Agreement, the Funder shall be entitled, in order to protect its own interest in relation to the Funding Agreement, to keep copies of the Documentation, including Confidential Information provided to it by the Nominated Lawyers pursuant to instructions given to the Nominated Lawyers under Clause 13.1,

- 12 -

provided that it adheres to the confidentiality requirements under <u>Clause 12</u>.

## 12.   CONFIDENTIALITY

12.1   <u>Exclusive Ownership of Information by Disclosing Party</u>.  The Recipient agrees and acknowledges that all Confidential Information provided to it is and shall remain at all times the exclusive property of and owned by the Disclosing Party (or its Affiliates or contract counterparties, as the case may be), and that the Recipient's use or awareness of such Confidential Information shall create no rights, at law or in equity, in the Recipient in or to such Information, or any aspect or embodiment thereof.  Neither the execution of this Agreement, nor the furnishing of any Confidential Information hereunder, shall be construed as granting, whether expressly or by implication, estoppel or otherwise, any license to distribute or title to any patent, trademark, service mark, business and trade secret or other proprietary right to such Confidential Information, or to use such Confidential Information for any purpose other than as specified in this Agreement or to constitute a waiver of any attorney-client privilege or work product protection or any other applicable or available privilege or protection.

12.2   <u>Non-Disclosure of Information</u>.  The Recipient shall not for any reason, during the term of this Agreement and for a period of seven years following termination of this Agreement, disclose, use, reveal, report, publish, transfer, or make available, directly or indirectly, to any Person other than its Representatives, any Confidential Information or Common Interest Material provided to it except in connection with the performance of its obligations under this Agreement or as permitted by the Disclosing Party; <u>provided</u>, that it is agreed and understood that, when the Claimants are the Recipients, the Claimants may disclose Confidential Information and/or Common Interest Material to (i) Torvia, the Minority Funders or any potential Minority Funders or (ii) any other sources of financing if the Funder declines to fund a Tranche pursuant to <u>Clause 2.1(d)</u>; <u>provided further</u>, that Torvia, any such Minority Funders, potential Minority Funders or sources of financing shall have entered into an agreement with the Claimants to treat such Confidential Information and/or Common Interest Material confidentially on terms no less restrictive than as set forth in this Agreement.

12.3   <u>Public Notices</u>.  For the avoidance of doubt, no press release or other announcement concerning the existence of this Agreement, the funding of the Claim under this Agreement, or the identity of the Funder or its Affiliates, shall be made by the Claimants or the Funder without the prior written consent of the other.

12.4   <u>Non-Disclosure of Funder Information</u>.  Without limiting the generality of <u>Clause 12.2</u>, the Claimants agree that they and their Representatives shall keep confidential all Funder Information that they receive and they shall not disclose such information to third parties without the prior written consent of the Funder.

12.5   <u>Confidentiality Procedures</u>.  The Recipient shall ensure that the Confidential Information it receives is not divulged or disclosed to any Person except its Representatives who have a "need to know" such information.  The Recipient shall be solely responsible for its and its Representatives' failure to comply with, and shall ensure

- 13 -

its Representatives' compliance with, the provisions of this Agreement.

12.6     Covenants/Severability.     The Recipient recognizes and agrees that (i) the covenants and agreements contained in this Agreement are reasonable and necessary to protect and preserve the interests and properties of the Disclosing Party, (ii) irreparable loss and damage will be suffered by the Disclosing Party should the Recipient breach any such covenants and agreements, (iii) each of such covenants and agreements is separate, distinct and severable from the other and remaining provisions of this Agreement, (iv) if any such covenant is found by a court of competent jurisdiction to be overly broad in any respect, the Recipient desires and directs that such covenant be amended by such court to a reasonable breadth, and (v) in addition to other remedies available to it, the Disclosing Party shall be entitled to both temporary and permanent injunctions to prevent a breach or contemplated breach by the Recipient or any of its Representatives of any of such covenants or agreements.

