# 11-1150-cv,

## 11-2259-op (Con), 11-1264-cv (Con)

## United States Court of Appeals

*for the*

## Second Circuit

CHEVRON CORPORATION,

*Plaintiff-Appellee,*

- v. -

HUGO GERARDO CAMACHO NARANJO, JAVIER PIAGUAJE PAYAGUAJE,
STEVEN R. DONZIGER, THE LAW OFFICES OF STEVEN R. DONZIGER,

*Defendants-Appellants.*

ON APPEAL FROM AND PETITION FOR WRIT OF MANDAMUS TO THE
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

## RESPONDENT'S APPENDIX

### VOLUME I OF I
### (Pages RA-1 to RA-185)

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
(212) 351-4000

*Attorneys for Plaintiff-Respondent
Chevron Corporation*

# TABLE OF CONTENTS

**PAGE**

Copy of the certified transcription and translation of video file CRS-032-00-
CLIP-01, an excerpt from the unreleased footage from the movie Crude.......................RA1

Copy of the certified transcription and translation of video file CRS-350-04-
CLIP-01, an excerpt from the unreleased footage from the movie
Crude………..............................................................................................................RA3

Exhibit AO to the Declaration of Kristin L. Hendricks in Support of Chevron
Corporation's Motion to Compel Production of Documents from Joseph C.
Kohn and Kohn, Swift & Graf, P.C., dated June 16, 2011 - Letter dated
April 17, 2010 from S. Donziger to "Fellow Counsel" … ........................................RA7

Exhibit 12 to the Declaration of Kristen L. Hendricks in Support of Chevron
Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
Email chain dated May 16, 2010 among Jay Horowitz, Andrew Wilson,
Steven Donziger, and others with the subject, "Rule 60(b) and Stratus
Materials" .............................................................................................RA17

Exhibit 310 to the Declaration of Kristen L. Hendricks in Support of Chevron
Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
Memorandum dated May 24, 2010 from J. McDermott to Steven Donziger
regarding, "Steven Donziger" ……….................................................................RA29

Exhibit 11 to the Declaration of Kristen L. Hendricks in Support of Chevron
Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
Email dated March 30, 2010 from Julio Prieto to Steven Donziger, Luis
Yanza and Pablo Fajardo with the subject, "Protection Action"…………..................RA31

Exhibit 425 to the Declaration of Kristen L. Hendricks in Support of Chevron
Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
Email dated December 25, 2008 from Pablo Fajardo to Michael Bonfiglio
with the subject, "TRABAJO" ["WORK"], and a certified English
translation thereof………...............................................................................RA34

Exhibit 456 to the Declaration of Kristen L. Hendricks in Support of Chevron
Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
Email dated September 3, 2007 from Steven Donziger to Pablo Fajardo and
others with the subject, "Imputado con la situacion HAVOC" ["Pissed off
with the HAVOC situation"], and a certified English translation thereof…….....................RA37

## TABLE OF CONTENTS
### *(Cont.d)*

__PAGE__

Exhibit J to the Declaration of Kristin L. Hendricks in Support of Chevron
    Corporation's Motion to Compel Production of Documents from Joseph C.
    Kohn and Kohn, Swift & Graf, P.C., dated June 16, 2011 - an email dated
    June 13, 2007 from S. Donziger to A. Soltani, S. Tegel, K. Koenig, and J.
    DeLury Ciplet with the subject, "HUGE VICTORY." ................................................ …………RA42

Portion of Exhibit 405 to the Declaration of Kristen L. Hendricks in Support of
    Chevron Corporation's Motion for Preliminary Injunction, dated February
    3, 2011 - Portion of the transcript of the deposition of Steven Donziger,
    taken on January 29, 2011, in In re Application of Chevron, No. 10-MC-
    00002-LAK (S.D.N.Y.)…… ................................................................................ …RA43

Exhibit 79 to Declaration of Kristen L. Hendricks in Support of Chevron
    Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
    Email dated January 2, 2008 from Pablo Fajardo to Alejandro Ponce, Steven
    Donziger, Luis Yanza, and others with the subject, "TAREAS" ["TASKS"],
    and attached document entitled, "TAREAS NECESARIAS A
    DEARROLLAR EN EL ANO 2008" [NECESSARY TASKS TO BE
    COMPLETED IN THE YEAR 2008"], and a certified English translation
    thereof…… ............................................................................................... ……RA47

Copy of the certified transcription and translation of video file CRS-361-11-
    CLIP-1, an excerpt from the unreleased footage from the movie Crude… .......................... …..RA56

Exhibit 245 to Declaration of Kristen L. Hendricks in Support of Chevron
    Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
    Email chain dated August 3, 2010 among Joe Berlinger, Steven Donziger,
    Pablo Fajardo, and others with the subject, "GRACIAS" ["THANK YOU"],
    and a certified English translation thereof……… ................................................................ …..RA62

Exhibit 388 to Declaration of Kristen L. Hendricks in Support of Chevron
    Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
    Email dated May 2, 2010 from Steven Donziger to Eric Westenberger,
    Jonathan Abady, and others, with the subject, "Activity in Case 4:10-mc-
    00134 Chevron Corporation v. 3TM International, Inc. et al Memorandum
    and Order"…… ............................................................................................... …..RA69

Exhibit 292 to Declaration of Kristen L. Hendricks in Support of Chevron
    Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
    Email chain dated May 27, 2010 among Steven Donziger, lawyers from
    Donziger & Associates, lawyers from Emery Celli, lawyers from Patton
    Boggs, and lawyers from Motley Rice, with the subject, "Mini -
    revelation"…................................................................................................ ……RA76

Exhibit 411 to Declaration of Kristen L. Hendricks in Support of Chevron
    Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
    Email dated June 14, 2010 from Steven Donziger to N. Economou with the
    subject, "FYI" ……… ..................................................................................... …..RA78

# TABLE OF CONTENTS
## *(Cont.d)*

**PAGE**

Exhibit 323 to Declaration of Kristen L. Hendricks in Support of Chevron
Corporation's Motion for Preliminary Injunction, dated February 3, 2011 –
Email chain dated May 27, 2010 among Steven Donziger, lawyers from
Emery Celli, lawyers from Patton Boggs, and lawyers from Motley Rice,
with the subject, "Re: Ecuador/Texas: Foundational Dep Ordered"…… .........................……..RA80

Exhibit 26 to Declaration of Randy Mastro on Behalf of Plaintiff Chevron
Corporation in Opposition to the LAP Representatives' Application for an
Order to Show Cause Why the Presiding District Judge Should Not Be
Recused, Pursuant to 28 U.S.C. § 455(a), dated May 2, 2011 – the Lago
Agrio Plaintiffs' Response to "Update on Lago Agrio Proceeding and
Request for Status Conference on June 21, 2010," dated June 17, 2010, in
Chevron Corp. v. Stratus Consulting, Inc., No. 10-cv-00047 (MSK) (MEH)
(D. Colo.).………… .......................................................................... …..RA82

Exhibit 27 to Declaration of Randy Mastro on Behalf of Plaintiff Chevron
Corporation in Opposition to the LAP Representatives' Application for an
Order to Show Cause Why the Presiding District Judge Should Not Be
Recused, Pursuant to 28 U.S.C. § 455(a), dated May 2, 2011 – excerpts
from the Lago Agrio Plaintiffs' Second Response to "Update on Lago Agrio
Proceeding and Request for Status Conference on June 21, 2010," dated
June 21, 2010, in Chevron Corp. v. Stratus Consulting, Inc., No. 10-cv-
00047 (MSK) (MEH) (D. Colo.)…….................................................................RA88

Exhibit 334 to Declaration of Kristen L. Hendricks in Support of Chevron
Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
Portions of the transcript of the deposition of Mark Quarles, taken on
September 1, 2010, in In re Application of Chevron Corp., No. 10-cv-00686
(M.D. Tenn.).……… .......................................................................... …..RA92

Portion of Exhibit 91 to Declaration of Kristen L. Hendricks in Support of
Chevron Corporation's Motion for Preliminary Injunction, dated February 3,
2011 – Portion of the transcript of the theatrical version of Crude…………....................……..RA97

Exhibit 15 to Declaration of Randy Mastro on Behalf of Plaintiff Chevron
Corporation in Opposition to the LAP Representatives' Application for an
Order to Show Cause Why the Presiding District Judge Should Not Be
Recused, Pursuant to 28 U.S.C. § 455(a), dated May 2, 2011 – a letter from
Gerald Lefcourt to Steven Donziger, dated December 15, 2010……… ................................…..RA99

Exhibit 16 to Declaration of Randy Mastro on Behalf of Plaintiff Chevron
Corporation in Opposition to the LAP Representatives' Application for an
Order to Show Cause Why the Presiding District Judge Should Not Be
Recused, Pursuant to 28 U.S.C. § 455(a), dated May 2, 2011 – Email dated
January 4, 2011 from Steven Donziger to Sheryl Reich, Gerald Lefcourt and
others with the subject "Re: Suggested agenda"…………...................................................……..RA102

# TABLE OF CONTENTS
### *(Cont.d)*

**PAGE**

Portions of Exhibit 76 to Declaration of Kristen L. Hendricks in Support of Chevron Corporation's Motion for Preliminary Injunction, dated February 3, 2011 – Pages containing entries from Steven Donziger's personal notes…………….......................................................................................................RA105

Exhibit EK to the Declaration of Kristin L. Hendricks in Support of Chevron Corporation's Motion to Compel Production of Documents from Joseph C. Kohn and Kohn, Swift & Graf, P.C., dated June 16, 2011 - a true and correct copy of an Official Circular dated November 18, 2010 by Dr. Alexis Mera Giler, Legal Counsel to the Office of the President of the Republic of Ecuador, and a certified English translation thereof……...............................………..RA109

Exhibit 17 to Declaration of Randy Mastro on Behalf of Plaintiff Chevron Corporation in Opposition to the LAP Representatives' Application for an Order to Show Cause Why the Presiding District Judge Should Not Be Recused, Pursuant to 28 U.S.C. § 455(a), dated May 2, 2011 – Email dated September 6, 2010 from Special Master Gitter to Judge Kaplan with the subject "In re Application of Chevron, M-19-111 (LAK)"……… ......................................…RA115

Exhibit 18 to Declaration of Randy Mastro on Behalf of Plaintiff Chevron Corporation in Opposition to the LAP Representatives' Application for an Order to Show Cause Why the Presiding District Judge Should Not Be Recused, Pursuant to 28 U.S.C. § 455(a), dated May 2, 2011 – Judge Kaplan's Order, dated September 7, 2010, in In re Application of Chevron Corp., 10-mc-00002(LAK) (S.D.N.Y.)…………........................................................RA117

Exhibit 19 to Declaration of Randy Mastro on Behalf of Plaintiff Chevron Corporation in Opposition to the LAP Representatives' Application for an Order to Show Cause Why the Presiding District Judge Should Not Be Recused, Pursuant to 28 U.S.C. § 455(a), dated May 2, 2011 – Judge Kaplan's Order, dated September 15, 2010, in In re Application of Chevron Corp., 10-mc-00002(LAK) (S.D.N.Y.)…………......................................…..RA118

Exhibit 20 to Declaration of Randy Mastro on Behalf of Plaintiff Chevron Corporation in Opposition to the LAP Representatives' Application for an Order to Show Cause Why the Presiding District Judge Should Not Be Recused, Pursuant to 28 U.S.C. § 455(a), dated May 2, 2011 – Portions of the transcripts of the deposition of Steven Donziger, taken on November 29, 2010, December 23, 2010, December 29, 2010, January 14, 2011, January 18, 2011, January 19, 2011, and January 29, 2011,  in In re Application of Chevron Corp., No. 10-mc-00002-LAK (S.D.N.Y.)………… ...........................................…..RA119

Exhibit 21 to Declaration of Randy Mastro on Behalf of Plaintiff Chevron Corporation in Opposition to the LAP Representatives' Application for an Order to Show Cause Why the Presiding District Judge Should Not Be Recused, Pursuant to 28 U.S.C. § 455(a), dated May 2, 2011 – Chevron's Second Reply in Support of its Order to Show Cause to Hold Steven Donziger in Contempt, dated January 24, 2011, in In re Application of Chevron Corp., 10-mc-00002 (LAK) (S.D.N.Y.)…………….......................................……..RA168

# TABLE OF CONTENTS
## *(Cont.d)*

**PAGE**

Exhibit 22 to Declaration of Randy Mastro on Behalf of Plaintiff Chevron
    Corporation in Opposition to the LAP Representatives' Application for an
    Order to Show Cause Why the Presiding District Judge Should Not Be
    Recused, Pursuant to 28 U.S.C. § 455(a), dated May 2, 2011 – Judge
    Kaplan's Order, dated December 27, 2010, in In re Application of Chevron
    Corp., 10-mc-00002(LAK) (S.D.N.Y.)……………….....................................……..RA182

Exhibit 149 to Declaration of Kristen L. Hendricks in Support of Chevron
    Corporation's Motion for Preliminary Injunction, dated February 3, 2011 -
    Email chain dated July 26, 2006 among Joseph Mutti, Steven Donziger, and
    Joseph Kohn with the subject "Potentially huge"….........................................……RA184



STATE OF CALIFORNIA )
                     )
                     )
COUNTY OF SAN FRANCISCO )          ss


## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from English into Spanish of the attached transcription excerpt CRS-032-

00-CLIP 01.


Steve Walsh, West Coast Client Manager
Geotext Translations, Inc.


State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me

on this 15 day of September, 20 10,

by       Steve Walsh              ,

proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

Signature:



BRANDON CARNEY
COMM. # 1755114
NOTARY PUBLIC - CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires July 3, 2011

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  |  www.geotext.com

TITLE OF CLIP:   CRS-032-00-CLIP-01

UMV = Unidentified Male Voice (Voz Masculina No Identificada)

| SPEAKER | ORIGINAL | TRANSLATION (Spanish) |
|---------|----------|------------------------|
| | | |
| UMV | A year from now, where are we gonna be? | En un año, ¿dónde estaremos? |
| | | |
| STEVEN DONZIGER | In this van, comin' fat [sic] from another inspection, wondering, what the fuck we're doing. [laughs] | En esta furgoneta, regresando de otra inspección, qué carajo estamos haciendo. [risas] |
| | | |
| UMV | Just tell me the answer. | Simplemente deme la respuesta. |
| | | |
| DONZIGER | Uh, in a year from now, we're not comin' down here anymore. The case is over. All we're doin' is writing reports and preparing for final submissions of papers. And, really mobilizing the country, politically, so that no judge can rule against us and feel like he can get away with it in terms of his career. | Ah, en un año, no vendremos más aquí. La causa está terminada. Todo lo que hacemos es escribir informes y prepararnos para la presentación final de documentos. Y, realmente movilizar al país, políticamente, de manera tal que ningún juez pueda fallar  en contra nuestro y sentir como que puede salirse con la suya en términos de su carrera. |
| | | |
| | [end of recording] | [fin de la grabación] |

11



**GEOTEXT**
Translations, Inc.

STATE OF CALIFORNIA   )
                          )
                          )
COUNTY OF SAN FRANCISCO  )     ss

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from English into Spanish and Spanish into English of the attached

transcription excerpt CRS-350-04-CLIP-01.

Nicholas Bocek, Managing Editor
Geotext Translations, Inc.

State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me

on this _8th_ day of _August_ , 20 _10_ ,

by _Nicholas Bocek_ ,

proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

Signature:



BRANDON CARNEY
COMM. # 1755114
NOTARY PUBLIC - CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires July 3, 2011

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. **tel** 212.631.7432 **fax** 212.631.7778
San Francisco  220 Montgomery Street, 3rd Floor, San Francisco, CA 94104, U.S.A. **tel** 415.576.9500 **fax** 415.520.0525
London  107-111 Fleet Street, London EC4A 2AB, United Kingdom **tel** +44.(0)20.7936.9002 **fax** +44.(0)20.7990.9909
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong **tel** +852.2159.9143 **fax** +852.3010.0082
translations@geotext.com  |  www.geotext.com

417

**TITLE OF CLIP:  CRS-350-04-CLIP-01**

| SPEAKER | ORIGINAL | TRANSLATION (Spanish) | TRANSLATION (English) |
|---|---|---|---|
| LUIS YANZA | La idea de hacer el S.O.S. [ininteligible] | | The idea of sending an S.O.S. [unintelligible] |
| | | | |
| STEVEN DONZIGER | ¿Qué es? | | What is it? |
| | | | |
| YANZA | S.O.S. | | S.O.S. |
| | | | |
| ATOSSA SOLTANI | S.O.S. | S.O.S. | S.O.S. |
| | | | |
| | [risa] | | [laughter] |
| | | | |
| SOLTANI | S.O.S. [ininteligible] | | S.O.S. [unintelligible] |
| | | | |
| DONZIGER | Nos vamos de-- de-- de necesidades que tenemos nosotros. Yo-- yo creo que analizando la coyuntura del caso, que estamos perdiendo fuerza con la corte. Yo creo que, ah-- ¿puedo hablar en inglés rapidito? Ya, tú sabes lo voy a decir. | | Let's go to-- to-- to our needs. I-- I think that, analyzing the outlook of this case, we are losing strength with the court. I think that, uh-- can I speak in English really quickly? You already know what I'm going to say. |
| | | | |
| YANZA | ¿Qué va a decir? | | What are you going to say? |
| | | | |
| DONZIGER | Por qué la justificación por la marcha. | | Why the justification for the march. |
| | | | |
| YANZA | Ah, ya. | | Oh, okay. |
| | | | |
| DONZIGER | Okay. Uhm, this case has pretty much been asleep for five months. It's weird. I mean, we got-- we were getting, like, everything, for a while, that we wanted. You know, we got the cancellation of the inspections. You know, we we're getting the *peritaje global*, the final phase. But then, like, suddenly everything was in place and he won't swear in the *perito*, which is needed to start the hundred-and-twenty day period. It's been, like, weeks and weeks and weeks of delays. You know, after sort of analyzing the | Bien. Eh, este caso ha estado dormido por unos cinco meses. Es algo raro. Es decir, nos dieron-- nos dieron todo lo que queríamos por un tiempo. La cancelación de las inspecciones, ¿no? El peritaje global, la fase final. Pero luego, como que de pronto todo estaba listo y él no quiere juramentar al perito, lo cual es un requisito para que empiece a correr el periodo de ciento y veinte días. Han habido semanas y semanas de demoras. Saben, después analizar la situación, creemos que el juez está tratando de | ...we were  getting the global expert assessment, you know...

and he won't swear in the expert, which is needed |

| | | |
|---|---|---|
| | situation, we believe that the judge is trying to stall the case until the end of the year, until the new guy comes in. | alargar el caso hasta fin de año, cuando entra el nuevo fulano. | |
| | | | |
| SOLTANI | I agree with you. Yes. | Estoy de acuerdo contigo. Sí. | |
| | | | |
| DONZIGER | Okay. So, you know-- but it goes way beyond the problem of any individual judge, 'cause it's possible the next person could come in and s-- and not want to deal with it and do the same. You know, it's a problem of institutional weakness in the judiciary, generally, and of this court, in particular. We have concluded that we need to do more, politically, to control the court, to pressure the court. We believe they make decisions based on who they fear the most, not based on what the laws should dictate. So, what we want to do is take over the court with a massive protest that we haven't done since the first day of the trial, back in October of 2003. Remember all those people on the street? | Bien. Entonces, saben-- pero esto va mucho más allá del problema de cualquier juez en particular, porque es posible que la siguiente persona entre y di-- y no quiera lidiar con ello, y haga lo mismo. Sabes, es un problema con la debilidad institucional en la judicatura, en general, y de esta corte, en particular. Hemos llegado a la conclusión de que tenemos que hacer más, políticamente, para controlar a la corte, para presionar a la corte. Creemos que toman decisiones de acuerdo a quién temen más, no de acuerdo a lo que establecen las leyes. Así que, lo que queremos hacer es tomar control de la corte a través de una protesta masiva, como no hemos hecho desde el primer día del juicio, allá en octubre de 2003. ¿Recuerdan que había toda esa gente en la calle? | |
| | | | |
| SOLTANI | Mm-hmm. | Mm-hmm. | |
| | | | |
| DONZIGER | It's a huge effort, it costs money. Not that much, actually, but, few thousand dollars, to get everyone in for a day. And... *sí, doctor.* | Es un cometido grandísimo, cuesta dinero. No tanto, en realidad, pero unos cuantos miles de dólares, para que vayan todos por un día. Y... sí, doctor. | And... yes, doctor. |
| | | | |
| | [inaudible] | | [inaudible] |
| | | | |
| DONZIGER | ¿Seguro? [pausa] Okay. | | Are you sure? [pause] Okay. |
| | | | |
| YANZA | Entre gringos. [risa] | | Among *gringos*. [laughter] |
| | | | |
| DONZIGER | Uhm, and we want to do that the last week of June. Soon, like three weeks. Okay? Uhm, how | Eh, y queremos hacer todo eso durante la última semana de junio. Pronto, como en tres | |

| | | |
|---|---|---|
| | we're gonna do it—like, are we just gonna be outside, are we actually gonna go in and shut the court down for a day— are all issues we need to figure out strategically. But, it-- it's-- it's a critically important moment, because we want to send a message to the court that, 'don't fuck with us anymore-- not now, and not-- not later, and never.' 'Cause we have been weak on the political pressure. And all Texaco has to do, if you think about it, all they have to do is get the court to do nothing. That's easy. We have to get the court to act in a way no court has ever acted before in Ecuador. That's hard. You know, so, in a way, their job is easier. They work the back scenes. They probably pay some people off, they get friendly with them. You know, they do the little thing, and then suddenly there's, like, a paralysis in the court. You know, and we're stuck. And, you know, no one fears us right now. And, until they fear us, we're not gonna win this case. I'm convinced. | semanas. ¿Bien? Eh, cómo vamos a hacerlo, ¿vamos a estar afuera, o bien vamos a entrar y cerrar la corte por un día? Todos son asuntos que tenemos que determinar estratégicamente. Pero, es-- es-- es un momento de vital importancia, porque queremos enviarle un mensaje a la corte de que ya no se metan con nosotros-- ni ahora, ni-- ni después, ni nunca. Porque la presión política de nuestra parte ha sido débil. Y lo único que tiene que hacer Texaco, piénsenlo, es lograr que la corte no haga nada. Eso es fácil. Nosotros tenemos que lograr que la corte actúe como ninguna corte actuó jamás en Ecuador. Eso es difícil, ¿no? Así que, de cierta forma, el trabajo de ellos es más fácil. Ellos trabajan entre bastidores. Lo más seguro es que sobornan a la gente, se muestran amables con ellos, ¿no? Hacen cualquier cosita, y de pronto hay como una parálisis en la corte. Y saben, nos estancamos. Y, saben, nadie nos tiene miedo por ahora. Y, no vamos ganar este caso hasta que nos tengan miedo. De eso estoy convencido. | |
| SOLTANI | I have a question. | Tengo una pregunta. | |
| | | | |
| DONZIGER | Mm-hmm? | Mm | |
| | | | |
| SOLTANI | What ever happened to the idea of filing a precautionary measure at the OAS? | ¿Qué pasó con la idea de presentar una petición para medidas cautelares en la OAS? | |
| | | | |
| | [end of recording] | [fin de grabación] | |

# EXHIBIT AO

**PRIVILEGED/CONFIDENTIAL/ATTORNEY WORK PRODUCT**

Dear Fellow Counsel,

As you know, I was in Ecuador last week where I spent several hours meeting with local counsel and conducting due diligence on Ecuador law issues and the trial record as they relate to the *Aguinda* case. I was accompanied by Laura Garr and Aaron Page, both of whom are lawyers who have worked intensively on the case for several months and who have done substantial research on some of the issues. Among other things, we analyzed the status of the *Aguinda* case, the time frame for a possible decision given the various uncertainties now in the U.S. and the Hague, and how information gleaned by Chevron via its 1782 strategy could impact expectations and impose additional risks both for the case itself and for current counsel personally (including the undersigned). These issues need to be weighed carefully by our team, and plans needs to be in place to deal with likely contingencies.

*The Status of the Aguinda Case*

Local counsel believes a judgment in the *Aguinda* case could come as early as September of this year, assuming that the 1782 actions in the U.S. or other events don't impede the schedule. (My experience with these predictions is that they tend to be overly optimistic.) There are three evidentiary reports, all requested by Chevron, that are still outstanding although they have been ordered to be completed by May. Our counsel believes the court will issue the *autos para sentencia* (meaning the case is ripe for decision) as early as June or July, at which point the parties will submit their alegatos or final written arguments.

Because of risks relating to the Cabrera report as described below, it is possible the sentence won't come as quickly as local counsel predicts and there are several contingencies at play.

*The Cabrera Report and the Role of Stratus: Ecuador Law*

A major contingency is obviously the Colorado 1782 action. As previously indicated, if Chevron succeeds in obtaining discovery from Stratus and deposing the Stratus principals (which we assume will happen although questions remain about the scope of production), they will find that Stratus wrote the bulk of the report adopted by Cabrera and submitted to the court. Various annexes and an executive summary were provided to local counsel, who provided it to Cabrera, who adopted it. There was significant back and forth collaboration between local counsel and Cabrera, and separately, via local counsel and Stratus. There are also numerous emails between Stratus and local counsel documenting how this work was done, and there are some emails between Stratus and U.S. counsel that show U.S. counsel (relying on guidance of local counsel) approved of this process, encouraged it, and was involved in it from a supervisory perspective. There was also at least one ex parte meeting between Stratus and Cabrera at which U.S. counsel was present. The emails and testimony likely will show some effort to keep the extent of this ex parte collaboration between our local counsel and Cabrera from being disclosed. (The entirety of the emails and production needs to be reviewed and privileges asserted, so it is uncertain whether the emails will be disclosed.)

Our local counsel indicates there will be two very different perspectives on these facts. The traditional Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of collaboration between one party and the expert is problematic and improper in that all court-appointed experts in Ecuador should be independent. By working so closely with our local counsel and Stratus,

DONZ-HDD-0004621

Cabrera violated his duties to the court.   Under this perspective, treating Cabrera like a U.S.-style expert as we did will be seen as a violation of local court rules. Whether the court will see these facts as no big deal, improper, some sort of procedural defect that can be corrected, or (as the Gibson lawyers will surely assert) a fraud is uncertain.  Our side believes we can weather the storm with good advocacy in both the court and the media, in Ecuador and in the U.S.   However, it was not lost on us that our local counsel seemed concerned about how the information would land in Ecuador and what impact it would have on the case, and to them personally.   They fully expect that Chevron would refer the information to the national prosecutor for action.    (Note that two Chevron lawyers are currently under indictment in Ecuador for lying about the results of Texaco's earlier remediation.)  Local counsel agrees that we need to immediately take steps to expand and fortify our team in Ecuador to have in place a plan to defend the process in a timely manner.

Generally, our local team believes it is likely that the Cabrera report will survive and will be used by the court  as a basis (along with some of the 103 other expert reports in evidence) to impose a damages claim on Chevron.   However, local counsel believes it is also possible that the information could prompt the court to nullify the Cabrera report and order a new damages assessment based on the existing evidence. This would set back the timing of a decision for approximately two years.  An absolute worse-case scenario, which local counsel sees as highly unlikely for several reasons, would be for the court to conclude one party litigated in "bad faith" and end the trial.  Chevron will certainly ask that the Cabrera report be stricken and that the judge throw out the case. (Chevron already has made these requests re" the Cabrera report with no success, although with lesser fanfare.)

The other perspective is that given the customs and practices of the *Aguinda* case, nothing improper happened.  The information in the Cabrera report is sound, and is consistent with the high quality of work that Stratus has done as a world class environmental consultancy.  As you know, all of the court-appointed experts in the judicial inspections have been working closely with the parties in one form or another for several years with full knowledge of the court, and Cabrera was no different.   Chevron's experts, including U.S. citizens appointed by the judge at Chevron's request were working with Chevron's counsel.    Even though Cabrera was not an expert put forth by the parties, given that the plaintiffs unilaterally sought the global expert report and are paying him, that Chevron boycotted the process, and that the court ordered the parties to turn over materials to Cabrera and otherwise assist him, then the role of local counsel and Stratus was well within our rights and custom under the rules and practices of the *Aguinda* case as they had evolved since its inception almost seven years ago.  Further, there are three other court-appointed experts preparing reports right now at Chevron's behest along the same lines as Cabrera, with Chevron paying all costs and Chevron counsel presumably working closely with the individual experts.

In my opinion, it is critical that create a plan to deal with the disclosure of these facts and Chevron's public relations campaign.   This might involve hiring a crisis communications consultancy, having statements ready to be given to the press, getting in front of the issue by announcing the results of each deposition before Chevron can, putting out new counsel both in Ecuador and the U.S. to announce they will deal with any problems, possible change of status of existing counsel etc.  Ultimately, we need to project the image that these facts are more "business as usual" as Chevron tries to undermine a trial that it knows it will lose based on the scientific evidence.  Nevertheless, these are critical questions that need to be given thoughtful consideration immediately by the team.

DONZ-HDD-0004622

*The Hague: Do We Appear*

Another critical question is whether we engage the arbitration panel in the Hague, which has scheduled a hearing in London on May 10-11 to deal with Chevron's request for provisional measures which include ordering Ecuador's government to suspend the Lago trial until the arbitral panel can fully hear Chevron's claims. This is a case of first impression, as no arbitral panel has ever tried to order a country to halt an ongoing private litigation. Eric Bloom of Winston & Strawn believes it might help the government's case if we appear. This could be in the form of a letter we address to the panel. Bloom also would like permission to ask the panel to seek our views on Chevron's allegations. If we do engage, this will be a substantial amount of work. There is also the downside risk that we will be legitimating a process that we believe should have no impact on an enforcement action. This needs to be vetted and discussed with people with expertise in the field, with a decision made relatively quickly given the impending deadine.

*SRD Role*

Consistent with the Gibson Dunn playbook, the undersigned fully expects Chevron to continue to try build a narrative to attack him as the "mastermind" of a fraud in Ecuador. Chevron already is using Calmbacher's unrebutted (and largely inaccurate – see memo) statements in his recent deposition to this effect. Recently, Chevron's public relations spokesman told a journalist that company lawyers are preparing a "misconduct" complaint against SRD based on the Calmbacher deposition. Chevron might also file a 1782 action against SRD and other U.S. lawyers associated with him. SRD is not technically appearing in any proceeding, but obviously has taken a very public and high-profile role as legal advisor to the plaintiffs in Ecuador. Depositions of Stratus individuals will put SRD further in the center of activities that Chevron will attack as part of a fraud. Chevron's effort to target a lawyer personally by damaging his credibility raises a number of strategic and tactical questions for the team that need to be addressed immediately, including the possible change of status or the announcement of the broader team so SRD is no longer the sole "face" of the lawsuit in the U.S. Also, the defense of SRD in these actions – and any potential conflicts with the clients – need to be thought through.

*Calmbacher Report*

We have launched an internal review of the Calmbacher report and Calmbacher's deposition testimony. It is clear from emails that Calmbacher was not telling the truth, and in fact might have perjured himself during the deposition on multiple occasions although the dispositive question (did he approve final reports submitted to the court) is inconclusive. That said, there is powerful and even explosive information to undermine his credibility as a witness. Query whether we should release this information publicly, share it with the ROE which will have to deal with the issue in the Hague, or take some other measure to neutralize the negative fallout from the deposition.

*A 1782 Strategy for Plaintiffs and the ROE*

Finally, it might be worth considering how we can take the offensive against Chevron both in terms of an investigation in Ecuador and possible legal actions in the U.S. Some immediate opportunities come to mind:

- Diego Borja, regarding the wealth of material in the audiotapes tying Chevron's sting operation to company officials and agents, tampering with lab evidence, and other problems. This is

DONZ-HDD-0004623

potentially a mother lode of information; Borja is represented by a criminal defense lawyer paid by Chevron and the ROE appears to be interested in him as well;

- Ricardo Reis Veiga, the former Texaco executive now living in Miami who masterminded the sham remediation, supervised the trial, and we believe worked with Borja to conduct the secret taping of the judge to try to undermine and delay the trial;

- Wayne Hansen, Borja's partner in the secret videotaping;

- Charles James, retired Chevron General Counsel now teaching law at Arizona State University, on the Borja sting operation.

### *Summary*

I propose we talk though each of these issues as a team and formulate strategies accordingly.

Steven Donziger

DONZ-HDD-0004624

Document 1 of 1

```
BEG_CTRL_NUM      :  DONZ-HDD-0004621
END_CTRL_NUM      :  DONZ-HDD-0004624
DATECREATED       =  04/17/2010
PARENTDATE        =  04/17/2010
LASTSAVEDATE      =  04/17/2010
DATEACCESSED      =  04/17/2010
PAGES             =    4
ITEM_NO           =    1760
UPDATEDATE        =  02/21/2011
PRIV_DOC_NO       =    0
AUTHOR            :  Steven R Donziger
TEXT              :
```

PRIVILEGED/CONFIDENTIAL/ATTORNEY WORK PRODUCT

Dear Fellow Counsel,

As you know, I was in Ecuador last week where I spent several hours meeting with local counsel and
conducting due diligence on Ecuador law issues and the trial record as they relate to the Aguinda    case.  I
was accompanied by Laura Garr and Aaron Page, both of whom are lawyers who have worked
intensively on the case for several months and who have done substantial research on some of the issues.
Among other things, we analyzed the status of the    Aguinda    case, the time frame for a possible decision
given the various uncertainties now in the U.S. and the Hague, and how information gleaned by Chevron
via its 1782 strategy could impact expectations and impose additional risks both for the case itself and for
current counsel personally (including the undersigned).  These issues need to be weighed carefully by our
team, and plans needs to be in place to deal with likely contingencies.