12.7     No Reproduction.  The Recipient further agrees not to reproduce or in any manner copy the Confidential Information, in whole or in part, except for its or any of its Representative's own internal use for the purpose of this Agreement and then only under circumstances designed to ensure the full and complete protection of the Confidential Information as contemplated hereby.

12.8     Return of Confidential Information.  The Claimants agree that, within thirty (30) days following the termination of this Agreement, they shall destroy or return all Funder Information to the Funder, and the Claimants shall not for any reason retain or use any such Funder Information or any copies thereof.

12.9     Judicial and Official Disclosure Requests.  In the event one of the Parties receives a request, including without limitation a subpoena, civil investigative demand or similar process, for the production of Confidential Information (a "**Request**"), that Party, before complying with such Request, will first promptly provide written notification, including a copy of the Request, to the other Party.  If, upon such notice, any Party elects to contest the requested disclosure (all such contests being at the contesting Party's expense and under its control), no Party shall make any disclosure until such time as a final, non-appealable or non-stayed order has been entered compelling such disclosure.  Should the Disclosing Party not contest the required disclosure, the Recipient shall not have any obligation to do so; the Recipient may, however, contest the required disclosure even if the Disclosing Party elects not to do so.  If notice to the Disclosing Party is prohibited by law, the Recipient will make a good faith effort to contest the disclosure if appropriate and to obtain agreement for confidential treatment of the Confidential Information prior to Recipient's disclosure.

13.     **INFORMATION AND PRIVILEGE**

13.1     The Claimants hereby instruct and, to the extent further instructions are needed, undertake to instruct, as part of the conditions precedent to this Agreement, the Nominated Lawyers (and will direct any future attorneys representing them) to, among other things:

- 14 -

Private and Confidential
PMW Edits: October 27, 2010

(a) provide to the Funder copies of any and all material Documentation together with all material Confidential Information, that the Nominated Lawyers may receive at any time while engaged by the Claimants, from the Claimants, the Defendant or from any other third party in relation to the Claim save insofar as such Documentation is already in the possession or control of the Funder;

(b) provide to the Funder any material document or material written advice which the Nominated Lawyer provides to the Claimants;

(c) notify the Funder of any material verdict, award, settlement, discontinuance or ending with respect to the Claim;

(d) respond to reasonable requests for material information from the Funder; and

(e) call the Funder prior to any delivery or payment to verify the amount due to the Funder under this Agreement.

13.2 The Parties agree that they have a "common legal interest" in the Claim, this Agreement, and any discussion, evaluation and negotiation and other communications and exchanges of information relating thereto.

13.3 Notwithstanding any other contrary provision of this Agreement, the Parties agree that any Common Interest Material shall at all times remain subject to all applicable privileges and protections from disclosure, including the attorney-client privilege or any similar privilege in any jurisdiction including, for the avoidance of doubt, legal professional privilege and/or litigation privilege, common interest privilege, work-product immunity doctrine, and any applicable rules of professional secrecy in any jurisdiction, it being the express intent of the Parties and their Affiliates to preserve intact to the fullest extent applicable, and not to waive, by virtue of this Agreement, any action contemplated under this Agreement, or otherwise, in whole or in part, any and all privileges and immunities to which Common Interest Material, or any part of it, are, may be subject or may become subject in the future. It is the good faith belief of the Disclosing Party that common interest privilege attaches to the Common Interest Material; no disclosure of the Common Interest Material would occur without the protection of that privilege.

13.4 The Parties further acknowledge and agree that the Claimants' undertakings set out in Clause 13.1 are continuing and are part of their duty to cooperate and are of the essence of the Agreement and a condition thereof and that any material breach of that obligation to cooperate shall entitle the Funder to terminate this Agreement pursuant to Clause 11.1.

13.5 Notwithstanding any other contrary provision of this Agreement or otherwise, the Parties agree that the Claimants shall have no obligations to make, and the Nominated Lawyers may not make, any disclosure or deliveries under or in respect of this Clause 13

- 15 -