The Status of the Aguinda Case

Local counsel believes a judgment in the    Aguinda    case could come as early as September of this year,
assuming that the 1782 actions in the U.S. or other events don't impede the schedule. (My experience
with these predictions is that they tend to be overly optimistic.)  There are three evidentiary reports, all
requested by Chevron, that are still outstanding although they have been ordered to be completed by May.
Our counsel believes the court will issue the    autos para sentencia    (meaning the case is ripe for decision)
as early as June or July, at which point the parties will submit their alegatos or final written arguments.

Because of risks relating to the Cabrera report as described below, it is possible the sentence won't come
as quickly as local counsel predicts and there are several contingencies at play.

The Cabrera Report and the Role of Stratus: Ecuador Law

A major contingency is obviously the Colorado 1782 action.  As previously indicated, if Chevron
succeeds in obtaining discovery from Stratus and deposing the Stratus principals (which we assume will
happen although questions remain about the scope of production), they will find that Stratus wrote the
bulk of the report adopted by Cabrera and submitted to the court.    Various annexes and an executive

summary were provided to local counsel, who provided it to Cabrera, who adopted it.  There was
significant back and forth collaboration between local counsel and Cabrera, and separately, via local
counsel and Stratus.  There are also numerous emails between Stratus and local counsel documenting how
this work was done, and there are some emails between Stratus and U.S. counsel that show U.S. counsel
(relying on guidance of local counsel) approved of this process, encouraged it, and was involved in it
from a supervisory perspective. There was also at least one ex parte meeting between Stratus and Cabrera
at which U.S. counsel was present.   The emails and testimony likely will show some effort to keep the
extent of this ex parte collaboration between our local counsel and Cabrera from being disclosed. (The
entirety of the emails and production needs to be reviewed and privileges asserted, so it is uncertain
whether the emails will be disclosed.)

Our local counsel indicates there will be two very different perspectives on these facts.  The traditional
Ecuadorian law perspective (which will be asserted by Chevron) would hold that the level of
collaboration between one party and the expert is problematic and improper in that all court-appointed
experts in Ecuador should be independent.  By working so closely with our local counsel and Stratus,

Cabrera violated his duties to the court.   Under this perspective, treating Cabrera like a U.S.-style expert
as we did will be seen as a violation of local court rules.  Whether the court will see these facts as no big
deal, improper, some sort of procedural defect that can be corrected, or (as the Gibson lawyers will surely
assert) a fraud is uncertain.  Our side believes we can weather the storm with good advocacy in both the
court and the media, in Ecuador and in the U.S.  However, it was not lost on us that our local counsel
seemed concerned about how the information would land in Ecuador and what impact it would have on
the case, and to them personally.  They fully expect that Chevron would refer the information to the
national prosecutor for action.   (Note that two Chevron lawyers are currently under indictment in
Ecuador for lying about the results of Texaco's earlier remediation.)  Local counsel agrees that we need to
immediately take steps to expand and fortify our team in Ecuador to have in place a plan to defend the
process in a timely manner.

Generally, our local team believes it is likely that the Cabrera report will survive and will be used by the
court  as a basis (along with some of the 103 other expert reports in evidence) to impose a damages claim
on Chevron.  However, local counsel believes it is also possible that the information could prompt the
court to nullify the Cabrera report and order a new damages assessment based on the existing evidence.
This would set back the timing of a decision for approximately two years.  An absolute worse-case
scenario, which local counsel sees as highly unlikely for several reasons, would be for the court to
conclude one party litigated in "bad faith" and end the trial.  Chevron will certainly ask that the

Cabrera
report be stricken and that the judge throw out the case. (Chevron already has made these requests re" the
Cabrera report with no success, although with lesser facts.)

The other perspective is that given the customs and practices of the    Aguinda    case, nothing improper
happened.  The information in the Cabrera report is sound, and is consistent with the high quality of work
that Stratus has done as a world class environmental consultancy.  As you know, all of the court-appointed experts in the judicial inspections have been working closely with the parties in one form or
another for several years with full knowledge of the court, and Cabrera was no different.  Chevron's
experts, including U.S. citizens appointed by the judge at Chevron's request were working with Chevron's counsel.   Even though Cabrera was not an expert put forth by the parties, given that the
plaintiffs unilaterally sought the global expert report and are paying him, that Chevron boycotted the
process, and that the court ordered the parties to turn over materials to Cabrera and otherwise assist him,
then the role of local counsel and Stratus was well within our rights and custom under the rules and
practices of the    Aguinda    case as they had evolved since its inception almost seven years ago.  Further,
there are three other court-appointed experts preparing reports right now at Chevron's behest along the
same lines as Cabrera, with Chevron paying all costs and Chevron counsel presumably working closely
with the individual experts.

In my opinion, it is critical that create a plan to deal with the disclosure of these facts and Chevron's
public relations campaign.  This might involve hiring a crisis communications consultancy, having
statements ready to be given to the press, getting in front of the issue by announcing the results of each
deposition before Chevron can, putting out new counsel both in Ecuador and the U.S. to announce they
will deal with any problems, possible change of status of existing counsel etc.  Ultimately, we need to
project the image that these facts are more "business as usual" as Chevron tries to undermine a trial that it
knows it will lose based on the scientific evidence.  Nevertheless, these are critical questions that need to
be given thoughtful consideration immediately by the team.


The Hague: Do We Appear

Another critical question is whether we engage the arbitration panel in the Hague, which has scheduled a
hearing in London on May 10-11 to deal with Chevron's request for provisional measures which include
ordering Ecuador's government to suspend the Lago trial until the arbitral panel can fully hear Chevron's
claims.  This is a case of first impression, as no arbitral panel has ever tried to order a country to halt an
ongoing private litigation.  Eric Bloom of Winston & Strawn believes it might help the government's case
if we appear.  This could be in the form of a letter we address to the panel.  Bloom also would like
permission to ask the panel to seek our views on Chevron's allegations.  If we do engage, this will

be a
substantial amount of work.  There is also the downside risk that we will be legitimating a process
that we
believe should have no impact on an enforcement action.  This needs to be vetted and discussed
with
people with expertise in the field, with a decision made relatively quickly given the impending
deadine.

SRD Role

Consistent with the Gibson Dunn playbook, the undersigned fully expects Chevron to continue to
try
build a narrative to attack him as the "mastermind" of a fraud in Ecuador.  Chevron already is
using
Calmbacher's unrebutted (and largely inaccurate – see memo) statements in his recent deposition
to this
effect.  Recently, Chevron's public relations spokesman told a journalist that company lawyers are
preparing a "misconduct" complaint against SRD based on the Calmbacher deposition.   Chevron
might
also file a 1782 action against SRD and other U.S. lawyers associated with him.  SRD is not
technically
appearing in any proceeding, but obviously has taken a very public and high-profile role as legal
advisor
to the plaintiffs in Ecuador.  Depositions of Stratus individuals will put SRD further in the center of
activities that Chevron will attack as part of a fraud.  Chevron's effort to target a lawyer personally
by
damaging his credibility raises a number of strategic and tactical questions for the team that need
to be
addressed immediately, including the possible change of status or the announcement of the
broader team
so SRD is no longer the sole "face" of the lawsuit in the U.S.  Also, the defense of SRD in these
actions –
and any potential conflicts with the clients – need to be thought through.

Calmbacher Report

We have launched an internal review of the Calmbacher report and Calmbacher's deposition
testimony.
It is clear from emails that Calmbacher was not telling the truth, and in fact might have perjured
himself
during the deposition on multiple occasions although the dispositive question (did he approve final
reports submitted to the court) is inconclusive.  That said, there is powerful and even explosive
information to undermine his credibility as a witness.  Query whether we should release this
information
publicly, share it with the ROE which will have to deal with the issue in the Hague, or take some
other
measure to neutralize the negative fallout from the deposition.

A 1782 Strategy for Plaintiffs and the ROE

Finally, it might be worth considering how we can take the offensive against Chevron both in
terms of an
investigation in Ecuador and possible legal actions in the U.S.  Some immediate opportunities
come to
mind:

? Diego Borja, regarding the wealth of material in the audiotapes tying Chevron's sting
operation to
company officials and agents, tampering with lab evidence, and other problems.  This is

paid        potentially a mother lode of information; Borja is represented by a criminal defense lawyer

by Chevron and the ROE appears to be interested in him as well;

? Ricardo Reis Veiga, the former Texaco executive now living in Miami who masterminded the sham remediation, supervised the trial, and we believe worked with Borja to conduct the

secret      taping of the judge to try to undermine and delay the trial;

? Wayne Hansen, Borja's partner in the secret videotaping;

? Charles James, retired Chevron General Counsel now teaching law at Arizona State University,

on the Borja sting operation.

Summary

I propose we talk though each of these issues as a team and formulate strategies accordingly.

Steven Donziger

TITLE             : Dear Fellow Counsel.DOC
FILENAME    : Dear Fellow Counsel.DOC

| From: | jhorowitz@hflitig.com |
|---|---|
| Sent: | Sunday, May 16, 2010 3:01 PM |
| To: | Andrew Wilson |
| Cc: | Jonathan S. Abady; sdonziger@gmail.com; Ilann M. Maazel; sdonziger@donzigerandassociates.com; ewestenberger@pattonboggs.com; EYennock@pattonboggs.com; EDaleo@pattonboggs.com; jrockwell@pattonboggs.com |
| Subject: | Re: Rule 60(b) And Stratus Materials |

This document might end the discussion. These "comments" are written in a manner to give the impression that Cabrera was entirely independent and conducted his own research and came up with his own findings. There is no indication in this document that Stratus, ostensibly the company of experts independent from Cabrera, was itself involved in "ghosting" the Cabrera report. This might not be dispositive if there were other evidence showing that Chevron had actual or constructive knowledge that Stratus had been involved in the creation of the Cabrera report. In such a case Stratus's "comments" may have been a rather crude and awkward spin by a biased expert - but it would not have been a "fraud" upon Chevron. But, in the absence of such evidence, then it appears not only that Cabrera and plaintiffs can be charged with a "fraud" respecting the former's report, but that Stratus was an active conspirator.

Andrew Wilson wrote:
> I have attached the Stratus comments to the Cabrera report. The first
> line is "We have reviewed the report "Informe Sumario del Examen
> Pericial" that was prepared by Ing. Richard Cabrera Vega, who was
> appointed as a techincal expert by the Court in the case of Maria
> Aguinda y Octros against Chevron Corporation."
>
>
>
> -----Original Message-----
> From: jhorowitz@hflitig.com [mailto:jhorowitz@hflitig.com]
> Sent: Sunday, May 16, 2010 5:22 PM
> To: Jonathan S. Abady
> Cc: Andrew Wilson; sdonziger@gmail.com; Ilann M. Maazel;
> sdonziger@donzigerandassociates.com; ewestenberger@pattonboggs.com;
> EYennock@pattonboggs.com; EDaleo@pattonboggs.com;
> jrockwell@pattonboggs.com
> Subject: Re: Rule 60(b) And Stratus Materials
>
>
>
>
> Steve, et al:
>          As noted in my email earlier today attempting to salvage the
> Rule 60 motion, notwithstanding Ilann's good points, and, beyond this,
> trying to use passing comments or a footnote in the Rule 60 brief, as
> the way to downplay the significance of the apparently undisclosed
> delivery of Stratus materials to Cabrera by Fajardo,  my  argument
> turns
>
> very substantially on the facts.  If there is any interest in
> reclaiming the argument, these facts need to be checked. Thus you, and

> Fajardo, and anyone else who is conversant with the underlying facts,
> must inform us of each of the matters referred to by me in that
> lengthy email from earlier today:
>         when did plaintiffs retain Stratus?   what knowledge was there,
>
> by Chevron, or by the  public in general, of that retention?  although
> Cabrera may not have mentioned Stratus in his reports,  did he mention
> others whose work he used in a fashion similar to the way he used
> Stratus material, i.e. not attributing the work product to others by
> name just as he apparently did  not mention Stratus by name?  is there
> any room in the background information concerning Cabrera and the
> areas in which he may have expertise,  for an argument that it would
> have been clear to anyone familiar with him and with this case, that
> the annexes which were included in his report necessarily would have
> been the work-product of others who, unlike Cabrera, would have had
> the expertise to have written something of this nature  (which, of
> course, does not mean that Cabrera had not reviewed them and did not subscribe to them)?
>
> how long after the publication of Cabrera's report did Stratus itself
> publish its own material?  in the latter regard, I seem to recall
> reference to Stratus coming out with its "comments" within weeks of
> the Cabrera report?  did Stratus include in its comments a significant
> portion of its material furnished to Cabrera, such that any reader of
> its web-site obviously understood that Stratus was the author, or the
> originator, of substantial portions of the Cabrera report?  it appears
> that Stratus wrote some of its public comments regarding the Cabrera
> report in such a fashion as to give the impression that Cabrera had
> worked independently of any influence by or contributions from the
> parties or their respective experts; is that so?  If so, Stratus's
> caginess in this regard could look very bad for plaintiffs and make
> plaintiffs knowing conspirators in a fraud - together with Stratus and
> Cabrera?  did Chevron in fact file any complaint with the Lago Agrio
> court in which it referred specifically, or at least alluded, to the
> seeming origin of Cabrera's report - pointing to the Stratus web-site
> or other Stratus public statements, for this purpose?
>         In other words:  the Rule 60 motion could be helpful for
> us but it cannot be written as it is, to the extent that it currently
> does not acknowledge that there was some material which plaintiffs
> supplied to Cabrera about which Chevron was not concurrently informed,
> and our efforts to get around that problem are very dependent upon
> facts like those I have asked about.
>         Jay
>
>
>
> Jonathan S. Abady wrote:
>
>> Seems hard to suggest that Chevron was aware of Stratus' particular
>> role from the start.  Perhaps the better way to characterize it is
>> that the process clearly contemplated submissions by the parties to
>> Cabrera to facilitate his work. In fact, Cabrera requested input and
>> the court ordered with regard to the process. Plaintiffs choose to
>> cooperate and make certain transmitals; Chevron chose to boycott the
>> process.  Under these circumstances, Chevron can't be heard to
>> complain, much less contend there was any kind of fraud.
>>
>>
>> ----- Original Message -----

DONZ00056679 Page 2 of 12

```
>> From: Andrew Wilson
>> To: 'jhorowitz@hflitig.com' <jhorowitz@hflitig.com>;
>> sdonziger@gmail.com <sdonziger@gmail.com>
>> Cc: Ilann M. Maazel; Steven Donziger
>> <sdonziger@donzigerandassociates.com>; Westenberger
>> <ewestenberger@pattonboggs.com>; Yennock, Edward
>> <EYennock@pattonboggs.com>; Jonathan S. Abady; Daleo, Eric
>> <EDaleo@pattonboggs.com>; Rockwell, Jason <JRockwell@pattonboggs.com>
>> Sent: Sun May 16 15:52:42 2010
>> Subject: RE: Rule 60(b) And Stratus Materials
>>
>> I do not know how much of Stratus's work was later published on its
>> website, which seems key to this argument.  That said, Stratus did
>> put
>>
>
>
>> out a statement about its views on the Cabrera report which never
>> disclosed its substantial role and, indeed, went to great lengths to
>> praise the report at arms length.  Cabrera, for his part, never
>> mentions Stratus by name.  I think these facts are bad for us and may
>> still militate against arguing that Chevron was aware of Stratus's
>> role from the outset.
>>
>> -----Original Message-----
>> From: jhorowitz@hflitig.com [mailto:jhorowitz@hflitig.com]
>> Sent: Sunday, May 16, 2010 2:20 PM
>> To: sdonziger@gmail.com
>> Cc: Ilann M. Maazel; Steven Donziger; Westenberger; Andrew Wilson;
>> Yennock, Edward; Jonathan S. Abady; Daleo, Eric; Rockwell, Jason
>> Subject: Re: Rule 60(b) And Stratus Materials
>>
>>
>>
>>
>>
>> Steve et al:
>>
>>         Ilann has expressed an understandable concern about
>> several assertions we make  in the current version of the Rule 60(b)
>> motion.
>> The assertions  state that Chevron was aware at the time when our
>> local counsel supplied Cabrera with material that he was doing that
>> and, based on this and other facts, we therefore contend that
>> Chevron's now complaint to the District of Colorado  about a "fraud"
>> is wrong or, at least, vastly overstated. In fact, it now appears
>> that
>>
>
>
>> at some point, in or about March 2008 our local counsel conveyed a
>> substantial amount of information prepared by Stratus to Cabrera and
>> may not have contemporaneously advised Chevron  (or the Court) of
>> that
>>
>
>
>> submission.
```

>> If so, then, obviously it would be wrong for us to assert  that
>> Chevron was aware of this submission and undercuts our accusation
>> that
>>
>
>
>> Chevron itself is guilty of fraud.
>>          I think that there is an easy fix to this problem.   More
>> particularly, and directing you to the third indented paragraph of
>> page
>> 5 of the draft, in which we reference Fajardo's declaration, that
>> paragraph (which points up Ilann's concern) reads, currently, as
>> follows:   "Plaintiffs --- as Chevron knew at the time -- in fact
>> furnished Cabrera with extensive information which concerned the
>> matters which Cabrera was interested in examining and which it was
>> Cabrera's
>> charge to examine".   I propose we leave this paragraph exactly as it
>> currently is, but drop a footnote, to accommodate the "troubling"
>> fact, which footnote would read as follows:
>>            "It appears that there was one instance on which
>> plaintiffs' Ecuadorian counsel delivered information to Cabrera,
>> consisting of information prepared by Stratus,  and did not
>> contemporaneously inform Chevron of this delivery.   But, there
>> certainly could have been no fraud intended.   In about April 2008
>> Cabrera published this Stratus information substantially verbatim in
>> a
>>
>
>
>> number of  annexes to his report.  In about May 2008 Stratus itself
>> published substantially the same information, on its web-site.  Any
>> reader of both publications understood the obvious and the
>>
> unremarkable,
>
>>   i.e. that Cabrera had virtually adopted, as part of his report,
>> material from Stratus; there was hardly an effort to conceal or to
>> "plagiarize".  In fact Chevron, which, aided by its large crew of
>> attorneys and other consultants, undoubtedly read both publicationsm
>> timely  complained to the Lago Agrio court about this matter.  In
>> accordance with Ecuadorian procedure the court noted this complaint
>> (and the dozens of others Chevron regularly made about Cabrera's
>> work)
>>
>
>
>> and deferred its consideration of this matter until the conclusion of
>> the submission of the merits of plaintiffs' claims".
>>           *************************
>>       Comments about this possible fix:
>>            a) I am guessing at the facts.  I don't know when the
>> Cabrera report was published, when Stratus published its own version
>> of this material, etc.;
>>            b) I don't know if Chevron knew, at or prior to this
>> time, that Stratus was one of our consultants;
>>            c) I don't know, for sure, if Chevron timely read
>> both
>>

```
>
>
>> the Cabrera report and the Stratus web-site.  But, I cannot believe
>> that they did not do so;
>>                    d) I don't know if Chevron in fact made this
>> occurrence the subject-matter of a complaint to the Lago Agrio court
>> or, if it did, what the court did.  It would, however, not be fatal
>> to
>>
>
>
>> our tactic if Chevron elected not to make a complaint to the Lago
>> Agrio court - what is key is whether we can assert that Chevron
>> obviously knew of Cabrera's publication of the Stratus material.
>>           Now, some of these facts might not be as I assume them to
>>
> be.
>
>>    Nonetheless, there might be some advantage to our dealing with this
>> "troubling" subject this way, i.e. as a passing footnote to a
>> pleading
>>
>
>
>> which is otherwise our offensive challenge to the good faith of
>>
> Chevron.
>
>> We thereby are dealing with these facts as an "oh, by the way", not
>> as
>>
>
>
>> a significant deal; they are a yawn.  The notion is "fraud"? "who
>> commits a fraud by this type of undisguised adoption of material".
>>           Again without knowing the facts I don't know Fajardo's
>> explanation.  My guess is, however, that this well-intended guy,
>> pushed for time, felt that it was important to get this possibly
>> relatively technical information to Cabrera, and that the latter, not
>> having the experience himself, just adopted this relatively technical
>> information as part of his report.  These facts also could lend us
>> color in the way we depict what Chevron has wrongly portrayed as the
>> "smoking gun".
>>           If these facts are generally accurate, then, in addition
>> to using the Rule 60(b) for the reason we had all along, to wit, to
>> point out that Chevron used this weighty  and wrong allegation of
>> fraud by us, to justify this unlawful and intrusive discovery,  and
>> that Chevron, by so doing, over-reached, we use the Rule 60(b) to
>> take
>>
>
>
>> the sting out of what appears to be what they view as their trump
>> card.  On the latter point, by the way, it is my guess that they have
>> known about this "trump card" for some lengthy period of time and,
>> after they otherwise had their ducks in order, surfaced the petition
>> in December 2009.  Again, I don't know all of the facts which might
>> reveal this, having not reviewed all of the exhibits to the petition
```

>> filed in December or the additional hundreds of pages of exhibits
>> filed by them in early March 2010.
>>                Everyone's corrections ....to the facts, are invited,
>> and other thoughts as well.
>>                Of course, anything along this line which we do in the
>> Rule 60(b)  would need to be coordinated with what I understand is
>> the
>>
>
>
>> tentative plan, as counseled by another Ecuadorian law expert, to
>> raise this whole matter with Lago Agrio court. On the latter point,
>> and without being privy to the full scope of matters discussed with
>> the Ecuadorian law expert, query why, if Chevron itself had
>> previously
>>
>
>
>> raised this issue with the Lago Agrio court,  we need to do that
>>
> again.
>
>> However, if we do raise it, we do not want to be depicting it to the
>> Ecuadorian court as a "big deal", if we are contemporaneously telling
>> this court that it not only is no big deal, but, indeed, that Chevron
>> was misrepresenting when it portrayed our actions as "fraud".
>>                Jay
>>
>>
>>
>> Steve:
>>                I reviewed Ilann's message below and understand his
>>
> concern,
>
>> and I have reviewed the motion.   He and I will discuss the matter
>>
> later
>
>> this a.m. and be back to you.  We might or might not have a fix.
>>
> Jay
>
>> sdonziger@gmail.com wrote:
>>
>>> Really? Not sure I agree.
>>>
>>> Sent via BlackBerry by AT&T
>>>
>>> ----------------------------------------------------------------
>>> --
>>> --
>>> *From: * "Ilann M. Maazel" <imaazel@ecbalaw.com>
>>> *Date: *Sun, 16 May 2010 10:06:14 -0400
>>> *To: *Steven Donziger<sdonziger@donzigerandassociates.com>
>>> *Cc: *Westenberger, Eric<ewestenberger@pattonboggs.com>;
>>> <awilson@ecbalaw.com>; Yennock, Edward<EYennock@pattonboggs.com>;
>>> <jabady@ecbalaw.com>; <jhorowitz@hflitig.com>; Daleo,

```
>>> Eric<EDaleo@pattonboggs.com>; Rockwell,
>>> Jason<JRockwell@pattonboggs.com>
>>> *Subject: *Re: Re:
>>>
>>> As I wrote Jay last night, I don't think we should file Jay's
>>> motion, as good as it is.  I think we need to be careful about
>>> accusing Chevron of defrauding the court, for reasons we can discuss
>>>
> on a call.
>
>>> Sent from my iPhone
>>>
>>> On May 16, 2010, at 9:11 AM, "Steven Donziger"
>>> <sdonziger@donzigerandassociates.com
>>> <mailto:sdonziger@donzigerandassociates.com>> wrote:
>>>
>>>
>>>> Make sure the drafters take into account Jay's motion.  We need to
>>>> make sure this is part of a coordinated strategy... with a
>>>> consistent tone and push.  Thus, you might want to add a few lines
>>>> or a footnote referencing what we believe is Chevron's fraud.
>>>>
>>>> On Sun, May 16, 2010 at 8:52 AM, Westenberger, Eric
>>>> <ewestenberger@pattonboggs.com
>>>> <mailto:ewestenberger@pattonboggs.com>> wrote:
>>>>
>>>>     At this point, I would not add an alternative argument on
>>>>
> scope.
>
>>>>     At most (and I would like to discuss further), I would save
>>>>
> that
>
>>>>     suggestion as a last resort at oral argument if things are
>>>>
> going
>
>>>>     poorly. To suggest this here is very much a sign of weakness
>>>>
> and,
>
>>>>     if I were the judge, I would read it to mean that even we don't
>>>>     believe our own arguments. GD preys on weakness and thus we
>>>>
> need
>
>>>>     to be aggressive.
>>>>
>>>>     For the more specific suggestions, I think it would be helpful
>>>>
> if
>
>>>>     you sent us a redline.
>>>>     -------------------------
>>>>     Sent from my BlackBerry Wireless Device
>>>>
>>>>
```

```
>>>>
>> -----------------------------------------------------------------
>> -
>> --
>>
>>>>     *From*: Andrew Wilson <awilson@ecbalaw.com>
>>>>     <mailto:awilson@ecbalaw.com>>
>>>>     *To*: Yennock, Edward; Ilann M. Maazel <imaazel@ecbalaw.com
>>>>     <mailto:imaazel@ecbalaw.com>>; Jonathan S. Abady
>>>>     <jabady@ecbalaw.com <mailto:jabady@ecbalaw.com>>;
>>>>     sdonziger@donzigerandassociates.com
>>>>     <mailto:sdonziger@donzigerandassociates.com>
>>>>     <sdonziger@donzigerandassociates.com
>>>>     <mailto:sdonziger@donzigerandassociates.com>>;
>>>>     jhorowitz@hflitig.com <mailto:jhorowitz@hflitig.com>
>>>>     <jhorowitz@hflitig.com <mailto:jhorowitz@hflitig.com>>
>>>>     *Cc*: Westenberger, Eric; Daleo, Eric
>>>>     *Sent*: Sun May 16 01:53:24 2010
>>>>     *Subject*: RE:
>>>>
>>>>     Thanks, Ed.  This looks good.  My first general impression is
>>>>     that we should think about imposing our own narrative on this
>>>>     more than just responding to theirs.  Perhaps we can do a bit
>>>>     more to track our opening brief and summarize our best points
>>>>
> in
>
>>>>     each section before responding to Chevron's attacks.  With this
>>>>     in mind, I would be inclined to put the waiver argument towards
>>>>     the end (maybe last), and reduce the crime/fraud section even
>>>>
> more.
>
>>>>     I also wonder if we should have a section (or footnote) that
>>>>     suggests that even if the Court were to award discovery here,
>>>>
> it
>
>>>>     should do so only for a narrow band of documents that were
>>>>     communicated directly to Cabrera and depositions should be
>>>>     limited to authors of those documents and questions about those
>>>>     documents.  I think the odds favor discovery here and we should
>>>>     be preparing to narrow discovery rather than leave the scope up
>>>>     to the Judge.
>>>>
>>>>     I like the way you are handling the intersection between
>>>>     Ecuadorian and US law (shifting the burden and then reversing
>>>>
> the
>
>>>>     order of analysis to start with the privilege and then see if
>>>>     what we did allows them to pierce the privilege).  I might also
>>>>     include a footnote or short statement about while there is no
>>>>     discoverability requirement for s. 1782, US courts will not
>>>>
> allow
>
>>>>     discovery that violates a privilege or is otherwise
```

```
>>>>
> antithetical
>
>>>>        to the foreign jurisdiction (I think we have this elsewhere in
>>>>        one of our briefs in either CO or TX).
>>>>
>>>>
>>>>
>> -------------------------------------------------------------------
>> -
>> --
>>
>>>>        *From:* Yennock, Edward [mailto:EYennock@PattonBoggs.com
>>>>        <mailto:EYennock@PattonBoggs.com>]
>>>>        *Sent:* Saturday, May 15, 2010 8:38 PM
>>>>        *To:* Andrew Wilson; Ilann M. Maazel; Jonathan S. Abady;
>>>>        sdonziger@donzigerandassociates.com
>>>>        <mailto:sdonziger@donzigerandassociates.com>;
>>>>        jhorowitz@hflitig.com <mailto:jhorowitz@hflitig.com>
>>>>        *Cc:* Westenberger, Eric; Daleo, Eric
>>>>        *Subject:*
>>>>
>>>>        All -
>>>>
>>>>        A draft Reply Brief with respect to the Colorado Motion for a
>>>>        Protective Order is attached for your consideration.  You will
>>>>        note that there are some markers for citations, and we have
>>>>
> left
>
>>>>        markers where material from the expert affidavit will be
>>>>
> inserted
>
>>>>        as well.  These few gaps will be filled in shortly, but in the
>>>>        interest of time, we are circulating now.
>>>>
>>>>        Best regards,
>>>>
>>>>        *Edward M. Yennock*
>>>>
>>>>        Patton Boggs LLP
>>>>        One Riverfront Plaza, 6th Fl.
>>>>        Newark, New Jersey 07102
>>>>        www.pattonboggs.com <http://www.pattonboggs.com>
>>>>
>>>>        Phone: 973.848.5609
>>>>        Fax: 973.848.5601
>>>>        /eyennock@pattonboggs.com <mailto:eyennock@pattonboggs.com>/
>>>>
>>>>
>>>>
>>>>
>>>>
>>>>
>>>>        DISCLAIMER:
>>>>        This e-mail message contains confidential, privileged
>>>>
```

```
> information
>
>>>>    intended solely for the addressee. Please do not read, copy, or
>>>>    disseminate it unless you are the addressee. If you have
>>>>
> received
>
>>>>    it in error, please call us (collect) at (202) 457-6000 and ask
>>>>    to speak with the message sender. Also, we would appreciate
>>>>
> your
>
>>>>    forwarding the message back to us and deleting it from your
>>>>    system. Thank you.
>>>>
>>>>    This e-mail and all other electronic (including voice)
>>>>    communications from the sender's firm are for informational
>>>>    purposes only. No such communication is intended by the sender
>>>>
> to
>
>>>>    constitute either an electronic record or an electronic
>>>>    signature, or to constitute any agreement by the sender to
>>>>    conduct a transaction by electronic means. Any such intention
>>>>
> or
>
>>>>    agreement is hereby expressly disclaimed unless otherwise
>>>>    specifically indicated. To learn more about our firm, please
>>>>    visit our website at http://www.pattonboggs.com.
>>>>
>>>>    DISCLAIMER:
>>>>    This e-mail message contains confidential, privileged
>>>>
> information
>
>>>>    intended solely for the addressee. Please do not read, copy, or
>>>>    disseminate it unless you are the addressee. If you have
>>>>
> received
>
>>>>    it in error, please call us (collect) at (202) 457-6000 and ask
>>>>    to speak with the message sender. Also, we would appreciate
>>>>
> your
>
>>>>    forwarding the message back to us and deleting it from your
>>>>    system. Thank you.
>>>>
>>>>    This e-mail and all other electronic (including voice)
>>>>    communications from the sender's firm are for informational
>>>>    purposes only. No such communication is intended by the sender
>>>>
> to
>
>>>>    constitute either an electronic record or an electronic
>>>>    signature, or to constitute any agreement by the sender to
>>>>    conduct a transaction by electronic means. Any such intention
```

```
>>>>
> or
>
>>>>     agreement is hereby expressly disclaimed unless otherwise
>>>>     specifically indicated. To learn more about our firm, please
>>>>     visit our website at http://www.pattonboggs.com.
>>>>
>>>>
>>>>
>>>>
>>>> --
>>>> Steven Donziger
>>>> 212-570-4499 (land)
>>>> 212-409-8628 (fax)
>>>> 917-566-2526 (cell)
>>>>
>>>> Steven R. Donziger
>>>> Law Offices of Steven R. Donziger, P.C.
>>>> 245 W. 104th St., #7D
>>>> New York, New York 10025
>>>> Email: sdonziger@gmail.com <mailto:sdonziger@gmail.com>
>>>>
>> --
>>
>> Jay S. Horowitz
>>
>> Horowitz/Forbes, LLP
>>
>> 2940 Wells Fargo Center
>>
>> 1700 Lincoln Street
>>
>> Denver, CO 80203
>>
>> Telephone:  (303) 572-5100
>>
>> Telecopier:  (303) 572-5111
>>
>> Direct Dial: (303) 572-5102
>>
>>
>>
>
> --
>
> Jay S. Horowitz
>
> Horowitz/Forbes, LLP
>
> 2940 Wells Fargo Center
>
> 1700 Lincoln Street
>
> Denver, CO 80203
>
> Telephone:  (303) 572-5100
>
> Telecopier:  (303) 572-5111
```

```
>
> Direct Dial: (303) 572-5102
>
>

--

Jay S. Horowitz

Horowitz/Forbes, LLP

2940 Wells Fargo Center

1700 Lincoln Street

Denver, CO 80203

Telephone: (303) 572-5100

Telecopier: (303) 572-5111

Direct Dial: (303) 572-5102
```

Brownstein | Hyatt
Farber | Schreck

# Memorandum

**DATE:**  May 24, 2010

**TO:**  Steven Donziger

**FROM:**  John V. McDermott, Esq.

**RE:**  Steven Donziger

Although you know the facts summarized below, I will restate them at the request of your new co-counsel in Denver.

On March 24, 2010, when BHFS withdrew, we did not feel that we had a Rule 11 basis to file an opposition to Chevron's subpoenas. Notably, despite our repeated requests to you, we had not received the pertinent documents and information that were necessary to support the arguments we had discussed as being the main reasons to oppose the subpoenas and that would support the arguments we deemed to be compelling based on our legal research.

We were concerned by Jeff Shinder's abrupt decision to no longer be involved in the case - which he advised us of the day after he met with numerous witnesses in Boulder. We had been told by you almost three weeks prior that Shinder was joining the team and in a conference call among all of us, you advised us that he would take the lead in this matter and that we would assist when asked by you or Shinder. Accordingly, Shinder traveled to Boulder to meet with witnesses. BHFS did not participate in the interviews.

Further, Shinder told us that after meeting with the witnesses, he was concerned that despite your representations to us that Stratus' work with the Ecuadorian expert complied with Ecuadorian procedure and was proper, he understood the opposite to be true.

We had also been trying to set up a meet and confer with Gibson Dunn attorneys for a couple weeks. We were not given timely information or direction as to what our position would be at the meet and confer.

99999\1170\1405039.1

RA-30

Steven Donziger
May 24, 2010
Page 2


The culmination of these events led to our withdrawal approximately two weeks before the opposition brief was due.

2

DONZ00056918 Page 2 of 2

[See original for email header in English]
Subject: Protection Action

Steve,
Today Pablo and Luis were kind enough to tell us what was going on in Denver, and the fact that certainly ALL will be made public, including correspondence.
From what you say we must prepare ourselves to minimize the effects...
Apparently this is normal in the U.S. and there is no risk there, but the problem, my friend, is that the effects are potentially devastating in Ecuador (apart from destroying the proceeding, all of us, your attorneys, might go to jail), and we are not willing to minimize our concern and to sit to wait for whatever happens.
For us it is NOT acceptable for the correspondence, the e-mails, between Stratus and Juanpa and myself be divulged.
To avoid this, we have decided to file a writ of protection before a judge in Ecuador, asking the judge to write to the judge in Denver not to reveal the correspondence because this would affect our fundamental rights. This is an idea that may not work, but with adequate support perhaps we can do it.
I am telling you so you'll know. We will send you the document.

Regards

[see original for ad in English]

DONZ00055225

CERT. MERRILL VER: JD



# MERRILL CORPORATION

Merrill Communications LLC



25 West 45th Street, 8th Floor
New York, NY 10036 • (212) 840-1133

State of New York                    )
Estado de Nueva York
                                     )            ss:
                                     )            a saber:
County of New York                   )
Condado de Nueva York

## Certificate of Accuracy
## Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: January 19, 2011
Fecha: 19 de enero de 2011

_____
Weikwang Ng (Jason)
Project Manager – Legal Translations
Merrill Brink International/Merrill Corporation
_____[firmado]_____
Weikwang Ng (Jason)
Gerente de Proyecto – Traducciones Legales
Merrill Brink International/Merrill Corporation

Sworn to and signed before
Jurado y firmado ante
Me, this _____19th_____day of
mí, a los _____19_____días del
_____January_____2011
mes de ____enero_____de 2011

JANNEL Pablick
Notary Public, State of New York
No./01GU4956315
Qualified in New York County
Commission Expires September 18, 2013    [firmado]
                                         [sello]

| | |
|---|---|
| **From:** | Julio Prieto |
| **To:** | Steven Donziger; <juanpasaenz@hotmail.com>; luis; vanza; Pablo Fajardo Mendoza |
| **Subject:** | accion de proteccion |
| **Date:** | Tuesday, March 30, 2010 2:02:53 PM |

Steve,

Hoy día Pablo y Luis tuvieron la gentileza de contarnos lo que estaba pasando en Denver,
y el hecho de que seguramente TODO se haga publico, incluyendo la correspondencia.
Según dices debemos prepararnos para minimizar los efectos...
Aparentemente esto es normal en EEUU y no hay riesgo allá, pero el problema compañero
es que los efectos son potencialmente devastadores en Ecuador (aparte de destruir el
juicio, podemos ir todos tus abogados a la carcel), y no estamos dispuestos a minimizar
nuestra preocupación y sentarnos a esperar lo que suceda.
Para nosotros NO es aceptable que la correspondencia, los mails, entre Stratus y Juanpa
y yo, sean divulgados.
Para evitar esto hemos decidido presentar una acción de protección ante un juez de
ecuador, que pediremos que escriba al juez de denver para que no revele la
correspondencia porque esto afectaría nuestros derechos fundamentales. Esta es una idea
que puede no funcionar, pero con el apoyo adecuado talvez lo consigamos.
Te lo digo para que lo sepas. Te enviaremos el documento.

saludos

---

Hotmail has tools for the New Busy. Search, chat and e-mail from your inbox. Learn
More.

DONZ00055225

RA-34



**GEOTEXT**
Translations, Inc.

STATE OF NEW YORK      )
                       )      ss
COUNTY OF NEW YORK     )

**CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached page with Bates No. MB-

STIP00097061.

Abigail Simone, Project Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this __11th__ day of __November__, 20__10__.

KRISTEN DUFFY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01DU6121852
Qualified in Queens County
My Commission Expires January 31, 2013

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  I  www.geotext.com

| From: | Estenio Mendoza |
|-------|-----------------|
| To: | bonfiglio@radicalmedia.com |
| Sent: | 12/25/2008     10:19:05 p.m. |
| Subject: | WORK |

Greetings, Mike!

First of all, my best regards to you and the entire team. I hope you're enjoying Christmas Day and eating a delicious hamburger, [something] that I never stop liking.

I know you don't want to talk about the work you all have been doing, and you're right. In order for it to be a success, it is important to maintain absolute independence between the two parties.

Just to let you know, I've seen the work. My congratulations to you all, it's very good! However, I have one and only one suggestion for change.

It is very difficult at this point to make this change, but please do understand that if that is kept [the way it is] the entire case will simply fall apart on us. I'm referring to the scenes where the Spaniards Carlos Berinstain [sic] and Adolfo Maldonado appear. Those two guys must not appear in the documentary at all! Please, remove them from it. It really isn't that much, but it can complicate the entire case for us.

Those scenes are [shown] in the minutes:
1.16.11 to 1.16.25;
1.16.18 to 1.16.25
1.16.30 to 1.16.33.

As you can see, the time involved is very short. Please, help me with that. Otherwise, it's perfect, I have no objections, and I'm ready to cooperate in terms of anything you may need in order for the work to be as successful as you hope it will be.

A hug and best regards to you all.

I CREATED THIS ADDRESS FOR CONFIDENTIAL MATTERS ONLY.  THIS ADDRESS IS NOT PUBLIC...

Pablo F.

Explore the seven wonders of the world Learn more!

MB-STIP00097061

| From: | Estenio Mendoza |
|---|---|
| To: | bonfiglio@radicalmedia.com |
| Sent: | 12/25/2008 10:19:05 PM |
| Subject: | TRABAJO |

Saludos Mike.

Primero un saludo muy grande para ti y todo el equipo, espero que estés disfrutando del feriado de navidad y comiento la sabroza amburguesa que núnca me termina de gustar a mi.

Se que no quieres habñar del trabajo que ustedes han realizado y tienes razón, para que tenga éxito debe mantener la absoluta independencia de las dos partes.

Te cuento que he visto el trabajo, les felicito, esmuy bien. Sin embargo tengo una y solo una sugerencia de cambio.

Es difícil a ésta altura hacer ese cambio, pero por favor entíendanme que si eso se mantiene sencillamente todo el juicio se nos viene abajo. Me refiero a las escenas que aparecen los Españoles Carlos Berisntain y Adolfo Maldonado. Esos dos tipos no deben aparecer para nada en el documental. Por favor, saquenlo de allí. No es mucho en realidad, pero nos puede complicar todo el juicio.

Esas escenas están en los minutos:
1.16.11 a 1.16.25;
1.16.18 a 1.16.25
1.16.30 a 1.16.33.

Como ves, es muy poco tiempo. Por favor ayudenme con eso. Por lod emás todo está perfecto, no tengo reparos y esoy dispuesto a cooperar en lo que ustedes requieran para que el trabajo tenga´el éxito que ustedes esperan.

Un abrazo y saludos a todos.

CREE ESTA DIRECCIÓN SOLO PARA COSAS CONFIDENCIALES, ESTA DIRECCION NO ES PUBLICA...

Pablo F

Explore the seven wonders of the world Learn more!

MB-STIP00097061

```
BEG_CTRL_NUM      : DONZ00062973
END_CTRL_NUM      : DONZ00062973
DATESENT          = 09/03/2007
TIMESENT          = 14:41:50
RECEIVEDDATE      = 09/03/2007
TIMERECEIVED      = 14:41:50
FILENAME          : Imputado con la situacion HAVOC.msg
SUBJECT           : Pissed off with the HAVOC situation
TEXT              : From: Steven Donziger <sdonziger@gmail.com>
Sent              : Monday, September 3, 2007 2:42 PM
To                : PABLO FAJARDO <pafam@ecuanex.net.ec>
                    Cc: toxico <toxico@ecuanex.net.ec>; lupitadeheredia <lupitadeheredia@yahoo.com>;
                    garcesme<garcesme@gmail.com>; julprieto <julprieto@hotmail.com>; juanpasaenz
                    <juanpasaenz@hotmail.com>
                    Subject: Pissed off with the HAVOC situation
```

Guys,

I am pissed off.  I just spoke with Fausto Moreano and Pedro, Augustin's partner. The HAVOC situation is a possible DISASTER for me that we are NEGLECTING with possible terrible repercussions for our case in Lago.  What would happen if tomorrow Texaco started up its efforts again to get in illegally? What is the plan to stop this possibility?  We have to understand that Texaco DOESN'T CARE ABOUT THE LAW, those sons of bitches would go without any judge at all and with guards to try again.

I AM SURE THAT TEXACO WILL BE ABLE TO INSPECT HAVOC SOME DAY IF WE DON'T PAY MORE ATTENTION AND GIVE MORE IMPORTANCE TO THE SITUATION.  AN INSPECTION OF THIS SORT WOULD BE A DISASTER FOR THE LAGO AGRIO CASE.

I say that we consider adopting new strategies (some of which I mentioned months ago):

1) We accuse all of them, including the judge, of CORRUPTION for still even thinking of ordering an illegal inspection with no basis in the law in order to favor a corrupt transnational that is killing innocent Ecuadorians.

2) We ourselves request an inspection of the three offices of Callejas, Perez Pallares, and Ortiz to search for evidence of corruption and human rights violations against our team.

3) Every time there is a meeting with the Judge on the HAVOC matter, we go with a camera to film the corrupt people and we tell the media that an "event" is going to take place, like that time two years ago with me and Luiz.

Did you all know that today Texaco had FIVE lawyers with the judge, including the gringa Sylvia Garriga, who came directly from Reis Veiga's office in Miami.  And we had two young guys --Pedro and Mateo. This is really very bad friends – although the young guys are good lawyers, we are neglecting [the situation] because the judges here don't respect young people, plus they don't have the strength necessary.

Let's meet at the office on Wednesday to discuss the path ahead -- with Augustin, Fausto, and Alejandro I hope.

SRD

On 9/3/07, PABLO FAJARDO <pafam@ecuanex.net.ec> wrote:

I have the feeling that they have been a bit careless.
What worries me is that after this CV can request that the Judge conduct the inspection with law enforcement officers, in other words that they go in by force.  I think we need to reevaluate the HAVOC strategy.

PFM
----- Original Message -----
From: Steven Donziger <mailto:sdonziger@gmail.com>
To: PABLO FAJARDO <mailto:pafam@ecuanex.net.ec>; LUIS YANZA
<mailto:toxico@ecuanex.net.ec>

Sent: Monday, September 03, 2007 12:04 PM
Subject : HAVOC – how strange

       Guys,

       Didn't Alejandro Ponce and Augustin tell us THAT THE HAVOC INSPECTION WAS NOT GOING TO TAKE PLACE?

       Then why did the judge go there today if they had suspended the inspection?
I am worried about this "team" that is handling the HAVOC matter – that they are not fighting hard or something.

SRD
--
[See original for English]
[2 Mailscanner notices in Spanish]

FROM        : Steven Donziger <sdonziger@gmail.com>
RECIPIENT   : PABLO FAJARDO <pafam@ecuanex.net.ec>
CC          : toxico <toxico@ecuanex.net.ec>; lupitadeheredia <lupitadeheredia@yahoo.com>; garcesme<garcesme@gmail.com>; julprieto <julprieto@hotmail.com>; juanpasaenz <juanpasaenz@hotmail.com>
CUSTODIAN  : Donziger, Steven
SOURCE     : Sent.pst
DOCTYPE    : E-MAIL
PAGES       = 0
UPDATEDATE  = 01/15/2011
PRIV_DOC_NO = 0
NATIVELINK:
      M:\Production\Gibson\Chevron\CONCORDANCE_DONZIGER_COMPEL\DON028\NATIVES\023\DONZ00062973.msg

# MERRILL CORPORATION

Merrill Communications LLC

25 West 45th Street, 8th Floor
New York, NY 10036 • (212) 840-1133



State of New York )
Estado de Nueva York )

) ss:
) a saber:
County of New York )
Condado de Nueva York )

### Certificate of Accuracy
### Certificado de Exactitud

This is to certify that the attached translation is, to the best of our knowledge and belief, a
true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender,
traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: January 21, 2011
Fecha: 21 de enero de 2011

_____

Roberto J. Millan
Project Manager – Legal Translations
Merrill Brink International/Merrill Corporation
_____ [firmado]
Roberto J. Millan
Gerente de Proyecto – Traducciones Legales
Merrill Brink International/Merrill Corporation

Sworn to and signed before
Jurado y firmado ante
Me, this _____ 21st _____ day of
mí, a los _____ 21 _____ días del
_____ January _____ 2011
mes de _____ enero _____ de 2011

_____
Notary Public
Notario Público

GINA ST LAURENT                        [firmado]
Notary Public, State of New York       [sello]
No. 01ST6146442
Qualified in New York County
Commission Expires May 15, 2014

```
BEG_CTRL_NUM     :  DONZ00062973
END_CTRL_NUM     :  DONZ00062973
DATESENT         =  09/03/2007
TIMESENT         =  14:41:50
RECEIVEDDATE     =  09/03/2007
TIMERECEIVED     =  14:41:50
FILENAME         :  Imputado con la situacion HAVOC.msg
SUBJECT          :  Imputado con la situacion HAVOC
TEXT             :  From:  Steven Donziger <sdonziger@gmail.com>
```

Sent:  Monday, September 3, 2007 2:42 PM
To:  PABLO FAJARDO <pafam@ecuanex.net.ec>
Cc:  toxico <toxico@ecuanex.net.ec>; lupitadeheredia <lupitadeheredia@yahoo.com>; garcesme <garcesme@gmail.com>; julprieto <julprieto@hotmail.com>; juanpasaenz <juanpasaenz@hotmail.com>
Subject:  Imputado con la situacion HAVOC

Compas,

Estoy imputado.  Acabo de hablar con Fausto Moreano y Pedro, el socio de Augustin.  La cuestion de HAVOC para mi es un posible DESASTRE que estamos DESCUIDANDO con posibles impactos terribles para nuestro caso en Lago.  Que pasa si manana Texaco empieza otra vez con sus esfuerzos de lograr la entrada ilegal?  Cual es el plan para detener esa posibilidad?  Hay que entender que LA LEY NO IMPORTA a  Texaco, esos hijos de putas son capaces de ir sin ningun juez y con guardia para insistir.

ESTOY SEGURO QUE TEXACO UN DIA PODRA INSPECCIONAR HAVOC SI NO HAGAMOS MAS CASO Y MAS IMPORTANCIA A LA SITUACION.  UNA INSPECCION ASI SERIA UN DESASTRE PARA EL CASO EN LAGO AGRIO.

Digo que consideramos adoptar nuevas estrategia (algunas mencione yo hace meses):

1) Acusamos todos ellos, incluso el juez, de CORRUPCION por aun pensar de ordenar una inspeccion ilegal sin base in la ley para favorecer una transnacional corrupto que mata Ecuatorianos inocentes.

2) Solicitamos nosotros una inspeccion de las tres oficinas de Callejas, Perez Pallares, y Ortiz para buscar pruebas de corrupcion y violaciones de derechos humanos a nuestro equipo.

3)  Cada vez que haya una reunion con el Juez en la cuestion HAVOC vamos con una camera para filmar los corruptos y notificamos los medios que va a pasar un "evento" como la vez hace dos anos con yo y Luis.

Saben Uds. que hoy dia Texaco tenia CINCO abogados con el juez, incluyendo la gringa Sylvia Garriga quien apareció directamente de la oficina de Reis Veiga en Miami.  Y tuvimos nosotros dos jovenes -- Pedro y Mateo.  Eso es pesimisimo amigos -- aunque los jovenes son buenos abogados, estamos descuidando porque los jueces aqui no respetan jovenes y ademas no tienen la fuerza necesaria.

Reunimos el Miercoles en la oficina para discutir el camino adelante -- con Augustin, Fausto, y Alejandro ojala.

SRD


On 9/3/07, PABLO FAJARDO <pafam@ecuanex.net.ec> wrote:

        Tengo la senación que se han descuidado un poco.
        Lo que me preocupa es que luego de ésto CV puede solicitar al Juez que haga la inspección con al Fuerza pública, es decir que ingresen a la fuerza. Creo que debemos refefinir la estrategia HAVOC.

        PFM


                ----- Original Message -----
                From: Steven Donziger <mailto:sdonziger@gmail.com>
                To: PABLO FAJARDO <mailto:pafam@ecuanex.net.ec>  ; LUIS YANZA
<mailto:toxico@ecuanex.net.ec>

Sent: Monday, September 03, 2007 12:04 PM
Subject: HAVOC -- que extrano

Compas,

No nos dijo Alejandro Ponce y Augustin que la inspeccion de HAVOC NO IBA A REALIZARSE?

Entonces, porque llego el juez alla hoy dia si ellos habian suspendido la inspeccion?
Me preocupo este "equipo" que esta manejando la cuestion de HAVOC -- que no estan luchando fuerte o algo.

SRD

--
Steven Donziger
212-570-4499 (land)
212-570-9944 (fax)
917-566-2526 (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
████████████████████
Email: sdonziger@gmail.com

--
Este mensaje ha sido analizado por MailScanner <http://www.mailscanner.info/>
en busca de virus y otros contenidos peligrosos,
y se considera que está limpio.


--
Este mensaje ha sido analizado por MailScanner <http://www.mailscanner.info/>
en busca de virus y otros contenidos peligrosos,
y se considera que está limpio.



--
Steven Donziger
212-570-4499 (land)
212-570-9944 (fax)
917-566-2526 (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
245 W. 104th St., #7D
New York, New York 10025
Email: sdonziger@gmail.com

| | | |
|---|---|---|
| FROM | : | Steven Donziger <sdonziger@gmail.com> |
| RECIPIENT | : | PABLO FAJARDO <pafam@ecuanex.net.ec> |
| CC | : | toxico <toxico@ecuanex.net.ec>; lupitadeheredia <lupitadeheredia@yahoo.com>; garcesme <garcesme@gmail.com>; julprieto <julprieto@hotmail.com>; juanpasaenz <juanpasaenz@hotmail.com> |
| CUSTODIAN | : | Donziger, Steven |
| SOURCE | : | Sent.pst |
| DOCTYPE | : | E-MAIL |
| PAGES | = | 0 |
| UPDATEDATE | = | 01/15/2011 |
| PRIV_DOC_NO | = | 0 |
| NATIVELINK | : | M:\Production\Gibson\Chevron\CONCORDANCE_DONZIGER_COMPEL\DON028\NATIVES\023\DONZ00062973.msg |

**From:** Steven Donziger [sdonziger@gmail.com]

**Sent:** Wednesday, June 13, 2007 1:18 PM

**To:** Atossa Soltani; Simeon Tegel; Kevin Koenig; Jennifer DeLury Ciplet

**Subject:** HUGE VICTORY

The perito got sworn into after all those visits to the court... the 120-clock is ticking, this is huge for us, WE ARE GOING TO END THE TRIAL!!!!!!!

We need a good release, maybe to put out over pr newswire... let's see what we get out of Quito and translate.

Congratulations.... that visit to the judge last week was a huge help.

Love to all, SRD

--
Steven Donziger
212-          (land)
212-          (fax)
917-          (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.

New York, New York
Email: sdonziger@gmail.com

6/13/2007

DONZ-HDD-0113389

Page 3580

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 10 MC 00002(LAK)

5    -----------------------------------x

6    In re:

7        APPLICATION OF CHEVRON

8

     -----------------------------------x

9                    January 29, 2011

10                   9:09 a.m.

11

12

13

14        Continued Videotaped Deposition of

15    STEVEN DONZIGER, pursuant to Subpoena,

16    held at the offices of Gibson Dunn &

17    Crutcher LLP, 200 Park Avenue, New York,

18    New York, before Todd DeSimone, a

19    Registered Professional Reporter and

20    Notary Public of the State of New York.

21

22

23

24

25

Page 3601

```
 1                    DONZIGER
 2   because I'm not here to do whatever I can
 3   to preserve it.
 4                THE SPECIAL MASTER:  You have
 5   stated what you stated on the record.  I
 6   heard what you said.  It carries whatever
 7   weight and force it may have.
 8                Mr. Kaplan, would you please
 9   bring in the witness.
10                (Mr. Mitchell departs the
11   deposition.)
12                (Witness enters the room.)
13        *    *    *
14   S T E V E N    D O N Z I G E R,
15   having been previously duly sworn,
16   testified further as follows:
17   CONTINUED EXAMINATION
18   BY MR. MASTRO:
19       Q.      Good morning, Mr. Donziger.
20   You are still under oath.  You understand
21   that, sir?
22       A.      Yes.
23       Q.      Sir, are you aware that
24   yesterday, January 28th, the BIT
25   arbitration panel issued a procedural
```

Page 3737

1                    DONZIGER
2  and I will read them.  And Mr. Ormand will
3  read them.
4            Mr. Ormand, unlike me, was
5  raised to read from a screen and therefore
6  you can send him his missive by e-mail and
7  e-mail attachment, but I ask that,
8  particularly if you are going to have
9  cases attached, to deliver it to my
10  apartment.  You all have my address by
11  now.
12            MR. NARWOLD:  This relates just
13  to the Lefcourt issue?
14            THE SPECIAL MASTER:  Yes.
15  Let's call the witness in and resume
16  testimony, please.  Oh, I should have
17  added, and I will make a ruling on Monday
18  morning.
19            (Witness returns to the room.)
20  CONTINUED EXAMINATION
21  BY MR. MASTRO:
22     Q.      Mr. Donziger, am I correct that
23  in the Crude outtakes you permitted the
24  filmmakers to film a scene of you entering
25  and then presenting ex parte before a

Page 3738

1                    DONZIGER
2    judge about a lab inspection order that
3    you were trying to get overturned?
4        A.        If you are talking about the
5    film, in the movie itself, I think the
6    answer would be yes.
7                 MR. MASTRO:  Can we show that
8    scene, please.  We will mark this as
9    Exhibit 1639.  We will mark the transcript
10   and show the clip.  I will identify it for
11   the record as a March 30, 2006 clip from
12   the movie Crude that actually appeared in
13   the movie.
14                 (Exhibit 1639 marked for
15   identification.)
16                 MS. HENDRICKS:  The clip will
17   be marked as Exhibit 1639 and the
18   transcript will be Exhibit 1640.
19                 (Exhibit 1640 marked for
20   identification.)
21                 (A portion of Exhibit 1639 was
22   played at this time.)
23       Q.        Mr. Donziger, am I correct that
24   the "independent laboratory that does the
25   analysis of our water and soil samples"

| From: | Pablo Fajardo Mendoza [pafabibi@gmail.com] |
| --- | --- |
| Sent: | Wednesday, January 02, 2008 2:08 PM |
| To: | ALEJANDRO PONCE; ANCHUNDIA ALEXANDRA; Juan Pablo Saenz; JULIO PRIETO; LUIS YANZA: STEVEN DONZIGER |
| **Subject:** | TASKS |
| **Attachments:** | NECESSARY TASKS TO BE COMPLETED IN THE YEAR 2008 [TAREAS NECESARIAS A DEARROLLAR [sic] EN EL AÑO 2008].doc |

Friends, colleagues and comrades of the legal team:

I've attached a document about some tasks and goals for 2008 that [we will be] discussing.

Please take a look at it, and if I've missed something, add it and let me know.

Hugs to all you guys, there is no longer a woman on the team…

Pablo Fajardo

DONZ00025653 Page 1 of 1

[CERT.GEOTEXT]

## NECESSARY TASKS TO BE COMPLETED IN THE YEAR 2008

Dear friends, colleagues or comrades of the legal team, we're beginning a new year, and with it, we should rethink and reorganize the necessary tasks that we should complete over the year 2008.

Below I offer for your consideration the following activities which we should complete over the 363 days we have left in this year.

**GENERAL OBJECTIVE**: Knock out the opponent, until destroying it. But before that happens, we have to cash the juicy checks…

## SPECIFIC OBJECTIVES

1. Not wait for them to attack us, instead always keep attacking. Keeping in mind what they can do.
2. Show that they're corrupt, thieves and destroyers.
3. Create more arguments planned to destroy them further.
4. Stir up the cases: Supreme Court of Justice and Prosecutor's Office (we take advantage of the new Prosecutor). For example, we could file a complaint with the Prosecutor's Office reporting the fact that Texaco operated and extracted crude outside the concession area.
5. Watch over the Havoc case.
6. Coordinate with the President of the Republic for defense on the accusation of denial of justice.
7. We expand and sell the case better at different levels of Ecuadorian and Latin American society.
8. We watch over the process of naming new Superior Court Justices.

So, we will be alert and very watchful over all proceedings and activities related to the main case.

## JANUARY

1. Sustain the watch over the Court with the legal team and the social base (we should understand that there will be a new judge, and we need to show the new judge that have we've been strong, from day one).
2. Complete the answers to filings that we have pending.
3. Intensify the attack on the enemy (all of us should think of more aggressive things to further destroy the political, economic and social image of the company and its defenders).
4. Get the interpreter into position for the moral damages claim before the judge and follow the proper procedure.

[CERT.GEOTEXT]

5. Complete all preparation work for the inspection we need to conduct in upcoming days. (Annexes: genocide, health, HBT-AGRA, fusion, violations of justice…among others)
6. Prepare the legal scenario for the defense of the expert report.
7. Follow up on the theft case at Expert Cabrera's office.

**FEBRUARY**

1. Begin drafting the final argument…
2. Attack the enemy to defend the expert report…
3. Sustain the moral damages claim
4. Conduct the Aguarico 02 well inspection

**MARCH**

1. Write the answer to the expert report
2. Continue drafting the [final] argument
3. Respond to the CV attacks
4. Coordinate with the Communications team on the scheduled announcement of the expert report results. This will allow us to place the report before the Public opinion in order to make it airtight against the campaign Texaco will launch.

**APRIL**

1. Complete the draft of the [final] argument
2. Complete the draft of the position statement regarding the expert report and submit it
3. Keep up with minor responses and heavy attacks
4. Mediation Hearing in the Moral damages claim

**MAY**

……………………
………………
…………..

JUNE

RESPONSES BY THE EXPERT TO THE QUESTIONING BY Texaco AND US

JULY

…………………..
……………….

DONZ00025654 Page 2 of 3

[CERT.GEOTEXT]

AUGUST

File position statement on the expert's clarifications

**SEPTEMBER**

File [final] argument and request for resolution…

**DECEMBER**

Cash juicy checks


Well, we all know that there will be a ton of minor things we'll need to work on and that will, in fact, keep us busy the entire year.

What I want to make clear, comrades, are the most important points that we should carry out and the very strong front we must maintain. Our duty is to exert the maximum possible pressure, so that the judge or the Court, so that the case, does not become paralyzed. We need to press for CV to be given a lot of time to state our position on the expert report…in short, not give the enemy much time


Humbly,

Pablo Fajardo M

[CERT.GEOTEXT]



**GEOTEXT**
Translations, Inc.

STATE OF CALIFORNIA )
ESTADO DE CALIFORNIA )
)
COUNTY OF SAN FRANCISCO )
CONDADO DE SAN FRANCISCO )     ss

### CERTIFICATION/
### CERTIFICACIÓN

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and

accurate translation from Spanish into English of the attached document.

Por la presente certifico que la traducción adjunta de español a inglés es, a mi leal saber y entender,

traducción fiel y exacta del documento adjunto.

BRANDON CARNEY
COMM. # 1755114
NOTARY PUBLIC - CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires July 3, 2011

_____
Steve Walsh, West Coast Client Manager/Gerente de
Relaciones con Clientes Costa Occidental
Geotext Translations, Inc.

| | |
|---|---|
| State of California, County of San Francisco | Estado de California, Condado de San Francisco |
| Subscribed and sworn to (or affirmed) before me | Suscrito y declarado bajo juramento (o afirmado) ante |
| on this _7_ day of _December_ , 20 1_U_, | mí en este día _7_ de _diciembre_ del 20 _10_ , |
| by _____Steve Walsh_____ , | Por _____Steve Walsh_____ , |
| proved to me on the basis of satisfactory | Habiendo acreditado en mi presencia, mediante prueba |
| evidence to be the person(s) who appeared | satisfactoria, que es la persona (personas) que |
| before me. | compareció (comparecieron) ante mí. |
| Signature: _____ | Firma: _____[firma]_____ |

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082

translations@geotext.com  l  www.geotext.com

| From: | Pablo Fajardo Mendoza [pafabibi@gmail.com] |
|---|---|
| Sent: | Wednesday, January 02, 2008 2:08 PM |
| To: | ALEJANDRO PONCE; ANCHUNDIA ALEXANDRA; Juan Pablo Saenz; JULIO PRIETO; LUIS YANZA; STEVEN DONZIGER |
| Subject: | TAREAS |
| Attachments: | TAREAS NECESARIAS A DEARROLLAR EN EL AÑO 2008.doc |

Amigos, colegas y camaradas del equipo legal.

Adjunto un documento que lo iemos discutiendo sobre algunas tareas y metas del 2008.

Por favor denle un ojaso, si algo se me escapa, incrporen y haganmelo saber.

Un abrazo a todos ya no hay mujer en el equipo...


Pablo Fajardo

DONZ00025653 Page 1 of 1

## TAREAS NECESARIAS A DEARROLLAR EN EL AÑO 2008

Estimados amigos, colegas o camaradas del equipo legal, estaos iniciando un nuevo año, y con ello debemos repensar y reorganizar las tareas necesarias que debemos realizar en el transcurso del año 2008.

Pongo bajo vuestra consideración las siguientes actividades que debemos realizar a lo largo de los 363 días que nos restan de éste año.

**OBJEIVO GENERAL.-** Noquear al contrincante, hasta pulverizarlo. Pero antes que so ocurra debemos cobra los jugosos cheques…

**OBJETIVOS ESPECIFICOS.**

1. No esperar que ellos nos ataquen, sino nosotros continuar atacando siempre. Teniendo en cuenta lo que pueden hacer.
2. Demostrar que son unos corruptos, ladrones y destructores
3. crear más argumentos planificados para destruirlos más.
4. Remover los casos: Corte Suprema de Justicia y Fiscalía (aprovechamos el nuevo Fiscal). Se me ocurre por ejemplo poner un nuevo escrito ante la Fiscalía denunciando el hecho que Texaco operó y extrajo crudo fuera del área de la concesión.
5. Estar vigilantes del caso Havoc
6. Coordinar con al Presidencia de la República para la defensa sobre la acusación de la denegación de justicia.
7. Expandamos y vendemos mejor el caso en distintos niveles de la sociedad ecuatoriana y Latinoamericana.
8. Vigilamos el proceso de designación de nuevos Magistrados de las Cortes Superiores.

En fin estaremos pendientes y supervigilantes de todos los procesos y actividades vinculados con el caso principal.

**ENERO**

1. Sostener la vigilancia en la Corte con el equipo legal y la base social. (debemos entender que habrá nuevo juez, y necesitamos demostrarle al nuevo juez que somos fuerte, desde los primeros días).
2. Concluir con la respuesta los escritos que tenemos pendiente
3. Redoblar el ataque al enemigo. (debemos pensar todos en cosas más agresivas que destruyan más la imagen política, económica y social de la egresa y sus defensores)
4. Posesionar al intérprete para la demanda de daño moral ante el juez y darle el seguimiento adecuado al proceso.

5. Concluir con todos los preparativos para la inspección que debemos realizar en los próximos días. (anexos: genocidio, salud, HBT-AGRA, fusión, ofensas a la justicia… entre otros)
6. Preparar el escenario jurídico para la defensa del dictamen pericial
7. Dar seguimiento al caso del robo a la oficina del Perito Cabrera

**FEBRERO**

1. Iniciar la escritura del alegato final…
2. Atacar al enemigo para defender el dictamen pericial…
3. Sostener la demanda de daño moral
4. Realizar la inspección al pozo Aguarico 02

**MARZO**

1. Escribir la respuesta al dictamen pericial
2. Continuar con la escritura del alegato
3. responder a los ataques de CV
4. Coordinar con el equipo de Comunicación la difusión programada de los resultados del dictamen pericial. Esto nos permitirá posesionar el dictamen ante la opinión Pública para volverlo invulnerable por la campaña que Texaco emprenderá.

**ABRIL**

1. Concluir la escritura del alegato
2. Concluir la escritura del pronunciamiento al dictamen pericial y entregarlo
3. sostener los respuestas menores y ataques fuerte
4. Audiencia de Conciliación en la demanda de daño Moral

**MAYO**

……………..
………….
…………

JUNIO

RESPUESTAS DEL PERITO ANTE LOS CUESTIONAMIENTOS DE Texaco Y NOSOTROS

JULIO

……………….
…………..

AGOSTO

Presentar pronunciamiento a las aclaraciones del perito

**SEPTIEMBRE**

Presentar alegato y pedido de resolución…

**DICIEMBRE**

Cobrar jugosos cheques

Bueno todos sabemos que harán montón de cosas menores que debemos trabajar y que de hecho nos mantendrán muy ocupados todo el año.

Lo que quiero que esté claro compañeros son los puntos más importantes que debemos realizar y la línea muy fuerte que debemos mantener. Nuestro deber es presionar al máximo posible para que el juez o la Corte para que el caso no se paralice. Debemos presionar para que nos e conceda mucho tiempo a CV para pronunciarse sobre el dictamen pericial… en fin no darle mucho tiempo al enemigo

Humildemente

Pablo Fajardo M



**GEOTEXT**
Translations, Inc.

STATE OF CALIFORNIA

)
)
)

COUNTY OF SAN FRANCISCO )    ss

### CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from English into Spanish of the attached transcription excerpt CRS-361-

11-CLIP 1.

Nicholas Bocek, Managing Editor
Geotext Translations, Inc.

State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me

on this 27 day of August , 20 10 ,

by Nicholas Bocek ,

proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

Signature:



BRANDON CARNEY
COMM. # 1755114
NOTARY PUBLIC - CALIFORNIA
SAN FRANCISCO COUNTY
My Comm. Expires July 3, 2011



New York   259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco   220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. tel +1.202.828.1267 Fax +1.202.828.1271
London   8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong   20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com | www.geotext.com

Title of Clip: CRS-361-11-CLIP 1

| SPEAKER | ORIGINAL | TRANSLATION (Spanish) |
|---------|----------|----------------------|
| | | |
| STEVEN DONZIGER | We have to keep pushing on all fronts at all times. That simple. All fronts at all times. Push, push, push. It's just a matter of force. It's pure force. Who can put the most pressure and who can resist. It's just like-- you know? all this bullshit about the law and facts, you know? Yeah, that factors into it, 'cause that affects the level of force, but in the end of the day it is about brute force. Who can apply the pressure and who can withstand the pressure, and can you get them to the breaking point. It's the only way to litigate a case against a powerful company on behalf of people who have no power. You have to create the power. You have to leverage-- create the leverage. We've been doing that for years and years, and like, I feel like right now we have-- well, we were building leverage slowly and slowly, but I feel like it is just exploding. Like, I feel like, right now, it's sort of like a-- a-- a-- a-- a company, a new company that has [unintelligible] just very few revenues and more expenses than revenues the first few years and you sort of see the vision of how it can just completely explode into the mass consciousness, and, like, hit, you know, and suddenly earnings increase a thousand percent in one year and then they double the next, and then they triple the next year and then double the year after that. Like, I feel like we're starting to hit that huge, uhm, uptick in this case right now. Huge. I feel it. It's happening. I mean, you just-- you can't explain away things like Trudy Styler, and Sting, and | Tenemos que seguir presionando por todos los frentes, todo el tiempo. Así de simple. Todos los frentes, todo el tiempo. Presionar, presionar, presionar. Es simplemente un asunto de fuerza. Es fuerza pura. Quién puede presionar más y quién puede resistir. Es simplemente como-- ¿sabes? toda esta huevada sobre las leyes y los hechos ¿sabes? Sí, eso forma parte porque afecta al nivel de la fuerza, pero al final de cuentas, se trata de fuerza bruta. De quién puede aplicar la presión y de quién puede aguantarla, y de si puedes llevarlos al punto del quebranto. Es la única manera de litigar en un caso contra una compañía poderosa a nombre de gente que no tiene poder. Tienes que crear el poder. Tienes que aventajar-- crear la ventaja. Hemos estado haciendo eso año tras año, y como que, siento como que ahorita hemos-- bueno, hemos acrecentado la ventaja lentamente y lentamente, pero siento como que simplemente está explotando. Como que, siento como que, ahorita, es algo así como que una-- una-- una-- una-- una compañía, una compañía nueva que ha [ininteligible] sólo muy pocas ganancias y más gastos que ganancias durante los primeros años y tienes algo así como la visión de cómo podría explotar completamente en la conciencia colectiva, y, pegar, tú sabes, y de repente las ganancias aumentan en un mil por ciento en un año y luego se duplican al año siguiente, y luego se triplican al año siguiente y luego |

431

| | | |
|---|---|---|
| | Al Gore, uhm, who wants to meet with Pablo, and concerts and music and, uhm, and the overwhelming evidence, and the President of Ecuador being on our side and, uhm, you know... [honking] we're just-- we're just blowing it out right now. But I'm not confident that we're gonna win, because I still think that in the end of the day it's gonna boil down to how much cash is Chevron willing to pay for a cleanup, and I just don't know what they're willing to do. So that's why we cannot ever let up on the case itself and never let up on our initial goal of getting like a huge, huge judgment against them in a court of law that-- that-- that's a-- that has jurisdiction over them. | se duplican el año que viene después. Como que, siento como si ahora estamos teniendo un ascenso, um, gigantesco en este caso. Gigantesco. Lo estoy sintiendo. Se está haciendo realidad. O sea, sólo te-- no puedes encontrar una explicación a cosas como lo de Trudy Styler y Sting, y Al Gore, um, que quiere reunirse con Pablo, y conciertos y música y, um, y las pruebas abrumadoras, y que el Presidente del Ecuador esté de nuestro lado y, um, tú sabes... [bocina] estamos simplemente-- ahorita simplemente lo estamos potenciando. Pero no tengo confianza de que vamos a ganar, porque todavía pienso que al final todo se va a reducir a cuánto en efectivo está dispuesta a pagar Chevron por la limpieza, y es que sólo no sé qué están dispuestos a hacer. Así que por eso es que jamás debemos moderarnos en el caso en sí y jamás moderar nuestra meta inicial de conseguir así como que una sentencia gigantesca, gigantesca contra ellos en un tribunal de justicia que-- que-- que sea un-- que tenga jurisdicción sobre ellos. |
| UMV | Where do you think [the case is going to head next]? | ¿A dónde realmente crees [que se dirige el caso]? |
| DONZIGER | Up my ass. I'm just kidding [laughs] I'm way too close to you, guys. Uhm-- | ¡Por mi culo! Estoy bromeando solamente [risas]. Estoy intimando demasiado con ustedes, muchachos. Um-- |
| | | |
| | [laughs] | [risas] |
| UMV | You give me the true answers. | Me das las respuestas ciertas. |
| | | |
| | [laughs] | [risas] |
| | | |

432

| DONZIGER | Uhm... I think in a year I could see one or two scenarios. I think there'll be a more clear situation. In a year this case will either be over and we'll be celebrating, getting ready to start the cleanup, or it'll be perfectly clear we're not gonna really settle and we'll be gearing up for another few years to collect on a multibillion dollar judgment that I think we're gonna win. So, I think those are the two scenarios. The scenario that we might lose is out there, but I just... I'm having a hard time seeing how that one's gonna go down, unless there's an-- a pure act of corruption in the court. | Um... creo que en un año podría ver uno o dos escenarios. Creo que la situación va a estar más clara. Dentro de un año este caso ya va a haber concluido y vamos a estar celebrando, preparándonos para comenzar la limpieza, o va a estar perfectamente claro que en realidad no vamos a llegar a ningún arreglo y nos vamos a estar preparando por algunos años más para cobrar una sentencia multimillonaria, que pienso que vamos a ganar. Así que pienso que esos son los dos escenarios. El escenario de que podríamos perder está presente, pero yo simplemente... me cuesta ver cómo va a resultar eso, a menos que haya un-- un acto neto de corrupción en la corte. |
|---|---|---|
| UMV | And-- | Y-- |
| DONZIGER | And if that happens we'll find out about it and try to get it reversed, you know? | Y si eso sucede, nos vamos a enterar e intentar revertirlo ¿sabes? |
| UMV | Now that it seems like things are kind of going your way with the *perito* (expert) being [unintelligible], does it-- does it worry you that this judge probably won't be there by the end of the year, that-- | Ahora que parece que las cosas están más o menos saliendo a tu favor y que el perito haya sido [ininteligible] ¿Te-- te preocupa que este juez probablemente ya no estará para el fin del año? , que- |
| DONZIGER | It doesn't-- | No me-- |
| UMV | --[that he switches out]? | ¿[Que se substituirá]? |
| DONZIGER | It doesn't worry me that this judge is going-- is leaving in the end of the year [honking]. I've never trusted this judge; I think he's weak, and susceptible to corruption. I think he lacks self-confidence, he lacks capacity to-- to-- as a judge, you know? he's just-- he's not a good judge. I | No me preocupa que este juez va a-- vaya al final de año [bocina]. Nunca he confiado en este juez; pienso que es débil y propenso a la corrupción. Pienso que le falta confianza en sí mismo, le falta la capacidad para-- para-- como juez ¿sabes? Él simplemente-- no es un buen |

| | | |
|---|---|---|
| | think he-- he doesn't know the law that well and he doesn't understand what this case is about, frankly. Just crazy. So, as long as he moves the case forward, then hands the baton to the next guy who hopefully does have the capacity to deal with it, that's all we're asking for. I'd rather this judge not make the decision. I don't think he has the self-confidence to make the decision. I think he's scared. | juez. Pienso que él-- él no tiene tan buen conocimiento de la ley y no comprende de qué se trata este caso, francamente. Simplemente una locura. Así que, con tal de que haga avanzar el caso y entonces le pase la batuta al siguiente tipo, el cual esperamos que tenga la capacidad para lidiar con el caso, eso es todo lo que pedimos. Preferiría que este juez no tome la decisión. No creo que tenga suficiente confianza en sí mismo para tomar la decisión. Yo pienso que tiene miedo. |
| UMV | When'd you -- who told you about the uh... the ruling? Luis or Pablo or--? | Cuando tú-- ¿quién te dijo lo de ah... la providencia? ¿Luis o Pablo o--? |
| | | |
| DONZIGER | Uh... I heard about the ruling from a little note from Pablo. A little email. And, uh... he sent me a short email, said, "I have a little piece of gossip for you. You know? Richard was just sworn in today." But, I mean, I knew within fifteen minutes of it happening. So, I felt-- frankly I felt just overcome with emotion in that moment, 'cause I know how hard we've tried to just get here, to finish [honking] the case, you know? And we have struggled every step of the way to get everything we've earned. Nothing, nothing has been given to us, and, you know, this took five months, you know? five months of delay to do something the court could have done last December... and never would have done had we not really pushed him. | Ah... me enteré de la providencia por una notita de Pablo. Un pequeño email. Y, ah... él me envió un email cortito, diciendo: "Te tengo un chismecito, ¿sabes? Hoy juramentaron a Richard." Pero, o sea, yo lo supe a los quince minutos de que sucediera. Así que me sentí-- francamente me sentí sobrecogido por la emoción en ese momento, porque yo sé lo mucho que nos hemos esforzado para llegar aquí, para concluir [bocina] el caso ¿sabes? Y hemos pasado dificultades a cada paso para conseguir todo lo que nos hemos ganado. Nada, nada nos lo han dado y, tú sabes, esto se tardó cinco meses ¿sabes? Cinco meses de demora para que se hiciera algo, que el juez pudría haber hecho en diciembre del año pasado... y que nunca hubiese hecho si no fuera porque nosotros lo presionamos de verdad. |
| UMV | You wanna get out? | ¿Quieres bajarte? |
| | | |

| UMV2 | Yeah. | Sí. |
|------|-------|-----|
| | | |
| UMV | OK, well, have a good [unintelligible] | Bueno, que tengas un buen [ininteligible] |
| | | |
| | [end of recording] | [fin de la grabación] |

435



**GEOTEXT**
Translations, Inc.



DEPOSITION
EXHIBIT
214

PENGAD 800-631-6989

STATE OF NEW YORK )
)
) ss
COUNTY OF NEW YORK )

**CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from Spanish into English of the attached pages with Bates Nos. JB-

NonWaiver00091320–00091322.

Brandon Carney, West Coast Regional Manager
Geotext Translations, Inc.

Sworn to and subscribed before me

this 22ⁿᵈ day of October, 2010.

KRISTEN DUFFY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01DU6121852
Qualified in Queens County
My Commission Expires January 31, 2013

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.9500 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com | www.geotext.com

| From: | Joe Berlinger |
|---|---|
| Sent: | 8/3/2010 5:24:34 AM |
| Subject: | Fwd: GRACIAS |

Begin forwarded message:

**From:** "Steven Donziger" <sdonziger@gmail.com>
**Date:** January 22, 2009 1:24:56 PM EST
**To:** "Berlinger" <berlinger@radicalmedia.com>
**Subject:** Re: Fwd: GRACIAS
**Reply-To:** sdonziger@gmail.com

Let's talk

Sent via BlackBerry by AT&T

---

**From:** "Joe Berlinger"
**Date:** Thu, 22 Jan 2009 18:22:42 +0000
**To:** Steven Donziger@gmail.com>
**Subject:** Fw: Fwd: GRACIAS

These changes are costly. How do you feel about it? Is it as grave as pablo makes it seem? Who is going to pay for the changes?

Sent via BlackBerry from T-Mobile

---

**From:** Mike Bonfiglio
**Date:** Thu, 22 Jan 2009 13:03:53 -0500
**To:** Joe Berlinger<berlinger@radicalmedia.com>; Alyse Spiegel<spiegel@radicalmedia.com>
**Subject:** Fwd: GRACIAS

From Pablo (translation below -- Alyse: please correct any of my inevitable mistakes)...

Greetings Mike, Joe, Alyse, and everyone,

I imagine that you're still at Sundance, enjoying the snow and the presence of stars. I don't have Joe's address to send this to him as well.

First I'd like to express my thanks for the documentary. I believe that it is something important and historic, and that perhaps soon we will be talking about the time before the documentary and after the documentary.

Initially I didn't really understand why Sting and Trudie took up so much space in the film, but seeing the film all together, I liked it more. And once I saw the audience's reaction in the theatre, I was happy with what was done and I want to thank you again for all of the effort and sacrifice you have done to make this film and get it out.

With certainty, the film will also have strong repercussions in Ecuador once the public is able to see it.

I don't know what the future of the documentary is right now, if there is a distribution company or if you yourselves

JB-NonWaiver00091320

are creating a distribution plan, but whatever happens, I feel that the film will have a real impact.

I would lie to make clear that personally, I am at your disposal to support the film in any way you deem necessary. If there is anything I can do, you can always count on me.

Also, I don't want to finish without repeating my request the before the film is shown more widely, and before it is sold to a distribution company, that you remove the images that we discussed. This is so serious that we could lose everything, or a great deal, just because of these miniscule shots. I ask that you help me with this -- for me this is extremely urgent.

Again, let me send my regards to you all, your families, and the whole team.

Cordially,

Pablo Fajardo Mendoza


Begin forwarded message:

From: pafam@ecuanex.net.ec
Date: January 22, 2009 12:12:48 PM EST
To: bonfiglio@radicalmedia.com
Subject: THANK YOU

Hi Mike, Joe, Alicia and everyone
I imagine that you are still at the Sundance festival, enjoying the snow and the presence of the stars...

I don't have Joe's address to send this e-mail to him as well.

First, I want to express my gratitude to you for the documentary. It really seems to me that it is something important that can make history. We may be able to talk later about the before and after of the documentary.

Initially, I didn't understand very well why Trudie and Sting were in the documentary so much, but now that I have seen the whole documentary without interruption, it seems to me that it is the best thing. Now that I have seen the audience's reaction, I'm happy with what you have done and I want to reiterate my gratitude to you for all the effort and sacrifice that you have made so that this documentary could work out.

Surely, the documentary will also have strong repercussions in Ecuador once the public is able see it.

I don't know what the documentary's future is now, whether or not there is a distributor or whether you yourselves are going to make a dissemination or distribution plan. In any event, I think that the real impact will be in keeping with the distribution that the documentary has.

I want to make it clear that I am personally willing to support whatever you think is advisable. If I can or should do anything, please let me know and always count on me.

JB-NonWaiver00091321

However, I don't want to forget my request that, before further distribution of the movie or before a company purchases that right, that the images we had discussed be corrected or removed. They are so serious that we can lose everything or a lot just because of those few, miniscule images.
I ask you to help me with this please. For me that is urgent.

Once again I send my regards to all of you, your families and the whole support team.

Sincerely

Pablo Fajardo Mendoza


-------------------------------------------
[confidentiality statement]

JB-NonWaiver00091322

| | |
|---|---|
| **From:** | Joe Berlinger |
| **Sent:** | 8/3/2010 5:24:34 AM |
| **Subject:** | Fwd: GRACIAS |

Begin forwarded message:

**From:** "Steven Donziger" <sdonziger@gmail.com>
**Date:** January 22, 2009 1:24:56 PM EST
**To:** "Berlinger" <berlinger@radicalmedia.com>
**Subject: Re: Fwd: GRACIAS**
**Reply-To:** sdonziger@gmail.com

Let's talk

Sent via BlackBerry by AT&T

---

**From:** "Joe Berlinger"
**Date:** Thu, 22 Jan 2009 18:22:42 +0000
**To:** Steven Donziger<sdonziger@gmail.com>
**Subject:** Fw: Fwd: GRACIAS

These changes are costly. How do you feel about it? Is it as grave as pablo makes it seem? Who is going to pay for the changes?

Sent via BlackBerry from T-Mobile

---

**From:** Mike Bonfiglio
**Date:** Thu, 22 Jan 2009 13:03:53 -0500
**To:** Joe Berlinger<berlinger@radicalmedia.com>; Alyse Spiegel<spiegel@radicalmedia.com>
**Subject:** Fwd: GRACIAS

From Pablo (translation below -- Alyse: please correct any of my inevitable mistakes)...

Greetings Mike, Joe, Alyse, and everyone,

I imagine that you're still at Sundance, enjoying the snow and the presence of stars. I don't have Joe's address to send this to him as well.

First I'd like to express my thanks for the documentary. I believe that it is something important and historic, and that perhaps soon we will be talking about the time before the documentary and after the documentary.

Initially I didn't really understand why Sting and Trudie took up so much space in the film, but seeing the film all together, I liked it more. And once I saw the audience's reaction in the theatre, I was happy with what was done and I want to thank you again for all of the effort and sacrifice you have done to make this film and get it out.

With certainty, the film will also have strong repercussions in Ecuador once the public is able to see it.

I don't know what the future of the documentary is right now, if there is a distribution company or if you yourselves

JB-NonWaiver00091320

are creating a distribution plan, but whatever happens, I feel that the film will have a real impact.

I would lie to make clear that personally, I am at your disposal to support the film in any way you deem necessary. If there is anything I can do, you can always count on me.

Also, I don't want to finish without repeating my request the before the film is shown more widely, and before it is sold to a distribution company, that you remove the images that we discussed. This is so serious that we could lose everything, or a great deal, just because of these miniscule shots. I ask that you help me with this -- for me this is extremely urgent.

Again, let me send my regards to you all, your families, and the whole team.

Cordially,

Pablo Fajardo Mendoza


Begin forwarded message:

**From:** pafam@ecuanex.net.ec
**Date:** January 22, 2009 12:12:48 PM EST
**To:** bonfiglio@radicalmedia.com
**Subject:** GRACIAS

Saludos Mike, Joe, Alicia y todos

Me imagino que aún estás en el festival Sundance, disfrutando de la nieve y de la presencia de estrellas…

No tengo la dirección de Joe para hacerle llegar ésta e-mail también a él.

Primero quiero expresarle mis agradecimientos por el documental, en realidad me parece que es algo importante y que puede marcar la historia, es posible que luego hablemos del ante y después del documental.

Inicialmente no comprendía muy del porque Trudie y Sting ocupaban un espacio considerable dentro del documental, pero una vez que he visto todo el documental sin pausa me parece que es lo mejor. Una vez que he visto la reacción del auditorio estoy contento con lo que han hecho y quiero reiterarles mis agradecimientos a ustedes por todo el esfuerzo y sacrificio que han hecho para que éste documental salga.

Con seguridad, el documental también tendrá una fuerte repercusión en el Ecuador una vez que el público lo pueda observar.

No se cuál es el futuro del documental ahora, si existe o no una empresa distribuidora o si ustedes mismos van a hacer un plan de distribución o difusión, en todo caso creo que el impacto real se dará de acuerdo a la difusión que tenga el documental.

Quiero dejar en claro que personalmente estoy dispuesto a apoyar en lo que ustedes crean convenientes. Si algo puedo o debo hacer por favor me hacen saber y cuenten siempre conmigo.

JB-NonWaiver00091321

Sin embargo, No quiero dejar pasar por alto, mi pedido, para que antes que
se difunda más la película o antes que una empresa compre ese derecho se
corrija, o se quiten las imágenes que habíamos comentado. Son tan graves
que podemos perder todo o mucho solo por esas pocas y minúsculas imágenes.
Pido a ustedes me ayuden con esto por favor, para mi eso es urgente.

Una vez más expreso mis saludos a todos ustedes, sus familias y todo el
equipo de apoyo.


Cordialmente


Pablo Fajardo Mendoza




----------------------------------------------------------------------------------------
Este mensaje ha sido analizado en busca de virus y otros contenidos peligrosos, y se considera que está limpio. Se
deja expresa constancia que GPF Corporación no asume responsabilidad alguna por el uso que el CLIENTE dé al
servicio de correo electrónico, aclarando que el CLIENTE se hace responsable no sólo de sus propios actos sino de
sus dependientes, agentes, familiares o terceros. El CLIENTE deja expresa constancia de que conoce la Ley Especial
de Telecomunicaciones, Ley de Derechos de Autor, Ley de Propiedad Intelectual, y otras leyes conexas, así como
los Reglamentos y Resoluciones vigentes sobre la materia, y de que está ilustrado sobre las facultades, impedimentos
y prohibiciones determinados en estos cuerpos jurídicos, por lo que utilizará el servicio de GPF Corporación
ciñéndose estrictamente a los mismos. En consecuencia GPF Corporación no asume responsabilidad alguna, ni
directa ni indirecta, solidaria o subsidiaria, sobre las eventuales infracciones a las referidas disposiciones por parte del
solicitante, quien para efectos de esta obligación contractual asume el deber de informarse permanentemente sobre
las leyes y  sus reformas que se relacionen con el servicio que se brinda.

JB-NonWaiver00091322

| From: | sdonziger [sdonziger@gmail.com] |
|---|---|
| Sent: | Thursday, May 20, 2010 4:40 PM |
| To: | Westenberger; jabady; awilson; imaazel; sdonziger; Daleo, Eric; Yennock, Edward |
| Subject: | Re: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International, Inc. et al Memorandum and Order |

Let's do it

Sent via BlackBerry by AT&T

----

From: "Westenberger, Eric" <ewestenberger@pattonboggs.com>
Date: Thu, 20 May 2010 16:29:33 -0400
To: <jabady@ecbalaw.com>; <awilson@ecbalaw.com>; <sdonziger@gmail.com>;
<imaazel@ecbalaw.com>; <sdonziger@donzigerandassociates.com>; Daleo,
Eric<EDaleo@PattonBoggs.com>; Yennock, Edward<EYennock@PattonBoggs.com>
Subject: Re: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order

Can we have 3TM's counsel ask 3TM whether it knows of any documents going to plaintiffs? If
not, do we move for reconsideration noting that judge order the wrong party to disclose--no
subpoena to plaintiffs? Let that get resolved. If judge rules that 3tm has to disclose those
docs, they can say "we don't know of any such documents". This should buy time. And it's a
good faith argument.
-------------------------
Sent from my BlackBerry Wireless Device

----

From: Westenberger, Eric
To: 'jabady@ecbalaw.com' <jabady@ecbalaw.com>; 'awilson@ecbalaw.com' <awilson@ecbalaw.com>;
'sdonziger@gmail.com' <sdonziger@gmail.com>; 'imaazel@ecbalaw.com' <imaazel@ecbalaw.com>;
'sdonziger@donzigerandassociates.com' <sdonziger@donzigerandassociates.com>; Daleo, Eric;
Yennock, Edward
Sent: Thu May 20 16:11:01 2010
Subject: Re: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order

Let's have the discussion be lawyer to lawyer. Can you call silver? And let's not pass any
information to 3TM.
-------------------------
Sent from my BlackBerry Wireless Device

----

From: Jonathan S. Abady <jabady@ecbalaw.com>
To: Andrew Wilson <awilson@ecbalaw.com>; Westenberger, Eric; sdonziger@gmail.com
<sdonziger@gmail.com>; Ilann M. Maazel <imaazel@ecbalaw.com>;
sdonziger@donzigerandassociates.com <sdonziger@donzigerandassociates.com>; Daleo, Eric;
Yennock, Edward

Sent: Thu May 20 16:04:42 2010
Subject: RE: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order


i'm okay with it.


Jonathan S. Abady
Emery Celli Brinckerhoff & Abady LLP

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(212) 763-5000 (o)
(212) 763-5001 (f)

_____

From: Andrew Wilson
Sent: Thursday, May 20, 2010 3:55 PM
To: 'Westenberger, Eric'; sdonziger@gmail.com; Ilann M. Maazel; Jonathan S. Abady;
sdonziger@donzigerandassociates.com; Daleo, Eric; Yennock, Edward
Subject: RE: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order


I think we should know sooner, rather than later what the answer is to the latter point.

_____

From: Westenberger, Eric [mailto:ewestenberger@pattonboggs.com]
Sent: Thursday, May 20, 2010 3:30 PM
To: Andrew Wilson; sdonziger@gmail.com; Ilann M. Maazel; Jonathan S. Abady;
sdonziger@donzigerandassociates.com; Daleo, Eric; Yennock, Edward
Subject: Re: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order


If it's not final collateral order doesn't work, we could always seek certification.

I hate the thought of asking the court to fix it's mistake. Although, if the order was fixed,
3TM likely would not know what went to cabrera.
--------------------------
Sent from my BlackBerry Wireless Device

_____

From: Westenberger, Eric
To: 'awilson@ecbalaw.com' <awilson@ecbalaw.com>; 'sdonziger@gmail.com' <sdonziger@gmail.com>;
'imaazel@ecbalaw.com' <imaazel@ecbalaw.com>; 'jabady@ecbalaw.com' <jabady@ecbalaw.com>;
'sdonziger@donzigerandassociates.com' <sdonziger@donzigerandassociates.com>; Daleo, Eric;
Yennock, Edward
Sent: Thu May 20 14:56:56 2010
Subject: Re: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order

Also, fairly certain that the collateral order doctrine applies to orders regarding production of privileged material.
-------------------------
Sent from my BlackBerry Wireless Device

---

From: Westenberger, Eric
To: 'awilson@ecbalaw.com' <awilson@ecbalaw.com>; 'sdonziger@gmail.com' <sdonziger@gmail.com>; 'imaazel@ecbalaw.com' <imaazel@ecbalaw.com>; 'jabady@ecbalaw.com' <jabady@ecbalaw.com>; 'sdonziger@donzigerandassociates.com' <sdonziger@donzigerandassociates.com>; Daleo, Eric; Yennock, Edward
Sent: Thu May 20 14:55:18 2010
Subject: Re: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International, Inc. et al Memorandum and Order

How about writ of mandamus? Judge is acting outside of his jurisdiction. Only half kidding.
-------------------------
Sent from my BlackBerry Wireless Device

---

From: Andrew Wilson <awilson@ecbalaw.com>
To: Westenberger, Eric; sdonziger@gmail.com <sdonziger@gmail.com>; Ilann M. Maazel <imaazel@ecbalaw.com>; Jonathan S. Abady <jabady@ecbalaw.com>; sdonziger@donzigerandassociates.com <sdonziger@donzigerandassociates.com>; Daleo, Eric; Yennock, Edward
Sent: Thu May 20 14:53:06 2010
Subject: RE: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International, Inc. et al Memorandum and Order

It is not a final order - do we have an appellate jurisdictional issue?  Motley is looking into it.

---

From: Westenberger, Eric [mailto:ewestenberger@pattonboggs.com]
Sent: Thursday, May 20, 2010 2:39 PM
To: Andrew Wilson; sdonziger@gmail.com; Ilann M. Maazel; Jonathan S. Abady; sdonziger@donzigerandassociates.com; Daleo, Eric; Yennock, Edward
Subject: Re: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International, Inc. et al Memorandum and Order

I can't talk at 3. There's no question we're appealing, right? There is no basis for the judge to order pls to do anything. Let's start with the fact there is no subpoena to them. Next, plaintiffs are in ecuador--not outside of the jurisdiction of ecuador court.

I say we file notice of appeal first. And then move to stay. No reconsideration or chance for judge to fix his problem.
-------------------------
Sent from my BlackBerry Wireless Device

From: Andrew Wilson <awilson@ecbalaw.com>
To: Westenberger, Eric; sdonziger@gmail.com <sdonziger@gmail.com>; Ilann M. Maazel
<imaazel@ecbalaw.com>; Jonathan S. Abady <jabady@ecbalaw.com>;
sdonziger@donzigerandassociates.com <sdonziger@donzigerandassociates.com>; Daleo, Eric;
Yennock, Edward
Sent: Thu May 20 14:34:51 2010
Subject: RE: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order


Shall we talk this through at 3pm?
Eric's line?  If we are appealing, we need to do that tomorrow.


From: Westenberger, Eric [mailto:ewestenberger@pattonboggs.com]
Sent: Thursday, May 20, 2010 2:26 PM
To: Andrew Wilson; sdonziger@gmail.com; Ilann M. Maazel; Jonathan S. Abady;
sdonziger@donzigerandassociates.com; Daleo, Eric; Yennock, Edward
Subject: Re: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order


I don't think we want to do this right now.
-------------------------
Sent from my BlackBerry Wireless Device


From: Andrew Wilson <awilson@ecbalaw.com>
To: sdonziger@gmail.com <sdonziger@gmail.com>; Westenberger, Eric; Ilann M. Maazel
<imaazel@ecbalaw.com>; Jonathan S. Abady <jabady@ecbalaw.com>;
sdonziger@donzigerandassociates.com <sdonziger@donzigerandassociates.com>; Daleo, Eric;
Yennock, Edward
Sent: Thu May 20 14:12:33 2010
Subject: RE: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order


Let's find out from Stratus.  Maybe Steve calls Beltman?


From: sdonziger@gmail.com [mailto:sdonziger@gmail.com]
Sent: Thursday, May 20, 2010 2:00 PM
To: Westenberger; Andrew Wilson; Ilann M. Maazel; Jonathan S. Abady;
sdonziger@donzigerandassociates.com; Daleo, Eric; Yennock, Edward
Subject: Re: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order


Correct... Unless thru stratus via locals

Sent via BlackBerry by AT&T

From: "Westenberger, Eric" <ewestenberger@pattonboggs.com>
Date: Thu, 20 May 2010 13:45:51 -0400
To: <awilson@ecbalaw.com>; <imaazel@ecbalaw.com>; <jabady@ecbalaw.com>;
<sdonziger@donzigerandassociates.com>; <sdonziger@gmail.com>; Daleo,
Eric<EDaleo@PattonBoggs.com>; Yennock, Edward<EYennock@PattonBoggs.com>
Subject: Re: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International,
Inc. et al Memorandum and Order

Nothing from 3TM went to cabrera, right?
--------------------------
Sent from my BlackBerry Wireless Device


From: Andrew Wilson <awilson@ecbalaw.com>
To: Ilann Maazel <imaazel@ecbalaw.com>; Jonathan S. Abady <jabady@ecbalaw.com>; Westenberger,
Eric; Steven R. Donziger <sdonziger@donzigerandassociates.com>; Steven R. Donziger
<sdonziger@gmail.com>; Daleo, Eric; Yennock, Edward
Sent: Thu May 20 13:31:48 2010
Subject: Fwd: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International, Inc.
et al Memorandum and Order




Begin forwarded message:


        From: <DCECF_LiveDB@txs.uscourts.gov>
        Date: May 20, 2010 1:21:43 PM EDT
        To: <DC_Notices@txs.uscourts.gov>
        Subject: Activity in Case 4:10-mc-00134 Chevron Corporation v. 3TM International, Inc.
et al Memorandum and Order


        This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT
RESPOND to this e-mail because the mail box is unattended.
        ***NOTE TO PUBLIC ACCESS USERS*** There is no charge for viewing opinions.

        U.S. District Court

        SOUTHERN DISTRICT OF TEXAS

        Notice of Electronic Filing


        The following transaction was entered on 5/20/2010 at 12:21 PM CDT and filed on
5/20/2010

Case Name:   Chevron Corporation v. 3TM International, Inc. et al

Case Number: 4:10-mc-00134 <https://ecf.txsd.uscourts.gov/cgi-bin/DktRpt.pl?744633>
Filer:
WARNING: CASE CLOSED on 04/06/2010
Document Number:   50
<https://ecf.txsd.uscourts.gov/doc1/179111392414?caseid=744633&de_seq_num=148&magic_num=47396
229>


        Docket Text:
        MEMORANDUM AND ORDER that plaintiffs are ORDERED to produce a list of the 3TM documents
that were produced, directly or indirectly, to Cabrera by Monday 5/24/2010.(Signed by Judge
Gray H. Miller) Parties notified.(rkonieczny)


        4:10-mc-00134 Notice has been electronically mailed to:

        Andrea E Neuman      aneuman@gibsondunn.com

        Ilann M Maazel      maazel@echalaw.com

        Kristin Nicole Sapaugh Wallis      kristin@doreassociates.com

        O Andrew F Wilson      awilson@ecbalaw.com

        Samantha A Lunn      slunn@gibsondunn.com, lgoodwin@gibsondunn.com,
lsekiguchi@gibsondunn.com

        Sanford L Dow      dow@dowgolub.com, rsmith@dowgolub.com

        Scott A Edelman      sedelman@gibsondunn.com

        Thomas H Padgett , Jr      tpadgett@dowgolub.com, rsmith@dowgolub.com

        4:10-mc-00134 Notice has not been electronically mailed to:


        The following document(s) are associated with this transaction:

        Document description:Main Document
        Original filename:n/a
        Electronic document Stamp:
        [STAMP dcecfStamp_ID-1045387613 [Date-5/20/2010] [FileNumber-10702992-
        0] [5a30a294c64d499a97673ffa3e6b8e9e26820e8895c9abf028d67e69fabf167179
        4e79f14329b63e7fb55153a89357ab28e1afb3f02222710fb77a31b81d2902]]


DISCLAIMER:
This e-mail message contains confidential, privileged information intended solely for the
addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you
have received it in error, please call us (collect) at (202) 457-6000 and ask to speak with
the message sender. Also, we would appreciate your forwarding the message back to us and
deleting it from your system. Thank you.

This e-mail and all other electronic (including voice) communications from the sender's firm
are for informational purposes only. No such communication is intended by the sender to
constitute either an electronic record or an electronic signature, or to constitute any
agreement by the sender to conduct a transaction by electronic means. Any such intention or

agreement is hereby expressly disclaimed unless otherwise specifically indicated. To learn more about our firm, please visit our website at http://www.pattonboggs.com.

DISCLAIMER:
This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (202) 457-6000 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated. To learn more about our firm, please visit our website at http://www.pattonboggs.com.

DISCLAIMER:
This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (202) 457-6000 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated. To learn more about our firm, please visit our website at http://www.pattonboggs.com.

DISCLAIMER:
This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (202) 457-6000 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated. To learn more about our firm, please visit our website at http://www.pattonboggs.com.

DISCLAIMER:
This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (202) 457-6000 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated. To learn more about our firm, please visit our website at http://www.pattonboggs.com.

| From: | sdonziger [sdonziger@gmail.com] |
|---|---|
| Sent: | Thursday, May 27, 2010 11:47 PM |
| To: | Westenberger; imaazel; awilson; Tyrrell, James; sdonziger; Daleo, Eric; Yennock, Edward; jabady; mjasinski; imoll; bnarwold; jbrickell; lgarr; awoods |
| Subject: | Re: Mini-revelation |

Like this approach. Ilann?

Sent via BlackBerry by AT&T

_____

From: "Westenberger, Eric" <ewestenberger@pattonboggs.com>
Date: Thu, 27 May 2010 23:43:04 -0400
To: <imaazel@ecbalaw.com>; <sdonziger@gmail.com>; <awilson@ecbalaw.com>; Tyrrell,
James<JTyrrell@PattonBoggs.com>; <sdonziger@donzigerandassociates.com>; Daleo,
Eric<EDaleo@PattonBoggs.com>; Yennock, Edward<EYennock@PattonBoggs.com>;
<jabady@ecbalaw.com>; <mjasinski@motleyrice.com>; <imoll@motleyrice.com>;
<bnarwold@motleyrice.com>; <jbrickell@h5.com>; <lgarr@donzigerandassociates.com>;
<awoods@donzigerandassociates.com>
Subject: Re: Mini-revelation

What about the following? Appeal; move for stay; if we win with kane great; if we lose, we
produce whatever we want (narrow read); gd complains and then we move for clarification. If
we lose again, we think about another appeal.
-------------------------
Sent from my BlackBerry Wireless Device

_____

From: Ilann M. Maazel <imaazel@ecbalaw.com>
To: Westenberger, Eric; sdonziger@gmail.com <sdonziger@gmail.com>; Andrew Wilson
<awilson@ecbalaw.com>; Tyrrell, James; sdonziger@donzigerandassociates.com
<sdonziger@donzigerandassociates.com>; Daleo, Eric; Yennock, Edward; Jonathan S. Abady
<jabady@ecbalaw.com>; mjasinski@motleyrice.com <mjasinski@motleyrice.com>;
imoll@motleyrice.com <imoll@motleyrice.com>; bnarwold@motleyrice.com
<bnarwold@motleyrice.com>; jbrickell@h5.com <jbrickell@h5.com>;
lgarr@donzigerandassociates.com <lgarr@donzigerandassociates.com>; Andrew Woods
<awoods@donzigerandassociates.com>
Sent: Thu May 27 23:35:35 2010
Subject: Mini-revelation

Here's what I think is going to happen within the next week:

1. Our motion for a protective order in CO was denied.  We will make a motion for
clarification tomorrow, hopefully (after conferring) in the aft. to delay this a bit.  The
magistrate will act quickly.

2. However the judge clarifies his ruling, he will at a minimum require immediate production
of all Stratus materials given to Cabrera.

3. We will appeal and move for a stay before the magistrate.  We will lose.  Maybe we move for a stay before the D. Ct.  We will almost certainly lose.

4. Thus, very shortly, Stratus will be under a court order to produce all materials it gave Cabrera.  Stratus will not risk a contempt motion, it will comply.


Unless we want the Stratus/Cabrera revelation to come out in CO, which seems like the worst possible place, we need to make our submission in Ecuador and fast.  Say, Tuesday.  We've bought over a month in CO and everywhere else but time is almost certainly about to run out. So we need to make a decision whether we can file in Ecuador and control this story, or whether we let events overtake us in CO, as I think they will very shortly.

Where are we in terms of drafting the Ecuadorian submission?

Ilann M. Maazel
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
phone: 212-763-5000
fax: 212-763-5001
imaazel@ecbalaw.com <mailto:e@ecbalaw.com>
www.ecbalaw.com <http://www.ecbalaw.com/>

This electronic message transmission contains information from the law firm of Emery Celli Brinckerhoff& Abady LLP which may be confidential or privileged.  The information is intended to be for the use of the individual or entity named above.  If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited.  If you have received this electronic transmission in error, please notify us by telephone (212-763-5000) or by electronic mail (imaazel@ecbalaw.com <mailto:e@ecbalaw.com> ) immediately.


DISCLAIMER:
This e-mail message contains confidential, privileged information intended solely for the addressee. Please do not read, copy, or disseminate it unless you are the addressee. If you have received it in error, please call us (collect) at (202) 457-6000 and ask to speak with the message sender. Also, we would appreciate your forwarding the message back to us and deleting it from your system. Thank you.

This e-mail and all other electronic (including voice) communications from the sender's firm are for informational purposes only. No such communication is intended by the sender to constitute either an electronic record or an electronic signature, or to constitute any agreement by the sender to conduct a transaction by electronic means. Any such intention or agreement is hereby expressly disclaimed unless otherwise specifically indicated. To learn more about our firm, please visit our website at http://www.pattonboggs.com.

| From: | Steven Donziger [sdonziger@donzigerandassociates.com] |
|---|---|
| Sent: | Monday, June 14, 2010 8:35 AM |
| To: | Nicolas Economou |
| Subject: | FYI |

---------- Forwarded message ----------
From: **Steven Donziger** <sdonziger@donzigerandassociates.com>
Date: Mon, Jun 14, 2010 at 11:34 AM
Subject: important update/Ecuador
To: "Tyrrell, James" <JTyrrell@pattonboggs.com>, "Westenberger, Eric" <ewestenberger@pattonboggs.com>, "Daleo, Eric" <EDaleo@pattonboggs.com>

Jim and Eric:

A few things:

1) The Ecuador team is getting nervous that there is an increasing risk that our "cleansing" process is going to be outrun by the judge and we will end up with a decision based entirely on Cabrera. Absent our intervention ASAP, they believe the judge could issue autos para sentencia in about 3-4 weeks, which would in effect bar our remedy to the Cabrera problem. Abady's firm is re-editing the submission in light of the recent complications with the Stratus materials; should have another draft to distribute by end of day, with a goal of getting this to the judge by Wednesday of this week -- please be aware that this might require immediate attention.

2) The new technical expert is critical -- any leads? Pls give top priority to this.

3) I am preparing a memo for the team on administrative issues and substantive tasks to be used as a basis for discussion. Will send for your review b4 wider distribution.

4) We still are waiting for the budget -- let me know how I can be helpful in getting a draft, as funders are waiting.

Thanks guys -- call anytime.

SRD

--
Steven Donziger
212-570-4499 (land)
212-409-8628 (fax)
917-566-2526 (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.

New York, New York 10025
Email: sdonziger@gmail.com


--
Steven Donziger
212-570-4499 (land)
212-409-8628 (fax)
917-566-2526 (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.

New York, New York 10025
Email: sdonziger@gmail.com

| From: | Steven Donziger [sdonziger@donzigerandassociates.com] |
| Sent: | Thursday, May 27, 2010 1:25 PM |
| To: | Andrew Wilson |
| Cc: | Westenberger, Eric; Jonathan S. Abady; Ilann M. Maazel; Daleo, Eric; Yennock, Edward; Moll, Ingrid; Jasinski, Mathew |
| Subject: | Re: Ecuador/Texas: Foundational Dep Ordered |

I defer.


On Thu, May 27, 2010 at 12:51 PM, Andrew Wilson <awilson@ecbalaw.com> wrote:


        Our strategy in TX has been to use the good facts to bring this proceeding to a close and declare victory.  I am not sure this is worth the resources to fight a stay application (which we may lose b/c no harm) and an appeal which we will probably loose too.

        The dep is limited to (a) collaboration between 3TM and Cabrera; and (b) any 3TM work it recognizes in the Cabrera report. They have already answered to us that they did not communicate with Cabrera.  As long as Beltman is right, the second category should be one or two questions and we are done.

        Do we want the 5th Cir to be the first to weigh in on our privilege arguments vis-a-vis the 1782?


        _____

        From: Steven Donziger [mailto:sdonziger@donzigerandassociates.com]
        Sent: Thursday, May 27, 2010 12:46 PM
        To: Andrew Wilson
        Cc: Westenberger, Eric; Jonathan S. Abady; Ilann M. Maazel; Daleo, Eric; Yennock, Edward; Moll, Ingrid; Jasinski, Mathew
        Subject: Re: Ecuador/Texas: Foundational Dep Ordered


        I think we should appeal on the theory that we gain a greater advantage by fighting them on everything, and tying them up, than in conceding any one thing even if we expect to ultimately lose that one thing down the road.  I could be convinced otherwise but I think it important we adhere to that fundamental principle of our strategy as outlined by Jim at the meeting a few weeks ago.

        SRD


        On Thu, May 27, 2010 at 12:35 PM, Andrew Wilson <awilson@ecbalaw.com> wrote:


        Let's discuss whether to appeal - 3TM is a wildcard - but I think we do better in Texas by letting this happen.

        <<Chevron-TX. Order re deposition (00051941).PDF>>

        O. Andrew F. Wilson

DONZ00031335 Page 1 of 2

Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, New York 10019
Tel:  212-763-5000
Fax: 212-763-5001

    The pages accompanying this email transmission contain information from the law firm of Emery Celli Brinckerhoff & Abady LLP which is confidential or privileged. The information is intended to be for the use of the individual or entity named on this email. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the contents of this information is prohibited. If you have received this e-mail in error please notify us by telephone immediately so that we can arrange for the retrieval of the email at no cost to you.


    --
    Steven Donziger
    212-570-4499 (land)
    212-409-8628 (fax)
    917-566-2526 (cell)

    Steven R. Donziger
    Law Offices of Steven R. Donziger, P.C.
    ████████████████████
    Email: sdonziger@gmail.com


--
Steven Donziger
212-570-4499 (land)
212-409-8628 (fax)
917-566-2526 (cell)

Steven R. Donziger
Law Offices of Steven R. Donziger, P.C.
████████████████████
Email: sdonziger@gmail.com

# EXHIBIT 26

Case 11-1150, Document 508, 08/09/2011, 359718, Page89 of 191
RA-83
Case 1:10-cv-00047-MSK-MEH   Document 171   Filed 06/17/10   USDC Colorado   Page 1 of 5
Case 1:11-cv-00691-LAK   Document 298-26   Filed 05/02/11   Page 2 of 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:10-cv-00047-MSK-MEH

CHEVRON CORPORATION a Delaware corporation,

        Petitioner,

    vs.

STRATUS CONSULTING, INC.,
DAVID J. CHAPMAN, an individual,
DOUGLAS BELTMAN, an individual,
JENNIFER M.H. PEERS, an individual,
PETER N. JONES, an individual,
LAURA BELANGER, an individual, and
ANNE S. MAEST, an individual,

        Respondents.

and,

DANIEL CARLOS LUSITANDE YAIGUAJE, *et al.*,

        Ecuadorian plaintiffs/Interested parties.

---

## PLAINTIFFS' RESPONSE TO "UPDATE ON LAGO AGRIO PROCEEDING AND REQUEST FOR STATUS CONFERENCE ON JUNE 21, 2010" (Dkt. #167)

---

In response to Chevron's update and request for status conference (Dkt. #167), there has indeed been a significant update in this case, but in Colorado, not in Ecuador (*see* Dkt. #169; Chevron's Fed. R. Civ. P. 72(a) "Objections to Magistrate Judge Hegarty's June 1, 2010 Order").

With respect to the ongoing case in Ecuador, nothing has happened in the Lago Agrio Litigation since the parties appeared before the Court at the June 9, 2010 Status Conference. There has been no ruling of any kind. No party has made any submission to the

Court.  We remain in the same position today as we were in on June 9: at some point in the future, the Court will issue an *autos para sentencia*, which will then permit the parties to submit "allegato" (final arguments), followed at some point by a ruling by the trial court.  We still remain before even the penultimate stage of the proceeding at the trial level.

Rather than provide Your Honor with an update on the actual litigation, as the Court invited the parties to do, Chevron uses the Court's invitation to refer to an *interview* conducted by a lawyer for the plaintiffs in Ecuador, Pablo Fajardo Mendoza.  In the interview, Mr. Fajardo speculates that the Court will issue an *autos para sentencia* "in the coming weeks," to be followed by the allegato, to be followed at some point by a ruling.  Needless to say, prior predictions of court action in Ecuador have been proven wrong time and again, by a factor not of weeks, but of years.  Should there be any *actual* development in the Ecuadorian litigation, however, plaintiffs (and no doubt, Chevron) will promptly inform the Court.  Since June 9, there has been nothing to report.

Chevron also points the Court to a transcript of a hearing in New Jersey in which Mr. Wilson, counsel for the plaintiffs, stated: "[A]t sometime the court in Ecuador will issue a statement that the case is moving toward final arguments.  The parties will then have the opportunity to present closing arguments and then after their closing arguments are submitted, then the court has the opportunity to enter a judgment.  So, we're not on the eve of judgment."  Dkt. #166 Ex. F at 28.  This, of course, is exactly what plaintiffs represented to Your Honor on June 9, and it is accurate and undisputed by Chevron.  Mr. Wilson was then asked whether plaintiffs "[h]ave been urging the Ecuadorian court to issue an opinion and a decision as quickly as possible," and he responded "Absolutely. . . . the plaintiffs, as every plaintiff is, are trying to move that procedure along as fast as possible."  *Id.*  Mr. Wilson's statement, which Chevron has

Case 11-1150, Document 508, 08/09/2011, 359718, Page91 of 191
RA-85
Case 1:10-cv-00047-MSK-MEH   Document 171    Filed 06/17/10   USDC Colorado   Page 3 of 5
Case 1:11-cv-00691-LAK   Document 298-26    Filed 05/02/11   Page 4 of 6

taken out of context, was a general one: plaintiffs of course have tried to move the case forward, largely unsuccessfully, since 1993.  Chevron, in contrast, has delayed the case for seventeen years.  In any event, plaintiffs have not made any Ecuadorian submission of any kind since June 9 to move the case forward.  Nor is there any evidence that the Ecuadorian case is doing anything more than "lumbering forward," as we suggested last week (and still believe this week).  Again, should there be any actual update in Ecuador, plaintiffs will promptly inform the Court.

There has, however, been a very substantial development in the above-captioned action since June 9: Chevron's appeal to the District Court of Your Honor's June 1, 2010 Order.  At no point in the one hour Status Conference last week did Chevron disclose its intention to appeal Your Honor's ruling, or to press the position on appeal that every single privilege over every single document and deposition question has been waived.  With this appeal to the District Court, Chevron has completely undermined the premise for the June 9 Status Conference and displaced Your Honor's ruling.  In the clarification order, Your Honor provided for a document by document assertion of privilege, which was the premise for June 9 Order providing for a rolling document/privilege review.  Chevron has now appealed the clarification order, and asserts to the District Court that *no* document is privileged.  There is simply no point in spending hundreds of hours doing a privilege review while Chevron asks the District Court to reverse this Court's ruling.

During the June 9 conference, Chevron also failed to mention any request for Stratus depositions, and it was the expectation of the plaintiffs (and we believe, the Court) that any Stratus depositions would follow the document review/production/privilege log and a consolidated motion and ruling on outstanding privilege issues, which would have informed which questions Chevron could or could not ask in Stratus depositions.  In any event, Chevron's

Case 11-1150, Document 508, 08/09/2011, 359718, Page92 of 191
RA-86
Case 1:10-cv-00047-MSK-MEH   Document 171   Filed 06/17/10   USDC Colorado   Page 4 of 5
Case 1:11-cv-00691-LAK   Document 298-26   Filed 05/02/11   Page 5 of 6

appeal now supersedes all of these issues.  Again, there is no point producing someone for a

deposition and asserting various privileges on a question by question basis, if (as Chevron now

seeks) a higher court later rules that all privileges are waived, necessitating that each and every

deponent appear for yet another deposition, in the event the District Court adopts Chevron's

extreme position that the Ecuadorian Plaintiffs have waived all privileges.

Chevron's previously undisclosed appeal has altered the premise for the June 9

Status Conference and Your Honor's order.  We respectfully submit that Chevron's appeal,

which Chevron inexplicably failed to mention on June 9, alters the parameters of discovery,

moots the Court's June 9 order, and now requires plaintiffs to respond to the District Court

instead of proceeding with asserting privileges that Chevron now questions on appeal.

While we certainly appreciate any guidance from Your Honor, it appears to

plaintiffs that we must now address the scope and timing of discovery issues, and Chevron's

pending motion, before the District Court.

Dated: June 17, 2010

Respectfully submitted,

EMERY CELLI BRINCKERHOFF & ABADY,
LLP

By:/s Ilann Maazel
    Ilann Maazel
    Andrew W. Wilson
    75 Rockefeller Plaza, 20th Floor
    New York, NY 10019
    Telephone (202) 763-5000
    imaazel@ecbalaw.com
    awilson@ecbalaw.com

Attorneys for Ecuadorian plaintiffs/Interested
Parties Daniel Carlos Lusitande Yaiguaje, *et al.*

— 4 —

Case 11-1150, Document 508, 08/09/2011, 359718, Page93 of 191
RA-87
Case 1:10-cv-00047-MSK-MEH   Document 171   Filed 06/17/10   USDC Colorado   Page 5 of 5
Case 1:11-cv-00691-LAK   Document 298-26   Filed 05/02/11   Page 6 of 6

<u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on June 17, 2010, I electronically filed the foregoing Plaintiffs' Response To Stratus's Status Report And To Chevron's Response To Stratus's Status Report with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

     Andrea E. Neuman — ANeuman@gibsondunn.com
     John D.W. Partridge — jpartridge@gibsondunn.com
     Joe L. Siver — jsilver@s-d.com
     Martin D. Beier — beierm@s-d.comn
     Jay S. Horowitz – jhorowitz@hflitig.com
     Richard Kent Kornfeld — rick@rechtkornfeld.com
     Eric W. Bloom — ebloom@winston.com
     David S. Bloch — dbloch@winston.com

and I hereby certify that I have mailed or served the same upon the following non-CM/ECF system addresses as follows:

Mr. Peter N. Jones       Ms. Laura Belanger
1561 S. Foothills Highway, Lot C5   6090 Crestone Street
Boulder, CO 80305-7340     Golden, CO 80403-1016

             *Signed* Ian Johnson

             _____

— 5 —

# EXHIBIT 27

Case 11-1150, Document 508, 08/09/2011, 359718, Page95 of 191
RA-89
Case 1:10-cv-00047-MSK-MEH   Document 176   Filed 06/21/10   USDC Colorado   Page 1 of 12
Case 1:11-cv-00691-LAK   Document 298-27   Filed 05/02/11   Page 2 of 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:10-cv-00047-MSK-MEH

CHEVRON CORPORATION a Delaware corporation,

        Petitioner,

    vs.

STRATUS CONSULTING, INC.,
DAVID J. CHAPMAN, an individual,
DOUGLAS BELTMAN, an individual,
JENNIFER M.H. PEERS, an individual,
PETER N. JONES, an individual,
LAURA BELANGER, an individual, and
ANNE S. MAEST, an individual,

        Respondents.

and,

DANIEL CARLOS LUSITANDE YAIGUAJE, *et al.*,

        Ecuadorian plaintiffs/Interested parties.

---

**PLAINTIFFS' SECOND RESPONSE TO "UPDATE ON LAGO AGRIO PROCEEDING
AND REQUEST FOR STATUS CONFERENCE ON JUNE 21, 2010" (SINCE
CONVERTED TO MOTION) (Dkt. #167)**

---

Case 11-1150, Document 508, 08/09/2011, 359718, Page96 of 191
RA-90
Case 1:10-cv-00047-MSK-MEH   Document 176   Filed 06/21/10   USDC Colorado   Page 5 of 12
Case 1:11-cv-00691-LAK   Document 298-27   Filed 05/02/11   Page 3 of 4

submissions from the parties' own experts should it deem it necessary.

Second, contrary to Chevron's repeated claims of a rush to judgment (claims they have made for months, all of which have been proven wrong), plaintiffs themselves have now suggested that the Lago Agrio court delay the case to permit the parties to make supplemental submissions on the issue of global damages. The Court must first consider plaintiffs' suggestion, and should it adopt it, order a schedule that in practice would take a number of months. Chevron's incorrect and overheated claims of urgency, which Your Honor in any event rejected on June 9, are now even more displaced.

Chevron waited for *years* to bring this § 1782 application. The Cabrera report was filed in April 2008, yet Chevron has given no excuse at all for its delay in bringing this or the myriad other § 1782 applications filed throughout the United States, including New York, New Jersey, California, Washington, D.C., and Texas. Now, having themselves delayed for years, Chevron is attempting to rush this Court and others throughout the country with false claims of "emergency," created, if at all, by itself. But Chevron's decision to hire a new law firm and its desire (after seventeen years) to adopt a new litigation strategy in late 2009 are not reasons to hurry a proceeding involving sensitive issues of privilege and hundreds of hours of review. Chevron, represented by three multi-national law firms and with a virtually unlimited litigation budget, is simply attempting to overwhelm plaintiffs with massive, concurrent litigations in multiple jurisdictions, thousand-page filings, and expedited deadlines considerably shorter than those set forth in the Federal and the Local Rules,[3] resulting in a litigation pace involving plaintiffs' submission in these actions of an average of a brief almost *every business day*, in addition to court appearances all over the country, in addition to the discovery review

---

[3] For example, under Local Rule 7.1(c), plaintiffs would normally have three weeks, not a single business day, to respond to a motion to reconsider.

already set forth in the Order.  Given its own, unexcused multi-year delay, this rushed discovery
and attempt to reverse the Court's considered June 9 Order, based no less on (now-outdated)
speculation from an *interview* of a plaintiffs' lawyer, is unfair and absurd.

Given the above, there is little rationale for, and certainly no urgency to,
Chevron's 28 U.S.C. § 1782 application in Colorado.  For this reason, and because Chevron's
requested order is completely unworkable and directly at odds with Your Honor's ruling of just a
week ago, Chevron's motion to reconsider and reverse the June 9 Order should be denied.


## ARGUMENT

**I.      Chevron Does Not Meet the Standard for a Motion to Reconsider**

Chevron's "Update" is in every way a motion for reconsideration of the June 9
Order (as well as the June 1 Order that preceded it).  In the Tenth Circuit, however, "motions for
reconsideration are not lightly granted."  *Haggard v. Spine*, No. 09-cv-00721-CMA-KMT, 2009
WL 2372275, at *1 (D. Colo. July 30, 2009).  A motion for reconsideration is proper only
"where the court has misapprehended the facts, a party's position, or the controlling law."
*Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  "It is not appropriate to
revisit issues already addressed or advance arguments that could have been raised in prior
briefing."  *Id.*

Here, the Court's Order was not based on any misapprehension of the facts or
law, or of either party's position.  Chevron's alleged basis for seeking reconsideration of the
Order is an interview given by a lawyer for plaintiffs in Ecuador, Pablo Fajardo.[4]  In the

---

[4] Chevron also points to U.S. counsel's assertion that, indeed, Plaintiffs' would like the
Lago Agrio Court to issue a ruling sooner rather than later – hardly a new, previously unknown
piece of information that could somehow warrant reconsideration of this Court's prior rulings.

IN THE UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

In re Application of          )

CHEVRON CORPORATION, a        )

Delaware corporation,         )

                              )

                              )

        Applicant,            )

                              )

vs.                           )  Case No. 3:10-cv-00686

                              )

                              )

MARK QUARLES, an individual,  )

                              )

                              )

        Respondent.           )

The videotape deposition of

MARK QUARLES

September 1, 2010

Keith R. Lemons, RPR, CRR

ACCURATE COURT REPORTING

The Pilcher Building

144 Second Avenue North, Suite 230

Nashville, TN 37201

(615) 244-DEPO or 244-3376

RA-93

                                                                6

1              Will you please swear in the witness.

2                          MARK QUARLES,

3         having been first duly sworn, testified as follows:

4                          EXAMINATION

5    BY MS. NEUMAN:

6         Q.    Good morning, Mr. Quarles.

7         A.    Good morning.

8         Q.    How are you?

9         A.    Doing well.

10        Q.    Good.  Can you state your full name for the

11   record.

12        A.    It's Mark Anthony Quarles.

13        Q.    What's your date of birth?

14        A.    3/26/63.

15        Q.    You just took an oath from the court reporter.

16   Do you understand that's the same oath as you would take

17   in a court of law, even though we're in a conference

18   room?

19        A.    I do.

20        Q.    Now, have you ever been disposed before?

21        A.    I have not.

22        Q.    Okay.  Well, I'm going to go over the some of

23   the basics procedurally just to avoid confusion as we go

24   forward.  Feel free to ask for clarification if you need

25   it.

119

```
1        Q.    After you signed your declaration in September

2   of '07, did you subsequently learn that Mr. Cabrera was

3   not, in fact, the author of that work plan?

4        A.    I did not.

5        Q.    As you sit here today, do you know who the

6   author of the work plan is?

7        A.    I assume it's Mr. Cabrera.

8        Q.    And is that assumption, again, based

9   exclusively on information provided to you by

10  plaintiffs' counsel?

11       A.    It is.

12       Q.    At the time that you were drafting Exhibit 4,

13  your declaration, did you understand that it was being

14  used to respond to allegations that Mr. Cabrera was

15  actively collaborating with the plaintiffs in the Lago

16  Agrio action?

17       A.    No.  The -- I do not.

18       Q.    What was your understanding that the

19  declaration was in response to, if anything?

20       A.    There was a report by three Chevron experts

21  who were critical of his plan of work.

22       Q.    And your declaration was intended to respond

23  to that report?

24       A.    Correct.

25       Q.    Now, in your declaration, you state at
```

121

1    Q.    (By Ms. Neuman)  Are you going to follow that

2    instruction?

3    A.    Yeah.  I will.

4    Q.    Did you have any knowledge at the time you

5    executed your declaration of any active collaboration

6    between the Lago Agrio plaintiffs and Mr. Cabrera?

7    A.    Not that I remember.

8    Q.    At the time that you executed your

9    declaration, was it your understanding that he,

10   Mr. Cabrera, was an independent court expert separate

11   from the parties?

12   A.    Yeah.

13   Q.    Was it your understanding that he was supposed

14   to maintain his independence and do his work separate

15   from the parties?

16   A.    I just knew him as being a court-appointed

17   expert.

18   Q.    Did anybody ever discuss with you whether you

19   could or could not interact with Mr. Cabrera?

20   A.    I don't recall.

21   Q.    Was it your intent to convey to the court in

22   the Southern District of New York, when you submitted --

23   or executed, rather -- Exhibit 4, that Mr. Cabrera was

24   doing his work independent from the plaintiffs?

25   A.    Yes.

122

1      Q.    If you'd had knowledge at the time that you

2   signed Exhibit 4 that, in fact, Mr. Cabrera was working

3   directly with the plaintiffs, I take it you would not

4   have signed this declaration --

5      A.    Correct.

6      Q.    -- is that fair to say?

7           MS. MOLL:  Objection to form.

8           MS. NEUMAN:  Okay.  It's 12:00 -- quarter

9   after 12:00.  I think it's a good time to take our lunch

10  break, mainly because I'm hungry.

11          MS. MOLL:  What time did you want to come

12  back?

13          MS. NEUMAN:  Is an hour fine?

14          MS. MOLL:  Sure.

15          MS. NEUMAN:  I'm not familiar with the area.

16          MS. MOLL:  We'll do our best to be back in an

17  hour.

18          MS. NEUMAN:  Okay.  1:15 it is.

19          THE VIDEOGRAPHER:  Going off the record at

20  12:14 p.m.

21          (A recess was taken from 12:14 p.m. to 1:23

22  p.m.)

23          THE VIDEOGRAPHER:  We're back on the record.

24  This is Tape 4 in the deposition.  The time is 1:23 p.m.

25      Q.    (By Ms. Neuman)  Good afternoon.

SHOW TITLE: CRUDE

TRANSCRIPT

THEATRICAL VERSION

TEXT IN BLACK IS SPANISH DIALOGUE

TEXT IN RED IS AINGAE DIALOGUE

TEXT IN GREEN IS ENGLISH DIALOGUE/LOWER THIRDS/INTERTITLES

| Time code | Visual/Speaker | Dialogue |
|---|---|---|
| | | BLACK |
| | | Music |
| 01;00;00;00 | GRAPHIC OPEN | Helicopter Sound FX<br><br>A Red Envelope… of an… |
| 01;00;36;10 | Lower Third | (LOWER THIRDS) Amazon Rainforest<br><br>BLACK, CRICKET NOISE IN THE BACKGROUND.<br><br>(FADE IN) Present Day |
| 01;00;43;22 | Marina Aguinda o/c | (SUBTITLES) We used to adorn ourselves in traditional dress and decorations. |
| 01;00;49;02 | Marina Aguinda | (SUBTITLES) Since the company arrived, we are ashamed to wear our traditional clothing. |
| 01;00;56;00 | Marina Aguinda | (SUBTITLES) Most of our women no longer sing… |
| 01;00;59;03 | Marina Aguinda | (SUBTITLES) but today I will sing for you. |
| 01;01;02;03 | Marina Aguinda | (SUBTITLES) Thank you. |
| 01;01;03;19 | TITLE CARD | A Joe Berlinger film |
| 01;01;07;13 | ARCHIVAL FOREST AERIAL | (SUBTITLES, Singing) We lived upon the river of rich clear waters. |
| 01;01;14;03 | Marina Aguinda | (SUBTITLES, Singing) With the arrival of the company |

CRUDE

Page 1

MB-NonWaiver00092726

| Time code | Visual/Speaker | Dialogue |
|---|---|---|
| | | environment and on people's health. |
| 01;38;43;18 | Pablo Fajardo o/c | (SUBTITLES) Here is the evidence thirty years later this is exactly as Texaco left it. |
| 01;38;49;20 | Sara McMillian | To the point whether or not there's any water coming off these pits |
| 01;38;54;05 | Sara McMillian | (LOWERTHIRDS) Sara McMillen, Chevron Chief Environmental Scientist |
| | | that is posing a problem to the environment, we've sampled every stream at every inspection and again 99 percent of those samples meet US EPA and WHO drinking water standards. And we don't find any heavy metals or hydrocarbons at any concentration that would be a concern to health or the environment. |
| 01;39;14;11 | VISUALS | (LOWER THIRD) Quito, Ecuador

Driving through the streets of Ecuador. |
| 01;39;17;08 | Steven Donziger o/c | We have had an issue because Texaco is trying to destroy the independent laboratory that does… |
| 01;39;23;13 | Steven Donziger | …the analysis of our water and soil samples that are proving that they're guilty of massive contamination. |
| 01;39;28;14 | Alejandro Ponce | (LOWERTHIRDS) Alejandro Ponce Plaintiff's Attorney |
| 01;39;29;10 | Steven Donziger o/c | Their latest little tactic is they have gone to a really old judge in Quito and they've convinced him to sign an order for a judicial inspection of our, of our labs. It's the only way they can hurt the proof we've put into the court. So we're going down to have a little chat with the judge today. |
| 01;39;50;21 | Steven Donziger o/c | This is something you would never do in the United States. But in Ecuador, this is how the game is played. It's dirty. We have to occasionally use pressure tactics to neutralize their corruption. And today is one of those examples. |
| 01;42;12;25 | Alejandro o/c | (SUBTITLES) We are concerned about the amount of irregularities that exist in such a simple process. |
| 01;40;16;20 | Alejandro o/c | (SUBTITLES) We are also concerned because they are trying to interfere with the lab reports… |

CRUDE
Page 25

MB-NonWaiver00092750

# EXHIBIT 15

LAW OFFICES OF
## GERALD B. LEFCOURT, P.C.
A PROFESSIONAL CORPORATION
148 EAST 78TH STREET
NEW YORK, NEW YORK 10075

2/16

GERALD B. LEFCOURT
lefcourt@lefcourtlaw.com

SHERYL E. REICH
reich@lefcourtlaw.com
RENATO C. STABILE
stabile@lefcourtlaw.com
FAITH A. FRIEDMAN
ffriedman@lefcourtlaw.com

TELEPHONE
(212) 737-0400
FACSIMILE
(212) 988-6192

December 15, 2010

**BY E-MAIL**

Steven Donziger, Esq.
▮▮▮▮▮▮▮▮▮▮▮▮
New York, N.Y. 10025

*Retainer*

Dear Steve:

You have asked us to represent you in connection with your work on behalf of plaintiffs in certain litigation against Texaco/Chevron currently pending in Ecuador. ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ RICO. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

We have agreed that as an initial matter we would work on a straight hourly basis off an initial retainer. We have, however, discussed changing both the scope of the work and the means of compensation should either be desired.

It is our practice to charge a retainer fee and to deduct from that charge for the Firm's services based on professional time expended on the matter. We request a retainer in the amount of $75,000, against which attorney hours will be billed. The current hourly rates for the Firm's attorneys, subject to change from time to time, are as follows:

| | |
|---|---|
| Gerald B. Lefcourt: | $700 |
| Sheryl E. Reich: | $500 |
| Renato Stabile: | $400 |
| Faith Friedman: | $400 |

LAW OFFICES OF
GERALD B. LEFCOURT, P.C.

Steven Donziger, Esq.
December 15, 2010
Page 2

Additionally, the expenses incurred by this Firm in representing you, including, for example, overnight delivery, secretarial overtime, photocopying, facsimile transmission, filing fees, transcripts, transportation expenses, messenger services, etc., Lexis or Westlaw, will be billed to you and deducted from the retainer. Also, subject to your prior approval, this Firm will, if necessary, retain on your behalf appropriate outside consultants, experts and/or investigators. In such instances, this Firm will require that advance payment be made by you before the third party is retained.

You will receive a statement each month reflecting the amounts credited against the retainer. Please review the statement promptly. Any questions must be brought to our attention prior to the next monthly statement. When and if the retainer is exhausted we reserve the right to ask for an additional amount.

Pursuant to New York law, we advise you that, should any fee-related issues arise, you may have a right to arbitration under Part 137 of the Rules of the Chief Administrator. In the event it is necessary for a party to this Agreement to initiate a lawsuit to enforce the provisions of this Agreement against any other party, the prevailing party shall be entitled to actual and reasonable attorney's fees and costs in connection with said lawsuit.

If you are in agreement with the terms and conditions of our engagement, kindly indicate your acceptance by signing in the space provided below and returning this letter to us along with a check for the retainer.

We are very pleased to have been selected as your legal counsel and we look forward to being of assistance to you and to a successful resolution of this matter.

Sincerely,

Gerald B. Lefcourt

Accepted and Agreed to:

_____
Steven Donziger

SM_PRIV00006922

# EXHIBIT 16

| | |
|---|---|
| **From:** | sdonziger@gmail.com |
| **Sent:** | Tuesday, January 04, 2011 7:06 PM |
| **To:** | Sheryl E. Reich; Steven Donziger; Gerald Lefcourt |
| **Cc:** | Andrew M. Woods |
| **Subject:** | Re: Suggested agenda |

Looks good.

Sent via BlackBerry by AT&T

------

**From:** "Sheryl E. Reich" <reich@lefcourtlaw.com>
**Date:** Tue, 4 Jan 2011 16:57:25 -0500
**To:** Steven Donziger<sdonziger@donzigerandassociates.com>; Gerald Lefcourt<lefcourt@lefcourtlaw.com>
**Cc:** Andrew M. Woods<awoods@donzigerandassociates.com>
**Subject:** RE: Suggested agenda

The following large tasks have been discussed. Assuming we agree to proceed on them, we must set priorities, staff and determine a time frame for each.

*Task 1: Defense of Steven Donziger.* We must prepare to respond to any civil complaint or criminal investigation that is initiated, including getting on top of the deposition transcripts. (Have summaries been prepared?)

*Task 2: Foreign Corrupt Practices Act complaint to Department of Justice.* The components of the complaint are (1) ███████████████████████████ ████████████████); (2) corruption of the trial through creation of phony army report inducing the cancellation of an important site inspection – this has already been drafted; and (3) ████████████████████████████ ███████████████████████y.

SM_PRIV00007007

*Task 3: RICO complaint.* This would be brought by the plaintiffs, who are being harmed by a pattern of racketeering activity, with a focus on the mail and wire fraud "dirty tricks" but also ██████████████████████

Other: we would like an update on the 1782 proceedings, any indications on when a decision is coming, etc.

SM_PRIV00007008

of the fees.  The question is when would the checks arrive, and would Winston have the guts in light of these promises (which have been made in the past without fulfillment) to hire the expert and maintain the fraud claim even if the money takes a few more days to arrive.  This is where I am right now – I just fired off a quick email to Raul and Neil from the Quito airport, telling them to please get going and to not let the perfect be the enemy of the good.  Jesus, putting in a fraud claim that is 75% factually developed is far better than no fraud claim at all.  Just do it!  And if it does not work, withdraw later rather than now so as to keep the hammer over their head for as long as possible.

On Tuesday, went to see Vargos with Luis, the Siuna guy, the Shushifindi leader, and Lauren in her jeans, jogging shoes, and navel-revealing T-shirt.  We are using Vargos to pressure Galo, but it is unclear if even Vargos gets the stakes.  He took me aside and again asked me for the camioneta for the close of the campaign.  This is starting to stress me.  He also makes passing references to fact no "cumplo" and cosas asi.  It is starting to cross the line from good-natured ribbing to something more serious, and I'm not really liking it nor do I feel I am handling it well.  It is clear he expects something serious and material in return for the favors.  We bought two meals at Crepes and Waffles for his wife's raffle yesterday for $60.

Our case: we are asking for inspections today.  Ask for 3, not 4, all in same week, but we still don't have perito.  Woman biologist turned us down.  Joe ignoring money memos, and we could be facing serious problems as a result.

September 13, 2006

Ec culture: none of the bank machines worked, none of the machines near airport worked, and almost missed plane as a result.  Andres told me that to extend visa, had to pay $10 in cash – but made people go to bank, do direct deposit, and then show the receipt to get the visa.  The government doesn't trust itself.

Had b'fast and dinner yesterday with Vargos Pazos, who is now a VP of PetroEc working under his old friend Chiriboga.  Convinced him to do deposition asked for by Chevron, and he agreed after initially rejecting it.   Told me about three tendencies in government re: arbitration: Tandazo (ignore it); Chiriboga, head of PE (show up to defend, but do not participate); and JMB and Alberto Wray (fully participate and defend).  The Tandazo position might explain why the Winston bill has not been paid.  I need to understand this issue better – how do I know Tandazo is wrong?  VP said he would set up a meeting with Chiriboga and Tandazo.  Tandazo and others have attacked Alberto for being a traitor.  We have to see how this plays out – it certainly is not the image we want when he makes the final argument.  On the other hand, it might allow him an oppty to redeem himself.  Correa seems to be rising in the polls, and VP thinks he might be the defense

**minister if Correa wins. He asked me for a camioneta so he could campaign for Correa and increase his chances of getting the defense ministry post. Incredible! The campaigns here seem to be all about caravans of cars going thru the steets, waving flags and playing music.**

**PDVSA rep in Ecuador was at dinner meeting – Luis Marquez. Gave him stuff. Got ball rolling. Really nice, humble guy. Interesting PDVSA has rep in Ec. Larger vision is that Venezuela builds a huge refinery in Ecuador on the Pacific Coast, from which it can export to new markets in China and Asia. Love it. If Correa wins, that kind of thing could really happen.**

VP's daughter there. Told story of how stole 51 head of cattle. Has 3,500 acre farm in Concordia. Sells African Palm oil, bananas, raises cattle. The guy has wealth even though always crying poor. Wants to sue Noboa.

Legal case: going well with Yanez decision to cancel inspections. Chevron erupts. Big blow. Ironically, a function of other complaints about Yanez that we had nothing to do with, but that her perceives that we are behind. Pablo seemed to really handle it well. We wrote up a complaint against Yanez, but never filed it, while letting him know we might file it if he does not adhere to the law and what we need. The worst part is that after the decision – which was covered in the Ec press and the Oil Daily – he told Luis that we needed to back him now as he fights for survival on the court. So instead of a strong judge who sees the viability of our case, we now might have a weak judge who wants to rule correctly for all the wrong, personal reasons. Need to get going on the inspections (looking for perito) and peritaje global.

It is obvious Ecuador is a country where stuff gets done based on personal relationships. As I develop more of them, the more fuerza we will have. But to do that, I really need to spend more time in Quito – even live in Quito. Then I could know Correa, Maria Paula, etc. Our team couldn't be working better right now. Camino lawsuit against me and Joe in U.S.

Trip last Friday to Coca with Charles Champ. Visited Lago Central and Sacha Central. Champ's impressions. Old saying in East Texas: "It has to look good from the road." Saw clean –up operation by PE in Sacha Central for 300 plus pits. Encouraging, and threatening. Need to look into it more.

**July 25, 2006**

Odd lunch with Vargos Pazzos at Troncos – vive was awesome. Had Argentine beef, glass of red wine. Came casually in a leather jacket and slacks. Gave us the star table right up front without reservation. Showed me his loan application to get 260,000 out of his apartment, wants to by a 4-wheel drive vehicle to impress Correa when they meet next Wed about VP slot, said he had been on radio Turquia slamming Chevron about its TLC position. He wanted me to loan him 50,000 until he could get the money out of his Miami apt. Worried in campaign they would bring it up and use it against him. Wants to get clean before campaign. Asked if US was like Ec, where you could pay fewer taxes (sell for 500,000, report sold for 200,000). Frank Bucaram worked under Bucaram, set out table from 4 to 6 am to receive people – considered crazy. I didn't say I couldn't do it, but I cannot do it – how can I, in my position, get involved with him like this? This could kill me and hurt our case. As VP says, "I want to live well. I worked for 50 years, earned four stars, diputado, Senator. I deserved to be treated well." He is work 3m, but has no cash. Says once his African Palm gets up and running, that will generate 30,000 per month. Says only sells 1,000 boxes of bananas, rather than 3,000, because of the sequia. I feel like I one of the Ecuador inside people – like Andrew Raisej at USC. Noboa is "maricon" who ripped him off 1m by paying him less for bananas than he deserved by the market. Also called him "Capone" and "torpe". Brags about wife, champion bowler . Says Ec loses 4m daily  -- market price of oil is 70 per barrel, Ec gets 43.

LY was weak about CB. Drafted ltr to Oreilly, made us look stupid. I had the idea, then I called it off. We have to get rid of him. Had conversation with LY again about it, said he scared it will come back on him if CB fights back. Does not want to be out front. Weak, weak.


Cristobal – LY weak side

Jan 24 -- Ruptura de 25 in morning at Hotel Quito. Maria Paolo is awesome, said work thru presidential campaign to get msg out this year. These are young, idealistic people in their 20s. Could lead country someday, or could just be playing important. They want to form political party. Want to do good. Will power corrupt them? Valentina y Malki were there.

Key issue is inspections sked. PF presents, T rejects; T presents, we reject. LY y PF meet with Callejas today for two hours. Came back with a "compromise" that was 80% our inspections, 20% T's inspections. This was disappointing – wanted opposite proportion, so it seemed initially like a capitulation. The advantages for us were that it would allow us to do Guanta and San Carlos, two places T was terrorized to show up at (Guanta they canceled, and San Carlos was suspended by the paro last August – and these are our two biggest inspections in terms of people and media). It would also allow us to inspect two wells in the Aguarico field, where we have not been, and two additional wells on the other side of the Lago field. This is all designed to allow us to cover evidence from every field, which will strengthen

DON_00040088
DONZ00036245

our ultimate extrapolation to every well Texaco built. However, I still don't think necessary. Since T used all the same methods everywhere, and they admit to such, I just don't think we need to keep doing inspections in every filed and in fact even under our own plan we are going to avoid to small, isolated fields. I don't think these inspections advance the case – in many respects, they slow it down and play into T's hands. But T rejected even this. Part of their complaint which I find utterly ridiculous is that their tech team is not ready for the next wells on the list they should inspect, because it is in the south – south of Coca. Then we analyzed, and Pablo changed again on my and APM's advice. We are going to withdraw inspections publicly – a big breakthrough for PF since our first discussion about this last Wed. Those withdraen will be Shushu y all of Sacha Central (look at map and explain) – a total of 26. This reduces the number left from 87 to 51, while T has 10 left. We want to consume their 10 quickly, and then quit at our convenience. They want to drag it out, so they propose the 80-20 formula. T prefers delay. Run numbers. Make at least 300m per year, pay lawyers 10m a year – with this rate of return they want to keep it going forever.

I feel like PF listens to me and respects me, but never acts on my advice unless APM tells him how to do something.

Walk into evening discussion between Ermil, PF, LY – they had yellowed the part of the lawsuit demanda that says 10% goes to Frente. Judy K and Quenema was using it to say 100% of the money would go to the Frente, and the communities would get nothing. They were drafting a precautionary statement explaining the reality, that the money would go to all of the communities. Most interestingly LY said AW never consulted them on the writing of the complaint, and they never had a chance to revise it. This goes back to Alberto's errors: suing the wrong party in the complaint, then asking for too many inspections rather than controlling the process, capitulating on the field lab at the first inspection, letting work visa slide at first inspection, signing the Plan of Analysis – most all of these a function of his inability to take on the TEX lawyers and take control of the litigation.

*Alberto's error* [handwritten marginal note]

AW receives 12 page letter. Leila says she is nervous.

Davos award today to Chevron for "corporate irresponsibility"

Anita in – Lupita invents: Caso Texaco/Ecuador en la lucha. So lucky to have Lou and Kayana pics to choose from the pics on the front of the carpeta.

Jan 23 -- Had six meetings yesterday, most with film crew. Interview with Manul P and doc crew. meeting with Telesistama – Lucy Peralta and Ala were there. Joe proposed relationship to look at footage. Classic Ec meeting. Ala's huge boobs hanging out; she suggested her husband was available to be hired, as he is a biologist, and she said she would like to work for the film, until she laughed coquettishly. Lucy is awesome, she told me to call her in G'quil to see Salinas. As I said after, that meeting was all about sex. They agreed to help, but we have to send letter to Munoz, the head of the station. Then, Esperanza came by to discuss

# EXHIBIT EK

**OFFICE OF THE PRESIDENT OF THE REPUBLIC**

Official Circular Nº T1.C1-SNJ-10-1689
Quito, November 18, 2010

**MINISTERS AND SECRETARIES OF STATE**

Dear Sirs,

The unlawful abuse of the protection action and protective measures, established in the Constitution and in the Organic Statute of Judicial Guarantees and Constitutional Control, in public works, concerning aspects related to the public procurement system and to administrative acts, such as expropriations and other similar acts, has benefited private interests at the expense of public interests.

This situation has resulted in an enormous opportunity cost since it has deprived the country of the timely use of public works.

Therefore, by order of the Constitutional President of the Republic, if the final court of appeal, as dictated by the justice system established in the Constitution, hearing the protection action or protective-measure action rules in favor of the procurement entity, that is, the State, then a suit for damages must be filed immediately against the judge who caused the suspension or delay of the public work as a consequence of the suspension of the act of the public authority obtained by the protection action or the protective measure. The technical, financial and legal teams of the procurement entity must prepare the necessary estimates to determine the damages caused to the Ecuadorian State.

Best regards,

[Signature]
Dr. Alexis Mera Giler
LEGAL COUNSEL TO THE OFFICE
OF THE PRESIDENT OF THE REPUBLIC

Dr. Benjamin Cevallos, President of the Judiciary Council

---

Palacio de Carondelet [Presidential Palace], García Moreno 1043 and Chile. Phone: 3827000
www.presidencia.gov.ec

CERT. MERRILL VER: JD

OFFICIALLY COMPARED TO THE COPY.- I CERTIFY IT.
Quito, April 1, 2011


[signature]
Atty. Oscar Pico Solorzano
NATIONAL UNDERSECRETARY OF
PUBLIC ADMINISTRATION

# MERRILL CORPORATION

Merrill Communications LLC



225 Varick Street
New York, NY 10014

State of New York            )
Estado de Nueva York

                             )            ss:
                             )            a saber:
County of New York           )
Condado de Nueva York

**Certificate of Accuracy**
**Certificado de Exactitud**

This is to certify that the attached translation is, to the best of our knowledge and belief, a true and accurate translation from Spanish into English of the attached document.

Por el presente certifico que la traducción adjunta es, según mi leal saber y entender, traducción fiel y completa del idioma español al idioma inglés del documento adjunto.

Dated: June 15, 2011
Fecha: 15 de junio de 2011

_____

Violeta Lejtman
Team Lead – Legal Translations
Merrill Brink International/Merrill Corporation
_____[firmado]_____

Violeta Lejtman
Líder del equipo – Traducciones Legales
Merrill Brink International/Merrill Corporation

Sworn to and signed before
Jurado y firmado ante
Me, this _____15th_____ day of
mí, a los _____15_____ días del
_____June_____2011
mes de ___junio_____ de 2011

_____
Notary Public
Notario Público

GINA ST LAURENT
Notary Public, State of New York    [firmado]
No. 01ST6146442                      [sello]
Qualified in New York County
Commission Expires May 15, 2014

OFFICES IN MAJOR CITIES THROUGHOUT THE WORLD



## PRESIDENCIA DE LA REPÚBLICA

Oficio  Circular No. T1.C1- SNJ-10-1689

Quito, noviembre 18 de 2010

**SEÑORES MINISTROS Y SECRETARIOS DE ESTADO**

De mi consideración:

El abuso ilegítimo de la acción de protección y de las medidas cautelares, previstas en la Constitución y en la Ley Orgánica de Garantías Jurisdiccionales y Control Constitucional, en la obra pública, sobre aspectos relacionados con el sistema de contratación pública o con actos administrativos, tales como expropiaciones y otros de similar naturaleza, ha significado un grave retroceso en la prevalencia del interés general sobre el interés particular.

Esta situación ha supuesto un enorme costo de oportunidad para el País, ya que ha privado de contar en el tiempo conveniente la obra pública.

Por ello, por disposición del señor Presidente Constitucional de la República, se instruye que si la instancia definitiva del régimen de la justicia constitucional sobre la acción de protección o medidas cautelares otorga la razón a la entidad contratante, es decir, al Estado, inmediatamente se deberá proponer el correspondiente juicio de daños y perjuicios en contra del juez que ocasionó la suspensión o retraso de la obra como consecuencia de la suspensión del acto de autoridad pública obtenida por la acción de protección o de medidas cautelares. Los equipos técnico, financiero y jurídico de la entidad contratante deberán efectuar los cálculos necesarios para determinar los daños y perjuicios causados al Estado Ecuatoriano.

Atentamente,

Dr. Alexis Mera Giler
**SECRETARIO NACIONAL JURIDICO**
**DE LA PRESIDENCIA DE LA REPUBLICA**

c.c. Dr. Benjamín Cevallos, Presidente del Consejo de la Judicatura

**ES COMPULSA DE LA COPIA.- LO  CERTIFICO.**
**Quito, 1 de abril de 2011**

**Ab.  Oscar Pico  Solórzano**
**SUBSECRETARIO NACIONAL DE LA**
**ADMINISTRACIÓN  PÚBLICA**



"Max GITTER"
<mgitter@cgsh.com>
09/06/2010 08:51 PM



cc

bcc

Subject  In re Application of Chevron, M-19-111 (LAK)

Dear Judge Kaplan,

As you requested, I set out below the relationships among Cleary Gottlieb, the parties to this
(consolidated) case, and me. I have reviewed this email for accuracy with the firm's managing partner, the
senior litigation partner on the firm's executive committee, the partner in charge of the underwriting
matters discussed below, and several others at the firm. I also set out additional facts that might be
pertinent to Your Honor's consideration. Your Honor is of course free to share the substance, and indeed
the exact text, of this email with the parties.

**Cleary Gottlieb and the Parties**

A conflict search by the firm that identified matters going back 25 years reveals no instance of the firm
representing any of the parties, with one exception: Shortly after the 2001 merger of Chevron and Texaco,
the firm, on a referral from Chevron's regular counsel, which had a conflict, represented Caltex, which
before the merger had been a 50/50 joint venture of Chevron and Texaco but which by 2002 was a wholly
owned subsidiary of Chevron, in a financing that closed in July 2002. (Historically, in the 90's and earlier
the firm from time to time had represented the Caltex joint venture, which had retained independent
counsel, on financings and other matters).

For some years, the firm has acted and continues to act (there is one matter pending) as designated
underwriters counsel in debt financings by Chevron Corporation and affiliates. Although
selected by Chevron to serve in that capacity, the firm in fact represents the underwriters in the financings,
who are its clients (and who in nearly all cases pay the firm's invoices out of their underwriting fees), and
not Chevron or any of its affiliates. Given the nature and purpose of "designated underwriters counsel,"
the firm can anticipate future assignments for underwriters of such offerings. The "designated
underwriters counsel" role is commonly used in the financial world among companies that frequently
access capital markets, in order to expedite the underwriters' due diligence process, as the designated
law firm has familiarity with the issuer and remains informed of developments, while the underwriters may
vary from underwriting to underwriting. In the interest of the fullest disclosure, the firm for internal
administrative purposes lists these matters under a Chevron "diary number," although Chevron is not the
firm's client.

The firm does not believe that any of the foregoing would create a conflict if even an active partner of the
firm were to be appointed as a Special Master, and certainly not when the candidate is a retired
partner/Senior Counsel. Nevertheless, to avoid any appearance of conflict, the firm would create an
appropriate firewall/screen, and both the firm and I would be prepared to exclude from the calculation of
my pension any firm income attributable to the underwriter representations described above, if Your Honor
deems that appropriate (and for whatever period you deem appropriate).

**My relationship with Cleary Gottlieb**

I retired as a partner of the firm on January 1, 2010, and I was later that month elected a Senior Counsel,
effective January 1.

As a retired partner, I receive a pension from the firm that is measured by the firm's profits in the preceding year. So for example this year I receive a pension based on the firm's profits in calendar 2009 (i.e. a small fraction of the profits that an active senior partner earned). I am prohibited under the firm pension agreement from the private practice of law for profit, except as may be permitted by the firm's executive committee. I am, however, permitted to receive fees personally as an arbitrator, mediator, special master, and the like, as well as compensation for teaching, in house counsel or public service employment, and other specified exceptions. (In that connection, my billing practices and fees -- while I was in active practice -- were specifically approved as reasonable and fair by Chief Judge Kimba Wood and Judge John Martin, in opinions in separate cases.)

As Senior Counsel, I have a role that is roughly similar to that of an "of counsel" partner emeritus at other large firms, but at Cleary Gottlieb the role entails a somewhat closer relationship with the firm than in most "of counsel" positions that I know about. I have an office at the firm (albeit smaller than the one I had as a partner); I am the beneficiary of secretarial and other administrative services; I am privy to financial and other matters at the firm; I do pro bono work with the firm's blessing and assistance; I help with associate training; and I am welcome at partner meetings -- among other ongoing relationships with the firm as Senior Counsel. I am subject to the firm's conflicts and other policies and procedures. The firm designates, and elects by vote of the partners , each Senior Counsel, annually.

**Personal Matters**

My professional biography is summarized on the firm's website (www.clearygottlieb.com) as of January 1, 2010. To briefly update it: I have since then become a volunteer at the Medicare Rights Center, counseling seniors on their Medicare rights and pursuing appeals on their behalf. In June I wrote an amicus brief, pro bono, in US v. Flores-Villar, a sex discrimination/immigration law case that will be argued by the parties in the US Supreme Court in November. I continue to serve as a Special Master for the Appellate Division, First Department, devoting at least one day a month to that assignment.

I have no professional or personal relationship with any of the parties in this case or their counsel, except as follows: 1) I have known Richard Kurnit for many years; we worked together when he was an associate at Paul Weiss, and we were opposing counsel in an IP case after he left Paul Weiss, a case we settled amicably and quickly. 2) I have known Bruce Kaplan for over 35 years, as he joined Paul Weiss soon after I did, but I do not believe we ever had any matters together, either at Paul Weiss or after he left the firm. 3) I believe I have had passing professional contacts with Randy Mastro and Scott Edelman, although I cannot recall any specific ones at the moment.

I have no significant scheduling commitments in the next several months that cannot be re-arranged, except that I will be abroad  from September 23 through October 4 and from December 30 through January 6.


I thank Your Honor for the privilege of being considered.


Respectfully,


Max Gitter

_____
Max Gitter
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York NY 10006

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- x

In re Application of

CHEVRON CORPORATION                                              10 MC 00001 (LAK)

This Document Applies to: ALL CASES

--------------------------------------------------------------------- x

**ORDER**

LEWIS A. KAPLAN, *District Judge.*

        In a memorandum opinion of even date, the Court indicated that it will appoint a special master for purposes set forth therein.

        The identity and certain other information regarding an attorney whom the Court is considering appointing is available to counsel of record from chambers and shall be held in confidence pending further order of the Court. Any objections to the appointment of this individual shall be made by letter delivered to chambers not later than September 13, 2010.

        SO ORDERED.

Dated:     September 7, 2010

Lewis A. Kaplan
United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
In re:

Application of CHEVRON CORPORATION.                    10 MC 00001 (LAK)

This Document Applies to: ALL CASES
------------------------------------------------------------------ x

```
┌────────────────────────────────┐
│ USDS SDNY                       │
│ DOCUMENT                        │
│ ELECTRONICALLY FILED            │
│ DOC #: _____             │
│ DATE FILED: 9/15/10             │
└────────────────────────────────┘
```

                              ORDER


LEWIS A. KAPLAN, *District Judge.*

          The parties having been afforded an opportunity to object and no objections having
been made, Max Gitter, Esq., hereby is appointed Special Master for the purposes set forth in the
Memorandum Opinion entered September 7, 2010 [DI 54]. Mr. Gitter shall be compensated at his
customary hourly rate, plus reimbursement for disbursements, and may obtain assistance in the
performance of his duties of such associates and paralegals from his firm as he deems appropriate.
Should he employ such assistance, the firm shall be compensated for those services at the hourly
rates customarily charged by it for those persons. Mr. Gitter shall render bills no less frequently
than every two months. Subject to the qualification made in the Memorandum Opinion, Chevron
Corporation shall be responsible for the payment of all such charges.

          SO ORDERED.

Dated:        September 15, 2010

                                                   _____
                                                         Lewis A. Kaplan
                                                   United States District Judge

Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 10 MC 00002(LAK)

5  -----------------------------------x

6  In re:

7      APPLICATION OF CHEVRON

8

   -----------------------------------x

9                  November 29, 2010

                   9:46 a.m.

10

11

12

13

14          Videotaped Deposition of STEVEN

15  DONZIGER, pursuant to Subpoena, held at

16  the offices of Covington & Burling LLP,

17  620 Eighth Avenue, New York, New York,

18  before Todd DeSimone, a Registered

19  Professional Reporter and Notary Public of

20  the State of New York.

21

22

23

24

25

Page 39

1                    DONZIGER
2              THE WITNESS:  Yes.
3              THE SPECIAL MASTER:  And that
4    is to say it was done in writing?
5              THE WITNESS:  I believe it was
6    done in writing.
7              THE SPECIAL MASTER:  And who
8    sent the writing?
9              THE WITNESS:  I believe it was
10   Mr. Luis Yanza.
11             THE SPECIAL MASTER:  Do you
12   have a copy of that writing?
13             THE WITNESS:  I may.
14             THE SPECIAL MASTER:  Did the
15   writing have any substance to it other
16   than you are hereby terminated?
17             THE WITNESS:  I believe it did.
18             THE SPECIAL MASTER:  Did you
19   see the writing before it was sent?
20             THE WITNESS:  I don't know.
21             THE SPECIAL MASTER:  As you sit
22   here, do you recall the substance of the
23   writing that was contained on that
24   termination letter or notice?
25             THE WITNESS:  Yes.

Page 40

1                    DONZIGER

2               THE SPECIAL MASTER:  What did

3  it say?

4               MR. KAPLAN:  Objection.

5               MR. BRINCKERHOFF:  Objection.

6               THE SPECIAL MASTER:  Is the

7  ground privilege?  We will take it up at a

8  break.

9               Mr. Reporter, would you please

10  note this point.

11               MR. VINEGRAD:  May I continue,

12  Mr. Gitter?

13               THE SPECIAL MASTER:  Yes,

14  please.

15       Q.     Who drafted the letter?

16       A.     I don't know.

17       Q.     Do you have copies of the

18  invoices to the Kohn Swift & Graf firm

19  that you described before?

20       A.     Yes.

21               MR. VINEGRAD:  I call for their

22  production.

23               THE SPECIAL MASTER:  I want to

24  go back to the questions I was asking.

25               Mr. Donziger, without going

Page 269

1                    DONZIGER
2  with that?  There are two kinds of work
3  product, weak work product, which can be
4  overcome by a showing of need and --
5             MR. BRINCKERHOFF:  Well, all
6  work product can be overcome.  It is a
7  qualified privilege.
8             THE SPECIAL MASTER:  No, no,
9  no.  Maybe I'm not making myself clear,
10  although I think this is the language that
11  every court uses.
12             There is two kinds of work
13  product.  Weak work product is the kind
14  that applies to non-strategies, non-mental
15  impressions and the like.  That is
16  overcome by a showing of need.  There is
17  another kind of work product that is
18  relating to mental impressions, the
19  strategy of a lawyer and things of that
20  sort, that is extraordinarily difficult to
21  overcome.  Okay?
22             A fact, reporting of a fact, is
23  at best weak work product.  We agree on
24  that?
25             MR. KAPLAN:  Yes, I agree.

Page 372

1

2              CERTIFICATION

3

4    I,  TODD DeSIMONE, a Notary Public for

5  and within the State of New York, do

6  hereby certify:

7    That the witness whose testimony as

8  herein set forth, was duly sworn by me;

9  and that the within transcript is a true

10  record of the testimony given by said

11  witness.

12    I further certify that I am not related

13  to any of the parties to this action by

14  blood or marriage, and that I am in no way

15  interested in the outcome of this matter.

16    IN WITNESS WHEREOF, I have hereunto set

17  my hand this 30th day of November, 2010.

18

19

              _____

20                TODD DESIMONE

21

22              *       *       *

23

24

25

Page 1720

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 10 MC 00002(LAK)

5    -----------------------------------x

6    In re:

7        APPLICATION OF CHEVRON

8

     -----------------------------------x

9                    December 23, 2010

                     9:30 a.m.

10

11

12

13

14        Continued Videotaped Deposition of

15    STEVEN DONZIGER, pursuant to Subpoena,

16    held at the offices of Gibson Dunn &

17    Crutcher LLP, 200 Park Avenue, New York,

18    New York, before Todd DeSimone, a

19    Registered Professional Reporter and

20    Notary Public of the State of New York.

21

22

23

24

25

Page 1757

1              DONZIGER

2      Q.      Do you know if the experts were

3  ever asked to review certified

4  translations of the Spanish versions of

5  their reports for accuracy?

6      A.      I don't know.

7      Q.      Did you ever ask them to do

8  that?

9      A.      No.

10      Q.      Did you approve the filing of

11  the expert reports in the Ecuador matter?

12      A.      I supported it.

13      Q.      Did you approve it?

14      A.      Well, I supported it.  When you

15  say "approve," it sounds like I'm the

16  final arbiter.  It was a collective

17  decision by the lawyers on our team, local

18  counsel in Ecuador included, to do this.

19  So I supported it.

20      Q.      Who has to make a decision

21  about whether or not something is going to

22  be filed on behalf of the plaintiffs in

23  Ecuador?

24      A.      Ultimately it is Pablo Fajardo.

25      Q.      He can make those decisions

Page 1758

1          DONZIGER
2   unilaterally should he choose to do so?
3       A.      Yes.
4       Q.      Are you able to make unilateral
5   decisions about what gets filed on behalf
6   of the plaintiffs in Ecuador?
7       A.      No.
8       Q.      In the United States, who has
9   the authority to approve pleadings for
10  filing on behalf of the plaintiffs?
11      A.      Well, ultimately the pleadings
12  in the United States are approved by the
13  person in the respective law firms that
14  would sign them.  Generally our decisions
15  are made via discussion and consensus as
16  to what to do.
17      Q.      Does any client ever have to
18  approve any pleading being filed in the
19  United States?
20      A.      There is a general -- well, the
21  local counsel, Mr. Fajardo, who represents
22  the clients, is involved in strategy
23  discussions and has authorized U.S.
24  counsel to engage in the litigation that
25  it is currently engaged in, that is

Page 1822

1                    DONZIGER
2    the bill, did they request payment?
3         A.        The whole issue was that.
4         Q.        So that's a yes?
5         A.        Yes.
6         Q.        And did they report to you that
7    they had finished the testing?
8         A.        I don't remember.  When you say
9    "finished the testing," you mean the
10   inspections were ongoing?
11        Q.        Well, analyze the samples that
12   had been provided to them to that date.
13        A.        I don't remember.
14        Q.        Who was the plaintiffs'
15   representative who primarily interacted
16   with Catolica Lab?
17        A.        I don't remember.  It might
18   have been someone on our technical team.
19   Maybe Edison Camino, but I don't remember
20   as I sit here today.
21        Q.        Who ultimately made the
22   decision not to pay Catolica Lab?
23        A.        I don't know.
24        Q.        Was that not a decision you
25   made?

Page 1823

1                    DONZIGER
2       A.        It might have been.
3                THE SPECIAL MASTER:  Counsel,
4    can we have a time frame or did I miss it?
5                MR. KAPLAN:  The year?
6                THE SPECIAL MASTER:  Yes,
7    roughly.
8                MS. NEUMAN:  They used Catolica
9    I believe in --
10               THE SPECIAL MASTER:  Ask him.
11   Don't tell me.  Ask the witness.
12      Q.        What time frame did plaintiffs
13   use the Catolica Laboratory to analyze
14   judicial inspection samples?
15      A.        I believe it was at the
16   beginning of the inspections process,
17   which began in August '04.  So it must
18   have been maybe the fall -- you know,
19   August into the fall of '04, maybe into
20   '05, is my guess.
21      Q.        If the Catolica bill had been
22   paid, who would have paid it at that point
23   in time?
24               MR. KAPLAN:  Objection,
25   relevance.

Page 1829

1                    DONZIGER

2    facts to support my questioning of

3    Mr. Donziger on Catolica.

4                    With regard to HAVOC, we have

5    evidence that HAVOC was never an

6    accredited laboratory, wasn't accredited

7    to do the test they had them doing, and

8    that the results from that lab are not

9    valid results.

10                   And so I think it is important

11   to show that Mr. Donziger was involved in

12   the selection of HAVOC and knew it wasn't

13   accredited to perform the tests that would

14   later be submitted to the court as having

15   been done by this so-called lab.

16                   THE SPECIAL MASTER:  And why do

17   you need to know, for example, the first

18   time he went to visit HAVOC and the last

19   time he went to visit HAVOC?

20                   MS. NEUMAN:  I'm just trying to

21   establish a time frame of his interaction

22   with HAVOC.

23                   THE SPECIAL MASTER:  I think

24   that could be done more briefly.

25                   Okay, Ms. Gross, would you go

Page 1835

1                    DONZIGER

2    didn't you say that you understood the

3    only language the judge would understand

4    was pressure, intimidation and

5    humiliation?

6         A.      I don't know.  What I did,

7    though, was entirely proper and was

8    captured in the movie.

9              THE SPECIAL MASTER:  Strike

10   that.  Strike everything after "I don't

11   know."

12             Counsel, don't you have a clip

13   or something or text or something on this?

14   Do you really need to test his

15   recollection when he says "I don't know"?

16             MS. NEUMAN:  Yes, we have the

17   clips.

18             THE SPECIAL MASTER:  Why don't

19   you use it.

20             MS. NEUMAN:  Can I see Exhibit

21   286, please, clip CRS052-00, clip 5.

22             (A portion of Exhibit 286 was

23   played at this time.)

24        Q.      In that --

25             THE SPECIAL MASTER:  The

Page 1836

1              DONZIGER

2    question is, did you say that?  Why do you

3    need to go beyond that?

4        Q.      Did you make the statements we

5    just saw in Crude?

6        A.      Yes, obviously.

7              THE SPECIAL MASTER:  Move on,

8    Counsel.  You just saved at least five

9    minutes by doing that, you know.

10             MS. NEUMAN:  I'm going to mark

11   as Exhibit 754 an e-mail correspondence

12   bearing the Bates number DONZ00019860.  It

13   is a two-page document in Spanish.

14             (Exhibit 754 marked for

15   identification.)

16       Q.      Is Exhibit 754 an e-mail

17   exchange in which you participated,

18   Mr. Donziger?

19       A.      Yes.

20       Q.      The e-mail at the bottom from

21   you, that is to HAVOC Laboratories?

22       A.      Yes, to Fausto Moriano.

23       Q.      Since it is in Spanish, can you

24   read for us in English what you said in

25   your original e-mail?

Page 1870

1                    DONZIGER
2    drafted it?
3              THE WITNESS:  I believe
4    Mr. Kohn did.
5        Q.      Have you ever had a retainer
6    agreement signed by the 47 plaintiffs?
7        A.      No.
8        Q.      Have you ever had a retainer
9    agreement signed by someone authorized to
10   represent the 47 plaintiffs?
11       A.      No.  Well, when I signed this,
12   I believed the Frente had the authority to
13   bind the interests of the class.
14             THE SPECIAL MASTER:  By "this"
15   he means 353, correct?
16             THE WITNESS:  Yes.
17       A.      So I believed that at that
18   time.  Subsequent to that, as we have
19   brought in new law firms and done a more
20   in depth examination of the authority, as
21   I sit here today, I believe it is
22   possible, if not probable, that the Frente
23   does not have that legal authority.
24             And when I said we are trying
25   to perfect it, we are engaged in a process

Page 1871

1                    DONZIGER
2  where Mr. Fajardo got explicit authority,
3  and based on that we are in the process of
4  signing new agreements, two of which have
5  already been signed with the law firms.
6        Q.      By the actual plaintiffs?
7        A.      No, by Mr. Fajardo.
8               THE SPECIAL MASTER:  I'm still
9  not clear.  As of April 27, 2006, the date
10 of Exhibit 353, we agreed that Mr. Fajardo
11 is not a signatory, correct?
12              THE WITNESS:  That's correct.
13              THE SPECIAL MASTER:  Was
14 Mr. Fajardo counsel of record at that time
15 in the Lago Agrio case in Ecuador?
16              THE WITNESS:  I believe he was,
17 yes.
18              THE SPECIAL MASTER:  Are you
19 certain that he was?
20              THE WITNESS:  I'm not certain.
21 I don't know if the transition between
22 Dr. Wray and Mr. Fajardo had taken place,
23 but I think it had.
24              THE SPECIAL MASTER: Ms. Neuman,
25 refresh me, because I think it was your

Page 2061

1

2                    CERTIFICATION

3

4      I,  TODD DeSIMONE, a Notary Public for

5   and within the State of New York, do

6   hereby certify:

7      That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12      I further certify that I am not related

13   to any of the parties to this action by

14   blood or marriage, and that I am in no way

15   interested in the outcome of this matter.

16      IN WITNESS WHEREOF, I have hereunto set

17   my hand this 23rd day of December, 2010.

18

19

         _____

20                 TODD DESIMONE

21

22

23

24

25

Page 2063

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    Case No. 10 MC 00002(LAK)

5    -----------------------------------x

6    In re:

7        APPLICATION OF CHEVRON

8
     -----------------------------------x

9                    December 29, 2010

10                    8:51 a.m.

11

12

13

14        Continued Videotaped Deposition of

15    STEVEN DONZIGER, pursuant to Subpoena,

16    held at the offices of Gibson Dunn &

17    Crutcher LLP, 200 Park Avenue, New York,

18    New York, before Todd DeSimone, a

19    Registered Professional Reporter and

20    Notary Public of the State of New York.

21

22

23

24

25

Page 2159

1                     DONZIGER

2    publicly as the court's global expert, he

3    would work privately with plaintiffs'

4    consultants and lawyers on the case?

5         A.      That is not exactly how I would

6    characterize it.

7                 MS. NEUMAN:  Move to strike as

8    nonresponsive.

9                 THE SPECIAL MASTER:  No, I

10   think the question was long enough so

11   that, you know, in a sense you invited it.

12                I think you could do -- you

13   could hone in, and particularly in light

14   of the materials that I remember from

15   Exhibit 422 that were discussed

16   previously.  If you want to wait to review

17   422 at the break, the lunch break or

18   something, and return to this, you would

19   be welcome to do that.

20                MS. NEUMAN:  That's fine.

21                I'm going to mark as Exhibit

22   778 handwritten notes produced by Ann

23   Maest bearing the Bates number Stratus

24   Native 128168 through 128171.

25                (Exhibit 778 marked for

Page 2396

1

2                     CERTIFICATION

3

4      I,  TODD DeSIMONE, a Notary Public for

5    and within the State of New York, do

6    hereby certify:

7      That the witness whose testimony as

8    herein set forth, was duly sworn by me;

9    and that the within transcript is a true

10    record of the testimony given by said

11    witness.

12      I further certify that I am not related

13    to any of the parties to this action by

14    blood or marriage, and that I am in no way

15    interested in the outcome of this matter.

16      IN WITNESS WHEREOF, I have hereunto set

17    my hand this 29th day of December, 2010.

18

19

        _____

20                  TODD DESIMONE

21

22

23

24

25

Page 2715

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 10 MC 00002(LAK)

5   ----------------------------------x

6   In re:

7     APPLICATION OF CHEVRON

8

    ----------------------------------x

9                   January 14, 2011

                    9:08 a.m.

10

11

12

13

14       Continued Videotaped Deposition of

15   STEVEN DONZIGER, pursuant to Subpoena,

16   held at the offices of Gibson Dunn &

17   Crutcher LLP, 200 Park Avenue, New York,

18   New York, before Todd DeSimone, a

19   Registered Professional Reporter and

20   Notary Public of the State of New York.

21

22

23

24

25

Page 2803

1              DONZIGER

2  to this declaration.

3              THE SPECIAL MASTER:  Off the

4  record.  And I would do that ex parte,

5  because otherwise she is going to be

6  afraid that she is going to be giving away

7  to you her strategy.  So I'm asking

8  counsel's consent to ask her to give me an

9  ex parte offer of proof of what it is she

10  hopes to accomplish.

11              MR. ABADY:  You have consent

12  from plaintiffs.

13              THE SPECIAL MASTER:  Do I have

14  consent from you?

15              MR. KAPLAN:  Yes, you do have

16  consent.

17              THE SPECIAL MASTER: Ms. Neuman,

18  would you step outside with me for a

19  minute and make that offer of proof.

20              MR. KAPLAN:  Can the witness be

21  excused for a minute?

22              THE SPECIAL MASTER:  Yes, of

23  course.

24              THE VIDEOGRAPHER:  Off the

25  record, 11:20 a.m.

Page 2854

1                    DONZIGER

2    chance to read Exhibit 877?

3        A.      Yes.

4        Q.      This is an e-mail exchange you

5    had with the people I listed on June 12th,

6    2010; is that right?

7        A.      Yes.

8        Q.      Going down to the bottom of the

9    first page of Exhibit 877, Mr. Maazel

10   writes "Belanger's appeal is due Tuesday.

11   Do we appeal?"

12              Do you understand that to be a

13   reference to Laura Belanger?

14       A.      I'm sorry, I don't have the

15   right document.

16              THE SPECIAL MASTER:  I don't

17   have the right document either.  What we

18   have before us is not what you described

19   as the exhibit.

20              MS. HENDRICKS:  Do you have May

21   4th, Donziger 00031258?

22              THE SPECIAL MASTER:  Yes, we

23   do.  But that's not what was described as

24   the exhibit.  The exhibit was described as

25   something dated June 12.

Page 2987

1

2          CERTIFICATION

3

4    I,  TODD DeSIMONE, a Notary Public for

5   and within the State of New York, do

6   hereby certify:

7    That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10  record of the testimony given by said

11  witness.

12   I further certify that I am not related

13  to any of the parties to this action by

14  blood or marriage, and that I am in no way

15  interested in the outcome of this matter

16   IN WITNESS WHEREOF, I have hereunto set

17  my hand this 17th day of January, 2011.

18

19


         _____

20               TODD DESIMONE

21

22            *      *      *

23

24

25

Page 2989

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 10 MC 00002(LAK)

5  ----------------------------------x

6  In re:

7    APPLICATION OF CHEVRON

8

   ----------------------------------x

9                    January 18, 2011

                     9:30 a.m.

10

11

12

13

14        Continued Videotaped Deposition of

15  STEVEN DONZIGER, pursuant to Subpoena,

16  held at the offices of Gibson Dunn &

17  Crutcher LLP, 200 Park Avenue, New York,

18  New York, before Todd DeSimone, a

19  Registered Professional Reporter and

20  Notary Public of the State of New York.

21

22

23

24

25

Page 3220

1                DONZIGER

2       A.        I would say July of 2010.

3       Q.        So that was definitely after

4  Mr. Tyrrell and his law firm, Patton

5  Boggs, were on board, correct?

6       A.        Yes.

7       Q.        Now, going farther down the

8  page here --

9                MR. KAPLAN:  Mr. Gitter, could

10  we --

11                THE SPECIAL MASTER:  You know

12  what, you have just anticipated something

13  I was going to do.  I assume that

14  Mr. Mastro will not make an offer of proof

15  except on an ex parte basis as we had once

16  before.

17                Will you consent to my asking

18  him outside the room ex parte what his

19  offer of proof is going to this kind of

20  detail in this document?

21                MR. KAPLAN:  Yes.

22                THE SPECIAL MASTER:  Mr. Abady?

23                MR. ABADY:  Yes.

24                (The Special Master and

25  Mr. Mastro depart the room.)

Page 3221

1          DONZIGER

2               THE SPECIAL MASTER:  This

3    subject is going to go a lot faster right

4    now.

5    BY MR. MASTRO:

6        Q.        Am I also correct that the

7    Patton Boggs firm is doing the case on

8    contingency?

9        A.        Is that a question?

10       Q.        Yes.

11       A.        Partial.

12       Q.        They are also being paid some

13   amount for the case while they also get a

14   contingency component, correct?

15       A.        Yes.

16       Q.        And the Burford Group in

17   investing in the case is on a contingency

18   arrangement?

19       A.        I think that's accurate.

20       Q.        Now, Patton Boggs on this list

21   is responsible for, it says here,

22   identifying Chevron asset locations,

23   correct?

24       A.        Where are you looking?

25       Q.        Towards the bottom of the page,

Page 3234

1                    DONZIGER
2              THE VIDEOGRAPHER:  Back on the
3    record, 4:15 p.m.  This is the beginning
4    of disk five, Volume XI, deposition of
5    Steven Donziger.
6              THE SPECIAL MASTER:  Let me
7    just say two things quickly.
8              One, we are going to continue
9    without pause or break from now until
10   about 5:30, when I have to leave for an
11   engagement, and therefore we are breaking
12   at about 5:30 today.  That's number one.
13             Number two is I didn't want to
14   create a misleading impression when I came
15   back on the record after talking to
16   Mr. Mastro before.  I did not intend to
17   say -- I didn't say, but I did not want it
18   interpreted as having been said -- that
19   his line of questioning was not relevant.
20   I was satisfied that what he was doing was
21   relevant.  However, I thought I could, and
22   I did, make it go much faster than it
23   otherwise might have.
24             MR. MASTRO:  Yes, you did.
25             MR. KAPLAN:  I think the level

Page 3235

1                    D O N Z I G E R

2    of detail on this document at this time in

3    the deposition is simply too great an

4    expenditure of time.  I appreciate very

5    much the Special Master's expediting it,

6    but it has been a long time of questioning

7    on this particular document.

8                    THE SPECIAL MASTER:  Actually,

9    as I believe you will find out in the not

10   that distant future, there was real

11   relevance to this.  Go on.

12                    MR. KAPLAN:  One other thing I

13   should note.  I told the Special Master

14   we, our firm, did not make any redactions

15   whatever on this Exhibit 1615.

16   Mr. Haggerty is checking whether the

17   document had been redacted before

18   Mr. Donziger received it, if that can be

19   determined.

20                    THE SPECIAL MASTER: Mr. Mastro,

21   please proceed.

22   BY MR. MASTRO:

23       Q.        Mr. Donziger, I believe you

24   testified that you were among a group from

25   the plaintiffs' team that met with Burford

Page 3236

1                    DONZIGER

2    to encourage them to invest in the Lago

3    Agrio litigation, correct?

4         A.      Yes.

5         Q.      In your communications with the

6    Burford Group, did you tell the Burford

7    Group that plaintiffs' team had drafted

8    Cabrera's final report?

9         A.      I believe the issue of Stratus'

10   role in preparing those documents to be

11   given to Cabrera was well known to

12   Burford.

13               THE SPECIAL MASTER:  That was

14   not the question.

15        A.      I don't know who told them, if

16   I did, or a combination of people.

17        Q.      Was the Burford Group told that

18   plaintiffs' team had drafted Cabrera's

19   final report?

20        A.      The Burford Group was --

21        Q.      Yes or no.

22               THE SPECIAL MASTER:  The answer

23   to that question is really a yes or no.

24        A.      I can't answer that yes or no.

25        Q.      During your communications with

Page 3237

1              DONZIGER

2    the Burford Group before the Burford Group

3    committed to invest in the Lago Agrio

4    litigation, did you or anyone else on

5    plaintiffs' team tell anyone from the

6    Burford Group that Dr. Calmbacher had

7    accused you and Selva Viva of committing a

8    fraud on the court?

9         A.      I don't know.

10        Q.      Do you recall anyone on

11   plaintiffs' team telling anyone in the

12   Burford Group that before the Burford

13   Group decided to invest?

14        A.      That was publicly available

15   information, and I believe it was all

16   disclosed via --

17        Q.      It is a yes or no.  Do you

18   recall anyone on plaintiffs' team telling

19   the Burford Group before it decided to

20   invest in the Lago Agrio litigation that

21   Dr. Calmbacher had accused you and Selva

22   Viva of committing a fraud on the court?

23        A.      I don't know.

24        Q.      You don't know whether anyone

25   told them that?

Page 3238

1                          DONZIGER

2          A.          I don't know.

3          Q.          You didn't tell anyone from the

4    Burford Group that, did you, sir?

5          A.          I don't remember.

6          Q.          Did anyone from the Burford

7    Group ask you about Dr. Calmbacher before

8    the Burford Group decided to invest?

9          A.          I don't know.

10         Q.          You don't know or you don't

11   remember?

12         A.          I don't remember.  There were a

13   lot of conversations.

14         Q.          Did Dr. Calmbacher's name ever

15   come up in any of the conversations with

16   the Burford Group prior to it deciding to

17   invest in the litigation?

18         A.          I don't remember.

19         Q.          Did you or anyone else from

20   plaintiffs' team disclose to the Burford

21   Group before it decided to invest in the

22   Lago Agrio litigation that David Russell

23   had renounced his $6 billion remediation

24   cost estimate prepared at your insistence?

25         A.          I didn't tell him that.  I

Page 3239

DONZIGER

1

2    don't know if anyone else did.

3       Q.      Was David Russell's name

4    mentioned in any of the conversations that

5    you could recall between plaintiffs' team

6    and the Burford Group before it decided to

7    invest in the Lago Agrio litigation?

8       A.      I don't recall his name being

9    mentioned.

10      Q.      Did you or anyone else on

11   plaintiffs' team -- did you or anyone else

12   on plaintiffs' team discuss with the

13   Burford Group before it decided to invest

14   in the Lago Agrio litigation that the

15   plaintiffs' lawyers were researching the

16   doctrine that courts do not punish clients

17   when their representatives have committed

18   misdeeds?

19      A.      I don't know.  There were a lot

20   of conversations between Mr. Tyrrell and

21   Burford that I was not part of.

22      Q.      Would it be fair to say that it

23   was Mr. Tyrrell who played a leading role

24   in convincing the Burford Group to invest

25   in the Lago Agrio litigation?

Page 3240

DONZIGER

1

2          A.      I think he probably played the
3    primary role.
4          Q.      Would it also be -- strike
5    that.
6                  Do you recall any specific
7    conversations that you or anyone from the
8    plaintiffs' team had with the Burford
9    Group before it decided to invest about
10   the Cabrera report?
11         A.      To the best of my recollection,
12   that was very much a part of our
13   discussions.
14         Q.      Did you, just you individually
15   now, did you tell anyone at the Burford
16   Group before it decided to invest in the
17   Lago Agrio litigation that plaintiffs'
18   team had drafted Cabrera's final report?
19                 THE SPECIAL MASTER:  That's
20   been asked and answered.
21         Q.      Did anyone on the Burford team
22   before Burford decided to invest express
23   concerns about the fact that plaintiffs'
24   team had drafted Cabrera's final report?
25         A.      Well, Burford assessed the

Page 3310

1

2                    CERTIFICATION

3

4      I,  TODD DeSIMONE, a Notary Public for

5     and within the State of New York, do

6     hereby certify:

7      That the witness whose testimony as

8     herein set forth, was duly sworn by me;

9     and that the within transcript is a true

10    record of the testimony given by said

11    witness.

12     I further certify that I am not related

13    to any of the parties to this action by

14    blood or marriage, and that I am in no way

15    interested in the outcome of this matter.

16     IN WITNESS WHEREOF, I have hereunto set

17    my hand this 18th day of January, 2011.

18

19


        _____

20                TODD DESIMONE

21

22

23

24

25

Page 3312

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   Case No. 10 MC 00002(LAK)

5   -----------------------------------x

6   In re:

7     APPLICATION OF CHEVRON

8

    -----------------------------------x

9                       January 19, 2011

                        9:25 a.m.

10

11

12

13

14        Continued Videotaped Deposition of

15   STEVEN DONZIGER, pursuant to Subpoena,

16   held at the offices of Gibson Dunn &

17   Crutcher LLP, 200 Park Avenue, New York,

18   New York, before Todd DeSimone, a

19   Registered Professional Reporter and

20   Notary Public of the State of New York.

21

22

23

24

25

Page 3333

1                    DONZIGER

2    good friend of many years, Mr. Abady, who

3    he recommended for a matter, attended his

4    wedding.  So what?

5                    THE SPECIAL MASTER: Mr. Kaplan,

6    on that point, on that last point, let me

7    deal with that first, I said to you at the

8    close yesterday that I was satisfied with

9    the relevance of the line of questioning

10   that Mr. Mastro was making and I think you

11   will find -- I could be surprised -- but

12   my hunch is you are going to see some

13   filing about the subject of the

14   relevance -- wait a second, hear me out,

15   Mr. Kaplan -- there will be a filing in my

16   judgment at some point that will show you

17   the relevance that I was satisfied about.

18   And I believe, I could be wrong, but I

19   believe the questioning which you think

20   was about a personal matter is actually

21   related to that subject.

22                    Mr. Mastro, am I correct about

23   that?

24                    MR. MASTRO:  You are absolutely

25   correct.  But it won't come as a surprise

Page 3336

1                    DONZIGER

2    questions of the witness at the outset to

3    follow up on things I want clarified.  Go

4    off, please.

5                    THE VIDEOGRAPHER:  Off the

6    record, 9:48 a.m.

7                    (Recess taken.)

8                    THE VIDEOGRAPHER:  Back on the

9    record, 9:50 a.m.

10                   MR. R. KAPLAN:  We had one

11   suggestion to try to speed the process

12   along.  Obviously what is going to take a

13   lot of time is the privilege review.  We

14   have already agreed that documents that

15   relate to Cabrera and so on we are not

16   going to assert a privilege.  But there

17   may well be a large group of documents as

18   to which we do think we have a privilege

19   and would assert a privilege but which we

20   don't really care to litigate over because

21   it simply doesn't matter.  And producing a

22   smaller privilege log and asking you to

23   review a smaller set of documents seems to

24   be in everybody's interest.

25                   So what we would like to have

Page 3337

1                DONZIGER

2     on the record is an understanding that we

3     are not waiving any privilege by producing

4     some documents and not others.  That will

5     allow us to concentrate on the things we

6     really think matters.

7                THE SPECIAL MASTER:  There is a

8     problem with that, Mr. Kaplan.  There is a

9     way to deal with it but there is a problem

10    with that approach.  I have seen several

11    times now -- there are a variety of

12    problems.  I don't want to go into all of

13    them now; among them, that disputes can

14    arise nevertheless.  I think the way to do

15    that is -- let me think on it further.  I

16    will come up with something that I think

17    will satisfy you.

18                I appreciate the effort to just

19    reduce the workload, particularly mine.

20    If I don't have to rule that something is

21    privileged because you don't really

22    care --

23                MR. R. KAPLAN:  Obviously our

24    problem --

25                THE SPECIAL MASTER:  No, I

Page 3338

1                    DONZIGER

2   understand.  I understand.  Maybe the way

3   to do it -- let me think on it further and

4   we will talk off the record later -- but

5   maybe some variant of the following, that

6   you will have a special stamp, PWW --

7                    MR. R. KAPLAN:  Privileged

8   without waiver?

9                    THE SPECIAL MASTER:  Exactly,

10  something like that.  Something of the

11  sort.  And I don't like a formulation that

12  was -- that I regretted quasi agreeing to

13  with Mr. Jasinski, and actually that he

14  agreed to with Mr. Mastro, he is producing

15  it without waiver as to this line.  I

16  didn't like that, as to this line.

17  Disputes can arise as to what that "line"

18  is.  Happily it turned out no disputes

19  arose and things went well beyond it.

20                    Let me also tell you one

21  further thing in your analysis of

22  privilege.  You need to be mindful that,

23  and the same is true for Mr. Maazel and

24  his firm, that there was a great deal of

25  testimony, unobjected to on privilege

Page 3339

1                    DONZIGER

2    grounds by Mr. Donziger on the preceding

3    three days on matters utterly unrelated to

4    the Cabrera report and the lines as to

5    which agreement -- the line about a whole

6    variety of subjects of testimony, really a

7    wide variety of subjects, of communication

8    with counsel, among counsel, on a wide

9    variety of subjects.  I'm telling you that

10   I consider those a waiver, a knowing

11   waiver.  You cannot sit there and not

12   assert privilege on a total subject and

13   then suddenly claim privilege on that

14   subject.  You better go over the

15   transcript and see what the subjects were.

16   Okay?

17            But as I was listening to that

18   testimony I was noticing that lots of

19   different subjects were being covered in

20   questioning about communications among the

21   lawyers and no objection was being made on

22   privilege grounds by anybody, not even

23   just the word "objection, privilege,"

24   without an instruction not to answer, but

25   a deliberate and knowing decision to not

Page 3340

1                         DONZIGER

2    assert privilege.  Whatever the

3    consequence is, it is.  And I tell you one

4    of those consequences may well be a waiver

5    of privilege for large areas of subject

6    matter.

7                    I'm done.  Let's move on and

8    let's get some testimony.

9                    MR. MASTRO:  Mr. Gitter, I

10   appreciate the suggestions in this regard.

11   We did with the filmmakers have the

12   understanding that they produced with some

13   limited claw-back right on attorney-client

14   or work product related materials as long

15   as there was a cutoff date.  That might

16   obviate the need for this.

17                    THE SPECIAL MASTER:  Certainly

18   stuff you don't care about.  Anyway, let's

19   leave that for later in the day.  That's

20   the kind of thing you ought to talk about

21   off the record.  I'm reasonably confident

22   that will be the kind of thing that the

23   parties can work out, and you certainly

24   don't need me in the first instance about

25   that.

Page 3578

1

2               CERTIFICATION

3

4      I,  TODD DeSIMONE, a Notary Public for

5   and within the State of New York, do

6   hereby certify:

7      That the witness whose testimony as

8   herein set forth, was duly sworn by me;

9   and that the within transcript is a true

10  record of the testimony given by said

11  witness.

12     I further certify that I am not related

13  to any of the parties to this action by

14  blood or marriage, and that I am in no way

15  interested in the outcome of this matter.

16     IN WITNESS WHEREOF, I have hereunto set

17  my hand this 19th day of January, 2011.

18

19

        _____

20                 TODD DESIMONE

21

22

23

24

25

Page 3580

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Case No. 10 MC 00002(LAK)

5  ------------------------------------x

6  In re:

7     APPLICATION OF CHEVRON

8

   ------------------------------------x

9                  January 29, 2011

10                 9:09 a.m.

11

12

13

14        Continued Videotaped Deposition of

15  STEVEN DONZIGER, pursuant to Subpoena,

16  held at the offices of Gibson Dunn &

17  Crutcher LLP, 200 Park Avenue, New York,

18  New York, before Todd DeSimone, a

19  Registered Professional Reporter and

20  Notary Public of the State of New York.

21

22

23

24

25

Page 3911

1                    DONZIGER

2    either today or even on Monday.  My

3    intention is to not set another date yet

4    on Monday.  I want to see what else

5    emerges both in the testimony and in the

6    examination of the hard drive.

7              I think it would be premature

8    for me to make a ruling about the next

9    date, how much time is needed and so

10   forth, until I have seen what has gone on

11   on Monday and what I see in terms of the

12   examination of the hard drive.

13             MR. MASTRO:  Understood,

14   appreciated.  I just felt compelled to

15   make the application.

16             And as I have already --

17             THE SPECIAL MASTER:  You know

18   my position and my views.

19             MR. MASTRO:  I understand.

20             THE SPECIAL MASTER:  I'm not

21   deciding today and I don't expect to

22   decide on Monday.

23             MR. MASTRO:  I understand.

24             As I have already explained to

25   Mr. Gitter when he asked for a proffer of

Page 3912

1                    DONZIGER
2    some of the areas that we were going to
3    cover, with the consent of the other side
4    to make that proffer, my colleague Andrea
5    Neuman will cover certain areas on Monday,
6    very discrete, but important areas.  So
7    she will be here on Monday.  I will be
8    here on Monday.  And we are both looking
9    forward to seeing Mr. Donziger then.
10                    THE SPECIAL MASTER:  Mr.
11   Vinegrad wants to say something very
12   quickly.
13                    MR. VINEGRAD:  Yes.  I
14   understand your rulings and I'm not in any
15   way questioning it.  I just want to note
16   for the record that after you determined
17   the additional time Chevron will get to do
18   its questioning, and I fully join
19   Mr. Mastro's application, I just want to
20   state the intention of the individual
21   applicants for similar reasons based on,
22   you know, many new documents that have
23   been produced to us, multiples of what we
24   got before, that we would want to reopen
25   our questioning of Mr. Donziger focused

Page 3917

1                          DONZIGER

2    feel handicapped in trying to make any

3    comment about what the course of conduct

4    has been over the prior 12 days and how

5    efficient or inefficient the questioning

6    has been.

7              So I would like, if I could, to

8    defer to Bruce Kaplan if you want to take

9    further argument on this issue.

10             THE SPECIAL MASTER:  Mr.

11   Vinegrad, can I ask you to do this for me.

12   You have seen a lot of the documents

13   presumably by now.  Can you show me at the

14   lunch hour in an ex parte submission, if

15   you wish, the nature of the new documents

16   that you expect to -- maybe you won't have

17   all of them, but you will have a fair

18   bunch I expect -- so before I hear any

19   further from you on this, or indeed think

20   further, I would like to see on an ex

21   parte basis the documents you believe you

22   are entitled to examine about.

23             MR. VINEGRAD:  As a

24   professional courtesy, if nothing else,

25   Mr. Gitter, can I at least ask or know

Page 3918

1                    DONZIGER

2    that whatever additional questioning that

3    you will permit me, I do not have to do on

4    Monday?

5              THE SPECIAL MASTER:  Does any

6    counsel object to Mr. Vinegrad presenting

7    me ex parte with the documents that he

8    believes permit him to go forward with

9    more examination?

10             MR. R. KAPLAN:  I don't object

11   to that.  I would request really on

12   Bruce's behalf that before you make any

13   ruling about further extension of

14   deposition, that Bruce has an opportunity

15   to be heard.

16             MR. NARWOLD:  If you are

17   soliciting my views, I don't have an

18   objection to an ex parte submittal.  My

19   only comment would be at some point I

20   think there ought to be an offer of proof

21   that can be responded to so that we can

22   have -- at least get our point of view

23   that this would either be duplicative or

24   unnecessary.

25             THE SPECIAL MASTER:  I

Page 3919

1                    DONZIGER

2    understand that.  But, first, in my own

3    mind, I want to be comfortable before he

4    makes any formal offer of proof that it is

5    worth the candle.

6              MR. NARWOLD:  I understand.

7              THE SPECIAL MASTER:  All right,

8    Mr. Vinegrad, will you do that?

9              MR. VINEGRAD:  Yes, I will.

10             MS. HENDRICKS:  Mr. Gitter, one

11   thing about the hard drives.  We are

12   proceeding with the analysis as

13   expeditiously as possible.  We just imaged

14   the drives yesterday.  We received drives

15   that were imaged before.  They were imaged

16   in September and a couple of weeks ago.

17   But we wanted the most current images

18   possible.  We did image six drives

19   yesterday and we are proceeding with the

20   analysis as quickly as possible.

21             I wanted to let you know there

22   is a lot to be done.  One of the things we

23   have to do is comparison to the over

24   100,000 documents that we have received to

25   determine if there is anything that we

Page 3924

1

2                    CERTIFICATION

3

4      I,  TODD DeSIMONE, a Notary Public for

5    and within the State of New York, do

6    hereby certify:

7      That the witness whose testimony as

8    herein set forth, was duly sworn by me;

9    and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12     I further certify that I am not related

13   to any of the parties to this action by

14   blood or marriage, and that I am in no way

15   interested in the outcome of this matter.

16     IN WITNESS WHEREOF, I have hereunto set

17   my hand this 29th day of January, 2011.

18

19

          _____
20                 TODD DESIMONE

21

22

23

24

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------- x
In re Application of                                    :
                                                       :
CHEVRON CORPORATION, et al.,                           :          10 MC 00002 (LAK)
                                                       :
                                Petitioners.            :
                                                       :
This document applies to:   ALL CASES                  :
------------------------------------------------------------------- x

CHEVRON'S SECOND REPLY MEMORANDUM OF LAW
IN SUPPORT OF ITS APPLICATION BY ORDER TO SHOW CAUSE TO
**(1)** HOLD STEVEN DONZIGER IN CONTEMPT OF THIS COURT'S ORDERS
TO PRODUCE ALL RESPONSIVE DOCUMENTS "FORTHWITH";
**(2)** COMPEL DONZIGER TO PRODUCE THE MIRROR IMAGES
OF HIS HARD DRIVES FOR INSPECTION;
**(3)** COMPEL SEARCHES OF DONZIGER'S DOCUMENTS
USING SPECIFIC SEARCH TERMS;
**(4)** COMPEL DONZIGER TO CONSENT TO SUBPOENAS
BY CHEVRON OF HIS E-MAIL SERVICE PROVIDERS; AND
**(5)** SANCTION THE EMERY CELLI, MOTLEY RICE, AND PATTON BOGGS LAW FIRMS
FOR PURPORTING TO REPRESENT THE "LAGO AGRIO PLAINTIFFS"

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone:  212.351.4000
Facsimile:  212.351.4035

*Attorneys for Applicant Chevron Corporation*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ....................................................................................................... 2

    I.    The U.S. Firms Are Not Authorized to Represent the Individual
           Plaintiffs .......................................................................................... 2

    II.    Emery Celli's Conduct in Particular Cries Out for Sanctions ............... 7

    III.    Patton Boggs Should Be Barred From Any Future Appearance in
           This Case........................................................................................ 8

    IV.    The U.S. Firms Should Produce Fajardo for a Hearing Before This
           Court ............................................................................................. 9

CONCLUSION .................................................................................................. 10

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Aguinda v. Texaco, Inc.*,
    142 F. Supp. 2d 534 (S.D.N.Y. 2001) ............................................................ 4

*Bergeron v. State Farm Mut. Auto. Ins. Co.*,
    198 F. Supp. 723 (E.D. La. 1961)................................................................... 10

*Breen Air Freight, Ltd. v. Air Cargo, Inc.*,
    470 F.2d 767 (2d Cir. 1972) ........................................................................... 6

*Cologne Life Reinsurance Co. v. Zurich Reinsurance (N. Am.), Inc.*,
    286 A.D.2d 118, 730 N.Y.S.2d 61 (N.Y. App. Div. 1st Dep't 2001)........................................ 6

*Diversified Grp., Inc. v. Daugerdas*,
    139 F. Supp. 2d 445 (S.D.N.Y. 2001) ............................................................ 6

*Gross v. Gross*,
    36 A.D.3d 318, 830 N.Y.S.2d 166 (N.Y. App. Div. 2d Dep't 2006) ........................................ 6

*King v. Fox*,
    851 N.E.2d 1184, 818 N.Y.S.2d 833 (N.Y. 2006)......................................... 6

*Lightfoot v. District of Columbia*,
    No. Civ. 01-1484 (CKK), 2006 WL 175222 (D.D.C. Jan. 24, 2006)...................................... 10

*Meredith v. Ionian Trader*,
    279 F.2d 471 (2d Cir. 1960) ........................................................................... 7

*N.Y. State Med. Transporters Ass'n v. Perales*,
    566 N.E.2d 134, 77 N.Y.2d 126 (N.Y. 1990)................................................ 6

*Perma Research & Dev.. Co. v. Singer Co.*,
    410 F.2d 572 (2d Cir. 1969) ........................................................................... 10

## Statutes

28 U.S.C. § 1746..................................................................................................... 10

28 U.S.C. § 1782............................................................................................... *passim*

## Other Authorities

Código de Procedimiento Civil: art. 52 (Ecuador) ........................................... 3

ii

## PRELIMINARY STATEMENT

Emery Celli, Motley Rice, and Patton Boggs have become key players in Donziger's scheme to obtain a corrupt, multi-billion-dollar judgment against Chevron in Ecuador—a judgment this Court has recognized could be entered "'at any point.'" Dkt. 171 at 1 (quoting Donziger). Those U.S. firms are accountable for their roles in what this Court has called a "giant game" of delay, Ex. 8 at 26:20, for they have orchestrated the strategy that has obstructed Chevron's ability to obtain the discovery it urgently needs. In attempting to prevent or delay disclosure of information they know could send their Ecuadorian colleagues "to jail," Ex. 64, the U.S. firms have made false and misleading statements to this Court and others. The firms executed their obstructionist strategy by purporting to appear on behalf of "The Lago Agrio Plaintiffs," Ex. 65, when, in fact, they had no authority to do so. They apparently have never met or even communicated with their "clients," much less obtained informed consent for their activities, but instead are acting on contingency for their own interests and those of the litigation financiers they recruited to fund their activities as an investment opportunity. They seek to obstruct discovery, obtain a fraudulent judgment in Ecuador, and enforce it against Chevron in jurisdictions where they believe they can "leverage" their "political connections and strategic alliances" such that "barriers to judgment recognition in a given country may not necessarily preclude enforcement." Ex. 1 at 19. In all this, they have joined Donziger in what he describes in the *Crude* outtakes as "The business of plaintiffs' law. To make f**king money." Dkt. 41-5 at 258-00-01.

It is undisputed that the U.S. firms have never entered into a retention agreement with the individuals they claim to represent. The firms point instead to Pablo Fajardo, plaintiffs' supposed lead lawyer in Ecuador, as the exclusive source of their authority. Fajardo invokes two sets of documents: Ecuadorian court documents from 2006 and a "power of attorney" from late 2010. But the 2006 documents are inadequate to grant Fajardo authority to hire counsel—and

1

they were the documents in existence last year when the U.S. firms began claiming to be plaintiffs' legal representatives.  Effectively admitting that the 2006 documents were insufficient, the U.S. firms in late 2010 scrambled to generate a *new* instrument granting Fajardo power to hire counsel and to ratify all his past actions.  *See* Ex. 66 at 3421:11–3422:6.  But even today, they still have not cured the problem.  The 2010 power of attorney is not signed by all of the plaintiffs—confirming beyond doubt that the firms do not represent those who have not signed it.  And the attempt to "ratify" Fajardo's past actions raises more questions than it answers— including whether the individuals who supposedly did sign were told of the litigation misconduct and dubious investment and retention agreements they "ratified."  Indeed, conspicuously absent from the documents Chevron has reviewed are any communications with the actual plaintiffs.

With no valid basis for their claimed representation, the U.S. firms should be sanctioned, including by being barred from future appearances in this proceeding.  At the very least, this Court should require the U.S. firms to produce Fajardo—upon whom alone they rely—for questioning concerning his authority to retain them.  In any scenario, it is now clear that the U.S. firms have misrepresented their status over the past year and should be held accountable.

## ARGUMENT

**I.    The U.S. Firms Are Not Authorized to Represent the Individual Plaintiffs**

**1.     There is no dispute on the fundamental point that *not one* of the U.S. firms has ever executed a retainer agreement with any of the individual plaintiffs—the "clients" on whose behalf they purport to act.**  *See* Ex. 66 at 3206:9–3209:17.[1]

---

[1]    Donziger e-mailed: "We cannot agree to have each individual plaintiff sign the [retention] agreement at this point. . . . [I]t is terribly costly to gather all of these signatures."  Ex. 67 at 2.  Richard Emery replied, referring to that and other issues: "This is not what we agreed to and is totally unacceptable.  I am becoming extremely wary of this negotiation and will not allow it to continue much further."  *Id.* at 1.

**2.     The U.S. firms claim Fajardo has been authorized to hire lawyers on plain-tiffs' behalf since 2006, but the supposed authorizing documents—and the lawyers' own e-mails—tell a different story.**

Alone among the U.S. firms, Patton Boggs refers to a 2006 "Poder Especial y Procura-cion Judicial," or "special and judicial power of attorney," as having empowered Fajardo to re-tain other lawyers to represent plaintiffs.  Dkt. 163 at 3 n.4.  Patton Boggs chose not to submit the actual document, however, knowing that the 2006 "power of attorney" was executed by only *one* of the individual plaintiffs and does not expressly give Fajardo authority to hire counsel.  *See* Ex. 33 at 9–13.  Nevertheless, Donziger's lawyers submitted the document to this Court to estab-lish Fajardo's authority "to act for the Lago Agrio plaintiffs."  *See* Ex. 68 at 1.[2]

The other 2006 documents, which Fajardo and all the U.S. firms now invoke, are filings in the Lago Agrio court naming Fajardo plaintiffs' "common attorney" for purposes of appearing there.  Dkt. 165-1 at 2.  The documents "authorize[]" Fajardo to "file all types of documents or requests *during this trial*."  *Id.* (emphasis added).  The documents do not, as Fajardo self-servingly claims, authorize him to "retain other law firms" anywhere in the world "in cases re-lated to the *Lago Agrio* Litigation."  Dkt. 165 at ¶ 5; *see also* Código de Procedimiento Civil: art. 52 (Ecuador) (attached as Ex. 70) (describing procedure for appointing a "common legal repre-sentative" to act on behalf of multiple parties in a particular case); Ex. 66 at 182:19–183:2 (Donziger testifying that Fajardo "has an agreement with the individual plaintiffs to be the pro-curador common," which "means the lawyer who represents the individual plaintiffs before the

---

[2]   Donziger himself later admitted that the 2006 power of attorney did not specifically authorize Fa-jardo to hire counsel.  *See* Ex. 66 at 3419:4–10.  And after seeing the other U.S. firms' submissions, Pat-ton Boggs sent a last-minute letter to this Court in which it shifted its argument, making no mention of the 2006 power of attorney.  *See* Ex. 69 at 2.  All three firms now essentially have abandoned that document as the source of any relevant authority.

3

court").  Fajardo cites no other document to show a supposed 2006 power.[3]

Emery Celli recognized from the start that Fajardo's authority was suspect.  In January 2010, Jonathan Abady asked for proof that Fajardo and Luis Yanza—"the signators on our retainer, who purport to have authorization to enter into the engagement with us"—actually had such authority.  Ex. 71.  Responding by e-mail, Fajardo declared that, "[a]ccording to the power of attorney that the claimants have conferred to me, I may delegate certain actions to other colleagues."  Dkt. 166-4 at 3.  It is now clear that this was the "power of attorney" executed in the name of *just one* plaintiff.  *See* Ex. 33 at 9–13.

Throughout 2010—as they implemented their obstruct-and-delay strategy—the U.S. firms based their representation on the 2006 power of attorney, despite knowing its inadequacy. In early September, Donziger's associate, Andrew Woods, stated that it was "unclear if Fajardo has a *separate* power of attorney that would allow him to . . . retain other lawyers."  Ex. 72 at 2 (emphasis added).  In October, Purrington Moody attorney William Carmody put it starkly:

> [W]e need to more definitively understand who has the authority to act on behalf of the individual named plaintiffs.  To date, **we've relied on assumptions and assertions that Pablo has . . . authority to sign for each of the named plaintiffs** (and [Emery Celli's] mark-up has assumed the same), but we should see evidence of that authority.  The **POA that we've seen for Pablo doesn't seem [to] give him that authority** – it is a "Special and Judicial Power of Attorney" **granted by 1 of the indivdual [sic] named plaintiffs** on behalf of Pablo.

Ex. 73 at 1 (emphases added).[4]  Only now, when forced to produce some basis for their represen-

---

3    In its supplemental letter to this Court, Patton Boggs claims the Lago Agrio litigation is "akin to a class action" and that Fajardo is "vested" with authority to hire counsel anywhere in the world "simply by virtue of having been retained to represent the class."  Ex. 69 at 2.  But plaintiffs' former counsel (Joseph Kohn and Cristobal Bonifaz) acknowledged while representing a different but overlapping set of plaintiffs in the *Aguinda* case that "Ecuador Does Not Recognize Class Actions and Has No Comparable Procedure."  *Aguinda v. Texaco, Inc.*, 142 F. Supp. 2d 534, 540–41 (S.D.N.Y. 2001) (quotation marks omitted); *see also* Ex. 66 at 1784:14–15 (Donziger confirming there is "no . . . class action mechanism under Ecuadorian law").  Fajardo's designation as the "common attorney" for a group of individual plaintiffs in an Ecuadorian action grants him no such worldwide authority.

tations in this and other courts, do the U.S. firms claim that the 2006 "common attorney" au-

thorization in Ecuadorian court somehow empowered Fajardo to hire lawyers in the United

States.  But the U.S. firms' prior behavior demonstrates that they know this to be false, and that

they knew all along they had no basis to act as plaintiffs' representatives.

      **3.**      **The 2010 power of attorney confirms that the U.S. firms operated without**

**authority for nearly a year and have not cured their lack of authority.**  Most telling is that,

after the issue of the U.S. firms' authority arose in this case, it set off a behind-the-scenes scram-

ble to obtain a "new" power of attorney.  *See* Ex. 66 at 3421:11–3422:6.  But the resulting

document is insufficient.  The U.S. firms and Fajardo admit that the 2010 power of attorney

bears the purported signatures of only *some* plaintiffs.  *See* Dkts. 163 at 3; 164 at 3; 165 at ¶ 6;

167 at 6.[5]  Furthermore, those signatures are not entitled to any presumption of validity.  A lead-

ing forensic examiner determined that nearly *half* of the signatures on the document purporting

to ratify the Lago Agrio complaint and appoint plaintiffs' first counsel were forged, *see* Exs. 21,

35—raising substantial doubt as to the authenticity of any document purporting to bear plaintiffs'

signatures.  The best the U.S. firms can muster in response to this disturbing evidence is to side-

step it.  *See* Dkts. 163 at 10; 164 at 2 n.2.

      Moreover, a power of attorney executed only within the past two months cannot excuse

the U.S. firms' repeated assertions over the past *year* that they were authorized to act for plain-

tiffs.  Acknowledging the lack of any prior authority, the 2010 power of attorney purports to

"broaden[]" previous authorizations and retroactively "ratify and approve each and every one of

---

[Footnote continued from previous page]

   [4]   Both of these communications were to Donziger or his counsel, but it is hard to believe that these questions were not relayed to the U.S. firms.

   [5]   The U.S. firms have not filed corrective statements acknowledging that they lack authority to act on behalf of all of the individual plaintiffs.  In some filings, the U.S. firms listed their purported "clients" by name, not limiting the list to those who signed the 2010 power of attorney.  *See, e.g.*, Dkt. 27 at 1 n.1.

the actions performed by" Fajardo, both in the Lago Agrio case and "in other legal actions in other law courts, national or foreign."  Dkt. 166 Ex. 6 at 5.  Of course, this "ratification" would not be necessary if Fajardo had possessed proper authority in 2006, as the U.S. firms now claim.

Under New York law, the purported "ratification" is inadequate.  There is no evidence that the individual plaintiffs know *any* of what Fajardo and the U.S. firms have done, much less evidence they have "full knowledge of all the material circumstances known to the attorney." *King v. Fox*, 851 N.E.2d 1184, 1190, 818 N.Y.S.2d 833, 839 (N.Y. 2006) (quotation marks omitted); *see also N.Y. State Med. Transporters Ass'n v. Perales*, 566 N.E.2d 134, 137, 77 N.Y.2d 126, 131 (N.Y. 1990) (finding no ratification where there was no showing the principal "knew of and intentionally condoned its agent's practice").[6]  There is no evidence anyone has even told plaintiffs of the U.S. firms' engagement.  In fact, the U.S. firms do not communicate with plaintiffs at all, *see* Dkt. 163 at 14, and Donziger admitted multiple plaintiffs "couldn't be found" in 2010 and he is not even "sure if all of the plaintiffs live there now," Ex. 66 at 1866:8, 1787:3–4.

Tellingly, the U.S. firms argue that Ecuadorian ratification law should apply and that plaintiffs therefore need not have known about *any* of Fajardo's or the firms' prior acts in order to ratify them.  But regardless of whether Ecuadorian law permits a blanket "ratification," the ability of U.S. lawyers to appear in U.S. courts is necessarily governed by U.S. (here, New York) law.  *See, e.g.*, *Diversified Grp., Inc. v. Daugerdas*, 139 F. Supp. 2d 445, 452–53 (S.D.N.Y. 2001) ("A state has a paramount interest in regulating the conduct of attorneys licensed to prac-

---

[6]   Patton Boggs cannot distinguish *King*, *see* Dkt. 163 at 12 n.5, which plainly stands for the proposition that a client must have full knowledge of all material circumstances in order to ratify aspects of the attorney-client relationship.  New York courts have applied *King* when analyzing ratification of attorney representation generally.  *See, e.g.*, *Gross v. Gross*, 36 A.D.3d 318, 321–22, 830 N.Y.S.2d 166, 169 (N.Y. App. Div. 2d Dep't 2006).  Further, under basic principles of agency law, ratification requires the principal to have "knowledge of material facts."  *Cologne Life Reinsurance Co. v. Zurich Reinsurance (N. Am.), Inc.*, 286 A.D.2d 118, 128, 730 N.Y.S.2d 61, 69 (N.Y. App. Div. 1st Dep't 2001); *see also Breen Air Freight, Ltd. v. Air Cargo, Inc.*, 470 F.2d 767, 773 (2d Cir. 1972).

tice within its borders.").  And any after-the-fact "ratification" does not change the fact that the U.S. firms entered appearances purportedly on behalf of all the individual plaintiffs when, in the *best-case* scenario for the firms, only in November 2010 did they obtain authority to represent some of them.[7]  In short, the U.S. firms have failed to meet their burden to show their authorization to appear on plaintiffs' behalf.[8]

## II.   Emery Celli's Conduct in Particular Cries Out for Sanctions

Emery Celli appeared in this case from the outset on plaintiffs' behalf despite its lack of authority, and the firm has made knowing misrepresentations in Section 1782 proceedings around the country to cover up the fraud it knew Donziger and his allies perpetrated.

Ecuadorian lawyer Julio Prieto understood how dire it would be if it came out that plaintiffs' team (primarily, Stratus) ghostwrote the Cabrera report.  Reacting to the issuance of a Section 1782 subpoena against Stratus and the news that "certainly ALL will be made public, including correspondence," Prieto warned Donziger, Fajardo, and others that "the effects are potentially devastating in Ecuador **(apart from destroying the proceeding, all of us, your attor-**

---

[7]   The retainer agreements the U.S. firms do claim to have are in disarray.  Patton Boggs, for example, claims merely that it *sent* an agreement to *Donziger*, not that an agreement was ever signed by anyone.  *See* Dkt. 163 at 12.  Motley Rice—spurred by a letter from Chevron's counsel asking whether it had been properly retained, *see* Ex. 40—apparently rushed to execute a "written retainer agreement" in "mid-December 2010," but it refuses to produce even a redacted copy of the supposed agreement.  Dkt. 167 at 3–4; *id.* at 2 (promising only to submit the agreement "for *in camera* review").  Emery Celli's retainer agreement, executed in October 2010, was in the name of only 37 plaintiffs.  *See* Dkt. 166 Ex. 2 at 2 & Ex. A.  Apparently not until its response to this motion did Emery Celli realize its glaring mistake, at which point it simply stapled a list of all 47 plaintiffs to the original agreement.  *See* Dkt. 166 Ex. 2 at 17–18 (letter from William J. Camody dated Jan. 15, 2011 claiming a "clerical error" and attaching a "complete Exhibit A" listing 47 individual plaintiffs).  But this was no "clerical error."  Camody flagged the issue before the agreement was signed.  *See* Ex. 73 at 1; *see also id.* ("We should reconcile these variances before anything gets signed.").  Emery Celli submitted a redacted retainer agreement; Donziger recently produced what appears to be the same document, unredacted.  *See* Ex. 74.

[8]   Unable to prove their authorization, the U.S. firms attempt to shift the burden to Chevron, arguing that courts are "loathe to separate a client from his chosen attorney."  Dkt. 163 at 9 (internal quotation marks omitted).  Of course, the issue is that the U.S. firms are *not* plaintiffs' "chosen attorneys."  The burden lies squarely on the U.S. firms to show they are the legal representatives of the individuals they claim as clients.  *See, e.g., Meredith v. Ionian Trader*, 279 F.2d 471, 473–74 (2d Cir. 1960) (citing cases).

**neys, might go to jail)**." Ex. 64 (emphasis added).  As Donziger admitted, Emery Celli knew

the substance of Prieto's fears.  Ex. 66 at 3356:23–3357:20.[9]  These e-mails provide context for

Andrew Wilson's remark that Stratus's David "Chapman did an excellent job of not remember-

ing anything" in his deposition, Ex. 4 at 1, and for the alarm Emery Celli's Ilann Maazel sounded

in May 2010 that "the Stratus/Cabrera revelation" was about "to come out," Ex. 3 at 2.

      When it became clear the Stratus documents would be disclosed, Emery Celli turned

from bad-faith delay to outright misrepresentation.  Emery Celli's motion to quash in this Court

suggested that plaintiffs submitted materials to Cabrera only pursuant to the order of the Lago

Agrio court.  *See* Dkt. 28 at 12.  The Fajardo declaration upon which Emery Celli's brief relied

was false, and Emery Celli knew it.  *See* Dkt. 147 at 34–35 n.25.  Ilann Maazel said in an e-mail

that a declaration listing Fajardo's "submissions to Cabrera without mentioning that he sent

documents that originated from Stratus" would be "misleading at best."  Ex. 75 at 2.  But Fa-

jardo's declaration made no such mention.[10]  Emery Celli's central role in the delay-and-obstruct

strategy Donziger and his cohorts have implemented in this and other Section 1782 proceedings

only heightens the urgency of Chevron's request that Emery Celli be barred from future appear-

ances in this proceeding.

### III.   Patton Boggs Should Be Barred From Any Future Appearance in This Case

      Patton Boggs has not previously appeared before this Court, and Chevron has never

claimed otherwise.  *See* Dkt. 147 at 31 n.22.  But Patton Boggs has appeared multiple times in

---

   [9]   Motley Rice and Patton Boggs also knew.  Ex. 66 at 3385:1–8, 3386:22–3388:4, 3396:9–3397:5.
Indeed, only 10 days later, plaintiffs' counsel responded to Prieto's e-mail by filing a motion in Ecuador
to try to get the court there to halt all Section 1782 discovery in the United States.  Ex. 76.

   [10]   Instead of answering the mounting evidence of its knowing misrepresentations, Emery Celli tries
to attack Chevron, citing a brief filed in the Court of Appeals in a separate case as supposed documenta-
tion of allegedly false statements.  *See* Dkt. 164 at 6 n.6.  Chevron already responded to those empty alle-
gations, *see Republic of Ecuador v. Chevron Corp.*, No. 10-1020 (2d Cir. Sept. 17, 2010) Dkt. 229-6 at 1–
2, 7–10, but suffice it to say that Emery Celli's example of a "false statement" is nothing of the kind.

the Court of Appeals in this proceeding, and it strains credulity for Patton Boggs to suggest that this Court lacks jurisdiction when the firm has appeared in this very courthouse to appeal this Court's very rulings.  Furthermore, Patton Boggs (through counsel) has now repeated its misrepresentations in this Court.  Patton Boggs has played an integral role in the U.S. firms' strategy of cover-up by means of delay and obstruction, and its bad faith in these proceedings is evident.

Patton Boggs' lead attorney James Tyrrell told the Court of Appeals that "[t]his is a human rights case.  There is no money on this side of the case[]," Ex. 77 at 18:4–5, even though the Kohn law firm and internet gambling tycoon Russell DeLeon had invested millions of dollars in the case before Burford Group's commitment of $15 million more, *see* Dkt. 147 at 8 n.3, 15 n.12.  At the same November 2010 oral argument, Tyrrell stated that his firm "only came into this case last Thursday" and was "doing the very best we can to get up to speed."  Ex. 77 at 20:10–12.[11]  In fact, Patton Boggs was devising plaintiffs' legal strategy as early as March or April 2010, including during the Stratus proceeding.  *See* Ex. 66 at 3205:18–3206:8.[12]  Mindful that Patton Boggs has appeared in this matter but not openly before this Court, Chevron seeks prophylactic relief barring Patton Boggs from any future appearance.  *See* Dkt. 147 at 31 n.22.

## IV.   The U.S. Firms Should Produce Fajardo for a Hearing Before This Court

The U.S. firms rely exclusively on Fajardo to support their submissions—both his decla-

---

[11]   Patton Boggs also has falsely claimed that plaintiffs are "a group of indigenous persons residing in the Amazonian Rainforest." *In re Application of Chevron*, No. 10-4699, Br. of Ecuadorian Plaintiffs at 31 (3d Cir. Jan. 19, 2011).  But Donziger has admitted that "the vast majority of the people in the former concession area" are not indigenous but are *colonos* (colonists) who moved to the region from other parts of Ecuador. *See* Ex. 66 at 1931:2–5.  Fajardo, Yanza, and many of the individual plaintiffs are *colonos*.

[12]   Indeed, it was Patton Boggs' Eric Westenberger who proposed abusive tactics—"if we lose, we produce whatever we want (narrow read); gd complains and then we move for clarification"—to avoid producing Stratus documents. Ex. 3.  When Stratus was required to produce *all* non-privileged documents, Patton Boggs' Eric Daleo explained to Westenberger that an upcoming production would "be the leanest to date . . . .  If you think this is unacceptably low, we can produce **some documents we were trying to hold off producing that are non-privileged but potentially damaging**." Ex. 78 (emphasis added).

ration (Motley Rice and Patton Boggs) and his representations as to his authority (Emery Celli).
But written statements not subject to cross-examination are "the weakest form of evidence."
*Bergeron v. State Farm Mut. Auto. Ins. Co.*, 198 F. Supp. 723, 726 (E.D. La. 1961) (citing *Eccles v. Peoples Bank of Lakewood Vill.*, 333 U.S. 426, 434, 68 S. Ct. 641, 645–46 (1948)); *see also Perma Research & Dev. Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969) ("The deposition of a witness will usually be more reliable than his affidavit, since the deponent was . . . at least available . . . for cross-examination." (quotation marks omitted)).  Courts often order a party to produce a declarant for cross-examination to test the strength of a declaration.  *See, e.g.*, *Lightfoot v. District of Columbia*, No. Civ. 01-1484 (CKK), 2006 WL 175222, at *2 (D.D.C. Jan. 24, 2006).  Subjecting Fajardo to cross-examination before this Court is particularly necessary because the earlier declaration he submitted, concerning plaintiffs' interactions with Cabrera, is demonstrably false.  *See* Dkt. 147 at 34–35 n.25.  Moreover, the U.S. firms have put Fajardo's veracity at issue by submitting his declaration in this Court "pursuant to 28 U.S.C. § 1746" and attesting to its truthfulness "under the penalty of perjury under the laws of . . . the United States." Dkts. 165, 167-1.  They cannot use his testimony as a sword and then hide behind his Ecuadorian residency as a shield.[13]

## CONCLUSION

Chevron respectfully requests that this Court sanction Emery Celli, Motley Rice, and Patton Boggs, including by barring them from future appearances in this proceeding.

---

[13]  This is not the first time the U.S. firms have used Fajardo in an attempt to insulate the substance of a declaration from challenge.  In fact, that is why they chose him to sign the declaration concerning plaintiffs' interactions with Cabrera.  Two days before Emery Celli submitted that declaration for the first time, Patton Boggs' Eric Westenberger explained in an e-mail to Patton Boggs and Emery Celli lawyers "why we struggled with who would sign the declaration.  If Steve signs, he will most certainly be deposed. . . .  We figured that with Pablo, they likely would not slow down the process by deposing him (as we would say the dep needs to go forward in Ecuador)."  Ex. 75 at 1; *see also* Dkt. 147 at 34–35 n.25.

Dated: January 24, 2011
        New York, New York

                                        GIBSON, DUNN & CRUTCHER LLP


                                        By:   /s/ Randy M. Mastro
Scott A. Edelman                                Randy M. Mastro
2029 Century Park East                  200 Park Avenue
Los Angeles, CA 90067                   New York, New York 10166-0193
Telephone: 310.552.8500                 Telephone: 212.351.4000
Facsimile: 310.551.8741                 Facsimile: 212.351.4035

Andrea E. Neuman                        William E. Thomson
3161 Michelson Drive                    333 S. Grand Avenue
Irvine, CA 92612                        Los Angeles, CA 90071
Telephone: 949.451.3800                 Telephone: 213.229.7891
Facsimile: 949.451.4220                 Facsimile: 213.229.6891

                                        *Attorneys for Applicant Chevron Corporation*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
In re Application of

CHEVRON CORPORATION                                              10 MC 00002 (LAK)

This Document Applies to ALL CASES
------------------------------------------------------------------ x

ORDER

LEWIS A. KAPLAN, *District Judge*.

The Special Master has e-mailed the Court, with copies to the parties and interested persons, for assistance in connection with the deposition of Steven Donziger as follows:

"I write, reluctantly, to seek your Honor's assistance in connection with the continuation of Mr. Donziger's deposition, which is about half concluded; two more sessions remain this week (the blizzard cancelled the session that was to occur today), and there will be further sessions after the New Year.

"The problem is this: From virtually the first day of his deposition, Mr. Donziger gave many unresponsive, self serving answers to questions that should have been answered directly, with no embellishment. I have cautioned him many times and have stricken unresponsive, evasive, self serving testimony. By late last Thursday, when counsel for one of the individuals was concluding his examination, my instructions to the witness and my striking of portions of his answers seemed to have little effect. Attached below is the transcript of last Thursday's deposition. By way of example, let me ask you to read from page 2007, line 8 to page 2018, line 10. Your Honor may also wish to read the record of my conference with counsel at the end of the day (pp. 2046-58 ). (I hasten to add that the portion of my session with counsel relating to the conduct/objections of counsel is not part of my request for Your Honor's assistance: I am confident that a ruling I intend to make and my further discussions with counsel will resolve those issues.)

"By the conclusion of last Thursday's session, as I stated to counsel after the witness was excused for the day, it was evident that more may be needed to assure that Mr. Donziger would act as a responsible witness rather than as an advocate for his cause. To his credit, Mr. Bruce Kaplan (who already had cautioned his client on several prior occasions) assured me at the end of the session that he would meet with Mr. Donziger Sunday afternoon to caution him, at even greater length, to carry out the requirements of a witness. But that may not be any more effective than his prior cautions.

"Going forward, Chevron's counsel will be examining Mr. Donziger. But the issues they surely will raise in questioning will overlap with issues important to the individuals -- e.g. the allegedly fraudulent nature of the Cabrera report. And the two days of examination remaining this week (Tuesday and Wednesday) were scheduled to allow the individuals as a practical matter to use evidence developed at these sessions in the Equador criminal hearing early next week, notwithstanding the lag time needed for translations, government certifications, and other issues. Hence, I ask for your Honor's assistance now.

"It may well be that Mr. Donziger's mere recognition that your Honor is apprised of the situation and stands ready to intercede will suffice. If your Honor wishes, the deposition, which is already being streamed to Chevron personnel and counsel outside NY, can be streamed live to any computer in chambers or elsewhere without any technical personnel having to intrude upon you --evidently it can all be done from the offices of Veritext, the reporting service. Alternatively, the court reporters can be instructed to send you by email rough copy of transcript within a few hours after testimony is taken, or at the end of each day. Or, perhaps a brief statement made by your Honor, reinforcing my instructions and cautions to the witness, on the conference speaker telephone that is placed in the middle of the deposition room, would be an appropriate course at this juncture.

"I thank your Honor for your indulgence and assistance, and ask you how you wish to proceed and how you wish me to proceed."

The Court has reviewed the portions of the transcript cited by the Special Master. While it does not now rule on the propriety of the conduct of Mr. Donziger or counsel in those passages, it is appropriate to make clear the manner in which the deposition is to be continued.

1.     Mr. Donziger shall respond to questions put to him directly and fully and without any unresponsive statements, efforts to argue his position, explanation not called for by the questions, evasion, self-serving statements, or criticism of the questions or the questioner. He shall comply with all directions of the Special Master.

2.     During the examination, counsel other than the examining attorney may object to questions as to form, in which case the appropriate means of doing so is by stating "objection as to form," and on the ground that the question calls for privileged information, in which case the appropriate means of doing so is by stating "objection - privilege." In the case of objections as to form, no explanation or argument shall be made unless requested by the examining attorney or permitted by the Special Master. The Special Master shall hear any privilege objections only at such times as he determines appropriate.

3.     Attention is invited to the fact that "[t]estimonal obduracy by a witness . . . may take any of a number of forms," including unresponsive and evasive answers, and that "[a]ny may be met with . . . judicial or governmental sanctions." *In re Weiss*, 703 F.2d 653, 662 (2d Cir. 1983); *see also United States v. Appel*, 211 F. 495 (S.D.N.Y. 1913) (L. Hand, J.). The Special Master is hereby authorized to recommend to the Court the imposition of sanctions, including civil or criminal contempt, should he consider it appropriate.

SO ORDERED.

Dated:       December 27, 2010

_____
Lewis A. Kaplan
United States District Judge

| | |
|---|---|
| **From:** | Joseph Mutti [josephmutti@gmail.com] |
| **Sent:** | Wednesday, July 26, 2006 5:34 PM |
| **To:** | Steven Donziger |
| **Subject:** | Re: Potentially huge |
| **Attachments:** | FCPA[1].DOJ-SEC_letter (revised).3 |

This is an excellent, clearly worded letter that is very easy to understand. All I did was
make some corrections and suggestions. It needs no more and stands as is. There is a citation
that needs to be added that I highlighted just in case it gets forgotten.

J


On 7/26/06, Joseph Mutti <josephmutti@gmail.com> wrote:
> This is GREAT news! Does Luis know? We'll draft a boletin and send it to you.
>
> On 7/26/06, Steven Donziger <sdonziger@gmail.com> wrote:
> >
> > Joseph andn Lupita: I just sent this to Joe Kohn.  I will often
> > blind copy you on emails so you can keep up with events.  This is huge.  No press yet,
> > let's discuss.  Perhaps you should draft a boletin.   Thanks, SRD
> >
> > ---------- Forwarded message ----------
> > From: Steven Donziger <sdonziger@gmail.com>
> > Date: Jul 26, 2006 4:22 PM
> > Subject: Potentially huge
> > To: "Joseph C. Kohn" <jkohn@kohnswift.com>
> >
> >
> > Pablo met with the judge today.  The judge, who is on his heels from
> > the charges of trading jobs for sex in the court, said he is going
> > to accept our request to withdraw the rest of the inspections save
> > the four we still want to do.  This follows our press conference
> > Monday that was attended by 32 journalists and several prominent
> > supporters, and the filing of a very well-written amicus signed by
> > 11 Ecuadorian lawyers supporting the withdrawal of the inspections.
> > The judge also I believe wants to forestall the filing of a
> > complaint against him by us, which we have prepared but not yet
> > filed.  The judge told Pablo that the Texaco lawyers came by the
> > other day to urge him to make us do all the inspections.  The judge
> > told Pablo they were nervous about the peritaje global.  These
> > representations are sometimes overly optimistic, so I will wait for
> > the official order, but things are looking better.  We are
> > definitely gaining back some ground.   SRD
> >
> > --
> > Steven Donziger
> > 212-570-4499 (land)
> > 212-570-9944 (fax)
> > 917-566-2526 (cell)
> >
> > Steven R. Donziger
> > Law Offices of Steven R. Donziger, P.C.
> > ██████████████
> > New York, New York 10021

```
> > Email: sdonziger@gmail.com
> >
> > --
> > Steven Donziger
> > 212-570-4499 (land)
> > 212-570-9944 (fax)
> > 917-566-2526 (cell)
> >
> > Steven R. Donziger
> > Law Offices of Steven R. Donziger, P.C.
> > ████████████
> > New York, New York 10021
> > Email: sdonziger@gmail.com
>
```